John P. Kristensen (SBN 224132)
**KRISTENSEN LAW GROUP**
120 Santa Barbara St., Suite C9
Santa Barbara, California 93101
Telephone: (805) 837-2000
*john@kristensen.law*

Devin J. Stone (SBN 260326)
**EAGLE TEAM LLP**
1050 Connecticut Ave., NW
Suite 5038
Washington, DC 20036
Telephone: (833) 507-8326
*devin@eagleteam.law*
***Attorneys for Plaintiffs and all
others similarly situated***
(*denotes *pro hac vice* forthcoming)

Josh Sanford*
Arkansas Bar No. 2001037
Jarrett Ellzey*
Texas Bar No. 24040864
Leigh S. Montgomery*
Texas Bar No. 24052214
Tommy Kherkher*
Texas Bar No. 24113389

**EKSM, LLP**
1105 Milford Street
Houston, Texas 77066
Telephone: (713) 554-2377
*jsanford@eksm.com*
*jellzey@eksm.com*
*lmontgomery@eksm.com*
*tkherkher@eksm.com*

## THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| Wendover Productions, LLC, a Limited Liability Company; Businessing, LLC, a Limited Liability Company; The Charismatic Voice, LLC, a Limited Liability Company; Clearvision Media, Inc.; and Gear Live Media, LLC, a Limited Liability Company<br><br>*Plaintiffs*<br><br>vs.<br><br>PAYPAL, INC.,<br><br>*Defendant.* | Case No.: 5:24-cv-9470-BLF<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED AND SUBSTITUTED COMPLAINT FOR DAMAGES FOR:**<br><br>(1) Intentional Interference with Contract Relations; and<br>(2) Intentional Interference with Prospective Economic Relations; and<br>(3) Unjust Enrichment; and<br>(4) Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200; and<br>(5) Conversion.<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED AND SUBSTITUTED CLASS ACTION COMPLAINT;
DEMAND FOR JURY TRIAL

Plaintiffs Wendover Production, LLC ("Wendover"), Businessing, LLC ("Businessing"), The Charismatic Voice, LLC ("Charismatic"), Clearvision Media, Inc. ("Clearvision"), and Gear Live Media, LLC ("Gear") (collectively "Plaintiffs"), by and through their undersigned counsel, plead on their own behalf and on behalf of all others similarly situated. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.[1]

# I.

## HOW BIG TECH RUINED AFFILIATE LINKS

1. Plaintiffs are content creators and marketers who earn substantial revenue through contracts promoting products and services from third parties.

2. As a part of Plaintiffs' businesses, Plaintiffs receive commissions and other benefits when they refer audience members to purchase the product or services of their contractual partners in an online store.

3. Plaintiffs use individualized tracking links and promotional codes (collectively, "Affiliate Links") that tell their partners that a particular online customer was referred by that plaintiff.

4. By virtue of the Affiliate Links, Plaintiffs (who referred the customer to the store) receive attribution for the referral when a customer checks out of an online store. This is the online equivalent of a salesperson being acknowledged that they helped a customer when the customer goes to the cash register (and receiving a sales commission for the help they provided).

5. Defendant PayPal, Inc. ("Defendant" or "Paypal") owns Honey, a browser extension that purports to find consumers the best deal at checkout by gathering and applying available discount codes.

---

[1] The purposes of this First Amended and Substituted Complaint are to add three Plaintiffs with individual and class claims, as well as to refine and correct certain prior statements and scrivener's errors.

6.      PayPal offers Honey to online shoppers as a free browser extension that purports to save shoppers money.  These representations have attracted over 17 million users (on the Google Chrome browser alone) who use the Honey browser extension to find deals online.

7.      Online marketers, such as YouTubers and online influencers, direct their followers and viewers to specific products and services and earn commissions and other benefits when their audience members purchase the products and services they are promoting.

8.      Online merchants work with these online marketers through affiliate marketing programs ("Affiliate Programs"),[2] which rely on attribution tracking through Affiliate Links (which create unique HTML tracking tags or cookies) to determine who gets credit for online referrals and product sales.

9.      The online marketer provides Affiliate Links to their audience and, if someone clicks on that link or uses that code immediately prior to making a purchase, the online marketer receives affiliate attribution credit for the sale.

