Jason S. Rathod (*pro hac vice*)
jrathod@classlawdc.com
**MIGLIACCIO & RATHOD LLP**
412 H St NE
Washington DC 20002
Telephone: (202) 470-3520

*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| *IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION* | Case No.: 5:24-cv-9470-BLF<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO APPOINT JASON S. RATHOD AS INTERIM CO-LEAD CLASS COUNSEL**<br><br>Hearing Date: May 29, 2025<br>Time: 9:00 a.m.<br>Courtroom: 3, 5th Floor<br>Judge: Hon. Beth Labson Freeman |
| EDDIE BLOTNICKI, MIESHA DOBBS, COURTNEY DORAN, JULES FLETCHER, CAROLYN JOHNSTON, ANGELA KACHONIK, LAUREN LEATHERMAN, AMY MALCOLM, TATIANA MARQUEZ, KARA MILLER, AND LEILANI SHIMODA, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PAYPAL HOLDINGS, INC. and PAYPAL, INC.,<br><br>Defendants. | Case No.: 5:25-cv-01386-BLF |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 29, 2025, at 9:00 a.m., or as soon thereafter as the motion may be heard before the Hon. Beth Labson Freeman of the United States District Court for the Northern District of California, San Jose Division, located at 280 South 1st St., San Jose, California 95113, pursuant to Federal Rule of Civil Procedure 23(g), and the Court's January 29, 2025 Order (Doc. 49), Plaintiffs Eddie Blotnicki, Miesha Dobbs, Courtney Doran, Jules Fletcher, Carolyn Johnston, Angela Kachonik, Lauren Leatherman, Amy Malcolm, Tatiana Marquez, Kara Miller, and Leilani Shimoda will and hereby do move for entry of the proposed Order appointing Jason S. Rathod of Migliaccio & Rathod LLP as Interim Co-Lead Counsel in this proceeding. Plaintiffs' Motion is based on this Notice of Motion, the incorporated memorandum of points and authorities, exhibits, and the argument of counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

On behalf of Eddie Blotnicki, Miesha Dobbs, Courtney Doran, Jules Fletcher, Carolyn Johnston, Angela Kachonik, Lauren Leatherman, Amy Malcolm, Tatiana Marquez, Kara Miller, and Leilani Shimoda (collectively, "Plaintiffs"), I, Jason S. Rathod of Migliaccio & Rathod LLP ("M&R"), write to the Court to seek appointment as co-lead counsel based on (a) a depth of knowledge in practice areas implicated in this case and a breadth of experience across other complex civil litigation, (b) a demonstrated willingness and ability to commit to a time-consuming and resource-intensive process, (c) a record of working collaboratively with others, (d) substantial work completed investigating this case, and (e) a diverse viewpoint that enhances decision making.

**EXTENSIVE EXPERIENCE IN AND KNOWLEDGE OF COMPLEX CIVIL LITIGATION**

This case cuts across practice areas, with an emphasis on wage theft and emerging technologies, which means the most qualified lead counsel should possess both (1) a depth of experience in these specific areas, and (2) a breadth of skills as a generalist class action litigator. I am unique among leadership applicants in having both.

*First*, at its core, this case involves wage theft: laborers contracted to earn pay for their work but a third party stole those wages. M&R and I have a wealth of experience recovering payments owed to workers from all walks of life, just like the content creators here. M&R has recovered tens of millions of dollars from the successful prosecution of class and collective action cases for restaurant servers, oilfield workers, delivery drivers, nurses, and firefighters, among others. Maximizing value for the classes in these cases often involved advancing unconventional litigation strategies. For example, after a failed mediation in *Snodgrass v. Bob Evans*, No. 2:12-cv-768 (S.D. Ohio), I wrote an early summary judgment motion and briefing that advocated for adoption of an uncommon damages theory anchored in statutory text, rather than the parties' perceived expectations. The motion was granted, tripling the company's expected exposure and leading to a nationwide $16.5 million class and collective action settlement after a second mediation. My experience advancing liability and damages theories for workers that spring from a close read of the elements of relevant claims, even when it challenges convention, will enable me to hit the ground running in crafting a viable strategy for classwide recovery for the content creator workers here.

