# EXHIBIT 1

John P. Kristensen (SBN 224132)
**KRISTENSEN LAW GROUP**
120 Santa Barbara St., Suite C9
Santa Barbara, California 93101
Telephone: (805) 837-2000
*john@kristensen.law*

Josh Sanford*
Arkansas Bar No. 2001037
Jarrett Ellzey*
Texas Bar No. 24040864
Leigh S. Montgomery*
Texas Bar No. 24052214
Tommy Kherkher*
Texas Bar No. 24113389
**EKSM, LLP**
1105 Milford Street
Houston, Texas 77066
Telephone: (713) 554-2377
*jsanford@eksm.com*
*jellzey@eksm.com*
*lmontgomery@eksm.com*
*tkherkher@eksm.com*

Devin J. Stone (SBN 260326)
**EAGLE TEAM LLP**
1050 Connecticut Ave., NW
Suite 5038
Washington, DC 20036
Telephone: (833) 507-8326
*devin@eagleteam.law*

*Attorneys for Plaintiffs and all others*
*similarly situated*
(*denotes *pro hac vice* forthcoming)

Electronically FILED by
Superior Court of California,
County of Los Angeles
1/16/2025 1:51 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Cordon, Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF LOS ANGELES – SPRING STREET

| | |
|---|---|
| FOOTDOCDANA, LLC, a Limited Liability Company; DOCTOR MYRO, LLC, a Limited Liability Company; CARLOS GUEVERA, an individual; individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br>    vs.<br><br>PAYPAL, INC., a California Corporation; and DOES 1-100, inclusive,<br><br>            Defendants. | ) Case No.: 25STCV01140<br>)<br>) **CLASS ACTION**<br>)<br>)<br>) **COMPLAINT FOR DAMAGES FOR:**<br>)<br>) **(1) Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs FOOTDOCDANA, LLC ("FootDocDana"), DOCTOR MYRO, LLC ("Doctor Myro"), and CARLOS GUEVERA ("Guevera") (collectively "Plaintiffs"), by and through their undersigned counsel, plead on their own behalf and on behalf of all others similarly situated. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## I.

## HOW BIG TECH RUINED AFFILIATE LINKS

1.     Plaintiffs are content creators and marketers who earn substantial revenue through contracts promoting products and services from third parties.

2.     As a part of Plaintiffs' businesses, Plaintiffs receive commissions and other benefits when they refer audience members to purchase the product or services of their contractual partners in an online store.

3.     Plaintiffs use individualized tracking links and promotional codes (collectively, "Affiliate Links") that tell their partners that a particular online customer was referred by that plaintiff.

4.     By virtue of the Affiliate Links, Plaintiffs (who referred the customer to the store) receive attribution for the referral when a customer checks out of an online store. This is the online equivalent of a salesperson being acknowledged that they helped a customer when the customer goes to the cash register (and receiving a sales commission for the help they provided).

5.     Defendant PayPal, Inc. ("Defendant" or "Paypal") owns Honey, a browser extension that purports to find consumers the best deal at checkout by gathering and applying available discount codes.

6.     PayPal offers Honey to online shoppers as a free browser extension that purports to save shoppers money.  These representations have attracted over 17 million users (on the Google Chrome browser alone) who use the Honey browser extension to find deals online.

7.     Online marketers, such as YouTubers and online influencers, direct their followers and viewers to specific products and services and earn commissions and other

1    benefits when their audience members purchase the products and services they are

2    promoting.

3           8.      Online merchants work with these online marketers through affiliate marketing

4    programs ("Affiliate Programs"),[1] which rely on attribution tracking through Affiliate Links

5    (which create unique HTML tracking tags or cookies) to determine who gets credit for online

6    referrals and product sales.

7           9.      The online marketer provides Affiliate Links to their audience and, if someone

8    clicks on that link or uses that code immediately prior to making a purchase, the online

9    marketer receives affiliate attribution credit for the sale.

10          10.     The industry refers to this practice as "last click attribution."

11          11.     This case involves a scheme by Defendant to unlawfully steal the attribution for

12   online sales from Plaintiffs by using Honey to intentionally supplant Plaintiffs' affiliate

13   attribution and replace it with their own, thereby taking all benefits that would have otherwise

14   gone to the Plaintiffs.

