1
2
3
4
5

Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
Trevor T. Tan (SBN 281045)
Nina Gliozzo (SBN 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800

Elizabeth J. Cabraser (SBN 083151)
Roger N. Heller (SBN 215348)
Jason L. Lichtman (*pro hac vice*)
Sean A. Petterson (*pro hac vice*)
Danna Z. Elmasry (*pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

6
7
8
9

Nanci E. Nishimura (SBN 152621)
Thomas E. Loeser (SBN 202724)
Karin B. Swope (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Rd #200,
Burlingame, CA 94010
Telephone: 650.697.6000

10

*Interim Co-Lead Counsel*

11
12
13
14
15
16
17

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

18
19
20
21
22

IN RE PAYPAL HONEY BROWSER
EXTENSION LITIGATION

Case No. 5:24-cv-9470-BLF

**CONSOLIDATED CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

NATURE OF THE ACTION ........................................................................................... 1

PARTIES ......................................................................................................................... 3

JURISDICTION AND VENUE ...................................................................................... 6

DIVISIONAL ASSIGNMENT ....................................................................................... 7

CHOICE OF LAW .......................................................................................................... 7

FACTUAL ALLEGATIONS .......................................................................................... 7

I.      The Affiliate Marketing Industry ....................................................................... 7

        A.      Affiliate Marketing Is A Rapidly Growing Industry ............................... 7

        B.      Affiliate Marketers Are of Central Importance to the Affiliate Marketing
                Ecosystem. ............................................................................................... 8

        C.      The Affiliate Marketing Process in Five Steps. ..................................... 10

II.     Merchants Use Tracking Mechanisms to Credit Affiliate Marketers for Sales. ............... 11

        A.      Tracking Mechanisms Rely on Affiliate IDs to Attribute Credit. .......... 11

        B.      The Industry Uses "Last Click Attribution" to Attribute Credit for A Sale ......... 13

III.    The Honey Browser Extension ......................................................................... 15

        A.      PayPal Uses the Honey Browser Extension to Steal Affiliate Commissions
                from Affiliate Marketers. ....................................................................... 16

                1.      The Honey Browser Extension Exploits Attribution Mechanisms to
                        Steal Credit for Sales ..................................................................... 19

                2.      PayPal's Conduct Constitutes Cookie Stuffing. .......................... 21

                        a.      Clicking an Affiliate Link to a Merchant Website Sets A
                                Cookie on the Consumer's Browser. ............................. 21

                        b.      The Honey Browser Extension Tracks Consumers'
                                Browsing Behavior. ....................................................... 25

                        c.      When A Consumer Interacts with The Honey Browser
                                Extension, it Replaces the Affiliate Marketer's Affiliate ID
                                with Honey's Own Affiliate ID ..................................... 28

        B.      PayPal's Conduct is Traceable Through its Own Records and Statistical
                Analysis. ................................................................................................ 34

        C.      PayPal Knew It Was Using The Honey Browser Extension to Steal
                Affiliate Commissions. .......................................................................... 36

        D.      PayPal Has Harmed Plaintiffs. ............................................................. 37

CLASS ALLEGATIONS ............................................................................................. 62

COUNT ONE Unjust Enrichment ............................................................................... 65

COUNT TWO Intentional Interference with  Prospective Economic Advantage ....................... 67

COUNT THREE Negligent Interference with  Prospective Economic Advantage ..................... 69

COUNT FOUR Intentional Interference with  Contractual Relations ...................................... 72

COUNT FIVE Conversion ........................................................................................... 75

1
2

**TABLE OF CONTENTS**
**(continued)**

Page

3

COUNT SIX Violation of the California Unfair Competition Law ............................................. 76

4

COUNT SEVEN Violation of the Connecticut Unfair Trade Practices Act ............................... 77

COUNT EIGHT Violation of the Hawaii Unfair and Deceptive Trade Practices Act ................ 79

5

COUNT NINE Violation of the New Hampshire Consumer Protection Act .............................. 80

6

COUNT TEN Violation of the New York General Business Law .............................................. 81

7

COUNT ELEVEN Violation of the Washington Consumer Protection Act ............................... 82

PRAYER FOR RELIEF.............................................................................................................. 84

8

DEMAND FOR JURY TRIAL.................................................................................................... 84

9

CERTIFICATE OF SERVICE ................................................................................................... 87

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs, on behalf of themselves and all other similarly situated individuals (the "Class," and "State Subclasses," as defined below), bring this Consolidated Class Action Complaint against Defendants PayPal, Inc. and PayPal Holdings, Inc. (collectively, "PayPal" or "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      Journalists, bloggers, podcasters, YouTubers, and other online content creators ("Affiliate Marketers") earn revenue by promoting the products and services of e-commerce merchants ("Merchants") to their online audiences. Pursuant to agreements between Affiliate Marketers, Merchants, and affiliate networks, when a consumer clicks on an Affiliate Marketer's affiliate link and then purchases a product or service online from the Merchant, the Merchant is supposed pay a commission for that sale ("Affiliate Commission") to the Affiliate Marketer whose link was followed to the Merchant website. The Merchant is able to identify which Affiliate Marketer created that business opportunity based on the unique identifier ("Affiliate ID") contained in the affiliate link associated with the sale. Affiliate Commission amounts can be significant per transaction; some are up to 40% of the sale price. And the Affiliate Marketer ecosystem is likewise significant, estimated at $32.3 billion in 2024. The market is forecasted to be worth $48 billion by 2027.[1]

2.      Unbeknownst to Plaintiffs and other Affiliate Marketers, however, PayPal has been serially interfering with the economic relationship between Affiliate Marketers and the more than 30,000 participating retailers who work with the Honey Browser Extension. PayPal has been stealing for itself Affiliate Commissions that properly belong to the Affiliate Marketers. Through a browser extension that it owns and controls, called the "Honey Browser Extension," PayPal has implemented a practice whereby it replaces the Affiliate Marketer's Affiliate ID with PayPal's own Affiliate ID during the consumer's checkout process, thus diverting the Affiliate

---

[1] Shubham Singh, *115 Affiliate Marketing Statistics (2025) – Market Size & Growth*, DemandSage, Feb. 18, 2025, available at https://www.demandsage.com/affiliate-marketing-statistics/.

Commission to itself, even though it did not promote the product or refer the consumer to the Merchant website to make the purchase. By this practice, PayPal misappropriated and continues to misappropriate Affiliate Commissions from thousands of Affiliate Marketers. At the time the original complaints in this litigation were filed, the Honey Browser Extension swapped in PayPal's Affiliate ID on the websites of major Merchants including Amazon, BestBuy, and Walmart as well as thousands of smaller Merchants.

3.      Plaintiffs are Affiliate Marketers who use websites and social media platforms such as Instagram, YouTube, and TikTok to promote products sold by Merchants. When one of Plaintiffs' followers clicks on Plaintiffs' affiliate link, the follower is directed to the Merchant's website. If that follower makes a purchase on that website, the Plaintiff associated with that affiliate link is supposed to earn an Affiliate Commission from the Merchant.

4.      When a consumer clicks an affiliate link, the Affiliate Marketer's unique Affiliate ID is inserted within the web link URL that sends consumers to the Merchant's website. The website receives the Affiliate ID in the link and immediately stores the Affiliate ID, typically as a "cookie" (a persistent storage data/record within the browser specific to the website). This process allows the Merchant to properly identify and pay the Affiliate Commission to the Affiliate Marketer who created that business opportunity.

5.      PayPal purchased Honey Science Corporation ("Honey") in 2020 for approximately $4 billion. Honey had, by that time, developed the popular Honey Browser Extension, which purported to scan the internet for coupons and discounts and apply them at checkout. As advertised to consumers, if the Honey Browser Extension finds no applicable coupons or discounts, it will offer consumers cashback through its rewards program, and offer the choice to pay with PayPal. Consumers who download the Honey Browser Extension will see a pop-up at checkout when they make a purchase on certain websites. If they click on the pop-up, the Honey Browser Extension ostensibly will tell them if there is a coupon or better deal for the product they are purchasing, or if they can get cashback on their purchase through the rewards program.

6.      In many if not most cases where a consumer clicks on the Honey pop-up, however, Honey provides no coupon or discount for the consumer, the coupon it selects has been provided directly to Honey by the Merchant (to the exclusion of better coupons retrievable from the Internet), or the coupon or code provided is invalid and/or expired. Nevertheless, owing to its marketing, at the time PayPal purchased Honey in 2020, the Honey Browser Extension had approximately 17 million active users.

7.      PayPal's business model for Honey relies on the scheme that is at issue in this case. Pursuant to that scheme, where a consumer is directed to a Merchant by an Affiliate Marketer, and that consumer interacts with the Honey Browser Extension at checkout in any way—including by seeking applicable discounts or cashback rewards, making payment via PayPal, or, at least at the time the original complaints in this litigation were filed, dismissing the pop-ups—the Honey Browser Extension surreptitiously replaces the Affiliate Marketer's Affiliate ID with PayPal's own, and the Affiliate Commission that should be paid to the Affiliate Marketer is diverted to (i.e., stolen by) PayPal. PayPal swaps in its Affiliate ID even though PayPal did not (1) generate the sale, or (2) find a discount code for the product (and even when there was no reasonable chance of finding a discount code because no such code exists in the Honey database). If the consumer interacts with the Honey Browser Extension's pop-ups in any way, the Honey Browser Extension replaces the Affiliate Marketer's Affiliate ID. By this scheme, PayPal steals millions of dollars in Affiliate Commissions from Plaintiffs and other Affiliate Marketers.

8.      Plaintiffs, on behalf of themselves and the proposed Class and State Subclasses, seek monetary relief and equitable relief, including an order enjoining PayPal's illegal, unfair, abusive, and deceptive practices.

## **PARTIES**

9.      Plaintiff Gymcaddy LLC ("Gymcaddy") is a limited liability company organized and existing under the laws of New Jersey with its principal place of business in New Jersey.

10.     Plaintiff Motion Butter, LLC ("Motion Butter") is a limited liability company organized and existing under the laws of Texas with its principal place of business in Texas.

1      11.      Plaintiff Dan Becker, LLC ("Dan Becker") is a limited liability company

2  organized and existing under the laws of Wisconsin with its principal place of business in

3  Wisconsin.

4      12.      Plaintiff Angry Snowboarder is a sole proprietorship organized and existing under

5  the laws of Colorado with its principal place of business in Colorado.

6      13.      Plaintiff Brevard Marketing LLC ("Brevard Marketing") is a limited liability

7  company organized and existing under the laws of Florida with its principal place of business in

8  Florida.

9      14.      Plaintiff Daniel Lachman ("Mr. Lachman") is an individual who resides in

10  Tennessee.

11      15.      Plaintiff GamersNexus LLC ("Gamers Nexus") is a limited liability company

12  organized and existing under the laws of North Carolina with its principal place of business in

13  North Carolina.

14      16.      Plaintiff Justin Tech Tips LLC ("Justin Tech Tips") is a limited liability

15  corporation organized and existing under the laws of Texas with its principal place of business in

16  Texas.

17      17.      Plaintiff Stephen Sistek ("Mr. Sistek") is an individual who resides in Florida.

18      18.      Plaintiff Storm Productions LLC ("Storm Productions") is a limited liability

19  company organized and existing under the laws of New York with its principal place of business

20  in New York, New York.

21      19.      Plaintiff Red Beard Studios LLC ("Red Beard Studios") is a limited liability

22  company organized and existing under the laws of Montana with its principal place of business in

23  Montana.

24      20.      Plaintiff Reid Tomasko ("Mr. Tomasko") is an individual who resides in New

25  Hampshire.

26      21.      Plaintiff Gents Scents LLC ("Gents Scents") is a limited liability company

27  organized and existing under the laws of North Carolina with its principal place of business in

28  North Carolina.

22.    Plaintiff Sebastian Ventura ("Mr. Ventura") is an individual who resides in Tennessee.

23.    Plaintiff Colbow Design LLC ("Colbow Design") is a limited liability company organized and existing under the laws of Ohio with its principal place of business in Ohio.

24.    Plaintiff Justin Tech Tips LLC ("Justin Tech Tips") is a limited liability corporation organized and existing under the laws of Texas with its principal place of business in Texas.

25.    Plaintiff Edizia LLC ("Edizia") is a limited liability company organized and existing under the laws of Idaho with its principal place of business in Idaho.

26.    Plaintiff Richard Young ("Mr. Young") is an individual who resides in New York.

27.    Plaintiff Aaron Ramirez ("Mr. Ramirez") is an individual who resides in California.

28.    Plaintiff Be Victorious LLC ("Be Victorious") is a limited liability company organized and existing under the laws of Illinois with its principal place of business in Illinois.

29.    Plaintiff Stuber Holdings, LLC ("Stuber") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Washington.

30.    Plaintiff Christopher Komuves ("Mr. Komuves") owns a sole proprietorship by default under the laws of Connecticut with its principal place of business in Connecticut.

31.    Plaintiff Eli Silva ("Mr. Silva") is an individual who resides in California.

32.    Plaintiff John Pugh ("Mr. Pugh") is an individual who resides in Virginia.

33.    Plaintiff Joseph Larson ("Mr. Larson") is an individual who resides in Utah.

34.    Plaintiff David Hiser ("Mr. Hiser") is an individual who resides in Washington.

35.    Plaintiff Just Josh Inc. ("Just Josh") is a corporation organized and existing under the laws of Arizona with its principal place of business in Arizona.

36.    Plaintiff Miniac, LLC ("Miniac") is a limited liability company organized and existing under the laws of Minnesota with its principal place of business in Minnesota.

37.    Plaintiff Shanger Danger LLC ("Shanger Danger") is a limited liability company organized and existing under the laws of Hawaii with its principal place of business in Hawaii.

38.     Defendant PayPal Holdings, Inc. is a Delaware corporation with its principal place of business at 221 North First St. c/o Corporate Legal Department, San Jose, CA 95131.

39.     Defendant PayPal Holdings, Inc. holds all assets and liabilities of Defendant PayPal, Inc., a subsidiary Delaware corporation with its principal place of business at 221 North First St. c/o Corporate Legal Department, San Jose, CA 95131.

40.     PayPal Holdings, Inc. and PayPal Inc. were principals, agents, alter egos, joint venturers, partners, or affiliates of each other, and in doing the acts alleged herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. PayPal Holdings, Inc. and PayPal, Inc. are collectively referred to as "PayPal."

41.     In 2020, PayPal Holdings, Inc. acquired Honey Science Corporation ("Honey") for approximately $4 billion. Unless otherwise noted, "PayPal" includes Honey.

**JURISDICTION AND VENUE**

42.     The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the Class is a citizen of a state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the Class consists of more than 100 Class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

43.     The Court has personal jurisdiction over PayPal, Inc. and PayPal Holdings, Inc. because they maintain their principal places of business in this District, have purposely availed themselves of the privilege of conducting business in this District, and because many of the specific events giving rise to this action, including their deliberate diversion of Affiliate Commissions, occurred in this District.

44.     Venue is proper under 28 U.S.C. § 1391(b)(1) because PayPal resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

45.     The practices described herein were conceived, reviewed, approved, and otherwise controlled from PayPal, Inc. and PayPal Holding's headquarters in San Jose, California.

1  Employees at PayPal's headquarters designed and directed the implementation of the Honey

2  Browser Extension, and the challenged practice of replacing the Affiliate Marketers' Affiliate IDs

3  with PayPal's own Affiliate ID during consumers' checkout process. The Affiliate Commissions

4  were directed from Class members to PayPal in California and PayPal interfered with the

5  contracts and/or business relationships between Class members and Merchants through its

6  employees located in California. In addition, promotional activities and literature regarding

7  Honey were developed and coordinated at, and emanated from, PayPal's California headquarters.

8  **DIVISIONAL ASSIGNMENT**

9  46.    Assignment to the San Jose Division of this Court is proper because Defendants'

10  principal place of business is in San Jose, California.

11  **CHOICE OF LAW**

12  47.    California law governs the substantive legal issues in this case. The State of

13  California has a significant interest in regulating the conduct of businesses operating within its

14  borders.

15  48.    PayPal's principal place of business is California, where it maintains the "nerve

16  center" of its business activities—the place where its high-level officers direct, control, and

17  coordinate the corporation's activities, including its marketing, product development, and major

18  policy, financial, and legal decisions.

19  49.    PayPal's theft of Affiliate Commissions as described herein emanated from and was

20  conceived and executed in California.

21  50.    Under California's choice of law principles, which are applicable to this action, the

22  common law of California applies to the common law claims of the Class members.

23  **FACTUAL ALLEGATIONS**

24  I.    **The Affiliate Marketing Industry**

25  A.    **Affiliate Marketing Is A Rapidly Growing Industry.**

26  51.    As more commerce occurs online, Merchants are turning from traditional forms of

27  marketing and advertising to what is known as affiliate marketing.

28

52.    Affiliate marketing refers to the advertising model where a company compensates Affiliate Marketers for generating traffic or leads to the company's products and services.[2] In exchange for generating leads, the Affiliate Marketers earn Affiliate Commissions when their marketing efforts result in a sale.

