RICHARD A. JACOBSEN (*admitted pro hac vice*)
rjacobsen@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:     +1 212 506 5000
Facsimile:     +1 212 506 5151

CLEMENT S. ROBERTS (SBN 209203)
croberts@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irvine, CA 92614-8255
Telephone:     +1 949 567 6700
Facsimile:     +1 949 567 6710

Attorneys for Defendants
PAYPAL, INC. AND PAYPAL HOLDINGS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION | Case No. 5:24-cv-09470-BLF<br><br>**DEFENDANTS PAYPAL, INC.'S AND PAYPAL HOLDINGS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS, AND THEIR MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    November 6, 2025<br>Time:    9:00 AM<br>Judge:   Honorable Beth Labson Freeman<br>Dept:    Courtroom 1, 5th Floor |

# **TABLE OF CONTENTS**

**INTRODUCTION AND ISSUES TO BE DECIDED** ................................................. 1

**FACTUAL BACKGROUND** ........................................................................................ 2

    A.   Honey Benefits Both Consumers And Merchants. ..................................... 2

    B.   Honey Receives Commissions Through The Affiliate Marketing Industry's Last Click Attribution Rules. ............................................................................ 3

    C.   Plaintiffs Allege They Are Contractually Entitled To Commissions That Are Sent To Honey And Other Major Browser Extensions. ..................................... 4

**ARGUMENT** ............................................................................................................... 4

I.    Plaintiffs Do Not Plausibly Allege Article III Standing. .......................................... 4

    A.   Any Harm From Lost Commissions Is Not Traceable To Honey. ............................. 5

    B.   Plaintiffs Do Not Plausibly Allege They Would Have Earned More Commissions But For Honey's Alleged Conduct. ........................................... 6

II.   Plaintiffs' CFAA And CDAFA Claims Fail (Counts I, VI). ................................. 9

    A.   Plaintiffs Have Not Alleged Cognizable "Loss" or "Damage" Under the CFAA and CDAFA Because They Suffered No Technological Harm. ..................................... 10

    B.   Plaintiffs Admit PayPal Acted With Permission. ..................................... 12

    C.   Plaintiffs Do Not Have An Ownership Interest In Their Affiliate IDs. ................... 13

III.  Plaintiffs' Common-Law Claims Fail. ................................................................... 14

    A.   Plaintiffs Cannot State a Claim for Unjust Enrichment (Count II). ......................... 14

    B.   Plaintiffs Fail To State Claims For Intentional Or Negligent Interference (Counts III-V). ............................................................................................................... 15

        1.   Plaintiffs fail to plead relationships with a reasonable probability of benefit or actual disruption of those relationships. ................................................... 15

        2.   If the Court dismisses Plaintiffs' other claims, their interference claims fail for lack of an independently wrongful act. ................................................... 19

        3.   Plaintiffs cannot state a claim for negligent interference because competitors do not owe each other a duty of care. ........................................................... 20

IV.  Plaintiffs' Consumer-Protection / Unfair Competition Claims (Counts VII-XII) Fail. ........ 20

    A.   Plaintiffs fail to plead any wrongful conduct. ......................................... 21

    B.   Plaintiffs fail to plausibly allege they lack adequate alternative legal remedies. ....... 22

    C.   Plaintiffs' claims fail for additional, state-specific reasons. ..................................... 23

        1.   Out-of-state laws do not apply to Honey's alleged California-based conduct (Counts VIII-XII). ............................................................................................ 23

        2.   Plaintiffs do not allege anticompetitive conduct (Counts VII, IX). .............. 23

        3.   Plaintiffs do not allege substantial consumer or public-interest harm (Counts XI, XII). ............................................................................................................ 24

**CONCLUSION** ........................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                  **Page(s)**

*In re Accellion, Inc. Data Breach Litig.*,
    713 F. Supp. 3d 623 (N.D. Cal. 2024) ................................................................................. 14

*In re Adobe Sys., Inc. Priv. Litig.*,
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) ................................................................................ 22

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,
    28 Cal. App. 5th 923 (2018) ............................................................................................... 21

*Andrews v. Sirius XM Radio Inc.*,
    932 F.3d 1253 (9th Cir. 2019) ............................................................................................ 10

*Barnes v. Black*,
    71 Cal. App. 4th 1473 (1999) ............................................................................................. 20

*Behr Process Corp. v. RPM Int'l Inc.*,
    2014 WL 12584385 (C.D. Cal. May 20, 2014) ................................................................. 20

*Bui-Ford v. Tesla, Inc.*,
    2024 WL 694485 (N.D. Cal. Feb. 20, 2024) ..................................................................... 10

*California Expanded Metal Prods. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC*,
    2014 WL 5475214 (C.D. Cal. Oct. 29, 2014) ................................................................... 16

*In re Cap. One Fin. Corp.*,
    2025 WL 1570973 (E.D. Va. June 2, 2025) ................................................................. *passim*

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ................................................................................................. 21, 24

*Cenatiempo v. Bank of Am., N.A.*,
    333 Conn. 769 (2019) ........................................................................................................ 22

*Cent. Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002) ................................................................................................ 9

*Chiulli v. Am. Honda Motor Co.*,
    690 F. Supp. 3d 1038 (N.D. Cal. 2023) ............................................................................. 14

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ......................................................................................................... 6, 8

*Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*,
    687 F. Supp. 3d 201 (D.N.H. 2023) ................................................................................... 21

*Cottle v. Plaid Inc.*,
    536 F. Supp. 3d 461 (N.D. Cal. 2021) ........................................................ 10

*Davis v. Four Seasons Hotel Ltd.*,
    122 Haw. 423 (2010) .................................................................................... 24

*Doe v. Cnty. of Santa Clara*,
    2024 WL 3346257 (N.D. Cal. July 8, 2024) .............................................. 10

*Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*,
    2019 WL 8631502 (C.D. Cal. Dec. 16, 2019) ........................................... 18

*eBay Inc. v. Digital Point Sols., Inc.*,
    608 F. Supp. 2d 1156 (N.D. Cal. 2009) ..................................................... 12

*Elson v. Black*,
    56 F.4th 1002 (5th Cir. 2023) ...................................................................... 25

*Fac. v. New York Univ.*,
    11 F.4th 68 (2d Cir. 2021) ............................................................................. 9

*Forrett v. Gourmet Nut, Inc.*,
    634 F. Supp. 3d 761 (N.D. Cal. 2022) ....................................................... 22

*Gill v. Marsh USA, Inc.*,
    2024 WL 3463351 (N.D. Cal. July 18, 2024) ........................................... 21

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
    98 N.Y.2d 314 (N.Y. 2002) ......................................................................... 23

*Griffith v. TikTok, Inc.*,
    697 F. Supp. 3d 963 (C.D. Cal. 2023) ....................................................... 12

*Hadley v. Kellogg Sales Co.*,
    243 F. Supp. 3d 1074 (N.D. Cal. 2017) ..................................................... 21

*Hambrick v. Healthcare Partners Med. Grp., Inc.*,
    238 Cal. App. 4th 124 (2015) ...................................................................... 22

*Harris v. LAZ Parking Ltd., LLC*,
    No. 3:24-CV-889 (SVN), 2025 WL 473654 (D. Conn. Feb. 12, 2025) ...... 23

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
    810 F. Supp. 2d 1013 (C.D. Cal. 2011) ..................................................... 21

*Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*,
    2013 WL 489899 (C.D. Cal. Feb. 7, 2013) .............................................. 18

*Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*,
    2014 WL 3372583 (N.D. Cal. July 9, 2014) ............................................. 18

DEFENDANTS' MOTION TO DISMISS
5:24-CV-09470-BLF

*Integrity Applied Sci., Inc. v. Clearpoint Chems. LLC,*
    2020 WL 12584444 (D. Colo. Apr. 20, 2020) .......................................................................... 11

*Ixchel Pharma, LLC v. Biogen Inc.,*
    2017 WL 4012337 (E.D. Cal. Sept. 12, 2017) .................................................................. 17, 20

*Jacobs v. Sustainability Partners LLC,*
    No. 20-cv-01981-PJH, 2020 WL 5593200 (N.D. Cal. Sept. 18, 2020) ................................. 15

*Keegan v. Am. Honda Motor Co.,*
    838 F. Supp. 2d 929 (C.D. Cal. 2012) ................................................................................... 25

*Ketab Corp. v. Mesriani & Assocs., P.C.,*
    734 F. App'x 401 (9th Cir. 2018) ........................................................................................... 20

*Korea Supply Co. v. Lockheed Martin Corp.,*
    29 Cal. 4th 1134 (2003) ........................................................................................... 15, 19, 20

*Landmark Inv. Grp., LLC v. Calco Const. & Dev. Co.,*
    141 Conn. App. 40 (2013) ...................................................................................................... 21

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.,*
    729 F. App'x 528 (9th Cir. 2018) ........................................................................................... 19

*Levitt v. Yelp! Inc.,*
    765 F.3d 1123 (9th Cir. 2014) ................................................................................................ 24

*LiMandri v. Judkins,*
    52 Cal. App. 4th 326 (1997) ................................................................................................... 20

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................................................. 5

