Dena C. Sharp (SBN 245869)
Trevor T. Tan (SBN 281045)
Nina Gliozzo (SBN 333569)
Anthony Rogari (SBN 353784)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800

Nanci E. Nishimura (SBN 152621)
Thomas E. Loeser (SBN 202724)
Karin B. Swope (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Rd #200,
Burlingame, CA 94010
Telephone: 650.697.6000

Elizabeth J. Cabraser (SBN 083151)
Roger N. Heller (SBN 215348)
Jason L. Lichtman (*pro hac vice*)
Sean A. Petterson (*pro hac vice*)
Danna Z. Elmasry (*pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

*Interim Co-Lead Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION | Case No. 5:24-cv-9470-BLF<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing date: Nov. 6, 2025<br>Time: 9:00 a.m.<br>Courtroom: 1 – 5th Floor |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND ............................................................................................................. 2

       A.     Last click attribution. ........................................................................................ 2

       B.     Honey illegally games last click attribution. ..................................................... 3

III.   LEGAL STANDARDS .................................................................................................. 4

IV.    ARGUMENT .................................................................................................................. 4

       A.     Plaintiffs have Article III standing. .................................................................... 4

              1.     Plaintiffs' alleged harm is traceable to Honey. ...................................... 4

              2.     Plaintiffs plausibly allege PayPal harmed them. .................................... 6

       B.     Plaintiffs state claims under CFAA and CDAFA. .............................................. 8

              1.     Honey exceeds authorized access. .......................................................... 9

              2.     Plaintiffs suffered cognizable damage and loss. .................................. 10

              3.     Plaintiffs plausibly allege a cognizable ownership interest in their Affiliate IDs. ............................................................................................................ 11

       C.     Plaintiffs adequately plead their common law claims. ..................................... 13

              1.     Plaintiffs plead an unjust enrichment claim. ........................................ 13

              2.     Plaintiffs adequately plead tortious interference claims. ..................... 15

       D.     Plaintiffs adequately plead state consumer protection claims. ......................... 21

V.     CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*3500 Sepulveda, LLC v. Macy's West Stores, Inc.*,
  980 F.3d 1317 (9th Cir. 2020) ................................................................................. 15

*In re Accellion, Inc. Data Breach Litig.*,
  713 F. Supp. 3d 623 (N.D. Cal. 2024) ..................................................................... 14

*In re Adobe Sys., Inc. Priv. Litig.*,
  66 F. Supp. 3d 1197 (N.D. Cal. 2014) ...................................................................... 22

*Andrews v. Sirius XM Radio Inc.*,
  932 F.3d 1253 (9th Cir. 2019) ............................................................................ 10, 11

*In re Apple Processor Litig.*,
  2023 WL 5950622 (9th Cir. Sept. 13, 2023) ........................................................... 23

*AT&T Servs., Inc. v. Fed. Commc'ns Comm'n*,
  21 F.4th 841 (D.C. Cir. 2021) .................................................................................... 7

*Behr Process Corp. v. RPM Int'l Inc.*,
  2014 WL 12584385 (C.D. Cal. May 20, 2014) ........................................................ 21

*Byton N. Am. Co. v. Breitfeld*,
  2020 WL 3802700 (C.D. Cal. Apr. 28, 2020) .......................................................... 18

*California Expanded Metal Prods. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC*,
  2014 WL 5475214 (C.D. Cal. Oct. 29, 2014) .......................................................... 17

*In re Capital One Fin. Corp. Affiliate Mktg. Litig.*,
  2025 WL 1570973 (E.D. Va. June 2, 2025) .....................................................*passim*

*Castillo v. Walmart, Inc.*,
  2025 WL 1828465 (N.D. Cal. July 1, 2025) (Freeman, J.) ...................... 13, 14, 23

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ......................................................................................... 22, 24

*Cenatiempo v. Bank of Am., N.A.*,
  333 Conn. 769 (Conn. 2019) ..................................................................................... 22

*Chiulli v. Am. Honda Motor Co.*,
  690 F. Supp. 3d 1038 (N.D. Cal. 2023) .................................................................... 14

*Clapper v. Amnesty International, USA*,
  568 U.S. 398 (2013) .................................................................................................... 6

**TABLE OF AUTHORITIES**
(continued)

Page

*Code Rebel, LLC v. Aqua Connect, Inc.*,
2013 WL 5405706 (C.D. Cal. Sept. 24, 2013) ................................................................. 20

*Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*,
687 F. Supp. 3d 201 (D.N.H. 2023) .............................................................................. 22

*Collyer v. Catalina Snacks Inc.*,
712 F. Supp. 3d 1276 (N.D. Cal. 2024) ..................................................................... 22, 23

*ConsumerDirect, Inc. v. Pentius, LLC*,
2022 WL 16949657 (C.D. Cal. Aug. 25, 2022) ............................................................. 18

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ............................................................................ 10

*Davis v. Four Seasons Hotel Ltd.*,
122 Haw. 423 (2010) ......................................................................................................... 24

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
11 Cal. 4th 376 (1995) ...................................................................................................... 20

*Doe v. Cnty. of Santa Clara*,
2024 WL 3346257 (N.D. Cal. July 8, 2024) ................................................................... 10

*Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*,
2019 WL 8631502 (C.D. Cal. Dec. 16, 2019) ............................................................... 19

*eBay Inc. v. Digital Point Sols., Inc.*,
608 F. Supp. 2d 1156 (N.D. Cal. 2009) ............................................................................ 8

*EcoHub, LLC v. Recology Inc.*,
2023 WL 6725632 (N.D. Cal. Oct. 11, 2023) ................................................................ 16

*Epicor Software Corp. v. Alt. Tech. Sols, Inc.*,
2013 WL 2382262 (C.D. Cal. May 9, 2013) .................................................................. 18

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .......................................................................................... 13

*Faculty v. N.Y. Univ.*,
11 F.4th 68 (2d Cir. 2021) ................................................................................................... 7

*Forrett v. Gourmet Nut, Inc.*,
634 F. Supp. 3d 761 (N.D. Cal. 2022) .............................................................................. 23

*Fortinet, Inc. v. Forescout Techs., Inc.*,
2021 WL 5565836 (N.D. Cal. Nov. 29, 2021) ............................................................... 16

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Garrabrants v. Erhart,*
98 Cal. App. 5th 486 (Cal. Ct. App. 2023) ...................................................................... 11, 12

*In re Google Inc. Cookie Placement Consumer Priv. Litig.,*
806 F.3d 125 (3d Cir. 2015)....................................................................................................... 4, 5

*Goshen v. Mut. Life Ins. Co. of New York,*
98 N.Y.2d 314 (2002) ...................................................................................................................... 24

*Griffith v. TikTok,*
697 F. Supp. 3d 963 (C.D. Cal. 2023) .................................................................................. 11

*Guzman v. Polaris Indus. Inc.,*
49 F.4th 1308 (9th Cir. 2022) ................................................................................................... 23

*Harris v. LAZ Parking Ltd., LLC,*
2025 WL 473654 (D. Conn. Feb. 12, 2025) ...................................................................... 24

*Hokto Kinoko Co. v. Concord Farms, Inc.,*
810 F. Supp. 2d 1013 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir. 2013).......................... 22

*Idaho Conservation League v. Bonneville Power Admin.,*
83 F.4th 1182 (9th Cir. 2023) ..................................................................................................... 6

*Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers,*
2013 WL 489899 (C.D. Cal. Feb. 7, 2013)...................................................................... 19

*Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.,*
2014 WL 3372583 (N.D. Cal. July 9, 2014)...................................................................... 19

*Integrity Applied Sci., Inc. v. Clearpoint Chemicals LLC,*
2020 WL 12584444 (D. Colo. Apr. 20, 2020).............................................................. 10, 11

*Ixchel Pharma, LLC v. Biogen, Inc.,*
9 Cal. 5th 1130 (2020) ........................................................................................................... 15, 17

*Jacobs v. Sustainability Partners LLC,*
2020 WL 5593200 (N.D. Cal. Sept. 18, 2020) ............................................................. 14

*Ketab Corp. v. Mesriani & Assocs., P.C.,*
734 F. App'x 401 (9th Cir. 2018) ............................................................................................ 21

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003) ...................................................................................................... 15, 20

*Levitt v. Yelp! Inc.,*
765 F.3d 1123 (9th Cir. 2014) ................................................................................................... 24

**TABLE OF AUTHORITIES**
(continued)

Page

*Lindsay-Stern v. Garamszegi*,
2016 WL 11745948 (C.D. Cal. Oct. 13, 2016) ............................................................ 11

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................................................ 4

*Maurizio v. Goldsmith*,
230 F.3d 518 (2d Cir. 2000) .......................................................................................... 25

*Mencia-Montes v. Fit Foods Distribution, Inc.*,
2025 WL 1185372 (N.D. Cal. Mar. 31, 2025) ............................................................. 23

*Nelsen v. King Cnty.*,
895 F.2d 1248 (9th Cir. 1990) ........................................................................................ 8

*Oracle Am., Inc. v. CedarCrestone, Inc.*,
2013 WL 3243885 (N.D. Cal. June 26, 2013) ........................................................ 16, 18

*Oxley v. Madrigal*,
2025 WL 360858 (N.D. Cal. Jan. 31, 2025) (Freeman, J.) ............................................. 4

*PhD Mkt'g, Inc. v. Vital Pharms., Inc.*,
2021 WL 8693518 (C.D. Cal. Mar. 3, 2021) ............................................................... 18

*Precisely Software Inc. v. Loqate Inc.*,
2022 WL 4348469 (N.D. Cal. Sept. 19, 2022) (Freeman, J.) ....................................... 13

*Precourt v. Fairbank Reconstruction Corp.*,
856 F. Supp. 2d 327 (D.N.H. 2012) ............................................................................. 24

*Pro-Com Prods., Inc. v. Optimal Sante, LLC*,
2023 WL 11663237 (C.D. Cal. Oct. 30, 2023) ............................................................ 20

