# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| WENDOVER PRODUCTIONS, LLC, et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>PAYPAL INC, et al.,<br><br>　　　　　Defendants. | Case No.  5:24-cv-09470-BLF<br><br>**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>[Re:  ECF No. 205] |

Before the Court is Defendant's motion to compel arbitration.  ECF No. 205 ("Mot."); see also ECF No. 221 ("Reply").  Plaintiffs oppose the motion.  ECF No. 218 ("Opp.").  The Court held oral argument on November 6, 2025.  ECF No. 228.

For the reasons described below, the motion is DENIED.

## I.    BACKGROUND

This case involves the affiliate marketing industry.  First Amended Complaint ("FAC") ¶¶ 50–53, ECF No. 188.  Plaintiffs are bloggers, podcasters, and other social media influencers ("Affiliate Marketers") who use their websites and social media platforms to promote products sold by e-commerce merchants ("Merchants") to their online audiences.  FAC ¶¶ 3, 9–35.  The Honey Browser Extension ("Honey"), purchased by Defendant for $4 billion in 2020, is a free web browser extension that enables consumers to scan the internet for coupons and discounts, earn cashback through the reward program, and make purchases using PayPal, all at the point of sale. *Id.* ¶ 5, 39.  The basic structure of the affiliate marketing ecosystem is relatively straightforward: Affiliate Marketers—often acting through affiliate network platforms ("Affiliate Networks")— enter into agreements with Merchants in which Affiliate Marketers generate traffic and leads to Merchants' online storefronts in exchange for commissions from each resulting sale.  *Id.* ¶¶ 54–56.

1  Generally, Merchants provide partnering Affiliate Marketers with "affiliate links," hyperlinks that direct consumers to Merchants' online storefronts and contain identifiers that are unique to each Affiliate Marketer ("Affiliate IDs"), which in turn are used to track referrals and assign commissions. *Id.* ¶¶ 62–63. Clicking on the affiliate link also causes a tracking code or cookie containing the Affiliate Marketer's Affiliate ID to be stored on the consumer's web browser for a set amount of time and log the consumer's purchasing activity so that that any purchase resulting from clinking on the affiliate link is attributed to the referring Affiliate Marketer. *Id.* ¶¶ 65–66, 74. Plaintiffs assert numerous claims against Defendant, alleging that Defendant "has been stealing for itself Affiliate Commissions that properly belong to [them] . . . [by] replac[ing] the Affiliate Marketer[s'] Affiliate ID[s] with [Defendant's] own Affiliate ID during the consumer[s'] checkout process, thus diverting the Affiliate Commission[s] to itself." *Id.* ¶ 3.

Several Plaintiffs have opened accounts with Defendant through PayPal or Venmo, which Defendant wholly owns. Mot. at 1. When opening those accounts, each Plaintiff agreed to the respective PayPal User Agreement ("PUA") or Venmo User Agreement ("VUA") (together, the "User Agreements"). *Id.* Each User Agreement contains a mandatory arbitration provision providing that any arbitration will be conducted under AAA rules and contains a choice of law provision. *See* PUA at 48–57, ECF No. 205-2; VUA at 24–27, ECF No. 205-25. Each User Agreement also contains an introductory clause describing the scope of the Agreement. See PUA at 2 ("This user agreement is a contract between you and PayPal, Inc. governing your use of your PayPal account and the PayPal services."); VUA at 2 ("This user agreement is a contract between you and PayPal Inc. governing your use of your Venmo account and the Venmo services.").

Plaintiffs initiated this action against Defendant on December 29, 2024. ECF No. 1. On August 11, 2025, Defendant moved to dismiss the FAC as to all Plaintiffs and moved to compel arbitration as to the set of Plaintiffs that own PayPal or Venmo accounts (and thus have entered one or both of the User Agreements with Defendant). Mot.; *see also* ECF No. 204.

2

## II. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–402, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, a court must determine two issues in deciding a motion to compel arbitration: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Ross v. Shutterfly Lifetouch, LLC*, No. 20-cv-06040-BLF, 2021 WL 4776666, at *2 (N.D. Cal. Oct. 13, 2021). If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

As the party seeking to compel arbitration, Defendant bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *See Norcia v. Samsung Telecommc'ns Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Benson v. Casa de Capri Enters., LLC*, 980 F.3d 1328, 1330 (9th Cir. 2020). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted).

When the "existence of an arbitration agreement is at issue . . . the presumption in favor or arbitrability does not apply." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). Rather, the issue whether the parties formed an agreement to arbitrate is resolved under "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In California, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code. § 1636. "To determine the reach of a particular agreement, we must look to its express terms." *Walsh v. Ariz. Logistics, Inc.*, 998 F.3d 393, 396 (9th Cir. 2021).

