Dena C. Sharp (SBN 245869)
Trevor T. Tan (SBN 281045)
Nina Gliozzo (SBN 333569)
Anthony Rogari (SBN 353784)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800

Nanci E. Nishimura (SBN 152621)
Thomas E. Loeser (SBN 202724)
Karin B. Swope (*pro hac vice*)
Andrew J. Fuller (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Rd #200,
Burlingame, CA 94010
Telephone: 650.697.6000

*Interim Co-Lead Counsel*

Elizabeth J. Cabraser (SBN 083151)
Roger N. Heller (SBN 215348)
Jason L. Lichtman (*pro hac vice*)
Sean A. Petterson (*pro hac vice*)
Danna Z. Elmasry (*pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION | Case No. 5:24-cv-9470-BLF<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ............................................................................................. 1

PARTIES ........................................................................................................................... 5

JURISDICTION AND VENUE ....................................................................................... 6

DIVISIONAL ASSIGNMENT ......................................................................................... 7

CHOICE OF LAW ........................................................................................................... 7

FACTUAL ALLEGATIONS ............................................................................................ 8

I.      The Affiliate Marketing Industry ......................................................................... 8

        A.      Affiliate Marketing Is A Rapidly Growing Industry. ............................... 8

        B.      Affiliate Marketers Are of Central Importance to the Affiliate Marketing
                Ecosystem. ................................................................................................ 9

        C.      The Affiliate Marketing Process in Five Steps ...................................... 10

II.     Merchants Use Tracking Mechanisms to Credit Affiliate Marketers for Sales. ............... 12

        A.      Affiliate Marketers Create or Own Affiliate Links. ............................... 12

        B.      The Predominant Attribution Model In Affiliate Marketing Is "Last Click
                Attribution". ............................................................................................. 14

III.    PayPal Uses The Honey Browser Extension to Steal Affiliate Commissions from
        Affiliate Marketers. .............................................................................................. 18

        A.      The Honey Browser Extension ................................................................ 18

        B.      The Honey Browser Extension Exploits Attribution Mechanisms to Steal
                Credit for Sales. ...................................................................................... 20

        C.      Honey Diverted Named Plaintiffs' Commissions ................................... 33

        D.      PayPal's Actions Are Surreptitious, and Contrary To Common Contractual
                Terms and Industry Standards. ................................................................ 55

        E.      The Affiliate Marketing Industry Repudiated PayPal's Conduct When Its
                Scheme Came To Light. ........................................................................... 67

CLASS ALLEGATIONS ............................................................................................... 70

COUNT ONE VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18
U.S.C. § 1030, *ET SEQ.*) ............................................................................................ 73

COUNT TWO UNJUST ENRICHMENT ..................................................................... 79

COUNT THREE INTENTIONAL INTERFERENCE WITH PROSPECTIVE
ECONOMIC ADVANTAGE .......................................................................................... 82

COUNT FOUR INTENTIONAL INTERFERENCE WITH CONTRACTUAL
RELATIONS ................................................................................................................... 85

COUNT FIVE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS &
FRAUD ACT ................................................................................................................... 87

COUNT SIX VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ........... 90

COUNT SEVEN VIOLATION OF THE WASHINGTON CONSUMER PROTECTION
ACT .................................................................................................................................. 93

SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO. 5:24-CV-9470-BLF

1

**TABLE OF CONTENTS**
**(continued)**

2

**Page**

3    PRAYER FOR RELIEF...................................................................................................... 95

     DEMAND FOR JURY TRIAL......................................................................................... 96
4
     CERTIFICATE OF SERVICE ......................................................................................... 98

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Ahntourage Media LLC, Aaron Ramirez, Angry Snowboarder, Brevard Marketing LLC, Red Beard Studios LLC, Storm Productions LLC, Gents Scents LLC, Daniel Lachman, Justin Tech Tips LLC, Stuber Holdings, LLC, and Dan Becker LLC, on behalf of themselves and all other similarly situated individuals and entities (the "Class," and "State Subclasses," as defined below), bring this Second Amended Consolidated Class Action Complaint against Defendants PayPal, Inc. and PayPal Holdings, Inc. (collectively, "PayPal" or "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      This case is about PayPal's intentional interference with Affiliate Marketers' contractual relationships and its surreptitious theft of Plaintiffs' commissions, which wrongfully enriched PayPal at Plaintiffs' expense.

2.      Journalists, bloggers, podcasters, YouTubers, and other online content creators ("Affiliate Marketers") earn commissions by promoting the products and services of e-commerce merchants ("Merchants"). Plaintiffs are Affiliate Marketers who enter contracts with Merchants and Affiliate Networks. Affiliate Networks are middle-men entities that offer standardized terms to facilitate contracts between Merchants and Affiliate Marketers and distribute the commissions.

3.      Plaintiffs' contracts with Merchants and Affiliate Networks give Plaintiffs the right to receive a commission when the Affiliate Marketer (i) directs a consumer to the Merchant's website through an affiliate link and (ii) the consumer purchases a product or service on the Merchant's website ("Affiliate Commission"). Affiliate Commissions can be significant— some are up to 40% of the sale price—and Affiliate Marketers drive a significant (and increasing) volume of online commerce.

4.      Affiliate Marketers each have a unique Affiliate ID, which is added within a "cookie" on a consumer's browser when a consumer is directed to a Merchant website via an affiliate link, and is "read" by the Merchant at checkout.

5.      PayPal's interference with Plaintiffs' contracts subverts the economic relationship between Affiliate Marketers, Merchants, and Affiliate Networks. That relationship is commonly understood in the affiliate marketing industry and by PayPal, and set out in Plaintiffs' Merchant

and Affiliate Network contracts: when Plaintiffs refer a consumer to Merchants' websites and the consumer completes a purchase, Plaintiffs earn an Affiliate Commission. As one representative contract from Merchant Bergdorf Goodman explains: "Merchant agrees to pay Affiliate the commission specified in the [affiliate contract] if Merchant sells to a visitor to Merchant's site (a 'Customer') a product or service that is the subject of the [affiliate contract] and if that Customer has accessed Merchant's site and purchased the product or service via a Qualifying Link."

6.      A "qualifying link" or "qualifying click" for purposes of an Affiliate Commission, as another representative contract states, refers to an "affiliate link," which "means a link **from your website or social property to our website** . . . provided by us or through the Affiliate Network[.]"[1] In other words, under Plaintiffs' contracts—which are generally representative of what conduct does and does not qualify for Affiliate Commissions—if consumers are directed to Merchants by Plaintiffs' affiliate links and then make a purchase, Plaintiffs will be paid an Affiliate Commission, so long as there has not been an intervening referral to the Merchant by another Affiliate Marketer.

7.      The contracts also make clear what Affiliate Marketers can't do: game the system by creating the illusion of a referral where there isn't one, or otherwise engage in "cookie stuffing." "Cookie stuffing" is widely understood to "allow[] unscrupulous actors online to defraud affiliate marketing programs by causing themselves to receive credit for purchases made by web users, even if the affiliate marketer did not actively perform any marketing for the affiliate program."[2] "Cookie stuffing" is also widely forbidden in the affiliate marketing industry, and expressly prohibited by affiliate marketing contracts. By way of example, the Staples Affiliate Program Operating Agreement through the Affiliate Network Partnerize—a representative

---

[1] BACKCOUNTRY_0000005 at -008.

[2] Snyder, Peter, *Characterizing fraud and its ramifications in affiliate marketing networks*, 2 J. Cybersecurity, 1, 71-81 (Dec. 2016), available at https://academic.oup.com/cybersecurity/article/2/1/71/2629557.

affiliate marketing contract to which Plaintiff Ahntourage is a party—states that "[y]ou may not engage in cookie stuffing or include pop-ups, false or misleading links on your website. In addition, wherever possible, **you will not attempt to mask the referring URL information** (i.e. the page from where the click is originating); **[u]sing redirects to bounce a click off of a domain from which the click did not originate in order to give the appearance that it came from that domain** is prohibited[.]" (emphasis added). So common is this language that it appears, verbatim, in numerous other large companies' affiliate program terms, including, e.g., Square, Stripe, and Zendesk. Essentially, an Affiliate Marketer may not use surreptitious means to obtain Affiliate Commissions or otherwise make it appear as though the Affiliate Marketer earned an Affiliate Commission when they haven't actually referred the consumer—*i.e.*, by "mask[ing] the referring URL information," using "redirects" to give the false appearance that an Affiliate Marketer referred a consumer, or engaging in other tactics that qualify as cookie stuffing. Cookie stuffing of this sort is forbidden and improper regardless of whether a particular affiliate marketing contract explicitly calls the practice out.

8.      PayPal is one of the "unscrupulous actors" that engage in "cookie stuffing" through forbidden redirects. PayPal deliberately coded Honey to trick Merchants' technical systems into attributing a referral to PayPal, when that referral should be attributed to Plaintiffs. PayPal is not an Affiliate Marketer, as it does not market a Merchant's products or refer consumers to a Merchant's website to make purchases. But it tricks Merchants' technical systems into treating PayPal like an Affiliate Marketer, in knowing and direct interference with Plaintiffs' contractual relationships with Merchants and Plaintiffs' rights to Affiliate Commissions under those contracts.

9.      As a browser extension, Honey appears to sit passively on the consumer's browser as the consumer navigates to the Merchant's website until, at checkout, it pops up, inviting consumers to search for coupons. If a customer clicks on the pop-up, the Honey Browser Extension ostensibly tells them if there is a coupon or better deal for the product they are purchasing, or if they can get cash back on their purchase through the rewards program. Alternatively, customers can simply click on the pop-up to close it.

10. But at least until December 2024 when the first complaints in this matter were filed, the Honey Browser Extension secretly mimicked the activities of Affiliate Marketers, without actually being one. When a user interacted *in any way* with the Honey Browser Extension—including simply by clicking the button to tell the purported coupon-finder to go away—Honey would create a discrete, hidden tab (the "Secret Tab") that appears and then disappears within seconds. Opening and closing the Secret Tab mimics an actual, legitimate referral, which causes the Affiliate Marketer's Affiliate ID to be overwritten with PayPal's. This activity—creating a false tab, faking a referral, and overwriting an Affiliate ID—is the "cookie stuffing" that is routinely and specifically prohibited by contract (and an activity that has been found to constitute fraud).

11. Swiping Plaintiffs' Affiliate Commissions by overwriting Affiliate IDs is not the only way PayPal cheats. Affiliate Networks and Merchants were aware that browser extensions could redirect Affiliate Commissions by overwriting Affiliate IDs. As a result, industry participants developed "stand down" protocols, under which browser extensions like Honey were forbidden from overwriting Affiliate IDs belonging to Affiliate Marketers like Plaintiffs and proposed Class members. Stand down rules prohibit browser extensions like Honey from "popping up" (or otherwise seeking engagement that results in the overwriting of existing Affiliate IDs) when an Affiliate Marketer's Affiliate ID was already present, indicating the Affiliate Marketer had created the referral and thus driven the sale.

12. PayPal developed and implemented methods to intentionally circumvent stand down protocols and hide its circumvention from Merchants and Affiliate Networks. One such method is to stand down only when PayPal detects that the user is an industry insider or compliance tester, and not a consumer. When PayPal detects that the user may be testing the system, Honey does not open the Secret Tab described above to overwrite an existing Affiliate ID with PayPal's own.

13. Both PayPal's use of the Secret Tab and the various methods it employed to avoid detection, including its selective stand down procedures, confirm the actionability of PayPal's conduct.

1      14.     Plaintiffs, on behalf of themselves and the proposed Class and State Subclasses,

2  seek monetary and equitable relief against PayPal, as further detailed herein.

3

4                                   **PARTIES**

5      15.     Plaintiff Ahntourage Media LLC ("Ahntourage Media") is an LLC designated as

6  an S corporation organized and existing under the laws of Pennsylvania, with its principal place

7  of business in Pennsylvania.

8      16.     Plaintiff Aaron Ramirez ("Mr. Ramirez") is an individual who resides in

9  California.

10     17.     Plaintiff Avran LeFeber, aka Angry Snowboarder, is a sole proprietorship

11  organized and existing under the laws of Colorado with its principal place of business in

12  Colorado.

13     18.     Plaintiff Brevard Marketing LLC ("Brevard Marketing") is a limited liability

14  company organized and existing under the laws of Florida with its principal place of business in

15  Florida.

16     19.     Plaintiff Red Beard Studios LLC ("Red Beard Studios") is a limited liability

17  company organized and existing under the laws of Montana with its principal place of business in

18  Montana.

19     20.     Plaintiff Storm Productions LLC ("Storm Productions") is a limited liability

20  company organized and existing under the laws of New York with its principal place of business

21  in New York.

22     21.     Plaintiff Gents Scents LLC ("Gents Scents") is a limited liability company

23  organized and existing under the laws of Tennessee with its principal place of business in North

24  Carolina.

25     22.     Plaintiff Daniel Lachman ("Mr. Lachman") is an individual who resides in

26  Tennessee.

27     23.     Plaintiff Justin Tech Tips LLC ("Justin Tech Tips") is a limited liability company

28  organized and existing under the laws of Texas with its principal place of business in Texas.

24.    Plaintiff Stuber Holdings, LLC ("Stuber") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Washington.

25.    Plaintiff Dan Becker, LLC ("Dan Becker") is a limited liability company organized and existing under the laws of Wisconsin with its principal place of business in Wisconsin.

26.    Defendant PayPal Holdings, Inc. is a Delaware corporation with its principal place of business at 221 North First St. c/o Corporate Legal Department, San Jose, CA 95131.

27.    Defendant PayPal Holdings, Inc. holds all assets and liabilities of Defendant PayPal, Inc., a subsidiary Delaware corporation with its principal place of business at 221 North First St. c/o Corporate Legal Department, San Jose, CA 95131.

28.    PayPal Holdings, Inc. and PayPal Inc. were principals, agents, alter egos, joint venturers, partners, or affiliates of each other, and in doing the acts alleged herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. PayPal Holdings, Inc. and PayPal, Inc. are collectively referred to as "PayPal."

29.    In 2020, PayPal Holdings, Inc. acquired Honey Science Corporation ("Honey") for approximately $4 billion. Unless otherwise noted, "PayPal" includes Honey.

## JURISDICTION AND VENUE

30.    The Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under a federal statute, the Computer Fraud and Abuse Act ("CFAA").

31.    In addition, the Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the Class is a citizen of a state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, (c) the Class consists of more than 100 Class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

32.    The Court has personal jurisdiction over PayPal, Inc. and PayPal Holdings, Inc. because they maintain their principal places of business in this District, have purposely availed themselves of the privilege of conducting business in this District, and because many of the

1   specific events giving rise to this action, including their deliberate diversion of Affiliate

2   Commissions, occurred in this District.

3       33.    Venue is proper under 28 U.S.C. § 1391(b)(1) because PayPal resides in this

4   District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the

5   events giving rise to Plaintiffs' claims occurred in this District.

6       34.    The practices described herein were conceived, reviewed, approved, and otherwise

7   controlled from PayPal, Inc. and PayPal Holdings' headquarters in San Jose, California.

8   Employees at PayPal's headquarters designed and directed the implementation of the Honey

9   Browser Extension, and the challenged practice of replacing the Affiliate Marketers' Affiliate IDs

10  with PayPal's own Affiliate ID during consumers' checkout process. The Affiliate Commissions

11  were directed from Class members to PayPal in California and PayPal interfered with the

12  contracts and/or business relationships between Class members and Merchants through its

13  employees located in California. In addition, promotional activities and literature regarding

14  Honey were developed and coordinated at, and emanated from, PayPal's California headquarters.

## DIVISIONAL ASSIGNMENT

16      35.    Assignment to the San Jose Division of this Court is proper because Defendants'

17  principal place of business is in San Jose, California.

## CHOICE OF LAW

19      36.    California law governs the substantive legal issues in this case. The State of

20  California has a significant interest in regulating the conduct of businesses operating within its

21  borders.

22      37.    PayPal's principal place of business is California, where it maintains the "nerve

23  center" of its business activities—the place where its high-level officers direct, control, and

24  coordinate the corporation's activities, including its marketing, product development, and major

25  policy, financial, and legal decisions.

26      38.    PayPal's theft of Affiliate Commissions as described herein emanated from and was

27  conceived and executed in California. Moreover, PayPal has been unjustly enriched in California.

28

39.     Under California's choice of law principles, which are applicable to this action, the common law of California applies to the common law claims of the Class members.

## FACTUAL ALLEGATIONS

### I.     The Affiliate Marketing Industry

#### A.     Affiliate Marketing Is A Rapidly Growing Industry.

40.     As more commerce occurs online, Merchants are turning from traditional forms of marketing and advertising to affiliate marketing.

41.     Affiliate marketing refers to the advertising model where a company compensates Affiliate Marketers for generating traffic to or sales of the company's products and services. Affiliate Marketers create or produce online content, like YouTube videos, blogs, informational website, and/or content on social media platforms like Facebook, Instagram, X, TikTok and others. Affiliate Marketers have contracts with Merchants and Affiliate Networks, which allow them to earn Affiliate Commissions when their marketing efforts result in a sale.

42.     The affiliate marketing industry is growing rapidly, and affiliate marketing drives a significant volume of online commerce. In 2016, affiliate marketing had an estimated global market size of $13 billion, which more than doubled to an estimated $32.3 billion in 2024. There are estimates that this market will be worth $48 billion by 2027.[3]

43.     The meteoric growth of the affiliate marketing industry reflects both the reality of today's digital marketplaces and the fact that affiliate marketing provides an effective alternative to traditional marketing because a Merchant only has to pay for marketing that actually results in a sale. But the fact that this system requires a way to track whose online content led to sale (and identify who earned an Affiliate Commission) allowed PayPal to create and implement a systematic means of diverting to itself Affiliate Commissions that did not properly belong to it.

---

[3] Shubham Singh, *115 Affiliate Marketing Statistics (2025) – Market Size & Growth*, DemandSage, Feb. 18, 2025, available at https://www.demandsage.com/affiliate-marketing-statistics/.

**B.**   **Affiliate Marketers Are of Central Importance to the Affiliate Marketing Ecosystem.**

44.    The affiliate marketing ecosystem involves four major groups: consumers, Affiliate Marketers, Affiliate Networks, and Merchants. Each plays a specific, interconnected role. Consumers purchase products and services from Merchants, who create and sell or resell products and services online to consumers. Affiliate Marketers, who are sometimes referred to in contracts as "publishers," refer consumers to Merchants through marketing and promotional efforts. Affiliate Networks act as intermediaries that connect Merchants with Affiliate Marketers.

45.    Affiliate Marketers play a crucial role in this ecosystem because they gain the trust of their audiences, recommend and market products and services, and help consumers purchase a specific product or service from a specific Merchant utilizing an affiliate link. This is the actual work of affiliate marketing.

46.    The interconnected roles of consumers, Merchants, Affiliate Marketers, and Affiliate Networks benefit each group as follows: consumers receive trusted information about products and Merchants, Merchants receive sales, Affiliate Marketers receive Affiliate Commissions when a consumer follows their affiliate links to Merchants' websites and makes a purchase, and Affiliate Networks receive fees for connecting Merchants and Marketers. Merchants rely on the affiliate link to attribute credit for the sale. Merchants utilize certain attribution methods including, primarily, "last click attribution" (which is described further below). Pursuant to that general attribution model, Affiliate Marketers receive Affiliate Commissions when their marketing results in a sale and their link was the last link that a consumer followed to arrive at the Merchant's website prior to purchase.

