CLEMENT S. ROBERTS (SBN 209203)
croberts@orrick.com
GEOFFREY MOSS (SBN 258827)
gmoss@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 949 567 6700
Facsimile:    +1 949 567 6710

RICHARD A. JACOBSEN (admitted *pro hac vice*)
MARC R. SHAPIRO (admitted *pro hac vice*)
JENNIFER KEIGHLEY (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:    +1 212 506 5000
Facsimile:    +1 212 506 5151

*Attorneys for Defendant*
PAYPAL, INC. AND PAYPAL HOLDINGS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION | Case No. 5:24-cv-09470-BLF |
| | **DEFENDANTS PAYPAL, INC.'S AND PAYPAL HOLDINGS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT, AND THEIR MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date:    June 4, 2026 |
| | Time:    9:00 AM |
| | Judge:    Honorable Beth Labson Freeman |
| | Dept:    Courtroom 1, 5th Floor |

# **TABLE OF CONTENTS**

**INTRODUCTION AND ISSUES TO BE DECIDED** ...................................................1

**FACTUAL BACKGROUND** ..........................................................................................2

    A.   Honey benefits both Consumers and Merchants. ..........................................2

    B.   Honey receives commissions through the industry's last click attribution rules. ....... 2

        1.   Merchants determine which attribution model to employ ............................2

        2.   Affiliate Networks employ their own policies and practices to facilitate partnerships between Merchants and Affiliate Marketers .............................4

    C.   Plaintiffs allege they are contractually entitled to commissions that are sent to Honey and other major browser extensions. ................................................. 5

**ARGUMENT** ...................................................................................................................5

I.    Plaintiffs Do Not Plausibly Allege Article III Standing ................................................5

    A.   Plaintiffs do not plausibly allege that they were contractually entitled to the relevant commissions. ..................................................................................... 6

    B.   Plaintiffs do not plausibly allege that they would have earned more commissions but for Honey's alleged conduct. ...................................................... 9

II.   Plaintiffs Fail To State Claims Under The CFAA Or CDAFA ...................................12

    A.   Plaintiffs' prior admissions that users grant PayPal permission for the alleged unlawful conduct dooms their CFAA and CDAFA claims. .................................. 12

    B.   Plaintiffs still have not alleged any technological "loss" or "damage." .................. 14

III.  Plaintiffs Fail To State Claims For Intentional Interference (Counts III and IV) .................15

    A.   Plaintiffs fail to plead acts designed to disrupt Plaintiffs' relationship or actual disruption of such relationships. ................................................................. 15

    B.   If the Court dismisses Plaintiffs' other claims, their interference claims fail for lack of an independently wrongful act. ................................................................. 19

IV.  Plaintiffs Cannot State A Claim For Unjust Enrichment (Count II) .....................................20

V.   Plaintiffs' Claim Under California's Unfair Competition Law Fails (Count VI) .................21

    A.   Plaintiffs fail to plead any wrongful conduct. ........................................................ 21

    B.   Plaintiffs fail to plausibly allege they lack adequate alternative legal remedies. ....... 22

VI.  Plaintiffs' Claim Under Washington's Consumer Protection Act Fails (Count VII) .............23

    A.   Plaintiffs fail to plead any wrongful conduct. ........................................................ 23

    B.   Plaintiffs do not allege substantial consumer or public-interest harm. ..................... 23

**CONCLUSION** ...........................................................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

*In re Accellion, Inc. Data Breach Litig.*,
   713 F. Supp. 3d 623, 630 (N.D. Cal. 2024), ................................................................. 20

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,
   28 Cal. App. 5th 923 (2018) ........................................................................................... 21

*Andrews v. Sirius XM Radio Inc.*,
   932 F.3d 1253 (9th Cir. 2019) ........................................................................................ 14

*Bui-Ford v. Tesla, Inc.*,
   2024 WL 694485 (N.D. Cal. Feb. 20, 2024) .................................................................. 14

*Castillo v. Walmart, Inc.*,
   2025 WL 1828465 (N.D. Cal. July 1, 2025) .................................................................. 23

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) .............................................................................................. 21, 22

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................................. 10, 11

*Cottle v. Plaid Inc.*,
   536 F. Supp. 3d 461 (N.D. Cal. 2021) ............................................................................ 14

*Doe v. Cnty. of Santa Clara*,
   2024 WL 3346257 (N.D. Cal. July 8, 2024) .................................................................. 14

*Doe v. Santa Clara Cnty. Dep't of Health & Hum. Servs.*,
   2024 WL 4050396 (N.D. Cal. Sept. 3, 2024) ................................................................... 7

*Gill v. Marsh USA, Inc.*,
   2024 WL 3463351 (N.D. Cal. July 18, 2024) ................................................................ 21

*Hadley v. Kellogg Sales Co.*,
   243 F. Supp. 3d 1074 (N.D. Cal. 2017) .......................................................................... 21

*Hambrick v. Healthcare Partners Med. Grp., Inc.*,
   238 Cal. App. 4th 124 (2015) ......................................................................................... 23

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
   810 F. Supp. 2d 1013 (C.D. Cal. 2011) .......................................................................... 22

*Ixchel Pharma, LLC v. Biogen Inc.*,
   2017 WL 4012337 (E.D. Cal. Sept. 12, 2017) ............................................................... 19

*Jacobs v. Sustainability Partners LLC*,
  2020 WL 5593200 (N.D. Cal. Sept. 18, 2020) ........................................................ 20

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ............................................................................ 19, 20

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
  729 F. App'x 528 (9th Cir. 2018) ...................................................................... 19

*Levitt v. Yelp! Inc.*,
  765 F.3d 1123 (9th Cir. 2014) .......................................................................... 21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 6

*Mendez v. Selene Fin. LP*,
  2017 WL 1535085 (C.D. Cal. Apr. 27, 2017) ...................................................... 22

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  605 F. Supp. 3d 1218 (N.D. Cal. 2022) ............................................................ 12

*Moncada v. W. Coast Quartz Corp.*,
  221 Cal. App. 4th 768 (2013) .......................................................................... 13

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ...................................................................................... 11

*NovelPoster v. Javitch Canfield Grp.*,
  140 F. Supp. 3d 938 (N.D. Cal. 2014) .............................................................. 14

*Nowak v. Xapo, Inc.*,
  2020 WL 6822888 (N.D. Cal. Nov. 20, 2020) ...................................................... 14

*Oakley, Inc. v. Nike, Inc.*,
  988 F. Supp. 2d 1130 (C.D. Cal. 2013) ............................................................ 16

*Pech v. Doniger*,
  75 Cal. App. 5th 443 (2022) .......................................................................... 19

*Redfearn v. Trader Joe's Co.*,
  20 Cal. App. 5th 989 (2020) .......................................................................... 19

*Rhynes v. Stryker Corp.*,
  2011 WL 2149095 (N.D. Cal. May 31, 2011) ...................................................... 23

*Rosenthal & Rosenthal of California, Inc. v. Hilco Trading, LLC*,
  2020 WL 12948055 (C.D. Cal. Dec. 29, 2020) .................................................... 16

*S/Y Paliador, LLC v. Platypus Marine, Inc.*,
  750 F. Supp. 3d 1187 (W.D. Wash. 2024) .......................................................... 23

*Sicor Ltd. v. Cetus Corp.*,
    51 F.3d 848 (9th Cir. 1995)............................................................................................ 13

*Snapkeys, Ltd. v. Google LLC*,
    2020 WL 6381354 (N.D. Cal. Oct. 30, 2020)............................................................ 21

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020).................................................................................... 20

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................................... 5

*Stearns v. Select Comfort Retail Corp.*,
    763 F. Supp.2d 1128 (N.D. Cal. 2010) ...................................................................... 13

*Stiegler v. Saldat*,
    2015 WL 13686087 (W.D. Wash. Oct. 23, 2015) ...................................................... 24

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................................................... 12

*United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*,
    766 F.3d 1002 (9th Cir. 2014).................................................................................... 15

*United States v. Wyatt*,
    408 F.3d 1257 (9th Cir. 2005).............................................................................. 14, 15

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) .................................................................................................... 12

*Van Buren v. United States*,
    593 U.S. 374 (2021) .................................................................................................... 14

**Statutes**

18 U.S.C. § 1030............................................................................................ 12, 14, 15

Cal. Penal Code § 502 ........................................................................................ 12, 14

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2

  **PLEASE TAKE NOTICE** that on June 4, 2026, at 9:00 AM, or at such later date and time

3

as the Court may order, Defendants PayPal, Inc. and PayPal Holdings, Inc. ("PayPal" or

4

"Defendants"), will and hereby do move to dismiss Plaintiffs' Second Amended Complaint

5

("SAC"). This Motion is based on this Notice of Motion, the accompanying Memorandum of Points

6

and Authorities, the pleadings and records on file in this case, all matters of which the Court may

7

take judicial notice, PayPal's Request for Judicial Notice, and any other matter that the Court may

8

properly consider. Defendants seek an order pursuant to Federal Rule of Civil Procedure 12(b)(1)

9

dismissing the SAC with prejudice for lack of subject-matter jurisdiction, or, alternatively, an order

10

pursuant to Rule 12(b)(6) dismissing the SAC with prejudice for failure to state a claim.

