Dena C. Sharp (SBN 245869)
Trevor T. Tan (SBN 281045)
Nina Gliozzo (SBN 333569)
Anthony Rogari (SBN 353784)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800

Nanci E. Nishimura (SBN 152621)
Thomas E. Loeser (SBN 202724)
Karin B. Swope (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Rd #200,
Burlingame, CA 94010
Telephone: 650.697.6000

*Interim Co-Lead Counsel*

Elizabeth J. Cabraser (SBN 083151)
Roger N. Heller (SBN 215348)
Jason L. Lichtman (*pro hac vice*)
Sean A. Petterson (*pro hac vice*)
Danna Z. Elmasry (*pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION | Case No. 5:24-cv-9470-BLF<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>Hearing date: June 4, 2026<br>Time: 9:00 a.m.<br>Courtroom: 1 – 5th Floor |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     BACKGROUND ............................................................................................................ 2

        A.      Honey spoofs external referrals to Merchants. ................................................. 2

        B.      Honey diverted commissions from Plaintiffs. .................................................. 4

III.    LEGAL STANDARDS ................................................................................................. 4

IV.     ARGUMENT ................................................................................................................. 4

        A.      Plaintiffs have Article III standing................................................................... 4

                1.      Plaintiffs plausibly allege contractual entitlement to Affiliate Commissions. ............ 4

                2.      Plaintiffs plausibly allege concrete injury traceable to PayPal's conduct. .................. 8

        B.      Plaintiffs state claims under CFAA and CDAFA. .......................................... 11

                1.      Plaintiffs properly allege violation of 18 U.S.C. § 1030(a)(5)(A)............................ 11

                2.      Plaintiffs properly allege violations of 18 U.S.C. §§ 1030(a)(4) and (a)(5)(C)......... 12

        C.      Plaintiffs adequately plead their intentional interference claims. .......................................... 15

                1.      The contracts demonstrate that Plaintiffs are entitled to Affiliate Commissions, and who is *more* entitled is a question for trial. ............................... 16

                2.      Plaintiffs plausibly allege disruptions of Plaintiffs' relationships. ........................... 17

                3.      Plaintiffs allege independently wrongful acts........................................................... 19

        D.      Plaintiffs plead an unjust enrichment claim.................................................... 19

                1.      Plaintiffs allege no adequate remedy at law. ........................................................... 19

                2.      Plaintiffs' contracts with Merchants do not bar their claim against PayPal. ............. 21

        E.      Plaintiffs adequately plead their California Unfair Competition Law claim........................ 21

                1.      Plaintiffs allege unfair conduct. ............................................................................... 22

                2.      Plaintiffs allege no adequate remedy at law. ........................................................... 22

        F.      Plaintiffs adequately plead their Washington Consumer Protection Act claim.................... 23

V.      CONCLUSION............................................................................................................. 24

# TABLE OF AUTHORITIES

Page

**Cases**

*Brown v. Perris Park Apartments P'ship*,
2019 WL 1771662 (C.D. Cal. Feb. 22, 2019)...................................................................... 13

*Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*,
94 Cal. App. 4th 151 (2001) ....................................................................................... 21

*Castillo v. Walmart, Inc.*,
2025 WL 1828465 (N.D. Cal. July 1, 2025) (Freeman, J.) ........................................ 23

*Cisco Sys., Inc. v. STMicroelectronics, Inc.*,
2015 WL 3488923 (N.D. Cal. June 2, 2015) ............................................................. 17

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ....................................................................... 12

*Doe v. Cnty. of Santa Clara*,
2024 WL 3346257 (N.D. Cal. July 8, 2024) .............................................................. 12

*Dover v. Brit. Airways, PLC (UK)*,
2013 WL 5970688 (E.D.N.Y. Nov. 8, 2013) ............................................................. 10

*eBay Inc. v. Digital Point Sols., Inc.*,
608 F. Supp. 2d 1156 (N.D. Cal. 2009) ..................................................................... 14

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ............................................................................ 19, 20

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ................................................................................... 12

*Fish v. Tesla, Inc.*,
2022 WL 1552137 (C.D. Cal. May 12, 2022) ........................................................... 14

*Hall v. FCA US LLC*,
2022 WL 1714291 (9th Cir. May 27, 2022) ................................................................ 8

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
105 Wash.2d 778 (1986)............................................................................................. 24

*Hawkins v. Shimano N. Am. Bicycle Inc.*,
729 F. Supp. 3d 989 (C.D. Cal. 2024) ....................................................................... 20

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
810 F. Supp. 2d 1013 (C.D. Cal. 2011) ..................................................................... 22

**TABLE OF AUTHORITIES**
(continued)

Page

*Huey v. Honeywell, Inc.*,
   82 F.3d 327 (9th Cir. 1996) ................................................................................. 13

*Hunt v. Medtronic USA, Inc.*,
   627 F. Supp. 3d 1188 (W.D. Wash. 2022)........................................................ 24, 25

*In re Accellion, Inc. Data Breach Litig.*,
   713 F. Supp. 3d 623 (N.D. Cal. 2024) ................................................................... 21

*In re Apple Inc. Device Performance Litig.*,
   434, 451–52 (N.D. Cal. 2018)........................................................................... 12, 14

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
   2021 WL 1176645 (N.D. Cal. Mar. 29, 2021)...................................................... 20

*In re Cap. One Fin. Corp.*,
   2025 WL 1570973 (E.D. Va. June 2, 2025) ................................................. *passim*

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
   806 F.3d 125 (3d Cir. 2015)..................................................................................... 4

*In re Meta Pixel Tax Filing Cases*,
   724 F. Supp. 3d 987 (N.D. Cal. 2024) ............................................................. 20, 23

*Integrity Applied Sci., Inc. v. Clearpoint Chemicals LLC*,
   2020 WL 12584444 (D. Colo. Apr. 20, 2020) ..................................................... 15

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   9 Cal. 5th 1130 (2020) .......................................................................................... 16

*Jacobs v. Sustainability Partners LLC*,
   2020 WL 5593200 (N.D. Cal. Sept. 18, 2020) ..................................................... 21

*Klein v. Chevron U.S.A., Inc.*,
   202 Cal. App. 4th 1342 (2012) ............................................................................. 21

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ........................................................................................ 16

*Lindsey v. Starwood Hotels & Resorts Worldwide Inc.*,
   409 F. App'x 77 (9th Cir. 2010) ........................................................................... 17

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
   605 F. Supp. 3d 1218 (N.D. Cal. 2022) ................................................................ 11

*Murthy v. Missouri*,
   603 U.S. 43 (2024)........................................................................................... 10, 11

**TABLE OF AUTHORITIES**
(continued)

Page

*Oakley, Inc. v. Nike, Inc.*,
    988 F. Supp. 2d 1130 (C.D. Cal. 2013) ........................................................................ 18

*Oxley v. Madrigal*,
    2025 WL 360858 (N.D. Cal. Jan. 31, 2025) (Freeman, J.) ........................................... 4

*Precisely Software Inc. v. Loqate Inc.*,
    2022 WL 4348469 (N.D. Cal. Sept. 19, 2022) (Freeman, J.) ....................................... 21

*Rhynes v. Stryker Corp.*,
    2011 WL 2149095 (N.D. Cal. May 31, 2011) ............................................................. 23

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*,
    2020 WL 12948055 (C.D. Cal. Dec. 29, 2020) .................................................... 17, 18

*Rubio v. Cap. One Bank*,
    613 F.3d 1195 (9th Cir. 2010) .................................................................................... 22

*S/Y Paliador, LLC v. Platypus Marine, Inc.*,
    750 F. Supp. 3d 1187 (W.D. Wash. 2024).................................................................. 25

*Shah v. Cap. One Fin. Corp.*,
    768 F. Supp. 3d 1033 (N.D. Cal. 2025) ...................................................................... 21

*Sicor Ltd. v. Cetus Corp.*,
    51 F.3d 848 (9th Cir. 1995) ........................................................................................ 13

*Spartan Cap. Sec., LLC v. Vicinity Motor Corp.*,
    2023 WL 4004116 (N.D. Cal. June 13, 2023) ........................................................ 8, 17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).................................................................................................... 4

*Steen v. Am. Nat'l Ins. Co.*,
    609 F. Supp. 3d 1066 (C.D. Cal. 2022) ...................................................................... 23

*Stiegler v. Saldat*,
    2015 WL 13686087 (W.D. Wash. Oct. 23, 2015) ....................................................... 25

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009).................................................................................................... 10

*Talavera v. Glob. Payments, Inc.*,
    670 F. Supp. 3d 1074 (S.D. Cal. 2023) ...................................................................... 21

*Ten Bridges, LLC v. Midas Mulligan, LLC*,
    522 F. Supp. 3d 856 (W.D. Wash. 2021) .................................................................... 23

# TABLE OF AUTHORITIES
## (continued)

|  | Page |
|---|---|

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir. 2004) ................................................................. 14

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ............................................................................... 9

*United States v. Hernandez*,
831 F. App'x 932 (11th Cir. 2020) ............................................................. 8

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ............................................................................... 10

*Van Aldridge v. Tech. & Supply Mgmt., LLC*,
2018 WL 6340752 (C.D. Cal. June 7, 2018) .............................................. 21

