CLEMENT S. ROBERTS (SBN 209203)
croberts@orrick.com
GEOFFREY MOSS (SBN 258827)
gmoss@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 949 567 6700
Facsimile:    +1 949 567 6710

RICHARD A. JACOBSEN (admitted *pro hac vice*)
MARC R. SHAPIRO (admitted *pro hac vice*)
JENNIFER KEIGHLEY (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:    +1 212 506 5000
Facsimile:    +1 212 506 5151


*Attorneys for Defendant*
PAYPAL, INC. AND PAYPAL HOLDINGS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION | Case No. 5:24-cv-09470-BLF |
| | **DEFENDANTS PAYPAL, INC.'S AND PAYPAL HOLDINGS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS** |
| | Date:    June 4, 2026<br>Time:    9:00 AM<br>Judge:    Honorable Beth Labson Freeman<br>Dept:    Courtroom 1, 5th Floor |

**TABLE OF CONTENTS**

I.    PLAINTIFFS STILL DO NOT PLAUSIBLY ALLEGE ARTICLE III STANDING ........................................................................................................ 1

    A.    Plaintiffs cannot defend their position that they were contractually entitled to commissions when Honey was the last touchpoint driving the sale. .................. 1

    B.    Plaintiffs' Opposition only highlights the weakness of their attempt to show they would have earned more commissions but for Honey's alleged conduct. ........................................................................................................... 4

II.    PLAINTIFFS FAIL TO STATE CLAIMS UNDER THE CFAA OR CDAFA ............... 6

    A.    Neither the SAC nor Plaintiffs' Opposition explains away Plaintiffs' admission that the challenged conduct is done with user authorization. ............... 6

    B.    Plaintiffs' Opposition still does not identify any damage "to a protected computer" or any other cognizable "damage" or "loss." ....................................... 8

III.    PLAINTIFFS FAIL TO STATE CLAIMS FOR INTENTIONAL INTERFERENCE ...................................................................................................... 9

    A.    Plaintiffs fail to plausibly allege that PayPal interfered with their relationships. ..................................................................................................... 9

    B.    Plaintiffs fail to allege that PayPal's conduct constitutes an independently wrongful act. .................................................................................................... 12

IV.    PLAINTIFFS STILL FAIL TO CURE THE DEFICIENCIES THE COURT IDENTIFIED IN THEIR UNJUST ENRICHMENT CLAIM......................................... 12

    A.    Plaintiffs' reference to their request for nonrestitutionary disgorgement is insufficient to establish a lack of adequate remedy at law.................................... 12

    B.    Plaintiffs fail to refute the argument that the existing contracts governing the subject matter of Plaintiffs' claims bar their unjust enrichment claim. .......... 13

V.    PLAINTIFFS CANNOT SALVAGE THEIR CLAIM UNDER CALIFORNIA'S UNFAIR COMPETITION LAW.................................................................................. 14

VI.    PLAINTIFFS' EFFORT TO DEFEND THEIR CLAIM UNDER WASHINGTON'S CONSUMER PROTECTION ACT FAILS...................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Inc. Device Performance Litig.*,
347 F. Supp. 3d 434 (N.D. Cal. 2018) ............................................................................ 8

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ................................................................ 13

*Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*,
94 Cal. App. 4th 151 (2001) ........................................................................................... 13

*Castillo v. Walmart, Inc.*,
2025 WL 1828465 (N.D. Cal. July 1, 2025) ................................................................... 15

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......................................................................................................... 4

*Doe v. CVS Pharmacy, Inc.*,
982 F.3d 1204 (9th Cir. 2020) ........................................................................................ 14

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) .......................................................................................... 7

*Fish v. Tesla, Inc.*,
2022 WL 1552137 (C.D. Cal. May 12, 2022) .................................................................. 8

*Hall v. FCA US LLC*,
2022 WL 1714291 (9th Cir. May 27, 2022) ..................................................................... 3

*Hunt v. Medtronic USA, Inc.*,
627 F. Supp. 3d 1188 (W.D. Wash. 2022) ................................................................. 15, 16

*Jacobs v. Sustainability Partners LLC*,
2020 WL 5593200 (N.D. Cal. Sept. 18, 2020) ............................................................... 13

*Klein v. Chevron U.S.A., Inc.*,
202 Cal. App. 4th 1342 (2012) .......................................................................................... 4

*Lindsey v. Starwood Hotels & Resorts Worldwide Inc.*,
409 F. App'x 77 (9th Cir. 2010) ...................................................................................... 10

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
339 F.3d 1087 (9th Cir. 2003) ........................................................................................ 14

*Medoff v. Minka Lighting, LLC*,
2023 WL 4291973 (C.D. Cal. May 8, 2023) ..................................................................... 3

*Murthy v. Missouri*,
603 U.S. 43 (2024) .................................................................................................. 6

*NetApp, Inc. v. Nimble Storage, Inc.*,
41 F. Supp. 3d 816 (N.D. Cal. 2014) ...................................................................... 9

*Nguyen v. JP Morgan Chase Bank*,
2012 WL 294936 (C.D. Cal. Feb. 1, 2012) ............................................................ 3

*Oakley, Inc. v. Nike, Inc.*,
988 F. Supp. 2d 1130 (C.D. Cal. 2013) ................................................................. 11

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
96 F.3d 1151 (9th Cir. 1996) ................................................................................. 14

*Precisely Software Inc. v. Loqate Inc.*,
2022 WL 4348469 (N.D. Cal. Sept. 19, 2022) ...................................................... 12

