# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE META ANDROID PRIVACY LITIGATION<br><br>This Document Relates To:<br>All Actions | Case No.  25-cv-04674-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 101, 104 |

This consolidated set of putative class actions arises from Meta's advertising business and attempts to compile detailed advertising profiles about users.  Meta, like other advertising platforms, partners with third-party websites to display tracking pixels.  Those tracking pixels gather data as users navigate through the third party's website.  Meta then compiles that data into individual profiles, attempting to link it to the individual's Facebook or Instagram accounts.  According to Plaintiffs, Meta has an easy time doing this if the user is logged into Facebook or Instagram on the web, as Meta's Pixel code will load a cookie containing the user's account information.  But Plaintiffs say Meta has a harder time linking data to accounts if the user is not logged in on the web.  That is generally the case on mobile phones, since many mobile users download Meta's apps and fewer mobile users use Facebook or Instagram in a web browser.  Moreover, mobile operating systems allegedly operate under a sandboxing principle that is supposed to block one app (such as a browser) from accessing information contained in another app (such as a social media app).  This would naturally make Meta's matching task more difficult for mobile users.

According to Plaintiffs, Meta was not content with that status quo.  It allegedly developed

1

a novel technique to transmit a unique identifier from an Android user's browser through the phone's internal simulated ports.  Plaintiffs say that Meta's Android apps would listen to the communications sent through these ports and link the unique identifier with the user's Meta accounts.  Through this backdoor, Meta could allegedly be assured of matching browsing activity to accounts.  Though the Android operating system did not specifically block this technique, Meta's actions allegedly circumvented technical norms about sandboxing protection on Android phones.  Meta allegedly evolved its technique over time to evade detection and the operating system's attempts to block it.

The public and technical experts were allegedly unaware of Meta's creativity until internet security researchers disclosed Meta's technique in June 2025.  Google (which developed Android), browser developers, security researchers, and the public were reportedly shocked and dismayed.  This consolidated action followed.  Plaintiffs assert nine privacy-related claims against Meta, and an additional two claims against Google for negligence and negligent misrepresentation.  Both Defendants move to dismiss.  For the reasons stated below, both motions are **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs' pen register, unjust enrichment, and negligent misrepresentation claims are **DISMISSED** with **LEAVE TO AMEND**.  All other claims survive dismissal.

## I.       THE CONSOLIDATED COMPLAINT'S ALLEGATIONS

The following is a recitation of the Consolidated Complaint's allegations, which are required to be taken as true at this stage of the proceedings.[1]

Meta operates social media platforms that serve ads.  (Dkt. No. 84 ("Compl.") ¶ 18.)  So that users see more targeted ads, Meta collects personal information about users and "develops detailed insights into each user's behavior, preferences, and demographics."  (*Id.*)  Meta does so

---

[1] Meta's Privacy Policy and Cookies Policy are incorporated by reference as those documents "form[] the basis" of one of Plaintiffs' claims.  (*See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted); Compl. ¶ 189.)  Meta's remaining requests for judicial notice or incorporation by reference are denied as moot, as those documents do not affect the outcome of the motions.  Google's unopposed request for judicial notice is granted.

by tracking users' behavior, both on its own platforms and on other websites.  (*Id.* ¶ 19.)  Tracking on other websites occurs through the "Meta Pixel," which is "a piece of code that can be integrated into a website to imperceptibly capture information about website visitors and their communications."  (*Id.* ¶ 20.)  The Meta Pixel is found on "millions of websites across the Internet," including an estimated 30% of popular websites.  (*Id.* ¶ 22.)

The Pixel generally operates by placing cookies on a user's device and using those cookies to track user behavior across different websites.  (*Id.* ¶ 23.)  When a user visits a website with the Pixel, it "surreptitiously directs the web browser to send a message to Meta's servers" that contains "(i) the URLs of the webpages visited; (ii) the information (e.g., items, products, articles, etc.) the user searched for in a search bar; (iii) the actions the user took on a page (e.g., opened an article, added an item to a shopping cart); and (iv) the contents of commonly used form fields."  (*Id.* ¶ 24.)  The Pixel will also send data stored in cookies alongside that information to enable Meta's identification of the user who was browsing at that time.  (*Id.*)

Meta's success at matching users to browsing behavior depends upon whether the user is logged into their Meta accounts through their browser.  (*Id.* ¶ 25.)  The Pixel will automatically create an "_fbp" cookie containing a pseudonymous identifier typically "unique to the website the user is visiting."  (*Id.* ¶ 30.)  The _fbp cookie alone "cannot be used to personally identify the user."  (*Id.*)  If a user is logged in to Facebook or Instagram on their browser, that user will also have a "c_user" cookie containing the user's Facebook or Instagram ID.  (*Id.* ¶¶ 26–27.)  The Pixel will send those and any other Pixel-related cookies to Meta.  (*Id.* ¶ 26.)  As a result, if a user is logged into their Meta accounts on their browser, Meta can match the user to their browsing behavior with absolute confidence based on the c_user cookie.  (*Id.* ¶¶ 25, 31–32.)  But if a user is not logged in, Meta can only use the remaining cookies and other "customer information parameters" to perform the matching process.  (*Id.*)  Thus, the matching process for logged-out users is less precise.  (*Id.*)