10.      The industry refers to this practice as "last click attribution."

11.      This case involves a scheme by Defendant to unlawfully steal the attribution for online sales from Plaintiffs by using Honey to intentionally supplant Plaintiffs' affiliate attribution and replace it with their own, thereby taking all benefits that would have otherwise gone to the Plaintiffs.

12.      The online marketers whose benefits were redirected, which include Plaintiffs and the Proposed Class as described below, are entitled to damages for Defendants' predatory and unfair conduct.

13.      Plaintiffs and the Proposed Class are also entitled to injunctive relief as deemed appropriate by the Court.

---

[2] "Affiliate Programs" come in several forms, including but not limited to sponsorship relationships (usually on a flat fee, percentage, or "cost per acquisition" basis), endorsement relationships, or participation in a formalized affiliate relationship or platform (usually on a fee or percentage basis).

14.     Because Defendant, *via* Honey, has standardized practices and procedures to which all online marketers are subject or affected by, the appropriate vehicle for recovery is a class action lawsuit.

## II.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

15.     Under 28 U.S.C. § 1332(d), the Class Action Fairness Act, this Court has jurisdiction over the claims alleged herein. As alleged below, this claim has all of the following: (1) minimal diversity; (2) 100 or more putative class members; and (3) more than $5 million dollars in controversy.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), because a substantial portion of the events or omissions giving rise to the claim occurred in this District, and Defendant has its principal place of business in this District.

17.     Since the acts or omissions that give rise to Plaintiffs' claims occurred in the County of Santa Clara, Pursuant to Local Rule 3-2(c), this action must be assigned to the San Jose Division of the Northern District Court.

## III.

## PARTIES

18.     Plaintiff Wendover Production, LLC, is a Delaware limited liability company, with headquarters in Colorado.

19.     Plaintiff Businessing, LLC, is a California limited liability company, with headquarters in Los Angeles.

20.     Plaintiff The Charismatic Voice, LLC, is an Arizona limited liability company, with headquarters in Tucson.

21.     Plaintiff Clearvision Media, Inc., is a Nevada corporation, with headquarters in Nevada.

22.     Plaintiff Gear Live Media, LLC, is a Washington limited liability company, with headquarters in Washington.

23.     Defendant PayPal, Inc., is, and at all times mentioned herein was, a corporation with the principal place of business at 2211 North First Street, San Jose, California 95311. Its agent for service of process is CT Corporation System, 330 North Brand Boulevard, Glendale, California 91203.

24.     Honey is a browser extension, free to consumers, which purports to "automatically look for [discount] codes when [consumers] shop on select sites" to provide consumers with "the biggest savings" available.[3]

25.     Defendant acquired Honey in 2020 for approximately $4 billion.

26.     Defendant currently owns and operates Honey.[4]

27.     Defendant has partnered with over 30,000 businesses to include Honey in those businesses' online checkout processes ("Defendant's merchant partners") for any consumer who has downloaded the browser extension.[5]

28.     Plaintiffs are content creators with followings on YouTube, Instagram, and Tiktok, as well as other social media platforms and the internet.

***Plaintiff Wendover***

29.     Plaintiff Wendover has multiple YouTube channels, including Wendover Productions, with 4.7 million subscribers and over 240 videos; Half as Interesting, with 2.77 million subscribers and over 490 videos; and Jet Lag: The Game, with 773,000 subscribers and over 70 videos.

30.     Plaintiff Wendover regularly partners with online merchants, including Defendant's merchant partners, to promote products and services in their videos.

31.     Plaintiff Wendover partners with, or has partnered with in the recent past, businesses such as Nord VPN, Ground News, Audible, and Brilliant.org.

32.     When Plaintiff Wendover promotes products, payment comes from

---

[3]     *See* https://www.joinhoney.com/ (last visited Dec. 26, 2024).
[4]     *See* https://help.joinhoney.com/article/302-what-does-honey-joining-paypal-mean-for-members (last visited Dec. 26, 2024).
[5]     *See* https://www.joinhoney.com/ (last visited Dec. 26, 2024).

1    the business with whom he has partnered and who is selling the product.

2        33.    Plaintiff Wendover posts videos approximately twice per week,

3    including all videos posted across his various channels, and all his videos are

4    monetized as described above.