While wage theft is a simple concept, the scheme used by Defendant to do so here was technologically sophisticated. M&R and I have abundant experience in technology-oriented class action cases, which means we will be well-equipped to collaborate with experts and explain the details of the scheme to the factfinder. Many applicants rightfully tout their experience leading data privacy class action cases, but I have no shortage of leadership appointments and successes in this arena. For example, late last year I was one of five attorneys among dozens of applicants, and the only attorney who filed an individual application with no slate affiliation, selected to co-lead *In re: Snowflake, Inc. Data Security Breach Litig.*, No. 2:24-MD-03126-BMM (D. MT) ("Snowflake MDL"), a sprawling MDL involving Fortune 500 corporate defendants and impacting hundreds of millions of consumers. I serve as Chair of the Law and Briefing Committee. Relatedly, M&R and I are prosecuting data privacy class action cases that involve companies using embedded tracking technologies to surreptitiously capture and monetize sensitive user information. The firm and I have secured highly favorable rulings in this emerging area of law, including in this District. *See, e.g., A.J. v. LMND Med. Grp., Inc.*, No. 23-cv-03288-RFL, 2024 U.S. Dist. LEXIS 194480, at *14 (N.D. Cal. Oct. 25, 2024) (largely denying motion to dismiss in pixel tracking case under various contract, tort, and unfair practices statutory claims). Notably, in such cases the manipulation of "cookies" – information files generated by a web server and sent to a web browser – bears similarity to the issue at-hand in this case, in which PayPal manipulated cookies to seize commissions from vendors that were intended for content creators. M&R and I have also achieved significant relief through class action settlements in other tech-oriented cases, including in this District. *See Carlotti v. ASUS Computer International, et al*, No. 18-cv-00369 (N.D. Cal.) (defective laptop class action settlement valued at $16 million with M&R as settlement class counsel); *Salinas et al. v Block, Inc. et al.*, No. 3:22-cv-04823 (N.D. Cal.) ($15 million common fund settlement with M&R as settlement class counsel, pending final approval).

*Second,* the breadth of experience I have in prosecuting other complex civil cases, including in leading MDLs, class actions, and trials, means that I will draw from a deep well of legal knowledge to create a winning strategy. Fluency in the intricacies of civil litigation and class actions is also evidenced by my legal scholarship about private enforcement.

- 2 -

1    I have meaningful and relevant experience in other high-stakes MDLs and class actions. I was among a group of 12 attorneys (from a pool of approximately 75 applicants) appointed to the Plaintiff Steering Committee ("PSC") in *In re: Philips Recalled CPAP Recalled Products Litigation*, MDL No. 3014 (W.D. Pa.). The litigation concerned millions of defective devices subject to an FDA recall. I was the PSC co-chair of the Science and Experts Committee and also the PSC Chair of the Class Action and Experts Subcommittee in which I worked with top economists to develop intricate and viable damages models. I played an integral role in selecting and preparing experts including for a "Science Day" in the MDL and for expert reports. The case resulted in settlements totaling approximately $1.7 billion, which included class resolution of claims for economic loss and medical monitoring, as well as resolution of personal injury claims. My experience vetting, selecting, and working with top experts ensures that the classes will be in steady hands when relying on expert evidence to understand and explain the technical details of Defendant's scheme and presenting class damages models to quantify amounts owed at class certification.

M&R and I have an impressive record securing class certification in public interest litigation even on facts that appear on first blush to be individualized. *See, e.g., Hill v. Cty. of Montgomery*, No. 9:14-cv-00933 (BKS/DJS), 2018 U.S. Dist. LEXIS 140305 (N.D.N.Y. Aug. 20, 2018) (appointing M&R Class Counsel in a civil rights suit that alleged detainees at a New York jail were starved of food and, therefore, deprived of their constitutional rights under the 8th and 14th Amendments); *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, 2023 U.S. Dist. LEXIS 21112, at *217 (D.N.J. Feb. 8, 2023) (issuing landmark opinion granting class certification across multiple states for medical monitoring and appointing M&R, along with Lieff Cabraser, as class counsel); *Goodman v. Mept Anthology, LLC*, 2024 D.C. Super. LEXIS 28 (D.C. Super. Ct. 2024) (appointing M&R as class counsel and granting class certification on behalf of tenants who experienced a pest infestation). We would leverage our extensive experience securing class certification across a broad range of cases to help obtain class certification here.