15          12.     The online marketers whose benefits were redirected, Plaintiffs and the Proposed

16   Class are also entitled to injunctive relief and equitable relief, including disgorged profits as

17   deemed appropriate by the Court.

18          13.     Because Defendant, *via* Honey, has standardized practices and procedures to

19   which all online marketers are subject or affected by, the appropriate vehicle for recovery is a

20   class action lawsuit.

21                                              **II.**

22                                          **PARTIES**

23          14.     Plaintiff FootDocDana, LLC is a California limited liability company based in

24   Santa Monica, California in Los Angeles County.

25          15.     Plaintiff Doctor Myro, LLC is a California limited liability company, with

26   headquarters in California.

27   _____

28   [1] "Affiliate Programs" come in several forms, including but not limited to sponsorship relationships (usually on a flat fee, percentage, or "cost per acquisition" basis), endorsement relationships, or participation in a formalized affiliate relationship or platform (usually on a fee or percentage basis).

16. Plaintiff Carlos Guevera is an individual who runs his business out of Los Angeles County.

17. Defendant PayPal, Inc., is, and at all times mentioned herein was, a corporation with the principal place of business at 2211 North First Street, San Jose, California 95311. Its agent for service of process is CT Corporation System, 330 North Brand Boulevard, Glendale, California 91203.

18. Honey is a browser extension, free to consumers, which purports to "automatically look for [discount] codes when [consumers] shop on select sites" to provide consumers with "the biggest savings" available.[2]

19. Defendant acquired Honey in 2020 for approximately $4 billion.

20. Honey is based out of downtown Los Angeles.

21. Defendant currently owns and operates Honey.[3]

22. Defendant has partnered with over 30,000 businesses to include Honey in those businesses' online checkout processes ("Defendant's merchant partners") for any consumer who has downloaded the browser extension.[4]

23. Plaintiffs are content creators with followings on YouTube, Instagram, and Tiktok, as well as other social media platforms and the internet.

***Plaintiff FootDocDana***

24. Plaintiff FootDocDana has over 6 million followers on YouTube and TikTok and over 1 million on Instagram under the moniker FootDocDana and has posted numerous videos describing different products, and regularly partners with online merchants, including Defendant's merchant partners, to promote products and services in their videos.

25. When Plaintiff FootDocDana promotes products, payment comes from the business with whom it has partnered and who is selling the product.

26. Plaintiff FootDocDana frequently posts videos across various channels, and the videos are monetized as described above.

---

[2] *See* https://www.joinhoney.com/ (last visited Dec. 26, 2024).
[3] *See* https://help.joinhoney.com/article/302-what-does-honey-joining-paypal-mean-for-members (last visited Dec. 26, 2024).
[4] *See* https://www.joinhoney.com/ (last visited Dec. 26, 2024).

1    ***Plaintiff Doctor Myro***

2        27.    Plaintiff Doctor Myro, LLC has multiple social media portals, including a

3    YouTube channel, Instagram under the moniker doctormyro and has posted hundreds of videos

4    describing different products, and regularly partners with online merchants, including

5    Defendant's merchant partners, to promote products and services in their videos.

6        28.    When Plaintiff Doctor Myro, LLC promotes products, payment comes from the

7    business with whom he has partnered and who is selling the product.

8        29.    Plaintiff Doctor Myro, LLC frequently posts videos across his various channels,

9    and all his videos are monetized as described above.

10    ***Plaintiff Guevera***

11        30.    Plaintiff Carlos Guevera has multiple YouTube channels, under the moniker

12    Zgadgetreview, and has posted over 550 videos describing different products, and regularly

13    partners with online merchants, including Defendant's merchant partners, to promote products

14    and services in their videos.

15        31.    When Plaintiff Carlos Guevera promotes products, payment comes from the

16    business with whom he has partnered and who is selling the product.

17        32.    Plaintiff Carlos Guevera frequently posts videos across his various channels, and

18    all his videos are monetized as described above.