53.    The affiliate marketing industry is growing rapidly. In 2016, affiliate marketing had an estimated global market size of $13 billion, which more than doubled to an estimated $32.3 billion in 2024. There are estimates that this market will be worth $48 billion by 2027.[3]

54.    This growth reflects both the reality of today's digital marketplaces and the fact that affiliate marketing "provides a flexible and cost-effective alternative to traditional, pay-up-front marketing strategies. It can help ecommerce businesses cut customer acquisition costs, access niche consumer groups, and boost conversions."[4]

B.    **Affiliate Marketers Are of Central Importance to the Affiliate Marketing Ecosystem.**

55.    The affiliate marketing ecosystem involves three major groups: Merchants, consumers, and Affiliate Marketers. Each plays a specific, interconnected role. Merchants create and sell or resell products and services online to consumers. Consumers purchase products and services from Merchants. And Affiliate Marketers connect consumers and Merchants through Affiliate Marketers' marketing and promotional efforts.

56.    Affiliate Marketers play a crucial role in this system because they gain the trust of their audience, recommend and market products and services, and help consumers purchase a specific product or service from a specific Merchant utilizing an affiliate link. Their audience is

---

[2] *Affiliate Marketer: Definition, Examples, and How to Get Started*, INVESTOPEDIA, Feb. 22, 2025, available at https://www.investopedia.com/terms/a/affiliate-marketing.asp.

[3] Shubham Singh, *115 Affiliate Marketing Statistics (2025) – Market Size & Growth*, DemandSage, Feb. 18, 2025, available at https://www.demandsage.com/affiliate-marketing-statistics/.

[4] Charlotte Muzzi, *Affiliate Marketing Statistics You Can't Ignore in 2025*, SHOPIFY, July 31, 2024, available at https://www.shopify.com/blog/affiliate-marketing-statistics.

aware that clicking on Affiliate Marketers' affiliate links provides income to the Affiliate

Marketers and is a means for consumers to support Affiliate Marketers.

57.     These interconnected roles benefit each group as follows: Merchants receive sales,

consumers receive trusted information about products and Merchants, and Affiliate Marketers

receive Affiliate Commissions when a consumer follows their affiliate links to Merchants'

websites and makes a purchase. Merchants rely on the affiliate link to attribute credit for the sale.

Merchants utilize certain attribution methods including, primarily, "last-click attribution."

Pursuant to that method, Affiliate Marketers receive Affiliate Commissions when their marketing

results in a sale and their link was the last link that a consumer interacted with prior to purchase.

58.     Consumers trust Affiliate Marketers' expertise and authenticity. For example, in a

2021 Nielsen Study, 71% of consumers said that they "trust advertising, opinions and product

placements" from Affiliate Marketers, far more than said they trust other forms of online

marketing such as banner ads, ads on social media networks, ads served on search engine results,

ads on mobile devices, and online video ads.[5]

59.     Merchants also rely heavily on Affiliate Marketers to acquire new customers and

educate customers about their products.

60.     Affiliate Marketers cover all age ranges, with the largest age group (32%) between

35 and 44, the second largest (28%) between 25 and 34, and the third largest (22%) between 45

and 54.[6] The competition between Affiliate Marketers for followers and Affiliate Commissions is

also robust.

---

[5] *Getting closer: Influencers help brands build more personal consumer connections*, Nielsen,
May 2022, available at https://www.nielsen.com/insights/2022/getting-closer-influencers-help-
brands-build-more-personal-consumer-connections/.

[6] Geri Mileva, *Top Affiliate Marketing Statistics for 2023*, Influencer Marketing Hub, Jan. 26,
2024, available at https://influencermarketinghub.com/affiliate-marketing-stats/ ("Although this
information from Statista dates back to a 2016 survey, there is nothing to suggest there has been a
significant demographic change since then.").

61.     All told, as of 2024, affiliate marketing was "responsible for driving 16% of eCommerce sales in Canada and the US."[7]

**C.      The Affiliate Marketing Process in Five Steps.**

62.     The interconnected ecosystem described above generally works in five steps:

63.     *First*, an Affiliate Marketer partners with a Merchant to promote the Merchant's products and services. This partnership is frequently facilitated through an "affiliate network," which is a platform that connects Affiliate Marketers with Merchants. Affiliate Marketers can sign up with an affiliate network to increase the number of Merchants they partner with, when compared to signing up with each Merchant individually. (The relationship may also be run directly by the Merchant, such as Amazon's Amazon Associates program.[8])

64.     *Second*, after the Affiliate Marketer and Merchant agree to work together (either directly or through an affiliate network), the Merchant provides the Affiliate Marketer with an "affiliate link." An affiliate link is a hyperlink that directs a consumer to a Merchant's website where the consumer can purchase the product or service that the Affiliate Marketer is promoting. This affiliate link contains an identifier—their Affiliate ID—that is unique to the Affiliate Marketer. The Merchant uses the Affiliate ID to determine which Affiliate Marketer referred the consumer to the Merchant's site.

65.     *Third*, the Affiliate Marketer promotes the Merchant's product. This can be done in a variety of ways, but it generally involves creating "content"—including websites, videos (including reels, shorts, and livestreams), images, blogs, and social media posts—and distributing it to their online audiences on platforms such as YouTube, Instagram, TikTok, Twitch, and X (formerly Twitter). The Affiliate Marketer includes their affiliate link containing their Affiliate ID with the content promoting the Merchant's product. Creating this content takes time and, often,

---

[7] Emman Zahid, *21 Affiliate Marketing Statistics: Proven Data to Boost Earnings*, TrustPulse, Jan. 7, 2024, available at https://trustpulse.com/2024/01/07/affiliate-marketing-statistics/.

[8] *Amazon Associates - Amazon's affiliate marketing program*, AMAZON, https://affiliate-program.amazon.com/.

money. For example, an Affiliate Marketer who makes primarily video content must plan, stage, shoot, and edit their videos, in addition to planning their posting and promotion schedules. In this ecosystem, Merchants in essence outsource the work of marketing their products to an Affiliate Marketer and pay a fraction of the cost of the advertising (in the form of Affiliate Commissions) only when the advertising results in a sale. Affiliate Marketers use their content to reach new and larger audiences.

66.    *Fourth*, a consumer views the Affiliate Marketer's content and, if interested, clicks on the affiliate link to be directed to the promoted product on the Merchant's website. At this moment, the Merchant stores that Affiliate Marketer's Affiliate ID, typically in the website's persistent cookie storage in the consumer's web browser. Occasionally, undecided consumers may leave the website, view other affiliate content, and eventually come back to the Merchant website via a different Affiliate Marketer's link—in this scenario, that second-in-time Affiliate ID will typically be the one stored in the website's cookie storage.

67.    *Fifth*, as detailed below, when a consumer purchases the product on the Merchant's website, the Merchant uses the Affiliate ID stored in the cookie to credit with the sale the Affiliate Marketer associated with that Affiliate ID and pay them the Affiliate Commission. There are various methods for awarding credit for an online sale to Affiliate Marketers. The primary method used in the industry is "last click attribution," where the Affiliate Marketer who provided the last affiliate link used prior to purchase gets credit for the sale. Affiliate Marketers all know and understand that last click attribution is the primary attribution method.

68.    Thus, after the above five steps are taken, the Merchant has sold one of its products or services, the consumer has obtained the product or service, and the Affiliate Marketer has earned an Affiliate Commission for their work connecting the Merchant and consumer.

## II.    Merchants Use Tracking Mechanisms to Credit Affiliate Marketers for Sales.

### A.    Tracking Mechanisms Rely on Affiliate IDs to Attribute Credit.

69.    Because the transactions at issue in this case occur digitally, participants in the Affiliate Marketing ecosystem use certain digital mechanisms to determine whether an Affiliate Marketer is entitled to an Affiliate Commission.

70.     Specifically, Merchants typically track Affiliate IDs via cookies, URL parameters (the part of the URL following a question mark that contains additional information about a click), tracking tags, or server-side functions to ascertain whether a consumer used an affiliate link to arrive on their web page. Using those tracking mechanisms, Merchants can attribute credit for the purchase to the Affiliate Marketer who referred the consumer to the product.

71.     Each Affiliate Marketer's affiliate link contains their unique Affiliate ID in the URL parameter. The Affiliate ID is a custom alphanumeric string that Merchants use to identify the associated Affiliate Marketer. Merchants rely on the Affiliate ID to credit a particular Affiliate Marketer with Affiliate Commissions for sales of the Merchants' products that result from the Affiliate Marketer's promotion efforts.

72.     In general, affiliate links contain the following components: domain, path/page, and Affiliate ID.[9]



73.     This section addresses the technical details of cookies in the affiliate marketing context because of the prevalence of cookies as a mechanism for affiliate attribution tracking, but other mechanisms of affiliate attribution tracking, such as URL parameters, tracking tags, or server-side functions work analogously.

74.     When a consumer clicks on an affiliate link to navigate to a Merchant's website, a Merchant's website reads the URL parameters and creates a small text file called a "cookie," which is stored within storage dedicated to the consumer's web browser. The cookie contains information about the Affiliate Marketer whose affiliate link the consumer clicked on. The

---

[9] Dibakar Ghosh, *What Are Affiliate Links and How Do They Work?*, AuthorityHacker (Aug. 12, 2024) https://www.authorityhacker.com/what-are-affiliate-links/.

1    Affiliate ID stored within the website's cookie then remains until the cookie expires or is replaced

2    by a subsequent Affiliate ID. When the consumer subsequently makes a purchase from the

3    website, the Affiliate ID is read from the cookie and used to assign the Affiliate Commission for

4    the purchased product to the Affiliate Marketer responsible for the sale.

5    75.    Cookies associated with affiliate links have a set lifespan, which can last from 24

6    hours to 90 days. During that time, cookies store the last Affiliate ID clicked for the various

7    Merchant websites. This set up is designed to capture the scenario where a consumer clicks an

8    affiliate link and navigates to a Merchant's product, closes out of the webpage without purchasing

9    the product, but later returns to the page and purchases the product. So long as the consumer

10   purchases the product within the lifespan of the cookie, the most recent Affiliate Marketer whose

11   link the consumer clicked on to navigate to the Merchant's product will get credit for the sale.

12   **B.    The Industry Uses "Last Click Attribution" to Attribute Credit for A Sale.**

13   76.    There are multiple attribution methods used in the industry to account for the

14   possibility that a consumer clicks on an affiliate link from more than one Affiliate Marketer.

15   77.    Under any attribution method, the goal is for Merchants to fairly credit the

16   Affiliate Marketers who drove the sale of a product, and pay them Affiliate Commissions as

17   earned.

18   78.    The most commonly used attribution method is "last click attribution," in which

19   the Merchant provides an Affiliate Commission for the sale of a product to the Affiliate Marketer

20   associated with the consumer's last-used affiliate link. Last-click attribution has been described as

21   "the industry standard, especially in digital marketing."[10]

22

23

24   _____

25   [10] *First Click v. Last Click Attribution*, Hike, https://hikeseo.co/features/reporting/first-click-vs-last-click-attribution/. *See also Last-Click Attribution Model in Affiliate Marketing*, Affiliboost,

26   https://affiliboost.com/last-click-attribution-model-in-affiliate-marketing/ ("The Last-Click

27   attribution model has become a cornerstone of affiliate marketing for years.").

28

79.    Under this attribution method, all credit for a purchase goes to the Affiliate Marketer whose affiliate link was the final step in a consumer's journey to the Merchant's page where they subsequently completed a purchase.

80.    In the terminology of digital web advertising, "click" refers to the specific act of a consumer clicking on a URL link to an advertised website.

81.    Critically, "last click" in this context does not mean the consumer's literal last click of the mouse in the process of making a purchase—as the last physical device click is, of course, on a button that completes the purchase. Instead, the industry meaning of "click" refers to "navigating from one page to another by activating a hyperlink."[11] Here, "click" refers to a consumer's interaction with a link, in this instance an affiliate link, which takes the consumer to the Merchant's website. A "click" also occurs when a consumer copies and pastes a hyperlink into their URL bar, further demonstrating that "last click" does not refer simply to clicking the mouse.

82.    "Last click" does *not* refer to actions that the consumer takes once they have arrived at the Merchant's website—such as navigating the site, comparing items, entering one's credit card information, address, delivery instructions, and other product specifications such as size/style—after clicking the affiliate link.

83.    After a consumer clicks on an affiliate link, they may open a separate tab to read a product review. If the product review contains a different affiliate link and the consumer clicks on that affiliate link to navigate back to the Merchant's page, the Affiliate Marketer associated with the second-in-time affiliate link will earn the credit for the sale via last click attribution. If,

---

[11] Digital Attribution Primer 2.0, iab, Aug. 2016, at 3 https://iab.com/wp-content/uploads/2016/10/Digital-Attribution-Primer-2-0-FINAL.pdf ("A click is the measurement of navigating from one page to another by activating a hyperlink. Clicks may be broken down into ad clicks, search clicks, affiliate clicks, and possibly other sub-categories.").

however, the consumer returns to the Merchant page *without* clicking a different affiliate link,

then the original affiliate link attributes credit for the sale to the original Affiliate Marketer.

### III.     The Honey Browser Extension

84.     Honey is an Internet browser extension created in October 2012 by Ryan Hudson

and George Ruan.[12] A browser extension—sometimes called a "plug-in" or "add-on"—is a piece

of software that runs within the consumer's web browser and can modify the functionality of all

websites that the browser visits. Often, they are used to add functionality to websites or remove

unwanted website functions, like pop-up ads or usage trackers.[13] Browser extensions are often

easy to download and install onto a web browser. Consumers may download a browser extension

for a variety of purposes: to save passwords, block advertisements, check spelling, or, as in the

case of Honey, purportedly search for coupons when a consumer is at an online retailer's

checkout page.

85.     Within 18 months of its creation, by March 2014, Honey had approximately 1

million users.

86.     In 2015, Honey hired a Head of Partnerships who had experience working with

retailers.[14] Honey began to invest heavily in advertising its product. In or around 2017, Honey

began advertising on podcasts and on YouTube. In other words, Honey partnered with Affiliate

Marketers to promote its product.

---

[12] Samantha Brooks, *How Honey Co-Founder Ryan Hudson Built a $4 Billion Company From a Browser Extension*, CSQ (Mar. 11, 2020), https://csq.com/2020/03/honey-cofounder-ryan-hudson-interview-paypal/.

[13] Ivy Wigmore, Browser Extension, TechTarget, https://www.techtarget.com/whatis/definition/browser-extension.

[14] Samantha Brooks, *How Honey Co-Founder Ryan Hudson Built a $4 Billion Company From a Browser Extension*, CSQ (Mar. 11, 2020), https://csq.com/2020/03/honey-cofounder-ryan-hudson-interview-paypal/.

87.     Between 2019 and 2021, ads for Honey appeared on approximately 400 YouTube channels, including on channels of popular creators with many millions of followers.[15]

88.     Honey understood the value that Affiliate Marketers add to Merchants because it contracted with many Affiliate Marketers, including several of the most successful Affiliate Marketers, to promote its own browser extension.

89.     In addition to working with Affiliate Marketers, Honey worked with numerous affiliate networks to promote the Honey Browser Extension.[16]

90.     Honey's affiliate marketing efforts paid off. By 2020, Honey stated that it had approximately 17 million monthly active users[17] and more than ten thousand Merchant partners.[18] That same year, PayPal purchased Honey for $4 billion.[19]

A.     **PayPal Uses the Honey Browser Extension to Steal Affiliate Commissions from Affiliate Marketers.**

91.     On its website, and in response to the question, "How does Honey make money?", Honey states as follows:

---

[15] *See* Editorial Staff, *Honey Campaign Teardown*, NEOREACH (Jan. 28, 2021), https://neoreach.com/honey/ ("In our Social Intelligence Insights Report for Q3 [2021] Honey landed as the second top spender on YouTube overall and second top spender in the Tech industry on the platform.").

[16] *How Honey Works with Affiliates*, HONEY, https://get.joinhoney.com/business/how-honey-works-with-affiliates/.

[17] *PayPal Completes Acquisition of Honey*, PayPal Investor Relations (Jan. 6, 2020), https://investor.pypl.com/news-and-events/news-details/2020/PayPal-Completes-Acquisition-of-Honey/default.aspx.

[18] Samantha Brooks, *How Honey Co-Founder Ryan Hudson Built a $4 Billion Company From a Browser Extension*, CSQ (Mar. 11, 2020), https://csq.com/2020/03/honey-cofounder-ryan-hudson-interview-paypal/.

[19] *Id.*

> Honey makes commissions from our merchant partners. We earn these commissions when a member uses Honey to find available savings or to activate PayPal Rewards. We work with affiliates to help confirm your purchase, so we can get a commission from the merchant.[20]

92.     What Honey *does not* disclose—to consumers or Merchants—is that it gets its commissions by fraudulently intercepting and replacing affiliate cookies to steal Affiliate Commissions that rightfully belong to Affiliate Marketers. In December 2024, a YouTuber published a widely viewed investigative video exposing Honey's exploitative and deceptive practices.[21]

93.     After PayPal's conduct was first exposed, millions of users reportedly uninstalled the Honey Browser Extension,[22] and major tech news outlets swiftly picked up the story.