*Martinez v. Newsom,*
    46 F.4th 965 (9th Cir. 2022) ................................................................................................... 19

*Maurizio v. Goldsmith,*
    230 F.3d 518 (2d Cir. 2000) ................................................................................................... 24

*Mendez v. Selene Fin. LP,*
    2017 WL 1535085 (C.D. Cal. Apr. 27, 2017) ....................................................................... 21

*Meta Platforms, Inc. v. BrandTotal Ltd.,*
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) ................................................................................. 12

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ................................................................................................................... 8

*Nelsen v. King Cnty.,*
    895 F.2d 1248 (9th Cir. 1990) .................................................................................................. 9

DEFENDANTS' MOTION TO DISMISS
5:24-CV-09470-BLF

*NovelPoster v. Javitch Canfield Grp.*,
   140 F. Supp. 3d 938 (N.D. Cal. 2014) ................................................................. 10

*Nowak v. Xapo, Inc.*,
   2020 WL 6822888 (N.D. Cal. Nov. 20, 2020) ..................................................... 10

*Pech v. Doniger*,
   75 Cal. App. 5th 443 (2022) .............................................................................. 19

*Precourt v. Fairbank Reconstruction Corp.*,
   856 F. Supp. 2d 327 (D.N.H. 2012) ................................................................... 23

*Redfearn v. Trader Joe's Co.*,
   20 Cal. App. 5th 989 (2018) ........................................................................ 17, 19

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (2004) ..................................................................................... 17

*RitLabs, S.R.L. v. RitLabs, Inc.*,
   2012 WL 3263893 (E.D. Va. Aug. 9, 2012) ....................................................... 11

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
   2 Cal. 5th 505 (2017) ......................................................................................... 16

*Rutherford Holdings, LLC v. Plaza Del Rey*,
   223 Cal. App. 4th 221 (2014) ............................................................................ 14

*S/Y Paliador, LLC v. Platypus Marine, Inc.*,
   750 F. Supp. 3d 1187 (W.D. Wash. 2024) ......................................................... 25

*Sabini v. Sabini*,
   38 Haw. 394 (1949) ........................................................................................... 23

*Satanic Temple, Inc. v. Rokita*,
   No. 1:22-CV-01859-JMS-MG, 2023 WL 7016211 (S.D. Ind. Oct. 25, 2023) ......... 9

*Sepanossian v. Nat'l Ready Mix Co.*,
   97 Cal. App. 5th 192 (2023) .............................................................................. 14

*Sharma v. Volkswagen AG*,
   524 F. Supp. 3d 891 (N.D. Cal. 2021) ............................................................... 22

*Snapkeys, Ltd. v. Google LLC*,
   2020 WL 6381354 (N.D. Cal. Oct. 30, 2020) ..................................................... 24

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ........................................................................ 14, 15

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................. 4

DEFENDANTS' MOTION TO DISMISS
5:24-cv-09470-BLF

*Stapleton v. JPMorgan Chase Bank, N.A.*,
  2025 WL 1159881 (N.D. Cal. Apr. 21, 2025) ................................................. 14

*State v. Bridges*,
  83 Haw. 187 (1996) ........................................................................................ 23

*Stolz v. Wong Commc'ns Ltd. P'ship*,
  25 Cal. App. 4th 1811 (1994) ........................................................................ 20

*Stuart v. Cnty. of Riverside*,
  2024 WL 3455263 (C.D. Cal. Apr. 22, 2024) ............................................... 13

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................................... 9

*Talavera v. Glob. Payments, Inc.*,
  670 F. Supp. 3d 1074 (S.D. Cal. 2023) .......................................................... 15

*Trader Joe's Co. v. Hallatt*,
  835 F.3d 960 (9th Cir. 2016) .......................................................................... 23

*United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*,
  766 F.3d 1002 (9th Cir. 2014) ........................................................................ 17

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ......................................................................................... 9

*Van Buren v. United States*,
  593 U.S. 374 (2021) ....................................................................................... 10

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
  42 Cal. App. 4th 507 (1996) ............................................................. 15, 16, 17

*Windward Aviation, Inc. v. Rolls-Royce Corp.*,
  2011 WL 2670180 (D. Haw. July 6, 2011) .................................................... 24

**Statutes**

18 U.S.C. § 1030(a)(4) .................................................................................... 9, 12

18 U.S.C. § 1030(a)(5)(A) .................................................................... 9, 10, 11, 12

18 U.S.C. § 1030(e)(8) ......................................................................................... 10

18 U.S.C. § 1030(e)(11) ....................................................................................... 10

18 U.S.C. § 1030(g) .............................................................................................. 10

Cal. Penal Code § 502(c)(1) ............................................................................ 9, 12

Cal. Penal Code § 502(c)(4) ............................................................................ 9, 12

Cal. Penal Code § 502(c)(8) ................................................................. 9, 12

Cal. Penal Code § 502(c)(12) ..................................................................... 12

Cal. Penal Code § 502(e)(1) ....................................................................... 13

California Comprehensive Computer Data Access and Fraud Act ........................................ *passim*

California Unfair Competition Law ................................................... 4, 21, 22, 23

Computer Fraud and Abuse Act .................................................................... *passim*

Haw. Rev. Stat. § 480-1 .............................................................................. 23

Haw. Rev. Stat. § 480-2(d) .......................................................................... 24

Haw. Rev. Stat. § 480-2(e) .......................................................................... 24

Hawaii's Unfair and Deceptive Trade Practices Act ........................................... 23

New York General Business Law ..................................................... 4, 24, 25

Washington's Consumer Protection Act .................................................. 23, 24

**Other Authorities**

Fed. R. Civ. P. 9(b) ..................................................................................... 25

Fed. R. Civ. P. 12(b)(1) ................................................................................. 1

Fed. R. Civ. P. 12(b)(6) ................................................................................. 1

## NOTICE OF MOTION AND MOTION TO DISMISS

**PLEASE TAKE NOTICE** that on November 6, 2025, at 9:00 a.m., or at such later date and time as the Court may order, Defendants PayPal, Inc. and PayPal Holdings, Inc. ("PayPal" or "Defendants"), will and hereby do move to dismiss Plaintiffs' Amended Consolidated Class Action Complaint ("FAC"). This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the pleadings and records on file in this case, all matters of which the Court may take judicial notice, and any other matter that the Court may properly consider. Defendants seek an order pursuant to Federal Rule of Civil Procedure 12(b)(1) dismissing Plaintiffs' Complaint for lack of subject-matter jurisdiction, or, alternatively, an order pursuant to Rule 12(b)(6) dismissing Plaintiffs' FAC with prejudice for failure to state a claim.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION AND ISSUES TO BE DECIDED

This case is an attempt to use the judicial process to stifle competition in the online commerce market. Plaintiffs compete with PayPal's free Honey browser extension for commissions from merchants for online purchases. Merchants, sometimes acting through intermediary affiliate networks, have agreements with industry participants like Honey and Plaintiffs that specify the circumstances in which the merchant will award a commission. Pursuant to those agreements, Honey receives commissions from its merchant partners when it is the last touchpoint before a consumer purchases a qualifying product—such as when Honey provides coupons or rewards to consumers at checkout. Plaintiffs similarly receive commissions when their links are a consumer's last touchpoint prior to a purchase. Honey does not make the rules; it follows them.

Plaintiffs do not allege that Honey violated its agreements with merchants and affiliate networks when receiving commissions. Instead, Plaintiffs assert Honey received commissions to which Plaintiffs are entitled under their *own* alleged agreements with merchants and affiliate networks. Plaintiffs have thus chosen to sue Honey—and all other major browser extensions— asking the Court to rewrite contracts to which Honey is not a party to prevent Honey from competing with them. While Plaintiffs complain about the method by which Honey receives credit for commissions—i.e., inserting its affiliate ID into a consumer's browser after the consumer

interacts with Honey—Plaintiffs identify nothing improper about that practice. It is a convenient and logical way for merchants to allocate credit to Honey when it is entitled to a commission under its agreements with those merchants. Plaintiffs themselves seek commissions from merchants using the same method.

Plaintiffs' claims fail for a host of reasons, but most fundamentally because they have not plausibly alleged that Honey's conduct is wrongful or harmed them. Plaintiffs lack standing because any harm they may have experienced is traceable not to Honey but to the industry standard "last-click" attribution rules. Plaintiffs' computer fraud and abuse claims fail because Plaintiffs admit that Honey had permission from users, merchants, and affiliate networks for the conduct that allegedly violates both statutes. Plaintiffs' unjust enrichment claim fails because Plaintiffs cannot show that no adequate legal remedy exists. Plaintiffs' tortious interference claims fail because they have not identified any specific contractual right to receive payment Honey interfered with or any specific contractual term Honey induced Merchants to breach. And Plaintiffs' largely derivative consumer protection and unfair competition claims fail for many of the same collective reasons. For all those reasons, this Court should grant PayPal's motion to dismiss.