*Raymat Materials, Inc. v. A & C Catalysts, Inc.*,
2013 WL 5913778 (N.D. Cal. Oct. 31, 2013) .............................................................. 16

*Redfearn v. Trader Joe's Co.*,
20 Cal. App. 5th 989 (2018) ......................................................................................... 17

*Reeves v. Hanlon*,
33 Cal. 4th 1140 (2004) ................................................................................................ 17

*RitLabs, S.R.L. v. RitLabs, Inc.*,
2012 WL 3263893 (E.D. Va. Aug. 9, 2012), *order vacated in part*, 2012 WL 6021328 (E.D. Va. Nov. 30, 2012) ................................................................................................................ 10

**TABLE OF AUTHORITIES**
(continued)

Page

*Roy Allan Shurry Seal, Inc. v. Am. Asphalt S., Inc.*,
  2 Cal. 5th 505 (2017) ............................................................................................... 17

*S/Y Paliador, LLC v. Platypus Marine, Inc.*,
  750 F. Supp. 3d 1187 (W.D. Wash. 2024) ................................................................ 25

*Sabini v. Sabini*,
  38 Haw. 394 (Haw. 1949) .......................................................................................... 24

*Salmon Spawning & Recovery All. v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008) .................................................................................... 4

*Satanic Temple, Inc. v. Rokita*,
  2023 WL 7016211 (S.D. Ind. Oct. 25, 2023) ............................................................ 7

*Snapkeys, Ltd. v. Google LLC*,
  2020 WL 6381354 (N.D. Cal. Oct. 30, 2020) ........................................................... 24

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ............................................................................... 14, 23

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
  996 F. Supp. 2d 942 (S.D. Cal. 2014), *order corrected,* 2014 WL 12603117 (S.D. Cal. Feb. 10,
  2014) ........................................................................................................................... 6

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................................... 4

*State v. Bridges*,
  83 Haw. 187 (1996), *overruled by State v. Torres*, 125 Haw. 382 (2011) ............... 24

*Stolz v. Wong Commc'ns Ltd. P'ship*,
  25 Cal. App. 4th 1811 (Cal. Ct. App. 1994) ............................................................. 20

*Stuart v. County of Riverside*,
  2024 WL 3455263 (C.D. Cal. Apr. 22, 2024) ........................................................... 12

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .................................................................................................... 7

*Talavera v. Glob. Payments, Inc.*,
  670 F. Supp. 3d 1074 (S.D. Cal. 2023) ..................................................................... 14

*Trader Joe's Co. v. Hallatt*,
  835 F.3d 960 (9th Cir. 2016) ..................................................................................... 24

**TABLE OF AUTHORITIES**
(continued)

Page

*United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*,
766 F.3d 1002 (9th Cir. 2014) ................................................................. 19

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
143 F. Supp. 3d 982 (N.D. Cal. 2015) ..................................................... 20

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ................................................................................... 8

*Van Buren v. United States*,
593 U.S. 374 (2021) .................................................................................. 10

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
42 Cal. App. 4th 507 (Cal. Ct. App. 1996) ....................................... 16, 17

*WhatsApp Inc. v. NSO Group Technologies Limited*,
472 F. Supp. 3d 649 (N.D. Cal. 2020) ....................................................... 9

*Yoder & Frey Auctioneers, Inc. v. Equipmentfacts, LLC*,
2013 WL 1411757 (N.D. Ohio Apr. 8, 2013) ........................................... 10

**Statutes**

18 U.S.C. § 1030(a)(4) ..................................................................................... 8

18 U.S.C. § 1030(e)(11) ................................................................................... 10

18 U.S.C. § 1030(g) .......................................................................................... 10

Cal. Penal Code §§ 502(c)(1), (e)(1) ................................................................. 8

Cal. Penal Code § 502(e)(1) ............................................................................. 11

**Court Rules**

Fed. R. Civ. P. 8(d)(2), (3) .............................................................................. 14

**Treatises**

Black's Law Dictionary (11th ed. 2019) ......................................................... 11

1

**I.     <u>INTRODUCTION</u>**

2
        This case is about theft. Plaintiffs are small businesses and sole proprietors who recommend online

3
purchases to consumers. Defendants ("PayPal") use a browser extension (the "Honey Browser Extension" or

4
"Honey") to divert money that Plaintiffs earned from those referrals. Plaintiffs assert federal statutory

5
claims, common law claims under California law, and state-specific statutory claims—all similar to those

6
recently upheld in a case about a nearly identical browser extension. *See In re Capital One Fin. Corp.*

7
*Affiliate Mktg. Litig.*, 2025 WL 1570973 (E.D. Va. June 2, 2025). The only material difference between this

8
case and *Capital One* is that Plaintiffs here proactively amended their complaint to add facts that court

9
identified as important to the few claims that it did not affirm. *See* Dkt. 188 ("FAC"). PayPal's arguments

10
for a different result than in *Capital One* fail.

11
        *First*, PayPal argues that Plaintiffs lack standing because "industry standards" are responsible for

12
Plaintiffs' losses, and PayPal is simply profiting by following the rules of the game to which everyone in the

13
affiliate marketing industry has agreed. PayPal's version of "industry standards," however, directly conflicts

14
with the allegations in the operative pleading. And this argument has nothing to do with standing; at most, it

15
may later be relevant to the merits.

16
        *Second,* PayPal contends that Plaintiffs cannot make out federal (or similar, California-specific)

17
computer fraud claims because it did not take anything of value from Plaintiffs or exceed its level of

18
"authorized access" to any computer. But both arguments reach far beyond the Complaint, which pleads

19
exactly what PayPal took from Plaintiffs and how PayPal exceeded its level of "authorized access."

20
        *Third*, PayPal attacks Plaintiffs' common law claims based on a grab-bag of arguments, none of

21
which holds up. PayPal claims, for example, that California law does not recognize a cause of action akin to

22
unjust enrichment, when this Court has held to the contrary. By way of another example, PayPal claims that

23
the Complaint fails to show a "reasonable probability" that Plaintiffs would have obtained commissions but

24
for Honey, but the Complaint describes in detail how Plaintiffs were entitled to commissions and how

25
Honey prevented Plaintiffs from obtaining them (going so far as to support those claims with a detailed,

26
statistical analysis).

27
        *Finally*, PayPal's attacks on Plaintiffs' state-specific statutory claims fare no better than its other

28
arguments. PayPal's primary argument here is that because all Parties agree that California law applies to

1   Plaintiffs' common law claims, non-California Plaintiffs cannot assert their home state's unfair trade

2   practice statutes to protect them from harm within their states. The case law is uniformly to the contrary.

3           Plaintiffs respectfully ask the Court to deny the motion to dismiss in full.

4   **II.    <u>BACKGROUND</u>**

5           Plaintiffs are journalists and other online content creators ("Affiliate Marketers"), who earn revenue

6   promoting products and services to their online audiences. FAC ¶ 1. (In some cases, they have agreements

7   directly with specific "Merchants" such as Home Depot, in others they have agreements with "Affiliate

8   Networks" who in turn have contracts with Merchants. *Id.* ¶ 62.) Plaintiffs have a simple deal: in exchange

9   for recommending products to consumers, when a consumer makes a purchase after clicking on a product link

10  provided by an Affiliate Marketer, the Affiliate Marketer receives an "Affiliate Commission." *Id.* ¶ 51, 56.

11  The Affiliate Marketer ecosystem was estimated to be worth up to $32.3 billion in 2024 alone. *Id.* ¶ 52.

12          PayPal claims that its Honey Browser Extension is merely a successful player in that ecosystem. But

13  Plaintiffs allege that PayPal is no competitor and in fact, with respect to its conduct at issue in this case, is a

14  thief and a hacker. *Id.* III. If a consumer interacts with Honey, it will surreptitiously replace the Affiliate

15  Marketer's Affiliate ID with PayPal's own and take the Affiliate Commission, even where Affiliate Marketers

16  like Plaintiffs are the ones who drove the sale, and even where Honey provided no discount or other benefit

17  to the consumer. *Id.* ¶¶ 111–14. This is a form of what is called "cookie stuffing," which is not merely

18  unscrupulous, but frequently illegal. *Id.* ¶¶ 114–18. And it caused Plaintiffs concrete harm: PayPal has usurped

19  Affiliate Commissions that Plaintiffs otherwise would have received pursuant to their relationships with

20  Merchants and Affiliate Networks. *Id.* ¶¶ 156–57. (Plaintiffs have not merely alleged this harm plausibly, they

21  have also shown it to be overwhelmingly likely as a matter of statistics. *Id.* ¶¶ 157–349.) And Plaintiffs allege

22  that PayPal must give that money back.

23          **A.    <u>Last click attribution.</u>**

24          Merchants attribute credit for affiliate sales through "cookies," small bits of code that are stored on a

25  consumer's web browser and contain the Affiliate Marketer's "Affiliate ID."   *Id*. ¶ 65. The Affiliate

26  Marketer's cookie stays on the consumer's web browser for the duration of the cookie's lifespan, unless and

27  until the consumer clicks on a different affiliate marketing link. *Id.* ¶¶ 65, 73-74. If that happens, the second

28  affiliate marketer's cookie will usually replace the first-in-time marketer's cookie. *Id*. ¶ 65.