## III. DISCUSSION

There is no dispute that Plaintiffs entered into the User Agreements. Instead, in opposing

3

1    the motion Plaintiffs argue that there is no agreement to arbitrate Plaintiffs' claims because the
2    User Agreements "are expressly limited to consumer's 'use of' PayPal or Venmo." Opp. at 2.
3    (quoting PUA at 2, VUA at 2). Plaintiffs contend that Defendant's motion is foreclosed by the
4    Ninth Circuit's recent decision in *Johnson*. The Court agrees—because the parties did not enter an
5    agreement to arbitrate the claims, the inquiry ends at step one, and the motion must be denied.

At issue in *Johnson* was whether an arbitration provision contained in an online Terms of Use governed the parties' dispute as to in-store services. There, the plaintiff purchased a set of tires from the defendant's online platform, an in so doing, agreed to defendant's online Terms of Use, which contained a mandatory arbitration provision. *Johnson*, 57 F.4th at 679. While waiting for his tires to be installed, the plaintiff purchased a separate lifetime tire balancing and rotation service agreement from one of defendant's employees and brought the suit after defendant declined to service his tires. *Id.* at 680. The Ninth Circuit affirmed the district court's denial of defendant's motion to compel arbitration, explaining that plaintiff's "claim . . . d[id] not arise out of the contract containing the arbitration agreement." *Id.* at 681.

Here, just as in *Johnson*, the User Agreements "have a clear, delineated purpose—to regulate use of [Defendant's] online resources" and services. *Id.* at 682. The plain terms of the User Agreements make clear that the agreements are formed only with respect to the *individual Plaintiff's use* of their PayPal/Venmo account and services. *See, e.g.*, PUA at 2 ("governing *your* use of *your* PayPal account and the PayPal services" (emphasis added)). Resisting this straightforward interpretation, Defendant argues that "[t]he provision's plain reading directs that the [User Agreements] govern (1) users' use of their account and (2) the PayPal services generally," since "PayPal specifically chose to include 'your use of' before 'PayPal account,' and not to include 'your use of' before 'PayPal services.'" Reply at 1. Defendant's reading strains credulity and is simply at odds with how possessive pronouns in the English language function: No reasonable English speaker would interpret the phrase "you use your pen and papers" as limiting "your" to "pen," such that the pen—but not the papers—belong to the subject.

This straightforward reading is confirmed by looking to other provisions of the User Agreements, which are uniformly limited to governing the user's own use of Defendant's financial

technology services and not those financial technology services more broadly.  *See Johnson*, 57 F.4th at 682 ("[U]nder California law, a contract must be 'interpreted as a whole.'" (quoting *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020)).  Indeed, virtually every provision in the User Agreements is expressly cabined to regulating and delineating the precise contours of how consumers use PayPal to make purchases and manage their finances.  *See, e.g.*, PUA at 13 ("You have the right to receive an account statement showing your PayPal account activity."), 20 ("PayPal may allow you to redeem rewards associated with your eligible card(s) when making a purchase with your PayPal account through PayPal's Pay with Rewards program."), 36 ("We may place a hold on payments sent to your PayPal account if, in our sole discretion, we believe that there may be a high level of risk associated with you, your PayPal account, or your transactions . . . .").

Taking another tack, Defendant also seeks to distinguish *Johnson* on the ground that that case involved "separate and independent" contracts between the parties whereas in this case there is only one contract governing their relationship.  Reply at 2.  This argument, too, misses the mark.  The Ninth Circuit made clear in *Johnson* that its analysis was limited to the narrow issue as to whether there existed an agreement to arbitrate the dispute, expressly disclaiming any comparison as to the scope of the two agreements, which would be a matter left to arbitration under the FAA and AAA rules.  *See Johnson*, 57 F.4th at 681 ("We agree with the district court that Johnson contests the existence, not the scope, of an arbitration agreement that would encompass this dispute.").  Courts in this circuit have similarly applied the analysis in Johnson to the limited threshold issue whether the parties "formed an agreement to arbitrate the claims at issue."  *Attia v. Oura Ring, Inc.*, No. 23-cv-03433-HSG, 2024 WL 1382464, at *3 (N.D. Cal. Apr. 1, 2024), *aff'd*, No. 24-2622, 2025 WL 878971 (9th Cir. Mar. 21, 2025).

"Because [Plaintiffs] and [Defendant] never formed an agreement to arbitrate her discrimination claims via the [User Agreements] . . . th[ose] agreement[s] do[] not require [Plaintiffs] to arbitrate . . . [their] claims."  *Perez v. Discover Bank*, 74 F.4th 1003, 1011 (9th Cir. 2023).  There is no contract governing the claims at issue in this case, and as such there can be no agreement to arbitrate those claims.

5

**IV.     ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that the motion is DENIED.

Dated:  November 7, 2025

_____
BETH LABSON FREEMAN
United States District Judge