47.    Consumers trust Affiliate Marketers' expertise and authenticity. For example, in a 2021 Nielsen Study, 71% of consumers said that they "trust advertising, opinions and product placements" from Affiliate Marketers far more than they said they trust other forms of online

marketing such as banner ads, ads on social media networks, ads served on search engine results, ads on mobile devices, and online video ads.[4]

48.    Merchants also rely heavily on Affiliate Marketers to acquire new customers and educate customers about their products. Merchants do not expect this valuable work from Affiliate Marketers to go uncompensated; accordingly, they provide referral fees and commissions to Affiliate Marketers when their links drive consumers to the Merchant's website and result in a purchase. The competition between Affiliate Marketers for followers and Affiliate Commissions is also robust. All told, as of 2024, affiliate marketing was "responsible for driving 16% of eCommerce sales in Canada and the US."[5]

### C.    The Affiliate Marketing Process in Five Steps

49.    The interconnected ecosystem described above generally works in five steps:

50.    *First*, an Affiliate Marketer partners with a Merchant to promote the Merchant's products and services. This partnership is frequently facilitated through an "Affiliate Network," which is a platform that connects Affiliate Marketers with Merchants. Affiliate Marketers can sign up with an Affiliate Network to increase the number of Merchants they partner with, instead of signing up with each Merchant individually. (The relationship may also be run directly by the Merchant, such as Amazon's Amazon Associates program.[6])

51.    *Second*, after the Affiliate Marketer and Merchant agree to work together (either directly or through an Affiliate Network), the Affiliate Network frequently provides a widget that

---

[4] *Getting closer: Influencers help brands build more personal consumer connections*, Nielsen, May 2022, available at https://www.nielsen.com/insights/2022/getting-closer-influencers-help-brands-build-more-personal-consumer-connections/.

[5] Emman Zahid, *21 Affiliate Marketing Statistics: Proven Data to Boost Earnings*, TrustPulse, Jan. 7, 2024, available at https://trustpulse.com/2024/01/07/affiliate-marketing-statistics/.

[6] *Amazon Associates - Amazon's affiliate marketing program*, Amazon, https://affiliate-program.amazon.com/.

allows Affiliate Marketers to generate an associated "affiliate link" customized by the Affiliate Marketer. An affiliate link is a hyperlink that directs a consumer to a Merchant's website where the consumer can purchase the product or service that the Affiliate Marketer is promoting. This affiliate link contains an identifier—the Affiliate Marketer's Affiliate ID—that is unique to that Affiliate Marketer. The Affiliate Network and Merchant use the Affiliate ID to determine which Affiliate Marketer referred the consumer to the Merchant's site.

52.     *Third*, the Affiliate Marketer promotes the Merchant's product. This can be done in a variety of ways, but it generally involves creating or producing "content"—including websites, videos (including reels, shorts, and livestreams), images, blogs, and social media posts—and distributing it to online audiences on platforms including YouTube, Instagram, TikTok, Twitch, and X. Affiliate Marketers use their content to reach new and larger audiences. The Affiliate Marketer includes their affiliate link containing their Affiliate ID with the content promoting the Merchant's product. Creating this content takes time and, often, money. For example, an Affiliate Marketer who makes primarily video content must plan, stage, shoot, and edit their videos, in addition to planning their posting and promotion schedules. In this ecosystem, Merchants outsource the marketing of their products to an Affiliate Marketer and pay a fraction of the advertising cost (in the form of Affiliate Commissions) only when the advertising results in a sale.

53.     *Fourth*, a consumer views the Affiliate Marketer's content and, if interested, clicks on the affiliate link to go to the promoted product on the Merchant's website. At this moment, the affiliate link populates the Affiliate Marketer's Affiliate ID typically in the website's persistent cookie storage in the consumer's web browser. Occasionally, undecided consumers may leave the Merchant's website, view other affiliate content, and eventually come back to the Merchant website via a different Affiliate Marketer's link—in this scenario, that second-in-time Affiliate ID will typically be the one stored in the consumer's cookie storage.

54.     *Fifth*, as detailed below, when a consumer purchases the product on the Merchant's website, the Merchant reads the Affiliate ID stored in the cookie to credit the sale to the Affiliate Marketer associated with that Affiliate ID and pay them the Affiliate Commission.

There are various methods for awarding credit for an online sale to Affiliate Marketers. The primary method used in the industry is commonly referred to as "last click attribution," where the Affiliate Marketer who provided the last affiliate link used prior to purchase gets credit for the sale. Affiliate Marketers and PayPal know and understand that last click attribution is the primary attribution method.

55.    Thus, after the above steps are complete, the Merchant has sold one of its products or services, the consumer has obtained the product or service, and the Affiliate Marketer has earned an Affiliate Commission for their work connecting the Merchant and consumer.

## II.    Merchants Use Tracking Mechanisms to Credit Affiliate Marketers for Sales.

### A.    Affiliate Marketers Create or Own Affiliate Links.

56.    Because the transactions at issue in this case occur digitally, participants in the Affiliate Marketing ecosystem use certain digital mechanisms to determine whether an Affiliate Marketer is entitled to an Affiliate Commission.

57.    Specifically, Merchants and Affiliate Networks track Affiliate IDs via cookies, URL parameters (the part of the URL following a question mark that contains additional information about a click), tracking tags, or server-side functions to ascertain whether a consumer used an affiliate link to arrive on their web page. Using those tracking mechanisms, Merchants can attribute credit for the purchase to the Affiliate Marketer who referred the consumer to the Merchant's product.

58.    Each Affiliate Marketer's affiliate link contains their unique Affiliate ID in the URL parameter. The Affiliate ID is a custom alphanumeric string that Merchants use to identify the associated Affiliate Marketer. The Affiliate ID is often created by the Affiliate Marketer themselves, and can include their name, username, or branding. Merchants rely on the Affiliate ID to credit a particular Affiliate Marketer with Affiliate Commissions for sales of the Merchants' products that result from the Affiliate Marketer's promotional efforts.

59.     As shown in the screenshot above, in general, affiliate links contain the following components: domain, path/page, and Affiliate ID.[7] This section addresses the technical details of cookies in the affiliate marketing context because of the prevalence of cookies as a mechanism for affiliate attribution tracking, but other mechanisms of affiliate attribution tracking, such as URL parameters, tracking tags, or server-side functions work analogously.

60.     When a consumer clicks on an affiliate link to navigate to a Merchant's website, a Merchant's website reads the URL parameters and creates a small text file called a "cookie," which is written to storage on the consumer's device (phone, iPad, laptop, computer) dedicated to the consumer's web browser. The cookie contains information about the Affiliate Marketer whose affiliate link the consumer clicked on. The Affiliate ID stored within the website's cookie then remains until the cookie expires or is replaced by a subsequent Affiliate ID. When the consumer subsequently makes a purchase from the website, the Affiliate ID is read from the cookie and used to assign the Affiliate Commission for the purchased product to the Affiliate Marketer responsible for the sale.

61.     Cookies associated with affiliate links have a set lifespan, which can last from 24 hours to 90 days. During that time, cookies store the last Affiliate ID clicked for the various Merchant websites. This set up is designed to capture the scenario where a consumer clicks an

---

[7] Dibakar Ghosh, *What Are Affiliate Links and How Do They Work?*, AuthorityHacker (Aug. 12, 2024) https://www.authorityhacker.com/what-are-affiliate-links/ (available at https://web.archive.org/web/20250917025349/https://www.authorityhacker.com/what-are-affiliate-links/).

affiliate link and navigates to a Merchant's product, closes out of the webpage without purchasing

the product, but later returns to the page and purchases the product. So long as the consumer

purchases the product within the lifespan of the cookie, the most recent Affiliate Marketer whose

link the consumer clicked on to navigate to the Merchant's product will get credit for the sale.

**B.      The Predominant Attribution Model In Affiliate Marketing Is "Last Click Attribution".**

**a.      Last Click Attribution**

62.      Under any attribution method, the goal is for Merchants to fairly credit the

Affiliate Marketer that referred the consumer who made the purchase, and pay the Affiliate

Marketer Affiliate Commissions as earned. While there are other attribution methods, the most

commonly used attribution method and the industry standard[8] is "last click attribution," in which

the Merchant provides an Affiliate Commission for the sale of a product to the Affiliate Marketer

associated with the consumer's last-used affiliate link. The last click model is intended to award

an Affiliate Commission to the Affiliate Marketer who most recently referred the consumer to the

Merchant's site prior to completion of the sale. Under last click attribution, all credit for a

purchase goes to the Affiliate Marketer whose affiliate link was the last link used to refer the

consumer to the Merchant's website, where the consumer subsequently completed a purchase.

63.      In the terminology of digital web advertising, a "click" refers to the specific act of

a consumer using a URL link to navigate to an advertised website. As AWIN, a global affiliate

marketing platform explains simply, "'Click' means the intentional and voluntary following of a

---

[8] *First Click v. Last Click Attribution*, Hike, https://www.hikeseo.co/learn/reporting/first-click-vs-last-click-attribution (describing LCA as "the industry standard, especially in digital marketing."). *See also Last-Click Attribution Model in Affiliate Marketing*, Affiliboost, https://affiliboost.com/last-click-attribution-model-in-affiliate-marketing/ ("The Last-Click attribution model has been a cornerstone of affiliate marketing for years.").

link."[9] Critically, "last click" in this context does not mean the consumer's literal last click of the mouse in the process of making a purchase—the last physical device click is, of course, on a button that completes the purchase. Instead, according to the Interactive Advertising Bureau, a leading organization that represents the digital advertising industry globally, the industry meaning of "click" refers to "navigating from one page to another by activating a hyperlink."[10] A "click" also occurs when a consumer copies and pastes a hyperlink into their URL bar, further demonstrating that "last click" does not refer simply to clicking the mouse on a page.

64.    Notably, "last click" does *not* refer to actions that the consumer takes on the Merchant's website—such as navigating within the site, comparing items, entering one's credit card information, address, delivery instructions, and other product specifications such as size/style—after clicking the affiliate link.

65.    The last click model is designed to account for the common situation where a consumer interacts with multiple Affiliate Marketers' affiliate links before ultimately making a purchase. For instance, if a consumer first navigates to a Merchant's website using one Affiliate Marketer's affiliate link and then, before completing their purchase, uses a second Affiliate Marketer's affiliate link to navigate back to the Merchant's website and only then makes the purchase, the second Affiliate Marketer will rightfully receive the Affiliate Commission, as their affiliate link most recently referred the consumer to the Merchant's website before the purchase.

---

[9] *Standard Terms for Publishers*, AWIN, https://www.awin.com/docs.awin.com/Legal/Publisher+Terms/2025/US_EN_Awin+Ltd+Publisher+terms_2025.pdf (last visited June 10, 2025).

[10] Digital Attribution Primer 2.0, iab, Aug. 2016, at 3 https://iab.com/wp-content/uploads/2016/10/Digital-Attribution-Primer-2-0-FINAL.pdf ("A click is the measurement of navigating from one page to another by activating a hyperlink. Clicks may be broken down into ad clicks, search clicks, affiliate clicks, and possibly other sub-categories.").

66.     In addition to last click attribution, there are other attribution methods similarly designed to give credit to an Affiliate Marketer who played a role in facilitating a sale. No attribution method, however, contemplates rewarding an entity that surreptitiously tricks a Merchant into awarding undeserved credit.

b.      **Each Plaintiff's Contracts Award Credit Under Last Click Attribution.**

67.     What qualifies as a "click" and what "last click attribution" means (and doesn't mean) is reflected in Plaintiffs' contracts with Merchants and Affiliate Networks, including Merchants and Affiliate Networks that also partner with PayPal. Each named Plaintiff has contracts with Merchants and/or Affiliate Networks that are consistent with the "last click" model, several examples of which are described below. Pursuant to these contracts, Plaintiffs earn Affiliate Commissions when their affiliate link is the final affiliate link a consumer clicks that *directs* the consumer to the Merchant webpage on which the consumer completes a qualifying purchase.

68.     For example, Mr. Ramirez's contract with Merchant Kohl's, which also partners with PayPal, provides: "A 'qualifying link' is a link from Media Partner's site to Advertiser's site using one of the URL provided by Advertiser for use in the Platform if it is the last link to Advertiser's site that the Customer uses during the Session where a sale of a product or a service to Customer occurs."

69.     Mr. Ramirez, Ahntourage, Angry Snowboarder, Brevard Marketing, Dan Becker, Mr. Lachman, Justin Tech Tips, Red Beard Studios, and Stuber each have contracts with Amazon, which also partners with PayPal. Those contracts similarly provide that each of those Plaintiffs will receive Affiliate Commissions if "(i) a customer clicks through a Special Link on your Site to an Amazon Site; and (ii) during a single session . . . the customer purchases a Product . . . and (iii) the Product is shipped to, streamed, or downloaded by, and paid for by the customer."

70.     Justin Tech Tips' contract with Dell, which also partners with PayPal, similarly explains that a "'Qualifying Link' means a link from Your Marketing Platform(s) to the Dell Site

using the required URLs specified in an Offer (or other URL or graphic link expressly provided by Dell for use in connection with an Offer), provided that it is the last link to the Dell Site that a visitor uses during a Session where a sale of a product or a service occurs."

71.    Ahntourage's agreement with Staples, which also partners with PayPal, provides that "[s]ales generated through the Affiliate link entitle the Affiliate to earn a cash commission." The Staples agreement further provides that an Affiliate Marketer earns Affiliate Commissions on products "that are (i) sold by us, (ii) purchased by Customers linking to our participating websites from your Affiliate Website pursuant to a link, (iii) shipped and/or supplied by us, and (iv) full[y] paid for."

72.    Red Beard Studio's agreement with Lowe's, which also partners with PayPal, similarly specifies that an Affiliate Marketer will receive an Affiliate Commission if a consumer "(a) use[s] a browser that has its cookies setting enabled; and (b) complete[s] a purchase directly from an Affiliate Link provided in accordance with the Program and these Program Terms."

73.    Angry Snowboarder and Dan Becker's agreements with Backcountry, which also partners with PayPal, provide: "A 'Qualifying Link' means a link from your website or social property to our website using one of the URLs, cookies, deep links, or graphic links provided by us or through the Affiliate Network for use in the Program that allows us or our Affiliate Network to track the use of such links by your visitors." The Backcountry agreements further explain that an Affiliate Marketer earns Affiliate Commissions "based on 'last-click' attribution," which "means that Media Partners only earn a Commission on a sale if the end user's interaction with the Qualifying Link tracking the Media Partner's advertising or content constitutes the last attributable interaction prior to the end user's purchase of the product at issue." Backcountry's agreement also specifies that "[a] customer's use of a coupon or promotional code provided by a Media Partner does not, by itself, constitute a 'last-click' for the purposes of determining the Media Partner's commissions."

74.    Storm Productions' agreements with Bergdorf Goodman and Neiman Marcus, each of which also partners with PayPal, contain identical attribution language: "Merchant agrees to pay Affiliate the commission specified in the Engagement if Merchant sells to a visitor to

Merchant's site (a 'Customer') a product or service that is the subject of the Engagement and if that Customer has accessed Merchant's site and purchased the product or service via a Qualifying Link." Both agreements also define a "Qualifying Link" as "a link from Affiliate's site to Merchant's site using one of the Required URLs or any other URL provided by Merchant . . . if it is the last link to the Merchant's site that the Customer uses during a Session where a sale of a product or a service to Customer occurs."

75.    Gents Scents' agreement with Macy's similarly provides that "[a] 'Qualifying Link' is a link from an Affiliate's site to the Destination Site that contains Tracking Code using one of the Links or any other URL provided by Macys.com . . .  if it is the last link to [Macys.com] that the Visitor uses during an Action Referral Period where a sale of a product or a service to Visitor occurs." The agreement provides that an Affiliate Marketer is entitled to an Affiliate Commission "for referring Visitors . . . to the Destination Site who complete the Transaction required under the Program on the Destination Site" and that a qualifying "Transaction" is "the action that occurs when a Visitor: (a) clicks on a Link located on an Affiliate's website, e-mail, and/or other CJ-approved promotional channel; (b) is directed to the appropriate Destination Site; and (c) properly completes the appropriate action (e.g., a Sale or a Lead)."

76.    Thus, under the express language of their agreements with Merchants and Affiliate Networks, which are consistent with the "last click" attribution model, Plaintiffs and other Affiliate Marketers stand to earn Affiliate Commissions when their affiliate link was the final affiliate link "clicked" (i.e., used to ***direct*** the consumer to the Merchant's webpage) before the consumer completed a qualifying purchase.

77.    The agreements quoted above reflect and are generally representative of the common understanding of what conduct does and does not qualify for affiliate credit in the Affiliate Marketing industry.

III.   **PayPal Uses The Honey Browser Extension to Steal Affiliate Commissions from Affiliate Marketers.**

A.     **The Honey Browser Extension**

78.     Honey is an Internet browser extension created in October 2012 by Ryan Hudson and George Ruan.[11] A browser extension—sometimes called a "plug-in" or "add-on"—is a piece of software that runs within the consumer's web browser. Often, they are used to add functionality to websites that the browser visits, like translation to a different language, or to remove unwanted website functions, like pop-up ads or usage trackers. Browser extensions are easy to download and install onto a web browser. Consumers may download a browser extension for a variety of purposes: to save passwords, block advertisements, provide translations, check spelling, or, as in the case of Honey, purportedly search for online coupons when a consumer is at an online retailer's checkout page.

79.     Within 18 months of its creation, by March 2014, Honey had approximately one million users.[12]

80.     In 2015, Honey hired a Head of Partnerships who had experience working with retailers.[13] Honey began to invest heavily in advertising its product. In or around 2017, Honey began advertising on podcasts and on YouTube. In other words, Honey partnered with Affiliate Marketers to promote its product.

81.     Between 2019 and 2021, ads for Honey appeared on approximately 400 YouTube channels, including on channels of popular creators with many millions of followers. According to one 2021 analysis, Honey was at that time the second biggest spender on all of YouTube.[14]

---

[11] Samantha Brooks, *How Honey Co-Founder Ryan Hudson Built a $4 Billion Company From a Browser Extension*, CSQ (Mar. 11, 2020), https://csq.com/2020/03/honey-cofounder-ryan-hudson-interview-paypal/.

[12] *Id.*

[13] *Id.*

[14] *See* Editorial Staff, *Honey Campaign Teardown*, NeoReach (Jan. 28, 2021), https://neoreach.com/honey/ ("In our Social Intelligence Insights Report for Q3 Honey landed as the second top spender on YouTube overall and second top spender in the Tech industry on the

82.     Honey understood the value that Affiliate Marketers add to Merchants because it contracted with many Affiliate Marketers, including several of the most successful Affiliate Marketers in the world such as MrBeast, the single most popular YouTube creator, to promote its own browser extension.