11

**MEMORANDUM OF POINTS AND AUTHORITIES**

12

**INTRODUCTION AND ISSUES TO BE DECIDED**

13

14

  Plaintiffs' attempts to remedy the deficiencies in their First Amended Complaint ("FAC")

15

only highlight the fundamental flaws in their case. Tasked with substantiating their allegations with

16

actual contract language, two-thirds of the Plaintiffs voluntarily dismissed their claims. Even as to

17

the curated lot that remains, the language of their contracts fails to support their claims.

18

  Plaintiffs' argument that Honey does not cause a valid "last click" is contradicted by (1) the

19

contracts themselves, which demonstrate that a wide variety of affiliate links—including those

20

originating from browser extensions—can qualify for commissions, and (2) Merchants' and

21

Affiliate Networks' decision to partner with Honey and other browser extensions for nearly a

22

decade. While Plaintiffs portray Honey as surreptitious malware, the reality is Merchants and

23

Affiliate Networks are well aware of how Honey functions in choosing to partner with it. As this

24

Court noted at the prior Motion to Dismiss hearing, "if the Merchant promises many different

25

competing parties commissions and is fully on board with what Honey is doing, then Honey hasn't

26

done anything wrong." MTD Tr. 39:8-11. The contract language shows just that. As with their

27

FAC, Plaintiffs are alleging nothing more than frustration with how the industry works, and with

28

Merchants' and Affiliate Networks' decision to partner with Honey. Without any cognizable injury,

DEFENDANTS' MOTION TO DISMISS SAC
5:24-CV-09470-BLF

1   Plaintiffs still lack Article III standing, and the SAC should be dismissed on that basis alone.

2       Plaintiffs' attempt to remedy their inability to allege an injury by pointing to new alleged

3   violations related to Honey's "stand down" practices is unavailing. The contract language Plaintiffs

4   rely on does not support their interpretation of the stand down policies because the language was

5   either not in effect during the relevant period or doesn't require the behavior Plaintiffs allege it

6   requires. Plaintiffs' computer claims fail because they already admitted that Honey had permission

7   from all users for the challenged conduct. And Plaintiffs do not state a claim for intentional

8   interference because they cannot show their contracts entitle them to commissions over PayPal.

9   Plaintiffs' adequate legal remedies mean their unjust enrichment claim also cannot proceed. Finally,

10  Plaintiffs' derivative consumer protection and unfair competition claims fail for many of the same

11  collective reasons. This Court should grant PayPal's motion to dismiss, this time with prejudice.

## FACTUAL BACKGROUND

### A.   Honey benefits both Consumers and Merchants.

14      PayPal's Honey browser extension is a free, downloadable extension shoppers can install

15  on their web browsers to look for deals and earn rewards while shopping at participating Merchant

16  sites. SAC ¶ 9. Consumers who download Honey see a pop-up at checkout when they make a

17  purchase on participating websites. *Id.* If they click on the pop-up, Honey tells them if there is a

18  coupon or better deal available, or if they can obtain cashback through Honey's rewards program.

19  *Id.* Millions of consumers have downloaded Honey to obtain coupons and rewards. *Id.* ¶¶ 9, 78, 84.

20      Merchants enter into contractual agreements with Honey—sometimes acting through

21  intermediaries who support their affiliate programs known as Affiliate Networks—to provide

22  Honey commissions for qualifying sales "when a member uses Honey to find available savings or

23  to activate PayPal Rewards." *See How does Honey make money?*, PayPal Honey,

24  https://help.joinhoney.com/article/30-how-does-honey-make-money (last updated Nov. 25, 2024).

25  They do so because Honey drives sales that might otherwise not have been completed.

### B.   Honey receives commissions through the industry's last click attribution rules.

### 1.   Merchants determine which attribution model to employ

28  Affiliate Marketers or "affiliates" partner with Merchants to promote their products in return

for a commission on certain qualifying sales. Focused on driving website traffic and sales conversions, stakeholders within the affiliate ecosystem drive value to Merchants in a multitude of ways. To account for that, Merchants use various attribution models to assign credit for a qualifying sale to Affiliate Marketers. SAC ¶¶ 46, 66. According to Plaintiffs, Merchants primarily use the "last click" attribution model. *Id.* ¶ 46. That model attributes the entire credit for a sale to the Affiliate Marketer whose "link was the last link that a consumer followed to arrive at the Merchant's website prior to purchase." *Id.* Last click attribution makes it easier for Merchants to ascertain quickly who is entitled to credit for a purchase. But Plaintiffs' own sources recognize this method disregards contributions of affiliates further up the marketing "funnel." *Digital Attribution Primer 2.0*, iab at 2, SAC ¶ 63 n.10. For instance, the SAC acknowledges that if a consumer clicks on an Affiliate Marketer's link but later "click[s] another Affiliate Marketer's affiliate link for the same product, … that 'last clicked' Affiliate Marketer would get the credit." SAC ¶ 100. Plaintiffs allege that the "common understanding" of last click attribution "does not refer to actions that the consumer takes on the Merchant's website." *Id.* ¶¶ 64, 76-77.

The sources Plaintiffs cite, however, describe last click attribution as assigning credit to any "last touchpoint" before a conversion, not just a consumer's literal last click before arriving at a Merchant's page. *See Digital Attribution Primer 2.0*, *supra*, at 2 ("100% credit" is given "to the last meaningful event before a desired outcome takes place, generally the last ad impression (sometimes called ad view), last click, or last engagement"). Further, the contracts Plaintiffs cite do not reflect any "common understanding" that last click attribution refers solely to "the last Affiliate Marketer who drives the consumer to a Merchant's website." SAC ¶ 237. Instead, the definition of what constitutes a qualifying "click" for attribution purposes varies across these contracts, including in several instances by cross-referencing other controlling contracts Plaintiffs fail to cite in their SAC. For example, Plaintiffs cite to a representative contract from Merchant Bergdorf Goodman (the "Bergdorf Contract") explaining that the "Merchant agrees to pay Affiliate the commission specified in the [affiliate contract]…if that Customer has accessed Merchant's site and purchased the product or service via a Qualifying Link." *Id.* ¶ 5 (alteration in original). But what this provision actually says is that the Merchant agrees to pay "the commission specified in

the Engagement" between the Merchant and the Affiliate Marketer, and Plaintiffs do *not* include a copy of that Engagement. The Bergdorf Contract makes clear that "[a]ll determinations of Qualifying Links and whether a commission is payable will be made by the LinkShare Network, *subject to the Engagement*, as determined by Merchant, in its sole discretion, and will be final and binding on both Merchant and Affiliate." *See* Ex. B (emphasis added). The Bergdorf Contract, in addition to various other contracts cited by Plaintiffs, suggests that Plaintiffs' "common understanding" of the last click attribution model is not so common.