*Van Buren v. United States*,
593 U.S. 374 (2021) ............................................................................... 12

*Wallace v. SharkNinja Operating, LLC*,
2020 WL 1139649 (N.D. Cal. Mar. 9, 2020) ............................................. 21

*WeBoost Media S.R.L. v. LookSmart Ltd.*,
2014 WL 2621465 (N.D. Cal. June 12, 2014) ............................................ 18

*Wikimedia Found. v. Nat'l Sec. Agency*,
857 F.3d 193 (4th Cir. 2017) ................................................................... 10

*Yoder & Frey Auctioneers, Inc. v. Equipmentfacts, LLC*,
2013 WL 1411757 (N.D. Ohio Apr. 8, 2013) ............................................. 15

**Statutes**

18 U.S.C. § 1030 ................................................................................... *passim*

Cal. Penal Code § 502 ...................................................................... 12, 13

1    **I.    <u>INTRODUCTION</u>**

2        PayPal used programming buried in its "Honey" software to surreptitiously divert millions of dollars

3    in commissions from the proposed class to PayPal. The scheme was highly technical, to be sure: Honey stole

4    commissions except if it detected that someone might be watching for such theft. Dkt. 249 ("SAC") ¶¶ 262–

5    68. But theft is theft, and Plaintiffs have more than adequately pled how PayPal diverted money directly from

6    the proposed class into PayPay's coffers and the elements of the laws that entitle the proposed class to get that

7    money back.

8        Proposed class members are journalists, YouTubers, and other content creators ("Affiliate Marketers")

9    who earn revenue in the form of "Affiliate Commissions" when they refer a consumer to make a purchase on

10    someone else's website ("Merchants"). ¶ 2 (all references to ¶ refer to the SAC). PayPal argues that Honey is

11    in this same business, but that is incorrect: Honey prompts consumers to search for discounts or cashback

12    once they are already on the Merchant's website and have navigated to the checkout page. ¶¶ 107–08. That

13    service has theoretical value (although PayPal does not necessarily deliver it in practice), but it is not the

14    business of referring consumers to a Merchant's website. *See id.* The contracts cited in the SAC confirm this

15    commonsense distinction. They compensate referrals from outside a Merchant's website. *See id.* They do not

16    compensate anything that happens once a consumer is already there. *See id.*

17        The companies that connect Affiliate Marketers with Merchants are known as "Affiliate Networks."

18    At least some specifically prohibit using software like Honey to "interfere[e] with the shopping experience"

19    whenever there is an external referral. ¶ 250. But that is exactly what Honey does: after a consumer navigates

20    to the Merchant's website, Honey would replaces the code telling the Merchant that an Affiliate Marketer sent

21    the consumer to the website with a code claiming that Honey sent the consumer there. *See* ¶ 109–14. This

22    conduct directly violates specific "stand down" protocols that industry participants designed to prevent this

23    exact type of theft. ¶¶ 116, 237–61. It is also a form of "cookie stuffing," which is equally prohibited. *See id.*

24        PayPal's conduct caused real harm: PayPal took for itself Affiliate Commissions that the proposed

25    class would have received. ¶¶ 121–22. And it is more than plausible that Honey, which once had 17 million

26    users, did in fact take Affiliate Commissions from the individual Plaintiffs in this case, who generated many

27    thousands of sales: Plaintiffs even conducted test purchases to show that Honey takes Affiliate Commissions

28    that Plaintiffs earned. ¶¶ 121–236. PayPal, therefore, is just wrong to argue that the individual Plaintiffs have

not shown it "plausible" that PayPal took Affiliate Commissions specifically from them, and it is notable that PayPal relies almost entirely on cases about possible future harm (rather than actual past harm, the primary issue in this case) to make that argument.

So while this is a case about sophisticated technology, it is also very simple: PayPal wrongfully took millions of dollars that the proposed Class earned and then tried to cover its tracks. Plaintiffs respectfully ask the Court to deny PayPal's motion to dismiss in full.

## II.    BACKGROUND

Affiliate marketing is a multibillion-dollar industry. ¶ 42. Merchants determine which Affiliate Marketer should receive a given Affiliate Commission through technology like "cookies"—code that is stored on a web browser and contains the Affiliate Marketer's Affiliate ID. ¶ 60. When a consumer clicks an affiliate link to a Merchant's page, a cookie is stored on the consumer's web browser identifying the Affiliate Marketer who referred the consumer. *Id.* The Affiliate Marketer's cookie stays on the consumer's web browser for the duration of its lifespan, unless the consumer clicks on a different affiliate link from outside the Merchant's website, in which case the second-in-time cookie will usually replace the initial cookie. ¶¶ 60–61, 65, 100.

The industry standard and most common attribution method is "last click attribution." ¶ 62. This is *not* the "consumer's literal last click." ¶ 63. Under the relevant agreements, it is the last click from outside the Merchant's website. ¶¶ 62, 63 ("navigating from one page to another by activating a hyperlink."), ¶¶ 68–76 (quoting agreements). In other words, Affiliate Marketers earn Affiliate Commissions "when their affiliate link is the final affiliate link a consumer clicks that directs the consumer to the Merchant webpage on which the consumer completes a qualifying purchase." ¶ 67. Last click is not the only attribution method, but "[n]o attribution method . . . contemplates rewarding an entity that surreptitiously tricks a Merchant into awarding undeserved credit" by replacing a cookie that was generated by a referral from outside the Merchant's website with a cookie that was generated once a consumer was already on the Merchant's website. ¶ 66.

### A.    Honey spoofs external referrals to Merchants.

PayPal promotes Honey as a convenient coupon-searching tool. ¶¶ 78–84. When installed, Honey runs on a consumer's browser and tracks their browsing activity. ¶¶ 101–06. After a consumer has arrived at a Merchant's website, selected a product, and decided to make a purchase, Honey: (1) pops up to notify the consumer of possible coupons or the ability to search for such coupons; (2) encourages the consumer to

activate cashback; and/or (3) offers the option to checkout with PayPal. ¶¶ 107–08.

Prior to this litigation, when a consumer interacted with Honey in any way, it would "fabricat[e] a 'click'—i.e., a referral to a Merchant website—where none actually takes place." ¶ 87. It manufactured this fake referral by creating a Secret Tab that briefly appeared and then disappeared. ¶¶ 109–10. The Secret Tab tricked the Merchant's website into believing that Honey provided an actual later-in-time external referral. ¶¶ 111–14. Through its Secret Tab, Honey overwrote existing Affiliate IDs, signaling to the Merchant that PayPal referred the consumer and thus earned the Affiliate Commission. *Id.* The process occurred whether or not Honey offered discounts, cashback rewards, or the option to pay with PayPal. ¶ 117. Honey did not disclose this behavior to consumers upon installation or in Honey or PayPal's terms of service or privacy policies. ¶¶ 88, 119. In response to post-filing industry outcry, PayPal decreased the frequency of its misconduct, but it has not stopped.

PayPal's spoofed referral click is a form of "cookie stuffing" (which is prohibited in the Affiliate Marketing industry), and PayPal's particular method is often *specifically* forbidden by Merchants and Affiliate Networks. ¶¶ 116, 120, 237. For instance, Plaintiffs' contracts with Merchants expressly forbid "(i) engaging in 'cookie stuffing' (ii) intercepting or redirecting web traffic, and/or (iii) intercepting, redirecting, or diverting Affiliate Commissions." ¶¶ 238–40. PayPal's conduct also violates Affiliate Network contracts and policies that require browser extensions to "stand down" and not replace Affiliate IDs "when a visitor to a Merchant has come through an Affiliate Marketer's link." ¶ 251; *see also* ¶¶ 242–50, 253–61. At least until this litigation, Honey did not honor stand down rules for consumers, although it *was* coded to hide its conduct by "stand[ing] down" where it detected the user was likely a network tester. ¶¶ 263–68.

Soon after the SAC was filed, several Affiliate Networks and Merchants ended their relationships with Honey in direct response to its circumvention of the rules of affiliate marketing.[1]

---

[1] Rakuten Advertising Becomes First Major Network to Remove PayPal Honey Following Attribution Revelations, Affiverse Media (Jan. 13, 2026), https://tinyurl.com/zdcmx8e7; Luis Rijo, Impact.com just kicked Honey off its network for hiding cookie theft, PPC Land (Jan. 17, 2026), https://tinyurl.com/wwmwdhws; Adam Ross, Awin Group Statement on Honey Investigation and

**B.    Honey diverted commissions from Plaintiffs.**

At least 17 million people once used Honey, ¶ 84, though millions uninstalled it when PayPal's unscrupulous conduct came to light, ¶ 269. Any time one of those 17 million people followed an Affiliate Marketer's link to the Merchant website and made a purchase, PayPal took an Affiliate Commission, "swap[ping] out a legitimate Affiliate ID with PayPal's own." ¶ 121. Plaintiffs' test purchases confirm this: (1) when Plaintiffs' expert clicked Plaintiff Justin Tech Tips' affiliate link and purchased a product *without* interacting with Honey, Justin Tech Tips received an Affiliate Commission on the sale, but (2) when the expert repeated the same exact steps and *did* interact with Honey, Honey overwrote Justin Tech Tips' Affiliate ID with PayPal's and Justin Tech Tips did *not* receive an Affiliate Commission. ¶¶ 124–41.