*In re RetailMeNot Browser Extension Lit.*,
2026 WL 820585 (S.D.N.Y. Mar. 25, 2026) ....................................... 2, 5, 6, 9, 15

*Schneider v. Cal. Dep't of Corr.*,
151 F.3d 1194 (9th Cir. 1998) ................................................................................. 6

*Sicor Ltd. v. Cetus Corp.*,
51 F.3d 848 (9th Cir. 1995) .................................................................................. 5, 6

*Stearns v. Select Comfort Retail Corp.*,
763 F. Supp.2d 1128 (N.D. Cal. 2010) ................................................................... 6

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir. 2004) ............................................................................. 7, 8

*Van Buren v. United States*,
593 U.S. 374 (2021) ................................................................................................ 7

*Williamson v. Reinalt-Thomas Corp.*,
2012 WL 1438812 (N.D. Cal. Apr. 25, 2012) ........................................................ 3

**Other Authorities**

*In re Cap. One Fin. Corp.*,
No. 1:25-CV-023 (E.D. Va.) ................................................................................... 5

**INTRODUCTION**

Nothing in the Plaintiffs' Opposition explains, much less fixes, the deficiencies in their Second Amended Complaint ("SAC"). For example, PayPal's motion to dismiss explained (in detail) why the contractual provisions on which Plaintiffs rely are insufficient to plausibly allege that Plaintiffs are entitled to the relevant commissions, even where Honey is involved in a sale. Plaintiffs largely do not respond to these arguments. Instead, they merely repeat the contract snippets they quoted in the SAC and insist that the Court shouldn't question their implausible interpretations at the pleading stage. Plaintiffs also fail to respond to PayPal's argument that the SAC has not adequately alleged a violation of the stand-down provisions quoted in the SAC. Indeed, PayPal pointed out that Plaintiffs have not even ***alleged*** that their one and only test purchase violated any stand-down rules. In their Opposition, Plaintiffs do not dispute that failure.

Plaintiffs also do not connect the chain of assumptions they rely on to try to establish standing. Instead, they reiterate their theory that "the volume of transactions and overlapping Merchants show PayPal almost certainly took money from Plaintiffs." Opp. at 9. But as the words "almost certainly" indicate, that theory is based on *speculation* and *conjecture* and thus cannot establish standing. And Plaintiffs cannot explain away their prior admission that consumers grant PayPal permission to take the actions at issue in Plaintiffs' CFAA and CDAFA claims. For all those reasons and others set forth below, the Court should dismiss the SAC. And because the Plaintiffs clearly *cannot* fix their standing issues, the Court should enter the dismissal with prejudice.

**ARGUMENT**

**I.    PLAINTIFFS STILL DO NOT PLAUSIBLY ALLEGE ARTICLE III STANDING**

  **A.    Plaintiffs cannot defend their position that they were contractually entitled to commissions when Honey was the last touchpoint driving the sale.**

In their Opposition, Plaintiffs acknowledge it is their burden to "establish that [they] were in fact entitled to [the relevant] commissions pursuant to their contracts with the merchants." Opp. at 5 (quoting Order at 5). We agree on that. But Plaintiffs do very little (and nothing of substance) to defend the plausibility of their contractual interpretations. Indeed, the main thing Plaintiffs do is provide a chart gathering together the snippets of contract language they quoted in the SAC. Opp.

at 6. Aggregating this information into a chart does not help Plaintiffs meet their burden to plausibly allege their entitlement to commissions even where Honey was involved in the sale—much less *refute* the explanation that PayPal provided as to how and why the contracts do no such thing. *See* Mot. at 6-8. For example, Plaintiffs routinely fail to include either: (i) the contractual provisions defining the relevant terms, *see* SAC ¶¶ 69, 71, 72, 75; (ii) language identifying when qualifying links result in commissions, *see id.* ¶¶ 68, 70; or (iii) the agreement that the contract identifies as controlling on these questions, *compare id.* ¶ 74, *with* Ex. B (Bergdorf Contract) at 1.2, 3.4.[1]

Rather than providing the full picture—let alone the full contracts—Plaintiffs ask this Court to trust them that Honey user engagement could never qualify as the "last click." But the SAC provides no support for that position. While Plaintiffs insist that a link from Honey cannot constitute a "Qualifying Link" for purposes of purchases from Dell, Plaintiffs do not dispute that the Dell Contract—which Plaintiffs view as sufficiently representative to provide the basis for their sole test purchase—states that "***any media channel*** (including, but not limited to … approved ad-supported software)" "identified in your Program application forms" can generate a "Qualifying Link" and obtain commissions. Ex. A (Dell Contract) at 2.11 (emphasis added). Under the provision's plain language, Honey can properly generate a "Qualifying Link." Indeed, another court recently found in similar litigation against another browser extension that analogous contract terms permitting a "Qualifying Link" to originate from "your website or other presence (including, without limitation … [approved] software" "appear to foreclose Plaintiffs' argument that Defendants have caused [the Merchant] to breach its contract with Plaintiffs, as nothing within [the terms] … excludes a software-based browser extension like Defendants' from earning a commission through an affiliate link." *In re RetailMeNot Browser Extension Lit.*, 2026 WL 820585, at *10 (S.D.N.Y. Mar. 25, 2026). And Honey's ability to obtain commissions pursuant to its Dell contract is unsurprising because merchants like Dell have partnered with and provided commissions to Honey for ***years***, fully aware of how browser extensions function. *See, e.g.*, SAC ¶¶ 10, 51-52; *see also* Mot. at 17.