Those circumstances mean that Meta has more success at matching desktop or laptop users to browsing behavior than they do with mobile users.  (*Id.*)  Mobile users "overwhelmingly

access their Meta accounts by logging in via their Facebook and Instagram apps." (*Id.* ¶ 25.)  As a result, they are typically not logged into their Meta accounts in their web browser.  (*Id.*)  And due to principles of sandboxing, the Pixel is generally unable to grab account information from the Facebook and Instagram apps.  (*Id.* ¶¶ 50–51.)  Sandboxing requires each app to "operate[] in an isolated and contained environment."  (*Id.* ¶ 51.)  That means "apps can't interact with each other."  (*Id.*)  So "one app installed on an Android device (like the Facebook or Instagram app) is not supposed to be able to access data collected or stored by another app (like a web browser), and vice versa."  (*Id.*)

Around September 2024, Meta developed a creative solution to evade Android's sandboxing restrictions.  (*Id.* ¶¶ 48–49, 52.)  Devices have "localhost" ports, which simulate a communications channel by allowing "applications or services running on the device to communicate with each other . . . without those communications leaving the device."  (*Id.* ¶ 53.)  Meta modified its Pixel code (the "Modified Pixel") so that it would send the _fbp cookie's contents to a designated localhost port.  (*Id.* ¶ 55.)  In turn, Meta modified its Facebook and Instagram apps to listen to that localhost port for incoming data.  (*Id.*)  The Facebook and Instagram apps combined any incoming localhost data with personal information and identifiers, and subsequently "shipped that combined data from the user's Android device to its own servers."  (*Id.*)  As a result, even though Meta would typically have a harder time identifying Android users, Meta was now able to perfectly deanonymize Android users' browsing activity if they used its apps.  (*Id.*)

Meta's method originally employed the standard HTTP protocol.  (*Id.* ¶¶ 53, 57.)  But around November 2024, Meta changed communications protocols.  (*Id.* ¶¶ 58–59.)  One change involved using WebSocket, a protocol for two-way communications.  (*Id.* ¶ 58.)  The second change involved using WebRTC, a "peer-to-peer communication protocol typically used for making audio and video calls."  (*Id.* ¶ 59.)  Meta used a "complicated technique" called SDP munging to insert the contents of the _fbp cookie into a WebRTC data field "meant for connection information," tricking WebRTC into sending the cookie contents to a localhost port.

4

(*Id.*)  These changes allowed Meta to evade detection.  (*Id.* ¶ 74.)  In May 2025, a beta version of the Chrome browser mitigated the SDP munging technique that Meta utilized.  (*Id.* ¶ 60.) "Within days," Meta changed its Pixel code to circumvent that mitigation.  (*Id.*)

Meta could not similarly evade iOS's sandboxing restrictions.  (*Id.* ¶ 86.)  That was because iOS required apps to "declare specific network/server entitlements and tightly restricts background network activity, such that any attempt by Meta to listen on localhost ports on an Apple device would trigger a privacy warning."  (*Id.*)  Thus, Android's "'overly permissive' design" was key to allowing Meta's tracking.  (*Id.* ¶¶ 84, 91.)

Meta's conduct was unknown until a group of internet security researchers disclosed it on June 3, 2025.  (*Id.* ¶ 4; Dkt. No. 104-3.)  Those researchers described Meta's tracking method as "novel" and used by only one other company: Yandex, a Russian search engine and advertising platform.  (*See* Dkt. No. 104-3 at 2; Dkt. No. 104-4 at 2, 4.)[2]  This revelation caused a swift and strong public reaction.  A Google representative stated that Meta's conduct "violate[d] the terms of service for [Google's] Play marketplace and the privacy expectations of Android users." (Compl. ¶ 65.)  Firefox's developer Mozilla stated that it considered Meta's actions to be "severe violations of our anti-tracking policies."  (*Id.* ¶ 67.)  Mozilla and other browser developers implemented mitigations.  (*Id.* ¶¶ 5, 67.)  Shortly after the researchers' public disclosure, Meta announced that it "decided to pause" use of this tracking method.  (*Id.* ¶ 69; Dkt. No. 104-4 at 5.)

In this consolidated action, Plaintiffs assert nine claims against Meta: (1) intrusion upon seclusion; (2) invasion of privacy under the California Constitution, Cal. Const. art. I, § 1; (3) violation of the Wiretap Act, 18 U.S.C. § 2511(1); (4) violation of the California Invasion of Privacy Act's ("CIPA") wiretapping provisions, Cal. Penal Code § 631; (5) violation of CIPA's eavesdropping provisions, Cal. Penal Code § 632; (6) violation of CIPA's eavesdropping device provisions, Cal. Penal Code § 635; (7) violation of CIPA's pen register provisions, Cal. Penal Code § 638.51; (8) violation of the California Comprehensive Computer Data Access and Fraud

---

[2] All citations to page numbers in filings on the docket refer to ECF pagination.

Act ("CDAFA"), Cal. Penal Code § 502; and (9) unjust enrichment.  Plaintiffs assert an additional two claims against Google: negligence and negligent misrepresentation.

## II.   LEGAL STANDARD

A motion to dismiss for lack of Article III standing is evaluated under Federal Rule of Civil Procedure 12(b)(1).  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  Rule 12(b)(1) motions may be either facial, where the inquiry is confined to the allegations in the complaint, or factual, where the court looks beyond the complaint to extrinsic evidence.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  When a defendant challenges jurisdiction facially, all material allegations in the complaint are assumed true, and the court determines whether the factual allegations are sufficient to invoke the court's subject matter jurisdiction.  *Id.*

To survive a Rule 12(b)(6) challenge, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint must allege "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.

In ruling on a motion under Rule 12(b)(6), a court may consider only "the complaint, materials incorporated into the complaint by reference, and matters [subject to] judicial notice." *UFCW Loc. 1500 Pension Fund v. Mayer*, 895 F.3d 695, 698 (9th Cir. 2018) (citation omitted). A court must also presume the truth of a plaintiff's allegations and draw all reasonable inferences in their favor.  *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022).  However, a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted).