5    ***Plaintiff Businessing***

6        34.    Plaintiff Businessing operates multiple YouTube channels for Ali

7    Spagnola for the purpose of producing Ms. Spagnola's "outrageous art and

8    outrageous music for outrageous people."  Businessing's channels include Ali

9    Spagnola's Fitness Outrageous which has over 50,000 subscribers on YouTube

10   and Ali Spagnola which has approximately 2.25 million subscribers.

11       35.    Businessing has agreements with online merchants for promotion

12   and affiliate sales with third parties.

13   ***Plaintiff Charismatic***

14       36.    Plaintiff Charismatic Voice is an educational platform and YouTube

15   channel founded by Elizabeth Zharoff, an internationally acclaimed opera

16   singer and vocal expert. The platform is dedicated to demystifying the art and

17   science of singing, offering resources for both aspiring and professional

18   vocalists.

19       37.    Elizabeth Zharoff has performed in 18 languages across major

20   venues worldwide, including Carnegie Hall, Seattle Opera, and the English

21   National Opera. She holds degrees in music and voice from institutions such as

22   the Oberlin Conservatory and the Curtis Institute of Music. Beyond her operatic

23   career, she has contributed her talents to over 20 video game titles and has been

24   involved in projects bridging voice, science, and technology.

25       38.    Charismatic Voice YouTube channel has garnered over 1.83 million

26   subscribers, serving as a hub for music enthusiasts. The channel features vocal

27   analyses, reaction videos, and interviews with artists across various genres,

28   fostering a deeper appreciation for the art of singing.

---

**FIRST AMENDED AND SUBSTITUTED CLASS ACTION COMPLAINT;
DEMAND FOR JURY TRIAL**

39.    Charismatic has agreements with online merchants for promotion and affiliate sales with third parties.

### Plaintiff Clearvision

40.    Plaintiff Clearvision Media, Inc., also known as Think Media and Think Media TV, is a digital media company that primarily focuses on providing educational content for content creators, especially on YouTube. The company is known for its videos, podcasts, and courses that offer advice on growing YouTube channels, improving video production, and using video as a tool for business growth.

41.    Think Media TV is a huge YouTube strategy channel with over 3 million subscribers and thousands of videos breaking down the best way to grow your channel, the best tech to use, editing tips, and more. Think Media TV was founded by Sean Cannell, a YouTube strategist and international speaker. His various YouTube channels have over 2.5 million subscribers.

42.    Clearvision/Think Media has agreements with online merchants for promotion and affiliate sales with third parties.

### Plaintiff Gear Live

43.    Plaintiff Gear Live Media, LLC, operating as Gear Live, is a web magazine and social news site founded in 2004 by Andru Edwards. The company focuses on gadgets, consumer electronics, games, music, and tech trends, providing news, previews, reviews, commentaries, and advertising opportunities. Andru Edwards has a popular YouTube channel with over 423,000 subscribers that features similar content to his website.

44.    Headquartered in Bothell, Washington, Gear Live operates with a small team, including CEO Andru Edwards. Gear Live's content caters to technology enthusiasts, offering insights into the latest developments in consumer electronics and related fields. The platform serves as a resource for readers seeking information on emerging tech products and industry trends.

45. Gear Live has agreements with online merchants for promotion and affiliate sales with third parties.

46. All Plaintiffs promote products and services to audience members using Affiliate Links.

## IV.

## FACTUAL ALLEGATIONS

### How Customer Attribution Works

47. The growth of social media platforms like YouTube has driven online retailers to collaborate with online marketers—including influencers, bloggers, and reviewers—to promote their products.

48. These online marketers earn commissions and other benefits by directing their followers to Affiliate Links.

49. Affiliate Links may embed tracking tags or utilize a unique coupon or promotional code, which identify the source of a purchase and allow merchants to allocate commissions or other benefits to the appropriate online marketer.

50. The internet marketing industry relies on last click attribution to determine commission payments, wherein the most recent Affiliate Link used before purchase receives 100% of the credit and attribution. For example, a customer might click on a blogger's affiliate link to explore a product but delay their purchase. Weeks later, the customer might watch a YouTube video from a different content creator promoting the same product. If the customer then clicks the YouTuber's affiliate link and completes the purchase, the YouTuber receives credit under the last click attribution model because their link was the most recent referral.

51. Online retailers aggregate Affiliate Link data to determine how many customers are attributable to any given source.  This data is the most common way to determine how successful Plaintiffs were in driving traffic to websites and

1    acquiring customers. Affiliate Link tracking therefore plays a crucial part in
2    defining current and future business relationships with Plaintiffs.