In addition to pretrial class action experience, I am among the comparatively few class action attorneys with significant trial experience that will aid in moving this through trial if needed. In the infancy of starting my firm, I was co-lead trial counsel in *Adeli v. Silverstar Automotive, Inc.*, No.

- 3 -

5:17-cv-05224 (W.D. Ark.), an individual consumer protection case, involving solely economic losses, in which the jury returned a plaintiff's verdict on all counts and a punitive damages award of $5.8 million.[1] I was also on the class action trial team in a defective product class action trial and, in that role, deposed a key statistics expert and successfully had his testimony excluded, even though the expert had testified in dozens of class action cases without limitation. My trial experience prompted the American Association for Justice to select me as a panelist at a nationwide legal education program, *Trying the Class Action: Practical Tips from the Pros*.

Beyond the courtroom, I have deep knowledge of civil litigation from related academic research and writing. I have two published law review articles about private enforcement and class action litigation. One of the articles, comparing enforcement regimes in the United States and Europe, has been cited by leading authorities, including in a proposed rule to prohibit arbitration provisions in consumer finance contracts by the Consumer Financial Protection Bureau and a book by a senior U.S. senator. *See* Bureau of Consumer Financial Protection, 12 CFR Part 1040, Final Rule, *available at* https://files.consumerfinance.gov/f/documents/201707_cfpb_Arbitration-Agreements-Rule.pdf (n. 611) (citing Jason Rathod and Sandeep Vaheesan, "The Arc and Architecture of Private Enforcement Regimes in the United States and Europe: A View Across the Atlantic," 14 U. of N.H. L. Rev. 306) (2015) (The rule was, regrettably, later revoked, pursuant to the Congressional Review Act); Sen. Amy Klobuchar, *Antitrust: Taking on Monopoly Power from the Gilded Age to the Digital Age*, p. 419 (2022) (citing same article).

## A NATURAL ABILITY TO WORK COOPERATIVELY WITH OTHERS

I grew up in small towns in central Nebraska where my father was a United Methodist pastor and my mom a public librarian. From my upbringing, I have carried a spirit to always treat others as I would like to be treated. In my leadership role in the CPAP MDL, I pro-actively fostered a collaborative environment to elicit input from others and mobilize the committee's collective wisdom when making important decisions. M&R and I also routinely co-counsel with other firms in class

---

[1] The punitive damages award was reduced by the trial court on remittitur to $500,000, which still represented a rare double-digit ratio of punitive to economic damages of 25:1. The award was affirmed on appeal by the Eighth Circuit.

- 4 -

action and MDL litigation, including many who are in this litigation,[2] and enjoy working cooperatively toward a just and speedy result for our clients. In addition, while litigation demands zealous advocacy, that should not come at the expense of collegiality with the other side, and I take pride in having strong working relationships with defense counsel.

### COMMITMENT OF THE TIME AND RESOURCES NECESSARY

I can and will commit the time and resources to prosecute this case as co-lead counsel. M&R has never needed third-party litigation funding for cases and, with substantial cash reserves to pay assessments, will not need it here. The firm has only three other active MDL appointments, permitting me to take on a significant role here. Perhaps most importantly, I take seriously the weighty obligations that come with serving as class counsel. By way of example, in *Vasquez v. Libre by Nexus, Inc.*, No. 17-cv-00755-CW (N.D. Cal.) M&R is settlement class counsel in a settlement on behalf of poor migrants made by a private company to pay excessive monthly fees and wear ankle monitors as a condition of their release from detention. The defendant has failed to honor several promises in the parties' settlement agreement. Despite having not been paid for several years, M&R continues to seek to hold the defendant accountable including through contempt motions, which have been granted and affirmed on appeal, as well as assistance to regulators who are prosecuting a follow-on action. I would bring this same steadfast commitment to the putative class if appointed lead counsel.