19        33.    All Plaintiffs promote products and services to audience members using Affiliate

20    Links.

21                                        **III.**

22                          **VENUE AND JURISDICTION**

23        34.    This Court has jurisdiction over the subject matter of this action pursuant to

24    Article VI, § 10 of the California Constitution.

25        35.    This Court has general personal jurisdiction over Defendant, because

26    Defendant's division, Honey, has its principal place of business ("nerve center") in Los

27    Angeles County.

28

1      36.      Venue is proper in this Court because the principal acts and omissions

2   complained of were committed in Los Angeles County.

3      37.      Federal jurisdiction does not exist here. Plaintiffs, the Putative Class Members,

4   and Defendant are all California citizen and resident for purposes of determining jurisdiction.

5   There is no diversity. 28 U.S.C. §1332 requires complete diversity of citizenship among the

6   parties. None of the causes of action involve substantial questions of federal law. In fact, the

7   cause of action is an equitable claim, not a legal claim. The Ninth Circuit precludes claims

8   for equitable relief, and they must be dismissed **without prejudice**. <u>Guzman v. Polaris Indus.</u>

9   (9th Cir. Sep. 29, 2022) 2022 WL 4543709. Any removal would be sanction worthy.

10  Protection against local prejudice is another essential purpose of removal jurisdiction based

11  on diversity of citizenship. Thus, <u>defendants cannot remove</u> a case to federal court if <u>any</u>

12  defendant is a citizen of the State in which such action is brought. 28 U.S.C. §1441(b)(2);

13  *Spencer v. Altec Indus., Inc.* (9th Cir. 2004) 393 F.3d 867, 870. Therefore, there is neither

14  complete diversity nor federal question jurisdiction and this matter is properly venued in this

15  Court.

16                          **IV.**

17                  <u>**FACTUAL ALLEGATIONS**</u>

18          ***How Customer Attribution Works***

19     38.      The growth of social media platforms like YouTube has driven online retailers

20  to collaborate with online marketers—including influencers, bloggers, and reviewers—to

21  promote their products.

22     39.      These online marketers earn commissions and other benefits by directing their

23  followers to Affiliate Links.

24     40.      Affiliate Links may embed tracking tags or utilize a unique coupon or

25  promotional code, which identify the source of a purchase and allow merchants to allocate

26  commissions or other benefits to the appropriate online marketer.

27     41.      The internet marketing industry relies on last click attribution to determine

28  commission payments, wherein the most recent Affiliate Link used before purchase receives

100% of the credit and attribution. For example, a customer might click on a blogger's affiliate link to explore a product but delay their purchase. Weeks later, the customer might watch a YouTube video from a different content creator promoting the same product. If the customer then clicks the YouTuber's affiliate link and completes the purchase, the YouTuber receives credit under the last click attribution model because their link was the most recent referral.

42.    Online retailers aggregate Affiliate Link data to determine how many customers are attributable to any given source.  This data is the most common way to determine how successful Plaintiffs were in driving traffic to websites and acquiring customers. Affiliate Link tracking therefore plays a crucial part in defining current and future business relationships with Plaintiffs.

43.    Last click attribution is the industry standard and, upon information and belief, is the model by which all or most of Plaintiffs' business partners operate. The vast majority of online retailers credit only the source listed at the very last instance before making a purchase. Thus, Affiliate Programs are "winner take all."

### How Honey Misappropriates Affiliate Marketing Benefits

44.    PayPal markets its Honey browser extension as a free tool for online shoppers, promising to search the internet for discount codes that can be applied to items already in the user's shopping cart. Honey purports to operate by gathering coupon codes on websites or through user submission that are potentially applicable to a user's purchase.

45.    Defendant PayPal, through the Honey browser extension, has exploited these Affiliate Programs to divert commissions and other benefits from their rightful owners. Honey manipulates online shopping sessions to replace existing affiliate attribution with its own, falsely claiming credit for referrals and appropriating commissions and other benefits intended for the online marketers.

46.    Honey operates covertly, altering network communications between a user's browser and the online retailer's website. By removing and replacing affiliate attribution, Honey shifts referral credit to PayPal without the user's knowledge. For example, if a consumer clicks on a YouTuber's Affiliate Link to purchase a promoted product, Honey's

interference can result in a commission or other benefit being rerouted to PayPal instead of the YouTuber even where Honey provided no benefit to the consumer.