94.     *The Verge*, in a December 23, 2024 article, characterized Honey's scheme as a "scam" that "steals money from influencers, including the very ones they paid to promote their product," by hijacking affiliate revenue and often ignoring better coupon codes.[23] Notably, *The Verge*—which had previously recommended the Honey Browser Extension—explicitly disavowed the browser extension: "We've even recommended it here at *The Verge*; now we do not."[24]

---

[20] *How does Honey make money?*, PAYPAL HONEY, https://help.joinhoney.com/article/30-how-does-honey-make-money (last updated Nov. 25, 2024).

[21] *See* MegaLag, *Exposing the Honey Influencer Scam*, YOUTUBE (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk&t=2s.

[22] Ben Schoon, *Honey extension loses 3 million Chrome users after being exposed for shady tactics*, 9TO5GOOGLE (Jan. 3, 2025), https://9to5google.com/2025/01/03/honey-paypal-chrome-extension-lost-users/.

[23] Wes Davis, *Honey's deal-hunting browser extension is accused of ripping off customers and YouTubers* (Dec 23, 2024), https://www.theverge.com/2024/12/23/24328268/honey-coupon-code-browser-extension-scam-influencers-affiliate-marketing.

[24] *Id.*

95.     One of the most significant industry responses to the disclosure of the Honey scam came from Google, which took action to prevent similar schemes on its Chrome browser. In March 2025, Google announced updates to the Chrome Web Store extension policies explicitly targeting the kind of conduct Honey has been engaging in. The new policies prohibit browser extensions like Honey from injecting affiliate links, codes, or cookies without a clear, consumer-initiated action and a "direct and transparent user benefit related to the extension's core functionality."[25] In effect, these changes put Honey and similar browser extensions on notice: injecting or overwriting affiliate links without delivering a genuine, disclosed benefit to consumers now constitutes a violation of Chrome's terms of service.

96.     Cybersecurity researchers and affiliate marketing experts examined Honey's practices in detail, corroborating the recent reports of Defendants' conduct and providing additional context and commentary. Many experts agreed that what Honey was doing amounted to "referral hijacking" or "cookie stuffing," tactics long viewed as unethical and wrongful in the affiliate world, and widely condemned Honey's scheme.[26] For example, a December 2024 article by *Techopedia* reiterated the core allegations that Honey was stealing Affiliate Commissions that rightfully belonged to Affiliate Marketers. This article stressed the deceptiveness of Honey's

---

[25] *Affiliate Ads*, Chrome for Developers, https://developer.chrome.com/docs/webstore/program-policies/affiliate-ads (last visited Apr. 19, 2025).

[26] *See, e.g.*, *The Dark Side of the Honey Browser Extension: Insights into One of the Largest Influencer Scams*, The CyberSec Guru (Dec. 23, 2024), https://thecybersecguru.com/news/honey-browser-extension-dark-side/#:~:text=YouTuber%20Mega%20Lag%E2%80%99s%20investigative%20video,across%20the%20content%20creator%20community ("Honey's rise as a browser extension championed by influencers belies its predatory business practices. From hijacking affiliate earnings to offering subpar savings, Honey operates at the expense of both creators and users.").

behavior, finding it to be "strikingly similar to malware[,]" and concluding that it effectively amounted to "hacking users' browser data, which can be considered an invasion of privacy."[27]

### 1.    The Honey Browser Extension Exploits Attribution Mechanisms to Steal Credit for Sales.

97.    Why is the above so problematic? Affiliate marketing credit typically comes from a "last click," understood within the affiliate marketing industry to be the last "click of an affiliate link" which drives a consumer to the web page containing the product the consumer ultimately buys.[28] So, when a consumer clicks an Affiliate Marketer's affiliate link and is driven to a checkout page for a given product, the "last click attribution" will "belong" to the Affiliate Marketer who drove the consumer to the website where the purchase can be made. Other less frequently-used attribution methods similarly are designed to credit Affiliate Marketers who created the business opportunities for the Merchants.

98.    The Honey Browser Extension interposes itself into this process by surreptitiously fabricating a "click"—i.e., a referral to a Merchant website—where none actually takes place, every time a consumer interacts with the browser extension.

99.    The Honey Browser Extension seeks consumer engagement by pushing various pop-ups to the consumer at checkout that (1) notify the consumer of purportedly applicable coupons; (2) encourage the consumer to activate cashback in the absence of applicable coupons; and (3) offer the option to checkout with PayPal.

---

[27] Ray Fernandez, *Is PayPal's Honey Misleading Users? We Investigate* (Dec. 24, 2024), https://www.techopedia.com/paypal-honey-accused-of-fraud ("Honey is specifically coded to interfere with users' online shopping experiences, particularly during the checkout process. It deliberately removes all traces of the original links that led users to a product and replaces them with its own affiliate ID. This behavior is not an industry standard.").

[28] Ron Berman, *Beyond the Last Touch: Attribution in Online Advertising*, Marketing Science (2018) 37(5):771-792 ("last touch" method is when "the last touchpoint in a sequence of ads prior to conversion gets full credit for the conversion.").

100.    As explained in detail below, when a consumer engages with the Honey Browser Extension in any way, the browser extension creates a hidden tab, iframe, or refresh[29] to surreptitiously load the Merchant's website using PayPal's own affiliate link, thereby substituting PayPal's own affiliate link to take the credit for itself.

101.    Even if a Merchant uses an attribution model other than last click attribution, such as a model that splits Affiliate Commissions among multiple qualifying Affiliate Marketers, Honey's injection of PayPal's own Affiliate ID diverts Affiliate Commission funds to itself and away from the Affiliate Marketer who actually drove the sale.

102.    At least up until the time when the original complaints in this litigation were filed, the Honey Browser Extension swapped out Affiliate IDs even where it failed to find any usable coupon codes.

103.    The spoofed click enables Honey to insert PayPal's own Affiliate ID, which signals to the Merchant that PayPal, rather than the Affiliate Marketer who created the business opportunity, should receive the Affiliate Commission. In reality, neither PayPal nor Honey referred the consumer to the Merchant site at all and PayPal should not be taking an Affiliate Commission for itself. What PayPal is doing is known in the industry as "cookie stuffing."

104.    A 2015 article explains cookie stuffing, such as that employed by Honey, as follows:

> [I]nstead of using the affiliate URL as a clickable link, a fraudulent affiliate may cause the browser to directly fetch her affiliate URL on a page controlled by her without any explicit clicks from the user, thereby tricking the affiliate program into returning a cookie that then identifies the fraudulent affiliate as the referrer for the user's transactions. As a result, not only does an affiliate program pay a non-advertising affiliate, but the fraudulent cookie overwrites any existing affiliate cookie that may have already been present, thereby potentially stealing the commission from a legitimate affiliate. Furthermore, cookie-stuffing fraud is typically completely opaque to an end user and goes against the advertising guidelines issued by the Federal Trade Commission for marketers, which require

---

[29] *The Honey Trap: Hidden Dangers of Cookie Stuffing*, TRAFFICGUARD (Jan. 29, 2025), https://www.trafficguard.ai/blog/the-honey-trap-hidden-dangers-of-cookie-stuffing.

1    declaration of any financial relationship with advertisers.[30]

2    105.    Cookie stuffing can be the basis for criminal activity—in 2014, two influential

3    Affiliate Marketers pled guilty to wire fraud counts after obtaining $35 million from eBay by

4    using cookies to trick eBay into awarding them unearned Affiliate Commissions.[31]

5    **2.    PayPal's Conduct Constitutes Cookie Stuffing.**

6    106.    A representative example of PayPal's scheme is shown below.

7    **a.    Clicking an Affiliate Link to a Merchant Website Sets A Cookie on the Consumer's Browser.**

8    107.    Plaintiff Justin Tech Tips is an Affiliate Marketer with a popular YouTube channel

9    that, among other things, reviews gaming hardware. An example of one of Justin Tech Tips's

10    videos can be found here: https://www.youtube.com/watch?v=Uyhjwtl7jdA&t=3s, which leads to

11    a video entitled "iBUYPOWER and HYTE – What's Coming in 2025?!":

12

13

14

15

16

17

18

19

20

21

22

23

---

24    [30] Neha Chachra, *et al.*, *Affiliate Crookies: Characterizing Affiliate Marketing Abuse*, 1 (2015),

25    https://www.sysnet.ucsd.edu/~voelker/pubs/crookies-imc15.pdf.

26    [31] Jim Edwards, *Marketer Who Defrauded eBay Gets 5 Months in Federal Prison*, Slate (May 3,

27    2014), https://slate.com/business/2014/05/shawn-hogan-ceo-of-digital-point-solutions-and-

28    former-ebay-affiliated-marketer-is-sentenced-to-25000-fine-and-5-months-in-prison.html.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    108.    The description of the video contains a link to a hardware tower case sold by

16  online Merchant "Adorama":

17
18
19
20
21
22
23
24



25    109.    A consumer who clicks on the link can purchase the hardware tower case at the

26  following link:

27  https://www.adorama.com/hycshty7tiww.html?sterm=THeUEuxU2xycUHwXqnR-

28  QQuiUksR5HUFIXd4W00&utm_source=rflaid915793&utm_medium=affiliate

1  110.    The portion of the link containing "rflaid915793" indicates that the referral

2  Affiliate ID is "915793," which is the Affiliate ID for Justin Tech Tips.

3  111.    Clicking that link takes a consumer to the Adorama website, and specifically to the

4  product advertised by Justin Tech Tips in its YouTube video.



112.    When the consumer clicks the link, Adorama's web server reads the Affiliate ID

parameter in the URL and stores it in a cookie. This Affiliate ID tells Adorama which website

sent the consumer to its site, and which affiliate link was used. The Affiliate ID is highlighted in

the URL, and also reproduced here, where "915793" is Justin Tech Tips's Affiliate ID:



113.    At this point, an affiliate cookie has been created and stored in the cookie storage

for Adorama within the consumer's browser. In the industry, the directory where cookies are

stored on the consumer's computer, accessible only by their web browser, is referred to as the

"cookie jar." When a consumer clicks an affiliate link, the cookie containing the Affiliate ID for

the Affiliate Marketer—in this example, Justin Tech Tips—is stored in the consumer's cookie jar.

114.    Consumers can view their stored cookies—i.e., the contents of their "cookie jar" —in most browsers. For example, a Google Chrome browser extension "Global Cookie Manager" illustrates the cookie that stores Justin Tech Tips's Affiliate ID as displayed in the following image.



115.    If a transaction is completed and this cookie is properly stored within the cookie jar—as it is here—then Justin Tech Tips gets the Affiliate Commission. The process is relatively simple: a link is clicked, a cookie containing Justin Tech Tips's Affiliate ID is placed in the consumer's browser, and then when the sale goes through, the Merchant reads the Justin Tech Tips cookie and awards an Affiliate Commission to Justin Tech Tips.

116.    Without outside interference, the end result is the transaction that the consumer, Affiliate Marketer, and Merchant contemplated: the consumer purchased a good or service through a Merchant website using an affiliate link designed to relay a percentage of that purchase to the Affiliate Marketer.

117.    If a consumer were to click the Justin Tech Tips affiliate link, and then, two days later, click another Affiliate Marketer's affiliate link for the same product, the later-in-time

Affiliate Marketer's cookie would be placed in the cookie jar and that "last clicked" Affiliate Marketer would get the credit.

### b. The Honey Browser Extension Tracks Consumers' Browsing Behavior.

118.    Honey, however, interposes itself in this process and takes the credit, and thus the Affiliate Commission, for the sale. It does so even where it unequivocally did *not* drive the consumer to the Merchant website. At least until the time the original complaints in this litigation were filed, Honey did so even where it found no applicable coupons or cashback rewards.

119.    When a consumer downloads the Honey Browser Extension, the installation process grants the browser extension a set of "permissions"; i.e., what the extension is allowed to do to the consumer's device. The Honey Browser Extension implicitly promises the consumer that they will get discounts broadly in exchange for granting this broad set of permissions.

120.    The permissions granted to the Honey Browser Extension are extensive and far beyond what would be needed to deliver a coupon-searching tool. Due to a so-called "Wildcard" permission, denoted by a set of symbols "*://*/*", the Honey Browser Extension is able to access all domains—i.e., websites—that a consumer accesses, along with all "subdomains" on those sites. This means that the Honey Browser Extension, unbeknownst to the consumer, is able to operate in the background—accessing pages or, critically, creating pages—even where a consumer does not navigate to them. PayPal uses the Honey Browser Extension code to do at least the following:

- **Cookies**: Query and modify cookies, and be notified when they change;

- **webRequest**: observe and analyze web traffic, and block or modify incoming web traffic (i.e., signals sent from other computers over the Internet to the consumer's computer);

- **scripting**: the Honey Browser Extension can execute script, meaning it can run a sequence of instructions, or code, or perform specific tasks (i.e., follow the steps provided for it in a piece of computer code);

- **Storage**: store, retrieve, and track changes to consumer data; and

- **Alarms**: schedule code to run periodically or at a specified time

121.    Importantly, the Honey Browser Extension operated identically on all major available browsers, including Google's Chrome, Microsoft's Edge, Mozilla's Firefox, and Apple's Safari.

122.    Developer tools on the web browser show the activities a browser extension engages in. A screenshot of those developer tools appears here:



123.    The above screenshot describes the data being requested in the background by the Honey Browser Extension. The term "evs," highlighted at the bottom left of the above screenshot, represents a set of "events" tracked and logged by the Honey Browser Extension on its server at https://s.joinhoney.com/evs.

124.    Clicking "Payload" reveals the data the Honey Browser Extension is sending to its
server:



125.    In the context of a web developer tool like this one, "payload" means the data sent
by the browser. Here, the developer tools reveal that, among the other "payloads" —i.e., sets of
data the extension is seeking and receiving—is information from a "referrer url" associated with
Adorama:



126.    The information is logged with a particular "session id.," making it traceable for
PayPal. The line labeled "referrer url" contains a lengthy string of letters and numbers
(reproduced here over two lines due to its size), and which reads in full as follows:

127.    The referring url contains the Justin Tech Tips Affiliate ID—"915793"—and shows the Honey Browser Extension tracking and logging the consumer's web traffic, including and especially the traffic that indicates whether an Affiliate ID is already applied, as it is here. In other words, as shown in the developer tools, the Honey Browser Extension is *tracking* and *logging* consumer activities, including where on the internet the consumer is navigating their web browser. Thus, the Honey Browser Extension creates a record each time it replaces an Affiliate Marketer's Affiliate ID with PayPal's own Affiliate ID.

c.    **When A Consumer Interacts with The Honey Browser Extension, it Replaces the Affiliate Marketer's Affiliate ID with Honey's Own Affiliate ID.**

128.    Continuing with the above example, a consumer who has installed the Honey Browser Extension, and who has clicked the Justin Tech Tips affiliate link for the Adorama product described above, will be sent to the following checkout page for the product:



129.    The "Activate Cashback" overlay and accompanying animated graphic in the above screenshot appears (i.e., pops-up) if the consumer has the Honey Browser Extension is installed.

1    130.    After a consumer clicks on the "Activate Cashback" button, Honey claims that the

2    consumer has successfully activated cashback:



131.    In reality, the Honey Browser Extension uses its permissions to surreptitiously open up a discrete, hard-to-see/hidden tab to the left of all other tabs, denoted by just a small icon:



132.    The hidden tab only appears for a few seconds, and then automatically disappears. The hidden tab loads the generic homepage of the Merchant's website, with its own Affiliate ID appended as a URL parameter, before disappearing.

133.    In this scenario, by automatically launching the hidden tab for a few seconds, the Honey Browser Extension has inserted PayPal's own Affiliate ID into the URL and replaced the Affiliate ID of the original Affiliate Marketer. The opening of this hidden tab also opens the Adorama website, and so the Adorama website reads the URL parameters and stores that parameter into the cookie store, replacing the Justin Tech Tips Affiliate ID ("915793") with Paypal's own Affiliate ID, "914539".