## FACTUAL BACKGROUND

### A.    Honey Benefits Both Consumers And Merchants.

PayPal's Honey browser extension is a free, downloadable extension shoppers can install on their web browsers and use to look for deals and earn rewards while shopping at participating merchant sites. FAC ¶ 5. Consumers who download Honey see a pop-up at checkout when they make a purchase on participating websites. *Id.* If they click on the pop-up, Honey tells them if there is a coupon or better deal for the product they are purchasing, or if cashback is available on their purchase through Honey's customer rewards program. *Id.* Millions of consumers have downloaded Honey to obtain coupons and rewards. *Id.* ¶¶ 5-6, 95, 117.

Over 30,000 merchants partner with Honey. *Id.* ¶ 2. Pursuant to contractual agreements with Honey, those merchants—sometimes acting through intermediaries who support their affiliate programs known as Affiliate Networks—provide Honey commissions for qualifying sales "when a member uses Honey to find available savings or to activate PayPal Rewards." *Id.* ¶ 102. They do

so because Honey drives sales that might otherwise not have been completed. *See How does Honey make money?*, PayPal, FAC ¶ 102 n.21.

### B.    Honey Receives Commissions Through The Affiliate Marketing Industry's Last Click Attribution Rules.

Merchants use various attribution models to assign credit for a qualifying sale to Affiliate Marketers or "affiliates"—individuals or entities that promote a merchant's products or services in exchange for a commission. FAC ¶¶ 56, 87. According to Plaintiffs, merchants primarily use the "last-click" attribution model, which attributes the entire credit for a sale to the Affiliate Marketer whose "link was the last link that a consumer interacted with prior to purchase." *Id.* ¶ 56. Under this model, "the last touchpoint in a sequence of ads prior to conversion [i.e., sale] gets full credit for the conversion." *Id.* ¶ 108 n.29. Last-click attribution makes it easy for merchants to quickly ascertain who is entitled credit for a qualifying purchase. But it disregards contributions of affiliates further up the marketing "funnel." *Digital Attribution Primer 2.0*, iab at 2, FAC ¶ 92 n.12. For instance, if a consumer clicks on an affiliate link on a blogger's website but later "click[s] another Affiliate Marketer's affiliate link for the same product, … the 'last clicked' Affiliate Marketer would get the credit." FAC ¶ 130. Plaintiffs allege last-click attribution "does not refer to actions that the consumer takes once they have arrived at the Merchant's website." FAC ¶ 92. However, the sources Plaintiffs cite describe last-click attribution as assigning credit to any "last touchpoint" before a conversion, not just a consumer's literal last click before arriving at a merchant's page. FAC ¶ 108 n.29; *see Digital Attribution Primer*, *supra*, at 2 ("100% credit" is given "to the last meaningful event before a desired outcome takes place, generally the last ad impression (sometimes called ad view), last click, or last engagement").

Merchants determine who is entitled to receive credit for qualifying purchases based on "affiliate IDs"—unique identifiers merchants assign to each of their affiliates. *Id.* ¶ 63. Thus, to receive credit for qualifying sales, when a consumer clicks on Honey, Honey exercises permissions granted by the consumer to open another tab, which reloads the Merchant's website. *Id.* ¶ 111; *see id.* ¶¶ 132-33, 144. When a merchant uses last-click attribution, the merchant's website will replace any other affiliate ID previously loaded onto the consumer's browser with PayPal's affiliate ID. *Id.*

¶¶ 148, 162. If the consumer then completes the purchase without interacting with any other affiliate, Honey may receive a commission. *Id.* ¶ 162. However, when a merchant uses another means of attribution such as "first click" attribution, which allocates credit for contributions further up the marketing funnel, Honey "does not fully activate" and may not cause the merchant's webpage to swap out previously populated affiliate IDs. *Id.*; *see Last-Click Attribution Model in Affiliate Marketing,* Affiliboost, FAC ¶ 89 n.10 (discussing different attribution models).

### C. Plaintiffs Allege They Are Contractually Entitled To Commissions That Are Sent To Honey And Other Major Browser Extensions.

Plaintiffs—a group of online marketers who promote merchants' products—allege they have unspecified agreements with merchants and affiliate networks entitling them to receive commissions whenever their affiliate link was the last link a user clicked on prior to arriving at a merchant's page. *Id.* ¶¶ 2, 359. They further allege merchants and affiliate networks directed commissions to Honey that Plaintiffs were entitled to under their agreements with the merchants and affiliate networks. *Id.* ¶¶ 163-64. As a result, Plaintiffs have brought this twelve-count, putative class action lawsuit against PayPal seeking both damages and injunctive relief.

Affiliate marketers, including multiple Named Plaintiffs in this case, have also brought substantially similar suits against the other major browser extensions in this industry, such as Capital One, Rakuten, Microsoft, and RetailMeNot. *See* App'x A. In *Capital One*, which includes several of the same named plaintiffs as this case, the district court granted in part and denied in part the defendant's motion to dismiss, dismissing in particular three claims Plaintiffs assert here for violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"); California Unfair Competition Law ("UCL"); and New York General Business Law. *In re Cap. One Fin. Corp.*, 2025 WL 1570973 (E.D. Va. June 2, 2025).

## ARGUMENT

### I. Plaintiffs Do Not Plausibly Allege Article III Standing.

To have standing in federal court, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Plaintiffs have not established an Article III injury traceable to Honey for two reasons. First, Plaintiffs' alleged harm from lost commissions is traceable not to Honey, but rather to last-click attribution rules and decisions to award commissions which Honey does not control. Second, Plaintiffs have not plausibly alleged Honey received any commissions that Plaintiffs otherwise would have received.

### A.    Any Harm From Lost Commissions Is Not Traceable To Honey.

Plaintiffs' central complaint is that Honey and other browser extensions compete with them for commissions in the affiliate marketing industry. While Plaintiffs might prefer that that were not the case, their redress is not through the courts but any number of commercially available means to restructure the industry. But having elected to participate in the affiliate marketing ecosystem, they are not harmed by subjecting themselves to its rules. Even if they were, Plaintiffs lack standing because any alleged harm would not be attributable to Honey. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs acknowledge that "last-click" attribution assigns full credit for a sale whenever an affiliate was the "last link that a consumer interacted with prior to purchase." FAC ¶ 56. They further acknowledge that, under the industry's last-click attribution rules, an affiliate marketer who drove a consumer to a merchant's page may not receive any credit for that consumer's purchase if the consumer clicks on another marketer's affiliate link prior to checking out. *Id.* ¶ 130. Plaintiffs do not claim to be harmed by the later-in-time affiliate marketer when that happens. Those are just the terms of the agreements.

Honey is no different. Pursuant to its agreements, Honey may (but does not always) receive credit for a sale when a consumer clicks on Honey and then completes a purchase before clicking on any other affiliate's link, even if the consumer has previously clicked on another affiliate's link. *Id.* ¶¶ 7, 102, 162. To the extent that outcome constitutes "harm" to Plaintiffs, Honey is not the cause. Honey, like Plaintiffs, are simply recipients of commissions; it does not control allocation or distribution.

Plaintiffs cannot circumvent this fatal flaw by narrowly redefining "last-click" to exclude "actions that the consumer takes once they have arrived at the Merchant's website." *Id.* ¶ 93. As

explained above, *supra* at 3, last-click assigns credit to the "last touchpoint" or "meaningful event" before a conversion, not just the consumer's last click before arriving on a merchant's page. Plaintiffs do not dispute that whenever Honey receives a commission, the Honey browser extension is the "last touchpoint" prior to that conversion. Plaintiffs' redefinition of last-click is actually more akin to "first click," which "[c]redits the affiliate who initiated the customer journey" and ignores any later interactions with other affiliates. *Affiliboost*, *supra*.

The *Capital One* court's rejection of Capital One's traceability argument shows a misunderstanding of Plaintiffs' allegations regarding the commission attribution process. The *Capital One* court concluded that the plaintiffs there plausibly "allege[d] that *the Extension* is responsible for overriding their affiliate link, such that" others in the ecosystem were unaware "that Plaintiffs have had any involvement in the transaction." *Cap. One*, 2025 WL 1570973, at *6 n.15. But Plaintiffs admit in the FAC that merchants and affiliate networks, not browser extensions: (1) determine the relevant commission attribution rules (whether "last click" or some other scheme), FAC ¶¶ 1, 56, 112; (2) track affiliate interactions with a customer (e.g., by recording an affiliate ID in a cookie stored on a user's browser), *id.* ¶ 73; and (3) award commissions based on the data they tracked and their agreements with affiliate marketers, *id.* ¶ 66. This Court should thus decline to follow *Capital One's* reasoning as to traceability.

### B.  Plaintiffs Do Not Plausibly Allege They Would Have Earned More Commissions But For Honey's Alleged Conduct.

Plaintiffs' theory of standing fails for an additional reason: It relies on a "highly attenuated chain of possibilities" a mile long. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (citation omitted). Plaintiffs cannot cure that problem through the use of statistical probabilities or representative sampling.