Under the industry-standard practice of "last click attribution," "Affiliate Marketers receive Affiliate Commissions when their marketing results in a sale and their link was the last link that a consumer interacted with prior to purchase." *Id.* ¶ 56. Within the affiliate marketing industry, a click in this context "refers to 'navigating from one page to another by activating a hyperlink,'" *id.* ¶ 92, and "the specific act of a consumer clicking on a URL link to an advertised website." *Id.* ¶ 91. "Last click" refers to how the consumer gets to the Merchant's website, but *not* to the "actions that the consumer takes once they have arrived" there. *Id.* ¶ 93. In other words, "last click" is not a "consumer's literal last click of the mouse." *Id.* ¶ 92. This makes intuitive sense because "the last physical device click is, of course, on a button that completes the purchase." *Id.*

## B.  Honey illegally games last click attribution.

PayPal promotes Honey, which had approximately 17 million active users when purchased by PayPal in 2020, as a convenient coupon-searching tool. *Id.* ¶ 101. When installed, Honey runs on a consumer's browser and tracks their browsing activity across websites. *See id.* ¶¶ 133–140. After a consumer has decided to make a purchase on a Merchant's website, Honey does at least one of three things at checkout: (1) pops up to prompt the consumer to search for possible coupons; (2) encourages the consumer to activate cashback in the absence of applicable coupons; and (3) offers the option to checkout with PayPal. *See, e.g., id.* ¶ 110.

PayPal's goal is to get the consumer to interact with Honey. Up until the filing of the complaints in this action, when a consumer interacted with Honey, it would "interpose[] itself . . . by . . . fabricating a 'click'—i.e., a referral to a Merchant website—where none actually takes place." *Id.* ¶ 109. In other words, when a consumer interacted with the extension, Honey manufactured a fake "last click."

Honey did this by creating a shadow browser tab of the Merchant's website that appeared for seconds and then disappeared. *See id.* ¶¶ 144-45. By creating that shadow tab, PayPal spoofed the consumer's web browser into believing that the browser extension made a referral to the Merchant's website. *Id.* ¶¶ 146–48. The process worked the same whether or not the Honey Browser Extension was offering consumers any coupons or discounts, cashback rewards, or even the option to pay with PayPal. *Id.* ¶ 152. "The spoofed click enables Honey to insert PayPal's own Affiliate ID, which signals to the Merchant that PayPal, rather than the Affiliate Marketer who created the business opportunity, should receive the Affiliate Commission," even where "neither PayPal nor Honey referred the consumer to the Merchant site at all." *Id.* ¶ 114. This is known as "cookie stuffing," which can be an illegal practice. *Id.* ¶¶ 115–18.

III.   **LEGAL STANDARDS**

To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016), as revised (May 24, 2016); *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015) (standing to pursue claims based on "cookie stuffing").

To state a claim for relief, a plaintiff must "allege facts that allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *E.g.*, *Oxley v. Madrigal*, 2025 WL 360858, at *3 (N.D. Cal. Jan. 31, 2025) (Freeman, J.) (citations omitted).

IV.   **ARGUMENT**

   A.   **Plaintiffs have Article III standing.**

Plaintiffs' Complaint describes the "injury," "traceability," and "redressability," *see Spokeo*, 578 U.S. at 338, to establish standing. Plaintiffs allege: (1) they suffered loss of commissions (injury); (2) PayPal caused that harm by using Honey to engage in cookie stuffing, thus taking the Affiliate Commissions earned by Plaintiffs (traceability); and (3) the injury is redressable through the payment to Plaintiffs of money lost, along with injunctive relief prohibiting future harm (redressability). This is all that is required.

PayPal responds with two basic arguments, Mot. at 4-9, neither of which is persuasive. First, PayPal makes a merits-based affirmative defense, claiming that Plaintiffs' alleged injuries are not "traceable" to PayPal's actions because PayPal was acting legally. Next, PayPal argues that Plaintiffs fail to allege "direct" harm (ignoring Plaintiffs' allegations of a direct link between Honey spoofing a "last click" *at checkout* and the resulting loss of Plaintiffs' Affiliate Commissions). Both arguments lack merit.

   1.   **Plaintiffs' alleged harm is traceable to Honey.**

To show traceability, Plaintiffs must demonstrate a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). This requirement is met where, as here, a plaintiff alleges a defendant's unlawful digital manipulation diverted money that otherwise would have flowed to the plaintiff. *See Capital One*, 2025

WL 1570973, at *9–11 (standing on facts identical to those alleged here); *see also Google Cookie Placement*, 806 F.3d at 134–35 (standing based on cookie placement that usurped users' data value).

Like the plaintiffs in *Capital One* and *Google Cookie Placement*, Plaintiffs here allege that PayPal's unlawful digital manipulation caused Plaintiffs to lose Affiliate Commissions that were rightfully theirs. Plaintiffs generate consumer sales for online Merchants through their marketing. *See, e.g.*, FAC ¶¶ 64, 75– 84. When a consumer clicks one of Plaintiffs' affiliate links, the consumer's browser stores the respective Plaintiff's Affiliate ID in a cookie, which indicates to the Merchant that the specific Plaintiff referred the consumer to the Merchant's website and thus is entitled to an Affiliate Commission if the consumer completes a purchase. *See, e.g.*, *id.* ¶¶ 56, 63–67, 73–74, 108. But as described above, Honey hijacks this attribution process: when the consumer interacts with the Honey Browser Extension at checkout, Honey fabricates a "click" by opening a hidden tab, overwriting Plaintiffs' cookies with PayPal's Affiliate ID, and causing the Merchant to pay PayPal instead of Plaintiffs. *Id.* ¶¶ 109, 111–14, 144–46. Plaintiffs thus allege plausibly that the Affiliate Commissions flow to PayPal as a direct result of PayPal's technological manipulation.

PayPal claims that it is playing by industry rules and acting pursuant to its own contracts. *See* Mot. at 13–14. But in so arguing, PayPal asks the Court to ignore the Complaint's factual allegations, to credit PayPal's competing facts instead, and to draw illogical conclusions about the affiliate marketing industry from PayPal's alternative facts. This is unpersuasive.

*PayPal ignores factual allegations and substitutes its own.* PayPal argues that Plaintiffs are wrong on the facts and that "any harm [Plaintiffs] may have experienced is traceable not to Honey but to the industry standard 'last-click' attribution rules." Mot. at 2. But the Complaint alleges the industry standard is that credit is given to the "last click" where multiple *legitimate* clicks exist, while PayPal manufactures *illegitimate* clicks. FAC ¶¶ 89–94. Honey creates a phony "last click" after the consumer is already on the Merchant's site through a secret, "hidden tab" process. *Id.* ¶¶ 109, 111, 144–46. PayPal is *not* playing by the rules because the affiliate marketing industry standardg does not contemplate surreptitiously creating shadow tabs to trick consumers' browsers into inserting fabricated affiliate cookies. *See id.* ¶¶ 109, 111, 114, 117, 141–46, 151– 56. Plaintiffs also allege that PayPal's behavior is widely recognized as a form of "cookie stuffing," a practice that is widely prohibited in affiliate marketing, goes against the Federal Trade Commission advertising guidelines, and has been found illegal. *Id.* ¶¶ 115, 118. *See also Capital One*, 2025 WL 1570973, at *6

(plaintiff affiliate marketers have standing in part because a qualifying last click must occur *before* a consumer reaches the merchant's site).

PayPal disagrees that it is violating the standards and practices of the affiliate marketing industry or the law, but that disagreement has no relevance at this stage of litigation. *See, e.g.*, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 990 (S.D. Cal. 2014), *order corrected,* 2014 WL 12603117 (S.D. Cal. Feb. 10, 2014) ("industry-standard" defense is "not suitable for disposition on a motion to dismiss."). On the pleadings, courts accept a plaintiff's claim "as valid [on] the merits" when evaluating standing: the argument that the plaintiff will not ultimately prevail is of no moment. *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1189 (9th Cir. 2023) (citations omitted).

*PayPal's argument is illogical even under its alternative facts.* Plaintiffs allege that last-click attribution assigns credit to the Affiliate Marketer whose link was the consumer's final interaction *before* the consumer arrived at the Merchant's website and made a purchase, not to interventions that occur *after* the consumer is already there. *See* FAC ¶¶ 56, 89–94. PayPal's attempt to expand "last click" to cover post-arrival manipulations would undermine the system, allowing any browser extension to seize Affiliate Commissions by inserting itself at checkout.

### 2.    Plaintiffs plausibly allege PayPal harmed them.

PayPal next argues that Plaintiffs do not plausibly allege PayPal harmed them, claiming first that the theory of harm is attenuated, and next that Plaintiffs improperly rely on statistics for standing. Mot. at 6-8. Neither argument is persuasive.

*Plaintiffs' harm is not attenuated*. PayPal contends that Plaintiffs' theory of standing relies on a "highly attenuated chain of possibilities" similar to *Clapper v. Amnesty International, USA*, 568 U.S. 398, 410 (2013). Mot. at 6-7. There is nothing attenuated about the chain here: Plaintiffs are Affiliate Marketers who earned income through Affiliate Commissions, and they pled that PayPal used Honey to divert Affiliate Commissions. FAC ¶¶ 1–2, 9–35, 141–349. Plaintiffs allege that, at most, a consumer need only click one button at checkout for PayPal to divert Plaintiffs' Affiliate Commissions to itself. *Id.* ¶¶ 143–46, 155. Unlike the long chain of causation regarding *future* harm at issue in *Clapper* (where the alleged injury required government officials to decide to target certain individuals, choose specific surveillance methods, obtain court approval, successfully intercept communications, and capture plaintiffs' particular conversations), 568 U.S.

at 410, Plaintiffs here show that PayPal wrongly took Affiliate Commissions from Plaintiffs at checkout. FAC ¶¶ 141, 148.

PayPal offers a laundry list of potentially intervening causes (e.g., consumers might have clicked other affiliate links, might have used competing browser extensions, or might not have completed transactions in the absence of Honey). Mot. at 15. But this parade of speculative, attenuated harms is irrelevant at the pleadings. Each link in Plaintiffs' causal chain is plausible and supported by concrete facts: Plaintiffs have established affiliate marketing relationships under which they are entitled to Affiliate Commissions, Honey's presence is documented on over 17 million browsers, and Honey's operation mechanically replaces any existing affiliate code. FAC ¶¶ 101, 141–349; *accord, e.g.*, *Capital One*, 2025 WL 1570973, at *6. Plaintiffs' detailed allegations about (1) how Honey diverts Affiliate Commissions, including the "representative example" showing PayPal taking Plaintiff Justin Tech Tips's Affiliate Commission at checkout, *see* FAC ¶¶ 141–148,  and (2) their relationships with Merchants suffice to establish their injury for standing.