83.     In addition to working with Affiliate Marketers, Honey worked with numerous affiliate networks to promote the Honey Browser Extension.[15]

84.     Honey's affiliate marketing efforts paid off. By 2020, Honey stated that it had approximately 17 million monthly active users[16] and more than ten thousand Merchant partners.[17] That same year, PayPal purchased Honey for $4 billion.[18]

85.     Honey did not tell the Affiliate Marketers it worked with that Honey was designed to secretly redirect Affiliate Commissions, including the very commissions these Affiliate Marketers were previously earning from their own followers. It likewise had already developed strategies to prevent Affiliate Networks and Merchants from discovering its widespread theft of Affiliate Commissions.

**B.      The Honey Browser Extension Exploits Attribution Mechanisms to Steal Credit for Sales.**

---

platform.").

[15] *How Honey Works with Affiliates*, Honey, https://get.joinhoney.com/business/how-honey-works-with-affiliates/.

[16] *PayPal Completes Acquisition of Honey*, PayPal Investor Relations (Jan. 6, 2020), https://investor.pypl.com/news-and-events/news-details/2020/PayPal-Completes-Acquisition-of-Honey/default.aspx.

[17] Brooks, *supra* note 11.

[18] *Id.*

86.     As discussed above, affiliate marketing credit is typically given to the Affiliate Marketer whose affiliate link most recently directed a consumer to the Merchant website where the consumer completes a purchase.

87.     The Honey Browser Extension interposes itself into this process by surreptitiously fabricating a "click"—i.e., a referral to a Merchant website—where none actually takes place, every time a consumer interacts in any way with the Honey Browser Extension.

88.     When consumers install the Honey Browser Extension, they are never told or advised that Honey will surreptitiously use a Secret Tab to steal Affiliate Commissions. Nor is this conduct disclosed in Honey or PayPal's terms of service or privacy policies. Honey's Privacy Policy simply states that "PayPal Honey uses cookies, pixel tags, web beacons, and other online tracking technologies (we'll just call them 'cookies') *to collect* some of the data discussed in this Privacy Statement."[19] The Privacy Policy lists the ways that Honey "uses" cookies—e.g., "to identify irregular site behavior, prevent fraudulent activity and improve security"; to "allow you to make use of our functions such as shopping-carts, saved search, or similar functions"; "to assess the performance of our websites, applications, services, and tools"; or to "identify[] you when you sign into our sites or keep[] track of your specified preferences, interests, or past items viewed[.]" Nothing in Honey's Privacy Policy (or any of PayPal's other public disclosures) discloses or otherwise indicates that the Honey extension will modify, alter, or replace cookies that are already on the user's browser. Consumers thus do not authorize Honey to perform these actions.

89.     A representative example of PayPal's scheme is shown here:

90.     Plaintiff Justin Tech Tips is an Affiliate Marketer with a popular YouTube channel that, among other things, reviews gaming hardware. An example of one of Justin Tech Tips' videos can be found here: https://www.youtube.com/watch?v=Uyhjwtl7jdA, which leads to a video entitled "iBUYPOWER and HYTE – What's Coming in 2025?!":

---

[19] *PayPal Honey Privacy Statement*, Honey (Oct. 1, 2025), https://www.joinhoney.com/privacy/us.





91.    The description of the video contains a link to a hardware tower case sold by online Merchant Adorama and the content around the link plainly advises the consumer that Justin Tech Tips, under the name of its channel, Just!N Tech, earns an Affiliate Commission through the link:



92.    A consumer who clicks on the link can purchase the hardware tower case at the following link:

1  https://www.adorama.com/hycshty7tiww.html?sterm=THeUEuxU2xycUHwXqnR-

2  QQuiUksR5HUFIXd4W00&utm_source=rflaid915793&utm_medium=affiliate.

3       93.    The portion of the link containing "rflaid915793" indicates that the referral

4  Affiliate ID is "915793," which is the Affiliate ID for Justin Tech Tips.

5       94.    Clicking that link takes a consumer to the Adorama website, and specifically to the

6  product advertised by Justin Tech Tips in the YouTube video.



18       95.    When the consumer clicks the link, Adorama's web server reads the Affiliate ID

19  parameter in the URL and stores it in a cookie. This Affiliate ID tells Adorama which website

20  sent the consumer to its site, and which affiliate link was used. The Affiliate ID is highlighted in

21  the URL, and also reproduced here, where "915793" is Justin Tech Tips' Affiliate ID:



24       96.    At this point, an affiliate cookie has been created and stored in the cookie storage

25  for Adorama within the consumer's browser. In the industry, the directory where cookies are

26  stored on the consumer's computer, accessible only by their web browser, is referred to as the

27  "cookie jar." When a consumer clicks an affiliate link, the cookie containing the Affiliate ID for

28  the Affiliate Marketer—in this example, Justin Tech Tips—is stored in the consumer's cookie jar.

1    97.    Consumers can view their stored cookies, i.e., the contents of their "cookie jar," in

2   most browsers. For example, a Google Chrome browser extension "Global Cookie Manager"

3   shows the cookie that stores Justin Tech Tips' Affiliate ID as displayed in the following image.



4

5

6

7

8

9

10

11

12

13

14

15

16    98.    If a transaction is completed and this cookie is properly stored within the cookie

17   jar—as it is here—then Justin Tech Tips gets the Affiliate Commission. The process is relatively

18   simple: a link is clicked, a cookie containing Justin Tech Tips' Affiliate ID is placed in the

19   consumer's browser, and then when the sale goes through, the Merchant reads the Justin Tech

20   Tips cookie and awards an Affiliate Commission to Justin Tech Tips.

21    99.    Without outside interference, the end result is the transaction that the consumer,

22   Affiliate Marketer, and Merchant contemplated: the consumer purchased a good or service

23   through a Merchant website using an affiliate link designed to relay a percentage of that purchase

24   to the Affiliate Marketer.

25    100.    If a consumer were to click the Justin Tech Tips affiliate link, and then, two days

26   later, click another Affiliate Marketer's affiliate link for the same product, the later-in-time

27   Affiliate Marketer's cookie would be placed in the cookie jar and that "last clicked" Affiliate

28   Marketer would get the credit.

1    101.    If the consumer has installed the Honey Browser Extension, Honey will track and

2    log information about the consumer's web activity, including the webpages that the consumer

3    visits and the actions that the consumer takes as they navigate the internet.



16    102.    The above screenshot describes the data being requested in the background by the

17    Honey Browser Extension. The term "evs," highlighted at the bottom left of the above screenshot,

18    represents a set of "events" tracked and logged by the Honey Browser Extension on its server at

19    https://s.joinhoney.com/evs.

20    103.    Clicking the "Payload" tab reveals the data the Honey Browser Extension is

21    sending to its server:

104.    In the context of a web developer tool like this one, "payload" means the data sent by the browser. Here, the developer tools reveal that, among the other "payloads"—i.e., sets of data the extension is seeking and receiving—is information from a "referrer url" associated with Adorama:

```
code: "ext000012"
▸ extension: {screenview_id: "915629253334681
  is_logged_in: true
  reason: " For more information, please visit
  referrer_url: "https://www.adorama.com/hycsh
  session_id: 1746417954813
▸ store: {id: "8", session_id: 1746424204164)
  sub_src: "launchpad"
  tab_id: 120609192
```

105.    The information is logged with a particular "session id.," making it traceable for PayPal. The line labeled "referrer url" contains a lengthy string of letters and numbers (reproduced here over two lines due to its size), and which reads in full as follows:

```
referrer_url: "https://www.adorama.com/hycshty7tiww.html?sterm=THeUEuxU2xycUHwXqnR-QQuiUksR5HUFIXd4W00&u
utm_source=rflaid915793&utm_medium=affiliate"
```

106.    The referring url contains the Justin Tech Tips Affiliate ID—"915793"—and shows the Honey Browser Extension tracking and logging the consumer's web traffic, including and especially the traffic that indicates whether an Affiliate ID is already applied, as it is here. In other words, as shown in the developer tools, and even though Honey never discloses this to consumers when they install the extension, the Honey Browser Extension is *tracking* and *logging* consumer activities, including where on the internet the consumer is navigating their web browser. Thus, Honey knows when a consumer has navigated to a website using an affiliate link, and creates a record each time it replaces an Affiliate Marketer's Affiliate ID with PayPal's own Affiliate ID.

107.    A consumer who installed Honey and clicked the Justin Tech Tips affiliate link for the Adorama product described above will be sent to the following checkout page for the product:



108.    The "Activate Cash back" overlay and accompanying animated graphic in the above screenshot pop up if the consumer has the Honey Browser Extension installed.

109.    After a consumer clicks on the "Activate Cash back" button, Honey claims that the consumer has successfully activated cash back. In reality, the Honey Browser Extension surreptitiously, and without notifying or seeking permission from the consumer, opens the Secret Tab—a discrete, hidden pop-under tab—to the left of all other tabs, denoted by just a small icon:



110.     The Secret Tab only appears for a few seconds, and then automatically disappears. The only way to see what it contains is to be ready for it, click on it, and then screenshot the webpage it creates. The Secret Tab loads the generic homepage of the Merchant's website, with PayPal's own Affiliate ID appended as a URL parameter, before disappearing.



111.    By automatically and secretly launching the Secret Tab for a few seconds, the Honey Browser Extension "redirects" the consumers to the Merchant website (i.e. "redirects" them to where they already were, without the consumer ever having navigating away from that website) without the consumer's knowledge. In doing so, Honey has spoofed a click from a site external to the Merchant back to the Merchant, allowing it to insert PayPal's own Affiliate ID into the URL and replace the Affiliate ID of the original Affiliate Marketer. In other words, Honey has fabricated a click *from the Browser Extension to the Secret Tab.* Because the Secret Tab opens the Adorama website, the Adorama website reads the URL parameters and stores that parameter into the cookie jar, replacing the Justin Tech Tips Affiliate ID ("915793") with PayPal's own Affiliate ID, "914539".

112.    After a few seconds, the Secret Tab disappears, while all previous tab(s) remain open. PayPal has surreptitiously deceived the consumer's browser and the Merchant's website into replacing the previous Affiliate Marketer's legitimately-placed Affiliate ID in the cookie on the consumer's computer with its own illegitimately-placed Affiliate ID.

113.    PayPal's Affiliate ID, which replaces the Affiliate Marketer's Affiliate ID, is tracked in the developer tools view:

× | Headers  Payload  Preview  Response  Initiator  Timing  Cookies

▶ 4: {client_ts: 1746424362674, referrer_url: "https://www.adorama.com/Als.Mvc/CartView", action: "show",…}
▶ 5: {client_ts: 1746424363761, store: {id: "8", session_id: 1746424204164}, code: "ext004002",…}
▶ 6: {client_ts: 1746424363767, store: {id: "8", session_id: 1746424204164},…}
▶ 7: {client_ts: 1746424363767, store: {id: "8", session_id: 1746424204164},…}
▶ 8: {client_ts: 1746367967,…}
▶ 9: {client_ts: 1746424368116,…}
▶ 10: {client_ts: 1746424368172, experiment_name: "droplist_ocs_collections_popup:1",…}
▶ 11: {client_ts: 1746424368173, experiment_name: "personalized_offers_for_unauth_users:6",…}
▶ 12: {client_ts: 1746424368174, experiment_name: "web_shipping_in_comparisons:11",…}
▶ 13: {client_ts: 1746424368174, experiment_name: "ext_top_pick_savings_dollar:2", variant_name: "control",…}
▶ 14: {client_ts: 1746424368174, experiment_name: "ext_atlas_mismatch:2", variant_name: "control",…}
▶ 15: {client_ts: 1746424368175,…}
▶ 16: {client_ts: 1746424368176,…}
▶ 17: {client_ts: 1746424368182, product_id: "",…}
▶ 18: {client_ts: 1746424368185,…}
▶ 19: {client_ts: 1746424368186,…}
▶ 20: {client_ts: 1746424368187,…}
▶ 21: {client_ts: 1746424368188,…}
▶ 22: {client_ts: 1746424368188,…}
▶ 23: {client_ts: 1746424368225,…}
▶ 24: {client_ts: 1746424368881,…}
▼ 25: {client_ts: 1746424369456,…}
    client_ts: 1746424369456
    code: "ext009009"
  ▶ extension: {screenview_id: "9156293389823742937"}
    is_initial_observation: true
    is_logged_in: true
    products: []
    reason: " For more information, please visit www.joinhoney.com/data-and-privacy."
    referrer_url: "https://www.adorama.com/?sterm=THeUEuxU2xycUHwXqnR-QQuiUksR5C2NIXd4W00&utm_source=rflaid914539&utm_medium=affiliate"
    session_id: 1746417954813
  ▶ store: {id: "8", session_id: 1746424204164}
    tab_id: 120609200
    use_deterministic_parent_id: false
  ▶ where_am_i: {title: null, price: null, categories: [], keywords: [], images: [], group_lookup: null,…}
exv: "ch.17.1.1.910123408727497136B.9142738122918836102"
src: "extension"

114.    The Honey Browser Extension uses the Secret Tab to create the illusion that PayPal referred the consumer to Adorama. Adorama registers a referral to it from PayPal as if the consumer had intentionally come back to the site a second time through a referral from PayPal. In other words, the Merchant's website treats the PayPal Affiliate ID (and so-modified URL) as a second-in-time referral and replaces the Affiliate ID of the Affiliate Marketer who generated the sale with PayPal's Affiliate ID on the consumer's browser—i.e., "stuffing" the "cookie jar." PayPal is creating the illusion of a second-in-time external referral to the Merchant's website where none has taken place. There is no technical reason for this hidden redirect and use of the Secret Tab apart from stealing the Affiliate Marketer's credit and Affiliate Commission.

115.    This process works the same on other browsers, including at least Microsoft Edge, Safari, and Firefox.

116.    Notably, while earlier versions of cookie stuffing involved pop-ups, hidden images, and iframes, modern browsers are designed to restrict the use of those "classic" techniques through browser security policies like CSP (Content Security Policy). Cookie stuffing

therefore had to evolve. Redirecting, the technique used by the Honey Browser Extension, is now the predominant cookie-stuffing technique[20] because it circumvents browser security policies that block or limit the other cookie-stuffing methods mentioned above.

117.    This process also works the same regardless of whether Honey actually offers consumers any coupons or discounts, cash back rewards, or the option to pay with PayPal. At least through the time the original complaints in this litigation were filed, Honey engaged in this cookie stuffing even where it found no coupons, offered no cash back rewards, and even where consumers merely dismissed the pop-up after PayPal did not even purport to search for coupons.

118.    Following reporting in December 2024 that exposed PayPal's cookie stuffing and Affiliate Commission theft, and the filing of these lawsuits, Honey apparently made changes to its practices. Testing of the Honey Browser Extension in March 2025 revealed that it no longer (as it did before) replaces a preexisting Affiliate ID with PayPal's own where the extension offered no coupons or cash back and a consumer dismissed the Honey pop-up.[21] Subsequent investigations have determined that after its cookie stuffing and Affiliate Commission theft was exposed, Honey modified its methods so that it more often (but still not always) follows stand down requirements. In other words, once PayPal knew that its conduct had been detected, it changed its systems to steal Affiliate Commissions less often.

---

[20] *See, e.g.*, Neha Chachra, et al., *Affiliate Crookies: Characterizing Affiliate Marketing Abuse*, 1 (2015), https://www.sysnet.ucsd.edu/~voelker/pubs/crookies-imc15.pdf at Table 2.

[21] Ben Schoon, *Honey extension loses 3 million Chrome users after being exposed for shady tactics*, 9to5Google (Jan. 3, 2025), https://9to5google.com/2025/01/03/honey-paypal-chrome-extension-lost-users/.

119.    Testing of the Honey Browser Extension in May 2025 revealed further changes. Specifically, when a consumer navigates to a Merchant website using an affiliate link, Honey now (unlike before) sometimes pushes a pop-up stating that "Honey is disabled on this site" and that this "can happen if you interact with another coupon or rewards program." The pop-up encourages the consumer to "re-activate Honey and earn your rewards." After a consumer clicks "Activate Honey," Honey replaces the preexisting Affiliate ID with PayPal's own and takes the credit and Affiliate Commission for the sale, just as it did previously. Importantly, under this version of Honey's practice, the consumer is not told that this "reactivation" will cause the Affiliate Commission rightfully earned by a referring Affiliate Marketer to be instead paid to PayPal, nor does the consumer authorize that redirection.



120.    Honey's Secret Tab creation is a commercially unreasonable manipulation of tracking cookies for profit. A 2015 article by members of the University of California, San Diego Department of Computer Science and Engineering considered ways in which malicious actors

engage in "affiliate marketing abuse."[22] One common tactic is where a "fraudulent affiliate may

cause the browser to directly fetch" an "affiliate URL on a page controlled by [the fraudulent

affiliate] without any explicit clicks by the user."[23] That is *exactly* what Honey does. In doing so,

Honey wrongfully overwrites the actual Affiliate Marketer's Affiliate ID in the consumer's

cookie jar, and replaces it with PayPal's Affiliate ID.

### C.    Honey Diverted Named Plaintiffs' Commissions

121.    PayPal diverts an Affiliate Commission from Plaintiffs to itself every time a

consumer completes a purchase where PayPal has used the Honey Browser Extension to swap out

a legitimate Affiliate ID with PayPal's own. In at least some cases, PayPal receives a different

amount in Affiliate Commissions than Plaintiffs would have received if the transaction would

have been completed without Honey's interference. Honey also states that it uses the Honey

Browser Extension to transmit a log record of activities as they occur: "The extension reports

back certain events to let us know when a user interacts with it or performs an action on a site that

we support."[24] These financial and computer records in aggregate form a complete, detailed

record of PayPal's theft.

122.    As explained herein, each of the Plaintiffs *should* receive an Affiliate Commission

when a purchase is made following their affiliate links. Test purchases described below show that

when a consumer activates Honey, the Affiliate Commission is diverted from the Affiliate

Marketer to PayPal. Finally, each Plaintiff has clearly been harmed by Honey in the past because:

throughout the Class period, each Plaintiff made at least hundreds or thousands of sales through

its affiliate marketing links. At the time, Honey was available on at least 17 million United States

---

[22] Chachra, *supra* note 20.

[23] *Id.*

[24] *Honey's Data Collection Policies Explained*, Honey (Oct. 30, 2019),

https://www.joinhoney.com/data-and-privacy.

1    devices, making it statistically impossible that any of the Plaintiffs had no Affiliate Commissions

2    diverted to PayPal pursuant to its misconduct at issue.

3        123.    As noted above, PayPal records and sends information to its servers about

4    consumers' internet travels, including when a user has an Affiliate Marketer's Affiliate ID stored

5    in the cookie for a Merchant website and when that Affiliate ID is replaced with PayPal's

6    Affiliate ID.

7        **1.    Test Purchases From December 2025 Still Show Diversion**

8        124.    As discussed above, pursuant to their contracts with Merchants and Affiliate

9    Networks, Plaintiffs and other Affiliate Marketers are supposed to receive Affiliate Commissions

10    when they refer consumers to a Merchant's website through their affiliate links and the consumer

11    completes a purchase without using another affiliate link to return to the Merchant website.

12        125.    For example, Plaintiff Justin Tech Tips promotes goods from Dell and earns an

13    Affiliate Commission when a consumer uses Justin Tech Tips' Affiliate Link to navigate to the

14    Dell website and completes a purchase. Plaintiffs' expert, acting in the role of a buyer, followed

15    exactly that process and Justin Tech Tips was paid an Affiliate Commission as described below.