Merchants determine who is entitled to receive credit for qualifying purchases based on "affiliate IDs"—unique identifiers Merchants assign to affiliates. SAC ¶ 51. To receive credit for qualifying sales, when a consumer clicks on Honey, Honey opens another tab which reloads the Merchant's website—a process that occurs whether or not there was an earlier-in-time Affiliate Link present. *Id.* ¶ 10. When a Merchant uses last click attribution, *the Merchant's website* replaces any other affiliate ID previously loaded onto the consumer's browser with PayPal's affiliate ID. *Id.* ¶ 114. If the consumer completes the purchase without interacting with any other affiliate, Honey may receive a commission. *Id.* ¶ 62.

### 2. Affiliate Networks employ their own policies and practices to facilitate partnerships between Merchants and Affiliate Marketers

In most cases, Affiliate Marketers enter into agreements with Merchants through Affiliate Networks. SAC ¶¶ 2-3. These Affiliate Networks facilitate many aspects of the Affiliate Marketing ecosystem, including providing the Affiliate Links and creating "standards defining when Affiliate Marketers must be paid, and what activities are prohibited." *Id.* ¶¶ 51-52, 241. Affiliate Networks each have their own Terms and Conditions to which Merchants and Affiliate Marketers must assent to participate in the Network. *Id.* ¶¶ 50-51, 67. Contrary to Plaintiffs' assertions regarding the surreptitious nature of the Honey functionality, most Affiliate Networks specifically reference browser extensions and other software applications in their Terms and Conditions, including some of the largest: Commission Junction (*id.* ¶ 249), LinkConnector (*id.* ¶ 245), Impact (*id.* ¶ 250), Awin (*id.* ¶ 246), AvantLink (*id.* ¶ 244) and Rakuten (*id.* ¶ 248).

In certain instances, Affiliate Network agreements or guidelines may include "stand

down" protocols. These policies are intended to prevent Affiliate Marketers from overwriting affiliate IDs that are already present. *Id*. ¶ 11. In other words, when an Affiliate Marketer detects a prior publisher's attribution, it is directed to refrain from setting or modifying tracking cookies that could override existing ones. *Id*. Not all Affiliate Networks include stand down policies (*see, e.g*., LinkConnector), and most of the largest ones did not implement stand down policies until 2025 (*see, e.g*., Impact).

**C.**  **Plaintiffs allege they are contractually entitled to commissions that are sent to Honey and other major browser extensions.**

Plaintiffs allege they have agreements with Merchants and Affiliate Networks entitling them to commissions whenever their affiliate link was the last link a user clicked prior to arriving at a Merchant's page. *Id*. ¶¶ 3, 284. They further allege Merchants and Affiliate Networks directed commissions to Honey that Plaintiffs were entitled to under these agreements. *Id*. ¶¶ 122. Plaintiffs also assert that Honey "developed and implemented methods to intentionally circumvent stand down protocols." *Id*. ¶ 12. As a result, Plaintiffs originally brought a twelve-count, putative class action lawsuit against PayPal seeking both damages and injunctive relief (the "Original Complaint"). PayPal filed a motion to dismiss the Original Complaint, which was granted without prejudice on November 21, 2025. Plaintiffs filed this Second Amended Complaint on January 5, 2026, which drops 15 Plaintiffs and five claims. Affiliate Marketers, including multiple Named Plaintiffs, have also brought substantially similar suits against the other major browser extensions in this industry, such as Capital One, Rakuten, Microsoft, and RetailMeNot. *See* App'x A.

## ARGUMENT

## I.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE ARTICLE III STANDING

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

When this Court dismissed Plaintiffs' FAC for lack of standing, it explained that "amendment may not be futile" if Plaintiffs could (1) establish their "entitlement to commissions pursuant to their contracts," and (2) "add[] factual allegations of actual injury to the named Plaintiffs." Order at 7. Plaintiffs have not accomplished either task.

### A. Plaintiffs do not plausibly allege that they were contractually entitled to the relevant commissions.

In order for Honey's receipt of certain commissions to constitute a legally cognizable injury to Plaintiffs, Plaintiffs must "establish that [they] were in fact entitled to those commissions pursuant to their contracts with the Merchants." Order at 5. Plaintiffs allege that, under the prevailing "last click" attribution model, "Affiliate Marketers receive Affiliate Commissions when their marketing results in a sale and their link was the last link that a consumer followed to arrive at the Merchant's website prior to purchase." SAC ¶ 46. But what matters is not how Plaintiffs "choose to characterize the precise contours of the last click attribution system." Order at 5. What matters is how Plaintiffs' *contracts* provide for attribution. *See id.*; *see also* SAC ¶ 67 ("What qualifies as a 'click' and what 'last click attribution' means (and doesn't mean) is reflected in Plaintiffs' contracts[.]"). And the answer to that question is not what Plaintiffs would like.

For some of the contracts, Plaintiffs quote language that merely defines a "qualifying link," without explaining when the use of a qualifying link results in a commission. *See id.* ¶¶ 68, 70. For other contracts, Plaintiffs quote language that explains when they are to receive a commission, but they do not include the contractual provisions defining the relevant terms. *See id.* ¶¶ 69 (failing to define "Special Link" or "Site"), 71 (failing to define "Affiliate Website"), 72 (failing to define "Affiliate Link," "Program," or "Program Terms"), 75 (failing to define "Action Referral Period" or "Program"). In other cases, the language Plaintiffs cite itself indicates that browser extensions like Honey may in fact receive commissions. *See id.* ¶ 75 (qualifying links can originate from "an Affiliate's website, e-mail, and/or *other CJ-approved promotional channel*") (emphasis added). And in every case, Plaintiffs' selective excerpting—combined with their decision not to attach the relevant contracts to the SAC—deprives the Court of the opportunity to verify what the contracts say, pressuring the Court instead to accept Plaintiffs' legal characterizations as fact. *See generally*

*id.* ¶¶ 67-77. *Contra Doe v. Santa Clara Cnty. Dep't of Health & Hum. Servs.*, 2024 WL 4050396, at *3 (N.D. Cal. Sept. 3, 2024) ("Although the Court accepts the well-pleaded facts in the SAC as true, the Court does not accept the truth of legal conclusions[.]").

PayPal's copies of several of the relevant Merchant contracts—which, Plaintiffs imply, are materially identical to Plaintiffs' own Merchant contracts, *see* SAC ¶ 77—show that Plaintiffs are excluding important context and mischaracterizing the contracts' terms. Consider the Dell contract—the only contract implicated by Plaintiffs' one test purchase. *See id.* ¶¶ 70, 125-41. Plaintiffs focus on a single provision defining a "Qualifying Link" as a "link from Your Marketing Platform(s) to the Dell Site using the required URLs specified in an Offer …, provided that it is the last link to the Dell Site that a visitor uses during a Session where a sale of a product or a service occurs." *Id.* ¶ 70. But they ignore the contract's language explaining that "Your Marketing Platform(s)" encompasses "*any media channel* (including, but not limited to, … *approved ad-supported software*) that you will use to link to the Dell Site as identified in your Program application forms." Ex. A (Dell Contract) at 2.9 (emphasis added). In other words, the contract explicitly contemplates that *any media channel*, including approved ad-supported software—like Honey, *see* SAC ¶ 70 (Dell "partners with PayPal")—can also generate the last click and earn a commission.

Or take the Bergdorf Contract—while Plaintiffs excerpt certain contractual language on attribution, *see id.* ¶ 74, they fail to acknowledge contractual language elsewhere explaining that "[a]ll determinations of Qualifying Links and whether a commission is payable will be made by the LinkShare Network, *subject to the Engagement* [a separate document Plaintiffs do not quote or provide], *as determined by Merchant, in its sole discretion*." Ex. B (Bergdorf Contract) at 3.4 (emphasis added). And they further ignore language clarifying that "the terms of the Engagement shall govern" "in the event of any inconsistency between the terms of the specific Engagement and the terms of this Agreement." *Id.* at 1.2. Without showing that the controlling Engagement supports them, Plaintiffs cannot adequately allege that they (or rather, merely Storm Productions, *see* SAC ¶ 74) have a protected interest in commissions from Bergdorf even where Honey is involved in a sale. It would be easy enough for Plaintiffs to provide this Court with their contracts, but Plaintiffs

DEFENDANTS' MOTION TO DISMISS SAC
5:24-CV-09470-BLF

1   have instead chosen to provide cherry-picked quotes that raise more questions than answers about

2   their legal entitlement to the relevant commissions.