## III.    LEGAL STANDARDS

To establish Article III standing, Plaintiffs must allege plausibly that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016); *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015) (standing to pursue claims based on "cookie stuffing"). To state a claim for relief, a plaintiff must "allege facts that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *E.g.*, *Oxley v. Madrigal*, 2025 WL 360858, at *3 (N.D. Cal. Jan. 31, 2025) (Freeman, J.) (citations omitted).

## IV.    ARGUMENT

**A.    Plaintiffs have Article III standing.**

The SAC cures the two deficiencies the Court identified in its prior motion to dismiss order. *See* Dkt. 237 ("Order"). It includes: (1) citations to "Plaintiffs' agreements with the merchants," entitling Plaintiffs to earn Affiliate Commissions when consumers use their affiliate links to navigate to the Merchant website and make a purchase; and (2) test purchases showing that Honey in fact took Affiliate Commissions that would otherwise have gone to Plaintiffs. The SAC also addresses PayPal's related arguments. Mot. at 6–12.

**1.    Plaintiffs plausibly allege contractual entitlement to Affiliate Commissions.**

First, the SAC pleads exemplar terms showing that Plaintiffs are entitled to Affiliate Commission

---

Remediation Path, AWIN (Jan. 21, 2026), https://tinyurl.com/2kvfj253.

1  where users make purchases after clicking Plaintiffs' affiliate links to a Merchant website. *See, e.g.*, ¶¶ 67–

2  77, 237–61. Such contracts "establish that Plaintiffs were in fact entitled to those commissions pursuant to

3  their contracts with the merchants," because they provide that "Plaintiffs are entitled to the commission once

4  a consumer (i) navigates to the merchant's website through the Plaintiffs' affiliated link, (ii) does not

5  subsequently navigate to the website through another affiliate link, and (iii) makes a purchase." Order at 5

6  (citing *In re Cap. One Fin. Corp.*, 2025 WL 1570973, at *6 (E.D. Va. June 2, 2025) ("Cap. One")).

| Plaintiff | Contract Language Showing Entitlement To Commissions |
|---|---|
| Ahntourage Media | ¶ 69 (Amazon: Affiliate Commissions are earned "if '"(i) a customer clicks through a Special Link on your Site to an Amazon Site; and (ii) during a single session . . . the customer purchases a Product . . . and (iii) the Product is shipped to, streamed, or downloaded by, and paid for by the customer.'"), 71 (Staples: Affiliate "earn[s] a cash commission" on "[s]ales generated through the Affiliate link," and where products "are (i) sold by us [Staples,] (ii) purchased by Customers linking to our participating websites from your Affiliate Website pursuant to a link, (iii) shipped and/or supplied by us, and (iv) full[y] paid for." ) (citation modified). |
| Angry Snowboarder | ¶¶ 69 (Amazon, *see supra*), 73 (Backcountry: "'A Qualifying Link means a link from your website or social property to our website . . . provided by us or through the Affiliate Network . . . that allows us or our Affiliate Network to track the use of such links by your visitors.' . . . [A]n Affiliate Marketer earns Affiliate Commissions 'based on last-click attribution,' which 'means that Media Partners only earn a Commission on a sale if the end user's interaction with the Qualifying Link tracking the Media Partner's advertising or content constitutes the last attributable interaction prior to the end user's purchase of the product at issue.' . . . . '[A] customer's use of a coupon or promotional code provided by a Media Partner does not, by itself, constitute a last-click for the purposes of determining the Media Partner's commissions.'") (citation modified). |
| Mr. Ramirez | ¶¶ 68 (Kohl's: "A 'qualifying link' is a link from Media Partner's site to Advertiser's site using one of the URL provided by Advertiser for use in the Platform if it is the last link to Advertiser's site that the Customer uses during the Session where a sale of a product or a service to Customer occurs."), 69 (Amazon, *see supra*). |
| Brevard Marketing | ¶ 69 (Amazon, *see supra*). |
| Red Beard Studios | ¶¶ 69 (Amazon, *see supra*), 72 (Lowe's: Affiliate Commission earned "if a consumer '(a) use[s] a browser that has its cookies setting enabled; and (b) complete[s] a purchase directly from an Affiliate Link provided in accordance with the Program and these Program Terms.'"). |
| Storm Productions | ¶ 74 (Bergdorf Goodman and Neiman Marcus: "'Merchant agrees to pay Affiliate the commission specified in the Engagement if Merchant sells to a visitor to Merchant's site (a 'Customer') a product or service that is the subject of the Engagement and if that Customer has accessed Merchant's site and purchased the product or service via a 'Qualifying Link[,]'" defined as "'a link from Affiliate's site to Merchant's site . . . if it is the last link to the Merchant's site that the Customer uses during a Session where a sale . . . occurs."). |
| Gents Scents | ¶ 75 (Macy's: "An Affiliate Marketer is entitled to an Affiliate Commission 'for referring Visitors . . . to the Destination Site who complete the Transaction required under the Program . . . and a qualifying 'Transaction' occurs when a Visitor: (a) clicks on a Link located on an Affiliate's . . . promotional channel; (b) is directed to the appropriate Destination Site; and (c) properly completes the appropriate action (e.g., a Sale or a Lead).'"). |
| Mr. Lachman | ¶ 69 (Amazon, *see supra*). |
| Justin Tech Tips | ¶¶ 69 (Amazon, *see supra*), 70 (Dell: "'Qualifying Link' means a link from Your Marketing Platform(s) to the Dell Site using the required URLs specified in an Offer (or other URL or graphic link expressly provided by Dell for use in connection with an Offer), provided that it is the last link to the Dell Site that a visitor uses during a Session where a sale of a product or a service occurs.'"). |
| Stuber Holdings | ¶ 69 (Amazon, *see supra*). |
| Dan Becker | ¶¶ 69 (Amazon, *see supra*), 73 (Backcountry, *see supra*). |

a.    **PayPal's contract parsing does not defeat standing.**

PayPal attempts to raise contract-specific arguments to assert that Plaintiffs are not entitled to Affiliate Commissions. Mot. at 6–7. In particular, PayPal focuses on contracts with Dell and Bergdorf Goodman, asserting that Plaintiffs' choice of contract terms "raise[s] more questions than answers about their legal entitlement to the relevant commissions." Mot. at 8. This is wrong both factually and legally.

*First*, the facts. The contracts support Plaintiffs' claims. The relevant language uniformly describes Plaintiffs' right to Affiliate Commissions where users click Plaintiffs' affiliate links, navigate to a Merchant website, and complete a purchase. The Dell contract defines a "Qualifying Link" as a "link from Your Marketing Platform(s) to the Dell Site using the required URLs . . . provided that it is the last link to the Dell site that a visitor uses during a Session where a sale of a product or a service occurs." ¶ 70. The Bergdorf contract (also quoted above) is substantively identical. ¶ 74. This should end the inquiry, as Plaintiffs sufficiently alleged their entitlement to Affiliate Commissions where they refer customers to Dell or Bergdorf.

PayPal ignores this language, relying on a clause in the Dell contract that defines "Marketing Platform" to include "ad-supported software," which it insists—without explanation—encompasses Honey. Mot. at 7. But whatever Honey calls itself, it is still not permitted to use a Secret Tab to re-direct Plaintiffs' Affiliate Commissions (much less ignore stand down rules). Theft is theft, even when done by "ad-supported software." Additionally, the contract specifically prohibits PayPal's conduct, since it forbids using "any device that causes a Qualifying Link to be accessed **other than by a Visitor to your website manually and knowingly clicking on such link** on your Marketing Platform." Ex. A, 3.2(r) (emphasis added).

PayPal's attack on the Bergdorf contract also fails. PayPal insists that a separate agreement, an "Engagement," helps to define the amount payable after a link is followed. Mot. at 7. But PayPal does not quote or provide that agreement or otherwise dispute Plaintiffs' broader argument that *no* contractual term permits its conduct. The Bergdorf contract explicitly prohibits using "any type of software download or technology . . . which attempts to intercept or re-direct traffic or referral fees to or from, any other website without the written consent of Merchant." Ex. B, 2.7. That ends the inquiry.

*Second*, the law. PayPal claims that the SAC "vaguely" describes certain contractual terms and otherwise argues for certain provisions to be interpreted in its favor. Mot. at 8–9. But because Plaintiffs interpret the contracts plausibly, their claims cannot be dismissed based on PayPal's differing interpretation.

*Hall v. FCA US LLC*, 2022 WL 1714291, at *1 (9th Cir. May 27, 2022) (a court "err[s]" if it adopts a defendant's "proposed [contract] interpretation at the motion to dismiss stage"); *Spartan Cap. Sec., LLC v. Vicinity Motor Corp.,* 2023 WL 4004116, at *6 (N.D. Cal. June 13, 2023) (similar) (collecting cases).