Because Plaintiffs have no basis for insisting that Honey cannot generate a "Qualifying

---

[1] Plaintiffs fault PayPal for not attaching this contract, Opp. at 7, but standing is Plaintiffs' burden.

DEFENDANTS' REPLY
5:24-cv-09470-BLF

Link," they pivot and claim that Honey must be violating a separate provision of the Dell Contract (not cited in the SAC) that forbids using "any device that causes a Qualifying Link to be accessed" without the consumer "manually and knowingly clicking on such link." Opp. at 7 (quoting Ex. A at 3.2(r)). But that uncited provision offers no help to Plaintiffs, because Honey activates and "causes a Qualifying Link to be accessed" only when a consumer clicks on Honey. *See* SAC ¶¶ 9-10. Indeed, in the Dell test purchase, Honey did not open a new link with its Affiliate ID unless the tester clicked on Honey. *See id.* ¶¶ 125-41.[2] And in any event, Plaintiffs concede that allegations regarding cookie-stuffing or stand-down "do not impact the threshold question of whether Plaintiffs were ever entitled to the commissions in the first place." Opp. at 8 (quoting Mot. at 8); *see also* Opp. at 6. While Plaintiffs do assert that these allegations could show that PayPal "[knew] its actions [were] wrongful," Opp. at 8, they make no effort to engage with PayPal's explanation as to why its alleged actions would not violate these provisions. *See* Mot. at 8-9. Insofar as Plaintiffs seek to rely on factual developments that post-date the SAC, *see* Opp. at 3 n.1, they cannot do so. *See Nguyen v. JP Morgan Chase Bank*, 2012 WL 294936, at *3 (C.D. Cal. Feb. 1, 2012).

Unable to refute PayPal's arguments that they are providing an incomplete and misleading picture of the contractual terms, Plaintiffs offer a fallback argument: They claim that this Court must accept their contractual interpretation because "a court 'err[s]' if it adopts a defendant's 'proposed [contract] interpretation at the motion to dismiss stage.'" Opp. at 8 (quoting *Hall v. FCA US LLC*, 2022 WL 1714291, at *1 (9th Cir. May 27, 2022)). But *Hall* does not stand for that broad rule. Rather, *Hall* said that "the district court erred in adopting the [defendant's] proposed interpretation at the motion to dismiss stage" *in that case* because the defendant had drafted the ambiguous contract. *See* 2022 WL 1714291, at *1. Here, however, the usual rule prevails—i.e., the plaintiff must show that it is entitled to relief under a plausible reading of the contract. *See Williamson v. Reinalt-Thomas Corp.*, 2012 WL 1438812, at *7 (N.D. Cal. Apr. 25, 2012) (rejecting

---

[2] Relatedly, Plaintiffs' reliance on unpled language from the Bergdorf Contract prohibiting "technology" which redirects referral fees "without the written consent of Merchant" (Opp. at 7) is unavailing since the SAC contains no allegations that Bergdorf did not provide this consent.

- 3 -

plaintiff's contractual interpretation because it was "not reasonable in light of the allegations in the SAC"); *see also Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1387 (2012) (where "plaintiffs' complaint does not set forth a reasonable interpretation" of the contract, dismissal is appropriate). Plaintiffs have not met their pleading burden here.

### B.    Plaintiffs' Opposition only highlights the weakness of their attempt to show they would have earned more commissions but for Honey's alleged conduct.

Plaintiffs also lack standing because the SAC relies on "a 'highly attenuated chain of possibilities in place of alleging a concrete and particularized injury.'" Order at 6 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). While this Court stated it was not enough to ask the Court "to look at the state of the industry and guess as to how likely it is that PayPal has diverted commissions away from them," *id.*, Plaintiffs' SAC does exactly that. And in their Opposition, Plaintiffs fail to connect the links in their speculative chain and fail to show that their one and only test purchase establishes standing for Justin Tech Tips, let alone *all* Plaintiffs.

As PayPal explained in its motion, Plaintiffs' theory of standing relies on at least seven contingencies. *See* Mot. at 10. Plaintiffs address just one, claiming that, even if Honey "caused a material number of transactions that would not otherwise have occurred," that "has no bearing on" standing. Opp. at 9. That is a puzzling assertion. If a customer would not have completed the sale ***but for*** the benefits offered by Honey, then the commission would not exist ***but for*** Honey. As a result, Plaintiffs suffered *no* cognizable injury (and therefore lack standing) insofar as Honey caused a transaction that would not otherwise have occurred. In any event, this contingency is only one of the seven links in the chain of speculation on which the Plaintiffs rely. And Plaintiffs offer no rebuttal (at all) in response to the six other contingencies PayPal has highlighted.

Instead of contending with their attenuation problem, Plaintiffs focus on defending their statistical analysis. But, given that Plaintiffs do not dispute that their statistical analysis does not account for the many "reasons that a Plaintiff might not receive a commission that have nothing to do with Honey," their statistical analysis is not just "imperfect"—it is insufficient to establish standing. Opp. at 9. And, in any event, this Court already made clear that Plaintiffs "need more than a statistical probability of injury" to establish standing. MTD Tr. 42:4-5.