## III.   META'S MOTION TO DISMISS

### A.   Standing

Plaintiffs have standing to bring this lawsuit.  They allege that Meta extensively collects

browsing data, and through the Modified Pixel, non-consensually compiled detailed profiles linking that data to their Meta accounts.  (Compl. ¶¶ 24, 41, 55, 63.)  This Court has concluded in other pixel cases that similar allegations are sufficient to plead standing, either based on alleged harm like intrusion upon seclusion or a legal interest in unjustly earned profits.  *See Gilligan v. Experian Data Corp.*, No. 25-CV-02873-RFL, 2026 WL 32259, at *2 (N.D. Cal. Jan. 6, 2026) (citing *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 940, 942 (N.D. Cal. 2023)); *Tsering v. Meta Platforms, Inc.*, No. 25-CV-01611-RFL, 2026 WL 89320, at *3 (N.D. Cal. Jan. 12, 2026) (quoting *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020)).  The same is true here.  The Ninth Circuit's recent decision in *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025), does not demonstrate that Plaintiffs lack standing, as "[t]he scope of the alleged data collection and the creation of user profiles in this case is materially more invasive than the more limited tracking at issue" there.  *See Tsering*, 2026 WL 89320, at *3.

## B.    Consent

The parties agree that consent, or lack thereof, is either a defense to or element of Plaintiffs' claims against Meta.[3]  Consent "can be [express] or implied, but any consent must be actual."  *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (quoting *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013)).  That requires a disclosure to "'explicitly notify' users of the conduct at issue."  *Id.* (quoting *In re Google*, 2013 WL 5423918, at *13).  Additionally, consent is strictly construed in scope, reaching only "the particular conduct, or substantially the same conduct" as what was agreed to.  *Id.* (citation omitted).  This makes particular sense in the privacy context, since "privacy . . . is not a binary, all-or-nothing characteristic."  *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1073 (N.D. Cal. 2016) (quoting *Sanders v. Am. Broad. Cos., Inc.*, 20 Cal. 4th 907, 915 (1999)).  Since a court cannot resolve factual disputes on a motion to dismiss, if a plaintiff could have "plausibly

---

[3] The analysis here is the same regardless of whether consent is an element for Plaintiffs to negate or an affirmative defense for Meta.  *See In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 790 n.9 (N.D. Cal. 2019).  Thus, this Order does not resolve that issue.

understood the disclosures 'as *not* disclosing that [the defendant] would engage in particular conduct,'" their claims cannot be dismissed. *See Calhoun*, 113 F.4th at 1147 (quoting *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019)).

Meta contends that Plaintiffs consented to the activities they complain of by agreeing to its Privacy Policy. In relevant part, the Privacy Policy explains:

> We collect and receive information from partners, measurement vendors, marketing vendors and other third parties about a variety of your information and activities on and off our Products.
>
> Here are some examples of information we receive about you:
>
> - Your device information
> - Websites you visit and cookie data, like through Social Plugins or the Meta Pixel
> - Apps you use
> - Games you play
> - Purchases and transactions you make off of our Products using non-Meta checkout experiences
> - Your demographics, like your education level
> - The ads you see and how you interact with them
> - How you use our partners' products and services, online or in person
>
> Partners also share information like your email address, cookies and advertising device ID with us. This helps us match your activities with your account, if you have one.
>
> We receive this information whether or not you're logged in or have an account on our Products.
>
> (Dkt. No. 102-1 at 9.)

Meta's Cookies Policy, referenced in its Privacy Policy, provides a similar explanation:

> Our business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook or Instagram account or are logged in. Specifically, cookies named _fbc or _fbp may be set on the domain of the business partner whose site you're visiting. Unlike cookies that are set on Meta's own domains, these cookies aren't accessible by Meta when you're on a site other than the one on which they were set, including when you are on one of our domains. They serve the same purposes as cookies set in Meta's own domain, which are to personalise content (including ads), measure ads, produce analytics and provide a safer experience, as set out in this Cookies Policy.
>
> (Dkt. No. 102-5 at 6; *see also id.* at 7.)

8

As an initial matter, "the mere existence of a privacy policy" is generally not dispositive on a motion to dismiss because "users might lack actual or constructive notice of the policy." *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 601 (N.D. Cal. 2021) (citing *Opperman*, 205 F. Supp. 3d at 1073–74). However, Plaintiffs do not argue that they lacked notice of Meta's Privacy Policy and Cookies Policy (collectively, the "Privacy Policy"). Indeed, Plaintiffs implicitly allege that they agreed to the Privacy Policy by pleading that "[n]either Meta's nor any website's privacy policy provided clear, explicit, or adequate notice" of Meta's conduct, which they could not know if they were unaware of those policies. (*See* Compl. ¶ 189.) Thus, if the Privacy Policy disclosed the practices at issue, it could potentially be sufficient to find consent as a matter of law.