3    52.    Last click attribution is the industry standard and, upon information
4    and belief, is the model by which all or most of Plaintiffs' business partners
5    operate. The vast majority of online retailers credit only the source listed at the
6    very last instance before making a purchase. Thus, Affiliate Programs are "winner
7    take all."

8    ***How Honey Misappropriates Affiliate Marketing Benefits***

9    53.    PayPal markets its Honey browser extension as a free tool for online
10   shoppers, promising to search the internet for discount codes that can be applied
11   to items already in the user's shopping cart. Honey purports to operate by
12   gathering coupon codes on websites or through user submission that are
13   potentially applicable to a user's purchase.

14   54.    Defendant PayPal, through the Honey browser extension, has
15   exploited these Affiliate Programs to divert commissions and other benefits
16   from their rightful owners. Honey manipulates online shopping sessions to
17   replace existing affiliate attribution with its own, falsely claiming credit for
18   referrals and appropriating commissions and other benefits intended for the
19   online marketers.

20   55.    Honey operates covertly, altering network communications between
21   a user's browser and the online retailer's website. By removing and replacing
22   affiliate attribution, Honey shifts referral credit to PayPal without the user's
23   knowledge. For example, if a consumer clicks on a YouTuber's Affiliate Link
24   to purchase a promoted product, Honey's interference can result in a
25   commission or other benefit being rerouted to PayPal instead of the YouTuber
26   even where Honey provided no benefit to the consumer.

27   56.    Honey capitalizes on the last click attribution mechanism by
28   generating simulated referral clicks. Through pop-ups encouraging users to

apply coupons or earn rewards, Honey creates the appearance of a new referral, displacing the original marketer's Affiliate Link and affiliate attribution, thus securing 100% of the credit for Honey.

57.     Honey utilizes several deceitful and clandestine methods to displace rightful referrers like Plaintiffs and the Class.

**Simulated Discounts**

58.     In one scenario, a shopper may add an item to their cart after using an Affiliate Link shared by a marketer. During checkout, Honey might display a pop-up claiming to have found a coupon. If the shopper clicks "Apply Coupons," Honey replaces the marketer's affiliate attribution with its own, thereby stealing the commission or other benefits, even where Honey provided no benefit to the customer.

**No Coupon Needed**

59.     Even when Honey fails to locate a discount, it prompts the shopper with messages like "We searched for you but didn't find any deals" or "You already have the best price." Clicking these messages still triggers the replacement of the original marketer's affiliate attribution with Honey's, ensuring that PayPal receives the commission or other benefits.

**Honey Gold Program**

60.     Honey also offers a reward system called Honey Gold, allowing users to earn points redeemable for gift cards. Shoppers are enticed to click Honey's pop-ups with promises of rewards, regardless of coupon availability. This process, again, overrides the original affiliate attribution and allows Honey to steal the commission or other benefits. For example, Honey might award a shopper 89 points (equivalent to $0.89) while diverting a $35.60 commission owed to the marketer.

**PayPal Checkout**

61.     In some cases, when no discounts or rewards are available, Honey

displays a pop-up encouraging shoppers to "Get Rewarded with PayPal." Clicking this prompts users to complete their purchase via PayPal's checkout button instead of the merchant's. This action credits the sale to Honey, bypassing the original referrer entirely.

### *Impact on Content Creators and Marketers*

62.    Through these deceptive practices, PayPal systematically diverts commissions from rightful earners, undermining the affiliate marketing system. Adding to the irony, PayPal enlists content creators and influencers to promote the Honey browser extension to their audiences, effectively enabling it to usurp the commissions and other benefits those same creators depend on for income.

63.    Defendant designed its Honey browser extension to take credit for customer acquisition for which it is not responsible and for which, were the Honey browser extension not in place, Plaintiffs would be properly credited.

64.    In addition to taking the direct and indirect benefits that Plaintiffs would have received by stealing the affiliate attribution, Defendant's actions have damaged Plaintiffs' relationships with business partners.

65.    Defendant's actions have caused Plaintiffs to receive less favorable contract terms from their business partners and/or led to a failure to renew contracts between Plaintiffs and their business partners.