### SUBSTANTIAL WORK COMPLETED INVESTIGATING THE ACTION

The court should consider counsel's efforts in identifying or investigating potential claims in the action. *See* Fed. R. Civ. P. 23(g)(1)(A)(i). A key component of this factor is the number of putative class representative clients that counsel represents, which is 11, an amount close to the number of

---

[2] In the CPAP MDL, I worked closely with Chris Seeger and Dave Buchanan of Seeger Weiss LLP; Steve Schwartz and Beena McDonald of Chimicles Schwartz Kriner & Donaldson-Smith LLP; and Adam Polk of Girard Sharp LLP, and would appreciate the opportunity to do so again. I have enjoyed serving in leadership positions alongside others proposed to lead this litigation as well. *See, e.g., In re: Snowflake, Inc. Data Security Breach Litig*., No. 2:24-MD-03126-BMM (D. MT) (co-lead counsel appointment with DiCello Levitt and with Hausfeld, Seeger Weiss, Lieff Cabraser, and Stueve Siegel also in leadership positions); *In re Mapfre Data Disclosure Litigation*, No. 1:23-cv-12509 (D. Mass.) (Dkt. No. 38) (March 8, 2024) (interim co-lead class counsel appointment along with E. Michelle Drake of Berger Montague); *In re Trionfo Solutions, LLC, Data Breach Litig*., No. 1:24-cv-4547 (N.D. Ill.) (Dkt. 21) (interim co-lead counsel appointment along with Gary Klinger of Milberg in data privacy suit); *Crowell, et al. v FCA U.S. LLC*, 1:23-cv-00013-MN (Dkt. 35) (M&R interim class counsel in which Keller Rohrback is additional plaintiffs' counsel).

plaintiffs from all other applicants *combined*. This factor supports my appointment. *See Smith v. Zoll Med. Corp.*, Civil Action No. 1:23-cv-10575-IT, 2024 U.S. Dist. LEXIS 13276, at *13 (D. Mass. Jan. 25, 2024) (noting this was a plus factor, and proxy for work performed, for counsel who had five plaintiffs, as opposed to others who each had just one); Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 Vand. L. Rev. 107, 173 (2010) (those with many clients "have the opportunity to observe general themes or features of the litigation that might not be apparent to an attorney with a small number of clients."). Notably, the retention and inclusion of a diverse set of class representatives outweighs whether or not counsel was "first to file." *See In re Data Sec. Cases v. Nelnet Servicing, LLC*, No. 4:22CV3181, 2023 U.S. Dist. LEXIS 15332, at *26-27 (D. Neb. Jan. 30, 2023) (stating that the "pre-litigation planning by [firms with more plaintiffs] likely explains why it took them eight days longer to file a lawsuit. But it also exemplifies a commitment to limiting duplicative filings and work, resulting in less expense and delay for the named plaintiffs, the putative class members, the defendants, and the court."). In general, when cases are all roughly filed within the same timeframe, as here, the precise sequence of case filings should not inform leadership selection. *See, e.g., Vale v. McGuinn*, Nos. 09 Civ. 3807 (RMB), 09 Civ. 4963 (RMB), 2009 WL 3297490, at *4 (S.D.N.Y. Oct. 13, 2009) ("Whether someone was 'first to file' by itself has little to do with who is the best qualified to lead the case and does not satisfy the requirements of Rule 23(g). To hold otherwise would further encourage a 'rush to the courthouse.'") (internal citation and quotation omitted).

**A DIVERSE VIEWPOINT THAT ENHANCES LEADERSHIP AND DECISIONMAKING**

Diversity is an important consideration. However, government actors such as courts are proscribed from conferring an advantage to someone based *solely* on affiliation with broad identity categories, such as race or gender. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 220 (2023) (prohibiting college admissions practice that conferred "an inherent benefit in race *qua* race – in race for race's sake"). Discussion by applicants about unique life experiences such as "challenges bested, skills built, or lessons learned," including those that touch on categories such as race or gender, are permitted. *Id.* at 230-31.

My path is atypical: I had a rural upbringing of modest means as the son of immigrants in the plains of Nebraska and now live and work in the urban core of Washington D.C. I was inspired to become a class action lawyer after my 1L summer in India, where I worked on public interest litigation for the Self-Employed Women's Association, a union of predominantly poor women workers that is the organizational successor to the women's wing of a textile union founded by Mahatma Gandhi. To break into plaintiff-side class action litigation, I started as an intern with a plaintiffs' firm on an eight-week stipend paid for by my law school after graduation. I then became an associate and, in 2016 at the age of 33, I co-founded M&R, becoming one of the youngest named partners of a major class action firm, especially so for a person of color. The spirit of public interest that first inspired me remains central to my work today. It continues to shape M&R's docket, which spans diverse practice areas—including wage theft, data privacy, civil rights, tenants' rights, and product liability—united by a common commitment to advocating for those who have suffered injustice at the hands of powerful entities with greater resources.