47.    Honey capitalizes on the last click attribution mechanism by generating simulated referral clicks. Through pop-ups encouraging users to apply coupons or earn rewards, Honey creates the appearance of a new referral, displacing the original marketer's Affiliate Link and affiliate attribution, thus securing 100% of the credit for Honey.

48.    Honey utilizes several deceitful and clandestine methods to displace rightful referrers like Plaintiffs and the Class.

**Simulated Discounts**

49.    In one scenario, a shopper may add an item to their cart after using an Affiliate Link shared by a marketer. During checkout, Honey might display a pop-up claiming to have found a coupon. If the shopper clicks "Apply Coupons," Honey replaces the marketer's affiliate attribution with its own, thereby stealing the commission or other benefits, even where Honey provided no benefit to the customer.

**No Coupon Needed**

50.    Even when Honey fails to locate a discount, it prompts the shopper with messages like "We searched for you but didn't find any deals" or "You already have the best price." Clicking these messages still triggers the replacement of the original marketer's affiliate attribution with Honey's, ensuring that PayPal receives the commission or other benefits.

**Honey Gold Program**

51.    Honey also offers a reward system called Honey Gold, allowing users to earn points redeemable for gift cards. Shoppers are enticed to click Honey's pop-ups with promises of rewards, regardless of coupon availability. This process, again, overrides the original affiliate attribution and allows Honey to steal the commission or other benefits. For example, Honey might award a shopper 89 points (equivalent to $0.89) while diverting a $35.60 commission owed to the marketer.

**PayPal Checkout**

52.    In some cases, when no discounts or rewards are available, Honey displays a pop-

1   up encouraging shoppers to "Get Rewarded with PayPal." Clicking this prompts users to

2   complete their purchase via PayPal's checkout button instead of the merchant's. This action

3   credits the sale to Honey, bypassing the original referrer entirely.

4   ***Impact on Content Creators and Marketers***

5      53.    Through these deceptive practices, PayPal systematically diverts commissions from

6   rightful earners, undermining the affiliate marketing system. Adding to the irony, PayPal enlists

7   content creators and influencers to promote the Honey browser extension to their audiences,

8   effectively enabling it to usurp the commissions and other benefits those same creators depend on

9   for income.

10     54.    Defendant designed its Honey browser extension to take credit for customer

11  acquisition for which it is not responsible and for which, were the Honey browser extension not

12  in place, Plaintiffs would be properly credited.

13     55.    In addition to taking the direct and indirect benefits that Plaintiffs would have

14  received by stealing the affiliate attribution, Defendant's actions have damaged Plaintiffs'

15  relationships with business partners.

16     56.    Defendant's actions have caused Plaintiffs to receive less favorable contract terms

17  from their business partners and/or led to a failure to renew contracts between Plaintiffs and their

18  business partners.

19     57.    Plaintiffs' contractual business partners regularly evaluate whether Plaintiffs are

20  overperforming or underperforming regarding the business's benchmark for average customer

21  acquisition costs—e.g., the businesses track how many customers have been acquired via

22  Plaintiffs' Affiliate Link and divide that number into amounts paid to Plaintiffs to determine if

23  customer acquisition is less or more costly via Plaintiffs than anticipated.

24     58.    If Plaintiffs are overperforming regarding a contractual business partner, then that

25  business partner is more likely to renew contracts with Plaintiffs and offer them better terms on

26  future contracts.

27     59.    Defendant benefitted by disrupting last click attribution which should have been

28  attributed to Plaintiffs who should have received credit for customer acquisition.

60.     Because Defendant received credit for customer acquisition instead of Plaintiffs, Defendant benefitted at Plaintiffs' expense.

61.     Defendant misrepresented the nature of their actions and took steps to hide and obfuscate them from customers and marketers alike.

62.     Defendant misrepresented the nature of its product and services to consumers to entice them to download the Honey extension.