134.    After a few seconds, the "hidden tab" will disappear, while all previous tab(s) remain open. Thus, Paypal has surreptitiously replaced the previous Affiliate Marketer's Affiliate ID with its own Affiliate ID.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:24-CV-9470-BLF

135.    PayPal's Affiliate ID, which replaces the Affiliate Marketer's Affiliate ID, is
tracked in the developer tools view:

×   Headers   Payload   Preview   Response   Initiator   Timing   Cookies

▶ 3: {client_ts: 1746243302073, referrer_url: "https://www.adorama.com/Als.Mvc/CartView",…}
▶ 4: {client_ts: 1746243362674, referrer_url: "https://www.adorama.com/Als.Mvc/CartView", action: "show",…}
▶ 5: {client_ts: 1746243363761, store: {id: "8", session_id: 1746242204164}, code: "ext004002",…}
▶ 6: {client_ts: 1746243363767, store: {id: "8", session_id: 1746242204164},…}
▶ 7: {client_ts: 1746243363767, store: {id: "8", session_id: 1746242204164},…}
▶ 8: {client_ts: 1746243367967,…}
▶ 9: {client_ts: 1746243368116,…}
▶ 10: {client_ts: 1746243368172, experiment_name: "droplist_ocs_collections_popup:1",…}
▶ 11: {client_ts: 1746243368173, experiment_name: "personalized_offers_for_unauth_users:6",…}
▶ 12: {client_ts: 1746243368173, experiment_name: "web_shipping_in_comparisons:11",…}
▶ 13: {client_ts: 1746243368174, experiment_name: "ext_top_pick_savings_dollar:2", variant_name: "control",…}
▶ 14: {client_ts: 1746243368174, experiment_name: "ext_atlas_mismatch:2", variant_name: "control",…}
▶ 15: {client_ts: 1746243368175,…}
▶ 16: {client_ts: 1746243368176,…}
▶ 17: {client_ts: 1746243368182, product_id: "",…}
▶ 18: {client_ts: 1746243368185,…}
▶ 19: {client_ts: 1746243368186,…}
▶ 20: {client_ts: 1746243368187,…}
▶ 21: {client_ts: 1746243368188,…}
▶ 22: {client_ts: 1746243368188,…}
▶ 23: {client_ts: 1746243368225,…}
▶ 24: {client_ts: 1746243368881,…}
▼ 25: {client_ts: 1746243369456,…}
   client_ts: 1746243369456
   code: "ext009009"
  ▶ extension: {screenview_id: "9156293389823742937"}
   is_initial_observation: true
   is_logged_in: true
   products: []
   reason: " For more information, please visit www.joinhoney.com/data-and-privacy."
   referrer_url: "https://www.adorama.com/?sterm=THeUEuxU2xycUHwXqnR-QQuiUksR5C2NIXd4W00&utm_source=rflaid914539&utm_medium=affiliate"
   session_id: 1746417954813
  ▶ store: {id: "8", session_id: 1746242204164}
   tab_id: 120609200
   use_deterministic_parent_id: false
  ▶ where_am_i: {title: null, price: null, categories: [], keywords: [], images: [], group_lookup: null,…}
exv: "ch.17.1.1.918123480872749713368.9142738122918036102"
src: "extension"

136.    The Honey Browser Extension uses the hidden tab to create the illusion that
PayPal referred the consumer to Adorama. Adorama registers a referral to it from PayPal as if the
consumer had intentionally come back to the site a second time through a referral from PayPal. In
other words, the Merchant's website treats the created URL as a second-in-time referral and
replaces the Affiliate ID of the Affiliate Marketer who generated the sale with PayPal's Affiliate
ID on the consumer's browser.

137.    The result is a "stuffing" of the cookie jar on the consumer's web browser.

138.    This process works the same on other browsers including at least Microsoft Edge,
Safari, and Firefox.

139.    This process also works the same regardless of whether the Honey Browser
Extension is actually offering consumers any coupons or discounts, cashback rewards, or the
option to pay with PayPal. At least through the time the original complaints in this litigation were
filed, the Honey Browser Extension engaged in this cookie stuffing even where the Honey

Browser Extension found no coupons and offered no cashback rewards, and even where consumers dismissed the pop-up with no other action.

140.    Because this process works the same even when the Honey Browser Extension tells consumers that there is not a better coupon or deal, Honey discourages consumers from independently seeking better deals. Honey falsely assures them that they have already received the best offer when, in fact, superior discounts may exist elsewhere online. Indeed, Honey's FAQs reassure Merchants that they "have control over the content hosted on the Honey platform" and can "[s]imply reach out to [the] Honey Partnerships Team to update the codes and promotions currently being hosted." In some such instances, Honey knowingly suppresses better coupons or deals that are available. None of this affects how Honey does its cookie stuffing. Honey engages in this process, and steals Affiliate Marketers' Affiliate Commissions, in these instances as well.

141.    Following the publication of the widely viewed YouTube video in December 2024, and the filing of the original complaints in this litigation, Honey apparently made changes to its practices. Testing of the Honey Browser Extension in March 2025 revealed that it no longer (as it did before) replaces a preexisting Affiliate ID with PayPal's own where the extension offered no coupons or cashback and a consumer dismissed the popup.[32]

---

[32] Ben Schoon, *Honey extension loses 3 million Chrome users after being exposed for shady tactics*, 9TO5GOOGLE (Jan. 3, 2025), https://9to5google.com/2025/01/03/honey-paypal-chrome-extension-lost-users/.

142.     Testing of the Honey Browser Extension in May 2025 also revealed that Honey apparently made further changes to its pop- ups in 2025, after the filing of the original complaints in this litigation. Specifically, under the changes, when a consumer navigates to a Merchant website using an affiliate link, Honey now (unlike before) sometimes pushes a pop-up stating that "Honey is disabled on this site" and that this "can happen if you interact with another coupon or rewards program." The pop-up encourages the consumer to "re-activate Honey and earn your rewards." After a consumer clicks "Activate Honey," the Honey Browser Extension then replaces the preexisting Affiliate ID with PayPal's own and takes the credit and Affiliate Commission for the sale (i.e., just as it did previously, before this recent pop-up change).



143.     Honey's hidden-tab creation is a commercially unreasonable manipulation of tracking cookies for profit: Honey causes a "browser to directly fetch" an "affiliate URL on a page controlled by [the extension] without any explicit clicks by the user." In doing so, Honey wrongfully overwrites the legitimate Affiliate Marketer's Affiliate ID in the consumer's cookie jar, and replaces it with PayPal's own Affiliate ID.

**B.    PayPal's Conduct is Traceable Through its Own Records and Statistical Analysis.**

144.    PayPal receives an Affiliate Commission every time it uses the Honey Browser Extension to swap out a legitimate Affiliate ID with PayPal's own. Honey also states that it uses the Honey Browser Extension to transmit a log record of activities as they occur: "The extension reports back certain events to let us know when a consumer interacts with it or performs an action on a site that we support."[33] These financial and computer records in aggregate should form a complete, detailed record of PayPal's theft.

145.    In addition to PayPal's own records, its theft of Affiliate Commissions is traceable through statistical evidence. This evidence shows that it is a near statistical certainty that PayPal stole at least one Affiliate Commission from all Affiliate Marketers with at least 50 purchases for which they were eligible to receive an Affiliate Commission.

146.    Plaintiffs conducted a statistical analysis using a "Monte Carlo" simulation, a way to model the probability of different outcomes given the risk of unknown variables.[34] The simulation functions like a series of weighted coin flips. By using publicly available, limited data, the simulation determines the probability that a particular event occurred in the absence of discovery.

147.    Here, Plaintiffs ran a Monte Carlo simulation for sets of 1,000 sales involving affiliate links. The simulation took into account a number of variables, including the number of eligible purchases, the size of the internet audience, the share of US-based versus international activity, the prevalence of different internet browsers (such as Chrome, Firefox, or Edge), and the prevalence of the Honey Browser Extension. The simulation included a sensitivity analysis measuring the impact of the "swap probability"—the probability that the Honey Browser Extension performed the Affiliate ID swap described above. Based on these variables, the

---

[33] *Honey's Data Collection Policies Explained*, HONEY (Oct. 30, 2019), https://www.joinhoney.com/data-and-privacy.

[34] Will Kenton, *Monte Carlo Simulation: What It Is, How It Works, History, 4 Key Steps*, INVESTOPEDIA (June 27, 2024), https://www.investopedia.com/terms/m/montecarlosimulation.asp.

1    simulation calculated the likelihood that PayPal used the Honey Browser Extension to steal an

2    Affiliate Commission.

3          148.    This analysis demonstrates that for Affiliate Marketers who were eligible to

4    receive an Affiliate Commission on only 50 purchases, if Honey swaps Affiliate IDs at every

5    opportunity, there is a 98.4% likelihood that PayPal used Honey to steal at least one Affiliate

6    Commission. For an Affiliate Marketer with 100 eligible purchases, there is a 100% likelihood

7    that PayPal used the Honey Browser Extension to steal at least one Affiliate Commission. In

8    other words, all 1,000 simulations under this scenario showed at least one Affiliate Commission

9    stolen by the Honey Browser Extension.

10         149.    On information and belief, the Honey Browser Extension swaps out Affiliate IDs

11   essentially every time it is activated, except on certain websites (such as Amazon) where the

12   Honey Browser Extension does not fully activate and where Plaintiffs cannot yet prove what

13   happens when affiliate information is stored on the server side. Nevertheless, to account for the

14   possibility that the Honey Browser Extension replaces Affiliate IDs less than 100% of the time,

15   Plaintiffs performed a sensitivity analysis to test scenarios in which the Honey Browser Extension

16   replaced Affiliate IDs only 50%, 60%, 70%, 80%, or 90% of the time, as set out in Figure 1 under

17   the "Swap Probability" column. The "Number Affected" column represents a rounded 95%

18   upper-bound on the number of affected Affiliate Commissions using the variability seen in the

19   simulation analysis.

20         150.    The results of this analysis show that even if the Honey Browser Extension swaps

21   in PayPal's Affiliate ID only 50% of the time, there is an 83% likelihood that the Honey Browser

22   Extension stole at least one Affiliate Commission from an Affiliate Marketer with 50 eligible

23   purchases, and a 97.2% chance for an Affiliate Marketer with 100 eligible purchases.

| Affiliate Purchases | Swap Probability | Affected Probability | Number Affected (Mean) | Number Affected (95% UB) |
|---|---|---|---|---|
| **50** | **50%** | **83.0%** | **1.78** | **4** |
| 50 | 60% | 89.4% | 2.11 | 5 |
| 50 | 70% | 93.7% | 2.52 | 6 |
| 50 | 80% | 94.4% | 2.77 | 6 |
| 50 | 90% | 96.2% | 3.27 | 7 |
| **50** | **100%** | **98.4%** | **3.59** | **7** |
| **100** | **50%** | **97.2%** | **3.61** | **7** |
| 100 | 60% | 98.6% | 4.29 | 8 |
| 100 | 70% | 99.1% | 4.87 | 9 |
| 100 | 80% | 99.5% | 5.57 | 10 |
| 100 | 90% | 100.0% | 6.41 | 11 |
| 100 | 100% | 100.0% | 7.15 | 12 |

151.    Every Plaintiff listed below had at least one hundred eligible purchases over the past five years.

**C.    PayPal Knew It Was Using The Honey Browser Extension to Steal Affiliate Commissions.**

152.    PayPal knew that the Honey Browser Extension is designed to monitor and contemporaneously log detailed information about a consumer's browsing activity, including the full-string URL of each web page visited by a consumer. From these URLs, PayPal knew when a consumer navigated to a specific Merchant's website using a specific Affiliate Marketer's affiliate link.

153.    PayPal understood that the Honey Browser Extension is designed to inject a hidden tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with or displaced by PayPal's Affiliate IDs. Among other things,

1   PayPal knew that when a consumer navigated to a Merchant's website using a specific Affiliate

2   Marketer's affiliate link and the Honey Browser Extension was activated, the Honey Browser

3   Extension would use hidden processes to overwrite or displace the Affiliate Marketer's Affiliate

4   ID with PayPal's Affiliate ID, resulting in PayPal, rather than the Affiliate Marketer, being

5   assigned credit for the sale and awarded any Affiliate Commission, or allowing PayPal to

6   wrongly claim a portion of the Affiliate Commission that it did not earn.

7           **D.    PayPal Has Harmed Plaintiffs.**

8           154.    **Gymcaddy** is owned and operated by Alexis Herrera ("Mr. Herrera"), an Affiliate

9   Marketer who has had a platform on YouTube for about nine years.

10          155.    On YouTube alone, Gymcaddy's channel "gymcaddy" has about 160,000

11  subscribers. The channel features reviews for tech gadgets, including headphones, earbuds, and

12  speakers. Gymcaddy also publishes posts on its own website, Gymcaddy.net.

13          156.    Mr. Herrera invests substantial time and effort into cultivating Gymcaddy's

14  follower base, searching for the best deals from Merchants, and promoting those deals online.

15          157.    Gymcaddy partners with Merchants to promote their products to its online

16  audience. As part of that relationship, Gymcaddy receives Affiliate Commissions when

17  consumers buy products recommended by Gymcaddy by using its affiliate link.

18          158.    Gymcaddy regularly partners with or otherwise promotes the products of a number

19  of popular Merchants through its affiliate links, both directly and indirectly. For example,

20  Gymcaddy has been part of the Amazon Influencer affiliate network for approximately four

21  years, the CJ affiliate network for less than one year, the Howl affiliate network for

22  approximately two years, and the Impact affiliate network for less than one year, and has

23  promoted products from Merchants through those networks. Additionally, Gymcaddy has direct

24  relationships with Merchants to promote their products, including Amazon, Sony, JBL, and

25  Harmon, with which it has partnered with for at least two years. Gymcaddy intends to continue

26  creating affiliate marketing content and partnering with many, if not all, of these Merchants in the

27  future.

28

159.    Gymcaddy generates tens of thousands of transactions and about a hundred thousand dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

160.    Gymcaddy would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Gymcaddy generated with its affiliate links.

161.    **Motion Butter** is owned and operated by Andrew Tiu ("Mr. Tiu"), an Affiliate Marketer who has had a platform on YouTube for over eight years.

162.    On YouTube alone, Motion Butter's channel "dadverb" has 185,000 subscribers. The channel features content for new parents and young families from a dad's perspective. Motion Butter also has "dadverb" accounts on Instagram and TikTok.

163.    Mr. Tiu invests substantial time and effort into cultivating Motion Butter's follower base, searching for the best deals from Merchants, and promoting those deals online.

164.    Motion Butter partners with Merchants to promote their products to its online audience. As part of that relationship, Motion Butter receives Affiliate Commissions when consumers buy products recommended by Motion Butter by using its affiliate links.

165.    Motion Butter regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links. For example, Motion Butter has been a part of the Amazon, Impact, ShareASale, MagicLinks, Rakuten, Grin, Social Snowball, and Shopify affiliate networks for over two years, and has promoted products from Merchants such as Amazon, Graco, Logitech, BuyBuy Baby and Newton Baby through those networks. Motion Butter intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

166.    Motion Butter generated over 10,000 transactions and tens of thousands of dollars in Affiliate Commissions over the past five years through affiliate marketing with its Merchant partnerships and affiliate marketing.

167.    Motion Butter would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey

Browser Extension, PayPal stole credit for sales that Motion Butter generated with its affiliate links.

168.    **Dan Becker** is owned and operated by Dan Becker ("Mr. Becker"), an Affiliate Marketer who has had a platform on YouTube for over seven years.

169.    On YouTube alone, Dan Becker's channel "DanBecker" has over 450,000 subscribers. The channel features reviews for backpacking and hiking products. Dan Becker also has accounts on Instagram, TikTok, and Facebook, and publishes posts on his own website, www.danbeckeroutdoors.com.

170.    Mr. Becker invests substantial time and effort into cultivating Dan Becker's follower base, searching for the best deals from Merchants, and promoting those deals online.

171.    Dan Becker partners with Merchants to promote their products to its online audience. As part of that relationship, Dan Becker receives Affiliate Commissions when consumers buy products recommended by Dan Becker by using its affiliate link.

172.    Dan Becker regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. For example, Dan Becker has been part of the Avantlink affiliate network for approximately six years, the ShareASale and Shopify affiliate networks for approximately four years, and the Impact affiliate network for approximately two years, and has promoted products from Merchants such as Amazon, REI, and Backcountry.com through those networks. Additionally, Dan Becker has direct relationships with Merchants to promote their products, including Backcountry.com, with which it has partnered for approximately six years, and REI, with which it has partnered for approximately two years. Dan Becker intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

173.    Dan Becker generates about 5,000 transactions and over a hundred thousand dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

174.    Dan Becker would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey

Browser Extension, PayPal stole credit for sales that Dan Becker generated with its affiliate links.

175.    **Angry Snowboarder** is owned and operated by Avran LeFeber ("Mr. LeFeber"), an Affiliate Marketer who has had a platform on YouTube for eight years and was blogging using Affiliate Commissions for eleven years before starting his YouTube Channel.

176.    On YouTube alone, the Angry Snowboarder channel has over 53,000 subscribers. The channel features reviews for snowboards, bindings, boots, and other snowboard accessories. Angry Snowboarder also has accounts on Discord, Patreon, Facebook, and Instagram, and previously published posts on its own website, https://angrysnowboarder.com.

177.    Mr. LeFeber invests substantial time and effort into cultivating Angry Snowboarder's follower base, reviewing equipment, and promoting this equipment online.

178.    Angry Snowboarder partners with Merchants to promote their products to its online audience. As part of that relationship, Angry Snowboarder receives Affiliate Commissions when consumers buy products recommended by his channel and social media posts.

179.    Angry Snowboarder regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Amazon, Blauer Board Shop, REI, Evo, Christy Sports, and several more. Angry Snowboarder intends to continue partnering with many, if not all, of these Merchants in the future.