***Plaintiffs' theory of standing is too attenuated.*** Plaintiffs do not identify a single commission any Plaintiff would have received but for Honey's alleged wrongful conduct. Instead, they *assume* each "would have earned more in Affiliate Commissions but for" Honey's alleged conduct. FAC ¶¶ 157-349. To even get to a point where Honey *might* receive credit for a conversion after a consumer clicked on a Plaintiff's affiliate link, Plaintiffs' Complaint requires assuming, for

1   each Plaintiff, (a) at least one consumer, "if interested," clicks on the Plaintiffs' affiliate links to

2   arrive at a merchant's page, *id.* ¶ 65; (b) that specific consumer has downloaded and installed Honey

3   on the browser she is using to purchase a product, *id.* ¶ 5; and (c) Honey partners with the merchant

4   whose page that consumer has arrived at, *id.* ¶ 102. Plaintiffs do not connect any of these dots. They

5   do not allege the consumers who might, "if interested," click on Plaintiffs' affiliate links also use

6   the Honey browser extension. *Id.* ¶ 65. Nor do Plaintiffs allege that all or even a majority of the

7   merchants Plaintiffs work with also partner with Honey, or that Honey receives commissions from

8   any merchants with which it does not partner.

9       Even if Plaintiffs could overcome these failings, there are any number of reasons why the

10  Plaintiff might not receive the commission that have nothing to do with Honey. The "undecided

11  consumer[]" who clicked on a Plaintiff's affiliate link might decide not to buy the product after all.

12  *Id.* ¶ 65. Alternatively, she might click on another affiliate's link before completing the transaction,

13  in which case the Plaintiff would admittedly receive no credit. *Id.* ¶¶ 65, 130. Or she might check

14  out using a different browser extension, such as those offered by Capital One, Rakuten, Microsoft,

15  or RetailMeNot, all of which have been sued (including by Named Plaintiffs in this case) in similar

16  complaints for allegedly "stealing" affiliate marketers' commissions. *See* App'x A.

17      Even if the Plaintiff would otherwise receive a commission, it is still speculative to assume

18  that Honey usurps it. The user might not use the Honey extension when checking out. *See* FAC

19  ¶¶ 5, 7 (Honey activates only "if" the consumer clicks on the Honey pop-up). Or Honey's terms

20  with its partner affiliate networks and merchants might prohibit Honey from receiving any

21  commission where the consumer arrived at a merchant's page after clicking on an affiliate

22  marketer's link. Plaintiffs acknowledge that Honey "does not fully activate" and may not "swap[]

23  out affiliate IDs" on "certain websites," including Amazon, one of only four merchant websites

24  Plaintiffs identify that Honey allegedly operates on and a partner to nearly all the Named Plaintiffs.

25  *Id.* ¶ 162; *see id.* ¶¶ 2, 143. Moreover, Plaintiffs' claim that they would have earned commissions

26  but for Honey's involvement necessarily ignores an entire class of sales transactions: those that

27  would not have occurred but for the coupons, discounts, and cashback rewards Honey provides.

28  *See id.* ¶ 84 (alleging that consumers download browser extensions to search for coupons "when a

DEFENDANTS' MOTION TO DISMISS
5:24-cv-09470-BLF

1    consumer is at an online retailer's checkout page"). Plaintiffs are not injured by not receiving

2    commissions for purchases that would not have occurred absent Honey's involvement. This

3    guesswork that one or more Plaintiffs *might* have been injured based on a theoretical coincidence

4    of events and unpredictable actions of multiple third parties is plainly insufficient under *Clapper*.

5         **Plaintiffs' "representative example" does not establish standing.** Plaintiffs' Complaint

6    offers a "representative example" where someone who has installed Honey clicks on Plaintiff Justin

7    Tech Tips's affiliate link for a product sold by "Adorama." FAC ¶ 119. The person then clicks on

8    Honey's "Activate Cashback," which allegedly results in Honey "replacing the Justin Tech Tips

9    Affiliate ID … with Paypal's own Affiliate ID." FAC ¶ 146.

10        Plaintiffs do not cite this example as a source of any of their "harm[]." *See id.* ¶¶ 157-349.

11   Even if they had, it would not establish Plaintiffs' standing. As an initial matter, no Named Plaintiff

12   other than Justin Tech Tips is alleged to even partner with the merchant, Adorama. The example

13   therefore cannot establish standing for any other Plaintiff. *See Murthy v. Missouri*, 603 U.S. 43, 61

14   (2024) ("Standing is not dispensed in gross"). But even as to Justin Tech Tips, the Complaint does

15   not allege the purchase was ever completed. That means there was no commission Honey received

16   that Justin Tech Tips would have otherwise received. This is evidenced by the fact that Justin Tech

17   Tips does not discuss any commissions from or partnership with Adorama in the section of the

18   Complaint alleging how Honey harmed him. *See* FAC ¶¶ 258-264.

19        **Plaintiffs cannot manufacture standing with statistics.** Having failed to plead any actual

20   injury, Plaintiffs instead try to claim an "injury" was probable using statistics. Plaintiffs allege they

21   conducted a "Monte Carlo" simulation using unspecified "publicly available, limited data" to

22   model the likelihood that Honey "stole at least one Affiliate Commission" from Plaintiffs. FAC

23   ¶¶ 158-59. Plaintiffs allege "[t]he simulation took into account … the number of eligible purchases,

24   the size of the internet audience, the share of US-based versus international activity, the prevalence

25   of different internet browsers … and the prevalence of the Honey Browser Extension." *Id.* ¶ 160.

26   Notably, Plaintiffs make no attempt to claim they accounted for customers failing to complete any

27   sales transaction on a merchant website, the "robust" competition amongst affiliate marketers, *id.*

28   ¶ 59, or a user's use of a browser extension *other than* Honey. Despite these shortcomings, Plaintiffs

1   conclude there is at least a 97.2% chance "the Honey Browser Extension stole at least one Affiliate

2   Commission from" each Plaintiff. *Id.* ¶¶ 163-64.

3       Courts will not "base a determination of standing upon naked statistical assertion." *Nelsen*

4   *v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990). As the Supreme Court has long held, "[t]he law

5   of averages is not a substitute for standing," *Valley Forge Christian Coll. v. Am. United for*

6   *Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982), meaning a mere "statistical

7   probability" of injury does not suffice, *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

8   That is why courts, at the pleading stage, have rejected allegations of statistical injury as "plainly

9   insufficient" to establish Article III injury. *Fac. v. New York Univ.*, 11 F.4th 68, 76 (2d Cir. 2021);

10  *Satanic Temple, Inc. v. Rokita*, No. 1:22-CV-01859-JMS-MG, 2023 WL 7016211, at *6 (S.D. Ind.

11  Oct. 25, 2023) ("speculation through statistics is no replacement for specifics"). While statistics

12  *might* in certain cases be used to support a showing of threatened *future* harm, *see Cent. Delta*

13  *Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002), they cannot show a plaintiff has

14  *already* experienced a concrete, personalized injury.

15      The district court's decision in *Capital One* does not support a different result. That court

16  found the plaintiffs there had plausibly alleged standing based in part on statistics, but those

17  statistics merely "bolstered" allegations of harm stemming from "actual purchases on merchants'

18  websites." *Cap. One*, 2025 WL 1570973, at *5. As noted above, Plaintiffs' FAC here includes no

19  such allegations of actual purchases. *Capital One* does not conclude statistics *alone* could suffice

20  to establish injury, nor could it in light of the caselaw discussed above, recognizing that statistics

21  are not enough to establish standing, absent other evidence of harm.

22  **II.    Plaintiffs' CFAA And CDAFA Claims Fail (Counts I, VI).**

23      Plaintiffs bring claims under two different subsections of the Computer Fraud and Abuse

24  Act ("CFAA"), 18 U.S.C. §§ 1030(a)(4), (a)(5)(A), and three different subsections of California's

25  state law counterpart, CDAFA, Cal. Penal Code §§ 502(c)(1), (c)(4), (c)(8). Each of these claims

26  fail because Plaintiffs (1) have failed to plead "loss" or "damage"; (2) admit that PayPal's alleged

27  actions were done with user permission; and (3) have no ownership interest in their affiliate IDs.

28

DEFENDANTS' MOTION TO DISMISS
5:24-cv-09470-BLF

**A.    Plaintiffs Have Not Alleged Cognizable "Loss" or "Damage" Under the CFAA and CDAFA Because They Suffered No Technological Harm.**

Plaintiffs cannot maintain a civil claim for violation of the CFAA unless they suffered "damage or loss." *See* 18 U.S.C. § 1030(g). The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information" and "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *See* 18 U.S.C. §§ 1030(e)(8), (11). Both "damage" and "loss" under the CFAA are limited to "technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren v. United States*, 593 U.S. 374, 391–92 (2021). "[A]ny theory of loss must conform to the limited parameters of the CFAA's definition." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019). Lost revenue is recoverable only if losses occurred "because of interruption of service." *See id.* (quoting 18 U.S.C. § 1030(e)(11)). This Court, among others in this District, applies the CFAA's requirements for "loss" and "damage" to CDAFA claims. *See Nowak v. Xapo, Inc.*, 2020 WL 6822888, at *5 (N.D. Cal. Nov. 20, 2020); *Bui-Ford v. Tesla, Inc.*, 2024 WL 694485, at *6 (N.D. Cal. Feb. 20, 2024); *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 950 (N.D. Cal. 2014).