*Plaintiffs do not improperly rely on statistics for standing.* Plaintiffs also show that PayPal has harmed them using a "Monte Carlo" statistical analysis. Courts have acknowledged that a Monte Carlo analysis can provide a "view of potential outcomes and their associated likelihoods." *AT&T Servs., Inc. v. Fed. Commc'ns Comm'n*, 21 F.4th 841, 847 (D.C. Cir. 2021). Here, Plaintiffs show that, for any Affiliate Marketer with at least 100 eligible purchases (like each Plaintiff), there is a 97.2% likelihood that Honey stole at least one Affiliate Commission, even if it only swaps an Affiliate ID 50% of the time. FAC ¶ 163. If Honey swaps an Affiliate ID at every opportunity, as Plaintiffs allege they do, the likelihood of harm is 100%. *Id.* ¶ 161.

In response, PayPal incorrectly and broadly claims that statistics "cannot show a plaintiff has *already* experienced a concrete, personalized injury." Mot. at 9. This is unsupported and wrong. PayPal's cases stand only for the proposition that an organization asserting standing based on harm to its members cannot use statistics as a substitute for identifying at least one member who either has suffered or will imminently suffer a concrete injury. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009) (disregarding speculation that an unidentified member of an organization might suffer a future, unidentified injury should they decide to visit an unidentified forest parcel at the time a challenged logging project was set to begin); *Faculty v. N.Y. Univ.*, 11 F.4th 68, 77 (2d Cir. 2021) (similar); *Satanic Temple, Inc. v. Rokita*, 2023 WL 7016211, at *4-6 (S.D. Ind. Oct. 25, 2023) (rejecting organization's associational standing based on a

"statistics-based declaration" rather than identifying an affected member of the organization). PayPal's other cases are equally inapposite; they address either speculative future harms or abstract ideological grievances, not concrete financial loss that has already occurred. *See Nelsen v. King Cnty.*, 895 F.2d 1248, 1251–52 (9th Cir. 1990) (rejecting standing for a future harm that depended on plaintiff relapsing, being arrested, and returning to the same facility); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (holding that observing government conduct believed to be unconstitutional is not a concrete injury).

To be clear: Plaintiffs are all *identified* parties who used the Monte Carlo simulation to demonstrate the certainty of a financial injury *that has already occurred*. It is evidence quantifying an existing harm, and accordingly the court in *Capital One* ruled that the similar Monte Carlo analysis there supported the finding of standing. *Capital One*, 2025 WL 1570973, at *5.

### B.    Plaintiffs state claims under CFAA and CDAFA.

Both the federal Computer Fraud and Abuse Act ("CFAA") and California's Comprehensive Computer Data Access and Fraud Act ("CDAFA") prohibit unauthorized computer access that causes harm. The CFAA makes it unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value . . . more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(4). In other words, to show a CFAA violation, a plaintiff must show (1) unauthorized access and (2) use of access to take anything of value. Similarly, the CDAFA prohibits knowingly accessing and altering data "without permission" and provides civil remedies to "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss." Cal. Penal Code §§ 502(c)(1), (e)(1).

These statutes apply to a cookie stuffing scheme (i.e., what Plaintiffs allege here). *See Capital One*, 2025 WL 1570973, at *12; *eBay Inc. v. Digital Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009). This is unsurprising, since to effectuate the cookie-stuffing scheme, a defendant must (1) exceed the authorized access to a consumer's computer by "stuffing" cookies on a browser; and (2) use that "stuffing" to take money that would rightfully belong to the plaintiffs.

1    PayPal insists Honey is neither "exceeding authorized access" to consumers' computers nor taking

2    anything of value from Plaintiffs, and it further argues that Plaintiffs lack the ownership interest required for

3    their CDAFA claim. Both arguments fail.

4    **1.    Honey exceeds authorized access.**

5    PayPal claims that because Plaintiffs admit that Honey's permissions are "extensive," it follows that

6    PayPal acted with consumers' authorization. Mot. at 12–13. But as Plaintiffs explain, PayPal's "cookie

7    stuffing activities and associated practices are not disclosed in the Honey Browser Extension's terms of

8    service, or in any information disclosed to consumers who install the extension." FAC ¶ 437; *see also*, *e.g.*,

9    *id.* ¶¶ 375, 377, 434. Indeed, PayPal's cookie stuffing is designed to "circumvent[] the technical restrictions

10   modern browsers have in place . . . ." *Id*. ¶ 434. In other words, PayPal's conduct is designed to "artificially

11   'trick' the consumer's browser and the online merchant's website into replacing the legitimate tracking codes

12   of Plaintiffs . . . with PayPal's illegitimate tracking codes." *Id*. ¶ 435. Those tricks are far beyond anything

13   authorized by consumers, as "even assuming consumers are authorizing some degree of modification via the

14   'use' of their cookie . . . . consumers are not expressly authorizing [PayPal] to *override* Plaintiffs' tracking

15   codes . . . ." *Capital One*, 2025 WL 1570973, at *13.

16   To hold otherwise would mean that consumers who grant "extensive permissions" somehow also agree

17   to the abuse of those permissions. Courts reject that logic. For example, in *WhatsApp Inc. v. NSO Group*

18   *Technologies Limited*, 472 F. Supp. 3d 649 (N.D. Cal. 2020), the plaintiffs alleged that the defendants created

19   WhatsApp accounts to send malware using WhatsApp's system. *Id.* at 658. The court rejected the argument

20   that defendants did not exceed authorized access because they had broad permission to access WhatsApp's

21   computers and servers, noting that "no WhatsApp user had permission to access the technical call settings or

22   evade WhatsApp's security." *Id.* at 658, 681. The same logic applies here. Consumers authorize Honey to

23   search for coupons; consumers do not authorize Honey to surreptitiously inject hidden tabs and overwrite pre-

24   existing cookie data while bypassing browser security protocols. FAC ¶¶ 434–35. PayPal cannot point to its

25   agreements with Merchants to justify this trespass because those agreements are outside the allegations in the

26   Complaint and because a Merchant has no authority to grant PayPal permission to exceed the scope of access

27   that a consumer has agreed to on their own computer.

28

**2.     Plaintiffs suffered cognizable damage and loss.**

PayPal also argues that Plaintiffs have not suffered a cognizable "damage" or "loss" under 18 U.S.C. § 1030(g). Mot. at 10–12. While either would suffice, Plaintiffs allege both.

*Damage*. As PayPal acknowledges, Plaintiffs allege that their Affiliate IDs are "damaged" when PayPal overwrites and destroys their Affiliate IDs. *See, e.g.*, FAC ¶ 433. PayPal argues the damage is not cognizable because the "affiliate IDs . . . have no independent value as 'data'." Mot. at 10. But the Affiliate IDs are how Plaintiffs are paid by Merchants. They are "tokens," technological chits that can be exchanged for money. Overwriting them constitutes a "technological harm[]—such as the corruption of files." *Van Buren v. United States*, 593 U.S. 374, 392 (2021). PayPal's cases do not support its position because they involved alleged loss of control of personal, health, or financial information *not* meant to be part of a system of commerce. *See Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 485–86 (N.D. Cal. 2021) (alleging loss of "indemnification rights" from defendant's collection of financial information); *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262 (9th Cir. 2019) (alleging loss of the ability to commercialize plaintiff's personal information); *Doe v. Cnty. of Santa Clara*, 2024 WL 3346257, at *9 (N.D. Cal. July 8, 2024) (alleging loss of control of medical data). Here, by contrast, the Affiliate IDs being destroyed are the very means by which a multi-billion-dollar system of commerce operates.

*Loss*. Plaintiffs independently plead they suffer a cognizable "loss." PayPal makes much of the argument that cognizable losses under the CFAA (and CDAFA) are generally understood to be losses caused by an "interruption of service," 18 U.S.C. § 1030(e)(11), and claims that Plaintiffs do not plead an "interruption of service," Mot. at 19–20. But surreptitiously stuffing cookies and thus "redirecting communications within the Affiliate Commission attribution system," FAC ¶ 369, readily qualifies as an "interruption of a service," because it interrupts the orderly operation of the transaction that should be taking place. *See, e.g.*, *Yoder & Frey Auctioneers, Inc. v. Equipmentfacts, LLC*, 2013 WL 1411757, at *3 (N.D. Ohio Apr. 8, 2013) (defendant allegedly "interrupted service" within meaning of CFAA when it used a computer to place false fields and occupy bidding slots in auction service, as doing so impaired the integrity of the program by crowding out legitimate bidders); *Integrity Applied Sci., Inc. v. Clearpoint Chemicals LLC*, 2020 WL 12584444, at *2 (D. Colo. Apr. 20, 2020) (alleged interception and diversion of orders sufficient to state a claim for "interruption of service" under CFAA); *RitLabs, S.R.L. v. RitLabs, Inc.*, 2012 WL 3263893, at *8

(E.D. Va. Aug. 9, 2012), (unlawful redirection of website traffic can constitute CFAA violation), *order vacated in part*, 2012 WL 6021328 (E.D. Va. Nov. 30, 2012). These straightforward allegations distinguish this case from *Andrews*, PayPal's sole authority on loss, where the court found that leave to amend to add a CFAA claim would be futile because the defendant obtained the plaintiff's personal information from the national change of address database and not through the interruption of anything. 932 F.3d at 1256, 1262–63.