16

17

18

19

20

21

22

23

24

25

26

27

28



Image 1

126.    Here, the buyer used the following affiliate link for Justin Tech Tips—

https://www.jdoqocy.com/click-100387483-
12839518?sid=TrackingTest&url=https%3A%2F%2Fwww.dell.com%2Fen-us%2Fshop%2Fdell-
displayport-18-inch-cable%2Fapd%2F470-acms%2Fmonitors-monitor-accessories—which, as

shown in Image 1 above, directed the buyer to the page on the Dell website for the "Dell

DisplayPort 18-inch Cable" product, which has a product number of 470-ACMS.

127.    When the buyer landed on the Dell product webpage shown in Image 1 after

clicking Justin Tech Tips' affiliate link, the browser stored a cookie identifying Justin Tech Tips

as the referring affiliate.

Image 2

128.    As shown in Image 2 above, the value of the "dellven" cookie indicated that "Justin Tech Tips LLC" was the Affiliate Marketer associated with the referring affiliate link.

129.    As the buyer moved through the checkout process on Dell, the cookie naming Justin Tech Tips as the referring Affiliate Marketer persisted. Dell knew to award Justin Tech Tips an Affiliate Commission for any qualifying sale that was consummated as a result of a buyer following the affiliate link and completing a purchase on Dell's website because this cookie, stored in the buyer's browser, credited Justin Tech Tips with the purchase from the moment that the buyer landed on the Dell webpage after clicking on the Justin Tech Tips affiliate link through the completion of the buyer's purchase.

130.    As shown in Image 3 below, the buyer then completed the purchase on the Dell website without engaging the Honey Browser Extension or using another affiliate link to return to the Dell website.

1
2
3
4
5
6
7
8
9
10
11
12
13



14

Image 3

15  131.    The Affiliate Marketer got credit for the referral and should have received an

16  Affiliate Commission from the Merchant. As shown in Image 4 below, when Justin Tech Tips

17  subsequently reviewed his Dell transactions and commissions, he received an Affiliate

18  Commission in the amount of $2.45 for the purchase of the Dell DisplayPort 18-inch Cable

19  product with Product No. 470-ACMS on December 30, 2025, at or around 2:11 PM EST.

20
21
22
23
24
25
26
27
28

Image 4

132.    However, as described below, when everything stayed the same as in the above scenario, except the buyer engaged with the Honey Browser Extension before completing the purchase, Honey surreptitiously injected the Secret Tab and overwrote Justin Tech Tips' Affiliate ID with PayPal's Affiliate ID. Even though Justin Tech Tips referred the consumer to the Dell webpage through his affiliate link and the consumer completed a purchase without navigating away from the Dell webpage or clicking on any intervening affiliate links that also directed the buyer to the Dell website—and thus Justin Tech Tips should have received an Affiliate Commission—Justin Tech Tips was deprived of his Affiliate Commission as a result of PayPal's unlawful conduct.

133.    The buyer used the following affiliate link for Justin Tech Tips—https://www.jdoqocy.com/click-100387483-12839518?sid=TrackingTest&url=https%3A%2F%2Fwww.dell.com%2Fen-us%2Fshop%2Fdell-displayport-18-inch-cable%2Fapd%2F470-acms%2Fmonitors-monitor-accessories—and was

1  directed to the page on the Dell website for the "Dell DisplayPort 18-inch Cable" product, which

2  has a product number of 470-ACMS and is shown in Image 5 below.



Image 5

18  134.    When the buyer landed on the Dell product webpage shown in Image 5 after

19  clicking Justin Tech Tips' affiliate link, the browser again stored a value in the "dellven" cookie

20  identifying Justin Tech Tips as the referring affiliate. The value identifying Justin Tech Tips as

21  the referring affiliate persisted as the buyer added the product to the cart.

22  135.    However, after adding the product to the cart on the Dell website, the buyer

23  engaged with the Honey Browser Extension and attempted to activate the cash back offer from

24  PayPal Rewards, as shown below in Image 6, while remaining on the Dell webpage.



Image 6

136.    When the buyer engaged with Honey to activate the potential "cash back" offer, Honey surreptitiously forced a "redirect" to the same Dell check-out page that the buyer was already on in order to fabricate a referral.

Image 7

137.    Image 7, above, shows that this "redirect" caused the buyer's browser to overwrite and replace "Justin Tech Tips LLC" as the value of the "dellven" cookie. After the "redirect," the

value of the "dellven" cookie showed that "PayPal Inc." referred the sale, even though PayPal did not direct the buyer to the Dell webpage.



Image 8

138.     As shown in Image 8, above, the buyer subsequently completed the purchase for the Dell DisplayPort 18-inch Cable after engaging with the Honey Browser Extension and attempting to activate "cash back" rewards.

139.     In this scenario, the buyer was directed to the Dell website using Justin Tech Tips' affiliate link and completed a purchase without navigating away from the Dell webpage or clicking on any intervening affiliate links that also directed the buyer to the Dell website. Accordingly, Justin Tech Tips should have received an Affiliate Commission for this purchase.

140.     However, when Plaintiff Justin Tech Tips reviewed his transactions for potential Affiliate Commissions received for the purchase made by the buyer on December 23, 2025, at or around 10:42 AM EST after the buyer engaged with the Honey Browser Extension, there was no Affiliate Commission for this transaction despite the fact that the buyer never clicked on an

intervening affiliate link, never navigated away from the Dell website at all, and only engaged with Honey after already reaching the product page on Dell's website. Even though Justin Tech Tips should have received an Affiliate Commission on this transaction, he did not.

141.    In this test purchase, the buyer interacted with Honey by attempting to engage the cash back feature. Prior to PayPal's practice changes in 2025 following the filing of these lawsuits (discussed above), this transaction would have played out in the same way even if the buyer's only engagement with the Honey Browser Extension was to simply dismiss the pop-up.

### 2.    Each Plaintiff Has Made Sufficient Sales To Confer Standing.

142.    The Honey Browser Extension is widely used by consumers and Merchants. In 2020, even before PayPal's largescale efforts to popularize it, Honey was installed on approximately 17 million different browsers in the United States alone. Honey also has relationships with more than 30,000 Merchants. Each Plaintiff has referred sufficient sales to Merchants, including to Merchants with whom PayPal also partners, that given their volume of referrals and Honey's widespread presence on consumers' browsers across the country, PayPal wrongfully interfered with each Plaintiffs' receipt of, and improperly diverted to itself, Affiliate Commissions by its misconduct.

143.    **Ahntourage Media** is owned and operated by Daniel Ahn, an Affiliate Marketer who has had a platform on YouTube for over six years.

144.    On YouTube alone, Ahntourage Media's channel "Ahnestly" has over 110,000 subscribers. The channel features reviews for chairs, desks, and home decor. Ahntourage Media also has accounts on X, Facebook, and Instagram.

145.    Mr. Ahn invests substantial time and effort into cultivating Ahnestly's follower base by reviewing products and promoting brands.

146.    Ahntourage Media partners with Merchants to promote their products to its online audience. As part of that relationship, Ahntourage Media receives Affiliate Commissions when consumers buy products recommended by Ahntourage Media by using its affiliate link.

147.    Ahntourage Media regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Amazon, Andaseat, Branch

Furniture, Colamy, Herman Miller, Razer, SIHOO, Staples, and Steelcase. Ahntourage Media has partnered with and/or promoted products from Razer for six years; Herman Miller and Staples for five years; Steelcase for four years; Andaseat, Branch Furniture, and SIHOO for three years; and Colamy for one year. Ahntourage Media intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

148.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Ahntourage Media has partnerships, including Amazon, Andaseat Staples, and Steelcase.

149.    Ahntourage Media generates over 1,500 transactions and hundreds of thousands of dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

150.    Ahntourage Media would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Ahntourage Media generated with its affiliate links.

151.    **Angry Snowboarder** is owned and operated by Avran LeFeber ("Mr. LeFeber"), an Affiliate Marketer who has had a platform on YouTube for eight years and was blogging using Affiliate Commissions for eleven years before starting his YouTube Channel.

152.    On YouTube alone, the Angry Snowboarder channel has over 53,000 subscribers. The channel features reviews for snowboards, bindings, boots, and other snowboard accessories. Angry Snowboarder also has accounts on Discord, Patreon, Facebook, and Instagram, and previously published posts on its own website, https://angrysnowboarder.com.

153.    Mr. LeFeber invests substantial time and effort into cultivating Angry Snowboarder's follower base, reviewing equipment, and promoting this equipment online.

154.    Angry Snowboarder partners with Merchants to promote their products to its online audience. As part of that relationship, Angry Snowboarder receives Affiliate Commissions when consumers buy products recommended by his channel and social media posts.

155.    Angry Snowboarder regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Amazon, Backcountry, Blauer Board Shop, REI, Evo, Christy Sports, Gravity Coalition, and several more. Angry Snowboarder intends to continue partnering with many, if not all, of these Merchants in the future.

156.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Angry Snowboarder has relationships, including Amazon, Backcountry, and Gravity Coalition.

157.    Angry Snowboarder has generated thousands of transactions and over the past few years has earned over $100,000 dollars in Affiliate Commissions through affiliate marketing with its Merchant partnerships.

158.    Angry Snowboarder would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Angry Snowboarder generated with its affiliate links.

159.    **Mr. Ramirez** is an Affiliate Marketer who has had a platform on YouTube for approximately seven years.

160.    On YouTube alone, Mr. Ramirez's channel "AaronnRamirez" has about 225,000 subscribers. The channel features reviews content regarding fashion, fitness, technology, and more. Mr. Ramirez also has an account on Instagram.

161.    Mr. Ramirez invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

162.    Mr. Ramirez partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Ramirez receives Affiliate Commissions when consumers buy products recommended by Mr. Ramirez by using his affiliate link.

163.    Mr. Ramirez regularly partners with or otherwise promotes the products of a number of popular Merchants through his affiliate links, both directly and indirectly. For example, Mr. Ramirez has been part of the Amazon Influencer, LTK, MagicLinks, and Uniqlo

affiliate networks for over two years and has promoted products from Merchants such as Kohl's, New Balance, Old Navy, Finish Line, Urban Outfitters, Abercrombie & Fitch, H&M, American Eagle & Aerie, Ray-Ban, Gap, Forever 21, Prada, Levi's, and Banana Republic through those networks. Additionally, Mr. Ramirez has direct relationships with Merchants to promote their products, including Amazon, Walmart, and Hollister, with which he has partnered for the last two years. Mr. Ramirez intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

164.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Mr. Ramirez has relationships, including Amazon, Kohl's, Gap, and Walmart.

165.    Mr. Ramirez generates tens of thousands of transactions and tens of thousand dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

166.    Mr. Ramirez would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Ramirez generated with his affiliate links.

167.    **Brevard Marketing** is owned and operated by Charles A. and Tina Graudins "the Graudins"), Affiliate Marketers who have had platforms on YouTube for over five years. Brevard Marketing's YouTube channels are branded as "admtim," "craftwithfelicia," and "freshandfelicia".

168.    On YouTube alone, Brevard Marketing's channels collectively have almost 95,000 subscribers. The "admtim" channel features travel-related merchandise, the "freshandfelicia" channel features general merchandise (from electronics to kitchen gadgets), and the "craftwithfelicia" channel features crafts (with an emphasis on custom printing). Brevard Marketing also has accounts on Amazon, YouTube, Instagram, TikTok, and Facebook under the same branding, and publishes posts on its own website, www.freshandfelicia.com.

169.     The Graudins invest substantial time and effort into cultivating Brevard Marketing's follower base, searching for the best deals from Merchants, and promoting those deals online.

170.     Brevard Marketing partners with Merchants to promote their products to its online audience. As part of that relationship, Brevard Marketing receives Affiliate Commissions when consumers buy products recommended by Brevard Marketing by using its affiliate links.

171.     Brevard Marketing regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. For example, Brevard Marketing has been a part of the Amazon, YouTube, ShareASale, Impact, and GoAffPro affiliate networks for over three years, and has promoted products from Merchants such as Heybike, Annioki, Xtool, WeCreat, Velotric, and Aeon Laser USA through those networks. Additionally, Brevard Marketing has direct relationships with Merchants to promote their products, including Amazon, Cricut, HTvront, Rode, WeCreat, and Xtool. Brevard Marketing has promoted products from Amazon for approximately 15 years; promoted products from Cricut for approximately five years; promoted products from HTvront, WeCreat, and Xtool for approximately three years; and promoted products from Rode for approximately two years. Brevard Marketing intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

172.     PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Brevard Marketing has relationships, including Amazon, Cricut, YouTube, ShareASale, and Impact.

173.     Historically, Brevard Marketing has generated about 150,000 transactions and tens of thousands of dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

174.     Brevard Marketing would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Brevard Marketing generated with its affiliate links.

175. **Red Beard Studios** is owned and operated by Jeff King ("Mr. King"), an Affiliate Marketer who has had a platform on YouTube for over five years, along with his wife, Jesse King.

176. On YouTube alone, Red Beard Studios' channel "TheDenofTools" has over 300,000 subscribers. The channel features reviews for tools and content relating to do-it-yourself projects. Red Beard Studios also has an account on Facebook.

177. Mr. King invests substantial time and effort into cultivating Red Beard Studio's follower base, searching for the best deals from Merchants, and promoting those deals online.

178. Red Beard Studios partners with Merchants to promote their products to its online audience. As part of that relationship, Red Beard Studios receives Affiliate Commissions when consumers buy products recommended by Red Beard Studios by using its affiliate link.

179. Red Beard Studios regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links. For example, Red Beard Studios has partnered with Amazon Associates for more than ten years and Walmart, Ace Hardware, ACME, and Home Depot for approximately four years. Red Beard Studios intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

180. PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Red Beard Studios has relationships, including Amazon, Lowe's, and Walmart.

181. Red Beard Studios generates 1 million transactions and $80,000 in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

182. Red Beard Studios would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Red Beard Studios generated with its affiliate links.

183. **Storm Productions** is owned and operated by Hayley Storm Corwick ("Ms. Corwick"), an Affiliate Marketer who has had a platform on Instagram, Twitter, and Facebook for

several years and has operated the website madisonavenuespy.com since 2008. Collectively, these social media channels are branded as "Madison Avenue Spy."

184.    The Madison Avenue Spy Instagram alone has approximately 132,000 followers, and the account features the best deals in the world of fashion. Storm Productions also has accounts on TikTok, X (formerly Twitter), Facebook, Pinterest, and Telegram. In addition to these platforms, Storm Productions publishes posts on its own website, www.madisonavenuespy.com, which has nearly 22,000 subscribers and generates significant traffic by featuring the best deals in the fashion world.

185.    Ms. Corwick invests substantial time and effort into cultivating Storm Productions' follower base, searching for the best fashion deals from Merchants, and promoting those deals online.

186.    Storm Productions partners with Merchants to promote their products to its online audience. As part of that relationship, Storm Productions receives Affiliate Commissions when consumers buy products recommended by Storm Productions by using its affiliate link.

187.    Storm Productions regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Bergdorf Goodman, Neiman Marcus, Target, Nordstrom, Saks Fifth Avenue, Ulta, and Sephora. Storm Productions has partnered with and/or promoted products from these Merchants for several years. Storm Productions intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

188.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Storm Productions has relationships, including Bergdorf Goodman, Neiman Marcus, Target, and Saks Fifth Avenue.

189.    For years, Storm Productions has earned substantial commissions and generated thousands of transactions. In the past year alone, Madison Avenue Spy has earned over $200,000 in Affiliate Commissions through affiliate marketing with its Merchant partnerships and affiliate marketing.

190.    Storm Productions would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Storm Productions generated with its affiliate links.

191.    **Gents Scents** is owned and operated by Thomas Kirkland ("Mr. Kirkland"), an Affiliate Marketer who has had a platform on YouTube for over seven years.

192.    On YouTube, Gents Scents' channel "GentsScents" has over 550,000 subscribers. The channel features men's fragrance content and reviews.

193.    Mr. Kirkland invests substantial time and effort into cultivating the Gents Scents follower base, searching for the best deals from Merchants, and promoting those deals online.

194.    Gents Scents partners with Merchants to promote their products to its online audience. As part of that relationship, Gents Scents receives Affiliate Commissions when consumers buy products recommended by Gents Scents by using its affiliate link.

195.    Gents Scents regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links. For example, Gents Scents has been part of the Rakuten and Commission Junction affiliate networks for about eight years; the Awin affiliate network for about five years; the UpPromote affiliate network for about three years; the Howl and MagicLinks affiliate networks for about two years; and the AspireIQ network for about one year; and has promoted products from Merchants such as Macy's, Sephora, Ulta, Beauty House, Max Aroma, The Perfume Box, Twisted Lily, Jomashop, and FragranceNet through those networks. Gents Scents intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

196.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Gents Scents has relationships, including Macy's and Ulta.

197.    Gents Scents generates approximately ten thousand transactions and over a hundred thousand dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

198.     Gents Scents would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Gents Scents generated with its affiliate links.

199.     **Mr. Lachman** is an Affiliate Marketer who has had a platform on YouTube for about fourteen years.

200.     On YouTube alone, Mr. Lachman's channel "dannypops" has over 46,000 subscribers. The channel features audio speaker reviews. Mr. Lachman also has accounts on Instagram, BlueSky, and TikTok, and publishes posts on his own website, https://www.dannypops.com/.

201.     Mr. Lachman invests substantial time and effort into cultivating his follower base, searching for the best deals from Merchants, and promoting those deals online.

202.     Mr. Lachman partners with Merchants to promote their products to his online audience. As part of that relationship, Mr. Lachman receives Affiliate Commissions when consumers buy products recommended by Mr. Lachman by using his affiliate link.

203.     Mr. Lachman regularly partners with or otherwise promotes the products of popular Merchants through his affiliate links. For example, Mr. Lachman has been part of the Amazon, eBay, Howl, and ShareASale affiliate networks for approximately three years, and has promoted products from Merchants such as Soundcore and Sony through those networks. Mr. Lachman intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

204.     PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Mr. Lachman has relationships, including Amazon, eBay, and ShareASale.

205.     Mr. Lachman generates thousands of transactions and tens of thousands of dollars in Affiliate Commissions per year through affiliate marketing with his Merchant partnerships and affiliate marketing.

206.    Mr. Lachman would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Mr. Lachman generated with his affiliate links.

207.    **Justin Tech Tips** is owned and operated by Justin Wyatt ("Mr. Wyatt"), an Affiliate Marketer who has had a platform on YouTube for over four years.

208.    On YouTube alone, Justin Tech Tips' channel "Just!N Tech" has over 108,000 subscribers. The channel features reviews for gaming computers, as well as videos on gaming technology and virtual reality. Justin Tech Tips also has accounts on TikTok, Rumble, Facebook, and Instagram, and publishes posts on its own website, https://justintech.tips/.

209.    Mr. Wyatt invests substantial time and effort into cultivating Justin Tech Tips' follower base, searching for the best deals from Merchants, and promoting those deals online.

210.    Justin Tech Tips partners with Merchants to promote their products to its online audience. As part of that relationship, Justin Tech Tips receives Affiliate Commissions when consumers buy products recommended by Justin Tech Tips by using its affiliate links.