3        Insofar as Plaintiffs allege that Honey's manner of obtaining commissions violates "cookie

4   stuffing" prohibitions and/or contravenes Affiliate Networks' stand down policies, *see* SAC ¶¶ 237-

5   68—allegations that PayPal disputes—those allegations do not impact the threshold question of

6   whether Plaintiffs were ever entitled to the commissions in the first place. In other words, Plaintiffs

7   do not allege that "cookie stuffing" prohibitions or stand down policies create their entitlement to

8   commissions; rather, they allege that the Merchant contracts' attribution provisions entitle them to

9   commissions, and so their standing necessarily depends on those attribution provisions. *See id.* ¶¶

10   6, 67-77. The lack of connection between the cookie-stuffing/stand down allegations and Article

11   III standing perhaps explains why Plaintiffs chose *not* to allege that their lone test purchase violated

12   any cookie-stuffing or stand down rules. *See id.* ¶¶ 70, 125-141.

13        But even if this Court views the "cookie stuffing" prohibitions and stand down policies as

14   potentially relevant to standing, Plaintiffs' legal conclusion that those provisions bar Honey's

15   alleged conduct is unsupported. First, consider the "cookie stuffing" prohibitions. *See id.* ¶ 239.

16   The provisions Plaintiffs quote generally prohibit "intercept[ing]" or "redirect[ing]" traffic to

17   "divert commission income." *Id.* ¶ 239(a); *see also id.* ¶¶ 239(b-d), 239 (f-g). But that cannot mean

18   opening a link to the Merchant's site and inserting an affiliate ID in the consumer's cookie storage,

19   as Honey does, because that is what *all* affiliates do to obtain commissions—including Plaintiffs.

20   *See id.* ¶ 53 (alleging the affiliate marketing process involves an "affiliate link populat[ing] the

21   Affiliate Marketer's Affiliate ID typically in the website's persistent cookie storage," and even

22   sometimes replacing earlier-in-time Affiliate ID's "in the consumer's cookie storage"). Indeed, it

23   does not mean that. What the provisions are actually aimed at prohibiting is "cookie stuffing" that

24   "cause[s] the Platform's tracking systems to conclude that a user has clicked through a Qualifying

25   Link … even if the user has not actually clicked through any such link." *Id.* ¶ 239(g); *see also id.*

26   ¶¶ 239(a-f). But Honey does not insert its affiliate ID unless the consumer clicks on Honey. *See id.*

27   ¶¶ 9-10. Thus, the "cookie stuffing" provisions are inapposite.

28        The Affiliate Networks' stand down policies likewise fail to support Plaintiffs' legal

conclusions. For example, Plaintiffs quote Impact's recently instituted stand down policy, but they leave out that it is up to the individual Merchant whether to "enable" or "disable" the policy for their contracts. *Compare id.* ¶ 250, *with* Ex. E. Critically, Plaintiffs do not allege that *any* Merchant—never mind one that partners with Plaintiffs and PayPal—has enabled this mechanism. Plaintiffs also allege that AvantLink applies a stand down policy because AvantLink's contract states that "affiliate tracking cookies can be set by *outbound clicks only*." SAC ¶ 244. Yet Plaintiffs provide no definition of what qualifies as an "outbound click." Plaintiffs then claim that LinkConnector requires stand down because it states that an "'Affiliate Program' means a pay-for-performance program where an Affiliate receives a commission for sending an End User to the Merchant Site which then generates an Affiliate Event." *Id.* ¶ 245. Plaintiffs again fail to define these terms, and they do not explain why interacting with Honey would not qualify as an Affiliate Event—particularly when the LinkConnector agreement elsewhere makes clear that affiliates are *permitted* to receive commissions where they use approved "software application[s]" "in conjunction with an Affiliate Program." Ex. D at 1. Similarly, Plaintiffs quote from the Awin contract defining a qualifying "click" as "a hyperlink from a Promotional Space to an Advertiser URL," SAC ¶ 246, but they do not explain why Honey's pop-up would not qualify as a "Promotional Space." Finally, while Commission Junction's Publisher Service Agreement summarizes its stand down requirements, Plaintiffs omit the more specific Software Publishers Policy referenced in the Terms and Conditions. *See id.* ¶ 249. That separate policy notes that "a Software Publisher's extension *may activate* if a consumer proactively engages with the Software Publisher's software while on the advertiser's site." Ex. C (emphasis added). In other words, Commission Junction acknowledges that Honey *can* activate, even after an Affiliate Link has been clicked, so long as the user engages with it. Once again, none of the contractual provisions Plaintiffs cite support their theory—and, in some cases, the provisions they *don't* cite refute it altogether.

## B. Plaintiffs do not plausibly allege that they would have earned more commissions but for Honey's alleged conduct.

In assessing Plaintiffs' FAC, this Court found that Plaintiffs' theory of standing also failed because it "relie[d] on a 'highly attenuated chain of possibilities in place of alleging a concrete and

particularized injury." Order at 6 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). Plaintiffs' effort to cure this second—and independently fatal—deficiency falls flat. Indeed, the variability in contractual terms documented in the SAC only underscores the impropriety of Plaintiffs' reliance on "representative" sampling and statistical probabilities to establish standing.

**Plaintiffs' theory of standing remains too attenuated.** While Plaintiffs completed a single "test purchase" that allegedly deprived Justin Tech Tips of exactly one commission from Dell (in the amount of roughly $2.45), *see* SAC ¶¶ 124-41, the SAC otherwise simply *assumes* that Plaintiffs "would have earned more in Affiliate Commissions but for" Honey's alleged conduct. *Id.* ¶¶ 142-230. But that assumption—and, therefore, Plaintiffs' theory of standing—depends on a lengthy chain of speculation: (1) at least one consumer clicks on one of Plaintiff's links; (2) that consumer has Honey downloaded; (3) Honey partners with the Merchant website; (4) the consumer purchases the product in that same session, without first clicking on another affiliate marketers' link or switching to a new device; (5) Honey activates rather than standing down based on its contractual agreements and whether the consumer has proactively reactivated Honey; (6) the consumer uses Honey prior to completing the purchase; and (7) the consumer would have completed the purchase even without any incentive provided by Honey. As soon as one of the possibilities in the chain does not materialize, Plaintiffs' theory fails.

In reality, there are plenty of reasons that a Plaintiff might not receive a commission that have nothing to do with Honey. The "undecided consumer[]" who clicked on a Plaintiff's affiliate link might decide not to buy the product after all. *Id.* ¶ 53. Alternatively, she might click on another affiliate's link before completing the transaction, in which case the Plaintiff would admittedly receive no credit. *Id.* ¶¶ 53, 100. Or she might check out using a different browser extension, many of which have been sued (including by Named Plaintiffs in this case) in similar complaints for allegedly "stealing" affiliate marketers' commissions. *See* App'x A.

Moreover, Plaintiffs' claim that they would have earned commissions but for Honey's involvement necessarily ignores an entire class of transactions: those that would not have occurred but for the coupons, discounts, and cashback rewards Honey provides. *See* SAC ¶ 78 (alleging that consumers download browser extensions like Honey to "search for online coupons when a

consumer is at an online retailer's checkout page"). Plaintiffs are not injured by not receiving commissions for purchases that would not have occurred absent Honey's involvement. The SAC's speculation that each Plaintiff *might* have been injured based on a theoretical coincidence of events and unpredictable actions of third parties is plainly insufficient under *Clapper.*

And the lone "test purchase" that Plaintiffs engineered does not solve this attenuation problem. By having "Plaintiffs' expert, acting in the role of a buyer," *id.* ¶ 125, execute the purchase, Plaintiffs were able to control for the contingencies that, in the real world, would be left to chance: They were able to click on Justin Tech Tips' link, ensure that Honey was downloaded, select a Merchant that they knew partnered with Honey, purchase the product without clicking on another affiliate marketers' link, and use Honey when checking out. *See id.* ¶¶ 124-41.