        **b.**     **PayPal's surreptitious behavior demonstrates its awareness that Plaintiffs are entitled to Affiliate Commissions.**

PayPal insists that Plaintiffs' allegations regarding the Secret Tab and stand down are irrelevant because "those allegations do not impact the threshold question of whether Plaintiffs were ever entitled to the commissions in the first place." Mot. at 8. But those allegations demonstrate PayPal's awareness of Plaintiffs' entitlement to Affiliate Commissions. The Secret Tab and Honey's circumvention of stand down protocols are designed to effectuate and hide PayPal's theft; they serve no other function. ¶¶ 114 ("There is no technical reason for this hidden redirect . . . apart from stealing . . . ."); 268 ("PayPal is knowingly diverting and taking Affiliate Commissions . . . and attempting to evade detection and cover up its conduct . . . ."); 253–60 (email exchange where Honey admits it violated Rakuten's stand down protocol). These allegations support the inferences that: (1) Plaintiffs are entitled to Affiliate Commissions; and (2) PayPal knows its actions are wrongful. *Cf. United States v. Hernandez*, 831 F. App'x 932, 935 (11th Cir. 2020) (surreptitious conduct supports inference of consciousness of guilt).

At minimum, Plaintiffs have alleged that they have standing through: (1) ample contractual evidence that they are entitled to Affiliate Commissions when users click their links to Merchant websites and complete purchases; and (2) PayPal *itself* recognizing this entitlement by hiding its scheme. PayPal's cherry-picked contractual language does not persuade otherwise.

        **2.**     **Plaintiffs plausibly allege concrete injury traceable to PayPal's conduct.**

In response to the Order, the SAC details two test purchases demonstrating that Plaintiffs lose Affiliate Commissions when a user interacts with Honey. First, when Plaintiffs' expert clicked Plaintiff Justin Tech Tips' Dell affiliate link and completed a purchase *without* engaging Honey, Justin Tech Tips received an Affiliate Commission of $2.45. ¶¶ 125–31. Second, in an identical purchase where the expert engaged Honey, Honey surreptitiously opened and closed its Secret Tab to fabricate a referral, overwrote the "dellven" cookie value from "Justin Tech Tips LLC" to "PayPal Inc.," and Justin Tech Tips received no Affiliate Commission. ¶¶ 132–40. (This is the same type of "test purchase" that was conducted in the *Capital One* litigation. ¶¶ 124–

41; Order at 6.) The same type of diversion occurred for all Plaintiffs. ¶¶ 121–24, 142–236.

PayPal argues Plaintiffs' theory of standing is too attenuated because (1) it relies on a "lengthy chain of speculation" and ignores the class of transactions that would not have taken place but for Honey; and (2) the test purchase does not provide standing for all plaintiffs. Mot. at 9–12. None of these arguments persuades.

### a.    **It is plausible that Honey took at least one Affiliate Commission from each Plaintiff during the class period.**

The SAC lays out concrete facts showing that it is at least plausible that Honey took at least one Affiliate Commission from each Plaintiff: Honey was installed on 17 million different browsers and has relationships with at least 30,000 Merchants, and Plaintiffs generate many thousands of transactions each year from many of those same Merchants. ¶¶ 142, 156–57, 164–65, 172–73, 180–81, 188–89, 196–97, 204–05, 212–13, 220–21, 228–29 (detailing transactions ranging from 600 to 1 million and identifying Merchants and Affiliate Networks with whom PayPal also has relationships). There is nothing attenuated about this: the volume of transactions and overlapping Merchants shows PayPal almost certainly took money from Plaintiffs.

PayPal has two primary responses. *First*, it claims that there are "plenty of reasons that a Plaintiff might not receive a commission that have nothing to do with Honey," and that Plaintiffs ignore transactions that purportedly "would not have occurred but for the coupons, discounts, and cashback rewards Honey provides." Mot. at 10–11. But whether Honey may have increased the likelihood of purchase in some instances has no bearing on, and cannot defeat, standing. At most, discovery showing that Honey caused a material number of transactions that would not otherwise have occurred will reduce PayPal's damages. *Cf. Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455–56 (2016) (plaintiffs may use statistical sampling at class certification to show such damages).

*Second*, PayPal argues that the statistical analysis discussed in the SAC is imperfect and that statistics cannot be used to help establish standing. Mot. at 11. The SAC meets plausibility even without statistics, so this is to some degree an academic critique. But out of an abundance of caution, Plaintiffs stress that PayPal is wrong both factually and legally. PayPal is wrong factually because statistical analyses at the pleadings need merely be plausible. *See, e.g.*, *Dover v. Brit. Airways, PLC (UK)*, 2013 WL 5970688, at *4 (E.D.N.Y. Nov. 8, 2013) (declining to "judge the merits of the competing [statistical] analyses" on motion to dismiss).

1    Here, given Honey's widespread use by millions of consumers and the number of transactions each Plaintiff

2    generated, it is a near certainty that Honey diverted an Affiliate Commission for each Plaintiff. ¶¶ 231–36;

3    *see also Cap. One*, 2025 WL 1570973, at \*5 (similar analysis established standing at motion to dismiss

4    stage).

5        PayPal is wrong legally because its cases do not support the proposition that "the law of averages is

6    not a substitute for standing." Mot. at 12. As before, PayPal cites *Summers v. Earth Island Institute*, 555 U.S.

7    488 (2009) and *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,

8    454 U.S. 464 (1982). But those cases are about future harm—nearly always a much thornier standing issue

9    than past damages—and they contain no such proposition even in that context. *Summers* addressed

10    associational plaintiffs who argued vaguely that their members had visited "many national forests" and

11    "plan[ned] to visit several unnamed national forests in the future." 555 U.S. at 495–96. The Supreme Court

12    explained that such speculation about future visits was "a chance, but . . . *hardly a likelihood.*" *Id.* at 495

13    (emphasis added). Plaintiffs here do not describe a vague intention to perhaps do something in the future, but

14    a near statistical certainty that harm has already occurred. ¶¶ 231–36. *Valley Forge* is even further afield: it

15    had nothing to do with statistics, rejecting standing where the asserted "harm" was "psychological . . .

16    presumably produced by observation of conduct with which one disagrees." 454 U.S. at 485–86.

17        In short, neither of PayPal's critiques lands because Plaintiffs allege *actual* lost Affiliate

18    Commissions tied to specific transactions and a specific, identifiable mechanism that operates consistently

19    across their affiliate marketing activities. *See, e.g.*, *Cap. One*, 2025 WL 1570973, at \*3, 5; *see also, e.g.*,

20    *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 212 (4th Cir. 2017) (crediting plaintiffs' claim that,

21    to a near statistical certainty, some of their communications must have been intercepted by government);

22    *Dover*, 2013 WL 5970688, at \*4 (plausibly alleging improper charge with rudimentary statistics).

23        **b.    Plaintiffs' test purchase establishes standing, just as test purchases**

24        **established standing in *Capital One*.**

25        PayPal further argues that, under *Murthy v. Missouri*, 603 U.S. 43 (2024), a single test purchase can,

26    at most, establish standing for Justin Tech Tips. Mot. at 11. *Murthy* is inapposite. There, different plaintiffs

27    alleged different content restrictions on different platforms at different times, allegedly caused by different

28    defendants, who in that case were government actors. *Id.* at 61. On a preliminary injunction, the Supreme

- 10 -

Court required plaintiff-by-plaintiff, platform-by-platform proof and held that plaintiffs failed to show that "a particular defendant pressured a particular platform to censor a particular topic before that platform suppressed a particular plaintiff's speech on that topic." *Id.*

Here, by contrast, Plaintiffs allege uniform conduct by a single defendant causing the same injury (lost Affiliate Commissions) to all Plaintiffs through the same mechanism (Honey's Secret Tab). Each Plaintiff alleges substantial Affiliate Marketing activity across numerous Merchants, ¶¶ 142–230, and the SAC pleads transaction-level proof of how the Secret Tab works through the test purchases, ¶¶ 124–41. These "Test Purchases demonstrate, at this point, economic losses that plausibly allege a concrete injury that is directly traceable to the Extension." *Cap. One*, 2025 WL 1570973, at *5. And they do so for all Plaintiffs. *See id.*

## B.    Plaintiffs state claims under CFAA and CDAFA.

The Computer Fraud and Abuse Act ("CFAA") and California's Comprehensive Computer Data Access and Fraud Act ("CDAFA") prohibit: (1) unauthorized computer access; and (2) transmitting a program that causes unauthorized damage. "CDAFA claims generally rise or fall with . . . CFAA claims because the necessary elements of Section 502 do not differ materially from the necessary elements of the CFAA." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260 (N.D. Cal. 2022). PayPal violates the CFAA when it:

- "knowingly causes the transmission of a program . . . and as a result . . . intentionally causes damage without authorization." 18 U.S.C. § 1030(a)(5)(A).
- "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and . . . furthers the intended fraud and obtains anything of value." *Id.* § 1030(a)(4); or
- "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." *Id.* § 1030(a)(5)(C).

The first provision forbids transmitting a program that causes unauthorized "*damage.*" *Id.* § 1030(a)(5)(A). The other two address *access* that: (A) exceeds authorization, *id.* § 1030(a)(4); or (B) is "unauthorized," *id.* § (a)(5)(C). PayPal's challenges fail as to all three provisions.

### 1.    Plaintiffs properly allege violation of 18 U.S.C. § 1030(a)(5)(A).

18 U.S.C. § 1030(a)(5)(A) (and Cal. Penal Code § 502(c)(8)) forbids the transmission of a program that "intentionally causes damage without authorization, to a protected computer." There is no dispute that PayPal caused the transmission of a program, ¶¶ 78, 88, or that all at-issue computers are "protected

computers" because they are "used in or affect[] interstate or foreign commerce or communication," 18 U.S.C. § 1030(e)(2)(B).