Plaintiffs insist their (one) test purchase suffices to establish standing for all Plaintiffs. Opp. at 9-11. But that purchase does not solve the attenuation problem, as it merely "control[s] for the contingencies that, in the real world, would be left to chance." Mot. at 11. And it cannot even establish Justin Tech Tips' standing because Plaintiffs have not shown that the Dell contract entitles Justin Tech Tips to a commission where Honey was the last click. *See* Mot. at 11; *see also supra* § I.A. Since Plaintiffs' test purchase concerns a Merchant contract *permitting* Qualifying Links to originate from "any media channel," that purchase cannot establish standing for any Plaintiff.[3]

But even if that test purchase were enough to establish standing for Justin Tech Tips, it cannot provide standing for the other Plaintiffs—none of whom partner with Dell. In an effort to dispense with a plaintiff-by-plaintiff showing, Plaintiffs assert that PayPal engages in "uniform conduct … causing the same injury … to all Plaintiffs through the same mechanism." Opp. at 11. But that is wrong since Plaintiffs' injury, if any, depends on the terms of each of their specific contracts that purportedly entitle them to commissions. Furthermore, Plaintiffs' assertion of "uniform conduct" conflicts with their allegations. Plaintiffs admitted in the FAC that Honey *does not* "swap[] out Affiliate IDs … on certain websites (such as Amazon)." FAC ¶ 162. Yet they now rely exclusively on contracts with Amazon to support standing for multiple plaintiffs, with no effort to explain away that prior admission. *See* Opp. at 6 (for Brevard Marketing, Mr. Lachman, and Stuber Holdings, relying exclusively on contracts with Amazon); *see also Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995) (statements in prior pleading constitute binding "judicial admissions" unless a party "explains the error in a subsequent pleading"). Surely, if Plaintiffs could have shown a test purchase on Amazon—a Merchant with whom nine of the Plaintiffs partner, *see*

---

[3] *Capital One* is distinguishable on this basis, as Capital One did not argue that the merchant contracts at issue in the test purchases authorized Capital One to obtain commissions. *Compare In re Cap. One Fin. Corp.*, No. 1:25-CV-023 (E.D. Va.), at Dkt. 121 (FAC) ¶¶ 85-91 (test purchases), *with id.* at Dkt. 143 at 9 (MTD). The same is true in *RetailMeNot*, where the Court ultimately found that plaintiffs had established standing. *Compare RetailMeNot*, No. 1:25-cv-00783 (S.D.N.Y.), at Dkt. 35 (FAC) ¶¶ 83-88 (test purchase), *with id.* at Dkt. 44 at 10 (MTD).

DEFENDANTS' REPLY
5:24-cv-09470-BLF

Opp. at 6—they would have done so. In short, there is no reason to think that Plaintiffs' sole test purchase is generalizable, and the maxim that "[s]tanding is not dispensed in gross" is just as fatal here as it was in *Murthy v. Missouri*, 603 U.S. 43 (2024). *Contra* Opp. at 10.

## II.    PLAINTIFFS FAIL TO STATE CLAIMS UNDER THE CFAA OR CDAFA

### A.    Neither the SAC nor Plaintiffs' Opposition explains away Plaintiffs' admission that the challenged conduct is done with user authorization.

Plaintiffs' CFAA and CDAFA claims are doomed by their prior admission that consumers grant PayPal permission to do the actions that form the basis of those claims: "accessing" and "creating pages" and "[q]uery[ing] and modify[ing] cookies." *See* FAC ¶ 133. Faced with substantively identical allegations, *RetailMeNot* held that a browser extension that a consumer willingly downloads, grants permissions to, and chooses to use during a transaction does not "exceed[] [its] authority to access consumers' computers." 2026 WL 820585, at *15 (dismissing CFAA claim). The Opposition's arguments regarding "authorization" fail.

First, Plaintiffs contend that the Court must give "due weight" to Plaintiffs' "explanation for the change" in their allegations, which appears to be that their prior complaint was making a "colloquial use of the word" "permissions." Opp. at 12. Plaintiffs leave out that courts must only accord due weight to an explanation "in a subsequent pleading." *Sicor*, 51 F.3d at 859-60. Plaintiffs' "colloquial use" explanation does not appear in the SAC and the Court should disregard it as attorney argument. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197, n.1 (9th Cir. 1998). Moreover, Plaintiffs' explanation is not credible. *See* Opp. at 12. The FAC does not make a casual or informal reference to "permissions"; it admits that consumers grant Honey specific permissions (to "access[]" or "creat[e] pages" and "[q]uery and modify cookies") at a specific time (during "the installation process") "in exchange for" "discounts." *See* FAC ¶¶ 132-33.

Second, Plaintiffs contend that the permissions are irrelevant because Plaintiffs "allege that PayPal altered Affiliate IDs that it was not authorized to alter." Opp. at 13. But Plaintiffs' prior allegations show that consumers grant PayPal "broad" permissions which do not differentiate which cookies PayPal is permitted to modify. *See* FAC ¶ 133. To the extent the SAC contradicts those prior admissions, this Court "need not accept the new alleged facts as true." *Stearns v. Select*

- 6 -

*Comfort Retail Corp.*, 763 F. Supp.2d 1128, 1144-45 (N.D. Cal. 2010). And Plaintiffs' argument (Opp. at 12) that *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), means that PayPal needed to obtain authorization from **both** Affiliate Networks and consumers misreads that case, which holds that a **user's** permission was not sufficient to authorize "access [to] Facebook's computers after Facebook's express revocation of permissions," *id.* at 1068. Here, Plaintiffs allege that PayPal modifies cookies exclusively on a **user's** device. SAC ¶¶ 53, 60, 114.