But a reasonable user could plausibly read the Privacy Policy to not disclose that Meta would open a backdoor to link their Android web browsing activities to their Meta accounts with absolute certainty. Admittedly, the Privacy Policy capaciously explains that Meta broadly collects browsing data, including "cookie data" and "[h]ow you use our partners' products and services." (Dkt. No. 102-1 at 9.) And it further explains that "information like your email address, cookies and advertising device ID" is shared with Meta to help "match your activities with your account." (*Id.*) Still, a reasonable user could read that as disclosing only that Android browsing data will be broadly collected to be matched imperfectly on some occasions to the user's Meta account. Plaintiffs allege that users generally understand the sandboxing principle of mobile operating systems means that there is a "digital wall between mobile apps," including between browsers and other apps. (Compl. ¶¶ 47, 71.) Thus, a reasonable user could believe that, on their Android phones, Meta would only roughly "match your activities with your account." (*See* Dkt. No. 102-1 at 9.) Contrary to that belief, the Modified Pixel allegedly allowed Meta to match browsing activities to Meta accounts with perfect confidence using identifiers from users' Facebook and Instagram apps. (Compl. ¶ 63.) Moreover, techniques that users could understand to prevent Meta's matching, such as clearing cookies or using incognito mode, were apparently rendered useless. (*Id.* ¶¶ 31, 64.) Meta's Privacy Policy did nothing to

dispel those plausibly objectively reasonable beliefs.[4]

Meta objects to the consideration of such objectively reasonable beliefs when determining the scope of consent, arguing that only the four corners of the Privacy Policy are relevant. But consent requires consideration of more than just the plain text of an agreement. Courts evaluate "the circumstances, considered as a whole." *Calhoun*, 113 F.4th at 1147 (quoting *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018)). For that reason, seemingly broad text in a disclosure might not provide effective consent if it would be objectively reasonable for a person to interpret the text more narrowly. *See, e.g.*, *Opperman*, 205 F. Supp. 3d at 1073 (holding that users could reasonably understand "[f]ind friends on Yelp using your Contacts" or "look at your contacts to find friends" to disclose on-device contact matching, not matching on Yelp's servers); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) (holding that a user could reasonably believe data collection does not occur in private browsing mode when the disclosure "never mentions private browsing mode"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1215–16 (N.D. Cal. 2014) (holding that a prompt asking users to "Invite [your contacts] to connect with you" only provided effective consent for one email, not reminder emails). The issue here is not that users had buyer's remorse, like when users believe something is unlikely to occur simply because a privacy policy used "indefinite" language like "may" instead of "will." *See Silver v. Stripe Inc.*, No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *4–5 (N.D. Cal. July 28, 2021). Rather, a reasonable user in this scenario could believe that the conduct at issue would *never* occur.

In sum, Meta's Privacy Policy is "plausibly understood" as "*not* disclosing" that it would perfectly match Android browsing activity to Meta accounts by opening a backdoor to users' Facebook and Instagram apps. *See Calhoun*, 113 F.4th at 1147 (quoting *In re Facebook, Inc., Consumer Priv.*, 402 F. Supp. 3d at 789). Plaintiffs could have reasonably believed instead that

---

[4] Plaintiffs' specific subjective understanding of Android's privacy protections is not relevant because this inquiry focuses on the understanding of a reasonable person. *See Calhoun*, 113 F.4th at 1149.

Meta's matching would be imperfect, limiting the scope of their consent to matching occurring through the standard Pixel's operation and not that of the Modified Pixel.  Because of that, their claims cannot be dismissed based on consent.

### C.        Intrusion Upon Seclusion and Invasion of Privacy Claims

Claims for intrusion upon seclusion under California common law and invasion of privacy under the California Constitution are substantively similar.  *In re Facebook, Inc. Internet Tracking*, 956 F.3d at 601 (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286–87 (2009)).  Accordingly, both claims require alleging "(1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Id.*  Plaintiffs plausibly allege both elements.

First, Plaintiffs allege that they had a reasonable expectation of privacy.  This analysis requires considering "the amount of data collected, the sensitivity of data collected, the manner of data collection, and the defendant's representations to its customers." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022) (citation omitted).  According to Plaintiffs, for over nine months, Meta built detailed profiles of them by collecting detailed browsing data and covertly using a backdoor to link that data to their Meta accounts.  (Compl. ¶¶ 4, 24–25, 61–64.)  Those allegations support a reasonable belief that Meta would not accumulate such a "vast repository of personal data" perfectly linked to their identities through covert behaviors.  *See Gilligan*, 2026 WL 32259, at *2 (quoting *Katz-Lacabe*, 668 F. Supp. 3d at 942).  While Meta points to its Privacy Policy as evidence that Plaintiffs knew it would be amassing that data and therefore could not have a reasonable expectation of privacy, that policy did not disclose the extent and precision of the practice at issue, as detailed above.

Plaintiffs further allege that Meta intruded upon their privacy in a highly offensive way.  This element requires a "holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and . . . countervailing interests or social norms." *In re Facebook, Inc. Internet Tracking*, 956 F.3d at 606 (citing *Hernandez*, 47 Cal. 4th at 287).  As a result, it generally "cannot be resolved at the pleading stage." *Id.*  Courts will only dismiss claims based on this element if the plaintiff alleges

mere "routine commercial behavior." *Hammerling*, 615 F. Supp. 3d at 1090 (citations omitted). But Meta's behavior here is alleged to go far beyond that. According to Plaintiffs, Meta surreptitiously circumvented browsers' sandboxing protections in order to perfectly link users' browsing behavior with their Meta accounts. (Compl. ¶¶ 46–64.) Browser developers, researchers, and members of the public were shocked and concerned when this behavior came to light. (*Id.* ¶¶ 65–67.) Thus, like allegations of "surreptitious data collection when individuals were not using Facebook," Plaintiffs have plausibly alleged a highly offensive intrusion. *See In re Facebook, Inc. Internet Tracking*, 956 F.3d at 606.