66.    Plaintiffs' contractual business partners regularly evaluate whether Plaintiffs are overperforming or underperforming regarding the business's benchmark for average customer acquisition costs—e.g., the businesses track how many customers have been acquired via Plaintiffs' Affiliate Link and divide that number into amounts paid to Plaintiffs to determine if customer acquisition is less or more costly via Plaintiffs than anticipated.

67.    If Plaintiffs are overperforming regarding a contractual business partner, then that business partner is more likely to renew contracts with Plaintiffs and offer them better terms on future contracts.

68.     Defendant benefitted by disrupting last click attribution which should have been attributed to Plaintiffs who should have received credit for customer acquisition.

69.     Because Defendant received credit for customer acquisition instead of Plaintiffs, Defendant benefitted at Plaintiffs' expense.

70.     Defendant misrepresented the nature of their actions and took steps to hide and obfuscate them from customers and marketers alike.

71.     Defendant misrepresented the nature of its product and services to consumers to entice them to download the Honey extension.

72.     Defendant purports to search the internet for coupons and maintain a database of user-submitted coupons.  However, Defendant curates such coupons and rejects coupons that are not in Defendant's best interest, to the detriment of its users.

73.     Defendant's actions are a violation of the terms of service of the online merchants with whom it partners.

74.     Plaintiffs have suffered substantial economic damages as a result of the operation of Defendant's malicious and covert browser extension.

***PayPal's Extensive Records of Their Actions***

75.     Consumer shopping data is extremely valuable to tech companies such as PayPal. As a result, Defendant PayPal keeps extensive records of every transaction completed using Honey.

76.     For every completed Honey transaction, PayPal records (in a searchable database), among other things: the exact time and date, store, user ID, device ID, visitor ID, session ID, referrer URL, first referrer URL, location (including city and country), browser, and client.

77.     In other words, PayPal knows exactly whose affiliate attribution they replaced and when and how they replaced it.

///

1

**V.**

2

**CLASS ACTION ALLEGATIONS**

3

*Online Marketer Class*

4      78.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P.

5    23(b)(3) for monetary damages on behalf of themselves and all others similarly

6    situated.

7      79.    Plaintiffs' proposed Class is as follows, subject to amendment as

8    appropriate:

9            All persons (corporate or individual) in the United States who
             participated in an Affiliate Program with a United States online

10           merchant and had affiliate attribution redirected to Paypal as a
             result of the Honey browser extension.

11

12     80.    Excluded from this class definition are employees, officers, directors

13   of Defendant, and attorneys appearing this case, and any judge assigned to hear

14   this action.

15     81.    Plaintiffs reserve the right to modify this class definition as they

16   obtain relevant information, including attribution tracking data and other

17   records, through discovery.

18     82.    Each of the persons identified in this Putative Class has been harmed

19   by the acts of Defendant because Defendant interfered with a business relationship

20   of each member of the Putative Class, as well as converted each Class member's

21   rightfully owed commissions and other benefits.

22     83.    Defendant has been unjustly enriched at the expense of each member

23   of the Putative Class.

24     **The Action Meets the Requirements to be Certified as a Class**

25     84.    Plaintiffs are members of the proposed Class.

26     85.    The proposed Class can be identified through Defendant's records

27   and merchant partners' databases.

28   ///

**FIRST AMENDED AND SUBSTITUTED CLASS ACTION COMPLAINT;
DEMAND FOR JURY TRIAL**

-13-

1           *Numerosity*

2       86.    The number of Putative Class members is believed to be in the

3 thousands, rendering the class so numerous that individual joinder of all Class

4 members is impracticable.

5       87.    The exact number and identities of the Class members are unknown

6 at this time and can only be ascertained through discovery. Identification of the

7 Class members is a matter capable of ministerial determination from

8 Defendant's records.

9          **Common Questions of Law and Fact**

10       88.    There are common questions of law and fact raised in this Complaint

11 which predominate over any questions affecting only individual Class members.

12       89.    The following questions of law and fact common to the Class

13 members are ripe for determination:

14     (a)    Did Defendant's policies and practices effectively steal attribution

15 from members of the Putative Class?

16     (b)    Did Defendant profit from customer acquisition which was

17 generated by members of the Putative Class?

18     (c)    Did Defendant's actions in stealing attribution from Plaintiffs

19 damage the relationship between Defendant's merchant partners and members of

20 the Putative Class?