If appointed as co-lead counsel, my diversity of experiences, in life and litigation, would ensure a well-rounded leadership team. *See* Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, 90 N.Y.U. L. Rev. 71, 98-101 (noting that leadership is enhanced by "people with alternative perspectives" who "may be more capable problem solvers and may identify more successful solutions …."); Bolch Judicial Institute, Guidelines and Best Practices for Large and Mass-Tort MDLs, 46 (2d ed. 2018) ("Duke Guidelines") (describing research that shows leadership teams that possess a mix of experiences "enhance[] creativity and innovation, lead[] to better decision making and problem solving, and promote[] discussion of novel concepts"). By contrast, strict deference to a privately ordered slate may result in decision-making deficiencies inherent to the "repeat player dynamic" that "reduces fresh outlooks and innovative ideas." *See* Duke Guidelines, at 37. It can also lead to groupthink, "the psychological phenomenon of reaching irrational or non-optimal decisions as a result of a desire for harmony, conformity, or consensus." *Mattson v. Milliman, Inc.*, No. C22-0037 TSZ, 2024 U.S. Dist. LEXIS 107326, at *52 (W.D. Wash. June 17, 2024).[3]

---

[3] Consolidated class action litigation can at times feel reminiscent of the sentiment that the late federal judge Abner Mikva (when he was just a young man) experienced when he walked into a

1  Increasing the diversity of the leadership team has other salutary benefits as well. James F.
2  Humphreys Complex Litig. Ctr., George Wash. Law Sch., *Inclusivity and Excellence: Guidelines and*
3  *Best Practices for Judges Appointing Lawyers to Leadership Positions in MDL and Class Action*
4  *Litigation* (Mar. 15, 2021), pp. 10-11 (diverse teams can "demonstrate[e] to the parties and the public
5  that discrimination, bias, and exclusion have no place in the federal judicial system.").

6        In the spirit of introducing a new vantage point, I submit a proposal for a leadership structure
7  and two case management ideas, inspired by proceedings in the *Snowflake* MDL. First, for a
8  leadership structure, rather than insist that the Court select *only* my firm and I (or a slate of favored
9  colleagues) in a winner-take-all process, I propose a more open-ended approach in which the Court
10 also selects four other individuals and their law firms from the pool of applicants to serve as interim
11 class counsel. *See In re: Snowflake, Inc., Data Security Breach Litig.*, No. 2:24-MD-03126-BMM
12 (Dkt No. 248) (adopting a similar approach and structure, noting that "[t]he differing approaches to
13 this litigation presented by each of these lawyers will strengthen the group's decision-making process
14 and ensure that leadership will advance the interests of a diverse group of plaintiffs."). Five firms
15 with the stature and resources of the applicants here is sufficient to effectively prosecute this litigation.

16       *Second*, it may be beneficial for the Court to limit the impending Consolidated Complaint to
17 a small set (say, five) of "priority" claims of Plaintiffs. The claims in the Consolidated Complaint
18 would then supersede only identical claims pled in the constituent complaints comprising this
19 consolidated proceeding. Claims not presented in the Consolidated Complaint but that remain in
20 underlying actions would be stayed rather than superseded. This approach will allow the parties to
21 move quickly toward class certification and the merits. Prompt resolution of the priority claims will
22 also allow the parties and the Court to understand the likely fate of the balance of the claims that
23 remain stayed. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 92 (D.
24 Mass. 2008) (observing, after a single state bellwether class was certified and tried, that the process

---

27 local ward in Chicago in 1948 to volunteer for a political campaign. The ward boss took the cigar out of his mouth and asked, "Who sent you?" "Nobody sent me," Judge Mikva responded. "We don't want nobody that nobody sent," the ward boss replied. Private ordering of plaintiffs' counsel
28 can amount to rule by "we don't want nobody that nobody sent." *See In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 643 n.4 (E.D. La. 2010).