63.     Defendant purports to search the internet for coupons and maintain a database of user-submitted coupons.  However, Defendant curates such coupons and rejects coupons that are not in Defendant's best interest, to the detriment of its users.

64.     Defendant's actions are a violation of the terms of service of the online merchants with whom it partners.

65.     Plaintiffs have suffered substantial economic damages as a result of the operation of Defendant's malicious and covert browser extension.

### *PayPal's Extensive Records of Their Actions*

66.     Consumer shopping data is extremely valuable to tech companies such as PayPal. As a result, Defendant PayPal keeps extensive records of every transaction completed using Honey.

67.     For every completed Honey transaction, PayPal records (in a searchable database), among other things: the exact time and date, store, user ID, device ID, visitor ID, session ID, referrer URL, first referrer URL, location (including city and country), browser, and client.

68.     In other words, PayPal knows exactly whose affiliate attribution they replaced and when and how they replaced it.

## V.

## <u>CLASS ACTION ALLEGATIONS</u>

### *Online Marketer Class*

69.     Plaintiffs bring this action on behalf of herself and on behalf of all other persons similarly situated pursuant to the provisions of California Code of Civil Procedure § 382.

70.    Plaintiffs' proposed Class is as follows, subject to amendment as appropriate:

All persons (corporate or individual) in California who participated in an Affiliate Program with an online merchant and had affiliate attribution redirected to Paypal as a result of the Honey browser extension.

71.    Excluded from this class definition are employees, officers, directors of Defendant, and attorneys appearing this case, and any judge assigned to hear this action.

72.    Plaintiffs reserve the right to modify this class definition as they obtain relevant information, including attribution tracking data and other records, through discovery.

73.    Each of the persons identified in this Putative Class has been harmed by the acts of Defendant because Defendant interfered with a business relationship of each member of the Putative Class, as well as converted each Class member's rightfully owed commissions and other benefits.

74.    Defendant has been unjustly enriched at the expense of each member of the Putative Class.

75.    The proposed Class meets the criteria for certification under *Code Civ. Proc.* § 382 because the class of persons who suffered the same harm as Plaintiff is easily ascertainable.

**The Action Meets the Requirements to be Certified as a Class**

76.    Plaintiffs are members of the proposed Class.

77.    The proposed Class can be identified through Defendant's records and merchant partners' databases.

*Numerosity*

78.    The number of Putative Class members is believed to be in the thousands, rendering the class so numerous that individual joinder of all Class members is impracticable.

79.    The exact number and identities of the Class members are unknown at this time and can only be ascertained through discovery. Identification of the Class members is a matter capable of ministerial determination from Defendant's records.

*Commonality*

80.    There are common questions of law and fact raised in this Complaint which

predominate over any questions affecting only individual Class members.

81.    The following questions of law and fact common to the Class members are ripe for determination:

(a)    Did Defendant's policies and practices effectively steal attribution from members of the Putative Class?

(b)    Did Defendant profit from customer acquisition which was generated by members of the Putative Class?

(c)    Did Defendant's actions in stealing attribution from Plaintiffs damage the relationship between Defendant's merchant partners and members of the Putative Class?

(d)    Whether Defendant intentionally damaged the relationship between Defendant's merchant partners and members of the Putative Class?

***Typicality***

82.    Plaintiffs' claims are typical of the claims of the proposed Putative Class. In addition, Plaintiffs are entitled to relief under the same causes of action and upon the same facts as the other members of the Proposed Putative Class.

***Adequacy***

83.    Plaintiffs are adequate representative of the proposed Putative Class because their interests coincide with, and are not antagonistic to, the interests of the members of the proposed Putative Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they intend to prosecute this action vigorously. Plaintiffs and their Counsel will fairly and adequately protect the interests of members of the proposed Putative Class.

***Predominance***

84.    Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' had their affiliate links deleted by Defendant who replaced Plaintiff's data with their own to receive the commissions. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single

1    action has important and desirable advantages of judicial economy.