180.    Angry Snowboarder has generated thousands of transactions and over the past few years has earned over $100,000 dollars in Affiliate Commissions through affiliate marketing with its Merchant partnerships.

181.    Angry Snowboarder would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Angry Snowboarder generated with its affiliate links.

182.    **Brevard Marketing** is owned and operated by Charles A. and Tina Graudins "the Graudins"), Affiliate Marketers who have had platforms on YouTube for over five years. Brevard

Marketing's YouTube channels are branded as "admtim," "craftwithfelicia," and "freshandfelicia".

183.    On YouTube alone, Brevard Marketing's channels collectively have almost 95,000 subscribers. The "admtim" channel features travel-related merchandise, the "freshandfelicia" channel features general merchandise (from electronics to kitchen gadgets), and the "craftwithfelicia" channel features crafts (with an emphasis on custom printing). Brevard Marketing also has accounts on Amazon, YouTube, Instagram, TikTok, and Facebook under the same branding, and publishes posts on its own website, www.freshandfelicia.com.

184.    The Graudins invest substantial time and effort into cultivating Brevard Marketing's follower base, searching for the best deals from Merchants, and promoting those deals online.

185.    Brevard Marketing partners with Merchants to promote their products to its online audience. As part of that relationship, Brevard Marketing receives Affiliate Commissions when consumers buy products recommended by Brevard Marketing by using its affiliate links.

186.    Brevard Marketing regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. For example, Brevard Marketing has been a part of the Amazon, YouTube, ShareASale, Impact, and GoAffPro affiliate networks for over three years, and has promoted products from Merchants such as Heybike, Annioki, Xtool, WeCreat, Velotric, and Aeon Laser USA through those networks. Additionally, Brevard Marketing has direct relationships with Merchants to promote their products, including Amazon, Critcut, HTvront, Rode, WeCreat, and Xtool. Brevard Marketing has promoted products from Amazon for approximately 15 years, promoted products from Critcut for approximately five years, promoted products from HTvront, WeCreat, and Xtool for approximately three years, and promoted products from Rode for approximately two years. Brevard Marketing intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:24-CV-9470-BLF

187.    Historically, Brevard Marketing has generated about 150,000 transactions and tens of thousands of dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

188.    Brevard Marketing would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Brevard Marketing generated with its affiliate links.

189.    **Mr. Lachman** is an Affiliate Marketer who has had a platform on YouTube for about fourteen years.

190.    On YouTube alone, Mr. Lachman's channel "dannypops" has over 46,000 subscribers. The channel features audio speaker reviews. Mr. Lachman also has accounts on Instagram, BlueSky, and TikTok, and publishes posts on his own website, https://www.dannypops.com/.

191.    Mr. Lachman invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

192.    Mr. Lachman partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Lachman receives Affiliate Commissions when consumers buy products recommended by Mr. Lachman by using his affiliate link.

193.    Mr. Lachman regularly partners with or otherwise promotes the products of popular Merchants through his affiliate links. For example, Mr. Lachman has been part of the Amazon, eBay, Howl, and ShareASale affiliate networks for approximately three years, and has promoted products from Merchants such as Soundcore and Sony through those networks. Mr. Lachman intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

194.    Mr. Lachman generates thousands of transactions and tens of thousands of dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

195.    Mr. Lachman would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Lachman generated with his affiliate links.

196.    **Gamers Nexus** is owned and operated by Stephen Burke ("Mr. Burke"), an Affiliate Marketer who has had a platform on YouTube since 2009.

197.    On YouTube alone, Gamers Nexus's channel "GamersNexus" has nearly 2.5 million subscribers. The channel features consumer purchasing advice related to the quality of gaming computer hardware and consumer electronics. Gamers Nexus also has an account on Twitter/X and publishes posts on its own website, https://gamersnexus.net/.

198.    Mr. Burke invests substantial time and effort into cultivating Gamer's Nexus's follower base, searching for the best deals from Merchants, and promoting those deals online.

199.    Gamers Nexus partners with Merchants to promote their products to its online audience. As part of that relationship, Gamers Nexus receives Affiliate Commissions when consumers buy products recommended by Gamers Nexus by using its affiliate link.

200.    Gamers Nexus regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Amazon and Newegg. Gamers Nexus has partnered with and/or promoted products from Amazon for over ten years and has partnered with and/or promoted products from Newegg for the last two years. Gamers Nexus intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

201.    Gamers Nexus generates about 45,000 transactions and tens of thousands of dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

202.    Gamers Nexus would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Gamers Nexus generated with its affiliate links.

203.    **Mr. Sistek** is an Affiliate Marketer who has had a platform on YouTube for about four years.

204.    On YouTube alone, Mr. Sistek's channel "ToolDemos" has over 140,000 subscribers. The channel features instructional videos for auto repair and reviews of auto repair tools. Mr. Sistek also has an account on Instagram.

205.    Mr. Sistek invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

206.    Mr. Sistek partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Sistek receives Affiliate Commissions when consumers buy products recommended by Mr. Sistek by using his affiliate link.

207.    Mr. Sistek regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links, both directly and indirectly, including Amazon, Walmart, eManual Online, ThinkCar, Kingbolen, and Gooloo. For example, Mr. Sistek has been part of the ShareASale affiliate network for approximately three years and part of YouTube shopping for approximately two years, through which he has promoted products from Merchants such as Walmart. Additionally, Mr. Sistek has direct relationships with Merchants to promote their products, including eManual online, ThinkCar, Kingbolen, and Gooloo. Mr. Sistek intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

208.    Mr. Sistek generates hundreds of transactions and thousands of dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

209.    Mr. Sistek would have earned more in commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Sistek generated with his affiliate links.

210.    **Storm Productions** is owned and operated by Hayley Storm Corwick ("Ms. Corwick"), an Affiliate Marketer who has had a platform on Instagram, Twitter, and Facebook for

several years and has operated the website madisonavenuespy.com since 2008. Collectively, these social media channels are branded as "Madison Avenue Spy."

211.    The Madison Avenue Spy Instagram alone has approximately 115,000 followers, and the account features the best deals in the world of fashion. Storm Productions also has accounts on TikTok, X (formerly Twitter), Facebook, Pinterest, and Telegram. In addition to these platforms, Storm Productions publishes posts on its own website, madisonavenuespy.com, which has nearly 22,000 subscribers and generates significant traffic by featuring the best deals in the fashion world.

212.    Ms. Corwick invests substantial time and effort into cultivating Storm Production's follower base, searching for the best fashion deals from Merchants, and promoting those deals online.

213.    Storm Productions partners with Merchants to promote their products to its online audience. As part of that relationship, Storm Productions receives Affiliate Commissions when consumers buy products recommended by Storm Productions by using its affiliate link.

214.    Storm Productions regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Nordstrom, Saks Fifth Avenue, Ulta, and Sephora. Storm Productions has partnered with and/or promoted products from these Merchants for several years. Storm Productions intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

215.    For years, Storm Productions has earned substantial commissions and generated thousands of transactions. In the past year alone, Madison Avenue Spy has earned over $200,000 in Affiliate Commissions through affiliate marketing with its Merchant partnerships and affiliate marketing.

216.    Storm Productions would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Storm Productions generated with its affiliate links.

217.    **Red Beard Studios** is owned and operated by Jeff King ("Mr. King"), an Affiliate Marketer who has had a platform on YouTube for over five years, along with his wife, Jesse King.

218.    On YouTube alone, Red Beard Studio's channel "TheDenofTools" has over 300,000 subscribers. The channel features reviews for tools and content relating to do-it-yourself projects. Red Beard Studios also has an account on Facebook.

219.    Mr. King invests substantial time and effort into cultivating Red Beard Studio's follower base, searching for the best deals from Merchants, and promoting those deals online.

220.    Red Beard Studios partners with Merchants to promote their products to its online audience. As part of that relationship, Red Beard Studios receives Affiliate Commissions when consumers buy products recommended by Red Beard Studios by using its affiliate link.

221.    Red Beard Studios regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links. For example, Red Beard Studios has partnered with Amazon Associates for more than ten years and Walmart, Ace Hardware, ACME, and Home Depot for approximately four years. Red Beard Studios intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

222.    Red Beard Studios generates 1 million transactions and $80,000 in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

223.    Red Beard Studios would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Red Beard Studios generated with its affiliate links.

224.    **Mr. Tomasko** is an Affiliate Marketer who has had a platform on YouTube for about thirteen years.

225.    On YouTube alone, Mr. Tomasko's channel "ElectricShock14" has over 130,000 subscribers. The channel features energy drink product reviews, as well as other product reviews.  Mr. Tomasko also has accounts on Instagram, TikTok, Twitter/X, and Twitch.

226.    Mr. Tomasko invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

227.    Mr. Tomasko partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Tomasko receives Affiliate Commissions when consumers buy products recommended by Mr. Tomasko by using his affiliate link.

228.    Mr. Tomasko regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links, both directly and indirectly. For example, Mr. Tomasko has been part of the Impact network for approximately five years and part of the Grin network for approximately two years, and previously was part of the SharePTS network for approximately two years, and has promoted products from Merchants such as SteelSeries and GFUEL through those networks. Mr. Tomasko intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

229.    Mr. Tomasko generates approximately 20,000 transactions and about a hundred thousand dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

230.    Mr. Tomasko would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Tomasko generated with his affiliate links.

231.    **Mr. Ventura** is an Affiliate Marketer who has had platforms on YouTube, X (formerly Twitter), Twitch, and Reddit for approximately six years. The YouTube, X, and Twitch social media channels are branded as "Redmist2033" while the Reddit and Discord channels are branded as "GFUEL."

232.    The "Redmist 2033" social media channels collectively have nearly 4,500 followers, and the accounts feature reviews and content relating to gaming and e-sports. The "GFUEL" social media channels collectively have nearly 29,000 followers, and the accounts feature reviews and discussions of GFUEL products.

233.    Mr. Ventura invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

234.    Mr. Ventura partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Ventura receives Affiliate Commissions when consumers buy products recommended by Mr. Ventura by using his affiliate link.

235.    Mr. Ventura regularly partners with or otherwise promotes the products of popular Merchants through his affiliate links, both directly and indirectly. For example, Mr. Ventura has been part of the Amazon affiliate network for approximately six years, and has promoted products from Merchants such as GFUEL through that network. Additionally, Mr. Ventura has had a direct relationship with GFUEL for over three years. Mr. Ventura intends to continue creating affiliate marketing content and partnering with GFUEL in the future.

236.    Mr. Ventura has generated over 5,000 transactions and over ten thousand dollars in Affiliate Commissions over the past few years through affiliate marketing with his Merchant partnerships and affiliate marketing.

237.    Mr. Ventura would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Ventura generated with his affiliate links.

238.    **Gents Scents** is owned and operated by Thomas Kirkland ("Mr. Kirkland"), an Affiliate Marketer who has had a platform on YouTube for over seven years.

239.    On YouTube, Gents Scents's channel "GentsScents" has over 550,000 subscribers. The channel features men's fragrance content and reviews.

240.    Mr. Kirkland invests substantial time and effort into cultivating the Gents Scents follower base, searching for the best deals from Merchants, and promoting those deals online.

241.    Gents Scents partners with Merchants to promote their products to its online audience. As part of that relationship, Gents Scents receives Affiliate Commissions when consumers buy products recommended by Gents Scents by using its affiliate link.

242.     Gents Scents regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links. For example, Gents Scents has been part of the Rakuten and Commission Junction affiliate networks for about eight years, the AWin affiliate network for about five years, the UpPromote affiliate network for about three years, the Howl and MagicLinks affiliate networks for about two years, and the AspireIQ network for about one year, and has promoted products from Merchants such as Macy's, Sephora, Ulta, Beauty House, Max Aroma, The Perfume Box, Twisted Lily, Jomashop, and FragranceNet through those networks. Gents Scents intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

243.     Gents Scents generates approximately ten thousand transactions and over a hundred thousand dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

244.     Gents Scents would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Gents Scents generated with its affiliate links.

245.     **Colbow Design** is owned and operated by Bradley Colbow ("Mr. Colbow"), an Affiliate Marketer who has had a platform on YouTube for over ten years.

246.     On YouTube alone, Colbow Design's channel "@thebradcolbow" has over 890,000 subscribers. Colbow Design provides its audience with an array of reviews and recommendations for the latest technology, with a focus on digital illustration. Mr. Colbow also rates products and shares affiliate links via https://www.bradsartschool.com, which is owned by Colbow Design.

247.     Mr. Colbow invests substantial time and effort into cultivating Colbow Design's follower base, searching for the best deals from Merchants, and promoting those deals online.

248.     Colbow Design partners with Merchants to promote their products to its online audience. As part of that relationship, Colbow Design receives Affiliate Commissions when consumers buy products recommended by Colbow Design by using its affiliate link.

249.    Colbow Design regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly, including Best Buy, Amazon, and BHphotos. For example, Colbow Design has been part of the MagicLinks affiliate network for approximately four years and has promoted products from Merchants such as BestBuy and BHphotos through that network. Colbow Design intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

250.    In the past two years alone, Colbow Design's various affiliate links have generated nearly 9,000 transactions and $98,000 dollars in Affiliate Commissions through affiliate marketing with its Merchant partnerships and affiliate marketing.

251.    Colbow Design would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Colbow Design generated with its affiliate links.

252.    Justin Tech Tips is owned and operated by Justin Wyatt ("Mr. Wyatt"), an Affiliate Marketer who has had a platform on YouTube for over four years.

253.    On YouTube alone, Justin Tech Tips's channel "Just!N Tech" has over 108,000 subscribers. The channel features reviews for gaming computers, as well as videos on gaming technology and virtual reality. Justin Tech Tips also has accounts on TikTok, Rumble, Facebook, and Instagram, and publishes posts on its own website, https://justintech.tips/.

254.    Mr. Wyatt invests substantial time and effort into cultivating Justin Tech Tips's follower base, searching for the best deals from Merchants, and promoting those deals online.

255.    Justin Tech Tips partners with Merchants to promote their products to its online audience. As part of that relationship, Justin Tech Tips receives Affiliate Commissions when consumers buy products recommended by Justin Tech Tips by using its affiliate links.

256.    Justin Tech Tips regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly, including BestBuy, Amazon, Walmart, HP, and LG. For example, Justin Tech Tips has been part of the Impact and Howl affiliate networks for several years and has promoted products from Merchants

such as BestBuy, Walmart, and LG through those networks. Additionally, Justin Tech Tips has direct relationships with Merchants to promote their products, including HP, with which it has partnered with for approximately three years. Justin Tech Tips intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

257.    Justin Tech Tips generates about 10,000 transactions and hundreds of thousands of dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

258.    Justin Tech Tips would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Justin Tech Tips generated with its affiliate links.

259.    **Edizia** is owned and operated by Elliott Larsen ("Mr. Larsen"), an Affiliate Marketer who has had a platform on YouTube for over seven years.

260.    On YouTube alone, Edizia's channel "AmplifyDIY" has over 170,000 subscribers accumulating over 30,000,000 views. The channel features do-it-yourself content for home repair, vehicle maintenance, woodworking, and more. Edizia also has accounts on Instagram, Facebook, and X (formerly Twitter).

261.    Mr. Larsen invests substantial time and effort into cultivating Edizia's follower base, searching for the best deals from Merchants, and promoting those deals online.

262.    Edizia partners with Merchants to promote their products to its online audience. As part of that relationship, Edizia receives Affiliate Commissions when consumers buy products recommended by Edizia by using its affiliate link.

263.    Edizia regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. For example, Edizia has been part of the Amazon affiliate network for about six years and the Impact affiliate network for about a year, and has promoted products from Merchants such as Create-A-Bed, Onwote, and OdinLake through those networks. Additionally, Edizia has direct relationships with Merchants to promote their products, including Door-Parts.com and Create-A-Bed, with which it has partnered

for fifteen months and three months respectively. Edizia intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

264.    Edizia generates nearly 13,000 transactions and tens of thousands of dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

265.    Edizia would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Edizia generated with its affiliate links.

266.    **Mr. Young** is an Affiliate Marketer who has had a platform on YouTube for about five years.

267.    On YouTube alone, Mr. Young's channel "AudioHaze" has nearly 170,000 subscribers. The channel features microphone reviews and content relating to audio and music. Mr. Young also has accounts on Instagram and TikTok.

268.    Mr. Young invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

269.    Mr. Young partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Young receives Affiliate Commissions when consumers buy products recommended by Mr. Young by using his affiliate link.

270.    Mr. Young regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links. For example, Mr. Young has been part of the Amazon, Impact, and Sweetwater affiliate networks for over two years, and has promoted products from Merchants such as Universal Audio, Sennheiser, and Kali Audio through those networks. Mr. Young intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

271.    Mr. Young generates about 800 transactions and over four thousand dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

272.    Mr. Young would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Young generated with his affiliate links.

273.    **Mr. Ramirez** is an Affiliate Marketer who has had a platform on YouTube for approximately seven years.