Plaintiffs have not pleaded any "damage" under the CFAA or CDAFA. The "damage" Plaintiffs allege PayPal caused is to the "impairment of the integrity and availability" of Plaintiffs' affiliate IDs. FAC ¶ 369. But Plaintiffs' affiliate IDs—short strings of numbers or letters—have no independent value as "data." In similar cases involving data with questionable or hypothetical value, courts have concluded the loss of the value of that data or the loss of the right to control it are not "damages" under either statute. *See Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 486 (N.D. Cal. 2021) (concluding "loss of use and control" of financial information was not cognizable damage or loss under the CFAA); *Doe v. Cnty. of Santa Clara*, 2024 WL 3346257, at *9 (N.D. Cal. July 8, 2024) (dismissing CDAFA claims "based on damage as the lost value in plaintiff's PHI").

Because Plaintiffs have no "damage," they fail to state a claim under CFAA subsection

(a)(5)(A), which requires Plaintiffs to plead PayPal "intentionally cause[d] damage without authorization, to a protected computer." *See* 18 U.S.C. § 1030(a)(5)(A). Plaintiffs' assertions of harm to their affiliate IDs does not allege damage to users' computers or any other device.

Plaintiffs have also not pleaded any "loss" under the CFAA or CDAFA. Plaintiffs are seeking lost revenue, FAC ¶ 377, but have not pleaded a cognizable "interruption of service" as is required. *See Andrews,* 932 F.3d at 1263. The "service" they identify as allegedly interrupted by PayPal's actions is the "service" of crediting affiliate marketers for sales via commissions. FAC ¶ 369. Plaintiffs have not pleaded an actual "interruption" to that service, which functions as designed by merchants and affiliate networks. *Id.* ¶ 56. Merchants and affiliate networks provide affiliate marketers with links and, when a user clicks the link, the merchant's website "reads the URL parameters" and stores a cookie on a user's device to track the involvement of affiliate marketers in a sale. *Id.* ¶¶ 69, 73, 77. Following a sale, the merchants or networks use the data they stored in their cookies to determine which affiliate marketers to credit for the sale according to their rules. *Id.* Plaintiffs evidently do not like the results of that determination in situations where PayPal gets a commission, but that does not mean the merchant's commission attribution "service" was interrupted by the Honey browser extension.

In reaching a contrary conclusion, *Capital One* mischaracterized the affiliate marketing process and relied on inapposite cases. *Capital One* concluded the plaintiffs there sufficiently alleged a service interruption based on cases where "defendants are alleged to have used their programming prowess to alter the recipient field in order to redirect the information being communicated through computer traffic for their own financial benefit." 2025 WL 1570973, at *12. The cases *Capital One* relied on to find a cognizable loss in which a defendant interrupted the plaintiff's service by "redirect[ing] … traffic" and "divert[ing] customer orders" from plaintiff to defendant bear little resemblance to the facts here. *See Integrity Applied Sci., Inc. v. Clearpoint Chems. LLC*, 2020 WL 12584444, at *2 (D. Colo. Apr. 20, 2020) (redirecting email traffic); *RitLabs, S.R.L. v. RitLabs, Inc.*, 2012 WL 3263893 (E.D. Va. Aug. 9, 2012) (redirecting website traffic by swapping domain registrant field). Plaintiffs do not allege PayPal "interrupted" any merchant's ability to track affiliate marketers that were involved in a sale and assign commissions

1    to the appropriate affiliates based on their prior agreements with them. Instead, Plaintiffs do not

2    like the *outcome* of an uninterrupted commission attribution service.

3         Other cases cited in *Capital One* are similarly off the mark. In *eBay Inc. v. Digital Point

4    Sols., Inc.*, 608 F. Supp. 2d 1156 (N.D. Cal. 2009), defendant did not argue that plaintiff failed to

5    allege "damage or loss," and the court did not analyze those questions. *See id.* at 1164. *Griffith v.

6    TikTok, Inc.*, 697 F. Supp. 3d 963 (C.D. Cal. 2023), actually supports PayPal, because the court

7    dismissed a CFAA claim for a failure to plead damage or loss based on placement of cookies on

8    plaintiffs' computers. *See id.* at 975. Moreover, in finding that placement of cookies could

9    theoretically support a CFAA claim, *Griffith* relied on allegations that defendant "develop[ed] a

10   code that is designed to surreptitiously place cookies on users' computers." *Id.* at 974. Here,

11   Plaintiffs admit cookie placement is entirely controlled by merchants. Merchants provide affiliate

12   marketers like Honey with links containing tracking codes and then store those codes in a cookie

13   when a user clicks on an affiliate marketer's link. FAC ¶¶ 69, 73, 77.

14        **B.    Plaintiffs Admit PayPal Acted With Permission.**

15        Plaintiffs cannot maintain either their CFAA or CDAFA claims because they admit PayPal

16   had permission from users, merchants, and affiliate networks for the conduct that allegedly violates

17   both statutes. Each of Plaintiffs' CFAA and CDAFA claims require them to plead that PayPal either

18   acted without authorization or exceeded its authorization. *See* 18 U.S.C. § 1030(a)(4) (requiring

19   plaintiffs to plead that the defendant "access[ed] a protected computer without authorization, or

20   exceed[ed] authorized access"); 18 U.S.C. § 1030(a)(5)(A) (requiring plaintiff to plead that

21   defendant acted "without authorization"); Cal. Penal Code § 502(c)(1) (requiring plaintiff to plead

22   that defendant accessed a computer "[k]nowingly … and without permission"); Cal. Penal Code

23   § 502(c)(4) (same); Cal. Penal Code § 502(c)(8), (12) (requiring plaintiff to plead that defendant

24   introduced computer instructions "without the intent or permission of the owner"). Courts

25   recognize these elements of CFAA and CDAFA claims overlap and thus rise and fall together. *See,

26   e.g.*, *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260 (N.D. Cal. 2022).

27        Plaintiffs admit users grant PayPal "extensive" permissions when they choose to install the

28   Honey browser extension, including permission to "access[]" or "creat[e] pages" and "[q]uery and

modify cookies." *See* FAC ¶ 133. Plaintiffs also admit affiliate marketers like PayPal must enter into agreements with, and obtain affiliate links from, merchants and affiliate networks to receive affiliate commissions. *Id.* ¶¶ 1. PayPal thus operates in a system where it has received permission from both users, for its browser extension to operate on their computers, and merchants and affiliate networks, to participate in their affiliate programs.

The FAC's admissions that the Honey browser extension has "extensive" permissions distinguish this case from *Capital One*. Capital One's privacy policy merely gave it permission to "measure" and "record" user interactions with its extension, not to modify cookies. *See* 2025 WL 1570973, at *13. Here, Plaintiffs admit that Honey gets permission from users to modify cookies. FAC ¶ 133. The actions allegedly violating the CFAA and CDAFA are thus done with permission, precluding both claims.

### C.    Plaintiffs Do Not Have An Ownership Interest In Their Affiliate IDs.

The Court should also dismiss Plaintiffs' CDAFA claim because Plaintiffs failed to plead a cognizable ownership interest in affiliate IDs or links. CDAFA permits civil claims by only "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss" under the statute. *See* Cal. Penal Code § 502(e)(1). As the *Capital One* court recognized, Plaintiffs do not have an ownership interest in affiliate IDs because they are created by merchants and affiliate networks. *See* 2025 WL 1570973, at *14-15. Plaintiffs admit their affiliate links, which contain Plaintiffs' affiliate IDs, "are generated from an Affiliate Network or Merchant-provided tool." FAC ¶ 432. Plaintiffs lack an ownership interest over data generated or created by third parties sufficient to maintain a CDAFA claim. *See Cap. One*, 2025 WL 1570973, at *14-15; *see also Stuart v. Cnty. of Riverside*, 2024 WL 3455263, at *19 (C.D. Cal. Apr. 22, 2024) (rejecting CDAFA claim because "although the data pertains to Plaintiffs, …. [t]he State of California manages the CWS/CMS system, and an internal division with DPSS determines access permissions for DPSS employees").

Plaintiffs have tried to distinguish *Capital One* by alleging that Plaintiffs "often create an affiliate [ID] to include their own name or branding." FAC ¶ 432. But an affiliate has no greater ownership interest in a named or branded ID than in a randomly generated one. At bottom,

1    Plaintiffs' affiliate IDs are merely numbers and letters assigned to them by a third-party merchant

2    or affiliate network.

3    **III.    Plaintiffs' Common-Law Claims Fail.[1]**

4         **A.    Plaintiffs Cannot State a Claim for Unjust Enrichment (Count II).**

5              Plaintiffs' unjust enrichment claim fails because California does not recognize a cause of

6    action for unjust enrichment. *See, e.g.*, *Sepanossian v. Nat'l Ready Mix Co.*, 97 Cal. App. 5th 192,

7    206-07 (2023) ("[t]here is no cause of action in California labeled 'unjust enrichment.'") (citation

8    omitted); *Stapleton v. JPMorgan Chase Bank, N.A.*, 2025 WL 1159881, at *11 (N.D. Cal. Apr. 21,

9    2025) (in California, "[t]here is no cause of action ... labeled unjust enrichment") (citation omitted).

10             In limited circumstances, California courts may recognize such claims as "quasi-contract

11   claim[s] seeking restitution." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221,

12   231 (2014). But the court will only consider such quasi-contractual claims where no adequate

13   remedy at law exists. *See In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 648 (N.D.