As Judge Trenga recently explained in *Capital One*, citing *Integrity Applied* and *Ritlabs*, "the common denominator in these cases is that the defendants are alleged to have used their programming prowess to alter the recipient field in order to redirect the information being communicated through computer traffic for their own financial benefit, amounting to an 'interruption of a service.'" 2025 WL 1570973, at *12. PayPal argues that *Capital One* got it wrong, Mot. at 11–12, but Judge Trenga's "common denominator" exactly describes PayPal's alleged use of sophisticated and hidden programming to redirect Affiliate Commissions from Plaintiffs to itself by changing Affiliate IDs.

PayPal also relies on *Griffith v. TikTok*, 697 F. Supp. 3d 963 (C.D. Cal. 2023), Mot. at 12, but that case supports Plaintiffs. While the claim in *Griffith* was ultimately dismissed for reasons not at issue in this case, the *Griffith* court ruled that cookie stuffing *will* give rise to a CFAA claim, even if the "stuffing" technically occurred because the defendant manipulated a process in order to cause the placement of cookies by another party. *Griffith*, 697 F. Supp. 3d at 974. That is what happened here: PayPal manipulates consumers to interact with Honey, which wrongfully replaces Plaintiffs' Affiliate IDs with PayPal's.

### 3.    **Plaintiffs plausibly allege a cognizable ownership interest in their Affiliate IDs.**

The CDAFA requires that a plaintiff be "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss." Cal. Penal Code § 502(e)(1). Ownership need not be absolute. "An owner may have complete property in the thing or may have parted with some interests in it," and where ownership is not straightforward, it "is a question of fact to be determined by a jury under appropriate instructions of law." *Garrabrants v. Erhart*, 98 Cal. App. 5th 486, 508 (Cal. Ct. App. 2023) (citing Black's Law Dictionary (11th ed. 2019)). To that end, courts have recognized ownership interests where plaintiffs created or authored the data at issue, even when stored on third-party systems. *See, e.g.*, *Lindsay-Stern v. Garamszegi*, 2016 WL 11745948, at *5  (C.D. Cal. Oct. 13, 2016) ("Individuals can

have an ownership interest in the data within their emails even if the emails are not themselves owned by the individual.").

The Complaint here is replete with allegations that Plaintiffs create the very data (i.e., the Affiliate IDs) that Honey hijacks. Specifically, Plaintiffs allege that they took substantial steps to create their affiliate links and the unique identifiers within them, including: (1) reviewing and identifying relevant products; (2) navigating to applicable product pages; (3) ensuring products fit their audience and content; (4) using tools and extensions to generate different link types with unique conversion analytics; (5) choosing link formats and optimization; (6) embedding links within their content; (7) drafting associated marketing content; and (8) promoting their content across multiple platforms. FAC ¶¶ 76–85. While Merchants provide tools for generating affiliate links, Plaintiffs modify these tools with their own creative content and branding to produce unique affiliate identifiers tied to their marketing efforts. These factual allegations culminate in the Complaint's direct assertion of ownership: Plaintiffs allege they "create an affiliate code to include their own name or branding" and that they "own the affiliate links and affiliate codes because Affiliate Marketers create the affiliate links." *Id.* ¶ 432. At the very least, these allegations raise genuine questions of fact regarding Plaintiffs' ownership interest that must be resolved by a jury. *See Garrabrants*, 98 Cal. App. 5th at 508.

Ignoring these direct allegations of creation, PayPal argues that Plaintiffs' CDAFA claim is foreclosed by *Capital One*. Mot. at 13. But Plaintiffs have explicitly cured the deficiency identified by the *Capital One* Court. In that case, the California plaintiff had "not adequately alleged that it creates or generates the tracking codes," or that it "play[ed] a role in creating tracking codes," distinguishing the case from situations where plaintiffs "drafted" the data at issue. *Capital One*, 2025 WL 1570973, at *15. By contrast, the Complaint here details how Plaintiffs create, brand, and control the affiliate ID data, thus establishing a plausible ownership interest. FAC ¶¶ 76–85.

PayPal's reliance on *Stuart v. County of Riverside*, 2024 WL 3455263 (C.D. Cal. Apr. 22, 2024), is misplaced. That case involved government foster and adoption records *about* the plaintiffs that were held in a state-managed database. The court found that the plaintiffs did not own data merely because it pertained to them. *Id.* at *19. Here, the data is not a passive government record *about* Plaintiffs; it is an active commercial asset *created by* Plaintiffs to generate revenue.

C.    **Plaintiffs adequately plead their common law claims.**

The Parties agree that California law applies to Plaintiffs' common law claims for purposes of PayPal's pleading challenge. *See* FAC ¶ 49; Mot. at 14 n.1. Plaintiffs plead facts sufficient to support each of their common law claims.

1.    **Plaintiffs plead an unjust enrichment claim.**

Plaintiffs state a claim for unjust enrichment under California law because they plausibly allege that PayPal "received and unjustly retained a benefit at [Plaintiffs'] expense" by using Honey to divert Affiliate Commissions that rightfully belong to Plaintiffs. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). Specifically, the Complaint alleges:

- Plaintiffs "unwittingly drove their own followers to PayPal . . . through their affiliate links and marketing efforts, where [consumers] made purchases," FAC ¶ 382;

- "[T]he Honey Browser Extension wrongfully represent[ed] to Merchants that Defendants, rather than Plaintiffs . . . should be assigned credit for product sales," *id.* ¶ 383;

- Through Defendants' wrongful conduct, they "received monies in the form of Affiliate Commissions and referral fees that rightfully belong to Plaintiffs . . . ." *id.* ¶ 388; and

- PayPal is aware of each Affiliate Commission that it wrongfully retains because PayPal "uses the Honey Browser Extension to transmit a log record of activities as they occur," *id.* ¶ 157.

These allegations readily satisfy the elements of an unjust enrichment claim; indeed, *Capital One* upheld an unjust enrichment claim on nearly identical facts. 2025 WL 1570973, at *8 (Virginia law); *see also, e.g.*, *Precisely Software Inc. v. Loqate Inc.*, 2022 WL 4348469, at *3 (N.D. Cal. Sept. 19, 2022) (sustaining unjust enrichment claim where defendant wrongfully retained fees it was not owed under contract) (Freeman, J.).

PayPal does not dispute that Plaintiffs satisfy both elements of an unjust enrichment claim. Instead, it makes four arguments, none of which is persuasive.

*First*, PayPal asserts there is no claim for unjust enrichment under California law. Mot. at 14. That is wrong in substance: this Court has held that when a plaintiff properly asserts "a cause of action for unjust enrichment," she "'states a claim for relief as an independent cause of action or as a quasi-contract claim for restitution.'" *Castillo v. Walmart, Inc.*, 2025 WL 1828465, at *7 (N.D. Cal. July 1, 2025) (Freeman, J.) (quoting *ESG Cap. Partners, LP*, 828 F.3d at 1038).

*Second*, PayPal suggests that Plaintiffs cannot maintain a quasi-contract claim because relief is available pursuant to a contract claim against the Merchants or Affiliate Networks. Mot. at 15. But Plaintiffs

allege that *PayPal*—not Merchants or Affiliate Networks—diverted Plaintiffs' Affiliate Commissions. PayPal quotes a truncated section of the summary judgment opinion in *Talavera v. Glob. Payments, Inc.*, 670 F. Supp. 3d 1074, 1110 (S.D. Cal. 2023), to argue that "no action for unjust enrichment lies . . . where a legal remedy for the same wrong is available against a different party." Mot. at 15. But PayPal's ellipsis changes the meaning of the sentence. What *Talavera* actually said was: "no action for unjust enrichment lies *where a contract governs the parties' relationship to each other*." 670 F. Supp. 3d at 1110 (emphasis added). Here, of course, there is no contract governing "the parties' relationship to each other."

The same logic governed the court's order in *Jacobs v. Sustainability Partners LLC*, 2020 WL 5593200, at *17 (N.D. Cal. Sept. 18, 2020), which dismissed a former employee plaintiff's quantum meruit claim because he simultaneously sought to enforce his employment contract against former employer defendant via a breach of contract claim. Unlike the parties in *Jacobs* and *Talavera*, Plaintiffs do not allege the existence of (or seek to enforce) a contract between themselves and PayPal. The fact that Plaintiffs have contracts with non-parties is irrelevant to their unjust enrichment claim. *See Talavera*, 670 F. Supp. 3d at 1110. (And to the extent PayPal suggests that Plaintiffs cannot plead tort claims and quasi-contract claims at the same time, it is well-settled that "Rule 8(d) expressly permits [plaintiffs] to allege alternative and/or inconsistent theories of liability at the pleadings stage." *Castillo*, 2025 WL 1828465, at *7; *see* Fed. R. Civ. P. 8(d)(2), (3).)

*Third*, PayPal argues Plaintiffs have not plausibly alleged they lack an adequate remedy at law. Unlike the plaintiffs in the cases cited by PayPal, Plaintiffs allege that they "have an interest, both equitable and legal, in the Affiliate Commissions," and that "there is no adequate remedy at law to address [PayPal's] conduct." FAC ¶¶ 380–81. In PayPal's cases, by contrast, the complaints contained "no allegations regarding the adequacy of Plaintiffs' legal remedies." *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 648 (N.D. Cal. 2024); *Chiulli v. Am. Honda Motor Co.*, 690 F. Supp. 3d 1038, 1062 (N.D. Cal. 2023) (same); *Talavera v. Glob. Payments, Inc.*, 670 F. Supp. 3d 1074, 1110 (S.D. Cal. 2023) (same); *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837, 844 (9th Cir. 2020) (same). Additionally, and unlike the plaintiffs in *Accellion* or *Chiulli*, Plaintiffs allege that PayPal's conduct is ongoing and seek injunctive relief. *See, e.g.*, FAC ¶ 398. Notably, neither *Talavera* nor *Sonner* was decided on the pleadings: the former was at summary judgment, the later after the plaintiff voluntarily dismissed her damages claim "[o]n the brink of trial."