211.    Justin Tech Tips regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly, including Best Buy, Dell, Amazon, Walmart, HP, and LG. For example, Justin Tech Tips has been part of the Impact, Howl, Commission Junction, and YouTube affiliate networks for several years and has promoted products from Merchants such as BestBuy, Dell, Walmart, and LG through those networks. Additionally, Justin Tech Tips has direct relationships with Merchants to promote their products, including HP, with which it has partnered with for approximately three years. Justin Tech Tips intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

212.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Justin Tech Tips has relationships, including Amazon, Dell, Walmart, Impact, Commission Junction, and YouTube.

213.    Justin Tech Tips generates about 10,000 transactions and hundreds of thousands of dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

214.    Justin Tech Tips would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Justin Tech Tips generated with its affiliate links.

215.    **Stuber** is owned by and operated by James Stuber ("Mr. Stuber"), an Affiliate Marketer who has had a platform on YouTube for about five years.

216.    On YouTube, Stuber's channel "uberstuber" has over 3,000 subscribers. The channel features content relating to personal development and tech gadgets. Stuber also publishes posts on its own website, https://jamesstuber.com/.

217.    Mr. Stuber invests substantial time and effort into cultivating Stuber's follower base, searching for the best deals from Merchants, and promoting those deals online.

218.    Stuber partners with Merchants to promote their products to its online audience. As part of that relationship, Stuber receives Affiliate Commissions when consumers buy products recommended by Stuber by using its affiliate link.

219.    Stuber regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links. For example, Stuber has been part of the Amazon affiliate network for about nine years, and has promoted products from Merchants such as Sony, Fujifilm, Elgato, Glide Gear, and SanDisk through that network. Stuber intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

220.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Stuber has relationships, including Amazon and SanDisk.

221.    Stuber has generated about 600 transactions and about six thousand dollars in Affiliate Commissions over the past five years through affiliate marketing with its Merchant partnerships and affiliate marketing.

222.    Stuber would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Stuber generated with its affiliate links.

223.    **Dan Becker** is owned and operated by Dan Becker ("Mr. Becker"), an Affiliate Marketer who has had a platform on YouTube for over seven years.

224.    On YouTube alone, Dan Becker's channel "DanBecker" has over 450,000 subscribers. The channel features reviews for backpacking and hiking products. Dan Becker also has accounts on Instagram, TikTok, and Facebook, and publishes posts on his own website, www.danbeckeroutdoors.com.

225.    Mr. Becker invests substantial time and effort into cultivating Dan Becker's follower base, searching for the best deals from Merchants, and promoting those deals online.

226.    Dan Becker partners with Merchants to promote their products to its online audience. As part of that relationship, Dan Becker receives Affiliate Commissions when consumers buy products recommended by Dan Becker by using its affiliate link.

227.    Dan Becker regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, both directly and indirectly. For example, Dan Becker has been part of the AvantLink affiliate network for approximately six years, the ShareASale and Shopify affiliate networks for approximately four years, and the Impact affiliate network for approximately two years, and has promoted products from Merchants such as Amazon, REI, and Backcountry through those networks. Additionally, Dan Becker has direct relationships with Merchants to promote their products, including Backcountry.com, with which it has partnered for approximately six years, and REI, with which it has partnered for approximately two years. Dan Becker intends to continue creating affiliate marketing content and partnering with many, if not all, of these Merchants in the future.

228.    PayPal has independent relationships with some, if not all, of the Merchants and Affiliate Networks with whom Dan Becker has relationships, including Amazon, AvantLink, Backcountry, and ShareASale.

229.    Dan Becker generates about 5,000 transactions and over a hundred thousand dollars in Affiliate Commissions per year through affiliate marketing with its Merchant partnerships and affiliate marketing.

230.    Dan Becker would have earned more in Affiliate Commissions but for PayPal's theft and diversion of Affiliate Commissions via its Honey Browser Extension. Through the Honey Browser Extension, PayPal stole credit for sales that Dan Becker generated with its affiliate links.

### 3.    Honey Took A Commission From Each Named Plaintiff.

231.    The test purchases described above, combined with each Plaintiff's well-established affiliate marketing relationships (involving a significant volume of historical transactions) with Merchants with whom PayPal also partners confirms that PayPal, through its misconduct alleged herein, has stolen at least one Affiliate Commission from each Plaintiff.

232.    A rigorous statistical analysis provides further support. In short, if an Affiliate Marketer has at least 100 purchases for which they should be eligible for an Affiliate Commission—a number *far* eclipsed by each Plaintiff here—then least one Affiliate Commission was diverted from that Affiliate Marketer to PayPal through the Honey Browser Extension, including during the applicable statutory limitations periods.

233.    We know this through a so-called Monte Carlo simulation. The Monte Carlo simulation is a means of analyzing different outcomes given the risk of unknown variables.[25] The simulation functions like a series of weighted coin flips. By using publicly available, limited data, the simulation determines the probability that a particular event occurred in the absence of discovery.

234.    Here, Plaintiffs ran a Monte Carlo simulation for sets of 1,000 sales involving affiliate links. The simulation took into account a number of variables, including the number of eligible referral purchases, the size of the internet audience, the share of US-based versus

---

[25] Will Kenton, *Monte Carlo Simulation: What It Is, How It Works, History, 4 Key Steps*, Investopedia (June 27, 2024), https://www.investopedia.com/terms/m/montecarlosimulation.asp.

international activity, the prevalence of different internet browsers (such as Chrome, Firefox, or Edge), and the prevalence of the Honey Browser Extension. Based on these variables, the simulation calculated the likelihood that PayPal used Honey to steal an Affiliate Commission.

235.    This analysis demonstrates that for Affiliate Marketers who were eligible to receive an Affiliate Commission on only 100 purchases, there is a 100% likelihood that PayPal used Honey to steal at least one Affiliate Commission from them. In other words, all 1,000 simulations under this scenario showed at least one Affiliate Commission stolen by the Honey Browser Extension.

236.    Ultimately, this is simply statistical proof of what is intuitively plausible: the Honey Browser Extension has long had a widespread presence on consumers' internet browsers, and it is available and works same way on the most popular web browsers, including Chrome, Firefox, and Edge. Given the tens of millions of consumers with Honey on their browsers, and the number of referral sales for each named Plaintiff (for each, greater than 600, and for most, thousands), PayPal diverted credit and Affiliate Commissions for at least one sale from each Plaintiff itself through the misconduct alleged herein.

**D.    PayPal's Actions Are Surreptitious, and Contrary To Common Contractual Terms and Industry Standards.**

**1.    Plaintiffs' Contracts With Merchants Prohibit Honey's Conduct**

237.    As explained above, there is a common understanding in the affiliate marketing industry of how Affiliate Marketers obtain payment for their marketing activities, which is reflected in Plaintiffs' contracts with Merchants and/or Affiliate Networks. As these contracts provide, that common understanding is that (1) Plaintiffs should be paid when they are the last Affiliate Marketer who drives the consumer to a Merchant's website and the consumer makes a purchase within a relevant timeframe and (2) Honey's actions—fraudulently spoofing a "click" to steal Affiliate Commissions—are forbidden (often *specifically* called out as such) in the industry.

238.    Plaintiffs' contracts with Merchants (with whom PayPal also partners) reflect this common understanding in several ways. As detailed above, the contracts describe the attribution model for affiliate marketing sales. In addition, the contracts also prohibit conduct that attempts

to disrupt the attribution process. Specifically, these agreements expressly forbid activities like (i) engaging in "cookie stuffing" (ii) intercepting or redirecting web traffic, and/or (iii) intercepting, redirecting, or diverting Affiliate Commissions. The agreement language described below is representative, and often replicated word-for-word, across the industry.

239.    For example:

a.    **Amazon:** Mr. Ramirez, Ahntourage, Angry Snowboarder, Becker, Brevard Marketing, Mr. Lachman, Justin Tech Tips, Red Beard Studios, and Stuber have relationships with Amazon, which also has a relationship with PayPal. Amazon's affiliate agreement, to which these Plaintiffs have all agreed, provides that affiliates "will not attempt to intercept or redirect (including via software installed on users' computers) traffic from or on, or divert commission income from, any site that participates in the Associates Program."

b.    **Backcountry**: Angry Snowboarder and Dan Becker have relationships with Backcountry, which also has a relationship with PayPal. Like Amazon, Backcountry prohibits affiliate sites that "contain software or use technology that attempts to intercept, divert or redirect Internet traffic to or from any other website, or that potentially enables the diversion of affiliate commissions from another website." Plaintiffs' agreements with Backcountry also forbid the use of "pop-ups, pop-unders, iframes, frames or any other actions (whether or not visible) that set affiliate cookies unless the user has expressly consented to activating specific coupon or savings and the user is able to see information regarding the coupon or savings before an affiliate cookie is set (e.g., "click here to see coupons and open a window to Merchant Site" is not acceptable)." Identical and materially-identical language is common and found in at least hundreds of other affiliate participation agreements Plaintiffs have reviewed to date, including publicly available agreements with major companies.

c.    **Staples**: Ahntourage has a relationship with Staples, which also has a relationship with PayPal. Ahntourage's contract with Staples prohibits "engag[ing] in cookie stuffing or includ[ing] pop-ups, false or misleading links on your website" and provides that "wherever possible, [affiliates] will not attempt to mask the referring URL information (i.e. the page from where the click is originating)." Staples' affiliate agreement also expressly prohibits

redirects—"[u]sing redirects to bounce a click off of a domain from which the click did not originate in order to give the appearance that it came from that domain is prohibited[.]" Like the Amazon and Backcountry agreements, the Staples agreement specifically forbids interfering with or diverting commissions from other affiliates: an affiliate website may not "[c]ontain software or use technology that attempts to intercept, divert or redirect Internet traffic to or from any other website, or that potentially enables the diversion of affiliate commissions from another website. This includes toolbars, browser plug-ins, extensions and add-ons." Identical and materially-identical language is common and found in at least hundreds of other affiliate participation agreements Plaintiffs have reviewed to date, including publicly available agreements with major companies.

    d. **Lowe's:** Plaintiff Red Beard Studios has a relationship with Lowe's, which also partners with PayPal. Plaintiff Red Beard Studios' agreement with Lowe's expressly prohibits cookie-stuffing and hiding referrer information: "You may not engage in cookie stuffing or include pop-ups, false or misleading links on your website. In addition, wherever possible, you will not attempt to mask the referring URL information (i.e., the page from where the click is originating)." The Lowe's agreement also expressly prohibits PayPal's use of redirects: "[u]sing redirects to bounce a click off of a domain from which the click did not originate in order to give the appearance that it came from that domain is prohibited." And Lowe's provides that an affiliate site "is unsuitable" if it "contain[s] software or technology that attempts to or does intercept, divert or redirect Internet traffic to or from any other website, or that potentially enables the diversion of affiliate commissions from another website." Identical and materially-identical language is common and found in at least hundreds of other affiliate participation agreements Plaintiffs have reviewed to date, including publicly available agreements with major companies.

    e. **Macy's**: Gents Scents has a relationship with Macy's, which also partners with PayPal. Like Amazon, Backcountry, Staples, and Lowe's, Macy's directly prohibits behavior similar to PayPal's: "You shall not cause any Transactions to be made that are not in good faith, including, but not limited to, using any device, program, robot, Iframes, or hidden frames."

f.    **Neiman Marcus:** Storm Productions has a relationship with Neiman

Marcus, which also partners with PayPal. Like Amazon, Backcountry, Staples, Lowe's, and

Macy's, Neiman Marcus directly prohibits behavior similar to PayPal's: "Affiliate agrees not to

employ the use of any type of software download or technology ("Prohibited Software") which

attempts to intercept or re-direct traffic or referral fees to or from, any other website." Identical

and materially-identical language is common and found in at least hundreds of other affiliate

participation agreements Plaintiffs have reviewed to date, including publicly available agreements

with major companies, including multiple companies that contract with the affiliate network

Awin. *See, e.g.*, Warby Parker's program terms (it is prohibited to "use technology that attempts

to intercept, divert or redirect Internet traffic to or from any other website, or that potentially

enables the diversion of affiliate commissions from another website."). Mr. Lachman, Gents

Scents, and Red Beard Studios partner with Awin, as does PayPal.

g.    **Walmart:** Mr. Ramirez, Justin Tech Tips, and Red Beard Studios each

have relationships with Walmart, which also has a relationship with PayPal. Like the other

contracts discussed above, Mr. Ramirez, Justin Tech Tips, and Red Beard Studios' contracts with

Walmart prohibit PayPal's conduct. The Walmart contract states as follows: "You may not . . .

engineer any website containing a Qualifying Link in such a manner that pulls Internet traffic

away from any Sites [or] use any type of method, software, automated script, or technology

which attempts to intercept or redirect traffic or Commissions to or from any website, or

otherwise artificially increase Commissions, including through any click spam, botnets, traffic

generated by non-human visitors, or use of stolen credit card information to make purchases in

connection with the Program." Walmart's program terms further provide that affiliates may not

"employ, use, or receive any direct or indirect benefit from, any 'cookie stuffing' methods (e.g.,

use of 'cookie stuffing' to cause the Platform's tracking systems to conclude that a user has

clicked through a Qualifying Link - and to pay commissions accordingly - even if the user has not

actually clicked through any such link)."

240.    The prohibitions above from Plaintiffs' contracts with Merchants reflect the

common understanding that it is improper for entities (such as PayPal) to attempt to obtain

Affiliate Commissions by surreptitious means, including by engaging in "cookie stuffing" or using "re-directs" to fake a referral click.

### 2.    Affiliate Network Policies Implemented Stand Down Protocols To Prevent The Affiliate Commission Theft Described Herein.

241.    In addition to the prohibitions contained in Merchants' contracts, including with Plaintiffs, Affiliate Network contracts and policies also specifically prohibit PayPal's Affiliate Commission theft through the Honey Browser Extension. Affiliate Networks are a key player in the affiliate marketing industry. They create the standards by which the vast majority of Affiliate Marketers like Plaintiffs operate, including standards defining when Affiliate Marketers must be paid, and what activities are prohibited. Each and every Plaintiff contracts with at least one Affiliate Network.

242.    Stand down is one of the contract and policy provisions designed to prevent exactly the type of Affiliate Commission theft that is the core function of PayPal's Honey Browser Extension. For example, Rakuten's Affiliate Network Policies and Guidelines requires that "Software Publishers [] recognize and Stand-down on publisher-driven traffic immediately prior to the software dropping a cookie," where "'Stand-down' means the software may not activate and redirect the end user to the advertiser site with their Supplier Affiliate link for the duration of the browser session."[26]

243.    A December 2024 survey of nine large affiliate networks—AvantLink, Awin, Commission Junction, LinkConnector, Rakuten Advertising, Tradedoubler, ShareASale, Partnerize, and Webgains—asked whether the Affiliate Network policies require browser extensions like Honey to "stand down" when a visitor to a Merchant has come through an Affiliate Marketer's link. Seven of the nine Affiliate Networks made clear in the survey that they *do* require such a stand down. In other words, these Affiliate Networks dictate that browser

---

[26] *Rakuten Affiliate Network Policies and Guidelines*, Rakuten (July 18, 2022), https://go.rakutenadvertising.com/hubfs/Affiliate-Network-Policies.pdf.

extensions like Honey may not replace affiliate cookies with their own when a visitor has arrived through an Affiliate Marketer's link. These are not hidden rules.

244.    For example, AvantLink's Terms of Use requires that "affiliate tracking cookies can be set by *outbound clicks only*." Angry Snowboarder and Dan Becker partner with AvantLink, as does PayPal.

245.    The LinkConnector Affiliate Terms and Descriptions states that "'Affiliate Program' means a pay-for-performance program where an Affiliate receives a commission for sending an End User to the Merchant Site which then generates an Affiliate Event."[27]

246.    The two remaining Affiliate Networks also require stand down protocols: (1) ShareASale is now fully integrated to Awin, which defines a "click" that qualifies for an Affiliate Commission as "the intentional and voluntary following of a Link by a Visitor as part of marketing services as reported by the Tracking Code only," where "'Link' means a hyperlink from a Promotional Space to an Advertiser URL."; and (2) Partnerize contracts expressly prohibit the activities PayPal engages in with the Honey Browser Extension. Honey partners with both ShareASale and Partnerize. Ahntourage, Brevard Marketing, Mr. Lachman, Gents Scents, and Red Beard Studios partner with Awin; Dan Becker partners with ShareASale, and Ahntourage partners with Partnerize.

247.    In one publicly available Partnerize contract, for instance, it is prohibited for an Affiliate Marketer to "implement[] links, where there is an incentive to click on them without a User's full knowledge of the consequences of their actions – for example, activating a cookie which may later mean a conversion of sale to the owner of the publisher link ('forced clicks'), or to "mimic[] the action of a . . . link click which results in a cookie being stored on a User's machine which could later lead to the conversion of a sale to said Publisher [i.e., marketer]." This is exactly what Honey does. The Partnerize agreement describes these activities simply as "not

---

[27] *LinkConnector Affiliate Terms and Conditions*, LinkConnector (Nov. 1, 2019), https://www.linkconnector.com/affiliate-terms/.

transparent" and nonexclusive "[e]xamples of Unethical Activities" in which affiliate marketers may not engage.[28]

248.    Additionally, Rakuten's Downloadable Software Application policy, which applies to "software users install on their computer, such as a toolbar" must "stand down when it recognizes . . . publisher links."[29] Ahntourage, Justin Tech Tips, Gents Scents, and Storm Productions partner with Rakuten, as does PayPal.

249.    Commission Junction's Affiliate Publisher Service Agreement requires that "[s]oftware-based activity must honor the CJ Affiliate Software Publishers Policy requirements" including "requirements prohibiting usurpation of a Transaction that might otherwise result in a Payout to another Publisher" and "non-interference with competing advertiser/ publisher referrals."[30] Ahntourage, Justin Tech Tips, Gents Scents, Daniel Lachman, and Storm Productions partner with Commission Junction, as does PayPal.

250.    Impact's stand down policy "prevents certain partners—particularly those using browser extensions, toolbars . . . from interfering with the shopping experience if another click has already been recorded from another partner."[31] The policy requires software, "[u]pon

---

[28] *Terms and Conditions*, Partnerize,

https://docs.partnerize.com/terms_and_conditions/phg_terms_and_conditions_expedia.pdf.

[29] *Downloadable Software Applications (DSAs)*, Rakuten Advertising Publisher Help Center, (Oct. 29. 2025), https://pubhelp.rakutenadvertising.com/hc/en-us/articles/360061252752-Downloadable-Software-Applications-DSAs#h_01HTDFSPAW28H45FBG8ZWXHMYQ.

[30] *Affiliate Publisher Service Agreement (U.S.)*, CJ Legal, https://www.cj.com/legal/psa-us.

[31] *Stand-Down Policy Explained*, Impact (Oct. 23, 2025),

https://help.impact.com/en/support/solutions/articles/155000006769-stand-down-policy-explained.

[31] *Publisher Code of Conduct*, Awin, https://awin.foleon.com/code-of-conduct-publisher/en-gb/.

detecting prior publisher attribution" to "not display pop-ups, banners, or notifications encouraging users to activate cashback or other affiliate offers" and "[r]efrain from setting or modifying tracking cookies that could override existing ones."[32] Ahntourage, Mr. Ramirez; Angry Snowboarder, Dan Becker, Justin Tech Tips, Gents Scents, Mr. Lachman, and Red Beard Studios partner with Impact, as does PayPal.