That test purchase—buying a product from a Merchant (Dell) with whom just a *single* Plaintiff, Justin Tech Tips, partners, *see id.* ¶¶ 70, 142-230—could *at most* provide standing for Justin Tech Tips. In no event could this isolated example support standing for *all* the Plaintiffs named in the SAC. *See Murthy v. Missouri,* 603 U.S. 43, 61 (2024) ("Standing is not dispensed in gross"). But here, it cannot even provide standing for Justin Tech Tips: As discussed *supra* § I.A, Plaintiffs have *not shown a contractual entitlement* to commissions received by Honey under the Dell contract in the first place, as that contract permits qualifying links to originate from *any media channel*, including *software*. Thus, it should be no surprise that Justin Tech Tips did not receive a commission for this sale.

***Plaintiffs cannot manufacture standing with statistics.*** Plaintiffs' reliance on statistics to show the probability that each Plaintiff suffered harm traceable to Honey likewise falls short of establishing standing. Plaintiffs allege they conducted a "Monte Carlo" simulation using unspecified "publicly available, limited data" to model "the likelihood that PayPal used Honey to steal an Affiliate Commission." *Id.* ¶¶ 233-34. Notably, Plaintiffs make no attempt to claim they accounted for customers failing to complete any sales transaction on a Merchant website, the "robust" competition amongst affiliate marketers, *id.* ¶ 48, or a user's use of a browser extension *other than* Honey. Still, Plaintiffs confidently conclude "there is a 100% likelihood that PayPal used Honey to steal at least one Affiliate Commission … from each Plaintiff." *Id.* ¶¶ 235-36.

But as the Supreme Court has long held, "[t]he law of averages is not a substitute for standing," *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.,* 454 U.S. 464, 489 (1982), and a mere "statistical probability" of injury (particularly *past* injury) does not suffice, *Summers v. Earth Island Inst.,* 555 U.S. 488, 497–499 (2009). In other words, "Plaintiffs' theory at bottom [still] amounts to no more than asking the Court to look at the state of the industry and guess as to how likely it is that PayPal has diverted commissions away from them." Order at 6. That does not suffice for standing.

## II.    PLAINTIFFS FAIL TO STATE CLAIMS UNDER THE CFAA OR CDAFA

### A.    Plaintiffs' prior admissions that users grant PayPal permission for the alleged unlawful conduct dooms their CFAA and CDAFA claims.

The SAC does nothing to fix the fundamental issue this Court identified with Plaintiffs' CFAA and CDAFA claims—Plaintiffs "admit[ted] users granted PayPal substantial permissions when they downloaded the Honey Extension." Order at 7. The FAC admitted that users grant PayPal "extensive" permissions when they choose to install the Honey browser extension, including permission to "access[]" or "creat[e] pages" and "[q]uery and modify cookies." *See* FAC ¶ 133. Plaintiffs further admitted that PayPal "uses its permissions" to carry out the conduct they allege violates the CFAA and CDAFA. *See* FAC ¶ 133; Order at 8. As this Court previously concluded, those admissions doom Plaintiffs' CFAA and CDAFA claims. Order at 7-8. Each of those claims requires Plaintiffs to plead that PayPal either acted "without authorization" (or "permission") or "exceeded" its authorization. *See id.*; 18 U.S.C. § 1030(a)(4); 18 U.S.C. §§ 1030(a)(5)(A), (C); Cal. Penal Code § 502(c)(1); Cal. Penal Code § 502(c)(4); Cal. Penal Code § 502(c)(8), (12). These elements of the CFAA and CDAFA claims overlap and rise and fall together. *See, e.g.*, *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260 (N.D. Cal. 2022).

Plaintiffs pursue two strategies to save their CFAA and CDAFA claims, both of which fail. First, Plaintiffs remove their admissions that users grant PayPal "extensive permissions" when installing Honey. But that bell cannot be unrung. Statements in a prior pleading constitute binding "judicial admissions" unless a party amends and "explains the error in a subsequent pleading." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995). The SAC contains no such explanation.

1    Plaintiffs merely pretend these prior allegations do not exist, rather than denying their truth. Even

2    if Plaintiffs had denied those allegations, "[w]here allegations in an amended complaint contradict

3    those in a prior complaint, a district court need not accept the new alleged facts as true." *Stearns v.*

4    *Select Comfort Retail Corp.*, 763 F. Supp.2d 1128, 1144–45 (N.D. Cal. 2010). Here, without *any*

5    explanation from Plaintiffs regarding their prior allegations of the "extensive" permissions granted

6    by users, this Court should continue to treat these prior statements as binding judicial admissions.

7    Second, Plaintiffs allege that any permissions were fraudulently obtained. *See, e.g.*, SAC ¶

8    307 ("Any access PayPal was granted is invalid because PayPal misdescribed the nature of the

9    Honey Browser Extension."). Specifically, Plaintiffs point to two pieces of information that PayPal

10   allegedly concealed from consumers that purportedly fraudulently induced those consumers to

11   grant permissions to PayPal: (1) PayPal's alleged failure to "abid[e] by stand down requirements";

12   and (2) PayPal's alleged failure to provide the "best" coupons to consumers. *Id.* ¶¶ 300, 301.

13   Plaintiffs' new theory fails because Plaintiffs have not even attempted to plead several of the

14   elements required for fraudulent inducement, including that the allegedly withheld information was

15   "material," that PayPal had a "duty" to disclose it, that consumers would not have downloaded

16   Honey if they knew this information, and that consumers were harmed by the alleged nondisclosure.

17   *See Moncada v. W. Coast Quartz Corp.*, 221 Cal. App. 4th 768, 775 (2013). In reality, this second

18   strategy just repackages Plaintiffs' prior misguided theory that PayPal violated these statutes by

19   failing to disclose to users precisely how Honey operated. But as this Court already acknowledged,

20   "neither statute imposes any duty to disclose how permissions will be exercised." Order at 8.

21   Ultimately, Plaintiffs' CFAA and CDAFA theories seek to broaden the statutes to cover

22   ordinary competition. If failing to disclose to a consumer extensive details regarding affiliate

23   marketing cookies means that one has altered data on the consumer's computer without

24   "authorization" or "permission," it's hard to imagine how Plaintiffs themselves are not violating

25   both statutes. There is no evidence that Plaintiffs disclose to consumers that clicking on an affiliate

26   link will cause Plaintiffs' affiliate ID to be transmitted to and stored in a cookie on the consumer's

27   computer (i.e., "intentionally access[ing] a protected computer without authorization," 18 U.S.C. §

28   1030(a)(5)(C), or "[k]nowingly access[ing] and without permission … alter[ing] … data," Cal.

1    Penal Code § 502(c)(4)), and potentially overwrite a prior affiliate's ID (i.e., causing another

2    affiliate to "suffer[] damage or loss," 18 U.S.C. § 1030(g); Cal. Penal Code § 502(e)(1)). The rule

3    of lenity requires this Court to reject Plaintiffs' attempts to stretch the statutes that far. *See United*

4    *States v. Wyatt*, 408 F.3d 1257, 1260 (9th Cir. 2005).

5           **B.**       **Plaintiffs still have not alleged any technological "loss" or "damage."**

6           Plaintiffs also still fail to allege technological "damage" or "loss" under either statute. Both

7    "damage" and "loss" under the CFAA are limited to "technological harms—such as the corruption

8    of files—of the type unauthorized users cause to computer systems and data." *Van Buren v. United*

9    *States*, 593 U.S. 374, 391–92 (2021). "[A]ny theory of loss must conform to the limited parameters

10   of the CFAA's definition." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019).

11   Lost revenue can be recovered only if losses occurred "because of interruption of service." *See id.*

12   at 1261 (quoting 18 U.S.C. § 1030(e)(11)). This Court, among others, applies the CFAA's

13   requirements for "loss" and "damage" to CDAFA claims. *See Nowak v. Xapo, Inc.*, 2020 WL

14   6822888, at *5 (N.D. Cal. Nov. 20, 2020); *Bui-Ford v. Tesla, Inc.*, 2024 WL 694485, at *6 (N.D.

15   Cal. Feb. 20, 2024); *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 950 (N.D. Cal.

16   2014).