PayPal, however, argues that it did not cause any "damage" cognizable under the statute. Mot. 14. "Damage" is defined as "any impairment to the integrity or availability of data." 18 U.S.C. § 1030(e)(8). Plaintiffs' Affiliate IDs are "damaged" when PayPal overwrites and destroys them. *See, e.g.*, ¶¶ 295, 364. Those Affiliate IDs are digital tokens exchanged for money: destroying them constitutes a "technological harm[]—such as the corruption of files." *Van Buren v. United States*, 593 U.S. 374, 392 (2021). Affiliate IDs are the means by which a multi-billion-dollar system of commerce operates and thus have independent value; without them, Plaintiffs do not get paid. PayPal's cases are thus off-point; all involved loss of control of data that could not be redeemed for money. *See Doe v. Cnty. of Santa Clara*, 2024 WL 3346257, at *9 (N.D. Cal. July 8, 2024) (loss of control of medical data); *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 485–86 (N.D. Cal. 2021) (loss of "indemnification rights" from collection of financial data).

While PayPal does not appear to claim otherwise, Plaintiffs note for completeness that this damage was not authorized. ¶¶ 239, 241–68, 297–300, 304–05, 308–16; *see In re Apple Inc. Device Performance Litig.*, 434, 451–52 (N.D. Cal. 2018) (sustaining 18 U.S.C. § 1030 (a)(5)(A) violation where plaintiffs downloaded updates that slowed processor speeds because consumers "did not and could not consent to" the slower speeds where "Apple never disclosed the [updates'] intended effects"). Among other things, even if consumers "authorized" this damage, the Affiliate Networks certainly did not, and consumer authorization alone is insufficient. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016) (consumer authorization alone insufficient when data housed on consumers' computers and Facebook's servers).

### 2. Plaintiffs properly allege violations of 18 U.S.C. §§ 1030(a)(4) and (a)(5)(C).

#### a. PayPal's access was without or in excess of authorization.

PayPal's access of consumers' computers exceeded the scope of any authorization under 18 U.S.C. § 1030(a)(4) (and Cal. Penal Code § 502(c)(1)) and was wholly "without authorization" in violation of § (a)(5)(C) (and Cal. Penal Code § 502(c)(4)) because (i) consumers did not authorize PayPal to surreptitiously overwrite Plaintiffs' Affiliate IDs, (ii) any purported authorization was predicated on deception that went to the essential character of the access, and (iii) PayPal exceeded any purportedly authorized access because Honey used its access to alter information it was not entitled to alter. ¶¶ 88, 252–68, 297, 299, 301–

1    02, 307–314.

2         PayPal argues that: (i) the FAC's allegations on "permissions" constitute a judicial admission; (ii) the

3    SAC contradicts the FAC; (iii) the SAC fails to plead the elements for fraudulent inducement; and (iv)

4    Plaintiffs seek to apply the statutes to ordinary competition. Mot. at 12–14. PayPal is wrong.

5         *First*, PayPal misstates the law in claiming that the FAC's allegations regarding "permissions"

6    constitute a "binding" judicial admission. Mot. at 12–13. Factual allegations in a prior complaint are not

7    binding if they are amended. *See Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) ("When a pleading

8    is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission."). While the

9    prior allegations remain evidence, a court must afford "due weight" to a parties' explanation for the change,

10   *see Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859–60 (9th Cir. 1995), and courts routinely consider such

11   explanations in oppositions to a motion to dismiss. *See, e.g.*, *Brown v. Perris Park Apartments P'ship*, 2019

12   WL 1771662, at *4 (C.D. Cal. Feb. 22, 2019). That general rule should have particular force here, where there

13   is no mystery as to why Plaintiffs made this change: Plaintiffs removed the word "permissions" from the

14   complaint to avoid conflation of their initial, colloquial use of the word with the term of art used in CDAFA

15   ("permissions"). Consumers do not authorize PayPal to overwrite or destroy Affiliate IDs simply because the

16   consumer purposefully downloaded Honey. *See* ¶¶ 88, 313.

17        *Second*, PayPal misreads the SAC to argue that its allegations about "disclosure" and "authorization"

18   contradict the FAC. Mot. at 13. Both complaints contain near-identical allegations about "disclosure;" i.e.,

19   that consumers "did not authorize [Honey] to operate in this manner or to alter this data and PayPal's cookie

20   stuffing activities and associated practices are not disclosed in [Honey's] terms of service." FAC ¶ 375; SAC

21   ¶ 313. Even if the Court were to accept PayPal's unwarranted implication that consumers authorized PayPal

22   to surreptitiously manipulate their browsers, Plaintiffs clearly allege that PayPal altered Affiliate IDs that it

23   was not authorized to alter. ¶¶ 121–23, 239–68, 307–16. That is all the CFAA requires; under the statutory

24   definition, "exceeds authorized access" means to use computer access to "alter information . . . the accessor

25   is not entitled to . . . alter." 18 U.S.C. § 1030(e)(6). And as to authorization, both complaints allege that

26   consumers are unaware when they install Honey that it will overwrite Affiliate IDs to steal Affiliate

27   Commissions. *Compare* FAC ¶ 113; *with* SAC ¶ 88.

28        *Third*, the SAC adds "allegation[s] of fraud or deception" to "demonstrate that customers [did not]

- 13 -

voluntarily and affirmatively grant[] authorization to PayPal to carry out the actions that Plaintiffs complain of in their Computer Fraud claims." Order at 8. PayPal deceived consumers by (1) failing to inform them of PayPal's technical circumvention and that it contracted with Merchants to harm consumers and (2) misstating that PayPal provides consumers with the best coupon codes on the internet it intentionally hid such coupons from consumers. ¶ 301. Any purported authorization to access consumer's computers was achieved by deceiving consumers about Honey's nature and core value proposition. ¶¶ 301–03 ("PayPal also fundamentally misled consumers about the nature of [Honey]."). Courts routinely find allegations of deception sufficient to state a claim under these statutes. *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1073, 1078 (9th Cir. 2004) (deceit invalidates authorization under the CFAA); *Apple*, 347 F. Supp. 3d at 452–53 (authorization would be invalid if defendant "misdescribed the nature of the iOS updates in order to gain access to Plaintiffs' iPhones"); *Fish v. Tesla, Inc.*, 2022 WL 1552137, at *9 (C.D. Cal. May 12, 2022) (similar). Contrary to PayPal's assertion, this Court did not require Plaintiffs to satisfy the elements of a fraudulent inducement claim to raise the CFAA or CDAFA claims, Order at 8, nor do other courts require as much, *see Theofel*, 359 F.3d at 1073, 1078; *Apple*, 347 F. Supp. 3d at 452–53; *Fish*, 2022 WL 1552137 at *9.

*Finally*, PayPal's surreptitious hacking of consumers' computers to steal Affiliate Commissions fits squarely within the scope of the CFAA, notwithstanding PayPal's inapposite references to "competition." *See, e.g.*, *eBay Inc. v. Digital Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (upholding claim premised on alleged cookie-stuffing scheme). PayPal's conduct is *not* "ordinary competition," but a secret scheme to subvert the industry's rules. *See, e.g.*, ¶¶ 238–39 (Merchant contracts prohibit "cookie stuffing" or using "redirects" to divert Affiliate Commissions); ¶¶ 242–51 (stand down protocols); ¶¶ 253–61 (PayPal's repeated violations of stand down). The ordinary placement of a cookie does not require alterations to the computer's permissions, which is precisely *why* PayPal had to alter consumers' computers to steal Affiliate Commissions and try to hide its conduct. *See, e.g.*, ¶¶ 90–98, 116 (discussing how cookie-stuffing circumvents security protocols); ¶¶ 311–12, 365 (describing how cookies cannot be overwritten under a browser's standard settings); ¶¶ 297–300, 308 (describing selective adherence to stand down protocols to avoid detection).

### b.    Plaintiffs allege all remaining elements of 18 U.S.C. § 1030(a)(4).

Aside from unauthorized or exceeding "access," PayPal does not appear to challenge that Plaintiffs' allege all three elements of their 18 U.S.C § 1030(a)(4) claim, i.e., that PayPal (1) accessed a protected

1  computer used in interstate commerce; (2) did so with the intent to defraud and furthered such fraud against

2  Plaintiffs, ¶ 295; and (3) that PayPal obtained value in excess of $5,000. ¶¶ 295–303, 307–16, 362.

3     **c.**  **Plaintiffs allege all remaining elements of 18 U.S.C. § 1030(a)(5)(C).**

4    Plaintiffs also sufficiently plead the remaining elements of 18 U.S.C § 1030(a)(5)(C): (1) PayPal

5  impaired the integrity of data, namely Plaintiffs' Affiliate IDs, and thereby caused damage; (2) PayPal caused

6  loss, namely Plaintiffs' lost Affiliate Commissions; and (3) the accessed computers are protected computers.

7  ¶¶ 295–303, 307–16, 364. At this stage of litigation, PayPal appears to challenge only the first two elements—

8  "damage" and "loss." PayPal's arguments regarding "damage" should be rejected for the reasons explained

9  above. *See supra* at 11–12. As to loss, PayPal argues that Plaintiffs have failed to allege a cognizable loss

10  under the CFAA (and CDAFA), which are generally understood to be those caused by an "interruption of

11  service," 18 U.S.C. § 1030(e)(11).