Third, Plaintiffs don't respond to PayPal's argument (Mot. at 13) that the latest iteration of these claims is just a repackaging of their prior argument that this Court rejected—that PayPal's actions were not authorized because PayPal did not disclose to consumers precisely what it would do with the permissions granted. And any suggestion that the CFAA or CDAFA restrict the *use* of authorized permissions is foreclosed by *Van Buren v. United States*, 593 U.S. 374 (2021), which analogized the CFAA to a "gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system," *id*. at 376.

Fourth, Plaintiffs argue that Plaintiffs' new allegations that PayPal obtained consumers' permission via "fraud or deception" negates the permission that the consumers granted PayPal. Opp. at 13-14. Plaintiffs have overlooked that for alleged deception to vitiate granted permissions, the deception "must extend to the essential character of the act itself, which is to say that which makes it harmful or offensive, rather than to some collateral matter which merely operates as an inducement." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073 (9th Cir. 2004). For example, in *Theofel*, consent was vitiated because it was granted pursuant to a subpoena that the other party knew was void. *Id.* PayPal's alleged false representations that consumers would receive the "best" coupons (Opp. at 13), does not meet that test, as it is collateral to the cookie modification permission granted by consumers. "We have the best coupons" is, at most, an "inducement" to use Honey which does not render it "harmful or offensive" that PayPal obtained permission to modify cookies.

Additionally, as PayPal explained in its Motion, Plaintiffs have failed to plead the elements necessary to establish that this marketing puffery is actionable fraud. Mot. at 13. Plaintiffs do not deny they have not pleaded these elements, but assert that they are not required to. Opp. at 13. But Plaintiffs' cases are off point. Opp. at 13. Two of them involved software updates where the

- 7 -

DEFENDANTS' REPLY
5:24-cv-09470-BLF

plaintiffs alleged that the defendant **did not** get permission for the specific changes made in the update. *See In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 441 (N.D. Cal. 2018) (Apple did not get permission to "intentionally slow[] down the processing speeds" of their devices); *Fish v. Tesla, Inc.*, 2022 WL 1552137, at *9 (C.D. Cal. May 12, 2022) (Tesla did not get permission to update cars to "reduce[] performance, battery capacity, and charging speed"). Here, Plaintiffs admit that PayPal **did** obtain permission for the changes it allegedly made. And *Theofel* is inapposite since, as discussed above, permission was tied to a "void" subpoena. 359 F.3d at 1074.

Plaintiffs also argue that they are not improperly stretching the CFAA to cover ordinary competition. Opp. at 14. But the only distinction Plaintiffs draw between their conduct and PayPal's conduct is that Plaintiffs allegedly replace cookies without "alterations to the computer's permissions." *Id.* And neither the SAC nor Plaintiffs' Opposition identifies or explains (i) which computer permission PayPal allegedly alters, (ii) why that alteration is required for PayPal's methods but not for Plaintiffs', or (iii) how that difference is relevant to the CFAA—especially in light of the fact that PayPal *obtains permission* for its actions. And allegations that Honey's techniques amount to "redirection" that "circumvents browser security policies," SAC ¶ 116, do not identify any specific computer permissions or security policies that Honey allegedly *violates*.

### B. Plaintiffs' Opposition still does not identify any damage "to a protected computer" or any other cognizable "damage" or "loss."

Plaintiffs' Opposition also fails to identify any technological "damage" or "loss." *See* Opp. at 11-12, 14-15. Section 1030(a)(5)(A) requires Plaintiff to plead that PayPal has "intentionally cause[d] damage without authorization, to a protected computer." Plaintiffs allege that the relevant "protected computer[s]" are the computers of consumers. *See* SAC ¶ 306. But the SAC and Plaintiffs' Opposition identify only "damage" to Plaintiffs' Affiliate IDs—not to consumers' computers. *See id.* ¶ 295 ("Defendants caused damage … [to] Plaintiffs' and Class members' Affiliate IDs."); Opp. at 11 ("Plaintiffs' Affiliate IDs are 'damaged'"). *In re Apple Inc. Device Performance Litig.*, cited by Plaintiffs, shows the kind of damage that could be actionable—a software update that "slow[ed] processing speed[s]" on the plaintiffs' devices. 347 F. Supp. 3d 434, 453 (N.D. Cal. 2018). Plaintiffs do not allege any harm to consumers' devices in the SAC, or

explain why (if such harm existed) it would be a harm which the Plaintiffs had standing to pursue.

Plaintiffs also fail to allege any cognizable damage or loss for their remaining claims. "Damage" under the CFAA and CDAFA "means harm to computers or networks, not economic harm due to the commercial value of the data itself." *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 834 (N.D. Cal. 2014). But the **only** "damage" Plaintiffs allege is "economic harm due to the [alleged] commercial value" of their Affiliate IDs. *See id.*; Opp. at 11; *see also RetailMeNot*, 2026 WL 820585, at *17 (concluding similar allegations "do[] not allege any damage or alteration to the affiliate tracking codes themselves"). And Plaintiffs' assertion that Affiliate IDs are "digital tokens exchanged for money," Opp. at 11, is not pleaded in the SAC because it is not true. Affiliate IDs have no value on their own. *See* Mot. at 14.