### D.      Wiretap Act, CIPA Wiretap, and CIPA Eavesdropping Claims

Plaintiffs state a claim under the Wiretap Act and CIPA's wiretap and eavesdropping provisions. The Wiretap Act prohibits "intercept[ing]" a communication. 18 U.S.C. § 2511(1). That requires acquiring the "contents" of the communication "during transmission." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876, 878 (9th Cir. 2002). The analysis of these elements of CIPA's wiretap provision, Cal. Penal Code § 631(a), is "the same as that under the federal Wiretap Act." *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (citation omitted). CIPA's eavesdropping provisions, Cal. Penal Code §§ 632(a), 635(a), similarly concern the contents of "confidential" communications when in transit. *In re Apple Data Priv. Litig.*, No. 5:22-CV-07069-EJD, 2026 WL 146025, at *5–8 (N.D. Cal. Jan. 20, 2026); *Kight v. CashCall, Inc.*, 200 Cal. App. 4th 1377, 1389 (2011) (noting "the crux of section 632 is the right to prevent a simultaneous dissemination to an unannounced listener" (citing *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002))).

Plaintiffs adequately allege that Meta intercepted and eavesdropped on the contents of their communications during transmission. According to Plaintiffs, the standard Meta Pixel intercepts "information that the browser transmits to the host website," including "(i) the URLs of the webpages visited; (ii) the information (e.g., items, products, articles, etc.) the user searched for in a search bar; (iii) the actions the user took on a page (e.g., opened an article, added an item to a shopping cart); and (iv) the contents of commonly used form fields." (Compl.

¶ 24.)  Plaintiffs plausibly allege those types of information constitute the content of their communications.  *See Smith v. Rack Room Shoes, Inc.*, No. 24-CV-06709-RFL, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025).  And that content is sufficiently alleged to have been intercepted and eavesdropped on during transmission.  *See id.* (first citing *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 960–62 (N.D. Cal. 2023); and then citing *St. Aubin v. Carbon Health Techs., Inc.*, No. 24-CV-00667-JST, 2024 WL 4369675, at *6 (N.D. Cal. Oct. 1, 2024)).

Meta contends that these allegations regarding the standard Pixel's operation should be ignored because Plaintiffs' complaint is ultimately a challenge to the Modified Pixel, not the standard Pixel.  But Plaintiffs challenge the operation of the standard Pixel as enhanced by the Modified Pixel, so those allegations remain relevant.  (*See, e.g.*, Compl. ¶¶ 175–76 (alleging that Meta read the communications between "Plaintiffs . . . and the websites at issue," and used "signals sent on the Android communication channels" to de-anonymize those communications).)  Moreover, Meta cannot avoid these claims by relying on consent in the Privacy Policy to the standard Pixel's collection of data.  As detailed above, Plaintiffs have plausibly alleged that users would not agree, and have not agreed, to permit the collection of standard Pixel data in a context where it would be combined via the Modified Pixel with perfectly matched identifiers from their Facebook and Instagram phone apps.

### E.    CIPA Pen Register Claim

Plaintiffs fail to state a CIPA pen register claim against Meta.  A pen register is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).  A trap and trace device is relatedly defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  *Id.* § 638.50(c).  CIPA prohibits the installation or use of a "pen register or a trap and trace device without first

13

obtaining a court order." *Id.* § 638.51(a).  Plaintiffs contend that the Modified Pixel operated as a pen register or trap and trace device by recording two types of information: IP addresses and the contents of the _fbp cookie.

The Court has previously concluded that IP addresses "fall within the statutory definition of 'addressing' information." *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 929 (N.D. Cal. 2024) (citing *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014)).  But Plaintiffs' complaint references IP addresses only once, baldly asserting that the Modified Pixel is a pen register because it records information "such as Plaintiffs' . . . IP addresses." (Compl. ¶ 205.)  That conclusory allegation does not specify how or when IP addresses are recorded.  *Cf. Shah*, 754 F. Supp. 3d at 927 (plaintiffs alleged that "after the Trackers locate the cookie, they 'cause[] the browser to send the cookie along with the user's IP address' to the third party").  Without that specificity, Plaintiffs have not adequately alleged that the Modified Pixel records IP addresses.

Unlike IP addresses, the contents of the _fbp cookie do not fall within the scope of the pen register provision.  "[D]ialing, routing, addressing, or signaling information" refers to information that an intermediary might use to transmit a communication from its sender to its intended recipient, such as the "originating number" in the traditional telephone context.  *See* Cal. Penal Code § 638.50(c).  In analyzing federal law's almost-identical pen register statute, the listed categories are often referred to as "envelope information," since with physical letters, they would include "the mailing and return addresses, the stamp and postmark, and the size and weight of the envelope when sealed."  Orin S. Kerr, *Internet Surveillance Law After the USA Patriot Act: The Big Brother That Isn't*, 97 Nw. U. L. Rev. 607, 611 (2003); *see also In re Zynga*, 750 F.3d at 1108.  Accordingly, on the internet, pen registers might collect "telephone numbers, IP addresses, MAC addresses, network headers, or which cell tower communicated with a cell phone," in addition to "e-mail addresses and instant messaging addresses."  Josh A. Goldfoot, *The Pen-Trap Statute and the Internet*, 6 Va. J. Crim. L. 1, 13 (2018).

As opposed to that type of information, the _fbp cookie allegedly contains browser identifiers, including "a pseudonymous identifier associated with the user" generally unique to

an individual website. (Compl. ¶ 30.) This Court previously concluded that similar "unique device identifiers" fall outside the scope of CIPA's pen register provision. *Tsering*, 2026 WL 89320, at *6; *see also Bradshaw v. Lowe's Cos., Inc.*, No. 25-CV-0742-DMS, 2025 WL 3171740, at *5 (S.D. Cal. Nov. 12, 2025) (doubting that device identifiers can constitute routing information). That conclusion likewise applies here. The contents of the _fbp cookie are not used by communication providers to route Plaintiffs' communications, but instead by Meta to retrospectively compile the communications into detailed user profiles. (*See* Compl. ¶ 55 (alleging that the contents of the _fbp cookie were sent to Meta's apps and thereafter "shipped" to its servers, allowing it to "de-anonymize the user's otherwise anonymous browsing activity").) According to Plaintiffs, the contents of the _fbp cookie are routing information precisely because they "direct user information . . . to a specific user profile" stored by Meta. (Dkt. No. 107 at 25.) But the focus here is whether that information would be used by an intermediary to route the communication or signal its intended path, not the recipient's use of that communication. Were that not the case, "dialing, routing, addressing, or signaling" would become meaningless, as one can imagine a recipient using almost any information to direct data to a specific storage location. Such an interpretation would stretch CIPA's already broad statutory language too far.