21     (d)    Whether Defendant intentionally damaged the relationship between

22 Defendant's merchant partners and members of the Putative Class?

23         *Typicality*

24       90.    Plaintiffs' claims are typical of the claims of the proposed Putative

25 Class. In addition, Plaintiffs are entitled to relief under the same causes of action

26 and upon the same facts as the other members of the Proposed Putative Class.

27         *Adequacy*

28       91.    Plaintiffs are adequate representative of the proposed Putative Class

1   because their interests coincide with, and are not antagonistic to, the interests of

2   the members of the proposed Putative Class they seek to represent; they have

3   retained counsel competent and experienced in such litigation; and they intend

4   to prosecute this action vigorously. Plaintiffs and their Counsel will fairly and

5   adequately protect the interests of members of the proposed Putative Class.

6           ***Superiority***

7           92.    Questions of law and fact common to the proposed Putative Class

8   members predominate over questions affecting only individual members, and a

9   class action is superior to other available methods for fair and efficient

10  adjudication of the controversy. Liability will be determined based on a common

11  set of facts and legal theories. Willfulness will be determined based on

12  Defendant's conduct and knowledge, not upon the effect of Defendant's conduct

13  on Putative Class members.

14          93.    The damages sought by each member are such that individual

15  prosecution would prove burdensome and expensive given the complex and

16  extensive litigation necessitated by Defendant's conduct. It would be virtually

17  impossible for the members of the proposed Putative Class to individually redress

18  effectively the wrongs done to them, as the claims alleged herein have no

19  attorney's fee shifting provision. Even if the members of the proposed Putative

20  Class themselves could afford such individual litigation, it would be an

21  unnecessary burden on the courts. Furthermore, individualized litigation presents

22  a potential for inconsistent or contradictory judgments and increases the delay

23  and expense to all parties and to the court system presented by the complex legal

24  and factual issues raised by Defendant's conduct. By contrast, the class action

25  device will result in substantial benefits to the litigants and the Court by allowing

26  the Court to resolve numerous individual claims based upon a single set of proof

27  in just one case.

28          94.    Class certification is appropriate because Defendant has acted on

1   grounds generally applicable to the proposed Putative Class, making appropriate

2   equitable injunctive relief with respect to Plaintiffs and the proposed Putative

3   Class members. Fed. R. Civ. P. 23(b)(2).

4       95.     Injunctive and Declaratory Relief Appropriate. Defendant has acted

5   on grounds generally applicable to the Putative Class, thereby making final

6   injunctive relief and corresponding declaratory relief with respect to the Putative

7   Class appropriate on a class-wide basis. Moreover, on information and belief,

8   and based on their experience, Plaintiffs allege that Defendant's practices in

9   stealing attribution from members of the Putative Class as complained of herein

10  are substantially likely to continue in the future if an injunction is not entered.

11                                  **VI.**

12                          **CAUSES OF ACTION**

13                        **FIRST CAUSE OF ACTION**

14      **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

15      96.     Plaintiffs hereby incorporate by reference and re-allege each and

16  every allegation set forth in each and every preceding paragraph of this

17  Complaint, as though fully set forth herein.

18      97.     Plaintiffs and members of the Putative Class had existing contractual

19  relationships with one or more of Defendant's merchant partners.

20      98.     Defendants knew those contractual relationships existed. Defendant

21  knew that its merchant partners collaborated with Plaintiffs and members of the

22  Putative Class to drive traffic to the merchant partners' websites via Affiliate

23  Links.

24      99.     Defendant's conduct prevented performance of Plaintiffs and

25  members of the Putative Class of their contractual obligations, or made

26  performance more expensive or difficult.

27      100.    Defendant intended to disrupt the Plaintiffs' performance of their

28  contracts, or knew that their actions made performance more expensive or

---

1    difficult or impossible.

2      101.   Defendant's interference harmed Plaintiffs and members of the

3    Putative Class by artificially and negatively skewing the data regarding customer

4    acquisition via Affiliate Links, causing members of the Putative Class to appear to

5    merchant partners to underperform relative to actual customer acquisition.

6      102.   Defendant's conduct was a substantial factor in causing Plaintiffs and

7    the Putative Class harm.

8      103.   By virtue of the foregoing, Plaintiffs and members of the Putative

9    Class have been harmed and incurred damages cumulatively in an amount that

10   exceeds $5,000,000.