"permit[ted] the Court to take a searching look at the critical fact disputes, to make fact-findings for purposes of class certification and to make grounded predictions as to how the key contested issues will play out."). Other consolidated litigations have taken a similar approach and resulted in global resolution. *See, e.g., In re Facebook, Inc., Consumer Privacy User Profile Litig.*, MDL No. 2843, Pretrial Order No. 12, Doc. 156 (N.D. Cal. Nov. 9, 2018) (ordering prioritization of 12 claims and staying the rest). The alternative, in which the Consolidated Complaint supersedes all claims in other complaints, would prompt lead counsel to include the kitchen sink of all potential claims. The ensuing briefing would entail voluminous argument including over intricate issues of choice of law and state law variations. The process will then repeat itself at class certification and summary judgment. Judges have observed that adjudication of such overwrought motions is needlessly taxing, time-consuming, and inefficient. *See, e.g., In re GM Ignition Switch Litig.*, No. 1:14-md-2543, July 6, 2017 Status Conference Transcript, at 13:3-17, available at: https://tinyurl.com/June2017transcript (Judge Furman describing the "toll on me and on my chambers" from 260 pages of opinions on motions to dismiss under 16 states' laws). By contrast, a claim prioritization approach can permit the litigation to move at greater speed and focus attention on more critical issues of fact and law likely to drive resolution.

*Third*, the court could consider ordering exchange of "enhanced" Rule 26(a)(1) initial disclosures by the parties. In essence, the Court could, in consultation with the parties, identify at an early stage a limited set of critical categories of evidence that they would be ordered to exchange before formal discovery commences. The Manual for Complex Litigation, Fourth (2004) lists such "Automatic Disclosure" as one of the case management tools available to judges that can "help minimize the cost, delay, and burden associated with discovery" and notes that "the timing *and content* of this disclosure may be tailored to the needs of the particular case." *See id.* at § 11.423 (emphasis added).

Early enhanced mandatory disclosures have a compelling track record in reducing discovery disputes. For example, 75 federal district court judges participated in a pilot program requiring substantial initial disclosures in employment discrimination cases. *See Report on Pilot Project Regarding Initial Discovery Protocols for Employment Cases Alleging Adverse Action*, Federal

Judicial Center (Oct. 2015). A goal of the program was that "the amount and type of information initially exchanged ought to focus the disputed issues, streamline the discovery process, and minimize opportunities for gamesmanship." *Id.* The Federal Judicial Center study showed that the pilot program reduced discovery motion practice by 50 percent. *Id.* The success of the pilot program has led to judges' adoption of enhanced initial disclosures in other practice areas. States have also begun adopting similar enhanced initial disclosure regimes in their civil rules of procedure and, in one state, a survey of practitioners showed that most agreed that the initial disclosure change "reveal[ed] the pertinent facts early in the case," "help[ed] narrow the issues early in the case," and facilitated agreement on the scope and timing of discovery. *See* Hon. Andrew D. Hurwitz, *Possible Responses to the ACTL/IAALS Report: The Arizona Experience*, 43 Ariz. St. L.J. 461, 469 (2011) (quoting Inst. for the Advancement of the Am. Legal Sys. at the Univ. of Denver, Survey of the Arizona Bench & Bar on the Arizona Rules of Civil Procedure 1 (2010)).

If ideas of this kind resonate with the Court, I am well-suited to help effectuate them.

Dated: February 12, 2025                Respectfully submitted,

By: /s/ *Jason S. Rathod*
Jason S. Rathod (admitted *pro hac vice*)
**MIGLIACCIO & RATHOD LLP**
412 H St NE, Suite 302
Washington DC 20002
Telephone: (202) 470-3520
jrathod@classlawdc.com

*Attorney for Plaintiffs Eddie Blotnicki, Miesha Dobbs, Courtney Doran, Jules Fletcher, Carolyn Johnston, Angela Kachonik, Lauren Leatherman, Amy Malcolm, Tatiana Marquez, Kara Miller, and Leilani Shimoda*

**CERTIFICATE OF SERVICE**

I, Jason S. Rathod, certify that a true and correct copy of the foregoing document has been electronically filed via this Court's ECF system, notifying all registered users of this filing.

Dated: February 12, 2025                    /s/ Jason S. Rathod
                                            Jason S. Rathod