2              *Superiority*

3         85.    Questions of law and fact common to the proposed Putative Class members

4    predominate over questions affecting only individual members, and a class action is superior to

5    other available methods for fair and efficient adjudication of the controversy. Liability will be

6    determined based on a common set of facts and legal theories. Willfulness will be determined

7    based on Defendant's conduct and knowledge, not upon the effect of Defendant's conduct on

8    Putative Class members.

9         86.    The damages sought by each member are such that individual prosecution would

10   prove burdensome and expensive given the complex and extensive litigation necessitated by

11   Defendant's conduct. It would be virtually impossible for the members of the proposed Putative

12   Class to individually redress effectively the wrongs done to them, as the claims alleged herein

13   have no attorney's fee shifting provision. Even if the members of the proposed Putative Class

14   themselves could afford such individual litigation, it would be an unnecessary burden on the

15   courts. Furthermore, individualized litigation presents a potential for inconsistent or

16   contradictory judgments and increases the delay and expense to all parties and to the court

17   system presented by the complex legal and factual issues raised by Defendant's conduct. By

18   contrast, the class action device will result in substantial benefits to the litigants and the Court

19   by allowing the Court to resolve numerous individual claims based upon a single set of proof in

20   just one case.

21        87.    Class certification is appropriate because Defendant has acted on grounds

22   generally applicable to the proposed Putative Class, making appropriate equitable injunctive

23   relief with respect to Plaintiffs and the proposed Putative Class members. Rule 3.765(b)

24   Likewise, issues that will arise in this case are appropriate for certification under Rule

25   3.765(b) because such issues are common to the Class, the resolution of which would

26   advance the matter and the parties' interests therein. Such issues include, but are not limited

27   to:

28        (a)    Did Defendant's policies and practices effectively steal attribution from members

1    of the Putative Class?

2        (b)    Did Defendant profit from customer acquisition which was generated by

3    members of the Putative Class?

4        (c)    Did Defendant's actions in stealing attribution from Plaintiffs damage the

5    relationship between Defendant's merchant partners and members of the Putative Class?

6        (d)    Whether Defendant intentionally damaged the relationship between Defendant's

7    merchant partners and members of the Putative Class?

8                                    **VI.**

9                          **CAUSES OF ACTION**

10          **Violation of California's Unfair Competition Law (UCL),**

11              **Cal. Bus. & Prof. Code §§ 17200, _Et Seq._**

12        88.    Plaintiffs hereby incorporate by reference and re-allege each and every

13    allegation set for in each and every preceding paragraph of this Complaint, as though fully

14    set herein.

15        89.    Defendant has engaged in unlawful, unfair, and fraudulent business practices in

16    violation of the UCL by using Honey browser extension to wrongfully divert affiliate

17    attribution from Plaintiffs and members of the Putative Class .

18        90.     These practices are unlawful because they interfere with Plaintiffs' and Class

19    members' prospective economic advantage, constitute conversion, and result in unjust

20    enrichment.

21        91.     Defendant's conduct is unfair because it disrupts the legitimate referral

22    commission system, violates California's public policy, and harms content creators while

23    providing no legitimate benefit to consumers on the marketplace.

24        92.    Plaintiffs and members of the Putative Class have suffered financial losses as a

25    direct result of Defendant's actions, including the deprivation of affiliate commissions,

26    sponsorship opportunities, accurate consumer sales attribution data, money, and other

27    benefits.

28        93.    Plaintiffs and members of the Putative Class seek restitution, injunctive relief,

and other equitable remedies, as well as attorneys' fees and costs, as provided under the UCL.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and the Class described above seeks the following relief:

1.     For an Order certifying this action as a class action under the California Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the Class, and finding that Plaintiff is proper representatives of the Class requested herein;

2.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse of Plaintiff's and Class Members' affiliate links;

3.     For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

4.     For an award of attorneys' fees and costs, and any other expenses;

5.     Pre- and post-judgment interest on any amounts awarded; and

6.     Any other relief that this court may deem just and proper.

Dated: January 15, 2025

KRISTENSEN LAW GROUP ||
EKSM, LLP || EAGLE TEAM LLP

*/s/ John P. Kristensen*
John P. Kristensen
Jarrett L. Ellzey
Josh Sanford
Leigh Montgomery
Tommy Kherkher
Devin J. Stone
***Attorneys for Plaintiffs and the Class***