274.    On YouTube alone, Mr. Ramirez's channel "AaronnRamirez" has about 225,000 subscribers. The channel features reviews content regarding fashion, fitness, technology, and more. Mr. Ramirez also has an account on Instagram.

275.    Mr. Ramirez invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

276.    Mr. Ramirez partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Ramirez receives Affiliate Commissions when consumers buy products recommended by Mr. Ramirez by using his affiliate link.

277.    Mr. Ramirez regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links, both directly and indirectly. For example, Mr. Ramirez has been part of the Amazon Influencer, LTK, MagicLinks, and Uniqlo affiliate networks for over two years and has promoted products from Merchants such as New Balance, Old Navy, Finish Line, Urban Outfitters, Abercrombie & Fitch, H&M, American Eagle & Aerie, Ray-Ban, Gap, Forever 21, Prada, Levi's, and Banana Republic through those networks. Additionally, Mr. Ramirez has direct relationships with Merchants to promote their products, including Amazon, Walmart, and Hollister, with which he has partnered for the last two years. Mr. Ramirez intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

278.    Mr. Ramirez generates tens of thousands of transactions and tens of thousand dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

279.    Mr. Ramirez would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey

Browser Extension, PayPal stole credit for sales that Mr. Ramirez generated with his affiliate links.

280.    **Be Victorious** is owned and operated by Victoria Dorsano ("Ms. Dorsano"), an Affiliate Marketer who has had a platform on YouTube and Instagram for about four years.

281.    On YouTube, Be Victorious's channel "Victoria Dorsano" has 16,000 subscribers. On Instagram, Be Victorious's channel "Victoria Dorsano" has 21,000 followers. These channels feature content relating to health and fitness, training, and exercise.

282.    Ms. Dorsano invests substantial time and effort into cultivating Be Victorious's follower base, searching for the best deals from Merchants, and promoting those deals online.

283.    Be Victorious partners with Merchants to promote their products to its online audience. As part of that relationship, Be Victorious receives Affiliate Commissions when consumers buy products recommended by Be Victorious by using its affiliate link.

284.    Be Victorious regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. For example, Be Victorious has partnered with Merchants such as www.incrediwear.com, www.freakathlete.co, www.thetidbarguy.com, and www.egofitwalker.com for several years. Be Victorious has partnered with some Merchants directly and some Merchants through the affiliate networks Share-A-Sale, Awin, and UpPromote. Be Victorious intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

285.    Be Victorious has generated approximately 800 transactions and approximately $15,000 in Affiliate Commissions over the past five years through affiliate marketing with its Merchant partnerships and affiliate marketing.

286.    Be Victorious would have earned more in commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Be Victorious generated with its affiliate links.

287.    **Stuber** is owned by and operated by James Stuber ("Mr. Stuber"), an Affiliate Marketer who has had a platform on YouTube for about five years.

288.    On YouTube, Stuber's channel "uberstuber" has over 3,000 subscribers. The channel features content relating to personal development and tech gadgets. Stuber also publishes posts on its own website, https://jamesstuber.com/.

289.    Mr. Stuber invests substantial time and effort into cultivating Stuber's follower base, searching for the best deals from Merchants, and promoting those deals online.

290.    Stuber partners with Merchants to promote their products to its online audience. As part of that relationship, Stuber receives Affiliate Commissions when consumers buy products recommended by Stuber by using its affiliate link.

291.    Stuber regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links. For example, Stuber has been part of the Amazon affiliate network for about nine years, and has promoted products from Merchants such as Sony, Fujifilm, Elgato, Glide Gear, and SanDisk through that network. Stuber intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

292.    Stuber has generated about 600 transactions and about six thousand dollars in Affiliate Commissions over the past five years through affiliate marketing with its Merchant partnerships and affiliate marketing.

293.    Stuber would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Stuber generated with its affiliate links.

294.    **Mr. Komuves** is an Affiliate Marketer who has owned and operated the website https://wet-dry-vac.com/ for over four years.

295.    Mr. Komuves's website has approximately 5,000 unique active users per year. The website is a comparison-shopping site for wet/dry vacuums.

296.    Mr. Komuves invests substantial time and effort into cultivating his website and user base, searching for the best products from Merchants, and promoting those deals online.

297.    Mr. Komuves partners with Merchants to promote their products to its online audience. As part of that relationship, Mr. Komuves receives Affiliate Commissions when consumers buy products recommended by Mr. Komuves by using its affiliate link.

298.    Mr. Komuves regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. For example, Mr. Komuves has partnered with Merchants Amazon, Walmart, Target, Best Buy, and Home Depot. Additionally, Mr. Komuves has worked with affiliate networks Amazon Associates, Rakuten, Target Affiliate Program, Impact, Walmart Affiliate Program, and Vevor. Mr. Komuves intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

299.    Mr. Komuves has generated approximately 1,750 transactions and $2,000 in Affiliate Commissions over the past five years through affiliate marketing with its Merchant partnerships and affiliate marketing.

300.    Mr. Komuves would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Komuves generated with its affiliate links.

301.    **Mr. Silva** is an Affiliate Marketer who has had a platform on YouTube for over a decade, and he has also ran a Facebook Group for the last seven years.

302.    Mr. Silva's channel "DeepDiscounts" has approximately 9,500 subscribers, and the channel features product reviews for electronics and consumer goods.

303.    Mr. Silva provides his audience with an array of reviews and recommendations for the latest electronics and consumer goods. Mr. Silva also rates products and shares affiliate links on his website, www.deepdiscounts.club.

304.    Mr. Silva invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

305.    Mr. Silva partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Silva receives Affiliate Commissions when consumers buy products that he recommends by using his affiliate links.

306.    Mr. Silva regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links, including Amazon and Walmart with whom he has partnered for several years. Mr. Silva intends to continue creating affiliate marketing content and partnering with both of these Merchants in the future.

307.    Mr. Silva's various affiliate links have generated hundreds of transactions and thousands of dollars in Affiliate Commissions through affiliate marketing with his Merchant partnerships and affiliate marketing.

308.    Mr. Silva would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Silva generated with his affiliate links.

309.    **Mr. Pugh** is an Affiliate Marketer who has had a platform on YouTube for over two years.

310.    On YouTube, Mr. Pugh's channel "Upper 90 Football" has nearly 25,000 subscribers. The channel features content relating to soccer. Mr. Pugh also has an account on TikTok, and publishes posts on his website, https://upper90football.com/.

311.    Mr. Pugh invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

312.    Mr. Pugh partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Pugh receives Affiliate Commissions when consumers buy products recommended by Mr. Pugh by using his affiliate link.

313.    Mr. Pugh regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links, both directly and indirectly. For example, Mr. Pugh has been part of the ShareASale and Ascend affiliate networks for over a year and has promoted products from Merchants such as Pro Soccer, Soccer.com, and World Soccer Shop through those networks. Additionally, Mr. Pugh has direct relationships with Merchants to

promote their products, including Pro Soccer, Soccer.com, and World Soccer Shop, with which he has partnered for approximately three years. Mr. Pugh intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

314.    Mr. Pugh has generated about 1,000 transactions and tens of thousands of dollars in Affiliate Commissions over the past three years through affiliate marketing with his Merchant partnerships and affiliate marketing.

315.    Mr. Pugh would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Pugh generated with his affiliate links.

316.    **Mr. Larson** is an Affiliate Marketer who has had a platform on YouTube for over ten years.

317.    On YouTube alone, Mr. Larson's channel "3dpprofessor" has over 60,000 subscribers. The channel features 3D printing reviews, tutorials, and related content. Mr. Larson also has accounts on Instagram and Twitter/X.

318.    Mr. Larson invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

319.    Mr. Larson partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Larson receives Affiliate Commissions when consumers buy products recommended by Mr. Larson by using his affiliate link.

320.    Mr. Larson regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links. For example, Mr. Larson has been part of the Amazon and ShareASale affiliate networks for over two years, and has promoted products from Merchants such as Creality, Bambu Labs, Elegoo, and Flashforge through those networks. Mr. Larson intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

321.    Mr. Larson generates over 300 transactions and about a thousand dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

322.    Mr. Larson would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Larson generated with his affiliate links.

323.    **Mr. Hiser** is an Affiliate Marketer who has had a platform on YouTube for approximately eight years.

324.    On YouTube alone, Mr. Hiser's channel "Fate Unbound" has about 135,000 subscribers. The channel features video blogging relating to travel. Mr. Hiser also as an account on Facebook.

325.    Mr. Hiser invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

326.    Mr. Hiser partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Hiser receives Affiliate Commissions when consumers buy products recommended by Mr. Hiser by using his affiliate link.

327.    Mr. Hiser regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links, both directly and indirectly. For example, Mr. Hiser has been part of the Amazon affiliate network since approximately 2019, and he has also promoted products from Merchants such as WolfBox and HutchMountain. Mr. Hiser intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

328.    Mr. Hiser generates hundreds of transactions each year, and he has earned approximately $20,000 in Affiliate Commissions in that last year through affiliate marketing with his Merchant partnerships and affiliate marketing.

329.    Mr. Hiser would have earned more in commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Hiser generated with his affiliate links.

330.    **Just Josh** is owned and operated by Joshua van Aalst ("Mr. van Aalst"), an Affiliate Marketer who has had a platform on YouTube for four years.

331.    On YouTube alone, Just Josh's channel "JustJoshTech" has over 315,000 subscribers. The channel features reviews for laptops, cameras, and other computer accessories.

332.    Mr. van Aalst invests substantial time and effort into cultivating Just Josh's follower base, reviewing equipment, and promoting this equipment online.

333.    Just Josh partners with Merchants to promote their products to its online audience. As part of that relationship, Just Josh receives Affiliate Commissions when consumers buy products recommended by Just Josh by using its affiliate link.

334.    Just Josh regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Amazon, Lenovo, Best Buy, Samsung, Walmart, HP, and Dell. Just Josh intends to continue partnering with many, if not all, of these Merchants in the future.

335.    Just Josh has generated thousands of transactions and in the last year along earned approximately $250,000 dollars in Affiliate Commissions through affiliate marketing with its Merchant partnerships.

336.    Just Josh would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Just Josh generated with its affiliate links.

337.    **Miniac** is owned and operated by Scott Walter ("Mr. Walter"), an Affiliate Marketer who has had a platform on YouTube for about nine years.

338.    On YouTube alone, Miniac's channel "miniac" has over 350,000 subscribers. The channel features content relating to miniature figures. Miniac also has accounts on Instagram, Facebook, and Twitch.

339.    Mr. Walter invests substantial time and effort into cultivating Miniac's follower base, searching for the best deals from Merchants, and promoting those deals online.

340.    Miniac partners with Merchants to promote their products to its online audience. As part of that relationship, Miniac receives Affiliate Commissions when consumers buy products recommended by Miniac by using its affiliate links.

341.    Miniac regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. Miniac has direct relationships with Merchants to promote their products, including Hello Fresh, Helix Sleep, Squarespace, Skill Share, Factor, Cephalofair Games, Element Games, HeyGears, and Pk-Pro, with which it has partnered for several years. Miniac intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

342.    Miniac generated thousands of transactions and tens of thousands of dollars in Affiliate Commissions over the past five years through affiliate marketing with its Merchant partnerships and affiliate marketing.

343.    Miniac would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Miniac generated with its affiliate links.

344.    **Shanger Danger** is owned and operated by Shane Brown ("Mr. Brown"), an Affiliate Marketer who has had a platform on YouTube for approximately ten years.

345.    On YouTube alone, Shanger Danger's channel, "shangerdanger" has over 7.9 million subscribers. The channel features ocean and underwater content. Shanger Danger also has accounts on Instagram, Snapchat, and TikTok.

346.    Mr. Brown invests substantial time and effort into cultivating Shanger Danger's follower base, searching for the best deals from Merchants, and promoting those deals online.

347.    Shanger Danger partners with Merchants to promote their products to its online audience. As part of that relationship, Shanger Danger receives Affiliate Commissions when consumers buy products recommended by Shanger Danger by using its affiliate link.

348.    Shanger Danger regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including DiveVolk. Shanger Danger has partnered with and/or promoted products from DiveVolk for approximately five years. Shanger Danger intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

349.    Mr. Brown has generated approximately 1,000 transactions and thousands of dollars in Affiliate Commissions over the last five years through affiliate marketing with its Merchant partnerships and affiliate marketing.

350.    Mr. Brown would have earned more in Affiliate Commissions but for PayPal's scheme to poach Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Brown generated with its affiliate links.

## CLASS ALLEGATIONS

351.    This action is brought by Plaintiffs individually and on behalf of the following Class and State Subclasses:

**Class**:    All U.S.-based Affiliate Marketers whose Affiliate Commissions were diverted to PayPal when the Honey Browser Extension displaced their Affiliate IDs.

**Arizona Subclass:** All Class members who are domiciled in Arizona.

**California Subclass:** All Class members who are domiciled in California.

**Colorado Subclass:** All Class members who are domiciled in Colorado.

**Connecticut Subclass:** All Class members who are domiciled in Connecticut.

**Florida Subclass:** All Class members who are domiciled in Florida.

**Hawaii Subclass:** All Class members who are domiciled in Hawaii.

**Idaho Subclass:** All Class members who are domiciled in Idaho.

**Illinois Subclass:** All Class members who are domiciled in Illinois.

**Montana Subclass:** All Class members who are domiciled in Montana.

**Minnesota Subclass:** All Class members who are domiciled in Minnesota.

**New Hampshire Subclass:** All Class members who are domiciled in New Hampshire.

**New Jersey Subclass:** All Class members who are domiciled in New Jersey.

**New York Subclass:** All Class members who are domiciled in New York.

**North Carolina Subclass:** All Class members who are domiciled in North Carolina.

**Ohio Subclass:** All Class members who are domiciled in Ohio.

**Tennessee Subclass:** All Class members who are domiciled in Tennessee.

**Texas Subclass:** All Class members who are domiciled in Texas.

**Utah Subclass:** All Class members who are domiciled in Utah.

**Virginia Subclass:** All Class members who are domiciled in Virginia.

**Washington Subclass:** All Class members who are domiciled in Washington.

**Wisconsin Subclass:** All Class members who are domiciled in Wisconsin.

*See* Fed. R. Civ. P 23(a), (b)(2), (b)(3), and (c)(4).

352.    Excluded from the Class and Subclasses are Defendants, their employees, agents and assigns; any members of the judiciary to whom this case is assigned, their respective court staff, members of their immediate families; and Plaintiffs' counsel.

353.    The Class and Subclasses consist of at least thousands of Affiliate Marketers whose Affiliate Commissions were diverted to PayPal through the misconduct alleged herein and thus each is so numerous that joinder of all members is impractical. The identities of members of the Class and Subclasses can be readily ascertained from business records maintained by PayPal or Merchants.

354.    The claims asserted by Plaintiffs are typical of the claims of the Class and Subclasses, all of whom were harmed by PayPal's Affiliate Commission poaching scheme alleged herein.

355.    Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and do not have any interests antagonistic to those of other members of the Class or Subclasses.

356.    Plaintiffs have retained attorneys who are knowledgeable and experienced in consumer protection, class action, and complex litigation.

357.    This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Class and Subclasses predominate over those questions affecting only individual members. The common factual questions giving rise to common answers that move this litigation forward include:

a.    Whether PayPal, via the Honey Browser Extension, replaces the Affiliate IDs of Affiliate Marketers with PayPal's own Affiliate ID at checkout;

b.    Whether the Honey Browser Extension was knowingly designed to replace the

Affiliate ID of Affiliate Marketers with PayPal's own Affiliate ID at checkout;

c.  Whether Affiliate Commissions were diverted from Class members to PayPal;

d.  Whether PayPal's interception of Affiliate Commissions interfered with the contracts and/or business relationships between Class members and Merchants;

e.  Whether PayPal has been unjustly enriched to the detriment of the Class; and

f.  Whether Class members are entitled to declaratory, injunctive, or monetary relief, and if so, in what amount and form.

358.    In addition, the class device is the superior mechanism for handling this action, and a class trial is manageable.

359.    This action is also appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because PayPal's use of the Honey Browser Extension impacts Class and Subclass members in the same ways, and any injunctive relief awarded will affect the Class and Subclass as a whole. Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data. Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

360.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.  Whether PayPal, via the Honey Browser Extension, replaces the Affiliate IDs of Affiliate Marketers with PayPal's own Affiliate ID at checkout; and

b.  Whether the Honey Browser Extension was knowingly designed to replace the Affiliate ID of Affiliate Marketers with PayPal's own Affiliate ID at checkout.

361.    All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could not have reasonably discovered Defendants' practice of surreptitiously replacing Affiliate IDs to allow PayPal to take credit for sales it did not generate and Affiliate Commissions it did not earn.

362.    Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class members their practice of replacing Affiliate IDs which point to Affiliate Marketers as the source of a referral and substituting their own Affiliate IDs to appropriate Affiliate Commissions that belong to creators like Plaintiffs and Class members. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**COUNT ONE**
**Unjust Enrichment**
**Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf**
**of the State Subclasses Under their Respective State's Laws**

363.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully set forth herein.