14   Cal. 2024), *reconsideration denied*, 2024 WL 4592367 (N.D. Cal. Oct. 28, 2024) (requiring

15   Plaintiffs to show they lack an adequate remedy at law); *see also Chiulli v. Am. Honda Motor Co.*,

16   690 F. Supp. 3d 1038, 1062 (N.D. Cal. 2023) (dismissing unjust enrichment claim for failure to

17   plausibly allege inadequate remedy at law). Here, Plaintiffs merely state their unjust enrichment

18   claim is "in the alternative to those claims sounding in contract and seeking damages" and allege,

19   without supporting facts, "there is no adequate remedy at law to address Defendants' conduct."

20   FAC ¶ 364. This conclusory statement is insufficient to plead that no adequate remedy at law exists.

21   Plaintiffs must do more than simply plead an unjust enrichment claim in the alternative to claims

22   at law. "The question is not whether or when Plaintiffs are required to choose between two available

23   inconsistent remedies, it is whether equitable remedies are available to Plaintiffs at all…" *In re*

24   *Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d at 648; *see also Sonner v. Premier Nutrition*

---

25   [1] Plaintiffs allege California law applies to their common law claims. PayPal accepts that allegation

26   as true for purposes of this motion but reserves the right to explain, pursuant to a proper choice-of-

27   law analysis, why the laws of other states apply depending on the facts and circumstances

28   applicable to individual class members.

*Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (holding "[plaintiff] must establish that [he/she] lacks an adequate remedy at law before securing equitable restitution for past harm").

Plaintiffs' unjust enrichment claim fails for the additional reason that the subject matter of their claims is governed by their relationships with third parties. *See Talavera v. Glob. Payments, Inc.*, 670 F. Supp. 3d 1074, 1110 (S.D. Cal. 2023) ("no action for unjust enrichment lies…where a legal remedy for the same wrong is available against a different party") (citations omitted). Plaintiffs' claim focuses on the process by which they receive commissions via contracts with merchants and affiliate networks. *See* FAC ¶ 404 (invoking "the terms of these contracts" between Plaintiffs and merchants). They allege PayPal is wrongfully taking the commissions they are entitled to pursuant to their contractual relationships. Plaintiffs "may not plead the existence of an enforceable contract and maintain a quasi-contract claim at the same time, unless the plaintiff has pled facts suggesting that the contract may be unenforceable or invalid." *Jacobs v. Sustainability Partners LLC*, No. 20-cv-01981-PJH, 2020 WL 5593200, at *17 (N.D. Cal. Sept. 18, 2020) (citation omitted). Plaintiffs do not allege their contracts are unenforceable or invalid, so the existence of those contracts precludes a quasi-contractual claim.

### B.    Plaintiffs Fail To State Claims For Intentional Or Negligent Interference (Counts III-V).

#### 1.    Plaintiffs fail to plead relationships with a reasonable probability of benefit or actual disruption of those relationships.

Each of Plaintiffs' interference claims fail because Plaintiffs have not identified any actual, non-speculative interference that has taken place. Specifically, Plaintiffs have not identified: (1) a non-speculative basis to believe they had a reasonable probability of obtaining the commissions they were allegedly deprived of; or (2) actual disruptions of their relationships between Merchants and affiliate networks, based on the provisions of the relevant contracts.

***Reasonable Probability of Benefit.*** Plaintiffs' interference claims require Plaintiffs to plead the existence of a reasonable probability of economic benefit. *See Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 522 (1996); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). "[S]peculative expectancies" or "a hope for an economic relationship and a desire for future benefit" are not sufficient. *See Westside Ctr.*, 42 Cal. App. 4th at 522.

Plaintiffs' interference claims are premised on the idea that consumers would have completed a purchase even without interacting with the Honey Browser Extension, entitling Plaintiffs—not PayPal—to a commission. The FAC contains no plausible factual allegations suggesting this would be "reasonably probable." *See Westside Ctr.*, 42 Cal. App. 4th at 524. To the contrary, the FAC paints a picture that Honey plays an important role in the consumer journey and that a sale would ***not*** have been probable without the additional savings and/or peace of mind Honey offers. The FAC describes Honey's value proposition and how consumers voluntarily download Honey and give it "extensive" permissions to operate in their browser. FAC ¶ 133. The FAC also makes clear that even when a consumer clicks Plaintiffs' affiliate links, there is only "a hope for an economic relationship and a desire for future benefit." *See Westside Ctr.*, 42 Cal. App. 4th at 524. Plaintiffs admit competition between Affiliate Marketers is "robust" and losing a commission is a mere click away. FAC ¶¶ 59, 94. Honey's offer to find and apply coupons or provide cash back rewards incentivizes consumers to make purchases they otherwise would not have made. *Id.* ¶ 5.

Where a plaintiff identifies only a ***possibility*** of an economic benefit, as Plaintiffs have done here, courts have dismissed interference claims. For example, in *California Expanded Metal Prods. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC*, 2014 WL 5475214 (C.D. Cal. Oct. 29, 2014), the court concluded that "exploratory discussions" regarding the possibility of signing a licensing agreement were "insufficient, on their own, to establish any certainty that an agreement would be reached" and thus could not support an interference claim. *See id.* at *4. Similarly in *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505 (2017), the California Supreme Court concluded that bidders attempting to obtain a contract had only a "speculative" interest in being awarded the contract, which could not support an intentional interference claim. *See id.* at 518 ("[P]laintiffs were only one of several bidders …. No one knew if plaintiffs would be the lowest bidder, and the public entities had not yet decided whether or not to award the contracts.").

Here, prior to a consumer's purchase, Plaintiffs were "only one of several" affiliate marketers vying for a commission on a potential future purchase and Merchants "had not yet decided whether or not to award" them a commission. *See id.* Plaintiffs had merely a "speculative expectanc[y]" that the consumer would make a purchase at all, let alone that they would do so

without interacting with Honey prior to their purchase. *See Westside Ctr.*, 42 Cal. App. 4th at 524. Plaintiffs' statistical analysis, purportedly demonstrating Plaintiffs' probability of economic benefit, does not consider whether sales would have occurred without Honey. *See* FAC ¶¶ 157-64; *Capital One*, 2025 WL 1570973, at *10 (relying on statistical analysis to find a probably economic benefit). Because Plaintiffs have not identified a reasonable probability of economic benefit in connection with their future commissions from Merchants, their interference claims must be dismissed.

　　　　*Actual Disruption/Breach.* Each of Plaintiffs' interference claims also require that Plaintiffs' relationships were disrupted. *See Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148, 1152 n.6 (2004) (IICR and intentional interference with prospective economic advantage (IIPEA) claims require "actual disruption of the relationship" or "actual breach" of a contract); *Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 1005 (2018), *disapproved of on other grounds by Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020) (negligent interference claims require "actual disruption of the relationship"). The relationships and contracts PayPal allegedly disrupted were created by "agreements between Affiliate Marketers, Merchants, and affiliate networks." FAC ¶ 1. Plaintiffs identify laundry lists of Merchants and affiliate networks with whom they have agreements in the Complaint. FAC ¶¶ 167-347. But Plaintiffs do not allege that **PayPal** received commissions from any of the identified Merchants or participated in any of the identified affiliate networks. Without any facts indicating that **PayPal** was involved with the relevant Merchants and affiliate networks, Plaintiffs have not plausibly alleged a cognizable disruption of their relationships.

　　　　Even assuming PayPal received commissions from the identified Merchants, determining whether Plaintiffs' contracts were disrupted as a result "require[s] the district court to determine what contractual rights [Plaintiffs] possess[]." *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1009 (9th Cir. 2014). Plaintiffs have not identified any contractual right to receive payment PayPal interfered with or any specific contractual term that it asserts PayPal induced Merchants to breach. Instead, they merely assert that disruption occurred, because PayPal allegedly deprived Plaintiffs of "monies that [they] rightfully earned." *See, e.g.*, FAC ¶¶ 401-03. Courts routinely dismiss interference claims where, like here, plaintiffs fail to identify the specific

contracts and provisions at issue. *See, e.g.*, *Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*, 2019 WL 8631502, at *2 (C.D. Cal. Dec. 16, 2019) (dismissing IICR claim, because "[n]owhere does Underground identify specific contracts that were disrupted, the terms of the contracts, the parties involved, and how Beibei's actions disrupted the contracts"); *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, 2014 WL 3372583, at *13 (N.D. Cal. July 9, 2014) ("Although Plaintiff alleges that the contractual relationship was disrupted …, Plaintiff does not identify any specific contractual term or obligation. As a result, the allegation is conclusory and not entitled to the assumption of truth."); *Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*, 2013 WL 489899, at *9 (C.D. Cal. Feb. 7, 2013) (dismissing IICR claim, because "IOD cannot simply allege that ICANN has interfered with its business model; for this tort, it must allege … a specific breach"). Plaintiffs' purported prospective economic advantage flows from their contractual rights, *see* FAC ¶ 1, so their failure to identify the relevant contractual provisions dooms those claims as well.