## 2. **Plaintiffs adequately plead tortious interference claims.**

Plaintiffs properly allege claims for intentional interference with contractual relations ("IICR"), and both intentional and negligent interference with prospective economic advantage. FAC Counts 3–5. The Complaint satisfies the five elements for all three claims:

(1) The existence of a valid contractual relationship (IICR claim) or an economic relationship with the probability of future benefits to the Plaintiff (prospective economic advantage claims).

(2) The defendant's knowledge of that relationship.

(3) The defendant's intentional or negligent acts designed to induce a breach or disruption of the contract or relationship.

(4) Breach or disruption of the relationship.

(5) Resulting damages.

*3500 Sepulveda, LLC v. Macy's West Stores, Inc.*, 980 F.3d 1317, 1326 (9th Cir. 2020) ("The only difference between intentional and negligent interference is the defendant's intent."); *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020) (IICR elements); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 1158–59 (2003) (prospective economic advantage elements).

*First*, Plaintiffs have valid contracts with Merchants and/or Affiliate Networks, pursuant to which Plaintiffs promote Merchants' products and earn Affiliate Commissions when their marketing efforts result in sales, and Plaintiffs expect to maintain these business relationships in the future. *See* FAC III.D; *e.g.*, ¶ 171 (detailing the number of years that Plaintiff Gymcaddy has partnered with numerous Affiliate Networks). Likewise, for their prospective economic advantage claims, Plaintiffs "intend[] to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future." *Id.*

*Second*, PayPal knew about those contracts and business relationships because "economic relationships such as those between Affiliate Marketers like Plaintiffs and Class members and Merchants are standard in the affiliate marketing industry" *id.* ¶ 398; and Honey tracks and logs consumer browsing behavior including "whether an Affiliate ID is already applied," *id.* ¶ 140.

*Third*, PayPal, either intentionally or without reasonable care, used Honey to steal Affiliate Commissions, knowing Honey "would use hidden processes to overwrite or displace the Affiliate Marketer's Affiliate ID with PayPal's Affiliate ID, resulting in PayPal, rather than the Affiliate Marketer, being assigned credit for the sale and awarded any Affiliate Commission." *Id.* ¶ 166.

*Fourth*, PayPal actually disrupted Plaintiffs' contracts and business relationships when it diverted their Affiliate Commissions. The Complaint details precisely how this disruption occurs, documenting the process by which Honey overwrites Plaintiffs' Affiliate IDs. *Id.* ¶¶ 120–56.

*Fifth*, PayPal damaged Plaintiffs by diverting Affiliate Commissions that Plaintiffs had rightfully earned. The Complaint documents how PayPal takes Affiliate Commissions from Plaintiffs and further explains that if Plaintiffs had 50 purchases that were eligible to receive Affiliate Commissions, there was a 98% chance that PayPal used Honey to steal at least one Affiliate Commission from Plaintiffs. *Id.* III.

These allegations are consistent with those in numerous cases sustaining interference claims. *See, e.g.*, *Raymat Materials, Inc. v. A & C Catalysts, Inc.*, 2013 WL 5913778, at *3 (N.D. Cal. Oct. 31, 2013) (stating IICR claim where defendant "engaged in negotiations intended to interfere with the contract"); *EcoHub, LLC v. Recology Inc.*, 2023 WL 6725632, at *13 (N.D. Cal. Oct. 11, 2023) (sustaining intentional and negligent interference with prospective economic relations); *Fortinet, Inc. v. Forescout Techs., Inc.*, 2021 WL 5565836, at *26 (N.D. Cal. Nov. 29, 2021) (IIPEA pled and it is sufficient to allege "facts putting the defendant on notice that a third-party existed") (cleaned up). None of PayPal's arguments changes the analysis.

### a.    Plaintiffs assert a reasonable probability of economic benefit.

First, PayPal argues that Plaintiffs do not show that there was a reasonable probability of Plaintiffs obtaining Affiliate Commissions. Mot at 15. This is incorrect, as illustrated by the fact that *Capital One* recently found nearly identical allegations non-speculative. 2025 WL 1570973, at *9. The Complaint explains that Plaintiffs (1) have existing, ongoing contracts with specific Merchants and Affiliate Networks; (2) have generated thousands of transactions and have earned thousands of dollars in Affiliate Commissions pursuant to those relationships; and (3) "intend[] to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future." *See* FAC III.D. This is more than sufficient. *See Capital One*, 2025 WL 1570973, at *9; *accord, e.g.*, *Oracle Am., Inc. v. CedarCrestone, Inc.*, 2013 WL 3243885, at *3 (N.D. Cal. June 26, 2013) (sustaining claim where defendant "targeted and took licensees" of plaintiff's software because "[t]hese were actual customers with whom [plaintiff] had an existing economic relationship as [] software licensees").

These detailed allegations of current and ongoing business relationships distinguish Plaintiffs' Complaint from PayPal's authorities. PayPal relies on *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42

Cal. App. 4th 507, 522, 531 (Cal. Ct. App. 1996) to argue that Plaintiffs' allegations are "speculative," but the plaintiff in *Westside* claimed to have an "economic relationship with the entire market of all possible but as yet unidentified buyers." Similarly, the counterclaimant in *California Expanded Metal Prods. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC*, 2014 WL 5475214, *4 (C.D. Cal. Oct. 29, 2014) merely alleged "exploratory discussions." And the plaintiff in *Roy Allan Shurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 517–20 (2017) alleged a "public entity's solicitation for bids," which the court deemed an "inherently speculative" process. In stark contrast to those authorities, the Complaint here cites to thousands of collective transactions, names specific Affiliate Networks and Merchants, and describes Plaintiffs' intent to continue earning Affiliate Commissions through these ongoing economic relationships. *See* FAC III.D.

Finally, without a single citation, PayPal also asks the Court to draw a factual inference in its favor—arguing that Plaintiffs' claims are "premised on the idea that consumers would have completed a purchase even without interacting with the Honey Browser Extension," when, according to PayPal, any sales "would not have been probable without the additional savings and/or peace of mind Honey offers." Mot. at 16. This argument is illogical (consumers completed many purchases well before PayPal started diverting Affiliate Commissions) and unsupported by anything in the Complaint. At best, it is an issue on which the Parties will present contrasting evidence to the jury, not a permissible ground to grant a motion to dismiss.

### b.    Plaintiffs allege actual disruption of their interests.

PayPal next argues that Plaintiffs fail to allege actual disruption of their economic relationships because Plaintiffs do not allege that PayPal received Affiliate Commissions from the Merchants and Affiliate Networks identified in the Complaint. Mot. at 17. But even putting aside the extensive allegations about PayPal's receipt of Affiliate Commissions properly belonging to Plaintiffs, no element of these claims requires that the defendant receive benefits from their interference. PayPal's cases do not say otherwise. *See Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148, 1152 n.6 (2004) (stating elements of IICR and intentional interference with prospective economic advantage claims); *Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 1005 (2018) (stating elements of negligent interference claim), *disapproved of on other grounds by Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020). The Complaint's extensive allegations satisfy the "actual disruption" requirement because they set out how PayPal uses Honey to spoof a browser tab to act as if Honey referred the consumer to the Merchant's page. In particular, Plaintiffs supply specific allegations and illustrative

screenshots showing how Honey overwrote Plaintiff Justin Tech Tips LLC's existing Affiliate ID and replaced it with PayPal's Affiliate ID, thus ensuring that the commission went to PayPal, rather than to the Affiliate Marketer whose marketing generated the sale. FAC ¶¶ 120–49.

### c.    Plaintiffs allege what contractual rights they possess.

PayPal also argues that Plaintiffs do not explain what contractual rights they possess because the Complaint does not allege specific contract language. Mot. at 17. But PayPal conflates pleading specific language with the actual requirement of pleading what "contractual rights are at issue." *PhD Mkt'g, Inc. v. Vital Pharms., Inc.*, 2021 WL 8693518, at *9 (C.D. Cal. Mar. 3, 2021) (collecting cases). For example, in *ConsumerDirect, Inc. v. Pentius, LLC*, 2022 WL 16949657, at *4 (C.D. Cal. Aug. 25, 2022), a counterclaimant sufficiently identified its contractual rights "to obtain consumer credit and related information" and the district court did not require more specific contractual language. *See also Byton N. Am. Co. v. Breitfeld*, 2020 WL 3802700, at *6 (C.D. Cal. Apr. 28, 2020) ("Plaintiff's allegations are sufficient for the Court to determine what contractual rights are at issue. Plaintiffs described the contracts, and a specific, albeit unnamed, group of people who were parties to them."); *Epicor Software Corp. v. Alt. Tech. Sols, Inc.*, 2013 WL 2382262, at *4 (C.D. Cal. May 9, 2013) ("Contrary to [defendant's] argument, [plaintiff] was not required to attach copies of the specific contracts to its Complaint. The detailed allegations in the Complaint are sufficient[.]").

The Complaint satisfies this legal requirement because it walks through the relationships and obligations in Plaintiffs' contracts. Plaintiffs partner with Merchants (either directly or through Affiliate Networks) to promote Merchants' products. FAC ¶ 62, III.D. Those relationships entitle Plaintiffs to Affiliate Commissions "when their marketing results in a sale and their link was the last link that a consumer interacted with prior to purchase." *Id.* ¶ 56. Pursuant to their contracts, Merchants use Plaintiffs' Affiliate IDs to "credit the sale to the Affiliate Marketer associated with that Affiliate ID." *Id.* ¶¶ 63–64, 66. When consumers use Plaintiffs' affiliate links to complete a purchase and that link was "the last link that a consumer interacted with prior to purchase," *id.* ¶ 56, Plaintiffs are contractually entitled to the Affiliate Commission, *id.* ¶¶ 66–67. These same allegations about Plaintiffs' existing and ongoing relationships with Merchants and Affiliate Networks satisfy the elements for Plaintiffs' interference with prospective economic advantage claims, which merely require an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff. *See Oracle*, 2013 WL 3243885, at *3.