251.    Plaintiffs' contracts thus reflect the industry standard that Affiliate Networks require browser extensions like Honey to stand down when a visitor to a Merchant has come through an Affiliate Marketer's link, rather than swoop in to steal Affiliate Commissions in that scenario.

### 3.    PayPal Has Violated And Continues to Violate Affiliate Network Stand Down Protocols.

252.    Affiliate Networks implement manual and automated audits of browser extensions to enforce these extensive prohibitions and check whether Honey is, in fact, standing down when it is supposed to do so.

253.    Internal emails between Rakuten and PayPal show that Honey has repeatedly violated Rakuten's stand down policies, from as early as ███████ and continuing even after the filing of the complaints in this action ██████████████.

254.    These emails demonstrate that Honey repeatedly failed to stand down in ████████████████████████████████████████████████████████████████████ .

255.    For example, in ████████████████████████████████████████████████████████████████████████████████████████

---

[32] *Stand-Down Policy*, Impact (Aug. 26, 2025), https://app.impact.com/pcontent/stand-down-policy.ihtml.



[33]

256.

[35]

257.

[33] RAD_PayPal_000277 at 000277, -79–80.

[34] RAD_PayPal_000233 at -35; RAD_PayPal_000222 at -29.

[35] RAD_PayPal_000222.

[36] RAD_PayPal_000121.

[37] RAD_PayPal_0000096 at 11.

[38] RAD_PayPal_000096 at -105.

[39] RAD_PayPal_000096 at -105.

[40] RAD_PayPal_000096 at -102.



258. Notably, Plaintiffs have relationships with several of the identified Merchants.

259.

---

[41] RAD_PayPal_000258.

[42] RAD_PayPal_000237 at -238–40.

[43] RAD_PayPal_000237.

[44] RAD_PayPal_000162.

[45] RAD_PayPal_000162.

[46] RAD_PayPal_000163.

[47] RAD_PayPal_000164.

1    260.    ███████████████████████████████████

2    ████████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████[49]

5    261.    This ongoing pattern of violating Rakuten's stand down policies is just one

6    example of Honey's systemic and repeated refusal to stand down even when it knows the

7    customer reached the Merchant's website through the link of an Affiliate Marketer. PayPal has

8    long flagrantly violated industry rules in this respect, and the email exchanges with Rakuten show

9    that PayPal's conduct in this regard is ongoing even after the initial complaints in this action were

10    filed.

11                    **4.    PayPal Devised Several Methods To Ignore or Circumvent Stand
                            Down Protocols.**

12

13    262.    The Affiliate Networks' "stand down" policies described in paragraphs 242

14    through 250 above, remain in place, and their requirements are clear: where a browser extension

15    detects the existence of an affiliate link from an Affiliate Marketer, the browser extension must

16    "stand down."

17    263.    The Honey Browser Extension *purports* to have its own version of "stand down

18    rules"—computer code that governs whether Honey will "stand down" on a website. A version of

19    Honey's stand down rules is located here: https://cdn.honey.io/standdown-rules.json. These rules

20    are computer code that tell Honey to "stand down" when it recognizes a particular Affiliate ID

21    pattern, and not to replace the existing Affiliate IDs with its own.

22    264.    Honey's current and past stand down rules do not reflect the contracts and

23    applicable policies of the affiliate marketing industry. For example, Honey's stand down code as

24    of January 1, 2026, may cause Honey to "stand down," but only for 3600 seconds (one hour) after

25    a consumer has navigated to a Merchant's e-commerce site through an affiliate link. As noted in

26    _____

27    [48] RAD_PayPal_000251.

28    [49] RAD_PayPal_000253 at -253–55.

SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO. 5:24-CV-9470-BLF

the contracts and stand down policies detailed above, stand down does not have a temporal limitation. PayPal created this one-hour stand down limitation, which has no purpose other than to increase the number of transactions where Honey does not stand down. Tellingly, at least through April 2023—i.e., long before PayPal's Affiliate Commission theft was revealed—Honey's stand down rules were set to only stand down (if at all) for 360 seconds (just six minutes) which is far less time that the time it would take to complete most purchases on any Merchant site.

265.    In any event, PayPal designed Honey to surreptitiously avoid standing down *at all* when it detects the browser is likely being used by an actual consumer, rather than a network tester or network auditor—i.e., "users" who are there not to shop but to test the browser extension for compliance with stand down rules. A version of PayPal's selective stand-down criteria can be found on the following site: https://cdn.honey.io/ab/ssd.json.

266.    At bottom, Honey's code shows, and independent testing has confirmed, that Honey has created four basic criteria through which it determines whether or not to stand down.[50] In the vast majority of cases, at least until the filing of these lawsuits in December 2024, Honey did not honor stand down rules for consumer users, meaning that Honey would knowingly take Affiliate Commissions from Affiliate Marketers, *despite* the acknowledged requirement that it "stand down" when it detects an Affiliate Marketer's Affiliate ID. PayPal instead coded Honey to "stand down" *only* where certain criteria are met. These criteria appear designed to detect whether a user is a network tester, rather than a consumer.

267.    Currently, Honey will only stand down in the following circumstances:

- **Account Age**. Honey will stand down if the consumer's account is fewer than 30 days old. Auditors or tester often create new accounts to conduct their tests.
- **"Points" Threshold.** Much like a frequent-flier plan, Honey has a program where it awards "points" to consumers for using Honey. The more purchases a consumer

---

[50] *See* Ben Edelman, *Honey's Dieselgate: Detecting and Tricking Testers*, VPT Digital, (Dec. 30, 2025), https://vptdigital.com/blog/honey-detecting-testers/.

1    makes with Honey, the more points a user collects. Under Honey's *current* rules,

2    Honey will stand down if a user has fewer than 65,000 points—another indication

3    that the account is relatively new, which is often the case for auditors or testers.

4    Honey implemented this relatively high threshold after the filing of the complaints

5    in December 2024. At least until April 2023, there was no points requirement at all

6    for the vast majority of Merchants.

7    • **Blacklist.** A small set of Merchant sites were blacklisted or had code altered

8        particular to them (such as a higher points threshold). For example, even as of

9        2022 Honey had a unique code for eBay whereby Honey would always stand

10       down on ebay.com, even if Honey would have otherwise disregarded stand down

11       rules. Booking.com had a higher points threshold (120,000 points) before Honey

12       would not stand down on that site.

13   • **Affiliate industry identifiers**. Arguably the most glaring reveal of its bad intent,

14       Honey checks whether a user's browser has one of a specific set of cookies. The

15       cookies are labeled "CONTID", "s_vi", "_ga", "networkGroup", "_gid", and are

16       provided to those logged into the technical tools of the affiliate networks

17       Commission Junction ("CJ") Affiliate, Rakuten, Awin, and Swagbucks. If a user

18       has such a cookie—indicating that the user is a professional in the affiliate network

19       space or otherwise logged into an affiliate network industry tool—Honey stands

20       down.

21   268.    Taken together, the Honey Browser Extension's stand down protocol shows that

22   PayPal is knowingly diverting and taking Affiliate Commissions after an Affiliate Marketer has

23   referred a consumer to the Merchant, and attempting to evade detection and cover up its conduct

24   when the user may be a tester, rather than an ordinary consumer.

25   E.    <u>**The Affiliate Marketing Industry Repudiated PayPal's Conduct When Its**</u>
         <u>**Scheme Came To Light.**</u>

26

27

28

269.    After PayPal's deceptive conduct was first exposed, millions of users reportedly uninstalled the Honey Browser Extension,[51] and major tech news outlets swiftly picked up the story. Before the first reporting on PayPal's misconduct in December 2024, Honey reportedly had 20 million users on Chrome; in the year since, Honey has reportedly lost 8 million users, dropping to 12 million Chrome users.[52]

270.    *The Verge*, in a December 23, 2024 article, characterized Honey's scheme as a "scam" that "steals money from influencers, including the very ones they paid to promote their product," by hijacking affiliate revenue and often ignoring better coupon codes.[53] Notably, *The Verge*—which had previously recommended Honey—explicitly disavowed the browser extension: "We've even recommended it here at *The Verge*; now we do not."[54]

271.    Major online tech reviewers like MKBHD, who has 1.3 million followers on Facebook, spoke out about the "major, extremely shady things that Honey has been doing this entire time," in a video that has been viewed at least 209,000 times on the platform.[55]

272.    One of the most significant industry responses to the disclosure of Honey's scam came from Google. Shortly after this lawsuit was filed, in March 2025, Google announced

---

[51] Schoon, *supra* note 21.

[52] Ben Schoon, *Honey has lost 8 million Chrome users in the past year, now accused of fraud [Video]*, 9to5Google (Dec. 31, 2025), https://9to5google.com/2025/12/31/honey-chrome-users-fraud/.

[53] Wes Davis, *Honey's deal-hunting browser extension is accused of ripping off customers and YouTubers*, The Verge (Dec. 23, 2024), https://www.theverge.com/2024/12/23/24328268/honey-coupon-code-browser-extension-scam-influencers-affiliate-marketing.

[54] *Id.*

[55] *Here's Why You Should Delete Honey Right Now*, MKBHD, Facebook (Mar. 8, 2025), https://www.facebook.com/MKBHD/videos/959279909741331/.

updates to the Chrome Web Store extension policies explicitly targeting Honey's conduct. The new policy requires that "[a]ffiliate links, codes, or cookies must only be included when the extension provides a direct and transparent user benefit."[56] The policy prohibits any "extension that updates a shopping-related cookie without the user's knowledge while the user is browsing shopping sites" or one that "continuously injects affiliate links in the background without related user action." The policy specifically identifies as "example violations" "[a]n extension that updates a shopping-related cookie without the user's knowledge while the user is browsing shopping sites" and "[a]n extension that appends an affiliate code to the URL or replaces an existing affiliate code in the URL without the user's explicit knowledge or related user action."

273.    These changes put Honey and similar browser extensions on notice: injecting or overwriting affiliate links without delivering a genuine, disclosed benefit to consumers constitutes a violation of Chrome's terms of service.

274.    Cybersecurity researchers and affiliate marketing experts examined Honey's practices in detail, corroborating the recent reports of PayPal's conduct and providing additional context and commentary. Many experts agreed that what Honey was doing amounted to "hijacking sales" or "cookie stuffing," tactics long viewed as unethical and wrongful in the affiliate world, and widely condemned Honey's scheme.[57] For example, a December 2024 article

---

[56] *Affiliate Ads*, Chrome for Developers, https://developer.chrome.com/docs/webstore/program-policies/affiliate-ads (last visited Apr. 19, 2025).

[57] *See, e.g.*, *The Dark Side of the Honey Browser Extension: Insights into One of the Largest Influencer Scams*, The CyberSec Guru (Dec. 23, 2024), https://thecybersecguru.com/news/honey-browser-extension-dark-side/#:~:text=YouTuber%20Mega%20Lag%E2%80%99s%20investigative%20video,across%20the%20content%20creator%20community ("Honey's rise as a browser extension championed by influencers belies its predatory business practices. From hijacking affiliate earnings to offering

by *Techopedia* reiterated the core allegations that Honey was stealing Affiliate Commissions that rightfully belonged to Affiliate Marketers. This article stressed the deceptiveness of Honey's behavior, finding it to be "strikingly similar to malware[,]" and concluding that it effectively amounted to "hacking users' browser data, which can be considered an invasion of privacy."[58]

## CLASS ALLEGATIONS

275.    This action is brought by Plaintiffs individually and on behalf of the following Class and State Subclasses:

**Class**:    All U.S.-based Affiliate Marketers whose Affiliate Commissions were diverted to PayPal when the Honey Browser Extension displaced their Affiliate IDs.

**California Subclass:** All Class members who are domiciled in California.

**Colorado Subclass:** All Class members who are domiciled in Colorado.

**Florida Subclass:** All Class members who are domiciled in Florida.

**Montana Subclass:** All Class members who are domiciled in Montana.

**New York Subclass:** All Class members who are domiciled in New York.

**Pennsylvania Subclass:** All Class members who are domiciled in Pennsylvania.

**Tennessee Subclass:** All Class members who are domiciled in Tennessee.

**Texas Subclass:** All Class members who are domiciled in Texas.

**Washington Subclass:** All Class members who are domiciled in Washington.

**Wisconsin Subclass:** All Class members who are domiciled in Wisconsin.

*See* Fed. R. Civ. P 23(a), (b)(2), (b)(3), and (c)(4).

---

subpar savings, Honey operates at the expense of both creators and users.").

[58] Ray Fernandez, *Is PayPal's Honey Misleading Users? We Investigate* (Dec. 24, 2024), https://www.techopedia.com/paypal-honey-accused-of-fraud ("Honey is specifically coded to interfere with users' online shopping experiences, particularly during the checkout process. It deliberately removes all traces of the original links that led users to a product and replaces them with its own affiliate ID. This behavior is not an industry standard.").

276.     Excluded from the Class and Subclasses are Defendants, their employees, agents and assigns; any members of the judiciary to whom this case is assigned, their respective court staff, members of their immediate families; and Plaintiffs' counsel.

277.     The Class and Subclasses consist of at least thousands of Affiliate Marketers whose Affiliate Commissions were diverted to PayPal through the misconduct alleged herein and thus each is so numerous that joinder of all members is impractical. The identities of members of the Class and Subclasses can be readily ascertained from business records maintained by PayPal or Merchants.

278.     The claims asserted by Plaintiffs are typical of the claims of the Class and Subclasses, all of whom were harmed by PayPal's Affiliate Commission poaching scheme alleged herein.

279.     Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and do not have any interests antagonistic to those of other members of the Class or Subclasses.

280.     Plaintiffs have retained attorneys who are knowledgeable and experienced in consumer protection, class action, and complex litigation.

281.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Class and Subclasses predominate over those questions affecting only individual members. The common factual questions giving rise to common answers that move this litigation forward include:

a.   Whether PayPal, via the Honey Browser Extension, replaces the Affiliate IDs of Affiliate Marketers with PayPal's own Affiliate ID at checkout;

b.   Whether the Honey Browser Extension was knowingly designed to replace the Affiliate ID of Affiliate Marketers with PayPal's own Affiliate ID at checkout;

c.   Whether Affiliate Commissions were diverted from Class members to PayPal;

d.   Whether PayPal's interception of Affiliate Commissions interfered with the contracts and/or business relationships between Class members and Merchants;

e.   Whether PayPal intentionally circumvented browser code designed to prevent its

1          surreptitious replacement of Affiliate IDs;

2          f.    Whether PayPal created and implemented technological mechanisms to prevent the

3                detection of its theft of Affiliate Commissions from Plaintiffs and members of the

4                Class;

5          g.    Whether PayPal has been unjustly enriched to the detriment of the Class; and

6          h.    Whether Class members are entitled to declaratory, injunctive, or monetary relief,

7                and if so, in what amount and form.

8          282.    In addition, the class device is the superior mechanism for handling this action,

9    and a class trial is manageable.

10          283.    This action is also appropriate as a class action pursuant to Rule 23(b)(2) of the

11   Federal Rules of Civil Procedure because PayPal's use of the Honey Browser Extension impacts

12   Class and Subclass members in the same ways, and any injunctive relief awarded will affect the

13   Class and Subclass as a whole. Defendants, through their uniform conduct, acted or refused to act

14   on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to

15   the Class as a whole. Injunctive relief is necessary to uniformly protect the Class members' data.

16   Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

17          284.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification

18   because such claims present only particular, common issues, the resolution of which would

19   advance the disposition of this matter and the parties' interests therein. Such particular issues

20   include, but are not limited to:

21          a.    Whether PayPal, via the Honey Browser Extension, replaces the Affiliate IDs of

22                Affiliate Marketers with PayPal's own Affiliate ID at checkout; and

23          b.    Whether the Honey Browser Extension was knowingly designed to replace the

24                Affiliate ID of Affiliate Marketers with PayPal's own Affiliate ID at checkout.

25          285.    All applicable statute(s) of limitations have been tolled by Defendants' knowing

26   and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could

27   not have reasonably discovered Defendants' practice of surreptitiously replacing Affiliate IDs to

28   allow PayPal to take credit for sales it did not generate and Affiliate Commissions it did not earn.

286.    Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class members their practice of replacing Affiliate IDs which point to Affiliate Marketers as the source of a referral and substituting their own Affiliate IDs to appropriate Affiliate Commissions that belong to creators like Plaintiffs and Class members. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**COUNT ONE**
**Violation of the Computer Fraud and Abuse Act**
**(18 U.S.C. § 1030, _et seq._)**
**Asserted on Behalf of the Proposed Nationwide Class**

287.    Plaintiffs incorporate the allegations in paragraphs 1–286 by reference as if fully set forth herein.

288.    Defendants' actions, as alleged herein, constitute a breach of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

289.    18 U.S.C. § 1030(a)(4) makes it unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

290.    18 U.S.C. § 1030(a)(5)(A) makes it unlawful to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

291.    18 U.S.C. § 1030(a)(5)(C) makes it unlawful to "intentionally access[] a protected computer without authorization, and as a result of such conduct, cause[] damage and loss."

292.    "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

293.    The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

294.    The CFAA defines "loss" as "any reasonable cost to any victim, including… any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

295.    **Who:** Defendants have caused Plaintiffs and the Class to suffer damage and loss as understood within the meaning of 18 U.S.C. § 1030. Defendants have deceived consumers, Merchants, and Affiliate Networks to defraud Plaintiffs and the Class. **What:** Defendants caused damage through, without limitation, the impairment of the integrity and availability of Plaintiffs' and Class members' Affiliate IDs. **When:** Defendants caused such damage and loss since as early as 2020 when PayPal acquired Honey and continue to do so on an ongoing basis. **Where:** Defendants caused such damage and loss through practices described herein that were conceived, reviewed, approved, and enacted from PayPal's headquarters in San Jose, California. The harm and loss alleged herein occurred on consumers' browsers and computers across the United States and throughout the Affiliate Marketing system including Affiliate Network and Merchant systems. **How:** Defendants caused loss through an interruption of service constituted by, without limitation, overwriting Affiliate IDs and redirecting communications within the Affiliate Marketing attribution system. Defendants' actions without authorization, or in excess of authorization, caused damage and loss to Plaintiffs and the Class as a result of Affiliate Commissions being wrongfully paid to Defendants.

296.    Affiliate Marketing's unique system architecture differs from conventional systems where the injured party in a computer hacking is also the entity that is best positioned to technically grant or deny access to a potentially malicious actor. In other words, a malicious actor normally hacks a computer to injure or steal from the owner of that computer. Most security is set up to defend against this type of direct malicious attack. By contrast, PayPal's cookie stuffing scheme exploits the indirect and disconnected nature of the Affiliate Marketing system. Here, (1) the consumer's computer is where the Affiliate Marketer's ID is housed, but consumers lack knowledge or a financial incentive to defend their computers from attack and (2) the Affiliate Marketer is the victim of such a hacking, but makes no security decisions and cannot gather post-click networking data. For these reasons, Affiliate Marketing was vulnerable to abuse by PayPal.

297.    As described herein, PayPal implemented multiple covert systems to avoid detection by consumers and Affiliate Network auditors, and to circumvent both technical and practical security measures. PayPal employed these measures to hide its activities because it knew that consumers would not grant PayPal access to their computers and affiliate program participants would not grant PayPal access to the Affiliate Commission ecosystem if they knew about what PayPal was doing, let alone the full and true extent of what PayPal was doing.