17          Plaintiffs have not pleaded any "damage" under the CFAA or CDAFA. The "damage"

18   Plaintiffs allege PayPal caused is to the "impairment of the integrity and availability" of Plaintiffs'

19   affiliate IDs. SAC ¶ 295. But Plaintiffs' affiliate IDs—short strings of numbers or letters—have no

20   independent value as "data." In similar cases involving data without independent value, courts have

21   concluded that the plaintiff failed to state a claim. *See Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461,

22   486 (N.D. Cal. 2021) (concluding "loss of use and control" of financial information was not

23   cognizable damage or loss under the CFAA); *Doe v. Cnty. of Santa Clara*, 2024 WL 3346257, at

24   *9 (N.D. Cal. July 8, 2024) (dismissing CDAFA claims "based on damage as the lost value in

25   plaintiff's [Personal Health Information]"). Plaintiffs have previously contended the IDs are like

26   "technological chits that can be exchanged for money." Dkt. 219 at 10. But affiliate IDs do not

27   have a specific value and cannot be exchanged for money. Plaintiffs get paid only if their affiliate

28   ID is recorded in the Merchant's cookie and the Merchant determines that they qualify for a

commission. SAC ¶¶ 6, 56. Because Plaintiffs have no "damage," they also fail to state a claim under CFAA subsection (a)(5)(A), which requires Plaintiffs to plead PayPal "intentionally cause[d] damage without authorization, to a protected computer." *See* 18 U.S.C. § 1030(a)(5)(A). Plaintiffs' assertions of harm to their IDs does not allege damage to *users'* computers or any other device.

As to "loss," Plaintiffs have failed to identify revenue lost due to an "interruption of service." *See* Dkt 204 at 11. Plaintiffs' assertion that PayPal "redirect[ed] communications within the Affiliate Commission attribution system" is insufficient. SAC ¶ 295. Plaintiffs do not, in fact, allege that PayPal "redirects" communications but instead allege PayPal causes a Merchant website to store PayPal's affiliate ID in the Merchant's cookie instead of Plaintiffs'. *See* SAC ¶ 119. That action does not "interrupt" the Merchant's commission attribution service. At most, it changes the *outcome* of that process. If this qualifies as an "interruption in service," then *all* competition between affiliate marketers would "interrupt" the service for first-in-time affiliates. Again, this Court should decline to stretch the CFAA and CDAFA that far. *See Wyatt*, 408 F.3d at 1260.

## III.    PLAINTIFFS FAIL TO STATE CLAIMS FOR INTENTIONAL INTERFERENCE (COUNTS III AND IV)

### A.    Plaintiffs fail to plead acts designed to disrupt Plaintiffs' relationship or actual disruption of such relationships.

As this Court previously recognized, determining whether PayPal disrupted Plaintiffs' Merchant contracts and relationships "'require[s] the . . . court to determine *what contractual rights* [Plaintiffs] possess[ed].'" Order at 10 (*quoting United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1009 (9th Cir. 2014)). While Plaintiffs attempt to cure the deficiencies this Court identified by including piecemeal quotes from various Merchant and Affiliate Network contracts, their effort only proves PayPal's point: the varying contracts governing these relationships do not set forth any consistent definitions entitling Plaintiffs to receive commissions.

Plaintiffs rely on two theories to support their intentional interference claims, both of which fail. First, they allege that PayPal was knowingly diverting commissions Plaintiffs were otherwise entitled to, thereby interfering with Plaintiffs' Merchant contracts and relationships. *See* SAC § II.B.a. However, because Plaintiffs have not plausibly alleged that PayPal diverted any

commissions to which Plaintiffs were contractually entitled, they have not demonstrated that PayPal engaged in acts designed to disrupt their relationships, as required by both claims. Second, Plaintiffs newly allege that PayPal's purported failure to stand down in certain instances shows that PayPal was aware of the wrongfulness of its actions for purposes of Plaintiffs' intentional interference with prospective economic advantage claim. SAC ¶ 341. But Plaintiffs have not plausibly alleged that the governing contracts required PayPal to stand down, nor have Plaintiffs plausibly alleged that any purported stand down violations disrupted any of Plaintiffs' relationships.

**_Plaintiffs do not plausibly allege any acts designed to disrupt plaintiffs' relationships or contracts with Merchants_**. Plaintiffs' first theory is premised on the idea that PayPal intentionally and wrongfully diverts commissions it is not entitled to under the "last click" attribution method. SAC ¶¶ 63-67. Plaintiffs claim PayPal interferes with Plaintiffs' Merchant contracts by "secretly mimic[king] the activities of Affiliate Marketers without actually being one," thereby stealing commissions to which Plaintiffs were entitled. *Id.* ¶ 10. However, as discussed *supra* § I.A., Plaintiffs' own factual allegations do not support this interpretation of "last click." As a result, Plaintiffs cannot demonstrate that PayPal engaged in actions designed to do anything other than perform under PayPal's own contractual agreements with Merchants.

Where, like here, a party reasonably relies on its relationship with a third party, and the plaintiff has not demonstrated any intent to harm the plaintiff, the plaintiff has not alleged intentional acts designed to disrupt the relationship. *See Oakley, Inc. v. Nike, Inc*., 988 F. Supp. 2d 1130, 1138 (C.D. Cal. 2013) (finding defendant reasonably relied on third party representations and thus did not engage in acts intended to disrupt plaintiffs' contractual relationship). Indeed, "evidence that a party's conduct ultimately led to disruption or interference of a contract is … in and of itself, insufficient to establish intentional interference or disruption." *Rosenthal & Rosenthal of California, Inc. v. Hilco Trading, LLC*, 2020 WL 12948055, at *7 (C.D. Cal. Dec. 29, 2020), *aff'd*, 2022 WL 18906 (9th Cir. Jan. 3, 2022). Because Plaintiffs have not plausibly alleged that Honey violated its contracts, or that Honey was flawed in its belief that those contracts entitled it to commissions, Plaintiffs fail to plausibly allege that PayPal engaged in intentional acts designed to interfere with Plaintiffs' contractual or prospective economic relationships.

As described above, Plaintiffs' cherry-picked quotes from their own agreements with Merchants—divorced from other key provisions in those agreements and related contracts that Plaintiffs do not cite—do not plausibly support Plaintiffs' last "external click" interpretation. *See* supra § I.A. For instance, Plaintiffs refer to various Merchants' definitions of what constitutes a "qualifying click" for commissions, but none of these definitions demonstrate that PayPal was not entitled to a commission. Indeed, they largely define "Qualifying Link" or "Qualifying Click" as "a link from your website or social property," or a link from "*any media channel* (including, but not limited to…*approved ad-supported software*)"; definitions that contemplate more than just external links from Affiliate Marketers' websites. *See* SAC ¶¶ 70, 73-74; *see* Ex. A and B (Dell and Bergdorf Goodman agreements) (emphasis added). Plaintiffs' allegations demonstrate that what qualifies for a commission varies on a contract-by-contract basis—they are insufficient to plausibly allege that PayPal intentionally violated Plaintiffs' contractual rights.

As further support for their argument that PayPal supposedly knew it was not entitled to commissions, Plaintiffs attempt to paint a picture that PayPal is operating a "secret" and "commercially unreasonable" functionality behind Merchants and Affiliate Networks' backs. SAC ¶ 120. But Plaintiffs' own allegations disprove this logic. Plaintiffs themselves admit that "Affiliate Networks and Merchants were aware that browser extensions could redirect Affiliate Commissions by overwriting Affiliate IDs." SAC ¶¶ 11, 120. Further, the Affiliate Network agreements Plaintiffs reference demonstrate the Affiliate Networks' awareness and acknowledgement of browser extensions and their functionality. Commission Junction (SAC ¶ 249), LinkConnector (*id*. ¶ 245), Impact (*id*. ¶ 250), Rakuten (*id*. ¶ 248), Awin (*id*. ¶ 246), and AvantLink (*id*. ¶ 244) each specifically reference browser extensions or other software applications in their program guidelines. The Rakuten emails Plaintiffs cite further demonstrate that PayPal's partners are aware of Honey's functionality and consciously choose to award it commissions. *Id*. ¶¶ 253-260. In describing how another of Rakuten's partners functions, Rakuten explains that "the publisher's tab opens up on the left side of the first tab in the window. Like how the Honey extension works, it does the redirect from a new tab, then closes the tab when the redirect takes place." *See* Ex. F. Later, they note that their rules "do not require [the affiliate links] to be visible, as you know, since Honey works the

1    same way." *Id*. Far from Plaintiffs' allegation that PayPal was "creating a false tab, faking a referral,

2    and overwriting an Affiliate ID," Rakuten's emails demonstrate that Honey's functionality is not

3    only known and accepted, it is used by others in the industry.