12    PayPal is mistaken. By surreptitiously stuffing cookies and "redirecting communications within the

13  Affiliate Commission attribution system," PayPal engaged in an "interruption of a service." ¶¶ 295, 315–16,

14  366, 370. PayPal interrupted the orderly operation of a transaction by illicitly diverting payments from the

15  Affiliate Marketer that rightfully earned them. *Id.* Courts are clear that interrupting a transaction that would

16  otherwise take place is an interruption of service. *See, e.g.*, *Cap. One*, 2025 WL 1570973, at *12; *Integrity*

17  *Applied Sci., Inc. v. Clearpoint Chemicals LLC*, 2020 WL 12584444, at *2 (D. Colo. Apr. 20, 2020)

18  (interception and diversion of orders was "interruption of service" under CFAA); *Yoder & Frey Auctioneers,*

19  *Inc. v. Equipmentfacts, LLC*, 2013 WL 1411757, at *3 (N.D. Ohio Apr. 8, 2013) (defendant "interrupted

20  service," when it used a computer to impair the integrity of an auction service).

21    **C.**  **Plaintiffs adequately plead their intentional interference claims.**

22    Plaintiffs properly allege claims for intentional interference with contractual relations ("IICR") and

23  intentional interference with prospective economic advantage ("IIPEA"). SAC Counts 3 & 4. The elements

24  of an IICR claim are: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the

25  defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or

26  disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and

27  (5) resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020). The IIPEA elements

28  are identical, but instead of a contract there must be an economic relationship with the probability of future

benefits to the plaintiff. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 1158–59 (2003).

The Court previously dismissed these claims on the same basis it found Article III standing lacking—i.e., the FAC did not sufficiently allege contractual terms and rights that were disrupted. Order at 10. The SAC pleads the elements of these claims. First, Plaintiffs allege valid contracts with Affiliate Networks and Merchants and the specific terms they plausibly contend entitle them to Affiliate Commissions. *See* ¶¶ 62–77, 141–230. The same allegations plausibly allege the existence of an economic relationship with the probability of future benefits sufficient to form the basis of an IIPEA claim. Second, Plaintiffs allege that PayPal is aware of Plaintiffs' contracts and economic relationships because such relationships "are standard in the affiliate marketing industry," ¶ 339; and Honey tracks and logs "whether an Affiliate ID is already applied." ¶ 106. Third, Plaintiffs allege that PayPal's deliberate use of Honey to overwrite Plaintiffs' Affiliate IDs is designed to disrupt Plaintiffs' contracts because "[t]here is no technical reason for this hidden redirect and use of the Secret Tab apart from stealing" Affiliate Commissions. ¶ 114. Fourth, PayPal actually disrupted Plaintiffs' contracts and business relationships when it diverted their Affiliate Commissions using the Secret Tab. ¶¶ 86–236. And fifth, PayPal damaged Plaintiffs by diverting their Affiliate Commissions. ¶¶ 121–236.

Challenging only elements three and four—intentional acts and actual disruption—PayPal raises three arguments: (1) Plaintiffs are not more entitled than Honey to Affiliate Commissions under their contracts with Merchants; (2) allegations that Honey intentionally violates stand down protocols "do not plausibly allege violations of applicable requirements or disruptions of Plaintiffs' relationships;" and (3) if the Court dismisses Plaintiffs' other claims, the tortious interference claims fail for lack of an independently wrongful act. Mot. at 16–19. None of these arguments supports dismissal.

### 1. The contracts demonstrate that Plaintiffs are entitled to Affiliate Commissions, and who is *more* entitled is a question for trial.

As discussed above, the contracts cited in the SAC uniformly provide that Plaintiffs are owed Affiliate Commissions where users make purchases after clicking Plaintiffs' affiliate links to a Merchant website. *See supra* at 4–11; ¶¶ 67–77, 237–61. For example, the Staples contract provides that an Affiliate Marketer "earn[s] a cash commission" on "[s]ales generated through the Affiliate link," where products "are (i) sold by us [Staples, and] (ii) purchased by Customers linking to our participating websites from your Affiliate Website pursuant to a link[.]" ¶ 71 (Ahntourage Media contract). Plaintiffs also detail how Honey overwrites Plaintiffs'

Affiliate IDs using the Secret Tab. *See supra* at 8–11; ¶¶ 67–77, 86–236. *See Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 2015 WL 3488923, at *7 (N.D. Cal. June 2, 2015) (plaintiff alleged actual disruption where "intentional acts by the defendant resulted in cancellations of existing orders").

PayPal's response is a trial argument: that Plaintiffs are not *more* entitled than PayPal to Affiliate Commissions. But "[w]hether a plaintiff possesses legally enforceable rights under a contract is a question on the merits." *Lindsey v. Starwood Hotels & Resorts Worldwide Inc.*, 409 F. App'x 77, 78 (9th Cir. 2010); *Spartan Cap. Sec., LLC v. Vicinity Motor Corp.*, 2023 WL 4004116, at *6 (N.D. Cal. June 13, 2023) (denying motion to dismiss contract claim because "the non-moving party's interpretation of the contract need only be plausible to withstand a Rule 12(b)(6) motion."). At this stage, Plaintiffs are entitled to all reasonable inferences in their favor.

### 2.    <u>Plaintiffs plausibly allege disruptions of Plaintiffs' relationships.</u>

The SAC includes detailed allegations that PayPal intentionally disrupted Plaintiffs' contracts and economic relationships because PayPal knew that contractual interference or breach was a 'necessary consequence of [its] action,' even if not the primary purpose." *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*, 2020 WL 12948055, at *4 (C.D. Cal. Dec. 29, 2020), *aff'd*, 2022 WL 18906 (9th Cir. Jan. 3, 2022) (citation omitted). Plaintiffs allege that:

(A) PayPal knew of Plaintiffs' contracts with Merchants, ¶ 339;

(B) Honey logs whether an Affiliate ID is already present in the consumer's journey, ¶ 106;

(C) PayPal understood that Honey's Secret Tab "causes any existing Affiliate IDs to be overwritten with PayPal's Affiliate ID," ¶ 353;

(D) "[t]here is no technical reason for this hidden redirect and use of the Secret Tab apart from stealing" Affiliate Commissions, ¶ 114; and

(E) that PayPal deliberately coded Honey to avoid detection of its scheme by standing down only where the user is likely a network tester, ¶¶ 267–68.

These establish that PayPal "intended to cause the interference itself" because PayPal knew that a "necessary consequence" of its conduct was the diversion to itself of Affiliate Commissions that Plaintiffs had earned. *Rosenthal*, 2020 WL 12948055, at *3, 5, 7; *see WeBoost Media S.R.L. v. LookSmart Ltd.*, 2014 WL 2621465, at *3, 7 (N.D. Cal. June 12, 2014) (plaintiff pled intent element of IICR and IIPEA claims where it alleged

defendant "engineered the click fraud itself" by "initiat[ing] automated software processes designed to make it appear as if legitimate on-line consumers were visiting these bogus websites and then clicking ads") (citation modified). PayPal has three responses. None lands.

*First*, PayPal argues that Honey "reasonably relie[d] on its relationship with a third party" and Plaintiffs have "not demonstrated any intent to harm" Affiliate Marketers. Mot. at 16 (citing *Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130, 1138 (C.D. Cal. 2013)). But the *Oakley* summary judgment opinion expressly cabined a defendant's right to rely on a third party's representations to situations where the relevant information is "not within the knowledge of the person to whom the claim is made[.]" *Id.* at 1136–37 (citation omitted). Here, *PayPal* knew that its conduct disrupted Plaintiffs' contractual entitlements to Affiliate Commissions because: (1) Honey "is designed to monitor and contemporaneously log . . . the full-string URL of each web page visited by a consumer;" (2) from these URLs, Honey knew there was "a commission-based economic relationship between the specific Merchant and the specific Affiliate Marketer;" and (3) Honey overwrites Plaintiffs' Affiliate IDs to "falsely hold [PayPal] out as the referrer of the specific products and/or services, even though the sale in question emanated from an Affiliate Marketer's affiliate link." ¶¶ 351–52.

*Second*, PayPal says that the fact that Affiliate Network agreements reference browser extensions contradicts allegations that Honey's conduct was secret or unreasonable. Mot. at 17. Even putting aside that PayPal is asking the Court to construe allegations in PayPal's favor, this argument misses the mark. Affiliate Networks specifically sought to *prevent* conduct like PayPal's by barring cookie stuffing and enacting stand down policies. *See, e.g.*, ¶¶ 237–51. That does not mean they knew the details of PayPal's Secret Tab scheme, much less endorsed it. In fact, the SAC details the significant backlash PayPal has faced from industry insiders and consumers, which has only increased following the filing of the SAC's detailed allegations. *See* ¶¶ 269–74; *supra* n.1. PayPal also claims that its correspondence with Rakuten demonstrates that Honey's conduct was known and accepted. This is wrong; the exchange does not imply (much less show plausibly) that industry participants had any idea that Honey redirected commissions when it detected that an Affiliate Marketer had already sent the consumer to the Merchant site.