Nor have Plaintiffs pleaded any "interruption in service." The SAC identifies the allegedly interrupted "service" is the "Affiliate Marketing attribution system." SAC ¶ 295. Plaintiffs do not dispute that the attribution service is uninterrupted. *See* Mot. at 15. Instead, they argue that PayPal's actions "interrupt the orderly operation **of a transaction** by illicitly diverting payments from the Affiliate Marketer." Opp. at 14-15. But the fact that competition from other affiliates—including other Affiliate Marketers—may result in Plaintiffs not receiving a hoped-for commission does not mean that a "service" is interrupted. And the cases that Plaintiffs cite (Opp. at 15) are inapposite, as they concern instances where the defendant stopped a service from functioning.

### III.     PLAINTIFFS FAIL TO STATE CLAIMS FOR INTENTIONAL INTERFERENCE[4]

#### A.     Plaintiffs fail to plausibly allege that PayPal interfered with their relationships.

Plaintiffs fail to allege that PayPal engaged in any acts designed to interfere with Plaintiffs' relationships because Plaintiffs have not plausibly alleged that PayPal diverted any commissions to which Plaintiffs were entitled, never mind that PayPal did so intentionally. *See* Mot. at 15-19.

Plaintiffs claim that PayPal has argued only that "Plaintiffs are not *more* entitled than PayPal

---

[4] While PayPal applies California law for purposes of this Motion, it does not concede, under a choice of law analysis, whether distinct state common laws would apply to residents of other states.

DEFENDANTS' REPLY
5:24-cv-09470-BLF

to Affiliate Commissions," (Opp. at 16-17) which—according to Plaintiffs—is a question reserved for trial. But PayPal never argued that it was *more* entitled to commissions than Plaintiffs. Instead, PayPal argued that "Plaintiffs have not plausibly alleged that PayPal diverted any commissions to which Plaintiffs were contractually entitled" because "Plaintiffs' own factual allegations do not support [their] interpretation of 'last click.'" Mot. at 15-16. Plaintiffs' failure to plausibly allege that their contracts entitle them to commissions even when Honey is involved in the sale is a threshold flaw that defeats their intentional interference claims. While Plaintiffs claim that "the contracts cited in the SAC uniformly" support their entitlement to commissions (Opp. at 16), they point to just a single contract (Staples) to support this supposed uniformity. And yet, even for that one contract, they don't discuss the contract's definition of "Affiliate Website," nor include any contractual language addressing what happens when more than one link is clicked.

And Plaintiffs' cases demonstrate that, contrary to Plaintiffs' argument, the interpretation of a contract *is* appropriately resolved at the pleading stage. Indeed, the case they quote (Opp. at 17) holds that a plaintiff who fails to possess "legally enforceable rights under a contract … fails to state a claim on which relief can be granted," construing the motion to dismiss for lack of standing in that case as a "motion to dismiss for failure to state a claim." *Lindsey v. Starwood Hotels & Resorts Worldwide Inc.*, 409 F. App'x 77, 78 (9th Cir. 2010). And here, the SAC fails to plausibly support Plaintiffs' assertion that their contracts set forth an industry standard prohibiting PayPal from receiving commission if an Affiliate Marketer's link has been clicked. Indeed, Plaintiffs' interpretation would mean that a browser extension would never be entitled to commissions, because engaging with an extension would never qualify as a legitimate "click." Given that Plaintiffs acknowledge that Merchants partner with Honey (and other browser extensions) and have been paying them commissions for years, Plaintiffs' interpretation isn't plausible.

Even if Plaintiffs had plausibly alleged that a single contract supported their view, that still wouldn't suffice because that would not plausibly support Plaintiffs' allegations of *intentional* interference. Plaintiffs' tortious interference claims are premised on the idea that PayPal "knew that its conduct disrupted Plaintiffs' contractual entitlements to Affiliate Commissions." Opp. at 18. This necessarily depends upon PayPal's purported awareness that its conduct conflicted with a

pervasive and uniform contractual definition of "last click." But no such industry standard follows from the SAC's allegations. And the fact that Honey "log[ged]" "the full string URL of each web page visited by a consumer" and allegedly was thereby aware of the "commission-based economic relationship" between the Affiliate Marketer and the Merchant (Opp. at 18) doesn't plausibly allege PayPal knew Plaintiffs were contractually entitled to commissions.

Furthermore, as PayPal explained in its Motion (at 16), the SAC fails to plausibly allege that Honey was flawed in its belief that Honey's own contracts properly entitled it to commissions, which defeats these claims. Plaintiffs (Opp. at 18) attempt to distinguish *Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130, 1137 (C.D. Cal. 2013), which holds that a tortious interference claim was precluded where the defendant reasonably relied on third party representations that no contractual rights would be violated. Plaintiffs assert this holding is limited to situations where the relevant information is "not within the knowledge of the person to whom the claim is made." *Id.* But this fails to distinguish *Oakley* because Plaintiffs do not explain how Plaintiffs' own agreements qualify as being "within the knowledge" of PayPal. "A party accused of intentional interference is entitled to have relied on factual representations from a person in a position to know those facts," *id.*, which means here that PayPal properly relied on the Merchants and Affiliate Networks who were parties to contracts with Plaintiffs and nonetheless routinely awarded PayPal commissions.