### F. CDAFA Claim

CDAFA aims to prohibit "computer crime and other forms of unauthorized access to computers, computer systems, and computer data." Cal. Penal Code § 502(a). Plaintiffs assert claims under seven of CDAFA's subdivisions, Cal. Penal Code § 502(c)(1)–(4) and (c)(6)–(8). (Compl. ¶ 222.) Each subdivision requires the defendant to have acted "knowingly." Cal. Penal Code § 502(c)(1)–(4), (c)(6)–(8). Additionally, all but one require the defendant to have acted "without permission." *Id.* § 502(c)(1)–(4), (c)(6)–(7). The remaining subdivision concerns the introduction of a "computer contaminant," which is defined to only include software that acts "without the intent or permission of the owner of the information." *Id.* § 502(b)(12), (c)(8). Thus, Plaintiffs' CDAFA claim generally requires allegations that Meta knowingly acted without permission, except as to one subdivision which instead requires allegations that Meta knowingly

introduced software that acted without permission. *See Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, No. 5:13-CV-00034-PSG, 2014 WL 2213910, at *4–5 (N.D. Cal. May 28, 2014).

Plaintiffs plausibly allege that Meta knowingly acted without permission by using a backdoor to evade Android's sandboxing protection. According to Plaintiffs, users and developers understand that "one app installed on an Android device (like the Facebook or Instagram app) is not supposed to be able to access data collected or stored by another app (like a web browser), and vice versa." (Compl. ¶¶ 47, 50–51, 73.) But Meta developed a method to circumvent that protection. (*Id.* ¶¶ 52–55.) Meta is one of only two companies known to have used that method. (Dkt. No. 104-3 at 2.) Initially, this method sent the _fbp cookie over the HTTP protocol. (Compl. ¶ 57.) Meta then changed its technical implementation to make it harder to detect. *(Id.* ¶¶ 58–59, 74.) One of those changes involved a "complicated technique" to trick a protocol "typically used for making audio and video calls" into sending information by inserting it into a data field "meant for connection information." (*Id.* ¶ 59.) And when that method was partially mitigated through an update to the Chrome browser, Meta quickly updated the Modified Pixel to circumvent that mitigation. (*Id.* ¶¶ 56, 60.) Both the public and technical experts, like developers and internet security researchers, were unaware of Meta's behavior until researchers exposed it in June 2025. (*Id.* ¶¶ 4, 65, 67, 73.) From those allegations of secretive and evasive behavior that was surprising even to technical experts, it is reasonable to infer that Plaintiffs did not give Meta permission to evade Android's sandboxing in this way and that Meta knew it was acting without permission. There is a fundamental difference between using known functionality of a system in an unexpected way and employing subterfuge to exploit design flaws that are not broadly known. *Cf. Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1032–33, 1054 (N.D. Cal. 2014) (holding that apps did not overcome technical barriers when they had "open access" to devices' address books).

Plaintiffs do not simply "disapprove[] of the method" by which Meta acted, but instead contend that Meta knowingly used and introduced software that acted in a manner understood to be impermissible. *See Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir. 2018),

*rev'd in irrelevant part*, 586 U.S. 334 (2019).  While Meta was permitted to send the _fbp cookie to its servers, it allegedly circumvented "technical or code-based barriers" (Android's sandboxing protection) so that the Pixel would also know Plaintiffs' Meta account information. *See Facebook, Inc. v. Power Ventures, Inc.*, No. 08-CV-05780-JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010).  The Pixel could not have known Plaintiffs' identities with certainty if Meta did not circumvent that barrier.  (*See* Compl. ¶ 51.)  Thus, Meta was not "authorized in the first instance to take and use" Plaintiffs' Meta account information through the Pixel.  *See Oracle*, 879 F.3d at 962.  Meta is right to note that CDAFA should not create criminal liability for any unintended use of software, but "a person applying the technical skill necessary to overcome . . . a [technical] barrier will almost always understand that any access gained through such action is unauthorized."  *See Power Ventures*, 2010 WL 3291750, at *11.

### G.     Unjust Enrichment Claim

Plaintiffs concede that their unjust enrichment claim should be dismissed because they do not allege they lack an adequate remedy at law.  (Dkt. No. 107 at 32 n.14.)

## IV.    GOOGLE'S MOTION TO DISMISS

### A.     Negligence Claim

Negligence has three elements: duty, breach, and causation.  *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021) (citation omitted).  Plaintiffs have plausibly alleged each element. They are considered in turn.