11                    **SECOND CAUSE OF ACTION**

12   **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

13     104.   Plaintiffs hereby incorporate by reference and re-allege each and

14   every allegation set forth in each and every preceding paragraph of this

15   Complaint, as though fully set forth herein.

16     105.   Plaintiffs and members of the Putative Class had economic

17   relationships with Defendant's merchant partners that probably would have

18   resulted in economic benefits to Plaintiffs.

19     106.   Defendant was aware of the relationships.

20     107.   Defendants conduct as described above of removing Plaintiffs'

21   Affiliate Links, and replacing with their own affiliate attribution, after Plaintiffs

22   directed consumers to merchant checkout pages was wrongful.

23     108.   By engaging in this conduct, Defendants intended to disrupt the

24   relationships and/or knew that disruption of the relationship was certain or

25   substantially certain to occur.

26     109.   Plaintiffs' relationships were disrupted.

27     110.   Defendant's conduct was a substantial factor in causing Plaintiffs and

28   the Putative Class harm.

111.   By virtue of the foregoing, Plaintiffs and members of the Putative Class have been harmed and incurred damages cumulatively in an amount that exceeds $5,000,000.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

112.   Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

113.   Plaintiffs and members of the Putative Class have a clear legal and equitable interest in the commissions and other benefits they rightfully earned, which Defendant has wrongfully diverted for its own benefit.

114.   Defendant unjustly received and retained these commissions and other benefits through the actions of its Honey browser extension, which misappropriated affiliate attribution.

115.   Defendant knowingly benefitted from these diverted commissions and other benefits, fully aware that its Honey browser extension caused the financial harm described herein.

116.   Plaintiffs and members of the Putative Class have suffered financial loss as a direct result of Defendant's actions. These losses stem from commissions and other benefits that would have otherwise been paid to Class members had Defendant not diverted the proper affiliate attribution with their own.

117.   Retention of these improperly acquired funds by Defendant is inequitable and unjust.

118.   Defendant continues to profit from the unjust conduct of the Honey browser extension.

119.   Members of the Putative Class continue to have their affiliate commissions and other benefits diverted to Defendant.

120.    Defendant's unjust enrichment is directly and proximately related to the Honey browser extension's ability to divert affiliate attribution and other benefits by manipulating Affiliate Links to enrich itself with benefits it did not rightfully earn.

121.    Plaintiffs and members of the Putative Class did not willingly divert their affiliate commissions and other benefits to Defendant, and it would be inequitable and unjust for Defendant to retain the benefit.

122.    Plaintiffs and members of the Putative Class seek restitution, requiring Defendant to return improperly obtained commissions and other benefits, along with any additional relief deemed appropriate by the Court.

## FOURTH CAUSE OF ACTION

### Violation of California's Unfair Competition Law (UCL),

### Cal. Bus. & Prof. Code §§ 17200, *Et Seq.*

123.    Plaintiffs hereby incorporate by reference and re-allege each and every allegation set for in each and every preceding paragraph of this Complaint, as though fully set herein.

124.    Defendant has engaged in unlawful, unfair, and fraudulent business practices in violation of the UCL by using Honey browser extension to wrongfully divert affiliate attribution from Plaintiffs and members of the Putative Class .

125.    These practices are unlawful because they interfere with Plaintiffs' and Class members' prospective economic advantage, constitute conversion, and result in unjust enrichment.

126.    Defendant's conduct is unfair because it disrupts the legitimate referral commission system, violates California's public policy, and harms content creators while providing no legitimate benefit to consumers on the marketplace.

127.    Plaintiffs and members of the Putative Class have suffered financial

1   losses as a direct result of Defendant's actions, including the deprivation of

2   affiliate commissions, sponsorship opportunities, accurate consumer sales

3   attribution data, money, and other benefits.

4       128.   Plaintiffs and members of the Putative Class seek restitution,

5   injunctive relief, and other equitable remedies, as well as attorneys' fees and

6   costs, as provided under the UCL.

7                          **FIFTH CAUSE OF ACTION**

8                                  <u>**CONVERSION**</u>

9       129.   Plaintiffs hereby incorporate by reference and re-allege each and

10  every allegation set forth in each and every preceding paragraph of this

11  Complaint, as though fully set for herein.

12      130.   Plaintiffs and members of the Putative Class held a rightful interest in

13  the commissions and other benefits they earned from Affiliate Links. These

14  commissions and other benefits constitute identifiable sums owed to them.