364.    In the alternative to those claims sounding in contract and seeking damages, Plaintiffs and Class members allege that there is no adequate remedy at law to address Defendants' conduct.

365.    Plaintiffs and Class members have an interest, both equitable and legal, in the Affiliate Commissions. These payments were rightfully earned by Plaintiffs and Class members, not Defendants.

366.    Plaintiffs and Class members conferred a benefit on Defendants, because Plaintiffs and Class members unwittingly drove their own followers to PayPal when Plaintiffs and Class member sent those followers to Merchants' webpages, through their affiliate links and marketing efforts, where they made purchases resulting in Defendants' receipt of Affiliate Commission payments.

367.    Defendants benefitted from Affiliate Commission payments that were credited to them as a function of the Honey Browser Extension wrongfully representing to Merchants that Defendants, rather than Plaintiffs and Class members, should be assigned credit for product sales.

368.    Defendants understood that they so benefitted; i.e., that the Honey Browser Extension would cause the harm described herein because the Honey Browser Extension

monitors for existing Affiliate IDs in a consumer's browser and is designed to overwrite any existing Affiliate IDs.

369.    Defendants should have reasonably expected to repay those Affiliate Commission payments to Plaintiffs and Class members, because Defendants know that Affiliate Marketers are entitled to Affiliate Commissions for driving traffic and sales to Merchants.

370.    But for Defendants' unjust and improper use of the Honey Browser Extension, they would not have been credited and awarded Affiliate Commission on sales that emanated from Plaintiffs' and Class members' respective affiliate links.

371.    As a result of Defendants' wrongful conduct as alleged in this Complaint, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class members.

372.    As a result of Defendants' wrongful conduct as alleged in this Complaint, Defendants have received monies in the form of Affiliate Commissions and referral fees that rightfully belong to Plaintiffs and Class members.

373.    Defendants continue to benefit and profit from Plaintiffs and Class members directing prospective consumers to Merchants websites through their affiliate links and marketing efforts and driving them to make purchases that result in Defendants' receipt of Affiliate Commission payments, while Plaintiffs and Class members continue to have their rightful Affiliate Commissions diverted to Defendants.

374.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from the conduct alleged herein, including Defendants using the Honey Browser Extension to wrongfully credit themselves with referrals and commissions they did not rightfully earn.

375.    The monies and benefits conferred upon, received, and enjoyed by Defendants were not conferred officiously or gratuitously, and it would be inequitable, unconscionable, and unjust for Defendants to retain these monies and benefits.

376.    Equity and good conscience militate against permitting Defendants to retain the profits and benefits from their wrongful conduct, which should be restored to Plaintiffs and Class members.

**COUNT TWO**
**Intentional Interference with**
**Prospective Economic Advantage**
**Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf**
**of the State Subclasses Under their Respective State's Laws**

377.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully set forth herein.

378.    Plaintiffs and Class members are engaged in ongoing economic relationships with Merchants to promote products and services to consumers in exchange for commissions. These include, but are not limited to, economic relationships with the Merchants listed above.

379.    As part of these relationships, Plaintiffs and Class Members promote Merchants' products and services and utilize affiliate links to refer consumers to products and services sold or offered by Merchants. In return, Merchants provide Plaintiffs and Class members with an Affiliate Commission payment if a consumer completes a transaction on the Merchant's website after navigating to the Merchant's website through an affiliate link associated with Plaintiffs and Class members. In other words, Plaintiffs and Class members refer their followers to Merchants through affiliate links in exchange for receiving Affiliate Commission from the Merchant when a consumer uses their specific affiliate link to access the Merchant's website and complete a purchase of a product or service.

380.    These relationships are ongoing, and based on the length and extent of these relationships, Plaintiffs and Class members reasonably expect to continue earning Affiliate Commission payments in exchange for referring consumers to these Merchants.

381.    Defendants knew or reasonably should have known of the economic and business relationships between Merchants on the one hand and Plaintiffs and Class members on the other, whereby Plaintiffs and Class members promote and provide affiliate links to consumers for products or services on a Merchant's website in exchange for receiving Affiliate Commission

from the Merchant for consumer transactions for which Plaintiffs and Class members provided the business opportunity.

382.    Defendants knew that their conduct was certain or substantially certain to interfere with Plaintiffs' and Class members' business relationships with Merchants. Defendants knew that the Honey Browser Extension monitors and logs a consumer's browsing activity and understood that economic relationships such as those between Affiliate Marketers like Plaintiffs and Class members and Merchants are standard in the affiliate marketing industry.

383.    Through use of the Honey Browser Extension, Defendants divert Affiliate Commission payments from Plaintiffs and Class members who promoted and shared affiliate links and generated referrals and sales of a Merchant's product or service. Defendants, via the Honey Browser Extension, overwrite Affiliate IDs that identify Affiliate Marketers like Plaintiffs and Class members as the source of the referral with Defendants' own Affiliate IDs and hold themselves out as the referrer of the specific products and/or services, even though the sale in question emanated from an Affiliate Marketer's affiliate link. This conduct is wrongful, improper, and without justification, including without limitation because it independently constitutes intentional interference with contractual relations, negligent interference with prospective economic advantage, and conversion and violates California's Unfair Competition Law, Connecticut's Unfair Trade Practices Act, Hawaii's Unfair and Deceptive Trade Practices Act, New Hampshire's Consumer Protection Act, New York's General Business Law, and Washington's Consumer Protection Act. This conduct is further wrongful, improper, and without justification because it contravenes existing standards and norms in the affiliate marketing industry that prohibit the use of cookie stuffing to divert Affiliate Commissions.

384.    Defendants were aware that their actions were wrongful as evidenced by, *inter alia*, the stand-down policies that Honey itself purportedly had in place prior to its acquisition by PayPal.

385.    Defendants either desired to divert Affiliate Commissions from Plaintiffs and Class members to themselves through the conduct alleged herein or knew that the diversion of Plaintiffs and Class members' Affiliate Commissions was certain or substantially certain to occur

as a result of their conduct alleged herein. Specifically, Defendants understood that the Honey Browser Extension injects a hidden tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with PayPal's Affiliate ID. Defendants further understood that Merchants rely on Affiliate IDs to determine which party should be credited with a consumer's purchase and awarded with an Affiliate Commission payment. Defendants knew that when a consumer navigated to a specific Merchant's website using an Affiliate Marketer's affiliate link and had the Honey Browser Extension activated, the Honey Browser Extension would overwrite the existing Affiliate Marketer's affiliate link with PayPal's Affiliate ID, resulting in Defendants, rather than the Affiliate Marketer, being credited for the sale and rewarded with any Affiliate Commission or referral fee.

386.    Plaintiffs' and Class members' economic relationships with Merchants were actually disrupted by Defendants' conduct because such conduct deprived Plaintiffs and Class members of the monies that they rightfully earned as the true originators of sales arising from their affiliate links.

387.    Defendants' conduct interfered with Plaintiffs' and Class members' business relationships with Merchants by causing Merchants to pay Defendants, instead of Plaintiffs and Class members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their promotion efforts and corresponding affiliate links.

388.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Class members suffered economic injury by being deprived of Affiliate Commissions they should have earned from referrals through their affiliate links, pursuant to their business relationships with Merchants.

389.    As a result of the above conduct, Defendants are liable to Plaintiffs and Class members for damages in an amount to be determined at trial.

**COUNT THREE**
**Negligent Interference with**
**Prospective Economic Advantage**
**Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf**
**of the State Subclasses Under their Respective State's Laws**

390.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully set forth herein.

391.    Plaintiffs and Class members are engaged in ongoing economic relationships with Merchants to promote products and services to consumers in exchange for Affiliate Commissions. These include, but are not limited to, economic relationships with Merchants listed above.

392.    As part of these relationships, Plaintiffs and Class Members promote Merchants' products and services and utilize affiliate links to refer consumers to products and services sold or offered by Merchants. In return, Merchants provide Plaintiffs and Class members with an Affiliate Commission payment if a consumer completes a transaction on the Merchant's website after navigating to the Merchant's website through an affiliate link identifying Plaintiffs and Class members. In other words, Plaintiffs and Class members refer their followers to Merchants through affiliate links in exchange for receiving Affiliate Commission from the Merchant when a consumer uses their specific affiliate link to access the Merchant's website and complete a purchase of a product or service.

393.    These relationships are ongoing, and based on the length and extent of these relationships, Plaintiffs and Class members reasonably expect to continue earning Affiliate Commission payments in exchange for referring consumers to these Merchants.

394.    Defendants knew or reasonably should have known of the economic and business relationships between Merchants on the one hand and Plaintiffs and Class members on the other, whereby Plaintiffs and Class members promote and provide affiliate links to consumers for products or services on a Merchant's website in exchange for receiving Affiliate Commissions from the Merchant for consumer transactions for which Plaintiffs and Class members provided the business opportunity.

395.    Defendants knew or reasonably should have known that if they did not act with due care, their actions would interfere with Plaintiffs' and Class members' business relationships with Merchants. Defendants knew that the Honey Browser Extension monitors and logs a consumer's browsing activity and understood that economic relationships such as those between

Affiliate Marketers like Plaintiffs and Class members and Merchants are standard in the affiliate marketing industry.

396.    Defendants were negligent through their conduct towards Plaintiffs. Through use of the Honey Browser Extension, Defendants divert Affiliate Commission payments from Plaintiffs and Class members who promoted and shared affiliate links and generated referrals and sales of a Merchant's product or service. Defendants, via the Honey Browser Extension, overwrite Affiliate IDs that identify Affiliate Marketers like Plaintiffs and Class members as the source of the referral with Defendants' own Affiliate IDs and hold themselves out as the referrer of the specific products and/or services, even though the sale in question emanated from an Affiliate Marketer's affiliate link. This conduct is wrongful, improper, and without justification, including without limitation because it independently constitutes intentional interference with contractual relations, negligent interference with prospective economic advantage, and conversion and violates California's Unfair Competition Law, Connecticut's Unfair Trade Practices Act, Hawaii's Unfair and Deceptive Trade Practices Act, New Hampshire's Consumer Protection Act, New York's General Business Law, and Washington's Consumer Protection Act. This conduct is further wrongful, improper, and without justification because it contravenes existing standards and norms in the affiliate marketing industry that prohibit the use of cookie stuffing to divert Affiliate Commissions.

397.    Defendants were aware that their actions were wrongful as evidenced by, *inter alia*, the stand-down policies that Honey itself purportedly had in place prior to its acquisition by PayPal.

398.    Defendants either desired to divert Affiliate Commissions from Plaintiffs and Class members to themselves through the conduct alleged herein or knew that the diversion of Plaintiffs and Class members' Affiliate Commissions was certain or substantially certain to occur as a result of their conduct alleged herein. Specifically, Defendants understood that their Honey Browser Extension injects a hidden tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with PayPal's Affiliate ID. Defendants further understood that Merchants rely on Affiliate IDs to determine which party

should be credited with a consumer's purchase and awarded with an Affiliate Commission

payment. Defendants knew that when a consumer navigated to a specific Merchant's website

using an Affiliate Marketer's affiliate link and had the Honey Browser Extension activated, the

Honey Browser Extension would overwrite the existing Affiliate Marketer's affiliate link with

Defendants' Affiliate ID, resulting in Defendants, rather than the Affiliate Marketer, being

credited for the sale and rewarded with any Affiliate Commission.

399.    Plaintiffs' and Class members' economic relationships with Merchants were

actually disrupted by Defendants' conduct because such conduct deprived Plaintiffs and Class

members of the monies that they rightfully earned as the true originators of sales arising from

their affiliate links.

400.    Defendants' conduct interfered with Plaintiffs' and Class members' business

relationships with Merchants by causing Merchants to pay Defendants, instead of Plaintiffs and

Class members, the monies that Plaintiffs and Class members rightfully earned as the true

originators of sales arising from their promotion efforts and corresponding affiliate links.

401.    As a direct and proximate result of Defendants' conduct described herein,

Plaintiffs and Class members suffered economic injury by being deprived of Affiliate

Commissions they should have earned from referrals through their affiliate links, pursuant to their

business relationships with Merchants.

402.    As a result of the above conduct, Defendants are liable to Plaintiffs and Class

members for damages in an amount to be determined at trial.

**COUNT FOUR**
**Intentional Interference with**
**Contractual Relations**
**Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf**
**of the State Subclasses Under their Respective State's Laws**

403.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully

set forth herein.

404.    Plaintiffs and Class members are engaged in ongoing, valid contractual

relationships with Merchants to promote products and services to consumers in exchange for

Affiliate Commissions. These include, but are not limited to, contractual relationships with Merchants listed above. Under the terms of these contracts, Plaintiffs and Class members promote Merchants' products and services and provide affiliate links to refer consumers to products and services sold or offered by the Merchants. In return, Merchants provide Plaintiffs and Class members with an Affiliate Commission payment if a consumer completes a transaction on the Merchant's website after navigating to the Merchant's website through an affiliate link provided by Plaintiffs and Class members.

405. Defendants knew or reasonably should have known of the contractual relationships between Merchants on the one hand and Plaintiffs and Class members on the other, under which Plaintiffs and Class members receive Affiliate Commissions from Merchants through affiliate links, because the Honey Browser Extension monitors and logs a consumer's browsing activity. Defendants further understood that contracts between Affiliate Marketers like Plaintiffs and Class members and Merchants for Affiliate Commissions are standard in the affiliate marketing industry. Specifically, Defendants knew that their Honey Browser Extension is designed to monitor and contemporaneously log detailed information about a consumer's browsing activity, including the full-string URL of each web page visited by a consumer. From these URLs, Defendants knew when a consumer navigated to a specific Merchant's website using a specific Affiliate Marketer's affiliate link and thus knew of the existence of a commission-based economic relationship between the specific Merchant and the specific Affiliate Marketer.

406. Through use of the Honey Browser Extension, Defendants divert Affiliate Commission payments from Plaintiffs and Class members who promoted and shared affiliate links and generated referrals and sales of a Merchant's product or service. Defendants, via the Honey Browser Extension, overwrite Affiliate IDs that identify Affiliate Marketers like Plaintiffs and Class members as the source of the referral with Defendants' own Affiliate IDs and falsely hold themselves out as the referrer of the specific products and/or services, even though the sale in question emanated from an Affiliate Marketer's affiliate link. This conduct, which interferes with Plaintiffs' and Class members' contractual relationships with Merchants, is wrongful, improper, and without justification including, without limitation, because it independently

constitutes conversion, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and violates California's Unfair Competition Law, Connecticut's Unfair Trade Practices Act, Hawaii's Unfair and Deceptive Trade Practices Act, New Hampshire's Consumer Protection Act, New York's General Business Law, and Washington's Consumer Protection Act. This conduct is further wrongful, improper, and without justification because it contravenes existing standards and norms in the affiliate marketing industry, which prohibit the use of cookie stuffing to divert Affiliate Commissions.

407.    Defendants knew that a breach or disruption of Plaintiffs and Class members' contracts with Merchants was certain or substantially certain to occur as a result of its conduct alleged herein. Specifically, Defendants understood that their Honey Browser Extension injects a hidden tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with PayPal's Affiliate ID. Defendants further understood that Merchants rely on Affiliate IDs to determine which party should be credited with a consumer's purchase and awarded with an Affiliate Commission payment. Defendants knew that when a consumer navigated to a specific Merchant's website using an online marketer's affiliate link and had the Honey Browser Extension activated, the Honey Browser Extension would overwrite the existing online marketer's Affiliate ID with Defendants' Affiliate ID, resulting in Merchants breaching their agreements with Plaintiffs and Class members by paying Defendants, instead of Plaintiffs and Class members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their affiliate links.

408.    Defendants' conduct caused Merchants to breach their agreements with Plaintiffs and Class Members by paying Defendants, instead of Plaintiffs and Class members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their affiliate links.

409.    As a direct and proximate result of Defendants' interference with Plaintiffs' and Class members' contracts with Merchants, Plaintiffs and Class members suffered harm and economic injury by being deprived of Affiliate Commissions they should have rightfully received pursuant to their contracts with Merchants for providing referrals through their affiliate links. As

1  a result of the above conduct, Defendants are liable to Plaintiffs and Class members for damages

2  in an amount to be determined at trial.

3  **COUNT FIVE**
**Conversion**

4  **Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf**

5  **of the State Subclasses Under their Respective State's Laws**

6        410.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully

7  set forth herein.

8        411.    At the time consumers made purchases on Merchant's websites, Plaintiffs and

9  Class members possessed or had a right to possess the Affiliate ID that identified Plaintiffs and

10 Class members as entitled to Affiliate Commissions for referring consumers to products and

11 services sold at the Merchant's website. These Affiliate IDs are specific to each Plaintiff and

12 Class member.

13       412.    Defendants intentionally and substantially interfered with Plaintiffs' and Class

14 members' rights in their Affiliate IDs through the operation of the Honey Browser Extension,

15 which secretly and intentionally caused Plaintiffs' and Class members' Affiliate IDs to be

16 overwritten with Defendants' own Affiliate IDs, thus depriving Plaintiffs and Class members of

17 their Affiliate IDs.