    The actual contractual terms are important here, because Plaintiffs readily acknowledge that "[t]here are various methods for awarding credit for an online sale to Affiliate Marketers." FAC ¶ 66. What attribution model was in place for the alleged transactions in which PayPal was awarded commissions that Plaintiffs "rightfully earned"? *Id.* ¶ 402. The FAC does not say. Plaintiffs do not provide **any** details regarding the attribution rules put in place by **any** of the Merchants or affiliate networks they work with. Plaintiffs' failure to plead any contractual terms distinguishes this case from *Capital One*. *See* 2025 WL 1570973, at *9 (citing alleged contractual terms). Even for alleged transactions where a Merchant was using a "last-click" model, Plaintiffs do not allege contractual terms prohibiting PayPal from obtaining a commission in such a scenario. Plaintiffs' invocation of industry "understanding" of "last-click" (FAC ¶ 108) cannot support interference claims without allegations showing that understanding is reflected in Plaintiffs' contracts. *See Image Online*, 2013 WL 489899, at *9 (plaintiff "must allege actual interference with actual contracts, such that the result is a specific breach"). And the alleged industry "understanding" of "last-click" is contradicted by other allegations in the FAC. Plaintiffs admit that researchers characterize the "last-click" model as awarding a commission to the consumer's "last **touchpoint** … prior to conversion"—not the last

DEFENDANTS' MOTION TO DISMISS
5:24-cv-09470-BLF

link they clicked to navigate to a Merchant's website. *See* FAC ¶ 108 n.29 (emphasis added). And Honey's open participation in the same affiliate marketing programs as Plaintiffs undermines any suggestion that either "industry norms" or affiliate program terms only reward affiliates who drive traffic to a merchant site. Honey is a browser extension designed to surface coupons and rewards to consumers **when they are already on a Merchant site**, as the FAC readily acknowledges. *See* FAC ¶ 110. Plaintiffs do not attempt to explain the contradiction between Honey's open participation in affiliate marketing programs and their characterization of the "last click" model. The Court need not accept Plaintiffs' conclusory and self-defeating "understanding" of industry norms. *See Martinez v. Newsom*, 46 F.4th 965, 971 (9th Cir. 2022).

### 2. If the Court dismisses Plaintiffs' other claims, their interference claims fail for lack of an independently wrongful act.

Plaintiffs allege their non-interference claims constitute the "independently wrongful" acts required for their interference claims. FAC ¶¶ 399, 412, 422. As a result, if this Court dismisses Plaintiffs' other claims, it must also dismiss the interference claims.

Each of Plaintiffs' interference claims require Plaintiffs to plead the existence of an independently wrongful act. *See Redfearn*, 20 Cal. App. 5th at 1006 (IIPEA and negligent interference); *Pech v. Doniger*, 75 Cal. App. 5th 443, 457 (2022) ("[T]o state a claim for interference with an at-will contract … the plaintiff must allege that the defendant engaged in an independently wrongful act."(citation omitted)). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co.*, 29 Cal. 4th at 1159. When a plaintiff fails to allege whether a contractual relationship was at-will, it must plead an independently wrongful act to state a claim for IIRC. *See Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 532 (9th Cir. 2018). Here, Plaintiffs do not allege whether the contracts that PayPal allegedly interfered with are terminable at-will and thus they must allege independently wrongful acts.

Plaintiffs allege two types of allegedly independently wrongful acts in support of their interference claims: (1) other common law and statutory claims; and (2) PayPal's conduct allegedly "contravenes existing standards and norms in the affiliate marketing industry." FAC ¶¶ 399, 412,

422. The latter acts cannot support interference claims. Contravening "standards" or "norms" is not wrongful unless doing so is also "unlawful." *See Korea Supply*, 29 Cal. 4th at 1159. As to Plaintiffs' other claims, they can only constitute an independently wrongful act to the extent that Plaintiffs have pleaded valid causes of action. *See Ixchel Pharma, LLC v. Biogen Inc.*, 2017 WL 4012337, at *5 (E.D. Cal. Sept. 12, 2017) (holding that dismissed claims "are not sufficient bases for independently wrongful conduct"). If this Court dismisses Plaintiffs' non-interference claims, the interference claims must be dismissed as well for failure to allege an independently wrongful act.

### 3.    Plaintiffs cannot state a claim for negligent interference because competitors do not owe each other a duty of care.

Plaintiffs' negligent interference claim additionally fails because PayPal does not owe a duty of care to competing affiliate marketers. "The tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 348 (1997). "The existence of a duty of care is an issue of law for the court." *Barnes v. Black*, 71 Cal. App. 4th 1473, 1478 (1999). Plaintiffs fail to allege PayPal owes them a duty of care, nor can they. California courts have been clear that competitors do not owe each other a duty of care for purposes of a negligence claim. *See Stolz v. Wong Commc'ns Ltd. P'ship*, 25 Cal. App. 4th 1811, 1825 (1994) ("The complaint did not allege [defendants owed plaintiff a duty of care], nor could it, since it was plain that plaintiff and defendants were competitors."); *Ketab Corp. v. Mesriani & Assocs., P.C.*, 734 F. App'x 401, 408 (9th Cir. 2018) (being competitors in a "small, closely knit community" was "not a basis for a duty of care to establish negligence"); *Behr Process Corp. v. RPM Int'l Inc.*, 2014 WL 12584385, at *5 (C.D. Cal. May 20, 2014) ("Because the parties directly compete, Defendants cannot allege a duty of care existed."). The Court should dismiss Plaintiffs' negligent interference claim with prejudice because any attempt to cure will be futile.

## IV.    Plaintiffs' Consumer-Protection / Unfair Competition Claims (Counts VII-XII) Fail.

Like their other claims, Plaintiffs' statutory consumer-protection and unfair competition claims should be dismissed for failure to plausibly allege that Honey caused Plaintiffs any injury. Even setting that aside, Plaintiffs' claims each fail for the additional reasons detailed below.

1

### A.    Plaintiffs fail to plead any wrongful conduct.

2    As discussed above, Plaintiffs do not allege any "unfair" or otherwise proscribed conduct.

3    Plaintiffs principally argue that Honey's conduct is "unfair" because it purportedly interferes with

4    each state's alleged policy against "interfering with another's prospective economic advantage."

5    *E.g.*, FAC ¶¶ 447, 459. That theory fails because Plaintiffs do not plausibly plead any such

6    interference. *See supra* § III.B.; *see also, e.g.*, *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074,

7    1105 (N.D. Cal. 2017) (UCL unfairness claim that was derivative of other causes of action failed

8    because predicate claims failed); *Landmark Inv. Grp., LLC v. Calco Const. & Dev. Co.*, 141 Conn.

9    App. 40, 54-55 (2013) (similar). Plaintiffs' claim under the "unlawful" prong of the California UCL

10   fails for similar reasons: Plaintiffs have not plausibly alleged any violations of other law. *See AMN*

11   *Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 950 (2018) ("when the

12   underlying legal claim fails, so too will a derivative UCL claim").[2]

13   Plaintiffs fare no better with their theory that Honey's conduct is unfair because it is

14   "immoral, unethical, oppressive, and unscrupulous." FAC ¶ 459. Those allegations depend on the

15   premise that Honey wrongfully "appropriate[ed]" commissions "belong[ing]" to Plaintiffs. *Id.*

16   ¶¶ 449, 458. Plaintiffs have not plausibly alleged any commission *belonged* to them or Honey

17   received commissions it was not contractually entitled to receive. Instead, they attack only

18   "rigorous, but fair, competitive strategies," which unfair competition laws do not proscribe. *Cel-*

19   *Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 185 (1999); *see Hokto*

20   *Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1038 (C.D. Cal. 2011) ("exercise of" a

21   contractual right "does not amount to unfair competition"), *aff'd*, 738 F.3d 1085 (9th Cir. 2013);

22   *Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*, 687 F. Supp. 3d 201, 222 (D.N.H. 2023).

23

---

24   [2] Plaintiffs cannot make out a claim under either the unlawful or unfair prongs of the UCL based

25   on common-law violations. Modern authority holds "a UCL [claim] brought under the 'unlawful'

     prong may not be predicated on common law violations alone." *Gill v. Marsh USA, Inc.*, 2024 WL

26   3463351, at *6 (N.D. Cal. July 18, 2024) (collecting cases). Likewise, a UCL claim that alleges

27   unfair conduct must be tethered to a "*specific* constitutional, statutory, or regulatory provision."

28   *Mendez v. Selene Fin. LP*, 2017 WL 1535085, at *6 (C.D. Cal. Apr. 27, 2017).

1    Nor can Plaintiffs make out a claim by alleging Honey's conduct violates "industry

2    standards and norms." *E.g.*, FAC ¶ 447. An alleged deviation from industry norms does not, without

3    more, make such conduct "unfair." *See, e.g.*, *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769,

4    790-805 (2019) (analyzing whether conduct that departed from business norms was also separately

5    unfair); *compare In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1228, 32 (N.D. Cal. 2014)

6    (plaintiffs plausibly alleged unfair conduct based on defendant's failure to comply with industry

7    standard security measures only where industry *required* certification of compliance and defendant

8    failed to disclose noncompliance). Otherwise, established industry players could exploit unfair

9    competition laws to prevent innovation.