PayPal's cases are inapposite because they involved highly distinguishable facts. In one, for example, the alleged contractual duties in the relevant contract were *blank*, so "as far as the Court can tell the [contract] did not actually obligate [the p]laintiff to do anything." *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, 2014 WL 3372583, at *13 (N.D. Cal. July 9, 2014). Another of PayPal's cases did not "identify specific contracts that were disrupted, the terms of the contracts, the parties involved, and how [counter-defendant's] actions disrupted the contracts," *Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*, 2019 WL 8631502, at *2 (C.D. Cal. Dec. 16, 2019)—a far cry from the situation here, where Plaintiffs identified each of those things. Nor is this case similar to *Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*, 2013 WL 489899, at *9 (C.D. Cal. Feb. 7, 2013), where the plaintiff merely alleged "generalized disruption of contracts." PayPal's final authority, *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1009 (9th Cir. 2014), has no bearing on a motion to dismiss as the court in that case considered whether it should have interpreted the terms of a contract on an appeal from judgment as a matter of law. Here, the Complaint details agreements Plaintiffs have with Merchants and Affiliate Networks entitling them to Affiliate Commissions through the industry-standard last-click attribution. *See* FAC ¶¶ 62–64, 66, 70, 90, 108.

PayPal's remaining argument in this section of its briefing is that it "open[ly] participat[es]" in the same affiliate marketing programs as Plaintiffs, which "undermines" Plaintiffs' arguments that they are entitled to Affiliate Commissions when they drive sales to Merchants under the terms of their contracts and the last-click attribution standard. Mot. at 19. This argument is based on the fiction that PayPal is Plaintiffs' competitor, which is not found in Plaintiffs' Complaint nor a fair inference to draw from it.

### d.    Plaintiffs allege independently wrongful acts.

Plaintiffs allege two separately sufficient bases that satisfy the independently wrongful act requirement—(1) Plaintiffs' non-interference claims, i.e., their common law and statutory claims; *and* (2) that PayPal's conduct "contravenes existing standards and norms in the affiliate marketing industry." *See, e.g.*, FAC ¶¶ 115–16, 118, 399. PayPal does not dispute that if the Court sustains any of Plaintiffs' non-interference claims, Plaintiffs satisfy the independently wrongful act requirement.

Even if the Court dismisses Plaintiffs' non-interference claims, Plaintiffs' second basis (that PayPal's conduct contravenes existing standards and norms) satisfies the independently wrongful act requirement.

"Wrongful conduct" can include any conduct inconsistent with a statute, regulation, common law rule, or established standard of a trade or profession. *See Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 385 (1995); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1013 (N.D. Cal. 2015). The Complaint describes PayPal's unlawful cookie stuffing and explains that cookie stuffing is treated as fraud and "malicious code" by the industry and has resulted in guilty pleas. FAC ¶¶ 115–16, 118. These allegations that PayPal's conduct constitutes cookie stuffing, which can be criminal activity, demonstrate that PayPal engaged in independently wrongful acts. *See Korea Supply*, 29 Cal. 4th at 1159 (plaintiff "clearly satisfied the independent wrongfulness requirement" by alleging FCPA violations).

### e.      **PayPal owed a duty to Plaintiffs, and is not a competitor to them.**

PayPal's last argument is that it did not owe Plaintiffs a duty of care. Mot. at 20. That is incorrect. To determine the existence of a duty of care, courts consider: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." *Pro-Com Prods., Inc. v. Optimal Sante, LLC*, 2023 WL 11663237, at *3 (C.D. Cal. Oct. 30, 2023).

The Complaint alleges that (1) the transaction directly affected Plaintiffs because PayPal used Honey to overwrite their Affiliate IDs, FAC ¶¶ 141–56; (2) PayPal knew it harmed Plaintiffs by overwriting their Affiliate IDs and thereby taking their Affiliate Commissions, *id.* ¶¶ 120–56; (3) Plaintiffs suffered harm, as evidenced by, *inter alia*, the screenshots showing PayPal's theft at work and Plaintiffs' Monte Carlo simulation showing the extremely high likelihood that PayPal took Affiliate Commissions from each Plaintiff, *id.* ¶¶ 120–53, 162–64; (4) overwriting Plaintiffs' Affiliate IDs directly caused Plaintiffs' injury, *id.* ¶¶ 157–64; (5) PayPal's conduct constitutes cookie stuffing, which can be criminal activity, *id.* ¶¶ 107, 114–56; and (6) PayPal "continues to misappropriate Affiliate Commissions from thousands of Affiliate Marketers." *Id.* ¶ 2. Accordingly, Plaintiffs establish that PayPal owed them a duty. These substantial allegations distinguish this case from the two-paragraph count alleged in the case cited by PayPal, *Stolz v. Wong Commc'ns Ltd. P'ship*, 25 Cal. App. 4th 1811, 1824 (Cal. Ct. App. 1994).

PayPal also argues that it cannot owe Plaintiffs a duty of care because it competes with Plaintiffs. Setting aside that the *legal* premise of this assertion is not correct, *Code Rebel, LLC v. Aqua Connect, Inc.*,

2013 WL 5405706, at *7 (C.D. Cal. Sept. 24, 2013) (finding duty of care between competitors), it is entirely wrong on the facts because Plaintiffs do not allege that they compete with Honey. Plaintiffs are Affiliate Marketers who direct consumer traffic to Merchants, whereas PayPal runs a service that purportedly searches for discounts prior to checkout. There is no meaningful sense in which those two types of businesses compete with each other, and of course PayPal never cites the Complaint to support its contention (nor could it). That alone resolves the issue on the pleadings; all of PayPal's authorities involved allegations that the parties were competitors. *See Ketab Corp. v. Mesriani & Assocs., P.C.*, 734 F. App'x 401, 408 (9th Cir. 2018) (plaintiff "alleged that the . . . [d]efendants had a duty of care because they knew that they competed with [plaintiff]"); *Behr Process Corp. v. RPM Int'l Inc.*, 2014 WL 12584385, at *5 (C.D. Cal. May 20, 2014) (similar).

### D.    Plaintiffs adequately plead state consumer protection claims.

Plaintiffs state claims for violation of the California Unfair Competition Law ("UCL"), the Connecticut Unfair Trade Practices Act ("CUPTA"), the Hawaii Unfair and Deceptive Trade Practices Act, the New Hampshire Consumer Protection Act, the New York General Business Law ("GBL"), and the Washington Consumer Protection Act.  *See* FAC Counts 6–12. PayPal's scattershot arguments against certain elements of these claims fail.

*Plaintiffs allege injury.* In a single, unsupported sentence, PayPal argues that Plaintiffs fail to plausibly allege that Honey caused Plaintiffs' injury. Mot. at 20. But the Complaint details how PayPal injured Plaintiffs, as discussed more fully above. *See* FAC ¶¶ 120–49.

*Plaintiffs allege wrongful conduct.* Plaintiffs allege wrongful, "unlawful" conduct under the consumer protection laws because PayPal's conduct violates the CFAA and the CDAFA, and cookie stuffing is the basis for criminal charges. *Id.* ¶¶ 116–18, 445. PayPal states that Plaintiffs did not allege plausible violations of other law, but as explained above, PayPal is incorrect.

Even if Plaintiffs had not stated violations of other laws, however, their consumer fraud claims would still be viable because Plaintiffs also allege "unfair" conduct. Plaintiffs plausibly allege, for example, that PayPal's conduct is unfair because it is "immoral, unethical, oppressive, and unscrupulous." *Id.* ¶ 459. PayPal responds that it merely engaged in "rigorous, but fair, competitive strategies," Mot. at 21, but that is not what Plaintiffs allege in the Complaint. As stated above, Plaintiffs allege that Honey diverts Plaintiffs' Affiliate Commissions to itself by surreptitiously replacing Plaintiffs' Affiliate IDs with PayPal's own, and that such

1    conduct is cookie stuffing, which can be criminal activity. FAC ¶¶ 115–18, 120–49, 447. Those are not

2    legitimate "competitive strategies."

3        PayPal's cases are not to the contrary. In *Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*, 687

4    F. Supp. 3d 201, 222 (D.N.H. 2023), there was a contract between the parties about the subject matter of the

5    dispute, so the dispute fell "under contract law and its equitable relatives, not the Consumer Protection Act."

6    Plaintiffs do not have contracts with PayPal regarding Honey. In *Hokto Kinoko Co. v. Concord Farms, Inc.*,

7    810 F. Supp. 2d 1013, 1037 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir. 2013), the Plaintiffs failed to

8    show an element of their claim on summary judgment. In *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular*

9    *Tel. Co.*, 20 Cal. 4th 163, 187 n.12, 189, (1999), not only did the California Supreme Court find (after trial),

10   that "plaintiffs might be able to show the sales were unfair," but the court expressly cabined the test set out in

11   that case to "action[s] by a competitor alleging anticompetitive practices."  Plaintiffs do not allege they are

12   competitors of PayPal, so *Cel-Tech* is inapplicable.

13       Finally, PayPal's statement that Plaintiffs cannot state a claim by alleging Honey's conduct violated

14   "industry norms" is incorrect. Mot. at 22. PayPal's own authorities show that departure from specific industry

15   norms *can* be the basis of statutory fraud claims. *See Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 792

16   (Conn. 2019) (holding plaintiffs stated CUTPA claim by alleging "a conscious, systematic departure from

17   known, standard business norms"); *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1232 (N.D. Cal.

18   2014) (holding plaintiffs stated UCL claim by identifying "specific industry-standard security measures").