298.    As discussed above, when a user clicked on the Honey Browser Extension pop-up (even to just dismiss it), PayPal surreptitiously injected a Secret Tab into the consumer's browser. This redirected the consumer's browser to a distinct URL and altered network traffic without the consumer's knowledge. PayPal does all of this to artificially simulate an affiliate referral to the Merchant's website. PayPal's behavior is "Browser Hijacking [or] Malicious Redirects," which, unknown to the consumer, redirects consumer URLs and "bypass[es] user consent to navigate the browser to potentially harmful or fraudulent platforms. . . . These exploits are typically delivered via rogue extensions."[59]

299.    Affiliate Networks implement manual and automated audits of browser extensions to enforce these extensive prohibitions, but PayPal has countered by implementing mechanisms designed to avoid detection. PayPal gathers extensive telemetry and network data on consumers who downloaded Honey. With this and other information, PayPal determines whether an end-user is most likely a consumer or alternatively may be a Network auditor, and changes its behavior accordingly. When PayPal identifies that a likely Network auditor clicks on Honey, then PayPal adheres to program requirements, specifically stand down. But when PayPal determines that a likely consumer has clicked on Honey, then Honey displaces the Affiliate IDs of Plaintiffs and the Class.

---

[59] Eric Wolkstein, *Browser Security: Top 5 Threats and How to Defend Your Organization*, Seraphic Security (Sep. 29, 2025), https://seraphicsecurity.com/learn/browser-security/browser-security-top-5-threats-and-how-to-defend-your-organization/.

300.    Without permission to access, alter, or damage Plaintiffs' Affiliate IDs, PayPal has created an elaborate scheme to make the dubious and false claim that it abides by stand down requirements, while evading detection and tricking system auditors. All this to steal the Affiliate Commissions that Plaintiffs and the Class have rightly earned.

301.    While consumers knowingly *installed* PayPal's Honey Browser Extension, any implied access authorization consumers provided could not have been knowing because PayPal never disclosed to, and concealed from, consumers what PayPal was doing. And while PayPal's concealment of what it was doing, alone, would be sufficient to vitiate any consent or implied access authorization by consumers, PayPal also fundamentally misled consumers about the nature of the Honey Browser Extension itself. PayPal promised that the extension "automatically tests every coupon code on the internet and applies the best one to your cart."[60] However, PayPal simultaneously promised Merchants that by partnering with Honey, Honey would convince consumers to stop searching for online discount codes, and Merchants could "control the [coupon] discount code" consumers applied.[61] PayPal thus omitted key information and misdescribed the nature of the extension and what it would do for consumers.

302.    Given PayPal's concealment from consumers about the Honey Browser Extension, any access to any computers that PayPal was granted was induced by deceit and is invalid.

303.    PayPal, through its Honey Browser Extension and associated software, knowingly and with intent to defraud, accessed without authorization, or in excess of authorization, the browsers and computers of consumers that downloaded its browser extension to further its cookie stuffing schemes, to destroy Plaintiffs' Affiliate IDs, and wrongfully obtain Plaintiffs' and Class members' Affiliate Commissions.

---

[60] *See* MegaLag, *Exposing the Honey Influencer Scam*, YouTube (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk&t=2s.

[61] *Id.*

304.    PayPal knowingly caused the transmission of its Honey Browser Extension and associated software, which intentionally caused damage to Plaintiff and Class Members Affiliate IDs without authorization to cause such damage.

305.    PayPal knowingly caused the transmission of its technological mechanism to circumvent stand down and associated software, which intentionally caused damage to Plaintiff and Class Members Affiliate IDs without authorization to cause such damage.

306.    PayPal intentionally accessed consumers' protected computers in excess of any authorization, or with invalid authorization, and as a result of such conduct caused damage and loss.

307.    Defendants acted without authorization, or exceeded authorization, when accessing consumers' computers and the computers involved in the Affiliate Marketing system by deceiving consumers, Merchants, and Affiliate Networks and by accessing and altering or removing Affiliate IDs that PayPal was not entitled to access and alter or remove. Defendants' access was unauthorized or was in excess of authorization because it secretly exceeded the scope of what could be reasonably anticipated based on PayPal's representations. Any access PayPal was granted is invalid because PayPal misdescribed the nature of the Honey Browser Extension in order to gain access to protected computers and defraud Plaintiffs and the Class.

308.    Consumers, Merchants, and Affiliate Networks could never have anticipated that PayPal would lie about its fundamental value proposition, disregard stand down rules to destroy the Affiliate IDs of Plaintiffs and the Class, impair the integrity of the Affiliate Marketing system, and implement a defeat device to avoid detection. Had PayPal disclosed the software permissions that its installer sets, it would never have been granted access to these protected computers. Any access PayPal was granted was fraudulently induced by deceit and is invalid.

309.    As described herein, PayPal surreptitiously injected a Secret Tab into the consumer's browser to avoid detection by the consumer. This Secret Tab acts to covertly redirect the consumer's browser to a distinct URL and then artificially simulate a last click for an affiliate marketing link. This artificial click causes the Merchant's website to replace Plaintiffs' and Class members' Affiliate IDs with PayPal's ID.

310.    As described herein, PayPal did not adhere to contractual and mandatory policy stand down rules that would have prevented PayPal from overwriting and thus destroying Plaintiffs' Affiliate IDs. As described herein, PayPal circumvented browser and adblocker security measures that disallow hidden redirects, pop-under tabs, and the unanticipated diversion of network traffic. Moreover, PayPal created a technological mechanism whereby if PayPal determined that the user was likely an Affiliate Network auditor, it would stand down, but when PayPal determined that the end user was likely a consumer, it would overwrite Plaintiffs' Affiliate IDs.

311.    PayPal did not request or receive from consumers the access that is necessary to destroy Plaintiffs' Affiliate IDs; indeed, consumers themselves do not have the access or authority to overwrite tracking codes. From a browser's settings, an ordinary computer owner can see the fact that tracking codes are installed and can delete them, but an ordinary computer owner cannot access and overwrite them. Specialized "developer tools" or other specialized software is needed to access and overwrite tracking codes.

312.    Without permission to access and destroy Affiliate IDs, PayPal used the techniques described herein to circumvent the technical restrictions in place to allow the Honey Browser Extension to artificially "trick" the consumer's browser and the Affiliate Marketing system into replacing the legitimate tracking codes of Plaintiffs and Class members with PayPal's illegitimate tracking codes.

313.    Consumers, Merchants, and Affiliate Networks did not authorize the Honey Browser Extension to operate in this manner or to alter this data and PayPal's cookie stuffing activities and associated practices are not disclosed in the Honey Browser Extension's terms of service, and are not otherwise disclosed in any way. PayPal's deception about the nature of the Extension and failure to disclose its cookie stuffing activities and associated practices voids and obviates any purported authorization for this activity stemming from consumers' installation of the Honey Browser Extension or acceptance into affiliate programs.

314.    PayPal's code is executed in the browsers of computers that are used in or affect interstate commerce, and thus meet the definition of "protected computer" under the CFAA.

315.    PayPal wrongfully overwrote Affiliate IDs, which impaired the integrity and availability of the data contained within the original Affiliate IDs that designated Plaintiffs and Class members as the proper recipient of Affiliate Commissions. PayPal's cookie stuffing scheme disrupted the affiliate commission attribution system, including communications between or among the Affiliate Marketer, consumers, the Merchant website, the Affiliate Networks, and Affiliate Network or Merchant servers that otherwise would have attributed the sale to a Class Member instead of PayPal.

316.    As a result of this interruption of service, Plaintiffs and Class members have lost substantial revenue from these valuable Affiliate Commissions that were improperly diverted to PayPal. In some cases, the amount in Affiliate Commissions that PayPal obtained is different than what Plaintiffs and Class members would have received. PayPal's conduct has caused Plaintiffs and Class members to suffer damage and loss well in excess of $5,000 during a year within the relevant period.

317.    Plaintiffs and the Class seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the CFAA, including disgorgement of PayPal's ill-gotten profits to the extent that the amount of PayPal's profits from diverting Affiliate Commissions exceeds the amount of Plaintiffs' damages.

**COUNT TWO**
**Unjust Enrichment**
**Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf**
**of the State Subclasses Under their Respective State's Laws**

318.    Plaintiffs incorporate the allegations in paragraphs 1–286 by reference as if fully set forth herein.

319.    In the alternative to those claims sounding in contract and seeking damages, Plaintiffs and Class members allege that there is no adequate remedy at law to address Defendants' conduct.

320.    Plaintiffs and Class members have an equitable interest in the Affiliate Commissions that PayPal improperly diverted to itself through the Honey Browser Extension.

These Affiliate Commissions were rightfully earned by Plaintiffs and Class members, not Defendants.

321.    Plaintiffs and Class members conferred a benefit on Defendants, because Plaintiffs and Class members unwittingly drove their own followers to PayPal when Plaintiffs and Class members sent those followers to Merchants' webpages, through their affiliate links and marketing efforts, where their followers made purchases resulting in Defendants' receipt of Affiliate Commission payments.

322.    Defendants benefitted from Affiliate Commission payments that were credited to them as a function of the Honey Browser Extension wrongfully representing to Merchants that Defendants, rather than Plaintiffs and Class members, should be assigned credit for product sales.

323.    Defendants understood that they so benefitted; i.e., that the Honey Browser Extension would cause the harm described herein because the Honey Browser Extension monitors for existing Affiliate IDs in a consumer's browser and is designed to overwrite any existing Affiliate IDs.

324.    Defendants should have reasonably expected to repay those Affiliate Commission payments to Plaintiffs and Class members, because Defendants know that Affiliate Marketers are entitled to Affiliate Commissions for driving traffic and sales to Merchants.

325.    But for Defendants' unjust and improper use of the Honey Browser Extension, they would not have been credited and awarded Affiliate Commissions on sales that emanated from Plaintiffs' and Class members' respective affiliate links.

326.    As a result of Defendants' wrongful conduct as alleged in this Complaint, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class members.

327.    As a result of Defendants' wrongful conduct as alleged in this Complaint, Defendants have received monies in the form of Affiliate Commissions and referral fees that rightfully belong to Plaintiffs and Class members.

328.    Defendants continue to benefit and profit from Plaintiffs and Class members directing prospective consumers to Merchants' websites through their affiliate links and

marketing efforts and driving them to make purchases that result in Defendants' receipt of Affiliate Commission payments, while Plaintiffs and Class members continue to have their rightful Affiliate Commissions diverted to Defendants.

329.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from the conduct alleged herein, including Defendants using the Honey Browser Extension to wrongfully credit themselves with referrals and Affiliate Commissions they did not rightfully earn.

330.    The monies and benefits conferred upon, received, and enjoyed by Defendants were not conferred officiously or gratuitously, and it would be inequitable, unconscionable, and unjust for Defendants to retain these monies and benefits.

331.    Equity and good conscience militate against permitting Defendants to retain the profits and benefits from their wrongful conduct, which should be restored to Plaintiffs and Class members.

332.    Plaintiffs and Class members lack an adequate remedy at law to recover the amounts that Defendants received from their wrongful conduct, including to the extent that Plaintiffs cannot recover the amounts that Defendants received from their wrongful conduct through their legal claims or it is determined that such a recovery under Plaintiffs' legal claims would be less prompt or certain than a recovery pursuant to equitable relief. In such a scenario, Plaintiffs and Class members would have an equitable entitlement to recover the amounts Defendants received given that, *inter alia*, Plaintiffs and Class members referred the consumers to the Merchants for the sales at issue; industry standards and fairness dictate that Plaintiffs and Class members are entitled to credit for these sales; and it would be inequitable for Defendants, who did not refer the consumers to the Merchants and obtained these amounts only by virtue of their systemic, deliberate misconduct alleged herein, to receive credit for these sales and retain these amounts.

333.    In the alternative to their legal damages, and in the case that legal damages are inadequate to remedy Plaintiffs' and Class members' harm, such as because the amount of PayPal's ill-gotten profits from diverting Affiliate Commissions exceeds Plaintiffs' and Class

members' damages, Plaintiffs seek equitable relief, including nonrestitutionary disgorgement of PayPal's profits in an amount to be determined at trial.

### COUNT THREE
### Intentional Interference with
### Prospective Economic Advantage
**Asserted on Behalf of the Proposed Nationwide Class
Under California law, and in the Alternative on Behalf
of the State Subclasses Under their Respective State's Laws**

334.    Plaintiffs incorporate the allegations in paragraphs 1–286 by reference as if fully set forth herein.

335.    Plaintiffs and Class members are engaged in ongoing economic relationships with Merchants to promote products and services to consumers in exchange for commissions. These include, but are not limited to, economic relationships with the Merchants listed above.

336.    As part of these relationships, Plaintiffs and Class Members promote Merchants' products and services and utilize affiliate links to refer consumers to products and services sold or offered by Merchants. In return, Merchants provide Plaintiffs and Class members with an Affiliate Commission payment if a consumer completes a transaction on the Merchant's website after navigating to the Merchant's website through an affiliate link associated with Plaintiffs and Class members. In other words, Plaintiffs and Class members refer their followers to Merchants through affiliate links in exchange for receiving an Affiliate Commission from the Merchant when a consumer uses their specific affiliate link to access the Merchant's website and complete a purchase of a product or service.

337.    These relationships are concrete and ongoing. Based on the length and extent of these relationships, Plaintiffs and Class members reasonably expect to continue earning Affiliate Commission payments in exchange for referring consumers to these Merchants.

338.    Defendants knew or reasonably should have known of the economic and business relationships between Merchants on the one hand and Plaintiffs and Class members on the other, whereby Plaintiffs and Class members promote and provide affiliate links to consumers for products or services on a Merchant's website in exchange for receiving an Affiliate Commission

from the Merchant for consumer transactions for which Plaintiffs and Class members provided the business opportunity.

339. Defendants knew that their conduct was certain or substantially certain to interfere with Plaintiffs' and Class members' business relationships with Merchants. Defendants knew that the Honey Browser Extension monitors and logs a consumer's browsing activity and understood that economic relationships such as those between Affiliate Marketers like Plaintiffs and Class members and Merchants are standard in the affiliate marketing industry.

340. Through use of the Honey Browser Extension, Defendants divert Affiliate Commission payments from Plaintiffs and Class members who promoted and shared affiliate links and generated referrals and sales of a Merchant's product or service. Defendants, via the Honey Browser Extension, overwrite Affiliate IDs that identify Affiliate Marketers like Plaintiffs and Class members as the source of the referral with Defendants' own Affiliate IDs and hold themselves out as the referrer of the specific products and/or services, even though the sale in question emanated from an Affiliate Marketer's affiliate link. This conduct is wrongful, improper, and without justification, including without limitation because it independently constitutes intentional interference with contractual relations, and violates the Computer Fraud and Abuse Act, California's Comprehensive Computer Data Access & Fraud Act, California's Unfair Competition Law,  New York's General Business Law, and Washington's Consumer Protection Act. This conduct is further wrongful, improper, and without justification because it contravenes existing standards and norms in the affiliate marketing industry that prohibit the use of cookie stuffing to divert Affiliate Commissions.

341. Defendants were aware that their actions were wrongful as evidenced by, *inter alia*, the stand down policies that Honey itself purportedly had in place prior to its acquisition by PayPal, as well as the stand down policies of Affiliate Networks, which PayPal was made aware that it was violating, as alleged above.

342. Defendants either desired to divert Affiliate Commissions from Plaintiffs and Class members to themselves through the conduct alleged herein or knew that the diversion of Plaintiffs and Class members' Affiliate Commissions was certain or substantially certain to occur

as a result of their conduct alleged herein. Specifically, Defendants understood that the Honey Browser Extension injects a Secret Tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with PayPal's Affiliate ID. Defendants further understood that Merchants rely on Affiliate IDs to determine which party should be credited with a consumer's purchase and awarded with an Affiliate Commission payment. Defendants knew that when a consumer navigated to a specific Merchant's website using an Affiliate Marketer's affiliate link and had the Honey Browser Extension activated, the Honey Browser Extension would overwrite the existing Affiliate Marketer's Affiliate ID with PayPal's Affiliate ID, resulting in Defendants, rather than the Affiliate Marketer, being credited for the sale and rewarded with any Affiliate Commission or referral fee.

343.    Plaintiffs' and Class members' economic relationships with Merchants were actually disrupted by Defendants' conduct because such conduct deprived Plaintiffs and Class members of the monies that they rightfully earned as the true originators of sales arising from their affiliate links.

344.    Defendants' conduct interfered with Plaintiffs' and Class members' business relationships with Merchants by causing Merchants to pay Defendants, instead of Plaintiffs and Class members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their promotion efforts and corresponding affiliate links.

345.    In at least some cases, Merchants paid Defendants a different amount of money than Plaintiffs and Class members would have received in Affiliate Commissions.

346.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Class members suffered economic injury by being deprived of Affiliate Commissions they should have earned from referrals through their affiliate links, pursuant to their business relationships with Merchants.

347.    As a result of the above conduct, Defendants are liable to Plaintiffs and Class members for damages in an amount to be determined at trial.

348.    In the alternative to their legal damages, and in the case that legal damages are inadequate to remedy Plaintiffs' harm, such as because the amount of PayPal's ill-gotten profits

from diverting Affiliate Commissions exceeds Plaintiffs' damages, Plaintiffs seek equitable relief, including nonrestitutionary disgorgement of PayPal's profits in an amount to be determined at trial.

<div align="center">

**COUNT FOUR**
**Intentional Interference with**
**Contractual Relations**
**Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf**
**of the State Subclasses Under their Respective State's Laws**

</div>

349.    Plaintiffs incorporate the allegations in paragraphs 1–286 by reference as if fully set forth herein.

350.    Plaintiffs and Class members are engaged in ongoing, valid contractual relationships with Merchants to promote products and services to consumers in exchange for Affiliate Commissions. These include, but are not limited to, contractual relationships with the Merchants listed above. Under the terms of these contracts, Plaintiffs and Class members promote Merchants' products and services and provide affiliate links to refer consumers to products and services sold or offered by Merchants. In return, Merchants provide Plaintiffs and Class members with an Affiliate Commission payment if a consumer completes a transaction on the Merchant's website after navigating to the Merchant's website through an affiliate link provided by Plaintiffs and Class members.

351.    Defendants knew or reasonably should have known of the contractual relationships between Merchants on the one hand and Plaintiffs and Class members on the other, under which Plaintiffs and Class members receive Affiliate Commissions from Merchants through affiliate links, because the Honey Browser Extension monitors and logs a consumer's browsing activity. Defendants further understood that contracts between Affiliate Marketers like Plaintiffs and Class members and Merchants for Affiliate Commissions are standard in the affiliate marketing industry. Specifically, Defendants knew that their Honey Browser Extension is designed to monitor and contemporaneously log detailed information about a consumer's browsing activity, including the full-string URL of each web page visited by a consumer. From these URLs, Defendants knew when a consumer navigated to a specific Merchant's website using a specific

Affiliate Marketer's affiliate link and thus knew of the existence of a commission-based economic relationship between the specific Merchant and the specific Affiliate Marketer.