4        ***Plaintiffs' stand down allegations do not plausibly allege violations of applicable***

5    ***requirements or disruptions of Plaintiffs' relationships.*** While Plaintiffs also point to their stand

6    down allegations as purported evidence that PayPal was aware that its conduct was wrongful, the

7    Affiliate Network Agreements Plaintiffs rely upon disprove that theory. As discussed above,

8    contrary to Plaintiffs' assertions, many of the cited Affiliate Network Agreements do *not* set forth

9    stand down requirements prohibiting Honey from receiving commissions. *See* supra § I.A. Indeed,

10   it bears noting that some of the stand down language cited by Plaintiffs did not go into effect until

11   *after* Plaintiffs filed their initial complaints. *See* SAC ¶ 250; *see also* Ex. E (Impact stand down

12   policy first instituted in August 2025, which can be verified by checking the Wayback Machine).

13       Furthermore, even if Plaintiffs had alleged that applicable stand down rules prohibited

14   Honey from receiving commissions in these circumstances, they fail to plausibly allege that a

15   violation of stand down requirements disrupted any of their contracts or relationships. As discussed

16   *supra* § I, the SAC provides a single example of a purchase from Dell's website where Honey

17   purportedly improperly diverted commissions from Plaintiffs, but Plaintiffs do not allege any stand

18   down rules applied to this purchase, never mind that any were violated. *See* SAC ¶¶ 70, 125-139.

19       Plaintiffs' reliance on allegations from purported internet sleuths and a curated set of

20   Rakuten emails to support the alleged stand down violations is equally unavailing. Plaintiffs allege

21   that a "version" of Honey's stand down rules found online demonstrates that Honey fails to stand

22   down when it otherwise should by employing a set of specific criteria. SAC ¶¶ 266-267. But

23   Plaintiffs fail to demonstrate that any such criteria was actually triggered when Plaintiffs otherwise

24   would have received a commission pursuant to their Merchant contracts. The email

25   communications between PayPal and Rakuten further support the notion that PayPal was largely

26   complying with stand down rules. *See, e.g.*, Exs. F and G. The emails span four years, from 2020

27   through 2024, and demonstrate only a handful of instances where Rakuten reached out to PayPal

28   regarding issues with stand down compliance. In each of these circumstances, the Parties engaged

1    in a back and forth to troubleshoot the specific issue Rakuten flagged, demonstrating that

2    compliance with stand down policies was nuanced as new use cases arose and coding needed to be

3    reconstituted to account for the previously unknown circumstance. *Id*. Notably, the SAC fails to

4    identify a single instance where a named Plaintiff did not receive a commission because of alleged

5    stand down violations.

6           **B.    If the Court dismisses Plaintiffs' other claims, their interference claims fail
                     for lack of an independently wrongful act.**

7           Both intentional interference with prospective economic advantage and intentional

8    interference with contractual relations require Plaintiffs to plead the existence of an independently

9    wrongful act where the interference is with an at-will contract. *See Redfearn v. Trader Joe's Co.*,

10   20 Cal. App. 5th 989, 1006 (2020); *Pech v. Doniger*, 75 Cal. App. 5th 443, 457 (2022). When, as

11   here, a plaintiff fails to allege whether a contractual relationship is at-will, it must plead an

12   independently wrongful act. *See Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 729 F. App'x

13   528, 532 (9th Cir. 2018). "[A]n act is independently wrongful if it is unlawful, that is, if it is

14   proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal

15   standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).

16          Plaintiffs rely on the same two types of allegedly independently wrongful acts in support of

17   their interference claims as in their prior Complaint: (1) their other common law and statutory

18   claims; and (2) PayPal's conduct "contravenes existing standards and norms in the affiliate

19   marketing industry." SAC ¶¶ 340, 352. Plaintiffs' common law and statutory claims can only

20   constitute independently wrongful acts to the extent Plaintiffs' have pleaded valid causes of action.

21   *See Ixchel Pharma, LLC v. Biogen Inc.*, 2017 WL 4012337, at *5 (E.D. Cal. Sept. 12, 2017). If this

22   Court dismisses Plaintiffs' non-interference claims, the interference claims must be dismissed as

23   well for failure to allege an independently wrongful act. As to Plaintiffs' assertion that PayPal's

24   conduct "contravenes existing standards and norms," these allegations fail to constitute

25   independently wrongful acts because contravening existing standards and norms is not wrongful

26   unless doing so is also "unlawful." *See Korea Supply*, 29 Cal. 4th at 1159.

27

28

DEFENDANTS' MOTION TO DISMISS SAC
5:24-cv-09470-BLF

1    **IV.    PLAINTIFFS CANNOT STATE A CLAIM FOR UNJUST ENRICHMENT**

2    **(COUNT II)**

3         Plaintiffs' unjust enrichment claim fails for many of the same reasons this Court already

4    identified. *See* Order at 9. First, Plaintiffs' SAC still fails to plead that there is no adequate remedy

5    at law to address PayPal's alleged conduct. Second, as this Court previously noted, "the subject

6    matter of the claim is governed by Plaintiffs' relationships with third-party Merchants." *Id.*

7         Plaintiffs' SAC does nothing more than restate its conclusory allegations regarding the lack

8    of an adequate remedy at law, claiming Plaintiffs have no adequate remedy "to the extent that

9    Plaintiffs cannot recover the amounts that Defendants received from their wrongful conduct

10   through their legal claims" or in the event such recovery "would be less prompt." SAC ¶ 332. This

11   is nothing more than a roundabout way of stating their unjust enrichment claim in the alternative to

12   those claims sounding in contract and seeking damages, which is insufficient to plead that no

13   adequate remedy at law exists. *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 648

14   (N.D. Cal. 2024) ("[t]he question is not whether or when Plaintiffs are required to choose between

15   two available inconsistent remedies, it is whether equitable remedies are available to Plaintiffs at

16   all..."); *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) ("[plaintiff]

17   must establish that [he/she] lacks an adequate remedy at law before securing equitable restitution

18   for past harm").

19        Further, the SAC alleges that both Plaintiffs and PayPal have contractual relationships with

20   third party Merchants and Affiliate Networks that govern when commissions are due. As this Court

21   noted, "it is a well-established principle of California common law that a plaintiff 'may not plead

22   the existence of an enforceable contract and maintain a quasi-contract claim at the same time, unless

23   the plaintiff has pled facts suggesting that the contract may be unenforceable or invalid.'" *See* Order

24   at 9 (quoting *Jacobs v. Sustainability Partners LLC*, 2020 WL 5593200, at *17 (N.D. Cal. Sept.

25   18, 2020)). Plaintiffs do not allege that any of the at-issue contracts are unenforceable or invalid.

26   Instead, they allege only that PayPal "wrongfully appropriates for itself the commissions to which

27   [Plaintiffs] are entitled under their contracts with partnering Merchants." Order at 9.

28

## V. PLAINTIFFS' CLAIM UNDER CALIFORNIA'S UNFAIR COMPETITION LAW FAILS (COUNT VI)

### A. Plaintiffs fail to plead any wrongful conduct.

Plaintiffs claim that PayPal has "engaged in acts and practices that are unlawful and unfair in violation of the UCL," SAC ¶ 375, but Plaintiffs fail to plead either form of wrongful conduct.

Plaintiffs' claim under the "unlawful" prong of the California UCL fails because Plaintiffs have not plausibly alleged any violations of the law. *See AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.,* 28 Cal. App. 5th 923, 950 (2018) ("when the underlying legal claim fails, so too will a derivative UCL claim"). And insofar as Plaintiffs seek to rely on common-law violations, *see* SAC ¶ 377, they face an additional barrier: Modern authority holds "a UCL [claim] brought under the 'unlawful' prong may not be predicated on common law violations alone." *Gill v. Marsh USA, Inc.*, 2024 WL 3463351, at *6 (N.D. Cal. July 18, 2024) (collecting cases).