*Third*, PayPal attempts to turn in its favor the fact that *some* formal stand down protocols came into effect after PayPal's scheme was first revealed. Mot. at 18. But the industry's swift, formal repudiation of PayPal's conduct supports Plaintiffs, not PayPal. In any event, PayPal has no response to Plaintiffs'

allegations that it tries to prevent detection by selectively standing down only where it detects that the user might be a network tester, ¶¶ 267–68, or that PayPal was made aware of Honey's repeated failures to comply with stand down protocols for *years* before this litigation was filed. ¶¶ 252–61.

### 3. Plaintiffs allege independently wrongful acts.

Finally, PayPal's argument that Plaintiffs' tortious interference claims would fail for lack of an independently wrongful act if the Court dismisses Plaintiffs' non-interference claims is incorrect. Mot. at 19. This is so because PayPal's conduct "contravenes existing standards and norms in the affiliate marketing industry that prohibit the use of cookie stuffing to divert Affiliate Commissions," ¶¶ 340, 352. The SAC adds allegations that Honey's competitor browser extensions and Affiliate Networks drew up stand down policies to prohibit Honey's conduct and routinely alerted Honey when it violated their stand down policies. ¶¶ 11, 241–61. Indeed, following the filing of the SAC, three major Affiliate Networks removed Honey from their networks or suspended payments to Honey, *see supra* n.1, demonstrating that the industry repudiates Honey's conduct and enforces stand down protocols.

### D. Plaintiffs plead an unjust enrichment claim.

The SAC plausibly alleges an unjust enrichment claim because PayPal "received and unjustly retained a benefit at [Plaintiffs'] expense," *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016), by using Honey to "wrongfully represent[] to Merchants that Defendants, rather than Plaintiffs . . . should be assigned credit for product sales," ¶ 322. As a result, PayPal received "monies in the form of Affiliate Commissions and referral fees that rightfully belong to Plaintiffs." ¶ 327. PayPal knew it was unjust to retain the Affiliate Commissions: Honey logs "whether an Affiliate ID is already applied," ¶ 106; "[t]here is no technical reason for this hidden redirect and use of the Secret Tab apart from stealing" Affiliate Commissions, ¶ 114; and Honey only follows stand down protocol to avoid detection. ¶¶ 267–68.

PayPal argues Plaintiffs fail to allege they lack an adequate remedy at law and the existence of Plaintiffs' contracts with Affiliate Networks and Merchants forecloses Plaintiffs from pursuing an unjust enrichment claim against PayPal. Mot. at 20. Both arguments lack merit.

### 1. Plaintiffs allege no adequate remedy at law.

In light of the Court's Order, the SAC explains that Plaintiffs lack an adequate remedy at law "to the extent that Plaintiffs cannot recover the amounts that Defendants received from their wrongful conduct

through their legal claims" or if equitable recovery would be more "prompt or certain." ¶ 332. In particular, Plaintiffs seek nonrestitutionary disgorgement of PayPal's ill-gotten profits, which is different than legal damages. *See In re Cal. Gasoline Spot Mkt. Antitrust Litig.,* 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021) (upholding unjust enrichment where plaintiffs sought nonrestitutionary disgorgement, which was not available under their legal claims). It is also quite likely to be more "prompt or certain" given that it is a simple matter to calculate PayPal's ill-gotten profits, whereas PayPal argues extensively in briefing that it will be complicated to establish actual damages. Plaintiffs respectfully note, moreover, that this is an equitable right that is entirely separate from their contractual entitlement to Affiliate Commissions because:

> Plaintiffs and Class members referred the consumers to the Merchants for the sales at issue; industry standards and fairness dictate that Plaintiffs and Class members are entitled to credit for these sales; and it would be inequitable for Defendants, who did not refer the consumers to the Merchants and obtained these amounts only by virtue of their systemic, deliberate misconduct alleged herein, to receive credit for these sales and retain these amounts.

¶ 332. Plaintiffs also allege that PayPal's conduct is "ongoing even after the initial complaints in this action were filed," in support of their request for an injunction. ¶ 261; *Hawkins v. Shimano N. Am. Bicycle Inc.*, 729 F. Supp. 3d 989, 1011 (C.D. Cal. 2024) (establishing equitable jurisdiction where "monetary damages" would not prevent future harm).

The above allegations are sufficient. After all, "a plaintiff need not explain in great detail why her legal remedies are insufficient; an allegation to that effect is generally enough." *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1023 (N.D. Cal. 2024) (citation modified). For that reason, numerous courts have upheld allegations like those in the SAC. *See, e.g.*, *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1051 (N.D. Cal. 2025) ("Plaintiffs allege that Defendant benefited from using Plaintiffs' information and that Plaintiffs' remedies at law are inadequate. . . . These allegations are all that is necessary at this stage in the proceedings."); *Wallace v. SharkNinja Operating, LLC*, 2020 WL 1139649, at *13–14 (N.D. Cal. Mar. 9, 2020) (Freeman, J.) (unjust enrichment claim not duplicative because "plaintiffs are entitled to pursue alternative claims at the pleading stage"); *Van Aldridge v. Tech. & Supply Mgmt., LLC*, 2018 WL 6340752, at *5 (C.D. Cal. June 7, 2018) (denying motion to dismiss unjust enrichment claim because "[t]he court cannot say with certainty at this stage whether Plaintiffs have an adequate legal remedy"); *cf. In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 648 (N.D. Cal. 2024) ("no allegations regarding the adequacy of Plaintiffs' legal remedies.").

2.    **Plaintiffs' contracts with Merchants do not bar their claim against PayPal.**

Plaintiffs' claims stem from *PayPal's* misconduct. Plaintiffs do not allege misconduct by Merchants or Affiliate Networks, nor are they legally responsible for PayPal's scheme to steal Plaintiffs' Affiliate Commissions. The cases cited by PayPal involved the inapposite scenario where there was a contract *between the parties to the litigation*. *See Talavera v. Glob. Payments, Inc.*, 670 F. Supp. 3d 1074 (S.D. Cal. 2023) (defendant licensed software from plaintiff); *Jacobs v. Sustainability Partners LLC*, 2020 WL 5593200, at *1, 10 (N.D. Cal. Sept. 18, 2020) (former employee plaintiff sued employer defendant for breach of written employment agreement and quantum meruit); *see also Precisely Software Inc. v. Loqate Inc.*, 2022 WL 4348469, at *3 (N.D. Cal. Sept. 19, 2022) (Freeman, J.) (plaintiff licensed software to defendant, brought breach of contract and in the alternative unjust enrichment claims); *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388 (2012), *as modified on denial of reh'g* (Feb. 24, 2012) ("A plaintiff may not, however, pursue or recover on a quasi-contract claim *if the parties have an enforceable agreement regarding a particular subject matter.*") (emphasis added); *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 173, (2001) (district court was correct to dismiss plaintiff's quasi-contract claim where there was no direct contract between the parties because plaintiff "improperly [sought] to proceed on a quasi-contract claim only after trying unsuccessfully by its first amended complaint to enforce various express contracts against defendants directly.").

Plaintiffs thus respectfully ask the Court to reconsider its adoption of PayPal's argument about such cases. *See* Order at 9–10. Dismissing unjust enrichment claims in those cases made sense because *the parties* had agreed by contract to their respective right and entitlements *vis-à-vis each other*, and thus the contract between them governed disputes within that contract's scope. This situation is very different because Plaintiffs have no contractual relationship with PayPal related to Affiliate Commissions or to any of the conduct relevant to this case. Plaintiffs therefore could not, and do not, assert a breach of contract claim against PayPal.

E.    **Plaintiffs adequately plead their California Unfair Competition Law claim.**

The SAC plausibly alleges violations of the "unlawful" and "unfair" prongs of the UCL. First, PayPal's conduct is "unlawful" because it violates the CFAA, CDAFA, and Washington Consumer Protection Act. *See* ¶ 377. Second, PayPal's conduct is "unfair" because it "violates California's public policy against interfering with another's prospective economic advantage," and because the "gravity of harm" of PayPal's

scheme to Plaintiffs "outweighs any potential utility." ¶¶ 379–81. *See, e.g.*, *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1205 (9th Cir. 2010) (plaintiff stated "unfair" UCL claim under the balancing test by alleging harm to consumer from defendant's solicitation outweighed its utility and under alternative test by alleging violation of public policy through TILA violation). PayPal responds that Plaintiffs fail to (1) allege wrongful conduct, and (2) plead a lack of adequate legal remedies. Mot. at 21–23. PayPal is wrong.

### 1.  Plaintiffs allege unfair conduct.

The SAC contains detailed allegations about Honey's unfair and anti-competitive conduct, specifically alleging that Affiliate Networks and Merchants implemented stand down policies forbidding Honey and other browser extensions from doing the very misconduct alleged, ¶¶ 11, 237–51, and that the industry enforced its industry norms and repudiated Honey's conduct once its scheme was revealed, ¶¶ 269–74. In other words, "PayPal's conduct is actionable because it violated industry norms" and "such industry norm is actually required or enforced by the relevant market participants." Order at 11. PayPal largely ignores those allegations, instead arguing that Plaintiffs merely allege "rigorous, but fair, competitive strategies." Mot. at 22. But the SAC alleges no such a thing, and this Court has correctly declined "to accept the characterization of Honey as a competitor because [Plaintiffs] didn't plead it." Nov. 6, 2025 Hr'g Tr. 62:16–17. PayPal also cites *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1038 (C.D. Cal. 2011), to argue that "exercise of" a contractual right "does not amount to unfair competition," but Plaintiffs allege unfair conduct including cookie-stuffing and deliberately circumventing stand-down policies (and Honey has no contractual right to Plaintiffs' Affiliate Commissions).