Indeed, PayPal's Motion identifies numerous instances where the Affiliate Networks specifically acknowledged the existence and functionality of browser extensions in the affiliate marketing ecosystem—a fact that is not surprising given their presence in the space for over ten years. *See* Mot. at 17. In response, Plaintiffs argue that the Rakuten email exchange does not demonstrate that "industry participants had any idea that Honey redirected commissions." Opp. at 18. But the email specifically explains the "redirect from a new tab" process—the exact action Plaintiffs attempt to paint as "secret" and "commercially unreasonable." SAC ¶ 120. And while Plaintiffs continue to argue that PayPal failed to comply with stand-down policies, they fail to respond to PayPal's argument that the Rakuten emails demonstrate that these "violations" stemmed from coding changes needed to account for constantly evolving new use cases. And Plaintiffs do not dispute the SAC fails to allege that the criteria which would purportedly result in a stand-down

- 11 -

violation was ever triggered. Plaintiffs also do not dispute they fail to allege that any stand-down violations occurred in connection with their single test purchase. Accordingly, they have failed to plausibly allege any intentional acts that disrupted Plaintiffs' economic or contractual relationships.

**B.      Plaintiffs fail to allege that PayPal's conduct constitutes an independently wrongful act.**

Plaintiffs' attempt to construe PayPal's alleged stand down violations and "cookie stuffing" as an "independently wrongful act" is unsupported by the case law. As PayPal explained in its Motion (at 19), even an act that contravenes existing standards and norms does not qualify as an "independently wrongful act" unless it is also "unlawful." *See Korea Supply*, 29 Cal. 4th at 1159. Plaintiffs fail to respond to this binding law, which requires dismissal of the interference claims if the Court dismisses Plaintiffs' common law and statutory claims. Even assuming that Plaintiffs had adequately alleged "cookie stuffing" or violations of stand down policies, Plaintiffs do not explain how either practice qualifies as "unlawful" conduct under *Korea Supply*.

**IV.    <u>PLAINTIFFS STILL FAIL TO CURE THE DEFICIENCIES THE COURT IDENTIFIED IN THEIR UNJUST ENRICHMENT CLAIM</u>**

**A.      Plaintiffs' reference to their request for nonrestitutionary disgorgement is insufficient to establish a lack of adequate remedy at law.**

While Plaintiffs argue that they should be able to state their claim for unjust enrichment in the alternative, this does not obviate the requirement that they demonstrate a lack of adequate remedy at law. Indeed, this Court recognized in its prior Order that Plaintiffs had pleaded this claim in the alternative, but nonetheless held that this claim was not pleaded with "sufficient factual particularity" because they had failed to explain why they lacked an adequate remedy at law. Order at 9. For example, in *Precisely Software Inc. v. Loqate Inc.*, this Court permitted the plaintiff to plead a claim for unjust enrichment in the alternative because the plaintiffs had specifically "pled that there are no express provisions in the Contract governing the subject matter of reimbursements for overpayments and, therefore, there would be no adequate contractual remedy at law." 2022 WL 4348469, at *3 (N.D. Cal. Sept. 19, 2022) (Freeman, J.). Plaintiffs make no such showing here.

Instead, Plaintiffs insist that they lack an adequate remedy at law because nonrestitutionary disgorgement is "different than legal damages." Opp. at 19-20. Nonrestitutionary disgorgement,

however, is available where "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust." *In re Cal. Gasoline Spot Mkt. Antitrust Litig*., 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021). Plaintiffs do not allege that is the case here. Indeed, under Plaintiffs' theory, they lost out on commissions that instead went to PayPal; because Plaintiffs do not allege that their losses and PayPal's profits were different, they cannot plausibly request nonrestitutionary disgorgement. And even assuming Plaintiffs had plausibly alleged a theory for nonrestitutionary disgorgement, they fail to point to any factual allegations in the SAC supporting their claim that nonrestitutionary disgorgement is likely to be more "prompt or certain" than legal damages. Opp. at 20; SAC ¶ 332; *see Medoff v. Minka Lighting, LLC*, 2023 WL 4291973, at *12 (C.D. Cal. May 8, 2023). In addition, Plaintiffs' suggestion that their request for injunctive relief means their unjust enrichment claim can proceed ignores that injunctive relief is available through their CFAA claim.

**B.      Plaintiffs fail to refute the argument that the existing contracts governing the subject matter of Plaintiffs' claims bar their unjust enrichment claim.**

As this Court recognized, "the subject matter of [Plaintiffs' unjust enrichment] claim is governed by Plaintiffs' relationships with third-party merchants." MTD Order at 9. Accordingly, Plaintiffs "may not plead the existence of an enforceable contract and maintain a quasi-contract claim at the same time." *Id*. at 9-10 (quoting *Jacobs v. Sustainability Partners LLC*, 2020 WL 5593200, at *17 (N.D. Cal. Sept. 18, 2020)). Plaintiffs ask the Court to reconsider its position, claiming that this principle should only apply where the relevant contract is between the parties to the litigation. But the law is not so limited. *California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc*., which Plaintiffs cite, demonstrates this exact point. 94 Cal. App. 4th 151, 172 (2001). There, the court rejected plaintiffs' unjust enrichment claim because "the subject matter of [their] claim," "whether Physicians were entitled to compensation from defendants," was governed by a web of express contracts (although not between plaintiffs and defendants). *Id*. at 171-172; *see also Paracor Fin., Inc. v. Gen. Elec. Cap. Corp*., 96 F.3d 1151, 1167 (9th Cir. 1996) (barring an unjust enrichment claim because the "subject matter of the … dispute" was governed by contract even where the defendant and plaintiff had not both signed the agreement). The same is true here.