#### 1.     Duty

The general rule is that an individual only has a duty to take reasonable care if they "'created a risk' of harm to the plaintiff."  *Id.* at 214 (citation omitted).  Thus, there is generally "no duty to act to protect others from the conduct of third parties."  *Id.* (citation omitted).  The no-duty-to-protect rule is not absolute, though.  *Id.* at 215.  As relevant here, the law imposes a duty on persons in a "'special relationship' with either the victim or the person who created the harm."  *Id.* (citations omitted).  Traditional special relationships include those between "parents and children, colleges and students, employers and employees, common carriers and passengers,

and innkeepers and guests." *Id.* at 216 (citations omitted).  Such relationships are characterized by (1) "an aspect of dependency in which one party relies to some degree on the other for protection"; (2) the other party having "superior control over the means of protection"; (3) "a duty of care owed to a limited community"; and (4) in most instances, "especially benefit[ting] the party charged with a duty of care."  *Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607, 620–21 (2018).  Those characteristics can lead courts to find special relationships from commercial transactions that seem somewhat ordinary on first glance.  *See, e.g.*, *Dix v. Live Nation Ent., Inc.*, 56 Cal. App. 5th 590, 608 (2020) (festival operator and attendees).

Google had a special relationship with Plaintiffs.  First, Plaintiffs rely on Google to protect their personal information.  As Google touts, "your life is on your phone."  (Compl. ¶ 79.)  The Supreme Court has recognized that cell phones operate as a "digital record of nearly every aspect of [people's] lives—from the mundane to the intimate."  *Riley v. California*, 573 U.S. 373, 395 (2014).  Correspondingly, Google exercises superior control over protection of Plaintiffs' information.  Google designed Android and wrote its code, putting Google in a position to implement data safeguards.  Though Plaintiffs can implement some rudimentary safeguards like passcodes, they cannot patch Android design vulnerabilities on their own.  Moreover, Google is better placed to understand what design vulnerabilities exist.  Next, Google's duty of care would be limited to Android users, not the public at large.  Even though Android has many users, the community of Android users is still a specific subset of individuals.  *See Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 633 (N.D. Cal. 2024).  Finally, Google particularly benefits from this relationship, as it would not be able to successfully monetize Android if users were unwilling to share and store their personal information.  In sum, each factor suggests Plaintiffs and Google had a special relationship.  Indeed, courts applying California law often find special relationships between companies that obtain sensitive information and the individuals who provided that data.  *Id.* at 634 (collecting cases).

Even where a special relationship exists and gives rise to a duty of care, California law requires courts to "consult the factors described in *Rowland* [*v. Christian*, 69 Cal. 2d 108 (1968)]

18

to determine whether relevant policy considerations counsel limiting that duty." *Brown*, 11 Cal. 5th at 209. Those factors are: "foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Rowland*, 69 Cal. 2d at 113. The parties focus on three of those: foreseeability, moral blame, and the policy of preventing future harm.

None of those factors counsel in favor of limiting the duty of care here. First, it is entirely foreseeable that negligently designing software with inadequate data safeguards could result in harm to users. *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019). The foreseeability inquiry does not consider the facts of an individual case but rather "evaluate[s] more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed." *Regents*, 4 Cal. 5th at 629 (citations omitted). Thus, it is beside the point whether Google could have foreseen Meta's specific actions here. *See id.* As to moral blame and the policy of preventing future harm, "to hold that [the company] has no duty of care here 'would create perverse incentives for businesses who profit off the use of consumers' personal data to turn a blind eye and ignore known security risks.'" *See In re Accellion*, 713 F. Supp. 3d at 636 (quoting *Bass*, 394 F. Supp. 3d at 1039). There is no reason to believe that recognizing this duty to safeguard private information would chill innovation by "opening the floodgates of litigation." *Cf. Doe No. 14 v. Internet Brands, Inc.*, No. 12-CV-3626-JFW, 2016 WL 11824793, at *5 (C.D. Cal. Nov. 14, 2016) (holding that the *Rowland* factors counsel against a duty for social media websites to warn users of generalized threats).

### 2. Breach

Plaintiffs plausibly allege that Google breached its duty of care by designing Android with an "overly permissive" architecture. (*See* Compl. ¶ 253.) Though not dispositive, "[t]he

standard of care required in a particular circumstance may be based on . . . the custom and practice in the relevant community." *Bullis v. Sec. Pac. Nat. Bank*, 21 Cal. 3d 801, 809 (1978) (citations omitted). According to Plaintiffs, Apple's iOS "requires apps to declare specific network/server entitlements and tightly restricts background network activity," including by requiring "explicit user approval" for communication between apps. (Compl. ¶¶ 86, 88.) At this early stage in the case, and given the undeniably significant portion of mobile phones using Apple's iOS, it is reasonable to infer an industry custom of placing tight controls on communications between apps based on Apple's restrictions. In disregard of that custom, Google allegedly designed Android to allow apps to listen in on localhost ports without monitoring, requiring user consent, or imposing restrictions for Incognito browsing sessions. (*Id.* ¶¶ 88–89.) The existence of such a design flaw, which researchers deemed "fundamental," is sufficient to plausibly allege that Google breached its duty of care. (*See id.* ¶ 91; *In re Accellion*, 713 F. Supp. 3d at 637 (holding that plaintiffs plausibly alleged breach with allegations of "critical severity" vulnerabilities).)