15      131.   Defendant, through the Honey browser extension, wrongfully took

16  possession of these commissions and other benefits without authorization and

17  exercised ownership over them, depriving Plaintiffs and members of the Putative

18  Class of their rightful property.

19      132.   This unauthorized control over Plaintiffs' and Class members'

20  earned commissions and other benefits constitutes conversion.

21      133.   Plaintiffs and members of the Putative Class suffered financial losses

22  as a direct result of Defendant's conversion.

23      134.   Plaintiffs and members of the Putative Class seek compensatory

24  damages, attorneys' fees, and any additional relief deemed appropriate by the

25  Court.

26                     **REQUEST FOR INJUNCTIVE RELIEF**

27      135.   Plaintiffs hereby incorporate by reference and re-allege each and

28  every allegation set forth in each and every preceding paragraph of this

---

1   Complaint, as though fully set forth herein.

2       136.   Plaintiffs, on behalf of themselves and the Putative Class, also seek

3   injunctive relief prohibiting Defendant's policies and practices described herein.

4       137.   "[I]njunctive relief is appropriate . . . when there is a threat of

5   continuing misconduct." *People ex rel. Herrera v. Stender,* 212 Cal. App. 4th

6   614, 630, 152 Cal. Rptr. 3d 16, 31 (2012), as modified (Jan. 16, 2013).

7       138.   Injunctive relief is appropriate under Fed. R. Civ. P. 23(b)(2).

8       139.   Defendant's misconduct does not constitute a single past act but

9   rather a pattern of established practices that will likely continue unless this

10  Court grants injunctive relief on behalf of Plaintiffs and the Putative Class.

11                          **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiffs pray that the Court grant Plaintiffs and the Class

13  the following relief against Defendant:

14      A.    That the Court declare, adjudge, and decree that this action is a

15  proper class action and certify the proposed Class and/or any other appropriate

16  Class under F.R.C.P. Rule 23 (b)(1), (b)(2), and/or (b)(3), including the

17  appointment of Plaintiffs' counsel as Class Counsel;

18      B.    For an award of damages, including actual, nominal, consequential,

19  and punitive (exemplary) damages, disgorgement, and restitution, as allowed by

20  law in an amount to be determined at trial;

21      C.    A permanent injunction restraining Defendant from replacing pre-

22  existing attribution from Plaintiffs and members of the Class with its own

23  attribution at checkout;

24      D.    For prejudgment interest on all amounts awarded, at the prevailing

25  legal rate;

26      E.    Any and all statutorily enhanced fees;

27      F.    For an award of attorney's fees, costs, and litigation expenses, as

28  allowed by law;

---

**FIRST AMENDED AND SUBSTITUTED CLASS ACTION COMPLAINT;**
**DEMAND FOR JURY TRIAL**
**-21-**

1    G.    For all other Orders, findings and determinations identified and

2    sought in this Complaint;

3    H.    Leave to amend the complaint to conform to the evidence presented,

4    including at trial; and

5    I.    All general, special, and equitable relief to which Plaintiffs and the

6    members of the Class are entitled to by law.

7

8    Dated: January 2, 2025                          **KRISTENSEN LAW GROUP ||
                                                      EKSM, LLP || EAGLE TEAM**

9                                                     **LLP**

10                                                    */s/ John P. Kristensen*

11                                                   John P. Kristensen
                                                     Jarrett L. Ellzey

12                                                   Josh Sanford

13                                                   Leigh Montgomery
                                                     Tommy Kherkher

14                                                   Devin J. Stone

15                                                   ***Attorneys for Plaintiffs and***
                                                     ***the Class***

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**FIRST AMENDED AND SUBSTITUTED CLASS ACTION COMPLAINT;
DEMAND FOR JURY TRIAL**

**-22-**

1

## DEMAND FOR JURY TRIAL

2
Plaintiffs hereby demand a trial by jury for all such triable claims.

3

4
Dated: January 2, 2025

**KRISTENSEN LAW GROUP ||**
**EKSM, LLP || EAGLE TEAM**
**LLP**

5

6
*/s/ John P. Kristensen*

7
John P. Kristensen

8
Jarrett L. Ellzey
Josh Sanford

9
Leigh Montgomery
Tommy Kherkher

10
Devin J. Stone

11
***Attorneys for Plaintiffs and***
***the Class***

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28