18       413.    Defendants, without proper authorization, assumed and exercised control over

19 Plaintiffs' and Class members' Affiliate IDs through operation of the Honey Browser Extension,

20 in hostility to the rights of Plaintiffs and Class members and without justification.

21       414.    Defendants' wrongful exercise of control over Plaintiffs' and Class members'

22 Affiliate IDs constitutes conversion.

23       415.    Plaintiffs and Class members neither assented to nor ratified Defendants'

24 interference with their Affiliate IDs.

25       416.    As a direct and proximate result of Defendants' conversion, Plaintiffs and Class

26 members were harmed.

27       417.    Defendants are liable to Plaintiffs' and Class members for damages and costs

28 permitted by law.

**COUNT SIX**
**Violation of the California Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**
**Asserted on Behalf of the Proposed Nationwide Class Under**
**California law, and, in the Alternative, on Behalf of the California Subclass**

418.     Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully set forth herein.

419.     In the alternative to those claims seeking damages, Plaintiffs and California Subclass members allege that there is no adequate remedy at law to address Defendants' conduct.

420.     California's Unfair Competition Law ("UCL") defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.*

421.     Defendants have engaged in acts and practices that are unlawful and unfair in violation of the UCL.

422.     Defendants are each a "person" as defined by Cal. Bus. & Prof. Code § 17201.

**Unlawful**

423.     Defendants' business acts and practices are unlawful, in violation of the UCL, because they interfere with the prospective economic advantage and existing contractual relations of Affiliate Marketers and constitute conversion, as set forth herein. They also have unjustly enriched Defendants for the reasons stated below and constitute violations of intentional and negligent interference with prospective economic advantage, intentional interference with contractual relations, conversion, and unjust enrichment.

**Unfair**

424.     Defendants committed unfair business practices by using the Honey Browser Extension to overwrite Plaintiffs' and California Subclass members' Affiliate IDs in order to steal credit for sales referrals and thereby receive Affiliate Commission payments that rightfully belong to Plaintiffs and California Subclass members.

425.     Defendants' conduct is unfair in violation of the UCL because it violates California's public policy against interfering with another's prospective economic advantage. *See* 5 Witkin, Summary 11th Torts § 854 (2024). Defendants' conduct is also unfair in violation of

the UCL because it significantly harms or threatens competition in the Affiliate Marketing industry by contravening industry standards and norms that prohibit cookie stuffing or similar methods to wrongfully secure Affiliate Commissions.

426.    Defendants, though the operation of the Honey Browser Extension, wrongfully deprive Plaintiffs and California Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate links.

427.    The gravity of harm resulting from Defendants' practice of appropriating commissions that belong to Affiliate Marketers like Plaintiffs and California Subclass members outweighs any potential utility therefrom. Defendants' conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

428.    Defendants actually and proximately caused harm to Plaintiffs and California Subclass members in that, among other things, they suffered economic injury by being deprived of Affiliate Commissions they should have earned from referrals through their affiliate links and suffered a loss of property by being deprived of their Affiliate IDs.

429.    The conduct alleged herein is continuing and there is no indication that Defendants will cease such activity in the future.

430.    Defendants' conduct in violation of the UCL has caused Plaintiffs and California Subclass members to be deprived of Affiliate Commission payments for sales they rightfully originated. Plaintiffs and California Subclass members thus suffered lost money or property as a result of Defendants' conduct.

431.    Plaintiffs therefore seek restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

**COUNT SEVEN**
**Violation of the Connecticut Unfair Trade Practices Act**
**(Conn. Gen. Stat. § 42-110a, _et seq._) ("CUPTA")**
**Asserted on Behalf of the Connecticut Subclass**

432.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully set forth herein.

433. Plaintiffs, Connecticut Subclass members, and Defendants are each a "person" as defined by Conn. Gen. Stat. Ann. § 42-110a.

434. Defendants are engaged in the conduct of trade or commerce by offering and allowing use of the Honey Browser Extension in Connecticut.

435. Defendants, though the operation of the Honey Browser Extension, wrongfully deprive Plaintiffs and Connecticut Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate links.

436. Defendants committed unfair business practices by using the Honey Browser Extension to overwrite Plaintiffs' and Connecticut Subclass members' Affiliate IDs in order to steal credit for sales referrals and thereby receive Affiliate Commission payments that rightfully belong to Plaintiffs and Connecticut Subclass members.

437. Defendants' conduct is unfair in violation of the CUPTA because it violates Connecticut's public policy against interfering with another's business expectancy. Defendants' conduct is further unfair because it contravenes industry standards and norms that prohibit cookie stuffing or similar methods to wrongfully secure Affiliate Commissions and is immoral, unethical, oppressive, and unscrupulous.

438. The gravity of harm resulting from Defendants' practice of appropriating commissions that belong to online marketers like Plaintiff and Connecticut Subclass members outweighs any potential utility therefrom. Defendants' conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

439. Defendants actually and proximately caused an ascertainable loss of money or property to Plaintiffs and Connecticut Subclass members in that, among other things, they suffered economic injury by being deprived of Affiliate Commissions they should have earned from referrals through their affiliate links and suffered a loss of property by being deprived of their Affiliate IDs. Absent Defendants' unfair conduct, Plaintiffs and Connecticut Subclass members would have received the Affiliate Commission payments for sales they rightfully originated.

440.    The conduct alleged herein is continuing and there is no indication that Defendants will cease such activity in the future.

441.    Plaintiffs therefore seek injunctive relief, attorney's fees, actual damages, and any other relief the Court may deem just or proper.

**COUNT EIGHT**
**Violation of the Hawaii Unfair and Deceptive Trade Practices Act**
**(Haw. Rev. Stat. § 480-1, et seq.)**
**Asserted on Behalf of the Hawaii Subclass**

442.    Plaintiffs incorporate the allegations in in paragraphs 1–362 by reference as if fully set forth herein.

443.    Defendants, though the operation of the Honey Browser Extension, wrongfully deprive Plaintiffs and Hawaii Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

444.    Defendants committed unfair business practices by using the Honey Browser Extension to overwrite Plaintiffs' and Hawaii Subclass members' Affiliate IDs in order to steal credit for sales and thereby receive Affiliate Commission payments that rightfully belong to Plaintiffs and Hawaii Subclass members.

445.    Defendants' conduct is unfair in violation of the Hawaii Unfair and Deceptive Trade Practices Act because it violates Hawaii's public policy against interfering with another's business expectancy. Defendants' conduct is further unfair because it contravenes industry standards and norms that prohibit cookie stuffing or similar methods to wrongfully secure Affiliate Commissions; is immoral, unethical, oppressive, and unscrupulous; and caused substantial harm that greatly outweighs any possible utility from the conduct.

446.    The gravity of harm resulting from Defendants' practice of appropriating Affiliate Commissions that belong to online marketers like Plaintiff and Hawaii Subclass members outweighs any potential utility therefrom. Defendants' conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

447.    Defendants actually and proximately caused an ascertainable loss of money or property to Plaintiffs and Hawaii Subclass members in that, among other things, they suffered

economic injury by being deprived of Affiliate Commissions they should have earned from referrals through their affiliate links and suffered a loss of property by being deprived of their Affiliate IDs. Absent Defendants' unfair conduct, Plaintiffs and Hawaii Subclass members would have received the Affiliate Commissions payments for sales they rightfully originated.

448.    The conduct alleged herein is continuing and there is no indication that Defendants will cease such activity in the future.

449.    Plaintiffs therefore seek injunctive relief, reasonable attorneys' fees, actual damages, not less than $1,000 as provided by the statute and/ or statutory damages in the amount of threefold the damages sustained, whichever is greater, as well as any other relief the Court may deem just or proper.

## COUNT NINE
### Violation of the New Hampshire Consumer Protection Act
#### (N.H. Rev. Stat. §§ 358-A:1, *et seq.*)
### Asserted on Behalf of the New Hampshire Subclass

450.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully set forth herein.

451.    Defendants are engaged in the conduct of "trade" and "commerce" as defined by the statute by offering and allowing use of the Honey Browser Extension in New Hampshire. Defendants are "persons" as defined by the statute.

452.    Defendants, though the operation of the Honey Browser Extension, wrongfully deprive Plaintiffs and New Hampshire Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

453.    Defendants committed unfair business practices by using the Honey Browser Extension to overwrite Plaintiffs' and New Hampshire Subclass members' Affiliate IDs in order to steal credit for sales and thereby receive Affiliate Commission payments that rightfully belong to Plaintiffs and New Hampshire Subclass members.

454.    Defendants' conduct is unfair in violation of the New Hampshire Consumer Protection Act because it violates New Hampshire's public policy against interfering with another's business expectancy. Defendants' conduct is further unfair because it contravenes

industry standards and norms that prohibit cookie stuffing or similar methods to wrongfully

secure Affiliate Commissions; is immoral, unethical, oppressive, and unscrupulous; and caused

substantial harm that greatly outweighs any possible utility from the conduct.

455.    The gravity of harm resulting from Defendants' practice of appropriating Affiliate

Commissions that belong to online marketers like Plaintiff and New Hampshire Subclass

members outweighs any potential utility therefrom. Defendants' conduct set forth in this

Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

456.    Defendants actually and proximately caused a loss of money or property to

Plaintiffs and New Hampshire Subclass members in that, among other things, they suffered

economic injury by being deprived of Affiliate Commissions they should have earned from

referrals through their affiliate links and suffered a loss of property by being deprived of their

Affiliate IDs. Absent Defendants' unfair conduct, Plaintiffs and New Hampshire Subclass

members would have received the Affiliate Commissions payments for sales they rightfully

originated.

457.    The conduct alleged herein is continuing and there is no indication that Defendants

will cease such activity in the future.

458.    Plaintiffs therefore seek threefold their actual damages and statutory damages in

the amount of $1,000, whichever is greater, injunctive relief, and reasonable attorneys' fees, as

well as any other relief the Court may deem just or proper.

**COUNT TEN**
**Violation of the New York General Business Law**
**(N.Y. Gen. Bus. Law § 349)**
**Asserted on Behalf of the New York Subclass**

459.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully

set forth herein.

460.    Plaintiffs and the New York Subclass members are "persons" within the meaning

of N.Y. BL §349(h).

461.    N.Y. GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

462.    PayPal has engaged in acts in violation of N.Y. GBL § 349(a) by its Affiliate Commission poaching and related misconduct alleged herein.

463.    PayPal's violations of GBL §349(a) have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the New York Subclass members.

464.    Plaintiffs and the New York Subclass members are entitled to pursue claims against PayPal for damages, statutory damages, treble damages, exemplary damages, injunctive relief, costs and attorneys' fees pursuant to GBL §349(h) to redress PayPal's violations.

**COUNT ELEVEN**
**Violation of the Washington Consumer Protection Act**
**(Wash. Rev. Code §§ 19.86.010, <em>et seq.</em>)**
**Asserted on Behalf of the Washington Subclass**

465.    Plaintiffs incorporate the allegations in paragraphs 1–362 by reference as if fully set forth herein.

466.    Plaintiffs, Washington Subclass members, and Defendants are each natural persons, corporations, trusts, unincorporated associations or partnerships, and are thus "persons" within the meaning of RCW § 19.86.010(1).

467.    Defendants engaged in trade or commerce directly or indirectly affecting the people of Washington by allowing operation and use of the Honey Browser Extension in Washington.

468.    Defendants' unlawful acts and practices occurred in connection with their operation of the Honey Browser Extension, in commerce directly or indirectly affecting the people of the state of Washington.

469.    Defendants maintained and operated the Honey Browser Extension in such a manner as to appropriate Affiliate Commissions to which Affiliate Marketers are rightfully entitled by overwriting their Affiliate IDs with Defendants' own Affiliate IDs.

470.    Defendants, though the operation of the Honey Browser Extension, wrongfully deprive Plaintiffs and Washington Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate links.

471.    Defendants engaged in unfair acts that affect the public interest by maintaining and operating the Honey Browser Extension in such a manner as to appropriate commissions to which Affiliate Marketers are rightfully entitled by overwriting and replacing their Affiliate IDs with PayPal's Affiliate IDs in the United States, including Washington. Defendants' conduct is unfair because it offends Washington's public policy against intentional interference with contractual relationships. Defendants' conduct is further unfair and affects public policy because it because it contravenes existing standards and norms in the Affiliate Marketing industry that prohibit the use of cookie stuffing to divert Affiliate Commissions; is immoral, unethical, oppressive, or unscrupulous; and caused substantial harm that greatly outweighs any possible utility from the conduct.

472.    The gravity of harm resulting from Defendants' practice of appropriating Affiliate Commissions that belong to Affiliate Marketers like Plaintiffs and Washington Subclass members outweighs any potential utility therefrom. Defendants' conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

473.    Defendants' unfair acts have injured a substantial portion of the public. Defendants' general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

474.    As a direct and proximate result of Defendants' unfair conduct, Plaintiffs and Washington Subclass members conduct suffered injury in fact. Absent Defendants' maintenance and operation of the Honey Browser Extension in such a manner as to overwrite existing Affiliate IDs, Plaintiffs and Washington Subclass members would not have been deprived of affiliate commissions they should have rightfully received for providing referrals through their affiliate links.

475.    As a result of Defendants' conduct, Plaintiff and Washington Subclass members have suffered actual damages.

476.    Plaintiff and Washington Subclass members are entitled to an order enjoining the conduct complained of herein and ordering Defendants to take remedial measures to stop its conduct; actual damages; treble damages pursuant to RCW 19.86.090; costs of suit, including reasonable attorneys' fees; and such further relief as the Court may deem proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek that this matter be certified as a class action, and that their attorneys be appointed Class Counsel and that they be appointed Class Representatives, and Plaintiffs demand judgment against Defendants as follows:

1.    Awarding Plaintiffs and the proposed Class and the Subclasses actual damages, statutory damages, restitution, disgorgement of profits, attorneys' fees and costs, and any other relief that may be permitted by law or equity pursuant to the claim(s) for relief;

2.    Permanently enjoining PayPal from engaging in the misconduct alleged herein;

3.    Awarding Plaintiffs and the proposed Class and Subclasses pre-judgment and post-judgment interest pursuant to the claim(s) for relief;

4.    Awarding Plaintiffs and the proposed Class and Subclasses costs, expenses, and attorneys' fees as permitted by law;

5.    Awarding Plaintiffs and the proposed Class and Subclasses punitive, exemplary, and treble damages as permitted by law;

6.    Awarding Plaintiffs and the proposed Class and Subclasses further relief as the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all claims so triable.

1   Dated:  May 9, 2025

2

3                                By:    /s/ Jason L. Lichtman

4                                    Elizabeth J. Cabraser (SBN 083151)
                                     Roger N. Heller (SBN 215348)
5                                    **LIEFF CABRASER HEIMANN &**
                                     **BERNSTEIN, LLP**
6                                    275 Battery Street, 29th Floor
                                     San Francisco, CA 94111-3339
7                                    Telephone: (415) 956-1000
                                     ecabraser@lchb.com
8                                    rheller@lchb.com

9                                    Jason L. Lichtman (*pro hac vice*)
                                     Sean A. Petterson (*pro hac vice*)
10                                   Danna Z. Elmasry (*pro hac vice*)
                                     **LIEFF CABRASER HEIMANN &**
11                                   **BERNSTEIN, LLP**
                                     250 Hudson Street, 8th Floor
12                                   New York, New York 10013-1413
                                     Telephone: (212) 355-9500
13                                   jlichtman@lchb.com
                                     spetterson@lchb.com
14                                   delmasry@lchb.com

15                                   Dena C. Sharp (SBN 245869)
                                     Adam E. Polk (SBN 273000)
16                                   Trevor T. Tan (SBN 281045)
                                     Nina Gliozzo (SBN 333569)
17                                   **GIRARD SHARP LLP**
                                     601 California Street, Suite 1400
18                                   San Francisco, CA 94108
                                     Telephone: 415.981.4800

19                                   Nanci E. Nishimura (SBN 152621)
                                     Thomas E. Loeser (SBN 202724)
20                                   Karin B. Swope (*pro hac vice*)
                                     Jacob M. Alhadeff (*pro hac vice*)
21                                   **COTCHETT, PITRE & McCARTHY, LLP**
                                     840 Malcolm Rd #200,
22                                   Burlingame, CA 94010
                                     Telephone: 650.697.6000
23
                                     *Interim Co-Lead Counsel*
24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
                                                                   CASE NO. 5:24-CV-9470-BLF

1

## **ATTESTATION**

2       Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on

3 whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

4

5 Dated: May 9, 2025

6                             */s/ Jason L. Lichtman*

7                             Jason L. Lichtman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing was duly served upon all

Counsel of record in this action via electronic service, in accordance with the Federal Rules of

Civil Procedure, on May 9, 2025.

/s/ *Jason L. Lichtman*

Jason L. Lichtman

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:24-CV-9470-BLF