10    **B.    Plaintiffs fail to plausibly allege they lack adequate alternative legal remedies.**

11    Plaintiffs' claims for equitable remedies under state unfair competition / consumer

12    protection laws also all fail because Plaintiffs fail to plausibly allege they lack adequate alternative

13    remedies. As the *Capital One* court recognized when dismissing those plaintiffs' California UCL

14    claim, plaintiffs must "plausibly allege[] that [they] ha[ve] no adequate legal remedy" to state a

15    claim for equitable relief under state unfair protection law. 2025 WL 1570973, at *16. Plaintiffs

16    cannot allege they have no adequate remedy at law because their alleged harm—lost revenue—is

17    compensable through damages. *See supra* § III.A. Indeed, Plaintiffs do not even attempt to allege

18    they lack adequate legal remedies for their claims for equitable relief under the non-California

19    unfair competition / consumer-protection laws. FAC ¶¶ 454-498. Plaintiffs do cursorily allege in

20    the alternative a lack of adequately legal remedies for their California UCL claim. FAC ¶ 441. But

21    they fail to plead how the equitable remedies they seek under that statute are "any different than

22    the money they seek as damages," *Cap. One*, 2025 WL 1570973, at *16, or otherwise "demonstrate

23    the inadequacy of a legal remedy," *Forrett v. Gourmet Nut, Inc.*, 634 F. Supp. 3d 761, 768-69 (N.D.

24    Cal. 2022) (quoting *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 907 (N.D. Cal. 2021)).

25    Accordingly, the California UCL claim, which provides "for only equitable relief," *Hambrick v.

26    Healthcare Partners Med. Grp., Inc.*, 238 Cal. App. 4th 124, 155 (2015), must be dismissed in full.

27    Plaintiffs' other claims must be dismissed insofar as they seek equitable relief.

28

DEFENDANTS' MOTION TO DISMISS
5:24-cv-09470-BLF

**C.    Plaintiffs' claims fail for additional, state-specific reasons.**

**1.    Out-of-state laws do not apply to Honey's alleged California-based conduct (Counts VIII-XII).**

Plaintiffs' claims for alleged violations of the consumer protection laws and/or unfair trade practices laws of Connecticut, Hawaii, New Hampshire, New York, and Washington (Counts VIII-XII) all fail because those laws do not apply to Honey's alleged wrongful conduct. Plaintiffs allege Honey's wrongful conduct "emanated from and was conceived and executed in California," FAC ¶ 48, and "[t]he Affiliate Commissions were directed from Class members to PayPal in California," FAC ¶ 44; *see also* FAC ¶ 42. Plaintiffs do not allege Honey's alleged wrongful conduct occurred in the other states. Indeed, Plaintiffs do not even allege consumers clicked on Plaintiffs' affiliate links in those states, or that Plaintiffs experienced injury in those states. The *only* alleged relationship to those states is that certain Named Plaintiffs happen to reside or operate there, *e.g.*, FAC ¶¶ 17, 19, 27, 28, and that Honey is available in two of them, FAC ¶¶ 456, 473.

That is not sufficient to trigger those states' consumer protection and unfair competition laws. Three states—Connecticut, New Hampshire, and New York—expressly require that the defendant's alleged wrongful conduct have occurred within that state. *See Harris v. LAZ Parking Ltd., LLC*, No. 3:24-CV-889 (SVN), 2025 WL 473654, at *9 (D. Conn. Feb. 12, 2025); *Precourt v. Fairbank Reconstruction Corp.*, 856 F. Supp. 2d 327, 342-44 (D.N.H. 2012); *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324-26 (N.Y. 2002). Hawaii will not apply its statutes to a defendant's out-of-state conduct absent some express indication of legislative intent, which does not exist here. *See State v. Bridges*, 83 Haw. 187, 197 (1996), *overruled on other grounds by State v. Torres*, 125 Haw. 382 (2011); *Sabini v. Sabini*, 38 Haw. 394, 403 (1949); Haw. Rev. Stat. § 480-1, *et seq.* And while Washington's Consumer Protection Act has been held to apply extraterritorially, it "does not encompass" conduct like that alleged here, which has no meaningful connection to Washington. *See Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 977 (9th Cir. 2016).

**2.    Plaintiffs do not allege anticompetitive conduct (Counts VII, IX).**

Plaintiffs' claims under the unfair prong of the California UCL (Count VII) and Hawaii's Unfair and Deceptive Trade Practices Act (Count IX) fail because Plaintiffs do not plausibly allege

anticompetitive conduct. In California, a competitor alleging unfair competition must allege "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187; *see Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014). In Hawaii, competitors cannot sue for "unfair or deceptive acts or practices." Haw. Rev. Stat. § 480-2(d). Competitors *can* sue for "unfair methods of competition," *id.* § 480-2(e), but they must "allege how [the defendant's] conduct will negatively affect competition in order to recover on an unfair methods of competition claim," *Davis v. Four Seasons Hotel Ltd.,* 122 Haw. 423, 437-38 (2010).

Plaintiffs' conclusory allegation that Honey's conduct "significantly harms or threatens competition" (FAC ¶ 447) is insufficient to support either claim. *See Snapkeys, Ltd. v. Google LLC*, 2020 WL 6381354, at *3-4 (N.D. Cal. Oct. 30, 2020); *Windward Aviation, Inc. v. Rolls-Royce Corp.*, 2011 WL 2670180, at *20 (D. Haw. July 6, 2011). Moreover, it is *Plaintiffs*, not Honey, who are seeking to harm competition by preventing Honey and other browser extensions from receiving any part of commissions whenever a consumer previously clicked on an affiliate marketer's link, regardless of whether Honey or another extension drove the sale or otherwise provided value to consumers, merchants, and network affiliates, and regardless of whether consumers even value Plaintiffs' promotions at all. Unfair competition law is not meant to "enjoin[] *procompetitive* conduct," such as Honey's competition with Plaintiffs for commissions. *Cel-Tech*, 20 Cal. 4th at 185.

### 3. Plaintiffs do not allege substantial consumer or public-interest harm (Counts XI, XII).

Plaintiffs' claims under New York's General Business Law (Count XI) and Washington's Consumer Protection Act (Count XII) also fail for lack of substantial consumer or public-interest harm. New York requires that a plaintiff be injured by materially "deceptive" acts "directed at consumers." *Maurizio v. Goldsmith*, 230 F.3d 518, 522 (2d Cir. 2000). The "gravamen of the complaint must be consumer injury or harm to the public interest." *Id.* (citation omitted). The FAC does not specify what consumer-oriented deceptive conduct forms the basis of Plaintiffs' claim, *see*

1    FAC ¶¶ 481-486, and should be dismissed on that ground alone. Insofar as the FAC could be

2    construed to assert that consumers were deceived by Honey's alleged "cookie stuffing," FAC

3    ¶¶ 117, 153, that fails, because Plaintiffs do not allege that consumers or the public interest are

4    harmed by this purported conduct. Moreover, as the *Capital One* court recognized when dismissing

5    plaintiffs' New York claim in that case, any harm from such conduct is "too insubstantial … to

6    plausibly establish a claim under Section 349." 2025 WL 1570973, at *5 (citation omitted). Insofar

7    as Plaintiffs are alleging that consumers were deceived by Honey's alleged "fals[e]" promises to

8    find the "best offer," FAC ¶ 153, that also fails because Plaintiffs do not allege how either

9    consumers or Plaintiffs are harmed by any such deception. Finally, insofar as Plaintiffs' theory is

10   "grounded" in fraud, it must be dismissed due to their noncompliance with Rule 9(b)'s specificity

11   requirement, *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 957 (C.D. Cal. 2012); *Elson*

12   *v. Black*, 56 F.4th 1002, 1009 (5th Cir. 2023).

13        Washington similarly requires that the alleged unfair act impact the public interest of the

14   people of Washington. Plaintiffs' conclusory allegations on this score, ¶¶ 493-95, do not suffice to

15   show the requisite public impact. *See S/Y Paliador, LLC v. Platypus Marine, Inc.*, 750 F. Supp. 3d

16   1187, 1206-07 (W.D. Wash. 2024).

17                                        **CONCLUSION**

18        For the foregoing reasons, the Court should grant the Motion and dismiss Plaintiffs'

19   Complaint with prejudice.

20

21

22

23

24

25

26

27

28

1     Dated: August 11, 2025                  Respectfully submitted,

2

3                                       By: */s/ Paul F. Rugani*
                                    Paul F. Rugani (SBN 342647)
                                    **ORRICK, HERRINGTON & SUTCLIFFE LLP**

4                                     2050 Main Street, Suite 1100
                                    Irvine, CA 92614-8255

5                                     Telephone: (949) 567-6700
                                    prugani@orrick.com

6

7                                     Richard A. Jacobsen (admitted pro hac vice)
                                    **ORRICK, HERRINGTON & SUTCLIFFE LLP**

8                                     51 West 52nd Street
                                    New York, NY 10019-6142

9                                     Telephone: (212) 506-5000
                                    rjacobsen@orrick.com

10                                    *Attorneys for Defendants PayPal, Inc. and*
                                   *PayPal Holdings, Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28