19   Plaintiffs have pled far more than departure from "industry norms," as stated above.

20       *Plaintiffs allege a lack of adequate alternative legal remedies.* PayPal argues that Plaintiffs' statute-

21   based equitable claims fail because Plaintiffs' harm is compensable through damages. Mot. at 22. As an initial

22   matter, PayPal seeks dismissal of *all* of Plaintiffs' state statutory claims on this basis, but cites only UCL

23   cases without identifying any such requirement for the other five state statutes. In any event, this argument

24   fails as to all of Plaintiffs' statutory claims for equitable relief because, as discussed above regarding

25   Plaintiffs' unjust enrichment claims, the well-established law in this district is that courts "allow the pursuit

26   of alternative remedies at the pleadings stage." *Collyer v. Catalina Snacks Inc.*, 712 F. Supp. 3d 1276, 1289

27   (N.D. Cal. 2024) (collecting cases permitting plaintiffs to plead alternative equitable remedies); *see also*

28

1    *Mencia-Montes v. Fit Foods Distribution, Inc.*, 2025 WL 1185372, at *7 (N.D. Cal. Mar. 31, 2025) ("C]ourts

2    have generally concluded that *Sonner* has minimal application at the pleading stage.").

3              Unlike in the case PayPal cites—*Forrett v. Gourmet Nut, Inc.*, 634 F. Supp. 3d 761, 769 (N.D. Cal.

4    2022), where the plaintiff had "not pled the inadequacy of a legal remedy"—Plaintiffs here do allege "that

5    there is no adequate remedy at law to address Defendants' conduct." FAC ¶ 441. And Plaintiffs seek legal

6    and equitable remedies in the alternative. Namely, Plaintiffs seek legal remedies in the form of the Affiliate

7    Commissions Plaintiffs earned but did not receive due to PayPal's interference, and, in the alternative,

8    equitable remedies in the form of injunctive relief and disgorgement of the Affiliate Commissions that PayPal

9    diverted to itself. The Court may find that the Affiliate Commissions recoverable as restitution under

10   Plaintiffs' UCL claim are not available, or not fully available, under any of Plaintiffs' legal claims. This Court

11   has also acknowledged that "monetary damages for past harm are an inadequate remedy for the future harm

12   that an injunction under [the UCL] is aimed at." *Castillo*, 2025 WL 1828465, at *7 (permitting UCL claim to

13   proceed for injunctive relief).

14             Relying on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) and two of its

15   progeny—*Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022) and *In re Apple Processor*

16   *Litig.*, 2023 WL 5950622, at *2 (9th Cir. Sept. 13, 2023)—the *Capital One* Court dismissed a UCL claim for

17   failure to allege a lack of adequate alternative legal remedies. *Capital One*, 2025 WL 1570973, at *16. The

18   result is different in this district, which permits plaintiffs to advance "alternative remedies at the pleadings

19   stage." *Collyer*, 712 F. Supp. 3d at 1289.

20             *Out-of-state statutes apply to PayPal's conduct in those states.* PayPal argues that Plaintiffs' claims

21   under the Connecticut, Hawaii, New Hampshire, New York, and Washington statutes fail because those laws

22   do not apply to PayPal's conduct, which took place in California. Mot. at 23. But PayPal does not challenge

23   the nationwide scope of its conduct, including that Honey had 17 million monthly active users and worked

24   with more than 10,000 merchants when it was purchased by PayPal in 2020. FAC ¶ 101. Further, PayPal

25   concedes that Plaintiffs allege that they resided in the relevant state. Mot. at 23. Plaintiffs' residence

26   allegations are sufficient to bring claims under these state statutes because that is where Plaintiffs conducted

27   their Affiliate Marketing and were harmed by PayPal stealing their Affiliate Commissions. *See* FAC ¶¶ 17,

28   19, 24, 27, 28, 31, 34. PayPal's argument additionally conflates the appropriate choice-of-law analysis with

the ability of residents of a state to file claims under their home state's statutes. (PayPal's argument would also lead to the absurd result that *only* California residents can bring statutory claims against it.)

Again, PayPal's authorities are inapposite because in those cases, courts declined to apply out of state law where the plaintiff alleged out of state harm. *See Harris v. LAZ Parking Ltd., LLC*, 2025 WL 473654, at *7 (D. Conn. Feb. 12, 2025) (dismissing CUTPA claim brought by Missouri plaintiff over a "parking transaction [that] occurred in Missouri"); *Precourt v. Fairbank Reconstruction Corp.*, 856 F. Supp. 2d 327, 343 (D.N.H. 2012) (granting defendant judgment as to New Hampshire claim where defendant "processed beef in Nebraska and shipped it to New York and, thus, engaged in no offending conduct in New Hampshire"); *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 326 (2002) (dismissing GBL claim by plaintiffs alleging deception in Florida, but sustaining claim by other plaintiffs alleging deception in New York); *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 977 (9th Cir. 2016) (dismissing Washington claim brought by California plaintiff over alleged infringing activity in Canada); *Sabini v. Sabini*, 38 Haw. 394, 403 (Haw. 1949) (declining to apply Hawaii law where resident husband sought to divorce non-resident wife on grounds of Massachusetts separation order); *State v. Bridges*, 83 Haw. 187, 197 (1996), *overruled by State v. Torres*, 125 Haw. 382 (2011) (declining to apply Hawaii law to conduct outside of Hawaii).

*Plaintiffs allege anticompetitive conduct.* PayPal argues that Plaintiffs' claims under the UCL and Hawaii law fail because Plaintiffs do not plausibly allege anticompetitive conduct. Mot. at 23–24. Once again, PayPal's argument fails because it rests solely on the unsupported fiction that PayPal and Plaintiffs are competitors and cites cases in which plaintiffs actually alleged they were competitors. *Cel-Tech*, 20 Cal. 4th at 187 n.12 (cabining test requiring plaintiff to allege "an incipient violation of an antitrust law," to "an action by a competitor alleging anticompetitive practices"); *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014) (plaintiffs acknowledged that *Cel-Tech* standard applied to their to business-competitor claims); *Snapkeys, Ltd. v. Google LLC*, 2020 WL 6381354, at *3 (N.D. Cal. Oct. 30, 2020) (similar).

PayPal's Hawaii authority also supports Plaintiffs' claims. Under *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423, 435 (2010), a plaintiff "need not be a competitor" to bring a claim under the statute. Plaintiffs further allege the anticompetitive effect of PayPal's conduct: PayPal "serially" disrupted the "economic relationship between Affiliate Marketers and the more than 30,000 participating retailers who work with"

Honey by using Honey to "surreptitiously fabricat[e]" a referral, thereby diverting Affiliate Commissions from each Plaintiff. FAC ¶¶ 2, 109, 162–64.

*Plaintiffs allege consumer or public-interest harm.* PayPal argues that Plaintiffs' New York and Washington claims fail for lack of consumer or public-interest harm. Mot. at 24–25. Plaintiffs amply satisfy this requirement by alleging two separate bases of consumer and public-interest harm: that PayPal (1) stopped consumers from achieving their goal of paying Affiliate Marketers when they use their affiliate links to complete a purchase, FAC ¶¶ 55, 57, 114; and (2) deceived consumers because "[a]fter PayPal's deceptive conduct was first exposed, millions of users reportedly uninstalled the Honey Browser Extension," *id.* ¶ 104. Contrary to PayPal's assertion, *see* Mot. at 25, Plaintiffs here allege more substantial consumer harm than the plaintiffs in *Capital One*, whose bases of consumer harm focused more on the impact to Affiliate Marketers than to consumers. *See Capital One*, 2025 WL 1570973, at *15–16 (dismissing New York GBL claim based on allegations that browser extension harms consumers by depriving affiliate marketers of their commissions and pushing affiliate marketers out of the market, thereby reducing consumer choice). Additionally, PayPal's authority supports Plaintiffs' claims. Unlike the plaintiff in *Maurizio v. Goldsmith*, 230 F.3d 518, 522 (2d Cir. 2000), Plaintiffs allege that PayPal's conduct had a "direct impact on the body of consumers." *See also S/Y Paliador, LLC v. Platypus Marine, Inc.*, 750 F. Supp. 3d 1187, 1207 (W.D. Wash. 2024) (granting summary judgment as to Washington claim where there was no evidence defendant "advertise[d] to the public at large" or was "likely to solicit other[]" customers). The Court should reject PayPal's arguments.

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask the Court to deny Defendants' motion to dismiss in its entirety and seek leave to amend should the Court find any claim deficient.

1    Dated:  September 24, 2025              Respectfully submitted,

2                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3

4                                By:     */s/ Jason L. Lichtman*           

5                                      Elizabeth J. Cabraser (SBN 083151)
Roger N. Heller (SBN 215348)

6                                      **LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**

7                                      275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

8                                      Telephone: (415) 956-1000
ecabraser@lchb.com

9                                      rheller@lchb.com

10                                     Jason L. Lichtman (*pro hac vice*)
Sean A. Petterson (*pro hac vice*)

11                                    Danna Z. Elmasry (*pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**

12

13                                    250 Hudson Street, 8th Floor
New York, New York 10013-1413

14                                    Telephone: (212) 355-9500
jlichtman@lchb.com

15                                    spetterson@lchb.com
delmasry@lchb.com

16                                    Dena C. Sharp (SBN 245869)
Trevor T. Tan (SBN 281045)

17                                    Nina Gliozzo (SBN 333569)
Anthony Rogari (SBN 353784)

18                                    **GIRARD SHARP LLP**
601 California Street, Suite 1400

19                                    San Francisco, CA 94108
Telephone: (415) 981-4800

20

21

22

23

24

25

26

27

28

Nanci E. Nishimura (SBN 152621)
Thomas E. Loeser (SBN 202724)
Karin B. Swope (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000

*Interim Co-Lead Counsel*


Daniel R. Schwartz
**DICELLO LEVITT LLP**
10 North Dearborn St
Ste Sixth Floor
Chicago, IL 60602
312-214-7900
dschwartz@dicellolevitt.com

*PSC Member, On Brief*

# **ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: September 24, 2025

*/s/ Jason L. Lichtman*
Jason L. Lichtman

1

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was duly served upon all Counsel of record in this action via electronic service, in accordance with the Federal Rules of Civil Procedure, on September 24, 2025.


Dated: September 24, 2025


                                        */s/ Jason L. Lichtman*
                                        Jason L. Lichtman