352.     Through use of the Honey Browser Extension, Defendants divert Affiliate Commission payments from Plaintiffs and Class members who promoted and shared affiliate links and generated referrals and sales of a Merchant's product or service. Defendants, via the Honey Browser Extension, overwrite Affiliate IDs that identify Affiliate Marketers like Plaintiffs and Class members as the source of the referral with Defendants' own Affiliate IDs and falsely hold themselves out as the referrer of the specific products and/or services, even though the sale in question emanated from an Affiliate Marketer's affiliate link. This conduct, which interferes with Plaintiffs' and Class members' contractual relationships with Merchants, is wrongful, improper, and without justification including, without limitation, because it independently constitutes intentional interference with prospective economic advantage, and violates the Computer Fraud and Abuse Act, California's Comprehensive Computer Data Access & Fraud Act, California's Unfair Competition Law, New York's General Business Law, and Washington's Consumer Protection Act. This conduct is further wrongful, improper, and without justification because it contravenes existing standards and norms in the affiliate marketing industry, which prohibit the use of cookie stuffing to divert Affiliate Commissions.

353.     Defendants knew that a breach or disruption of Plaintiffs and Class members' contracts with Merchants was certain or substantially certain to occur as a result of its conduct alleged herein. Specifically, Defendants understood that their Honey Browser Extension injects a Secret Tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with PayPal's Affiliate ID. Defendants further understood that Merchants rely on Affiliate IDs to determine which party should be credited with a consumer's purchase and awarded with an Affiliate Commission payment. Defendants knew that when a consumer navigated to a specific Merchant's website using an online marketer's affiliate link and had the Honey Browser Extension activated, the Honey Browser Extension would overwrite the existing online marketer's Affiliate ID with Defendants' Affiliate ID, resulting in Merchants breaching their agreements with Plaintiffs and Class members by paying Defendants, instead of

Plaintiffs and Class members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their affiliate links.

354.    Defendants' conduct caused Merchants to breach their agreements with Plaintiffs and Class Members by paying Defendants, instead of Plaintiffs and Class members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their affiliate links.

355.    As a direct and proximate result of Defendants' interference with Plaintiffs' and Class members' contracts with Merchants, Plaintiffs and Class members suffered harm and economic injury by being deprived of Affiliate Commissions they should have rightfully received pursuant to their contracts with Merchants for providing referrals through their affiliate links. As a result of the above conduct, Defendants are liable to Plaintiffs and Class members for damages in an amount to be determined at trial.

356.    In the alternative to their legal damages, and in the case that legal damages are inadequate to remedy Plaintiffs' harm, such as because the amount of PayPal's ill-gotten profits from diverting Affiliate Commissions exceeds Plaintiffs' damages, Plaintiffs seek equitable relief, including nonrestitutionary disgorgement of PayPal's profits in an amount to be determined at trial.

## **COUNT FIVE**
### **California Comprehensive Computer Data Access & Fraud Act**
**(Cal. Penal Code § 502)**
**Asserted on Behalf of the Proposed Nationwide Class**
**Under California law, and in the Alternative on Behalf of the California Subclass**

357.    The Plaintiffs incorporate the allegations in paragraphs 1–286 by reference as if fully set forth herein.

358.    The California Comprehensive Computer Data Access & Fraud Act ("CDAFA") makes it unlawful to "knowingly access[] and without permission alter[], damage[], delete[], destroy[], or otherwise use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1).

359.    CDAFA also makes it unlawful to "knowingly access[] and without permission add[], alter[], damage[], delete[], or destroy[] any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(4).

360.    CDAFA also makes it unlawful to "knowingly introduce[] any computer contaminant into any computer, computer system, or computer network." Cal. Penal Code § 502(c)(8). CDAFA defines "computer contaminant" as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Cal. Penal Code § 502(b)(12).

361.    CDAFA provides that "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." Cal. Penal Code § 502(e)(1).

362.    PayPal uses its Honey Browser Extension to knowingly access and without permission alter, damage, delete, and/or destroy Plaintiffs and California Subclass members' tracking code data, in order to both (a) execute its unlawful and fraudulent scheme and (b) wrongfully control or obtain money, property, or data through the diversion of Affiliate Commissions that rightfully belong to Plaintiffs and California Subclass members.

363.    Plaintiffs and California Subclass members have an ownership interest in their Affiliate ID data that Defendants have modified, damaged, or destroyed through the Honey Browser Extension. Plaintiffs often create an Affiliate ID to include their own name or branding. Plaintiffs own the affiliate links and Affiliate IDs because Affiliate Marketers create the affiliate links that consumers click and take extensive aforementioned steps to ensure that the Affiliate ID is in fact populated in the consumer's cookies. While affiliate links are generated from an Affiliate Network or Merchant-provided tool, Affiliate Marketers use that tool, modify the link, position and embed this link, and create and promote content so a consumer may click on the affiliate link that populates the Affiliate ID in the consumer's browser. Plaintiffs and California Subclass members

also have an ownership interest in the content they create and publish in connection with their affiliate marketing activities, which includes the affiliate links and Affiliate ID data that they embed in that content.

364.   Through the Honey Browser Extension, PayPal knowingly accesses and without permission adds, alters, damages, deletes, and/or destroys the tracking code data of California Plaintiffs and California Subclass members, which resides on covered computer systems.

365.   PayPal did not request or receive permission from consumers, Affiliate Networks, Merchants, Plaintiffs or California Subclass members to add, alter, damage, delete, or destroy the tracking code data residing on consumers' browsers. PayPal did not request or receive permission to divert the Affiliate Commissions of Plaintiff and California Subclass members to PayPal. PayPal did not request or receive access necessary to alter Affiliate IDs through its Terms of Service, and because its redirecting technique circumvented the technical restrictions modern browsers have in place via browser security policies that block or limit classic cookie-stuffing methods like pop-ups, hidden images, and iframes. PayPal also did not request or receive access necessary to alter Affiliate IDs because consumers themselves do not have that access and cannot themselves overwrite tracking codes. From a browser's settings, an ordinary computer owner can see the fact that tracking codes are installed and can delete them, but an ordinary computer owner cannot access and overwrite them. Specialized "developer tools" or other specialized software is needed to access and overwrite tracking codes.

366.   Without access or permission to alter Affiliate IDs, as set forth above, PayPal implemented a sophisticated redirecting technique to circumvent the technical restrictions in place, like browser security policies, to allow the Honey Browser Extension to artificially "trick" the consumer's browser and the online merchant's website into replacing the legitimate tracking codes of Plaintiffs and Class members with PayPal's illegitimate tracking codes.

367.   As described herein, when the consumer activated the Honey Browser Extension, PayPal surreptitiously injected a Secret Tab into the consumer's browser to avoid detection by the consumer. This tab acts to covertly redirect the consumer's browser to a distinct URL and then artificially simulate a last click from an Affiliate Marketing link within this hidden tab. This

1    artificial click causes the Merchant's website to replace Plaintiffs' and Class members' Affiliate

2    IDs with PayPal's ID.

3        368.    PayPal's cookie stuffing activities and associated practices are not disclosed in the

4    Honey Browser Extension's terms of service, or in any information disclosed to consumers who

5    install the extension.

6        369.    Defendants acted without authorization, or exceeded authorization, when accessing

7    consumers' computers and the computers involved in the Affiliate Marketing system by deceiving

8    consumers, Merchants, and Affiliate Networks and by accessing and altering or removing Affiliate

9    IDs that PayPal was not entitled to access and alter or remove. Defendants' access was unauthorized

10    or was in excess of authorization because its access went far beyond the scope of what could be

11    reasonably anticipated based on PayPal's representations. Any access PayPal was granted is invalid

12    because it blatantly misdescribed the nature of the Honey Browser Extension in order to gain access

13    to protected computers and defraud Plaintiffs and the Class.

14        370.    As a result of PayPal's unlawful scheme, Plaintiffs and California Subclass

15    members have lost substantial revenue from Affiliate Commissions that were improperly diverted

16    to PayPal. In at least some cases, the amount in Affiliate Commissions that PayPal obtained is

17    different than what Plaintiffs and California Subclass members would have received.

18        371.    Plaintiffs and California Subclass members seek compensatory damages,

19    injunctive relief, and all other legal or equitable relief available under the CDAFA, including

20    disgorgement of PayPal's profits to the extent that the amount of PayPal's ill-gotten profits from

21    diverting Affiliate Commissions exceeds Plaintiffs' damages. Since PayPal's conduct is willful

22    and fraudulent, Plaintiff and California Subclass members seek punitive or exemplary damages,

23    as available under CDAFA.

24                            **COUNT SIX**
                **Violation of the California Unfair Competition Law**
25                  **(Cal. Bus. & Prof. Code § 17200, *et seq.*)**
            **Asserted on Behalf of the Proposed Nationwide Class Under**
26        **California law, and, in the Alternative, on Behalf of the California Subclass**

27        372.    Plaintiffs incorporate the allegations in paragraphs 1–286 by reference as if fully

28    set forth herein.

373. In the alternative to those claims seeking damages, Plaintiffs and California Subclass members allege that there is no adequate remedy at law to address Defendants' conduct.

374. California's Unfair Competition Law ("UCL") defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq*.

375. Defendants have engaged in acts and practices that are unlawful and unfair in violation of the UCL.

376. Defendants are each a "person" as defined by Cal. Bus. & Prof. Code § 17201.

**Unlawful**

377. Defendants' business acts and practices are unlawful, in violation of the UCL, because they violate the CFAA, CDAFA, and interfere with the prospective economic advantage and existing contractual relations of Affiliate Marketers, as set forth herein. They also have unjustly enriched Defendants for the reasons stated below and constitute intentional interference with prospective economic advantage, intentional interference with contractual relations, and unjust enrichment.

**Unfair**

378. Defendants committed unfair business practices by using the Honey Browser Extension to overwrite Plaintiffs' and California Subclass members' Affiliate IDs in order to steal credit for sales referrals and thereby receive Affiliate Commission payments that rightfully belong to Plaintiffs and California Subclass members.

379. Defendants' conduct is unfair in violation of the UCL because it violates California's public policy against interfering with another's prospective economic advantage. *See* 5 Witkin, Summary 11th Torts § 854 (2024). Defendants' conduct is also unfair in violation of the UCL because it significantly harms or threatens competition in the Affiliate Marketing industry by contravening industry standards and norms that prohibit cookie stuffing or similar methods to wrongfully secure Affiliate Commissions.

380.   Defendants, though the operation of the Honey Browser Extension, wrongfully deprive Plaintiffs and California Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate links.

381.   The gravity of harm resulting from Defendants' practice of appropriating Affiliate Commissions that belong to Affiliate Marketers like Plaintiffs and California Subclass members outweighs any potential utility therefrom. Defendants' conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

382.   Defendants actually and proximately caused harm to Plaintiffs and California Subclass members in that, among other things, they suffered economic injury by being deprived of Affiliate Commissions they should have earned from referrals through their affiliate links and suffered a loss of property by being deprived of their Affiliate IDs.

383.   The conduct alleged herein is continuing and there is no indication that Defendants will cease such activity in the future.

384.   Defendants' conduct in violation of the UCL has caused Plaintiffs and California Subclass members to be deprived of Affiliate Commission payments for sales they rightfully originated. Plaintiffs and California Subclass members thus suffered lost money or property as a result of Defendants' conduct.

385.   Plaintiffs therefore seek restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

386.   Plaintiffs and Class members lack an adequate remedy at law to recover the amounts that Defendants received from their UCL violations to the extent it is determined that Plaintiffs and Class members did not have a contractual entitlement, or other legal entitlement such as under the CFAA or CDAFA, to the Affiliate Commissions. In such a scenario, Plaintiffs and Class members would still have an equitable entitlement to recover the amounts Defendants received given that, *inter alia*, Plaintiffs and Class members referred the consumers to the Merchants for the sales at issue; industry standards and fairness dictate that Plaintiffs and Class members are entitled to credit for these sales; and it would be inequitable for Defendants, who did not refer the consumer to the Merchant and obtained these amounts only by virtue of their

systemic, deliberate misconduct alleged herein, to receive credit for these sales and retain these amounts.

387.   Plaintiffs and Class members lack an adequate remedy at law to stop Defendants' violations (i.e., to obtain the injunctive relief they seek by this claim) to the extent that, under Plaintiffs' legal claims, such relief is not available (for Plaintiffs, the Class or any of the Subclass(es)) or can only provide something less than Defendants completely ceasing their misconduct alleged herein. The UCL gives courts broad equitable power to "make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." Cal. Bus. & Prof. Code § 17203.

### COUNT SEVEN
### Violation of the Washington Consumer Protection Act
**(Wash. Rev. Code §§ 19.86.010, *et seq.*)**
**Asserted on Behalf of the Washington Subclass**

388.   Plaintiffs incorporate the allegations in paragraphs 1–286 by reference as if fully set forth herein.

389.   Plaintiffs, Washington Subclass members, and Defendants are each natural persons, corporations, trusts, unincorporated associations or partnerships, and are thus "persons" within the meaning of RCW § 19.86.010(1).

390.   Defendants engaged in trade or commerce directly or indirectly affecting the people of Washington by allowing operation and use of the Honey Browser Extension in Washington.

391.   Defendants' unlawful acts and practices occurred in connection with their operation of the Honey Browser Extension, in commerce directly or indirectly affecting the people of the state of Washington.

392.   Defendants maintained and operated the Honey Browser Extension in such a manner as to appropriate Affiliate Commissions to which Affiliate Marketers are rightfully entitled by overwriting their Affiliate IDs with Defendants' own Affiliate IDs.

393.    Defendants, though the operation of the Honey Browser Extension, wrongfully deprive Plaintiffs and Washington Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate links.

394.    Defendants engaged in unfair acts that affect the public interest by maintaining and operating the Honey Browser Extension in such a manner as to appropriate Affiliate Commissions to which Affiliate Marketers are rightfully entitled by overwriting and replacing their Affiliate IDs with PayPal's Affiliate IDs in the United States, including Washington. Defendants' conduct is unfair because it offends Washington's public policy against intentional interference with contractual relationships. Defendants' conduct is further unfair and affects public policy because it because it contravenes existing standards and norms in the Affiliate Marketing industry that prohibit the use of cookie stuffing to divert Affiliate Commissions; is immoral, unethical, oppressive, or unscrupulous; and caused substantial harm that greatly outweighs any possible utility from the conduct.

395.    PayPal's conduct directly and substantially impacted consumers and the public at large. PayPal stopped consumers from achieving their goal of paying Affiliate Marketers when they use their affiliate links to complete a purchase. PayPal also deceived consumers about how the Honey Browser Extension operated and made money as evidenced by the fact that millions of users reportedly uninstalled Honey after the scheme came to light.

396.    The gravity of harm resulting from Defendants' practice of appropriating Affiliate Commissions that belong to Affiliate Marketers like Plaintiffs and Washington Subclass members outweighs any potential utility therefrom. Defendants' conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

397.    Defendants' unfair acts have injured a substantial portion of the public. Defendants' general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

398.    As a direct and proximate result of Defendants' unfair conduct, Plaintiffs and Washington Subclass members suffered injury in fact. Absent Defendants' maintenance and operation of the Honey Browser Extension in such a manner as to overwrite existing Affiliate

IDs, Plaintiffs and Washington Subclass members would not have been deprived of Affiliate Commissions they should have rightfully received for providing referrals through their affiliate links.

399.    As a result of Defendants' conduct, Plaintiffs and Washington Subclass members have suffered actual damages.

400.    The conduct alleged herein is continuing and there is no indication that Defendants will cease such activity in the future.

401.    Plaintiff and Washington Subclass members are entitled to an order enjoining the conduct complained of herein and ordering Defendants to take remedial measures to stop its conduct; actual damages; treble damages pursuant to RCW 19.86.090; costs of suit, including reasonable attorneys' fees; and such further relief as the Court may deem proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek that this matter be certified as a class action, and that their attorneys be appointed Class Counsel and that they be appointed Class Representatives, and Plaintiffs demand judgment against Defendants as follows:

402.    Awarding Plaintiffs and the proposed Class and the Subclasses actual damages, statutory damages, restitution, disgorgement of profits, attorneys' fees and costs, and any other relief that may be permitted by law or equity pursuant to the claim(s) for relief;

403.    Permanently enjoining PayPal from engaging in the misconduct alleged herein;

404.    Awarding Plaintiffs and the proposed Class and Subclasses pre-judgment and post-judgment interest pursuant to the claim(s) for relief;

405.    Awarding Plaintiffs and the proposed Class and Subclasses costs, expenses, and attorneys' fees as permitted by law;

406.    Awarding Plaintiffs and the proposed Class and Subclasses punitive, exemplary, and treble damages as permitted by law;

407.    Awarding Plaintiffs and the proposed Class and Subclasses further relief as the Court may deem just and proper under the circumstances.

1

### **DEMAND FOR JURY TRIAL**

2     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

3     jury trial for all claims so triable.

Dated:  January 5, 2026

4                                                          By:    */s/ Roger N. Heller*

5                                                          Elizabeth J. Cabraser (SBN 083151)
                                                          Roger N. Heller (SBN 215348)
6                                                          **LIEFF CABRASER HEIMANN &**
                                                          **BERNSTEIN, LLP**
7                                                          275 Battery Street, 29th Floor
                                                          San Francisco, CA 94111-3339
8                                                          Telephone: (415) 956-1000
                                                          ecabraser@lchb.com
9                                                          rheller@lchb.com

10                                                         Jason L. Lichtman (*pro hac vice*)
                                                          Sean A. Petterson (*pro hac vice*)
11                                                         Danna Z. Elmasry (*pro hac vice*)
                                                          **LIEFF CABRASER HEIMANN &**
12                                                         **BERNSTEIN, LLP**
                                                          250 Hudson Street, 8th Floor
13                                                         New York, New York 10013-1413
                                                          Telephone: (212) 355-9500
14                                                         jlichtman@lchb.com
                                                          spetterson@lchb.com
15                                                         delmasry@lchb.com

16                                                         Dena C. Sharp (SBN 245869)
                                                          Trevor T. Tan (SBN 281045)
17                                                         Nina Gliozzo (SBN 333569)
                                                          Anthony Rogari (SBN 353784)
18                                                         **GIRARD SHARP LLP**
                                                          601 California Street, Suite 1400
19                                                         San Francisco, CA 94108
                                                          Telephone: 415.981.4800

20                                                         Nanci E. Nishimura (SBN 152621)
                                                          Thomas E. Loeser (SBN 202724)
21                                                         Karin B. Swope (*pro hac vice*)
                                                          Andrew J. Fuller (*pro hac vice*)
22                                                         Jacob M. Alhadeff (*pro hac vice*)
                                                          **COTCHETT, PITRE & McCARTHY, LLP**
23                                                         840 Malcolm Rd #200,
                                                          Burlingame, CA 94010
24                                                         Telephone: 650.697.6000

25                                                              *Interim Co-Lead Counsel*

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: January 5, 2026

*/s/ Roger N. Heller*
Roger N. Heller

1

## **CERTIFICATE OF SERVICE**

2   I hereby certify that a true and correct copy of the foregoing was duly served upon all

3 Counsel of record in this action via electronic filing, in accordance with the Federal Rules of Civil

4 Procedure, on January 5, 2026.

           _/s/ Roger N. Heller_

5

           Roger N. Heller

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO. 5:24-CV-9470-BLF