As to the "unfair" prong, Plaintiffs principally argue that Honey's conduct is "unfair" because it purportedly violates California's alleged policy against "interfering with another's prospective economic advantage." *E.g.,* SAC ¶ 379. Like the "unlawful" theory, the "unfair" theory fails because Plaintiffs do not plausibly plead any such interference. *See supra* § III.B.; *see also, e.g., Hadley v. Kellogg Sales Co.,* 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017) (UCL unfairness claim that was derivative of other causes of action failed because predicate claims failed).

Plaintiffs' attempt to satisfy the "unfair" prong of the UCL also fails because Plaintiffs do not plausibly allege anticompetitive conduct. In California, a competitor alleging unfair competition must allege "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 187 (1999); *see Levitt v. Yelp! Inc.,* 765 F.3d 1123, 1136 (9th Cir. 2014). Plaintiffs' conclusory allegation that Honey's conduct "significantly harms or threatens competition" (SAC ¶ 379) is insufficient. *See Snapkeys, Ltd. v. Google LLC,* 2020 WL 6381354, at *3-4 (N.D. Cal. Oct. 30, 2020). Far from alleging facts showing harm to competition, Plaintiffs allege that the "affiliate marketing industry is growing rapidly,"

SAC ¶ 42, and is "robust[ly]" competitive, *id.* ¶ 48. Moreover, it is *Plaintiffs,* not Honey, who are seeking to harm competition by preventing Honey from receiving commissions. "[I]n the absence of any showing that PayPal wrongfully misdirected commissions otherwise owed to Plaintiffs, the [SAC] only attacks 'rigorous, but fair, competitive strategies,' which unfair competition laws do not proscribe." Order at 11 (quoting *Cel-Tech*, 20 Cal. 4th at 185); *see also Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1038 (C.D. Cal. 2011) ("exercise of" a contractual right "does not amount to unfair competition"), *aff'd*, 738 F.3d 1085 (9th Cir. 2013).

Finally, Plaintiffs cannot salvage their claim under the "unfair" prong by alleging Honey's conduct violates "industry standards and norms." *E.g.*, SAC ¶ 379. Assessing Plaintiffs' unfair-competition claims, this Court explained that "[t]o the extent that Plaintiffs argue that PayPal's conduct is actionable because it violated industry norms, … they have not pleaded—as required—that any such industry norm is actually required or enforced by the relevant market participants." Order at 11. While Plaintiffs have since added allegations regarding stand down requirements, *see* SAC ¶¶ 241-51, they do not plausibly allege that these requirements prohibit Honey from receiving commissions for the reasons explained above. *See supra* § I.A. And regardless, a UCL claim alleging unfair conduct must be tethered to a "specific constitutional, statutory, or regulatory provision." *Mendez v. Selene Fin. LP*, 2017 WL 1535085, at *6 (C.D. Cal. Apr. 27, 2017).

**B.    Plaintiffs fail to plausibly allege they lack adequate alternative legal remedies.**

Plaintiffs' claim for equitable relief under the UCL also fails because Plaintiffs fail to plausibly allege they lack adequate alternative remedies. *See supra* § III.A. As the *Capital One* court recognized, plaintiffs must "plausibly allege[] that [they] ha[ve] no adequate legal remedy" to state a claim for equitable relief under the UCL. 2025 WL 1570973, at *16.

Plaintiffs cannot allege they have no adequate remedy at law here because their alleged harm—lost revenue—is compensable through damages. *See* SAC ¶ 386. While Plaintiffs newly allege, as to some of their equitable claims, that they are seeking "nonrestitutionary disgorgement of PayPal's profits" insofar as those profits "exceed[] Plaintiffs' damages," *e.g.*, *id.* ¶ 348, Plaintiffs fail to plead how the equitable remedies sought are "any different than the money they seek as damages," *Cap. One,* 2025 WL 1570973, at *16. In any event, an allegation that an equitable

1    remedy might provide Plaintiffs with an unearned windfall and be preferable to damages does not

2    plausibly "show" that Plaintiffs' legal remedies would be "'inadequate or incomplete' in making

3    [them] whole." *Castillo v. Walmart, Inc.*, 2025 WL 1828465, at \*7 (N.D. Cal. July 1, 2025).

4    Preferring a different measure of money is not the same as lacking an adequate legal remedy. Nor

5    does the mere risk that Plaintiffs may not "have a contractual entitlement, or other legal entitlement

6    …, to the Affiliate Commissions," SAC ¶ 386, make Plaintiffs' legal remedies inadequate. *See*

7    *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at \*4 (N.D. Cal. May 31, 2011) ("equitable relief is

8    unavailable" "[w]here the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at

9    law"). Accordingly, the UCL claim, which provides "for only equitable relief," *Hambrick v.*

10   *Healthcare Partners Med. Grp., Inc.,* 238 Cal. App. 4th 124, 155 (2015), must be dismissed in full.

11   ## VI.    PLAINTIFFS' CLAIM UNDER WASHINGTON'S CONSUMER PROTECTION

12   ACT FAILS (COUNT VII)

13   ### A.    Plaintiffs fail to plead any wrongful conduct.

14   Plaintiffs allege that PayPal's conduct was "unfair" because it "offends Washington's

15   public policy against intentional interference with contractual relationships," "contravenes existing

16   standards and norms," and "is immoral, unethical, oppressive, or unscrupulous." SAC ¶ 394. But

17   as explained above, *see supra* § IV.A, any claim based on intentional interference or contravention

18   of industry standards falls short. And Plaintiffs fare no better with their theory that Honey's conduct

19   is unfair because it is "immoral, unethical, oppressive, or unscrupulous." SAC ¶ 394. Again, those

20   allegations depend on the premise that Honey wrongfully "appropriat[ed]" commissions

21   "belong[ing]" to Plaintiffs. *Id.* ¶ 396. But Plaintiffs have not plausibly alleged that that is the case.

22   ### B.    Plaintiffs do not allege substantial consumer or public-interest harm.

23   Plaintiffs' CPA claim also fails because Plaintiffs have not plausibly alleged substantial

24   consumer or public-interest harm. *See S/Y Paliador, LLC v. Platypus Marine, Inc.,* 750 F. Supp. 3d

25   1187, 1206-07 (W.D. Wash. 2024).

26   Plaintiffs include two conclusory allegations aimed at satisfying this statutory requirement.

27   First, they allege that Honey "stopped consumers from achieving their goal of paying Affiliate

28   Marketers when they use their affiliate links to complete a purchase." SAC ¶ 395. And second, they

allege that Honey "deceived consumers about how the Honey Browser Extension operated and made money," allegedly resulting in some users uninstalling Honey after publication of a critical video. *Id.* But Plaintiffs do not allege how consumers were actually *harmed* by any such deception. And in any event, "the alleged harm to [Plaintiffs] far outweighs any incidental harm to the public at large." *Cap. One*, 2025 WL 1570973, at *15 (internal quotation marks omitted); *see also Stiegler v. Saldat*, 2015 WL 13686087, at *3 (W.D. Wash. Oct. 23, 2015) (absence of alleged injury to non-class-members required dismissal). Because "the core of [Plaintiffs'] claim is merely harm to a competitor," *Cap. One*, 2025 WL 1570973—not harm to consumers, and certainly not harm to the *Washington* consumers the CPA was meant to protect—Plaintiffs' allegations are a poor fit for Washington's consumer-protection statute.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Motion and Dismiss Plaintiffs' Second Amended Complaint with prejudice.

Dated: February 9, 2026

By: */s/ Clement S. Roberts*
Clement S. Roberts (SBN 209203)
Geoffrey Moss (SBN 258827)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
croberts@orrick.com
gmoss@orrick.com

Richard A. Jacobsen (*pro hac vice*)
Marc R. Shapiro (*pro hac vice*)
Jennifer Keighley (*pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5000
rjacobsen@orrick.com
mshapiro@orrick.com

*Attorney for Defendants PayPal, Inc. and PayPal Holdings, Inc.*