### 2.  Plaintiffs allege no adequate remedy at law.

The SAC sufficiently pleads the lack of an available remedy at law for the same reasons discussed above. *See supra* at 19–20. Of additional relevance to the UCL claim, the SAC adds allegations that Plaintiffs "lack an adequate remedy at law . . . to the extent it is determined that Plaintiffs and Class members did not have a . . . legal entitlement . . . to the Affiliate Commissions." ¶ 386. PayPal cites *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) to argue that "equitable relief is unavailable" "[w]here the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law." But more recent authority holds that it is sufficient to allege that legal remedies are "not equally prompt and certain and in other ways efficient" or that "claims for damages are less certain," *Meta Pixel*, 724 F. Supp. 3d at 1023; *cf. Castillo v.*

*Walmart, Inc.*, 2025 WL 1828465, at *7 (N.D. Cal. July 1, 2025) (Freeman, J.) (no equitable jurisdiction where plaintiff "does not show that such a legal remedy would somehow be 'inadequate or incomplete'").

The SAC also alleges that Plaintiffs lack an adequate remedy at law to obtain injunctive relief to the extent it is unavailable under Plaintiffs' legal claims, or that those claims "can only provide something less than Defendants completely ceasing their misconduct[.]" ¶ 387. This Court has recognized that "monetary damages for past harm are an inadequate remedy for the future harm that an injunction under California consumer protection law is aimed at." *Castillo*, 2025 WL 1828465, at *7. Indeed, since "injunctive relief *is itself* a remedy not available at law, and, as long as the injunctive relief sought is not completely duplicative of the plaintiff's legal claims, *Sonner* does not apply, and the plaintiff is not prohibited from pleading in the alternative." *Steen v. Am. Nat'l Ins. Co.*, 609 F. Supp. 3d 1066, 1075–76 (C.D. Cal. 2022).

### F.  **Plaintiffs adequately plead their Washington Consumer Protection Act claim.**

The SAC also sufficiently alleges each element of a Washington Consumer Protection Act ("WCPA") claim: "(1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) that impacts the public interest; (4) causes injury to the plaintiff's business or property; and (5) that injury is causally linked to the unfair or deceptive act." *Ten Bridges, LLC v. Midas Mulligan, LLC*, 522 F. Supp. 3d 856, 872 (W.D. Wash. 2021) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778 (1986)). Plaintiffs allege that (1) PayPal deliberately coded Honey to divert to itself (2) Affiliate Commissions that Plaintiffs had earned pursuant to their business relationships with Merchants and Affiliate Networks, and that this scheme (4) caused Plaintiffs to lose (5) Affiliate Commissions they had rightfully earned. ¶¶ 8, 121–22. Plaintiffs further plead PayPal's scheme (3) "impacts the public interest" because Honey "stopped consumers from achieving their goal of paying Affiliate Marketers when they use their affiliate links" and "deceived consumers about how [Honey] operated and made money as evidenced by the fact that millions of users reportedly uninstalled Honey after the scheme came to light." ¶ 395.

PayPal only challenges two elements, arguing that Plaintiffs fail to plead wrongful conduct and substantial consumer or public-interest harm. Mot. at 23–24. Neither argument has merit. *First*, as detailed throughout, Plaintiffs allege PayPal's wrongful conduct. *See supra* at 4–11 (Honey wrongfully appropriated commissions), 21–22 (Plaintiffs allege wrongful conduct).

*Second*, Plaintiffs allege consumer and public-interest harm. "An alleged unfair or deceptive act or

practice injures the public under the CPA if it . . . (a) [i]njured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons." *Hunt v. Medtronic USA, Inc.*, 627 F. Supp. 3d 1188, 1196 (W.D. Wash. 2022). To determine whether the public has an interest, courts consider, *inter alia*, if the alleged acts were "committed in the course of defendant's business," or "part of a pattern or generalized course of conduct[.]" *Id.* (quoting *Hangman*, 105 Wash.2d at 790). Here, Plaintiffs allege consumer harm because: (1) PayPal's scheme thwarts consumers' goal to "pay[]Affiliate Marketers when they use their affiliate links to complete a purchase," in recognition of the fact that "consumers receive trusted information about products and Merchants," and "trust Affiliate Marketers' expertise and authenticity," ¶¶ 46–47, 395; and (2) consumers were deceived by Honey's conduct, as evidenced by the fact that *millions* of consumers (not "some") uninstalled Honey after PayPal's scheme came to light, ¶¶ 88 ("consumers . . . are never told or advised that Honey will surreptitiously use a Secret Tab to steal Affiliate Commissions"), 269. *See, e.g.*, *Hunt*, 627 F. Supp. 3d at 1196 (harm to public where plaintiff alleged defendant made misrepresentations about medical device because "other consumers are at risk of falling victim to [defendant's] misrepresentations"). These allegations involve are about more than reducing consumer choice by taking Affiliate Marketers' commissions, *see Cap. One*, 2025 WL 1570973, at *15–16—they are about PayPal deceiving consumers.

This consumer harm impacted the public interest because it was "committed in the course of [PayPal]'s business" and impacted consumers whose purchases involved diverted Affiliate Commissions. ¶¶ 121, 142, 236; *Hunt*, 627 F. Supp. 3d at 1196. Unlike the single, private transaction at issue in *S/Y Paliador, LLC v. Platypus Marine, Inc.*, 750 F. Supp. 3d 1187, 1206 (W.D. Wash. 2024), and the plaintiffs' failure in *Stiegler v. Saldat*, 2015 WL 13686087, at *3 (W.D. Wash. Oct. 23, 2015), *aff'd*, 707 F. App'x 478 (9th Cir. 2017) to allege that non-members of the putative class were harmed, here Plaintiffs allege a wide-reaching, automatic scheme that deceived millions of non-class member consumers and thwarted their intention of compensating the Affiliate Marketers who provided them with the information they needed to make a confident purchase. These allegations establish that PayPal's scheme has "injured other persons" and that, because the conduct is ongoing, PayPal "has the capacity to injure other persons[.]" *Hunt*, 627 F. Supp. 3d at 1196.

## V.    <u>CONCLUSION</u>

Plaintiffs respectfully ask this Court to deny Defendants' motion to dismiss in full and seek leave to amend should the Court find any claim deficient. *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d

1048, 1052 (9th Cir. 2003).

Dated:  March 9, 2026                              Respectfully submitted,


                                                   By:    /s/ Jason L. Lichtman

                                                   Elizabeth J. Cabraser (SBN 083151)
                                                   Roger N. Heller (SBN 215348)
                                                   **LIEFF CABRASER HEIMANN &**
                                                   **BERNSTEIN, LLP**
                                                   275 Battery Street, 29th Floor
                                                   San Francisco, CA 94111-3339
                                                   Telephone: (415) 956-1000
                                                   ecabraser@lchb.com
                                                   rheller@lchb.com

                                                   Jason L. Lichtman (*pro hac vice*)
                                                   Sean A. Petterson (*pro hac vice*)
                                                   Danna Z. Elmasry (*pro hac vice*)
                                                   **LIEFF CABRASER HEIMANN &**
                                                   **BERNSTEIN, LLP**
                                                   250 Hudson Street, 8th Floor
                                                   New York, New York 10013-1413
                                                   Telephone: (212) 355-9500
                                                   jlichtman@lchb.com
                                                   spetterson@lchb.com
                                                   delmasry@lchb.com

                                                   Dena C. Sharp (SBN 245869)
                                                   Trevor T. Tan (SBN 281045)
                                                   Nina Gliozzo (SBN 333569)
                                                   Anthony Rogari (SBN 353784)
                                                   **GIRARD SHARP LLP**
                                                   601 California Street, Suite 1400
                                                   San Francisco, CA 94108
                                                   Telephone: (415) 981-4800

Nanci E. Nishimura (SBN 152621)
Thomas E. Loeser (SBN 202724)
Karin B. Swope (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000

*Interim Co-Lead Counsel*

Daniel R. Schwartz (*pro hac vice*)
**DICELLO LEVITT LLP**
10 North Dearborn St
Ste Sixth Floor
Chicago, IL 60602
312-214-7900
dschwartz@dicellolevitt.com

*PSC Member, On Brief*

1

**<u>ATTESTATION</u>**

2

      Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf

3

the filing is submitted, concur in the filing's content and have authorized the filing.

4

5

Dated: March 9, 2026

6

                            */s/ Jason L. Lichtman*

7

                            Jason L. Lichtman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that a true and correct copy of the foregoing was duly served upon all Counsel of

3  record in this action via electronic service, in accordance with the Federal Rules of Civil Procedure, on March

4  9, 2026.

5

6  Dated: March 9, 2026

7                                              */s/ Jason L. Lichtman*
                                              Jason L. Lichtman
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28