In any event, as this Court already recognized (MTD Order at 9), an equitable remedy is unnecessary where a legal remedy for the same wrong is available against a different party. *See McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1093 (9th Cir. 2003). Plaintiffs' alleged harm is rooted in contracts between Plaintiffs and the Merchants and Affiliate Networks. Accordingly, Plaintiffs have "potential legal claims against any number of parties" who "actually played a substantial role in the decision" to award Plaintiffs or PayPal commissions. *Id.* Because nothing in Plaintiffs' SAC changes the import of the Court's prior holding, the Court should (again) find that Plaintiffs cannot state a claim for unjust enrichment.

## V.   PLAINTIFFS CANNOT SALVAGE THEIR CLAIM UNDER CALIFORNIA'S UNFAIR COMPETITION LAW

Plaintiffs' claim under the UCL fails because Plaintiffs fail to plausibly allege either "unlawful" or "unfair" conduct. Plaintiffs do not dispute that, if this Court rejects their statutory claims, they cannot rely on those alleged violations to show "unlawful" conduct. Opp. at 21. Plaintiffs thus rely primarily on their theory that PayPal's conduct is "unfair," but that is also unavailing. They argue Honey's purported violation of stand-down policies "violated industry norms," Opp. at 22, but—as PayPal has explained and Plaintiffs' Opposition has not refuted—Plaintiffs have not plausibly alleged a violation of those policies, *see* Mot. at 8-9. Plaintiffs' argument that PayPal's conduct is unfair because it "violates California's public policy against interfering with another's prospective economic advantage," Opp. at 21 (quoting SAC ¶ 379), fails for the same reasons their intentional interference claims fail, *see supra* § III. And Plaintiffs' bare assertion that "the 'gravity of harm' of PayPal's scheme to Plaintiffs 'outweighs any potential utility,'" Opp. at 21-22 (quoting SAC ¶ 381), is not enough. *See Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1215 (9th Cir. 2020) (insufficient to "assert in a conclusory fashion that [defendant's] conduct 'outweighs any justification, motive or reason therefor,' but … not allege how that is so").

The UCL claim also fails because Plaintiffs fail to plausibly allege that they lack adequate alternative legal remedies, for the reasons explained above. *See supra* § IV. Plaintiffs argue that the fact they may not "have a … legal entitlement … to the Affiliate Commissions" means they may "lack an adequate remedy at law" for purposes of their UCL claim. Opp. at 22 (quoting SAC ¶ 386).

But if that is so, Plaintiffs do not have standing to sue PayPal in the first place. *See supra* § I. Plaintiffs acknowledge that there is "no equitable jurisdiction where [a] plaintiff 'does not show that … a legal remedy would somehow be inadequate or incomplete,'" Opp. at 23 (quoting *Castillo v. Walmart, Inc.*, 2025 WL 1828465, at *7 (N.D. Cal. July 1, 2025))—or, more specifically, where such legal remedy would be inadequate or incomplete "*in making [plaintiffs] whole*," *Castillo*, 2025 WL 1828465, at *7 (emphasis added)—and yet they do not make that showing. *See also RetailMeNot*, 2026 WL 820585, at *18-22 (dismissing analogous UCL claim for failure to plead lack of adequate legal remedies and failure to plead any unlawful or unfair conduct).

## VI.   PLAINTIFFS' EFFORT TO DEFEND THEIR CLAIM UNDER WASHINGTON'S CONSUMER PROTECTION ACT FAILS

Plaintiffs' claim under the Washington Consumer Protection Act (CPA) also fails, on two independent bases. First, and as with their other claims, Plaintiffs fail to adequately allege wrongful conduct. *See supra* § V; *see also* Mot. at 23. And second, Plaintiffs do not plausibly allege the substantial public-interest harm the CPA requires. *See* Mot. at 23-24. Plaintiffs reiterate claims that PayPal's alleged conduct "thwarts consumers' [purported] goal to 'pay[] Affiliate Marketers when they use their affiliate links to complete a purchase'" and that PayPal thus "deceived" consumers. Opp. at 24 (quoting SAC ¶ 395). But Plaintiffs do not allege how consumers were *harmed* by any such deception, nor do they allege facts rendering plausible their conclusory claim that consumers have a "goal" of paying Affiliate Marketers. Plaintiffs rely heavily on *Hunt v. Medtronic USA, Inc.*, 627 F. Supp. 3d 1188 (W.D. Wash. 2022), but the real public harm in that case—where the plaintiff alleged consumers were at risk of having spinal-cord implants that did not function as advertised implanted in their bodies, *see id*. at 1191-92, 1196—only underscores the lack of harm here.[5]

### CONCLUSION

For the foregoing reasons, the Court should grant the Motion and dismiss Plaintiffs' Second Amended Complaint with prejudice.

---

[5] Stuber Holdings—which relies exclusively on its Amazon contract for standing, *see supra* § I.B—is the only Plaintiff domiciled in Washington. *See* SAC ¶ 24. Dismissal of Stuber Holdings would thus require dismissal of the CPA claim. *See* SAC ¶¶ 24, 275; *see also id.* at 93.

DEFENDANTS' REPLY
5:24-cv-09470-BLF

Dated: March 30, 2026

By: */s/ Clement S. Roberts*
Clement S. Roberts (SBN 209203)
Geoffrey Moss (SBN 258827)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
croberts@orrick.com
gmoss@orrick.com

Richard A. Jacobsen (*pro hac vice*)
Marc R. Shapiro (*pro hac vice*)
Jennifer Keighley (*pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5000
rjacobsen@orrick.com
mshapiro@orrick.com

*Attorney for Defendants PayPal, Inc. and PayPal Holdings, Inc.*

DEFENDANTS' REPLY
5:24-cv-09470-BLF