### 3. Causation

Causation is "a question of fact which cannot be decided as a matter of law from the allegations of a complaint" unless "the only reasonable conclusion is an absence of causation." *State Dep't of State Hosps. v. Superior Ct.*, 61 Cal. 4th 339, 353 (2015) (citations omitted). The parties focus on whether Meta's conduct was a superseding cause, which would "break[] the chain of proximate causation" and relieve Google of responsibility. *See Cal. Med. Assn. v. Aetna Health of Cal. Inc.*, 14 Cal. 5th 1075, 1097 (2023). To qualify as a superseding cause, "the act must have produced 'harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible.'" *Lugtu v. Cal. Highway Patrol*, 26 Cal. 4th 703, 725 (2001) (citation omitted). Accordingly, when a negligence claim is premised on the defendant "having exposed the plaintiff to an unreasonable risk of harm from the actions of others, the occurrence of the type of conduct against which the defendant had a duty to protect the plaintiff cannot properly constitute a superseding cause." *Id.*

20

There is no basis for concluding as a matter of law at the pleading stage that Meta's conduct was a superseding cause. Google's duty is premised on the risk that inadequate data safeguards might allow bad actors to gain access to personal information. Plaintiffs plausibly allege that Meta's actions were the "foreseeable consequences of weakened cybersecurity controls over valuable and sensitive data." (*See In re Powerschool Holdings, Inc. & Powerschool Grp., LLC Customer Sec. Breach Litig.*, No. 25-MD-03149-BEN, 2026 WL 764701, at *11 (S.D. Cal. Mar. 18, 2026) (citing *Lugtu*, 26 Cal. 4th at 725); Compl. ¶ 252).

## B.        Negligent Misrepresentation Claim

As an initial matter, a negligent misrepresentation claim under California law must be pled with particularity under Rule 9(b). District courts in the Ninth Circuit are split on this issue. *Radus Tek Servs., Inc. v. IDC Techs. Inc.*, 767 F. Supp. 3d 972, 981 n.3 (N.D. Cal. 2025) (collecting cases). The decisions applying Rule 9(b) to negligent misrepresentation claims are more persuasive, as they more accurately reflect the understanding of that claim under California law. Under California law, negligent misrepresentation is a "species of the tort of deceit." *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407 (1992); Cal. Civ. Code § 1710(2) (defining deceit to include a false assertion "by one who has no reasonable ground for believing it to be true"). That conceptualization of negligent misrepresentation claims means that they necessarily "sound in fraud." *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). Accordingly, since one cannot plead a negligent misrepresentation claim by alleging "some non-fraudulent conduct," such a claim must be pled with particularity under Rule 9(b). *See id.* at 1104.

The elements of a negligent misrepresentation claim are "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 243 (2007) (citation omitted). Because Rule 9(b) applies, Plaintiffs must both plausibly allege those elements and state with specificity the "who, what, when, where, and how of the misconduct charged." *See Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d

21

1225, 1228 (9th Cir. 2019) (quoting *Vess*, 317 F.3d at 1106).  That includes explaining "what is false or misleading about a statement, and why it is false."  *Id.* (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute in irrelevant part*).  Though some elements are sufficiently alleged, others are not, and Rule 9(b) is not satisfied.

First, Plaintiffs plausibly allege that the statements were false.  The statements were plausibly false because Android had a design vulnerability allowing "third-party developers to access specific localhost ports" without "a security protocol to ensure such access was not misused."  (Compl. ¶¶ 84–85.)  As this vulnerability is allegedly inherent to Android's "overly permissive" design, it existed throughout the period the statements were made, so Plaintiffs are not alleging mere "fraud by hindsight."  (*See id.*; *In re GlenFed*, 42 F.3d at 1548 n.8.)  Nor are the statements puffery, as they are "misdescriptions of specific or absolute characteristics of a product."  *See Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) (citation omitted).  For instance, Google allegedly represented that Android "restricts access to technically ensure your privacy and safety," allows users to "choose when to share certain sensitive data with apps you download," and that Pixel devices "ensure the privacy and safety of your data by minimizing the amount of data stored, de-identifying it so that the data is not linked to you, and restricting its access altogether."  (Compl. ¶ 262.)  Those are specific representations that can be objectively verified.

Next, Plaintiffs plausibly allege that Google lacked reasonable grounds to believe the challenged statements were true.  As discussed with Plaintiffs' negligence claim, Google's primary competitor in the mobile operating system market allegedly took stronger steps to secure communications between apps.  (*Id.* ¶¶ 86, 88.)  Those allegations make it reasonable to infer other market participants were aware that design choices like Google's were "overly permissive."  (*See id.* ¶ 84.)  In turn, Plaintiffs plausibly allege that Google should have known the challenged statements were false.

However, Plaintiffs do not allege actual and justifiable reliance on the misrepresentations.  Plaintiffs make only conclusory allegations that they "reasonably and justifiably relied on" a

22

laundry list of misrepresentations. (*Id.* ¶¶ 272–73.) Those are insufficient to plausibly allege actual reliance. *See Dey v. Robinhood Mkts., Inc.*, 780 F. Supp. 3d 882, 891 (N.D. Cal. 2025). While it can sometimes be reasonable to infer that any purchaser of a product saw a particular misrepresentation and therefore relied on it, that generally requires allegations of a "massive advertising campaign" or some other circumstance leaving "little doubt" of exposure to the misrepresentations. *See In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. 119, 131 (N.D. Cal. 2025) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012)). Plaintiffs do not make any such allegations here. And absent factual allegations about their actual reliance, they cannot plausibly allege justifiable reliance. *See Dey*, 780 F. Supp. 3d at 891.

Finally, Plaintiffs do not allege when the misrepresentations were made or when they encountered them. Rule 9(b) requires such allegations. *See In re GlenFed*, 42 F.3d at 1547 n.7; *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009).

## V.    CONCLUSION

For the foregoing reasons, the motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' CIPA pen register, unjust enrichment, and negligent misrepresentation claims are **DISMISSED**. Dismissal is with **LEAVE TO AMEND** because the Court cannot conclude on the current record that amendment would be futile. All other claims survive dismissal. If Plaintiffs wish to file an amended complaint correcting the deficiencies identified above, they shall do so by **June 1, 2026**. They may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15. If no such amended complaint is filed by that date, the claims that were dismissed in this Order will remain dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: May 11, 2026

RITA F. LIN
United States District Judge

23