UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| IN RE: PAYPAL HONEY BROWSER EXTENSION LITIGATION | ) | 5:24-CV-09470 BLF |
| | ) | SAN JOSE, CALIFORNIA |
| | ) | JUNE 4, 2026 |
| | ) | PAGES 1 - 66 |

TRANSCRIPT OF CIVIL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS: LIEFF CABRASER HEIMANN BERNSTEIN, LLP
250 HUDSON ST. 8TH FLOOR
NEW YORK, NY 10013
**BY: JASON LOUIS LICHTMAN**

GIRARD SHARP LLP
601 CALIFORNIA STREET, SUITE 1400
SAN FRANCISCO, CA 94108
**BY: DENA C. SHARP**

**(APPEARANCES CONTINUE ON FOLLOWING PAGE.)**

OFFICIAL COURT REPORTER: TIFFANY SALINAS-HARWELL, RPR
CERTIFICATE NUMBER 971863

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONTINUED.)

COTCHETT, PITRE & MCCARTHY, LLP
840 MALCOM ROAD, SUITE 200
BURLINGAME, CA 94010
**BY: THOMAS ERIC LOESER**

FOR THE DEFENDANTS: ORRICK, HERRINGTON & SUTCLIFFE LLP
51 WEST 52ND ST.
NEW YORK, NY 10019
**BY: RICHARD JACOBSEN**
**BY: JENNIFER M. KEIGHLEY**
**BY: MARC R. SHAPIRO**

SAN JOSE, CALIFORNIA JUNE 4, 2026

P R O C E E D I N G S

(COURT CONVENED AT 10:54 A.M.)

**THE CLERK:** ALL RISE.

THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IS NOW IN SESSION, THE HONORABLE BETH LABSON FREEMAN PRESIDING.

**THE COURT:** GOOD MORNING, EVERYONE.

WELCOME, PLEASE BE SEATED.

ALL RIGHT, LET'S CALL OUR CASE AND GET YOUR APPEARANCES.

**THE CLERK:** 24-CV-09470 IN RE: PAYPAL HONEY BROWSER EXTENSION LITIGATION.

COUNSEL, CAN YOU PLEASE APPROACH THE PODIUM AND STATE YOUR APPEARANCES, BEGINNING WITH THE PLAINTIFF.

**MR. LICHTMAN:** GOOD MORNING, YOUR HONOR, ON BEHALF OF PLAINTIFFS IN THE PROPOSED CLASS, JASON LICHTMAN, LIEFF CABRASER.

**THE COURT:** HELLO, MR. LICHTMAN.

**MS. SHARP:** GOOD MORNING, YOUR HONOR.

DENA SHARP FROM GIRARD SHARP, ON BEHALF OF THE CLASS PLAINTIFFS.

**THE COURT:** WELCOME.

**MR. LOESER:** GOOD MORNING, YOUR HONOR.

TOM LOESER OF COTCHETT, PITRE & MCCARTHY ON BEHALF OF THE CLASS.

**THE COURT:** GOOD MORNING, MR. LOESER.

**MR. JACOBSEN:** GOOD MORNING, YOUR HONOR. RICHARD JACOBSEN OF ORRICK, HERRINGTON & SUTCLIFFE ON BEHALF OF PAYPAL.

**THE COURT:** GOOD MORNING.

**MR. SHAPIRO:** GOOD MORNING, YOUR HONOR.

MARC SHAPIRO FROM ORRICK, HERRINGTON & SUTCLIFFE ON BEHALF OF PAYPAL.

**THE COURT:** GOOD MORNING.

**MS. KEIGHLEY:** GOOD MORNING, YOUR HONOR.

JENNIFER KEIGHLEY FROM ORRICK, HERRINGTON & SUTCLIFFE, ON BEHALF OF PAYPAL.

**THE COURT:** GOOD MORNING.

ALL RIGHT. WELL, WELCOME TO EVERYONE TODAY.

WE'LL BEGIN IN OUR DISCUSSIONS ON THIS CURRENT MOTION TO DISMISS. I WAS HOPING TO BE A LITTLE BIT MORE ON TIME AT 10:30. MY LAST MATTER TOOK A LITTLE BIT LONGER, BUT AT LEAST YOU WEREN'T SITTING ON OUR COMFORTABLE BENCHES IN THE HALLWAY SINCE 9:00 O'CLOCK THIS MORNING, SO IT TOOK A LITTLE BIT OF THAT PRESSURE OFF, BUT I DIDN'T QUITE MAKE IT.

SO I THINK WE'RE READY TO GET DOWN TO WORK HERE.

LIKE THE FIRST GO ROUND, THE MOTION HERE RAISES MANY ISSUES, AND I'M FORTUNATE THAT OTHER COURTS HAVE COME BEFORE ME ON THIS ISSUE. I THINK LAST TIME WE WERE ABLE TO DISCUSS THE CAPITAL ONE MOTION TO DISMISS ORDER, AND I DON'T THINK THAT THE

RETAILMENOT BROWSER CASE HAD BEEN DECIDED YET, ALTHOUGH IT'S NOW A YEAR OLD.

SO I FIND THOSE CASES VERY INSTRUCTIVE IN REVIEWING THESE, THIS ITERATION OF THE COMPLAINT, AND VERY HELPFUL TO ME. I CLEARLY AM CONCERNED ABOUT STANDING. IT'S AN ISSUE THAT IS ALWAYS BEFORE ME FOR MY OWN DETERMINATION OF JURISDICTION. I WILL SAY THAT I GENERALLY BELIEVE THAT STANDING HAS BEEN ESTABLISHED HERE, BUT I RECOGNIZE THERE ARE SOME DIFFICULT ISSUES THERE, AND I DO -- WE NEED TO ADDRESS THE EFFECT OF THE STATISTICAL ANALYSIS ON THE PLAINTIFFS WHO WERE NOT PART OF THE TEST, AND WHETHER THAT'S GOING TO BE SUFFICIENT FOR PROOF, OR IF IT'S MERELY ENOUGH TO GET YOU OVER THE LINE ON A MOTION TO DISMISS. I WANT TO MAKE SURE THAT THE CASE DEVELOPS PROPERLY.

I AM A LITTLE FRUSTRATED WITH NOT HAVING THE COMPLAINT DRAFTED REALLY INCORPORATING THE EXACT TERMS OF THE VARIOUS CONTRACTS, MERCHANT CONTRACTS AT ISSUE, AND I WOULD SAY THAT PAYPAL HAS DONE A NICE JOB, ALTHOUGH MISSED SOME CITATIONS TO THE SECTIONS OF THE CONTRACTS IN SHOWING A DIFFERENT INTERPRETATION. I DON'T THINK IT ULTIMATELY WILL CAUSE THE CASE TO FAIL, BUT IT IS HELPFUL TO SEE THE CONTRACTS THEMSELVES.

I THINK ON THE CFAA CLAIM AND THE RELATED STATE-COURT CLAIM, I THINK WE REALLY NEED TO FOCUS ON WHETHER THE KIND OF LOSS ASSERTED IN THE SECOND AMENDMENT COMPLAINT IS APPROPRIATE UNDER THE CFAA.

RETAILMENOT, NO, ACTUALLY, CAPITAL ONE TALKS ABOUT INTERRUPTION IN SERVICE, AND THAT MAY BE ENOUGH, BUT I AM CONCERNED ABOUT THAT. I THINK IT'S ENOUGH, BUT I THINK THAT'S REALLY THE KEY ISSUE THERE.

AND THERE'S A LOT OF TALK ABOUT THE SCOPE OF THE PERMISSIONS PROVIDED BY THE CONSUMERS. I BELIEVE THAT THIS CASE CAN GO FORWARD ON THAT ISSUE, BECAUSE IN THIS CASE IT'S ARGUED THAT EVEN WHERE THE CONSUMER EXPRESSLY DECLINED TO HAVE THE BROWSER WORK, THAT HONEY BROWSER STILL BUMPED THE AFFILIATE'S ID TO TAKE THE COMMISSION, AND I THINK THAT'S DIFFERENT THAN IN RETAILMENOT. I THINK IT'S DIFFERENT, BECAUSE RETAILMENOT GOES ON AT LENGTH ABOUT THE DOUBLE PERMISSION, AND SO I WANT TO EXPLORE THAT, ALTHOUGH I CLEARLY DON'T KNOW, AND I DON'T THINK I ACTUALLY NEED TO KNOW THE FULL SCOPE OF THOSE PERMISSIONS. I CAN'T DECIDE WHETHER THE PERMISSIONS ARE ENOUGH FOR AUTHORIZATION AT THIS STAGE. AT SOME POINT, SOMEBODY WILL HAVE TO DECIDE IT, WHETHER IT'S ME AT SUMMARY JUDGMENT OR A JURY LATER, AND I THINK THE STATE CLAIM COMES ALONG WITH IT.

ON THE INTERFERENCE CLAIMS, I THINK IT MAY BE THAT THE INTERFERENCE WITH PROSPECTIVE CONTRACTUAL ADVANTAGE FAILS, LIKE IT DID IN RETAILMENOT BECAUSE THERE'S NO ALLEGATION THAT ANY MERCHANT STOPPED DOING BUSINESS WITH THE AFFILIATES, AND THAT MAY BE ENOUGH, BUT ON THE INTERFERENCE WITH CONTRACT, I THINK THAT PROBABLY GETS THROUGH.

UNJUST ENRICHMENT, I THINK THIS, WE REALLY NEED TO TALK

ABOUT WHETHER THERE'S AN INADEQUATE REMEDY AT LAW. I THINK THAT -- I'M NOT SURE THAT'S BEEN PLED. ON THE UCL IT'S THE SAME THING, WE REALLY GET THE SAME THING, ALTHOUGH THERE IS A REQUEST FOR AN INJUNCTION, ALTHOUGH THERE'S A SUGGESTION THAT YOU CAN GET AN INJUNCTION UNDER THE CFAA, SO WE SHOULD TALK ABOUT THAT.

THESE EQUITABLE CLAIMS LARGELY DON'T BELONG ALONG WITH LEGAL CLAIMS. THE NINTH CIRCUIT, I THINK, HAS BEEN CLEAR. WHETHER THEY GO AT THIS POINT OR NOT IS WHAT I WANT TO FOCUS ON.

AND I'M REALLY NOT INCLINED TO HAVE ANOTHER ROUND OF MOTION TO DISMISS ON THE CASE, SO UNLESS YOU PERSUADE ME THAT A THIRD AMENDED COMPLAINT IS WARRANTED, I'M NOT REALLY INCLINED FOR THAT.

SO, MR. JACOBSEN, ARE YOU TAKING THE LABORING ORDER ON THE ARGUMENT FOR PAYPAL?

**MR. JACOBSEN:** I AM, YOUR HONOR. MAY I APPROACH?

**THE COURT:** YES, PLEASE.

**MR. JACOBSEN:** THANK YOU VERY MUCH FOR THAT. WELL, THANK YOU FOR LAYING IT OUT FOR ME. I'M GOING TO GIVE SOME OF THESE THE OLD COLLEGE TRY.

**THE COURT:** PLEASE DO SO.

**MR. JACOBSEN:** AGAIN, GOOD MORNING, YOUR HONOR. RICHARD JACOBSEN FROM ORRICK, HERRINGTON ON BEHALF OF PAYPAL.

SO, YOUR HONOR, WE THINK FUNDAMENTALLY WHAT'S GOING ON

HERE IS THE PLAINTIFFS ARE TRYING TO STIFLE LEGITIMATE COMPETITION. AND WHEN WE CAME BEFORE YOU IN NOVEMBER, YOU ASKED THE PLAINTIFFS TO SUBSTANTIATE THEIR ALLEGATIONS ON THE STANDING ISSUE WITH ACTUAL CONTRACT LANGUAGE AND SHOW SOME CONCRETE INJURY RESULTING FROM HONEY'S CONDUCT.

I THINK IT'S INSTRUCTIVE AND A LITTLE TELLING THAT IN RESPONSE, TWO-THIRDS OF THE PLAINTIFFS IN THIS CASE, DROPPED OUT. WE WENT FROM 26 TO 11, AND THE REMAINING LOT FARE NO BETTER.

THE CRUX OF PLAINTIFFS' CASE, YOUR HONOR, IS THAT HONEY CANNOT RESULT IN A VALID LAST CLICK ENTITLING IT TO A COMMISSION, AND WE BELIEVE THAT'S CONTRADICTED BY BOTH THE CONTRACT LANGUAGE ITSELF, AND I APPRECIATE YOU LAYING OUT THAT THERE WERE, AS WE POINT OUT, SOME OMISSIONS IN THE CONTRACTS THEY PUT BEFORE YOU, AND ALSO IN HONEY'S LONG-STANDING RELATIONSHIPS, THIS IS AN ECOSYSTEM THAT'S EXISTED FOR 10 YEARS, WHERE WE HAVE OUR OWN CONTRACTS.

IN FACT, THEY ADMIT, I THINK, IN PARAGRAPH 70 OR 77 OF THE SECOND AMENDMENT COMPLAINT, THAT THESE ARE FORM CONTRACTS. IF THEY HAVE A CONTRACT WITH DELL, OURS IS SUBSTANTIVELY SIMILAR, JUST THE PARTIES' NAMES CHANGE, AND IT'S AN ECOSYSTEM, AS THE PLAINTIFFS PLEAD, THAT'S WORTH BILLIONS OF DOLLARS. FOR 10 YEARS, THE AFFILIATE NETWORKS AND THE MERCHANTS HAVE BEEN PAYING HONEY COMMISSIONS FOR THEIR SERVICE.

**THE COURT:** SO, I DON'T THINK THE PLAINTIFFS CARE

THAT HONEY IS GETTING A COMMISSION; THEY JUST WANT THEIR OWN, AND THEY DON'T THINK THAT HONEY OUGHT TO TAKE THEIRS. SO HAVING SEPARATE CONTRACTS IS NOT -- WITH THE MERCHANTS, IS NOT AN ISSUE IN THE CASE, AND MERCHANTS PAYING THE BROWSER EXTENSION IS NOT REALLY AT ISSUE, IT'S THE -- I'M GOING TO FOCUS ON THE WORDS "LEGITIMATE COMPETITION," AS OPPOSED TO "COMPETITION." AND I'M REALLY CONCERNED THAT THE DELL CONTRACT, AND I THOUGHT I BROUGHT EVERYTHING WITH ME, I THINK I DID. YES, I HAVE YOUR DELL CONTRACT. I THINK THE DELL CONTRACT PROVIDES THAT THE AFFILIATE GETS THE COMMISSION IF IT'S THE LAST CLICK THAT GETS THE CUSTOMER TO THE MERCHANT'S SITE, AND THEN -- THAT'S MY READING OF IT -- WHAT IS ALLEGED TO HAPPEN IS THAT ONCE THE CUSTOMER IS AT THE MERCHANT SITE, WHETHER THE CUSTOMER WANTS HONEY BROWSER TO DO ITS THING OR NOT, THAT HONEY BROWSER BUMPS THE AFFILIATE'S ID OFF THE MERCHANT'S WEBSITE OR OFF THE CUSTOMER'S COMPUTER AND TAKES THE COMMISSION. THAT'S HOW I READ IT, AND SO IT'S THE LEGITIMATE COMPETITION PART THAT I'M CONCERNED ABOUT.

AND IN THE DELL -- WE CAN WORK WITH THE DELL CONTRACT, BECAUSE THAT'S REALLY WHAT YOU FOCUS ON. THAT WAS THE TEST CASE.

**MR. JACOBSEN:** YES, YOUR HONOR.

**THE COURT:** AND YOU CRITICIZE THE PLAINTIFFS FOR RELYING ON 2.5, WHICH IS THE DEFINITION OF QUALIFYING LINK, BUT QUALIFYING LINK IS PROVIDED, IT IS THE LAST LINK TO THE DELL

SITE THAT THE VISITOR, A VISITOR, USES DURING THE SESSION WHERE A SALE OF A PRODUCT OR SERVICE OCCURS.

SO THIS IS, I KNOW THEY TALK ABOUT THE STAND-DOWN ORDERS LATER, I'M NOT REALLY SURE THAT'S AN ISSUE HERE, BUT THIS IS WHERE THEIR ALLEGATION, IN MY VIEW, OF WHAT HONEY BROWSER DOES IS TO SURREPTITIOUSLY, IN THEIR WORDS, TRICK THE MERCHANT INTO AWARDING AN UNDESERVED CREDIT. THAT'S NOT MY WORDS, THAT'S WHAT I'M TAKING FROM THE PLAINTIFFS, SO THAT'S WHAT I WANT YOU TO FOCUS ON.

**MR. JACOBSEN:** YEAH, SO LET ME -- LET ME GO RIGHT TO THE DELL CONTRACT.

**THE COURT:** OKAY.

**MR. JACOBSEN:** I'LL COME BACK TO SOME OF THE BROADER THEMES HERE, AND I THINK EVEN WITH DELL, JUST TO PREVIEW WHERE WE'RE GOING, THAT WAS ONE OF 11 TEST CASES, NOTABLY NONE OF THE OTHER 11 PLAINTIFFS PARTNER WITH DELL, SO I THINK THERE'S SOME ISSUES OF WHETHER OR NOT THAT CAN BE EXTRAPOLATED TO THE ENTIRE CLASS.

BUT TO GO TO YOUR POINT, YOUR HONOR, AND JUST SO THE RECORDS CLEAR, AND I CAN KIND OF GIVE CONTEXT FOR MYSELF HERE, SO THEY RELY ON THAT DEFINITION, QUALIFYING LINK, AS A LINK FROM YOUR MARKETING PLATFORM TO THE DELL SITE USING THE REQUIRED URLS SPECIFIED IN AN OFFER, PROVIDED THAT IT IS THE LAST LINK TO THE DELL SITE THAT A VISITOR USES DURING A SESSION WHERE A SALE OF A PRODUCT OR SERVICE OCCURS.

BUT, YOUR HONOR, HERE'S THE POINT WE'RE MAKING, AND THIS GOES TO OUR THEME ABOUT HOW WE THINK THEIR SNIPPETS WERE SELECTIVE AND FRANKLY MISLEADING, AND WE'VE GIVEN SOME EXAMPLES. WE DON'T HAVE ALL THE CONTRACTS AND ALL THE INFORMATION, BUT LET'S FOCUS ON DELL.

**THE COURT:** SURE.

**MR. JACOBSEN:** THE PLAINTIFFS ENTIRELY IGNORE THE CONTRACT'S LANGUAGE EXPLAINING QUOTE, "YOUR MARKETING PLATFORMS INCLUDES ANY MEDIA CHANNEL, INCLUDING, BUT NOT LIMITED TO, APPROVED AD-SUPPORTED SOFTWARE THAT YOU USE TO LINK TO THE DELL SITE AS IDENTIFIED IN YOUR PROGRAM APPLICATION." THAT'S EXHIBIT A, YOUR HONOR. THE DELL CONTRACT, THAT'S SECTION 2.9.

**THE COURT:** NO, IT'S NOT. YOU CAUSED ME MORE TROUBLE HERE. IT'S 2.11, WHICH IN YOUR REPLY BRIEF YOU CORRECT.

**MR. JACOBSEN:** OKAY, I APOLOGIZE.

**THE COURT:** 2.9 DEFINES THE WORD SESSION.

**MR. JACOBSEN:** OKAY, SO SECTION 2.11. I APOLOGIZE FOR THAT, YOUR HONOR.

YOUR HONOR, I GO BACK, AND NO ONE DISPUTES THAT WE HAVE OUR CONTRACTS HERE.

**THE COURT:** SURE.

**MR. JACOBSEN:** AND AS YOU SAID IN THE FIRST HEARING, IF THE MERCHANT PROMISES MANY DIFFERENT COMPETING PARTIES COMMISSIONS AND IS FULLY ON BOARD WITH WHAT HONEY IS DOING, THEN HONEY HASN'T DONE ANYTHING WRONG. AND THAT'S WHAT WE

SUBMIT ACTUALLY HAPPENED HERE, AND IF YOU WERE TO GO THROUGH THE DELL EXAMPLE CHAPTER AND VERSE, AND THAT'S AT PARAGRAPHS --

**THE COURT:** SO HERE'S MY CONCERN, AND I DON'T JUST -- I THINK THAT'S CORRECT, BUT IF HONEY BROWSER INSTALLED ITS OWN SEPARATE COOKIE TO GET ITS COMMISSION AND LEFT THE AFFILIATES IN PLACE, THAT WOULD BE ONE THING, THEN THE MERCHANT HAS TO DECIDE WHO TO PAY, BUT WHAT'S ALLEGED IS THAT HONEY DISPLACES THE AFFILIATE, AND THAT GOES BACK, IN MY VIEW, TO THE PLAINTIFFS' PROPER REFERRAL TO SECTION 2.5. SO I DON'T READ 2.11 AS ALLOWING THAT BROWSER EXTENSION TO SUPPLANT WHAT HAS BEEN WITH -- WHAT'S BEEN EARNED IN 2.5.

**MR. JACOBSEN:** WELL, I WOULD SAY THAT'S HOW LAST CLICK ATTRIBUTION FUNCTIONS.

**THE COURT:** DOES IT? THAT'S NOT WHAT IT SAYS HERE IN 2.5.

**MR. JACOBSEN:** I THINK YOU HAVE TO READ 2.5 IN CONJUNCTION WITH 2.11. AND WHEN YOU LOOK AT BOTH OF THEM, 2.11 CLEARLY SAYS THAT ANY -- WE CERTAINLY QUALIFY AS ANY MEDIA CHANNEL, THAT IS VERY BROAD. I'D ALSO STATE, YOUR HONOR, THAT WITH ALL OF THESE CONTRACTS, AND NOTABLY, THEY DID NOT ATTACH MANY OF THE ONES THAT THEY'RE RELYING ON HERE, AND THEY LEFT OFF VERY IMPORTANT ASPECTS WHEN THEY DID QUOTE FROM SOME OF THEM.

I'D SAY ALSO, IF YOU LOOK AT THE DELL INTERACTION THERE, THEY ACTUALLY BRING YOU THROUGH THE TWO SCENARIOS, ALL RIGHT?

AND IN THE ONE WHERE HONEY WASN'T ENGAGED, JUSTIN TECH TIPS GOT THE $2.45. AND THE ONE WHERE, AS THEY PLEAD, IT'S SOMEWHERE BETWEEN PARAGRAPHS 124 AND 141, WHEN HONEY WAS ENGAGED, IT WAS ENGAGED, ONE, AND IT WAS FOR THE CASH BACK REWARDS PROGRAM, AND THAT'S THE ENTIRE POINT OF THE LAST QUESTION. WHAT'S DRIVING ULTIMATELY, WHAT IS THE LAST POINT OF CONTACT THAT'S DRIVING THE CONSUMER TO THE MERCHANT? AND WE ACTUALLY THINK THAT THEIR EXAMPLE, THE ONLY ONE THEY HAVE, PROVES OUR POINT.

I'D ALSO NOTE, I THINK IT'S TELLING. ALL, I THINK, NINE OF THE ELEVEN REMAINING PLAINTIFFS HAVE ARRANGEMENTS WITH AMAZON, AND I THINK IT'S TELLING THAT THEY CAN'T CITE TO A SINGLE EXAMPLE IN AMAZON WHERE THIS ACTUALLY WORKS, SO IT'S NOT AS THOUGH THEY'RE PLEADING THAT HONEY WAS NOT ADDING ANY VALUE OR NOT DOING ANYTHING. THEY ACTUALLY PLEAD IN THE PARAGRAPH.

**THE COURT:** I DON'T THINK THAT'S THE ISSUE, THOUGH. SO, I THINK WHAT WE'VE GOT HERE IS, AND I THOUGHT IT WAS A VERY SIGNIFICANT PART OF THE PLEADING, IS THAT AT PRE-COMPLAINT, NOT WHAT WAS GOING ON WHEN THE TEST WAS DONE, THAT EVEN WHEN THE CUSTOMER CHOSE EXPRESSLY TO NOT ENGAGE THE BROWSER, THAT THE HONEY BROWSER WAS ABLE TO SUBSTITUTE ITS ID FOR THE AFFILIATE AND TAKE THE COMMISSION.

SO THERE IS, I MEAN, WE DON'T HAVE TO ARGUE ABOUT WHETHER IT ADDED VALUE OR NOT. THE CUSTOMER MADE THE ELECTION IN THEIR ALLEGATION TO NOT USE THE BROWSER AND THAT GOES TO THE CFAA CLAIM AS WELL ON THE PERMISSIONS, BUT IT'S MY CONCERN HERE,

ABOUT EVERYTHING THAT'S GOING ON.

NOW, WHETHER HONEY BROWSER CHANGED ITS PRACTICE SINCE THE PERIOD IN QUESTION, THAT'S NOT REALLY MY CONCERN EITHER, AND WHETHER IT WAS IN EFFECT DURING THE TEST. I THINK THEY'RE DIFFERENT IN TIME, AND I'LL CERTAINLY ASK MR. LICHTMAN TO DISCUSS THAT WHEN HE STEPS UP.

**MR. JACOBSEN:** YES, YOUR HONOR, I WOULD SAY LET'S GO TO RETAILMENOT. YOU INVOKED THAT EARLIER.

**THE COURT:** OKAY, YES.

**MR. JACOBSEN:** AND AS YOU NOTED, THIS IS A DECISION FROM JUST MARCH OF THIS YEAR IN THE SOUTHERN DISTRICT OF NEW YORK, AS THE COURT IN RETAILMENOT RECENTLY FOUND IN VERY ANALOGOUS CONTRACT TERMS, PERMITTING QUALIFYING LINKS TO ORIGINATE FROM APPROVED SOFTWARE, THEY QUOTE, "IT APPEARED TO FORECLOSE PLAINTIFFS' ARGUMENT AS NOTHING WITHIN THE TERMS EXCLUDES A SOFTWARE-BASED BROWSER EXTENSION LIKE THE DEFENDANTS FROM EARNING A COMMISSION THROUGH AN AFFILIATE LINK."

I'D ALSO ADD, YOUR HONOR, AND I GET YOUR POINT ABOUT YOUR READING OF 2.5.

**THE COURT:** OKAY.

**MR. JACOBSEN:** WHAT I WILL SAY, THOUGH, IS THAT IN NONE OF THESE CONTRACTS, THEY HAVE THEM, AT NO POINT HAVE THEY EVER ONCE POINTED YOU TO A SINGLE PROVISION THAT IN ANY WAY, SHAPE, OR FORM EXCLUDES OR PROHIBITS A BROWSER EXTENSION. THAT SAYS IT PLAIN AS DAY, AND THE WAY THEY'RE PLEADING IT, AND I DO

THINK IT HAS TO BE PLAUSIBLE --

**THE COURT:** I GUESS I SEE IT A LITTLE DIFFERENTLY.

**MR. JACOBSEN:** SURE.

**THE COURT:** SO MOST CONSUMERS ARRIVE AT THE MERCHANT SITE WITHOUT USING AN AFFILIATE ID, AND SO THE BROWSER COULD BE THE REASON -- COULD BE THE ONLY ASPECT OF THE SALE THAT PROVIDES A COMMISSION, SO OUR AFFILIATES DON'T CARE ABOUT THOSE SALES, THEY KNOW THEY'RE NOT PART OF THAT SITUATION, SO THE FACT THAT THE BROWSER EXTENSIONS HAVE CONTRACTS WITH MERCHANTS TO GET THE COMMISSIONS IS MUCH BROADER THAN -- IT'S NOT A CONTRACT WITH THE BROWSER EXTENSION. WHEN I HAVE A COMPETING AFFILIATE, YOU AGREE THAT I CAN BE THE LAST CLICK. THEY DON'T SAY THAT. I ACTUALLY DON'T READ 2.11 TO APPLY THE WAY YOU SUGGEST IT DOES.

**MR. JACOBSEN:** AND, YOUR HONOR, YOU'RE THE FINAL SAY, AND NOT ME. I WILL SAY, RESPECTFULLY, I DISAGREE. LOOKING AT THAT TOGETHER, THE FACT THAT IT'S THE ONLY EXAMPLE THEY COULD COME UP WITH --

**THE COURT:** RIGHT. WELL, IT'S A CONCERN.

**MR. JACOBSEN:** IT'S A CONCERN TO US, BECAUSE I DON'T SEE HOW THEY CAN TAKE THAT ONE EXAMPLE WITH DELL, WHEN NONE OF THE OTHER 10 PLAINTIFFS PARTNER WITH DELL AND SAY THAT'S EMBLEMATIC OF, AND CAN BE EXTRAPOLATED TO, AND USED BY ALL 11 PLAINTIFFS. I THINK THERE IS A FLAW IN THAT.

**THE COURT:** WELL, SO I GUESS, I MEAN, ULTIMATELY,

BECAUSE I HAVE TO STAY IN MY LANE HERE FOR A MOTION TO DISMISS, ARE THOSE REALLY ISSUES FOR SUMMARY JUDGMENT OR ARE THOSE ISSUES THAT PICK OFF VARIOUS PLAINTIFFS LATER? BECAUSE THE STANDING ARGUMENT ALSO RELIES ON THE STATISTICAL SURVEY, WHICH I THINK IS ENOUGH. I THINK IT'S ENOUGH, BECAUSE IT'S BACKWARD LOOKING AND NOT FORWARD LOOKING INTO SPECULATIVE. WHAT ARE THE CHANCES I'M GOING TO GET CANCER? WHAT ARE THE CHANCES SOMETHING THAT HASN'T HAPPENED WILL HAPPEN? THIS IS LOOKING AT WHAT IS -- WHAT'S THE LIKELIHOOD THAT IN THIS SPECIFIC SET OF CIRCUMSTANCES WHERE HONEY BROWSER IS SO POPULAR AND PRESENT THAT THESE PLAINTIFFS HAVE BEEN DEPRIVED OF COMMISSIONS BECAUSE OF HONEY BROWSER. I THINK THAT'S REASONABLE.

**MR. JACOBSEN:** YEAH, WELL, LET'S TALK ABOUT THE MONTE CARLO ANALYSIS REALLY QUICK. AS YOU KNOW, AND THE SUPREME COURT SAID STATISTICAL PROBABILITY OF INJURY ISN'T ENOUGH TO ESTABLISH STANDING. I UNDERSTAND WHAT YOU JUST SAID WITH RESPECT TO DELL.

**THE COURT:** ALL YOUR CASES ARE FORWARD LOOKING.

**MR. JACOBSEN:** YEAH, BUT LET'S JUST GET PRACTICAL ABOUT THIS FOR A MOMENT. TAKE THE CAPITAL ONE SETTLEMENT, WE KNOW, ALL RIGHT, THERE ARE SUPPOSEDLY 1000S OF INFLUENCERS, YOU KNOW, A VERY LARGE CLASS ASSERTED THERE, AS THERE IS HERE, IF THIS IS THAT PERVASIVE, AND THIS IS HAPPENING ALL THE TIME, ALL OF 18 HAVE COME FORWARD TO CLAIM A SETTLEMENT OUT OF THAT.

NOW, IT MAY BE, IT MAY NOT BE SOMETHING YOU CAN RECOGNIZE

IN A MOTION TO DISMISS. I UNDERSTAND THAT THEY'RE ENTITLED TO INFERENCES, AND ALL THAT, BUT I THINK IT'S VERY TELLING, YOUR HONOR, THAT THAT'S THE CASE, AND I DON'T THINK THAT THE MONTE CARLO SIMULATION MOVES THE NEEDLE. ITS PURPOSE IS TO SHOW THE INJURY INCURRED IN THE TEST PURCHASE. EVERYBODY --

**THE COURT:** IF I STOPPED ALLOWING CLASS ACTIONS BASED UPON THE RESPONSE OF THE LARGER CLASS, THAT'D BE A WHOLE DIFFERENT POLICY DISCUSSION. THAT'S JUST NOT -- I DON'T LOOK AT HOW LIKELY THE CLASS CARES, YOU KNOW, HOW MANY PEOPLE COME FORWARD BECAUSE THE FROZEN PEAS THEY BOUGHT HAD CITRIC ACID IN IT, AND WASN'T SUPPOSED TO. I MEAN, IT JUST -- THAT'S JUST NOT A FACTOR.

**MR. JACOBSEN:** ALL I'M SAYING IS --

**THE COURT:** OTHER THAN IN SETTLEMENT DISCUSSIONS, WHICH I HAVE NO PART IN.

**MR. JACOBSEN:** FAIR ENOUGH.

I'M SAYING, IF YOU WERE INCLINED TO GO THERE, I WOULD BE SUPPORTIVE OF THAT, BUT I GET YOUR POINT.

YOUR HONOR, I'LL MOVE ON TO THE CAFA AND CDAFA CLAIMS. LET'S FIRST START WITH WHAT WE DISCUSSED AT LENGTH LAST TIME AND THE LAW FROM THE SUPREME COURT, IN VAN BUREN, IT'S A GATE-UP, GATE-DOWN ANALYSIS. DO THEY HAVE PERMISSIONS OR DON'T THEY? AND THEY'VE ALREADY ADMITTED IN THEIR FIRST AMENDED COMPLAINT THAT THEY HAD EXTENSIVE PERMISSIONS.

**THE COURT:** WELL, WHAT DOES THAT MEAN, EXTENSIVE?

**MR. JACOBSEN:** YOUR HONOR, IT'S A GATE-UP, GATE-DOWN, IT'S A GATE-UP, GATE-DOWN ANALYSIS. WE DON'T HAVE TO ACTUALLY SHOW WHAT THE PERMISSIONS ARE, THEY PLED IT. AND WHAT THEY'RE ACTUALLY TRYING TO DO IS, AND THIS IS REALLY THE ONLY SUBSTANCE --

**THE COURT:** I DON'T RECALL THE CFAA SAYING THAT WHEN THE PERMISSION IS EXTENSIVE, THAT THERE'S NO CLAIM, THERE HAS TO BE AUTHORIZATION.

SO HERE, AGAIN, GOING BACK TO I THINK IT'S RETAILMENOT. THE DOUBLE PERMISSION SITUATION WAS IMPORTANT THERE -- WELL, MAYBE IT WAS CAPITAL ONE. I'M SORRY, I READ THEM NEXT TO EACH OTHER AND I MAY BE GETTING THEM MIXED UP -- THAT THE DOUBLE PERMISSION WAS SIGNIFICANT IN FINDING AUTHORIZATION. HERE WE HAVE THE ALLEGATION THAT EVEN WHEN THERE ISN'T, NOT ONLY THERE ISN'T THE SECOND PERMISSION, THERE'S THE CUSTOMER DECLINES THE SERVICES OF HONEY FOR THAT SALE.

**MR. JACOBSEN:** YEAH, YOUR HONOR, I WANT TO GO BACK TO THE PRIMARY POINT, WHICH IS THAT --

**THE COURT:** OKAY, SORRY.

**MR. JACOBSEN:** -- NEITHER STATUTE, AND I'M HAPPY TO BE CORRECTED, IMPOSES ANY DUTY TO DISCLOSE HOW PERMISSIONS WILL BE EXERCISED.

**THE COURT:** OKAY.

**MR. JACOBSEN:** I'M NOT AWARE OF THAT. WE'VE LOOKED AT THAT, AND THAT'S THE WHOLE, I BELIEVE, THAT'S THE TAKEAWAY

FROM VAN BUREN.

**THE COURT:** WELL, SO I DON'T DISAGREE WITH YOUR COMMENT ABOUT VAN BUREN. I'M LOOKING AT, AT THIS STAGE, I DON'T BELIEVE THAT I CAN FIND THAT THE EXTENSIVE PERMISSIONS COVER PERMISSION TO DO WHAT'S ALLEGED HERE. YOU'RE TRYING TO SAY WE'RE JUST TALKING ABOUT THE USE OF THE DATA THAT IS COLLECTED, AND I DON'T THINK THAT'S WHAT THE CLAIM IS.

**MR. JACOBSEN:** I THINK IT'S SIMPLER THAN THAT, WHICH IS THAT IT WAS PERMISSION SOUGHT AND GRANTED, OR NOT, AND TO HAVE THE HONEY BROWSER EXTENSION --

**THE COURT:** PERMISSION TO DO WHAT?

**MR. JACOBSEN:** AND THAT'S MY POINT. WE HAVE NO REQUIREMENT TO --

**THE COURT:** I'M TRYING TO THINK OF AN EXAMPLE. I PERMIT YOU TO ATTEND THE GIANTS GAME, AND YOU WALK INTO THE LOCKER ROOM, AND WANT TO INTERVIEW THE PLAYERS. I DIDN'T GRANT YOU PERMISSION TO GET INTO THE LOCKER ROOM. WHAT'S THE PERMISSION?

**MR. JACOBSEN:** YOUR HONOR, WITH ALL DUE RESPECT, I DON'T THINK THAT ANALOGY IS APT HERE, BECAUSE IT'S A SIMPLER CONSTRUCT UNDER VAN BUREN. IS THE PERMISSION EXTENDED OR NOT? AND IF THEY'RE SAYING, SOMEHOW ARGUING IT WAS FRAUDULENTLY --

**THE COURT:** OKAY. SO YOU'RE LOOKING AT EXCEEDING AUTHORIZED ACCESS, OR GIVING -- I DON'T KNOW WHAT YOU MEAN BY PERMISSION UNDER THE ACT THEN.

SHOW ME IN VAN BUREN -- SO VAN BUREN MAKES THE DISTINCTION BETWEEN ACCESS TO THE AFFECTED COMPUTER VERSUS MISUSE OF THE INFORMATION ONCE OBTAINED, CORRECT?

**MR. JACOBSEN:** SORRY, CAN YOU REPEAT THAT?

**THE COURT:** ACCESS TO THE COMPUTER VERSUS MISUSE OF SENSITIVE INFORMATION ONCE OBTAINED. SO MISUSE IS NOT COVERED BY THE CFAA, BUT THE ACCESS, WHAT IS THE SCOPE OF THE ACCESS THAT WAS GRANTED? AND I DON'T THINK YOU'VE ESTABLISHED THAT THE COMPLAINT DOES NOT -- THAT THEY'VE ADMITTED THAT HONEY BROWSER EXCEEDED THE AUTHORIZED ACCESS. YOU'RE JUST SAYING THEY GAVE PERMISSION.

**MR. JACOBSEN:** AND, YOUR HONOR, I HAVE NO BETTER WAY TO PUT IT, OTHER THAN TO SAY THAT UNDER VAN BUREN AND THE SUPREME COURT, WE THINK THAT'S IT.

**THE COURT:** AND WHAT PAGE ARE YOU REFERRING ME TO?

**MR. JACOBSEN:** OF VAN BUREN?

**THE COURT:** YES.

**MR. JACOBSEN:** LET ME GIVE YOU THE PIN CITES IN A MOMENT.

YOUR HONOR, I HAVE THE FULL CITES HERE, I DON'T HAVE THE SPECIFIC PAGE CITES, BUT I WILL GET THEM.

**THE COURT:** NO, I CAN READ IT. I'VE GOT THE CASE. I JUST WAS GOING TO MARK IT IF IT WAS WHAT YOU WERE ASKING ME TO LOOK AT.

**MR. JACOBSEN:** WELL, LET'S GO TO WHAT THE CFAA AND

THE CDAFA ARE ACTUALLY DESIGNED TO DO.

**THE COURT:** OKAY.

**MR. JACOBSEN:** THEY'RE ANTI-HACKING STATUTES.

**THE COURT:** RIGHT.

**MR. JACOBSEN:** THEY ARE DESIGNED TO PROVIDE RECOVERY FOR TECHNOLOGICAL HARMS, SUCH AS THE CORRUPTION OF FILES. THERE'S BEEN NO CORRUPTION OF FILES HERE, WITH ALL DUE RESPECT TO CAPITAL ONE, WE DISAGREE.

**THE COURT:** OKAY.

**MR. JACOBSEN:** WE THINK THEY'RE COMPLETELY MISREADING VAN BUREN, AND THERE'S SOME OTHER CASES HERE TOO THAT GO DIRECTLY TO THAT. AUTO V. CLOUD INC., WHICH IS A NORTHERN DISTRICT CALIFORNIA CASE AS WELL. HERE, A USER VOLUNTARILY INSTALLS THE HONEY BROWSER EXTENSION ONTO THEIR COMPUTER AND GIVES THE POINT THE -- AND AS PLAINTIFF SUBMITTED EXTENSIVE PERMISSIONS, AND WE HAD, WE WENT BACK AND FORTH ON THAT. I UNDERSTAND YOUR POINT, I'M NOT TRYING TO RELITIGATE THAT, BUT THE PAYPAL AND A MERCHANT VOLUNTARILY ENTERED INTO AN AFFILIATE MARKETING AGREEMENT, AND UNDER THAT AGREEMENT, IF A USER WITH THE HONEY BROWSER EXTENSION INSTALLED USES THE EXTENSION WHEN MAKING A PURCHASE ON THE MERCHANT'S SITE, PAYPAL MAY QUALIFY, AND EVERY BIT OF THIS TRANSACTION IS DONE WITH PERMISSION. HONEY HAS PERMISSION TO OPERATE FROM THE USER, THE CONSUMER, WHO MAKES THE PURCHASE, AND FROM THE MERCHANT WHO PAYS THE COMMISSION. IT'S ULTIMATELY THE MERCHANT OR THE AFFILIATE

NETWORK THAT'S DOLING OUT, ALL RIGHT, WHAT COMMISSIONS GO WHERE AND TO WHOM. THIS IS NOT HACKING.

THEY HAVEN'T PLEADED ANY DAMAGE OR LOSS, AND CERTAINLY NOT ANY DAMAGE OR LOSS TO A PROTECTED COMPUTER, AS REQUIRED BY THE STATUTES. THEY'RE SAYING, AND THEY ADMIT, THAT THE PROTECTED COMPUTER IS THE CONSUMER'S COMPUTER.

**THE COURT:** SURE.

**MR. JACOBSEN:** BUT THE DAMAGES THEY'RE ALLEGING, YOUR HONOR, ARE THAT THE -- THAT THEY'VE LOST COMMISSIONS. THOSE ARE NOT THE SORT OF -- THAT'S NOT THE SORT OF HARM, THE TECHNOLOGICAL DAMAGE THAT'S CONTEMPLATED --

**THE COURT:** SO YOU JUST DISAGREEING WITH CAPITAL ONE ON THAT POINT?

**MR. JACOBSEN:** ABSOLUTELY.

**THE COURT:** OKAY.

**MR. JACOBSEN:** THERE'S NO OTHER PLAN -- I THINK THEY GOT VAN BUREN WRONG. I THINK THEY EXPANDED THE SCOPE OF THE LAW, AND I THINK HAD THAT CASE GONE ON THAT IT WOULD HAVE BEEN UPSET ON APPEAL. THAT WAS -- THAT IS NOT A TECHNOLOGICAL HARM. PERIOD. FULL STOP.

**THE COURT:** OKAY.

**MR. JACOBSEN:** BUT ALSO, YOUR HONOR, LET'S LOOK AT THE AFFILIATED IDS. THESE IDS ARE JUST SHORT STRINGS OF NUMBERS AND LETTERS, THEY DO NOT HAVE ANY INTRINSIC VALUE ON THEIR OWN. IT'S A TRACKING SYSTEM, THAT'S IT.

**THE COURT:** SURE. I MEAN, MY DOLLAR BILL DOESN'T EITHER, BUT --

**MR. JACOBSEN:** I DON'T KNOW HOW TO RESPOND TO THAT.

FUNDAMENTALLY, YOUR HONOR, ON THE HARM POINT, IT MEANS HARM TO COMPUTERS OR NETWORKS, TECHNOLOGICAL HARM, AND LOST COMMISSIONS. LOST REVENUE UNDER CONTRACTS. CONTRACTS, I MIGHT ADD, THEY ARE IN PRIVITY WITH, WITH THE MERCHANTS, WITH THE AFFILIATE NETWORKS, AND I WOULD SAY MAYBE THE REDRESS IS THERE, BUT THERE'S NO TECHNOLOGICAL HARM HERE, AND I THINK INDEPENDENT --

**THE COURT:** SO IS IT YOUR VIEW THAT THE CAPITAL ONE COURT JUST MADE UP THIS INTERRUPTION IN SERVICE CONCEPT?

**MR. JACOBSEN:** YES.

**THE COURT:** WITH BEING A LOSS?

**MR. JACOBSEN:** YES.

**THE COURT:** OKAY. AND THEY MIGHT HAVE.

**MR. JACOBSEN:** YEAH.

**THE COURT:** I GUESS, AND AGAIN, I STILL COME BACK TO THE -- NOT THE -- YOU KNOW, I MAKE A DISTINCTION IN THE ALLEGATIONS IN THE SECOND AMENDMENT COMPLAINT BETWEEN THOSE CONSUMERS WHO AFFIRMATIVELY CHOSE TO ENGAGE HONEY BROWSER. THERE, I THINK THE PLAINTIFFS MAY HAVE PROBLEMS, BUT AT A MOTION TO DISMISS, I'M NOT PARSING IT THAT WAY. BUT THEY ALSO ALLEGE THAT EVEN WHEN THE BROWSER WAS REJECTED BY THE CONSUMER THAT HONEY STILL WENT IN THE BACKGROUND AND TOOK THE

COMMISSION.

AND WE HAVE -- AND I THINK IT'S REASONABLE TO INFER FROM THE PLEADING THAT WHEN A CONSUMER CLICKS ON THE AFFILIATE LINK TO GET THEM TO THE MERCHANT THAT THEY INTEND FOR THE AFFILIATE TO GET THE COMMISSION, I THINK THAT'S REASONABLE. THIS IS WELL, A WELL-KNOWN METHOD OF MONETIZING THE AFFILIATE'S WORK.

**MR. JACOBSEN:** AND ON THAT POINT, YOUR HONOR, I'LL GO BACK TO THE, KIND OF, CHAIN OF EVENTS HERE.

**THE COURT:** OKAY.

**MR. JACOBSEN:** COMING OUT OF THE PRIOR HEARING, YOU SAID, "SHOW ME THE CONTRACTS." YOU SAID, "SHOW ME THE INJURY."

**THE COURT:** YES.

**MR. JACOBSEN:** THE SCENARIO YOU JUST LAID OUT OF, ALL RIGHT, WHERE HONEY JUST DEFAULTS AND DEPRIVES JUSTIN TECH TIPS OF A COMMISSION HE OTHERWISE WOULD HAVE GOT. AS THEY PLED, THAT'S NOT WHAT THEY DO WITH THE ONE EXAMPLE THEY CAME FORWARD WITH. AND I REMEMBER WHEN WE WERE TALKING BACK IN THE FALL, I TOOK A STAB AT SAYING THEY HAVE TO DO IT FOR ALL 26 YOU DISAGREED, I APPRECIATE THAT. I TOOK A SWING, ALL RIGHT, BUT THEY DID IT FOR ONLY ONE OF ELEVEN.

**THE COURT:** YES.

**MR. JACOBSEN:** AND IN THAT ONE SCENARIO, THEY DON'T PLAY OUT THAT, THEY DO NOT SHOW YOU AS THEY ARE CAPABLE OF DOING. IF IT WERE TRUE, AN EXAMPLE WHERE THAT HAPPENED, THEY DON'T DO IT. SO I FEEL COMING OUT OF THE LAST HEARING WITH THE

GUIDANCE THEY HAD THAT THEY HAVE FAILED ON THOSE TWO COUNTS, YOUR HONOR.

THEY HAVE NOT GIVEN YOU A CONCRETE EXAMPLE OF HOW HONEY JUST POPPED IN THERE WITH NO ACTIVATION, DEFAULTED TO IT, AND DEPRIVED JUSTIN TECH TIPS OF A COMMISSION. THEY DON'T DO THAT. THEY DON'T, AND I THINK -- I THINK THAT IS FATAL, GIVEN THE GUIDANCE YOU GAVE IN THE LAST ONE AND I DO NOT THINK IT'S REASONABLE TO INFER OR VIEW IT AS PLAUSIBLE. ESPECIALLY, AND I KEEP GOING BACK TO THIS EXAMPLE, WHEN ONLY ONE OF THESE ELEVEN PARTNERS WITH DELL.

SO YOUR HONOR, I DO -- AT THE RISK, I KNOW YOU STARTED OUT BY SAYING YOU DON'T WANT TO INVENT ANOTHER MOTION TO DISMISS. I THINK THESE ARE FLAWS THEY HAVE TO CORRECT. YOU GAVE THEM A CLEAR ROADMAP. I ALSO THINK IT WOULD BE VERY INSTRUCTIVE TO THE COURT, AND I WON'T GO BACK AND FORTH WITH ALL THE DEFINITIONS OR THE OMISSIONS FROM THE VARIOUS CONTRACTS, WE CITE BERGDORF GOODMAN, NEIMAN MARCUS, STAPLES, AND, YOU KNOW, SOME ARE ABOUT REFERENCING THE ENGAGEMENT, OTHERS ARE AFFILIATE WEBSITES.

YOUR HONOR, AT THE MOTION TO DISMISS STAGE, BEFORE WE GO INTO LENGTHY DISCOVERY, AND WE HAVE TO CLAW THIS STUFF OUT OF THEM -- WELL, THEY'RE VERY NICE, GOOD LAWYERS -- WE ENGAGE IN DISCOVERY, AND WE GET THIS STUFF FROM THEM, WE CAN LAY THIS ALL OUT RIGHT NOW. PUT IT THERE, ATTACH THE CONTRACTS AND LOOK AT THEM. LET'S LOOK AT ALL OF THEM FULSOMELY.

I THINK IT IS, AND I DON'T WANT TO CHARGE THIS TOO MUCH, SUSPICIOUS THAT THEY HAVEN'T DONE THAT, YOUR HONOR. AND I THINK IT'S BECAUSE THEY'RE PICKING AND CHOOSING.

YOUR HONOR, IF IT'S OKAY, I'LL MOVE ON TO TORTIOUS INTERFERENCE.

**THE COURT:** YES, LET'S DO THAT.

**MR. JACOBSEN:** AS YOU ALREADY RECOGNIZED, YOUR HONOR, THE PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS REQUIRE THEM TO SHOW WHAT CONTRACTUAL RIGHTS THEY POSSESSED, AND MANY OF THE ISSUES I JUST WENT THROUGH, KIND OF, INFORM THE TORTIOUS INTERFERENCE. BUT A COUPLE POINTS: FIRST, THE PLAINTIFFS ARE REQUIRED TO ALLEGE AN ACT BY PAYPAL DESIGNED TO DISRUPT THEIR, SORRY, THEIR RELATIONSHIPS OR CONTRACTS WITH MERCHANTS. THEY ALLEGE THE CONTRACT LANGUAGE THEY INCLUDE SHOWS THAT THEY ARE ENTITLED TO COMMISSIONS AND PAYPAL IS NOT, WE SUBMIT THAT'S NOT THE CASE, AND I'VE EXPLAINED WHY, AND I THINK THEY COULD VERY READILY MAKE A MORE FULSOME SHOWING. BUT THEY'VE ALSO PLAUSIBLY -- THEY'VE NOT -- THEY HAVE NOT PLAUSIBLY ALLEGED THAT PAYPAL DIVERTED ANY COMMISSIONS PLAINTIFFS WERE ACTUALLY CONTRACTUALLY ENTITLED TO RECEIVE, AND THAT GOES BACK TO WHAT WE WERE JUST DISCUSSING, YOUR HONOR. WHERE'S THE EXAMPLE WHERE THEY BRING JUSTIN TECH TIPS, OR, YOU KNOW, ONE OF THE OTHER INFLUENCERS, AND THEY BRING YOU THROUGH THAT SCENARIO? THEY HAVEN'T DONE THAT.

I'LL REITERATE WHAT I SAID BEFORE, THAT NONE OF THESE

CONTRACTS WITH VERY SOPHISTICATED PLAYERS -- WE'RE TALKING ABOUT MAJOR MERCHANTS, DELL IS ONE, AMAZON'S ANOTHER ONE. VERY HUGE PLAYERS, THESE AFFILIATE NETWORKS, VERY SOPHISTICATED PARTIES. NOWHERE IS THERE ANYTHING REMOTELY LIKE, AND BY THE WAY, SO THERE IS NO CONFUSION, A BROWSER EXTENSION CANNOT APPLY. AND I GET YOUR POINT THAT HONEY COULD STILL BE THE THING IF THEY'RE THE ONLY TOUCH POINT EVER, BUT THAT DEFIES LAST CLICK. THAT'S HOW LAST CLICK WORKS. YOU KNOW, BY WAY OF ONE EXAMPLE --

**THE COURT:** WELL, LAST CLICK WORKS THE WAY THE CONTRACT SAYS IT WORKS, AND IT CAN WORK IN MANY DIFFERENT WAYS.

**MR. JACOBSEN:** FAIR, YOUR HONOR.

**THE COURT:** RIGHT?

**MR. JACOBSEN:** YES, WELL, IN THAT CASE, LET'S SEE ALL THE CONTRACTS.

**THE COURT:** WELL, ULTIMATELY THAT'S WHAT'S GOING TO HAVE TO HAPPEN. WHETHER I NEED A 1000-PAGE THIRD AMENDMENT COMPLAINT OR NOT IS ANOTHER MATTER.

**MR. JACOBSEN:** YEAH, AND, YOUR HONOR, LOOK, I'M NOT ADVOCATING THAT YOU SHOULD GET A COMPENDIUM OF 1000S OF PAGES WITH ALL THESE EXHIBITS. ALL I'M SAYING IS THEY DID -- THEY TRIED TO DO THE BARE MINIMUM. IT IS INSUFFICIENT. THE FACT PATTERN THEY'VE LAID OUT FOR YOU WITH THE DELL ONE, DOES NOT GO TO ALL THE THINGS YOU'RE SAYING YOU'RE GOING TO INFER FROM THE COMPLAINT. AND AT THE RISK OF BURDENING THE COURT MORE --

**THE COURT:** YES.

**MR. JACOBSEN:** -- I THINK THEY HAVE TO DO MORE. I THINK THEY HAVE TO DO MORE.

AND I ALSO DON'T THINK IT CAN BE IGNORED THAT HONEY HAS EXISTED IN THE SPACE AND OPERATED, GETTING LOTS OF COMMISSIONS, AS HAVE INFLUENCERS, FOR OVER A DECADE.

**THE COURT:** SURE.

**MR. JACOBSEN:** THEY WOULD HAVE YOU BELIEVE THAT THE AFFILIATE NETWORKS AND THE MERCHANTS WERE DOLING OUT COMMISSIONS TO HONEY AND PAYPAL WITH NO BASIS, ON A MISTAKEN BELIEF THAT, OH, WE JUST, WE JUST MESSED UP, OR WE DON'T APPRECIATE OR UNDERSTAND WHAT OUR CONTRACTS OBLIGATE US TO. WE DON'T UNDERSTAND LAST CLICK ATTRIBUTION IN THIS ECOSYSTEM, OR MAYBE THEY'RE JUST DOING OUT OF THE KINDNESS OF THEIR HEART.

**THE COURT:** WELL, WASN'T -- AND MAYBE I DON'T ACTUALLY UNDERSTAND THE STAND-DOWN PROTOCOL, BUT I THOUGHT THE STAND-DOWN PROTOCOL WAS ESSENTIALLY AN EFFORT TO FIX THIS SITUATION.

**MR. JACOBSEN:** A COUPLE THINGS YOU IMPLICATE THERE, YOUR HONOR. FIRST OF ALL, FOR MOST OF THE AFFILIATE NETWORKS THAT HAVE IMPOSED STAND-DOWN, THEY WERE IMPOSED IN 2025 AFTER THIS CASE WAS FILED.

**THE COURT:** OH, I KNOW THAT. YES.

**MR. JACOBSEN:** AND THAT JUST -- THAT'S PLAYERS IN THE MARKET BARGAINING AND WORKING WITH EACH, I DON'T THINK THE

COURT CAN TAKE NOTICE OF THAT, AND SAY THAT THAT CAN BE --

**THE COURT:** WAS A RESPONSE TO -- WELL, THE QUESTION IS, WAS IT A RESPONSE TO THIS PRACTICE THAT WASN'T UNDERSTOOD?

**MR. JACOBSEN:** WHETHER IT WAS OR WASN'T, THAT DOESN'T MEAN THAT WAS A CONTRACTUAL OBLIGATION THAT WAS IMPOSED.

**THE COURT:** OKAY.

**MR. JACOBSEN:** BECAUSE, AS I SAID, THIS ALL REALLY GOES BACK TO THE CONTRACTS, BUT I ALSO THINK IF THAT'S THE CASE, THERE'S AN ARGUMENT TO BE MADE THAT THIS IS A MUCH NARROWER CLASS FOR THOSE NETWORKS THAT MAYBE HAD STAND-DOWN IN. AND IF YOU LOOK AT THE EXAMPLES THEY GAVE WITH RAKUTEN, THE EMAILS ACTUALLY SHOW THAT WE'RE WORKING IT OUT WITH THEM AND IMPOSING STAND-DOWN, ALL RIGHT. IN THE FEW INSTANCES WHERE THEY'RE TROUBLESHOOTING THINGS, IT DOESN'T SHOW SOME SYSTEMIC --

**THE COURT:** SO IT -- YOU MAY BE EXACTLY RIGHT, THAT IT'S A NARROW CLASS, AND WE'RE NOT TALKING ABOUT THAT NOW, AND I WOULDN'T STRIKE THIS CLASS AT THE -- YOU DIDN'T ASK ME TO, BUT THAT'S -- AND I KNOW THAT'S DOWN THE LINE, AND IT'S A VERY EXPENSIVE EXERCISE TO GET TO CLASS CERTIFICATION, BUT I THINK THAT'S AN IMPORTANT POINT, AND I THINK YOU WILL HAVE PLENTY TO TALK ABOUT ON THE SCOPE OF THE CLASS.

**MR. JACOBSEN:** WELL, I APPRECIATE THAT, YOUR HONOR. I WOULD JUST POINT OUT TO THE OAKLEY CASE, IT'S A CENTRAL DISTRICT CASE, 2013, AND IN THAT CASE THE COURT NOTED THAT A

PARTY REASONABLY RELYING ON ITS RELATIONSHIP WITH A THIRD PARTY LIKE PAYPAL DOES HERE, AND RELYING ON ITS RELATIONSHIPS AND CONTRACTS WITH MERCHANTS AND AFFILIATE NETWORKS, AND NOT INTENDING TO HARM THE PLAINTIFF, WILL NOT BE FOUND TO HAVE ENGAGED IN INTENTIONAL ACTS DESIGNED TO DISRUPT THE PLAINTIFFS' RELATIONSHIPS.

IT GOES BACK TO WHAT YOU SAID IN THE FIRST HEARING, YOUR HONOR, WHICH IS THAT THERE ARE A NUMBER OF CONTRACTS HERE. IF WE HAVE A CONTRACTUAL RIGHT TO IT, OUR CONTRACT SAYS, HEY, YOU DO THIS AND WE DO IT, YOU'RE ENTITLED TO IT AND THEN MERCHANTS ARE PAYING US FOR THAT, I THINK THAT'S VERY INSTRUCTIVE.

**THE COURT:** SO, ON THE INTERFERENCE CLAIMS.

**MR. JACOBSEN:** THE STAND-DOWN, YOUR HONOR?

**THE COURT:** NO, THE INTERFERENCE CLAIM. BECAUSE YOU'RE SEEKING TO DISMISS THAT -- I'M NOT SURE MY NOTES ARE COMPLETE HERE -- THE ISSUE IS YOU'RE SUGGESTING THAT IF THAT THERE'S NO ALLEGATION THAT HONEY BROWSER INTENDED TO HARM THE AFFILIATES, IT WAS JUST ENGAGING IN THE MARKETPLACE, COMPETING IN THE MARKETPLACE?

**MR. JACOBSEN:** YES, YOUR HONOR.

**THE COURT:** ALL RIGHT. WELL, WE'LL GET A RESPONSE FROM THE PLAINTIFF ON WHERE THAT'S ALLEGED.

I WAS INTERESTED THAT THERE WAS A SUGGESTION IN YOUR BRIEFING THAT ON THE INTERFERENCE CLAIMS THAT WHEN IT'S A

PURELY EXECUTORY CONTRACT, AND AN UNLAWFUL, SEPARATE UNLAWFUL ACT NEEDS TO BE ALLEGED.

**MR. JACOBSEN:** YES, AND THAT, I THINK, GOES TO THEY HAVE TO SUSTAIN ON CFAA AND CDAFA.

**THE COURT:** OKAY.

**MR. JACOBSEN:** AND FOR THE REASONS I MENTIONED, I DON'T THINK THEY DO.

**THE COURT:** RIGHT. RIGHT. OKAY, BECAUSE THAT'S NOT NORMALLY AN ALLEGATION IN AN INTENTIONAL INTERFERENCE WITH CONTRACT ONLY WITH PROSPECTIVE ADVANTAGE.

**MR. JACOBSEN:** CORRECT, YOUR HONOR.

**THE COURT:** OKAY.

**MR. JACOBSEN:** YES.

**THE COURT:** OKAY.

**MR. JACOBSEN:** REAL QUICKLY, ON UNJUST ENRICHMENT. WE TALKED ABOUT THAT LAST TIME. THEY HAVE ADEQUATE REMEDIES AT LAW. I'LL GO BACK TO WHAT I SAID BEFORE, WHICH IS THAT THEY ARE IN PRIVITY WITH MERCHANTS, THEY ARE IN PRIVITY WITH AFFILIATE NETWORKS, THOSE ARE THE ENTITIES THAT THEY CONTRACT WITH, AND THOSE ARE THE ENTITIES THAT DETERMINE WHETHER OR NOT THEY'RE ENTITLED TO COMMISSIONS. I THINK THAT, FRANKLY, IS THE REDRESS HERE, AND ALSO I THINK YOU HAD MENTIONED THEY HAVE AN ADEQUATE REMEDY AT LAW, AND TO THE EXTENT THEY'RE LOOKING FOR RESTITUTIONAL DISGORGEMENT, THERE'S A LOT OF CASE LAW IN THE STATE, AND --

**THE COURT:** I THOUGHT IT WAS NON-RESTITUTIONARY?

**MR. JACOBSEN:** SORRY, EXCUSE ME, NON-RESTITUTIONARY DISGORGEMENT.

DISGORGEMENT IN THE STATE IS DISFAVORED, AS YOU POINTED OUT IN THE LAST HEARING.

**THE COURT:** YES.

**MR. JACOBSEN:** I'D ALSO NOTE, THAT THEY'RE NOT SAYING THEY DON'T HAVE AN ADEQUATE REMEDY AT LAW. I DON'T THINK THEY CAN ARGUE THIS AND, KIND OF, PLEAD IN THE ALTERNATIVE, IF WE DON'T SUCCEED ON OUR ADEQUATE REMEDY AT LAW, WE DON'T WIN OR PREVAIL, OR MEET OUR BURDEN, WHILE WE HAVE UNJUST ENRICHMENT AS A BACKGROUND.

**THE COURT:** SO I THINK, THE NINTH CIRCUIT HAS SHUT THAT DOOR. I THINK, IN POST-SONNER CASES.

SO, THERE WAS THE ARGUMENT THAT THEY'VE ESTABLISHED THAT THERE IS A MORE PROMPT AND CERTAIN REMEDY THAN ACTUAL DAMAGES, BECAUSE DAMAGES ARE HARD TO PROVE.

IS THAT AN ASPECT OF UNJUST ENRICHMENT?

**MR. JACOBSEN:** NOT THAT I'M AWARE OF, YOUR HONOR.

**THE COURT:** IT WAS NEW TO ME.

**MR. JACOBSEN:** I HAVE NO RESPONSE OTHER THAN TO SAY, I'M NOT AWARE OF ANY CASE THAT SAYS, BECAUSE IT'S QUICKER AND IN THEIR VIEW MORE EXPEDITIOUS, THEY CAN, KIND OF, JUMPED THE LINE. I'M NOT AWARE OF ANYTHING THAT SUPPORTS THAT PROPOSITION.

**THE COURT:** NOW, IN RETAILMENOT THE COURT SAID THERE WAS NO UNJUST ENRICHMENT BECAUSE THERE'S NO ALLEGATION THAT THE PLAINTIFF GAVE A BENEFIT TO THE DEFENDANT. I, AGAIN, THAT GETS OUTSIDE OF THE ADEQUATE REMEDY AND INTO THE MERITS.

**MR. JACOBSEN:** YEAH, AND I HAVE TO THINK ON THAT. I'D HAVE TO THINK ON THAT, YOUR HONOR.

**THE COURT:** SO, DOES THE UCL CLAIM FAIL FOR THE SAME REASON THAT THERE'S AN ADEQUATE REMEDY AT LAW?

**MR. JACOBSEN:** YES, YOUR HONOR.

**THE COURT:** SO, THERE IS THE REQUEST FOR INJUNCTIVE RELIEF, WHICH IS NOT AVAILABLE AT LAW, SO HOW DO YOU RESPOND TO THAT?

**MR. JACOBSEN:** WELL, THEY HAVE, THEY'VE PLED CLAIMS WHERE THERE IS AN ADEQUATE REMEDY AT LAW. THE CDAFA, THE TORTIOUS INTERFERENCE, AND THE CFAA CLAIMS GIVE THEM, ALLOW THEM TO POSSIBLY GET DAMAGES.

**THE COURT:** NO, INJUNCTION. SO UNDER THE UCLA -- UCL, THEY ARE PLEADING AS A REMEDY AN INJUNCTIVE RELIEF, THAT IS EQUITABLE RELIEF. AND SO HOW WOULD, IF THE PLAINTIFFS ALLEGE A REQUEST FOR AN INJUNCTION, WOULDN'T THE UCL CLAIM SURVIVE BECAUSE THEY CLEARLY DON'T HAVE AN ADEQUATE REMEDY IF THEY WANT TO SHUT DOWN THESE PRACTICES?

**MR. JACOBSEN:** I'D HAVE TO THINK ABOUT THAT ONE AS WELL, YOUR HONOR.

**THE COURT:** BECAUSE OFTEN THIS COMES UP IN THE

EMPLOYMENT CONTEXT, WHERE THE UCL COMES IN AS A, AS AN UNFAIR, UNLAWFUL BUSINESS PRACTICE, BUT REALLY ALL THE PLAINTIFFS CAN EXPECT IS THEIR BACK WAGES. THERE'S NO INJUNCTIVE RELIEF FOR THAT, SO THAT'S DIFFERENT THAN HERE, WHERE IT IS A PRACTICE THAT THEY'RE SEEKING TO STOP. I HAVE TO THINK ABOUT IT TOO, BUT I --

**MR. JACOBSEN:** YEAH, I WANT TO GIVE YOU A VERY THOUGHTFUL ANSWER ON THAT, AND I WOULD HAVE TO THINK MORE ON THAT.

WE'VE BEEN THROUGH ALL THE CAUSES OF ACTION HERE, I WILL JUST CONCLUDE BY SAYING, WHAT THEY'VE DONE DOESN'T DEMONSTRATE WHAT THEY SAY THEIR COMPLAINT ALLEGES. THEY WERE GIVEN VERY CLEAR INSTRUCTIONS TO LAY IT OUT.

**THE COURT:** YES.

**MR. JACOBSEN:** WE WENT THROUGH A COUPLE HYPOTHETICALS THAT ARE NOT COVERED BY THE ONE EXAMPLE, THE ONE MERCHANT THEY IDENTIFY IS NOT A MERCHANT ANY OF THE OTHER PLAINTIFFS WORK WITH, AND THEN WITH RESPECT TO THE CFAA AND THE CDAFA, WHICH I THINK ARE VERY IMPORTANT ELEMENTS OF THIS ENTIRE THING, THEY, KIND OF, COVER EVERYTHING. <u>CAPITAL ONE</u> JUST GOT IT WRONG.

**THE COURT:** OKAY.

**MR. JACOBSEN:** <u>VAN BUREN</u> MAKES IT VERY CLEAR.

SO, YOUR HONOR, THANK YOU VERY MUCH FOR YOUR TIME.

**THE COURT:** THANK YOU.

SO, I DO HAVE CONCERNS THAT YOU DIDN'T GIVE ME MORE

CHAPTER AND VERSE ON THE CONTRACTS TO WALK ME THROUGH IT. I'M CONCERNED WITH THE STANDING THAT I'VE GOT A LOT OF PLAINTIFFS WHO JUST STAND IN THE CHORUS TO TAKE ADVANTAGE OF THE STATISTICAL ANALYSIS.

SO I'M ONLY INTERESTED IN WHETHER THAT'S ENOUGH FOR YOU TO ESTABLISH STANDING AT THE PLEADING STAGE, AND YOU STILL HAVE TO PROVE IT, IT'S ALWAYS AN ISSUE, BUT WE'LL STAY RIGHT IN THE PLEADING STAGE.

I'M CONCERNED THAT THIS IS NOT THE KIND OF LOSS THAT THE CFAA PROTECTS, THAT THIS IS ACTUALLY MISUSE OF THE DATA BEYOND THE PERMISSIONS VERSUS UNAUTHORIZED ACCESS OR EXCEEDING THE SCOPE OF THE PERMISSIONS, SO, I'VE REAL CONCERNS THERE. SO THOSE ARE -- THOSE ARE MY MAIN CONCERNS.

THIS, THESE EQUITABLE CLAIMS, THEY NEVER DRIVE THE CASE. THERE, WE SPEND A LOT OF TIME TALKING ABOUT UNJUST ENRICHMENT. I DON'T EVER REMEMBER SEEING A JUDGMENT ON ONE, BUT WHATEVER. SO, I'M NOT SURE YOU'VE PLED AN A FAILURE OF, YOU DON'T HAVE AN ADEQUATE REMEDY AT LAW ON THE UNJUST ENRICHMENT, OR WHETHER IT'S THE KIND OF HARM THAT UNJUST ENRICHMENT REMEDIES. I'M NOT SURE. SO I'LL LET YOU MAKE YOUR ARGUMENT.

**MR. LICHTMAN:** GOOD MORNING, YOUR HONOR.

BEFORE I PROCEED ANY FURTHER, I DID WANT TO DO ONE THING, WHICH IS WE DO HAVE A COUPLE OF SUMMER ASSOCIATES WITH US. I WANTED TO MAKE SURE TO INTRODUCE JANE MACKERNON FROM GIRARD SHARP, AND MIA CUNEO FROM COTCHETT, AND I DID WANT TO MAKE SURE

TO INTRODUCE THEM.

**THE COURT:** OH, WELCOME. GREAT CASE FOR YOU TO BE WORKING ON THIS SUMMER.

**MR. LICHTMAN:** I HAVE TO ADMIT THAT JANE ALREADY KNOWS THE RECORD BETTER THAN I DO, WHICH WAS A LITTLE HUMBLING IN LAST EVENING'S PREPARATION SESSION.

THE WAY WE'VE DIVIDED SOME OF OUR ARGUMENT THIS MORNING, YOUR HONOR, ACTUALLY, THE -- IT SOUNDS LIKE YOU'RE GOING TO BE HEARING LESS FROM ME THAN WE ANTICIPATED YOU MIGHT. I'M GOING TO ADDRESS THE STANDING ISSUES, AND TO THE EXTENT YOU HAVE INTERNET AND INTENTIONAL INTERFERENCE, BUT WE DO WANT TO GET TO THE COMPUTER FRAUD CLAIMS, WHICH MR. LOESER WILL ADDRESS.

AND YOUR COMMENT ABOUT UNJUST ENRICHMENT, WE'RE VERY MINDFUL OF THAT, BUT MS. SHARP WILL ADDRESS EQUITABLE JURISDICTION, AND WE DO HAVE SOME REASONS FOR THINKING THIS IS A DIFFERENT CASE THAN, SORT OF, THE ORDINARY WHEN IT COMES TO THAT CLAIM.

BUT TURNING FIRST TO YOUR QUESTIONS ABOUT STANDING IN YOUR HONOR'S EARLIER COLLOQUY WITH MY COLLEAGUE, YOU REFERENCED THE PLEADING STANDARD AND THE DIFFERENCE BETWEEN THE PLEADINGS AND SUMMARY JUDGMENT AT THE OUTSET, WE APPRECIATE THAT, AND WE THINK IT'S EXACTLY RIGHT. WE THINK THE SPARTAN CAPITAL CASE, IN PARTICULAR AT *6, GOES THROUGH THE DIFFERENCE BETWEEN WHAT IT IS YOU NEED TO PLEAD IN THIS DISTRICT AND IN OTHERS, AND IT'S NOTABLE THAT, I DON'T WANT TO SAY ALL, BUT JUST SO MANY,

INCLUDING, FOR EXAMPLE, OAKLEY OF PAYPAL'S CASES ARE ALL SUMMARY JUDGMENT. WE'VE WEIGHED THE EVIDENCE, WE'VE LOOKED AND PLAINTIFFS JUST CAN'T MEET THEIR BURDEN AFTER WAIVING THE EVIDENCE. OF COURSE, AT THIS STAGE WE HAVE NO EVIDENCE, AND WE NEED ONLY SHOW PLAUSIBILITY. AND SO, NORMALLY, I WOULDN'T BEGIN SO HEAVILY WITH THIS PLEADING STANDARD, BUT HERE THIS IS A CASE WHERE WE REALLY DO THINK THAT THIS RESOLVES A LARGE NUMBER OF THE ISSUES BETWEEN THE PARTIES.

TALKING ABOUT THE STATISTICAL ANALYSIS, THE WIKIMEDIA CASE OUT OF THE FOURTH CIRCUIT, WHICH CAPITAL ONE ALSO RELIED ON AND IS CITED IN OUR BRIEF. WE THINK THAT ESSENTIALLY IS THE BEGINNING AND END OF THE COURT'S ANALYSIS JUST ON THE PLEADINGS, AND THE REASON IS WIKIMEDIA GOES INTO -- ACTUALLY SAYS EXPRESSLY THERE -- I'M BLANKING ON THE EXACT QUOTE, IT WAS A LITTLE COLORFUL -- THAT YOU KNOW WHAT SUFFICES ON THE PLEADINGS THAT MAY NOT DO IT AT SUMMARY JUDGMENT. THE BRITISH AIRWAYS CASE WE CITE IS A GREAT EXAMPLE OF THAT, ACTUALLY. THERE WAS STATISTICAL EVIDENCE PUT IN ON THE PLEADINGS, IT WAS HOTLY CONTESTED. THERE WAS NO QUESTION IT WOULDN'T HAVE BEEN ENOUGH ON SUMMARY JUDGMENT. ON SUMMARY JUDGMENT, COMPLETELY DIFFERENT ADDITIONAL STATISTICAL EVIDENCE, IN ADDITION TO OTHER EVIDENCE, WAS PUT IN. SO, SO THERE'S NO QUESTION IT'S A DIFFERENT EVIDENTIARY BURDEN ON SUMMARY JUDGMENT.

IN TERMS OF, WHY ONLY ONE EXAMPLE, THIS IS SOMETHING THAT CAME UP THAT IS WHAT THEY DID IN RETAILMENOT. CAPITAL ONE DID

HAVE TWO. THE REASON THAT ONE EXAMPLE, IN OUR OPINION SHOULD SUFFICE, AND IN THE OPINION OF THOSE OTHER TWO COURTS, ONE OR TWO EXAMPLES DID SUFFICE, WE'RE TALKING ABOUT CODE THAT RUNS THE SAME WAY, OR AT LEAST AT THE TIME OF THE FIRST AMENDED COMPLAINT RAN THE SAME WAY EVERY SINGLE TIME, UNLESS, OF COURSE, AS WE ALLEGED IT TO THE EXTENT THAT SOMEONE IS LOOKING TO SEE IF IT MIGHT BE RUNNING. AND SO THIS IS VERY DIFFERENT THAN, I THINK, THE LANGUAGE USED WAS CHERRY-PICKING. IT'S NOT CHERRY-PICKING, THIS IS CODE. IT'S -- IT DOESN'T VARY BASED ON WHETHER IT'S RUNNING ON DELL OR SOME OTHER SITE.

NOW, I DID WANT TO ADDRESS A FEW THINGS THAT MY COLLEAGUE SAID THAT WOULD FALL INTO ALMOST OPTICS, BECAUSE THEY DIDN'T SEEM TO MOVE THE COURT ON IN ITS OPINION, BUT I DO WANT TO MAKE SURE TO CLEAR UP A FEW THINGS. THE CAPITAL ONE SETTLEMENT CAME UP. CAPITAL ONE IS AN INFINITESIMALLY SMALLER CASE THAN THIS ONE. IT'S NOT A SURPRISE THAT THEY HAVE FEWER CLASS MEMBERS. IT'S ALSO A COMPLETELY DIFFERENT SITUATION THAN THIS ONE, WHERE, AS WE PLEAD, MILLIONS OF PEOPLE UPON LEARNING ABOUT HONEY'S BEHAVIOR, UNINSTALLED HONEY. WE KNOW THAT AFTER THE SECOND AMENDED COMPLAINT CAME OUT, THIS IS ONLY A FOOTNOTE IN OUR BRIEF, BECAUSE WE KNOW IT HAPPENED AFTER THE SECOND AMENDED COMPLAINT, BUT WE KNOW THAT NETWORKS HAVE SANCTIONED HONEY, MERCHANTS HAVE SANCTIONED HONEY, HAVE REQUIRED HONEY IN THE WAKE OF OUR ALLEGATIONS TO MAKE CHANGES TO ITS CONDUCT.

SO THIS IS NOT THE -- CAPITAL ONE, WHILE THE PLEADING

ALLEGATIONS ARE THE SAME, IT WAS A MUCH SMALLER CASE WITH A MUCH, MUCH DIFFERENT SET OF PUBLIC REACTION TO IT.

THE QUESTION CAME UP, WHY DID WE GO FROM 26 TO 11? AND AT THE RISK OF GETTING MYSELF INTO A BIT OF TROUBLE WITH MY COLLEAGUES, THAT THE TRUTH IS, WHEN YOU GET A MOTION TO DISMISS ORDER THAT ISN'T WHAT YOU HOPE AS A PLAINTIFF, IT SHARPENS YOUR THINKING A LITTLE BIT, AND YOU REALLY, YOU GO BACK INTO THE ROOM TOGETHER AND YOU THINK, HOW DO WE MAKE THIS A MORE FOCUSED CASE, RIGHT? WHAT DO WE REALLY WANT TO LITIGATE THROUGH CLASS CERTIFICATION? THE BOTTOM LINE IS, IT'S MESSIER TO LITIGATE 26 PLAINTIFFS THROUGH CLASS CERTIFICATION THAN TO LITIGATE 11. THERE WERE OTHER ISSUES DEALING WITH THE REALITIES OF DISCOVERY OBLIGATIONS THAT I WON'T GET INTO, BUT THERE'S NOTHING UNTOWARD ABOUT GOING TO A SMALLER NUMBER OF PLAINTIFFS.

THE AMAZON QUESTION THAT CAME UP, BECAUSE THIS IS ONE THAT'S VERY IMPORTANT. IN THEIR REPLY BRIEF THEY HAVE A PARTIAL QUOTE FROM PLAINTIFFS' FIRST AMENDED COMPLAINT ABOUT AMAZON. THAT THE ELLIPSES CHANGES THE COMPLETE MEANING OF PLAINTIFFS' FIRST AMENDED COMPLAINT. IN PLAINTIFFS' FIRST AMENDED COMPLAINT, PARAGRAPH TWO, WE PLEAD EXPRESSLY THAT PAYPAL TOOK COMMISSIONS OFF OF AMAZON. THEN IN PARAGRAPH 160, I BELIEVE IT'S 162, WHICH IS THE ONE THAT THEY ADD AN ELLIPSIS TO, WE EXPLAIN THAT YOU'LL -- JUST TO BE CLEAR, AMAZON IS A LITTLE DIFFERENT BECAUSE AMAZON IS SERVER SIDE, SO WHILE WE CAN PROVE WHAT HAPPENS ON THE CLIENT SIDE, WE CANNOT, YOU KNOW, WE

NEED DISCOVERY TO SHOW EXACTLY WHAT'S GOING ON AT AMAZON, BECAUSE AMAZON'S A SERVER-SIDE OPERATION, RATHER THAN A CLIENT-SIDE OPERATION. THAT IS ALL THAT PARAGRAPH SAYS. IT DOES NOT IN ANY WAY, AGAIN, I JUST WANT TO MAKE CLEAR THAT THERE WAS A MISTAKE IN PAYPAL'S BRIEF ON THAT POINT.

AND THEN THE LAST POINT THAT I WANTED TO MAKE CLEAR BEFORE I TURN IT OVER, I THINK, TO MR. LOESER, WHO REALLY DOES HAVE THE VAST MAJORITY OF WHAT IT IS YOU'RE INTERESTED IN TODAY. IT'S WHERE I STARTED, WHICH IS PAYPAL'S CONDUCT REALLY DID CHANGE SIGNIFICANTLY OVER TIME. STAND DOWN IS NOT A NEW 2025 TERM. WHAT WE ARE GETTING IS THE REACTION IN REAL TIME OF THE PUBLIC, OF THE MARKETPLACE TO THE REVELATIONS OF PAYPAL'S CONDUCT. AND SO IT IS VERY IMPORTANT THAT WHEN YOU SAY, WELL, WHAT EXACTLY IS PAYPAL DOING TODAY, THAT'S A DIFFERENT QUESTION THAN WHAT PAYPAL WAS DOING AT THE FILING OF OUR FIRST AMENDED COMPLAINT.

I'M HAPPY TO ANSWER ANY QUESTIONS YOUR HONOR HAS ON STANDING, BUT AS I SAID, IT SOUNDS AS IF YOU'LL BE HEARING MORE FROM MY COLLEAGUES THIS MORNING.

**THE COURT:** I THINK I'M OKAY ON THAT.

**MR. LICHTMAN:** THANK YOU VERY MUCH, YOUR HONOR.

**THE COURT:** ALL RIGHT, LET'S TALK ABOUT, MR. LOESER, THE CFAA, IS THAT YOUR DOMAIN?

**MR. LOESER:** YES, YOUR HONOR, THIS IS MY WORLD, HAVING BEEN A CYBER PROSECUTOR AND HANDLED THESE CASES

CRIMINALLY AND CIVILLY FOR, I HATE TO SAY, GOING ON 25 YEARS NOW.

AND ALSO WITH GOOD FORTUNE, I'M ACTUALLY LEAD COUNSEL IN THE RETAILMENOT CASE, SO I'M VERY CAPABLE OF EXPLAINING TO YOU WHAT THE DRAMATIC DIFFERENCES ARE BETWEEN THIS CASE AND THAT CASE.

BUT IMPORTANTLY, I THINK WE NEED TO START OUR DISCUSSION OF CFAA ON THE ACTUAL CLAIMS THAT ARE ALLEGED, BECAUSE THERE ARE REALLY TWO VERY DIFFERENT PRONGS OF THE CFAA AT ISSUE HERE, AND IT'S IMPORTANT THAT WE DISTINGUISH BETWEEN THE TWO, BECAUSE THE ELEMENTS FOR THE TWO ARE VERY DIFFERENT.

THE SECTION A4 AND THE SECTION A5C ARE WHAT YOU WOULD TRADITIONALLY CALL HACKING CLAIMS. THEY'RE YOUR VAN BUREN CLAIM. THEY'RE THE ONES THAT CONCERN WHETHER OR NOT YOU HAVE AUTHORIZED ACCESS OR EXCEED AUTHORIZED ACCESS. BUT THE A5A CLAIM, THAT IS A TROJAN HORSE CLAIM. IT DOES NOT HAVE ANY CONCERN WITH WHETHER OR NOT THE ACCESS WAS AUTHORIZED OR IN EXCESS OF AUTHORIZATION. ALL THAT REQUIRES IS THAT A PROGRAM OR CODE IS TRANSMITTED, AND THAT CODE CAUSES DAMAGE TO THE COMPUTER, AND THE DAMAGE ISN'T AUTHORIZED, AND THAT AUTHORIZATION QUESTION THAT MULTIPLE CASES EXPLORE AND DISCUSS THAT'S SOMETHING THAT REALLY RELATES TO WHETHER OR NOT THE PERSON WHO'S IN CONTROL OF THAT COMPUTER KNOWINGLY SAYS YOU CAN DO THAT.

**THE COURT:** AND THAT'S THE A5 --

**MR. LOESER:** THAT IS THE A5A CLAIM, YOUR HONOR.

**THE COURT:** A5A.

**MR. LOESER:** NOW THIS COMPLAINT HAS TWO DISTINCT A5A CLAIMS, AND THESE ARE SET FORTH IN PARAGRAPHS, I THINK, IT'S 295 TO 311 WHERE WE HAVE OUR CFAA CLAIMS. THE FIRST TROJAN HORSE CLAIM IS THE CLAIM THAT PAYPAL TRANSMITS HONEY, AND IT DOES SO WITHOUT EXPLAINING IN DETAIL, LIKE RETAILMENOT DID, WHAT THAT PROGRAM DOES. IT IS A CLASSIC TROJAN THAT IS DELIVERED UNDER ONE PURPOSE, BUT ACTUALLY DOES SOMETHING COMPLETELY DIFFERENT.

BUT WHAT'S ALLEGED IN THE COMPLAINT IS THAT HONEY IS PITCHED AS SCOURING THE INTERNET TO FIND YOU THE BEST POSSIBLE COUPONS, AND THAT PROCESS, DOING THAT, DOESN'T REQUIRE ANY OF THESE MACHINATIONS AND CODE AND HIDDEN TABS AND STAND-ON, NONE OF THAT IS IMPORTANT TO THE PROCESS OF SCOURING THE INTERNET TO FIND A COUPON, YET IT'S IN THE CODE, IT'S A CLASSIC TROJAN, AND THERE ARE MULTIPLE ACCOUNTS BY SECURITY EXPERTS THAT ACTUALLY DESCRIBE HONEY AS MALWARE, AS A TROJAN PROGRAM, THAT DOES SOMETHING THAT NO ONE WOULD EXPECT IT TO DO.

THE PROOF OF THAT PROCESS IS EVEN WHAT PAYPAL TELLS ITS DUAL CUSTOMER BASE, IT TELLS CONSUMERS WE SCAN THE INTERNET FOR YOU, SO YOU DON'T HAVE TO, AND FIND YOU THE BEST POSSIBLE COUPON TO GET YOU THE BEST DEAL. IT SIMULTANEOUSLY TELLS MERCHANTS, IF YOU PARTNER WITH US, CONSUMERS WON'T LOOK IN THE INTERNET THEMSELVES FOR COUPONS, THEY WON'T DO IT, AND WE'LL

GIVE THEM ONLY THE COUPON YOU TELL US TO GIVE THEM.

SO, WHAT PAYPAL IS PROGRAMMED TO DO WITH HONEY IS EXACTLY THE OPPOSITE OF WHAT IT TELLS CONSUMERS IT'S DOING IN ORDER TO GET THE ABILITY TO GET ON THEIR COMPUTER, BECAUSE THAT'S THE GOAL, AND THAT'S THE GOAL OF ANY HACKER. THAT HACKER WANTS ACCESS TO THE SYSTEM, AND THE FIRST THING THEY DO IN THE SYSTEM IS GIVE THEMSELVES THE ABILITY TO GO WHEREVER THEY WANT AND DO WHATEVER THEY WANT. SO WHEN A HACKER USES SOCIAL ENGINEERING TO GET YOUR PASSWORD, THEY GET ONTO THE SYSTEM AND THE FIRST THING THEY DO IS OPEN ALL THE DOORS IN THE SYSTEM, SO THEY CAN GET WHAT THEY WANT AND GET OUT, AND THAT IS EXACTLY WHAT HONEY IS --

**THE COURT:** IT EXCEEDS AUTHORIZATION?

**MR. LOESER:** IN TWO DIFFERENT, WELL, NOW WE'RE LOOKING AT THE HACKING CLAIM, AND YES, WE WILL GET TO THAT, BUT WHAT'S IMPORTANT HERE IS THE WORD THE COURT USED, WHICH IS PERMISSIONS, RIGHT? SO, HOW CAN A CONSUMER GIVE HONEY PERMISSION TO OVERWRITE AN AFFILIATE CODE, WHICH IS DATA HOUSED ON THAT COMPUTER, IF IT HAS NO IDEA IT'S DOING IT, WHICH IS, OF COURSE, THE ABSOLUTE KEY DIFFERENCE BETWEEN THIS CASE AND RETAILMENOT. THAT JUDGE ROSHAN EXPLAINED IN DETAIL IN THE ORDER WAS THAT RETAILMENOT EXPLICITLY DESCRIBES IN ITS TERMS OF SERVICE WHAT IT DOES. IT SAYS WE EARN A COMMISSION, AND WE SHARE IT WITH YOU FOR CASH BACK. THAT'S THE SERVICE THAT RETAILMENOT PROVIDES, AND IN THAT CONTEXT, WITH THOSE

DISCLOSURES, THAT IS PERMITTED, BECAUSE THE CONSUMER KNOWS, AND WITH THAT KNOWLEDGE ALLOWS IT TO HAPPEN. THIS COMPLAINT ALLEGES IN DETAIL THAT CONSUMERS HAVE NO IDEA, AND WHEN THEY FOUND OUT, 8 MILLION OF THEM DROPPED THE SERVICE.

**THE COURT:** SO, HOW DOES VAN BUREN PLAY INTO THAT ANALYSIS, IF IT DOES AT ALL?

**MR. LOESER:** VAN BUREN AFFECTS THE HACKING CLAIMS. VAN BUREN IS AN A4 CLAIM AND AN A5C CLAIM. IT'S ACTUALLY NOT PARTICULARLY INFORMATIVE ON THE TROJAN HORSE CLAIM, BUT VAN BUREN DOES SET UP THE ENVIRONMENT WHERE THE HACKING CLAIMS CAN PROCEED IN THIS CASE, AND IT'S BECAUSE OF THAT VERY DECEPTION THAT WE JUST TALKED ABOUT.

UNDER VAN BUREN IF -- LET'S TAKE THE SOCIAL ENGINEERING HACK WE JUST DESCRIBED. IF SOMEBODY USES SOCIAL ENGINEERING TO GET YOUR PASSWORD AND BREAKS INTO YOUR COMPUTER, AND WHILE THERE DAMAGES IT, THEY ARE STILL VIOLATING THE CFAA, AND VAN BUREN SAYS AS MUCH, BUT TECHNICALLY, IF YOU READ VAN BUREN THE WAY THEY SAY, THEN IF SOMEBODY USES SOCIAL ENGINEERING, IT'S NOT A HACK, BECAUSE THEY HAVEN'T EXCEEDED AUTHORIZATION, THEY WERE AUTHORIZED, THEY HAD YOUR PASSWORD. AND SO THAT READING OF VAN BUREN, WHICH ISN'T IN VAN BUREN, WOULD RENDER THE ENTIRE BODY OF CFAA THAT RELATES TO SOCIAL ENGINEERING HACKING NOT ACTIONABLE, AND THAT CAN'T BE THE LAW. AND THE CASES SAY AS MUCH, AND IN FACT, IN THIS DISTRICT, JUDGE DAVILA HAS EXPLORED THIS IN GREAT DETAIL, INCLUDING IN THE CONTEXT OF THE TROJAN

HORSE CLAIM --

**THE COURT:** WHICH -- IN WHAT CASE ARE YOU REFERRING?

**MR. LOESER:** THIS IS IN THESE TWO CASES. YES, THE APPLE THROTTLING CASE, WHICH APPLE THROTTLING IS 347 F. SUPP 3D 434, AND THE HP INKJET PRINTER CASES 317 F. SUPP 3D 1075.

BEFORE WE TALK IN DETAIL ABOUT APPLE, THOUGH, THERE WAS A SECOND ALLEGATION OF THE TROJAN HORSE PRONG OF THE CFAA IN THIS CASE, AND THAT SECOND INDEPENDENT AND SEPARATE OFFENSE IS THE TRANSMISSION OF THE SUPPRESSED STAND-DOWN CODE.

AS THE COMPLAINT DETAILS ONE OTHER THING THAT PAYPAL DOES IS IT HAS HONEY CALL OUT TO A FILE LOCATED ON ITS SERVERS CALLED A JSON FILE AND THAT FILE CONTAINS CODE AND THE CODE IT CONTAINS IS A SUPPRESSED STAND-DOWN CODE THAT IS TRANSMITTED TO CONSUMERS' COMPUTERS, AND IT CHANGES THE WAY HONEY WORKS. THAT'S THE CODE THAT IS A DEFEAT DEVICE, IN PLAIN AND SIMPLE TERMS. IT LOOKS AT THE COMPUTER IT'S ON, AND IT RENDERS A DECISION AS TO WHETHER OR NOT THIS MIGHT BE AN AUDITOR, WHETHER OR NOT THIS MIGHT BE SOMEONE TESTING TO SEE WHETHER OR NOT THEY STAND DOWN, AND IF IT IS, IT STANDS DOWN, BUT IF IT'S NOT, IT DOESN'T. SO THE EXECUTION OF THIS CODE LEADS DIRECTLY TO THE DELETION OF THE AFFILIATE IDS ON COMPUTERS, WHICH IS DAMAGE TO DATA ON A COMPUTER PLAINLY COVERED BY THE CFAA. SO THOSE ARE THE TWO PRONGS OF THE TROJAN BRANCH.

NOW WE CAN, AND WE WILL TALK ABOUT PERMISSIONS AND AUTHORIZATION, WHICH RELATES TO THE HACKING PRONGS. SO LET'S

TALK ABOUT APPLE, THE ALLEGATIONS IN THE APPLE CASE WERE THAT APPLE RELEASED A SOFTWARE UPDATE, AN IOS UPDATE THAT WAS SUPPOSED TO BE ENHANCED SECURITY AND IMPROVEMENTS TO THE SYSTEM. IN TRUTH AND IN FACT, IT THROTTLED THE PROCESSING SPEEDS IN ORDER TO PRESERVE BATTERY LIFE, AND IT CAUSED THE PHONES TO LAST SHORTER PERIODS OF TIME ON BATTERY, RESULTING IN PEOPLE WANTING TO UPGRADE THEIR PHONES. JUDGE DAVILA LOOKED AT THOSE TWO PRONGS THAT I DESCRIBED SEPARATELY. HE FIRST LOOKED AT THE TROJAN HORSE PRONG, AND THEN HE LOOKED AT THE HACKING PRONG. HE SUSTAINED THE TROJAN HORSE PRONG, AND THE REASON HE DID, AND I CAN QUOTE DIRECTLY FROM HIS ORDER, THE PHRASE WITHOUT AUTHORIZATION MODIFIES DIFFERENT ACTIONS IN 1030A5A, THAT'S OUR TROJAN HORSE PRONG, AND C, THAT'S OUR HACKING PRONG, THAT DISTINCTION PROVES CRUCIAL TO THE ANALYSIS IN THIS CASE. THERE IS NO DISAGREEMENT THAT APPLE, QUOTE, "KNOWINGLY CAUSED THE TRANSMISSION OF A PROGRAM INFORMATION CODE OR COMMAND BY SENDING IOS UPDATES, RATHER THE DISPUTE CENTERS ON WHETHER APPLE, AS A RESULT OF ITS KNOWING TRANSMISSION, INTENTIONALLY CAUSED DAMAGE WITHOUT AUTHORIZATION TO PLAINTIFFS' PHONES." THUS, THE RELEVANT QUESTION IS WHETHER PLAINTIFFS HAVE ADEQUATELY PLED THAT APPLE CAUSED DAMAGE TO THEIR PHONES WITHOUT PERMISSION, AND DID SO INTENTIONALLY.

**THE COURT:** SO IN THE APPLE CASE, LIKE THE TESLA CASE, DAMAGE WAS EASIER TO UNDERSTAND, BECAUSE IN FACT LESS BATTERY LIFE ACTUALLY IS DAMAGE TO THE COMPUTER, IT DIES. HERE

IT'S, I THINK, IT'S A HARDER ANALOGY TO MAKE OF THE DAMAGE TO THE COMPUTER. THERE'S MORE OF A PHYSICAL CHANGE IN THE COMPUTER, IT'S SOFTWARE-BASED, BUT SLOWING DOWN PROCESSING TIME OR REDUCING BATTERY LIFE DAMAGES THE PRODUCT THAT THE CUSTOMER BOUGHT. BUMPING OUT THE AFFILIATE CODE DOESN'T DAMAGE ANYTHING OF THE CONSUMERS.

**MR. LOESER:** I WOULD DISAGREE.

**THE COURT:** SO, TELL ME? BECAUSE NOW WE ARE INTO SOMETHING MORE INTANGIBLE.

**MR. LOESER:** SO, THERE'S A LITTLE BIT OF A CONFLATION BETWEEN TWO DIFFERENT THINGS: DAMAGE AND LOSS --

**THE COURT:** OKAY.

**MR. LOESER:** -- AND THOSE ARE VERY DIFFERENT THINGS.

**THE COURT:** THEY ARE.

**MR. LOESER:** THE CFAA DIRECTLY COVERS DELETING DATA, AND THAT IS THE ALLEGATION HERE. AFFILIATE IDS ARE DELETED, AND THEY ARE REPLACED WITH PAYPAL'S AFFILIATE ID. THAT IS UNQUESTIONABLY WHAT WE WOULD CALL TECHNICAL DAMAGE THAT IS FULLY COVERED BY THE CFAA.

THE QUESTION THEN BECOMES LOSS, AND THIS IS WHERE THE COURT IS CORRECT. THE LOSS IS THE FACT THAT OUR PLAINTIFFS DON'T GET COMMISSIONS. SO IN ORDER TO HAVE THE LOSS BE THE THRESHOLD FOR THE CFAA, IT HAS TO EXCEED $5,000, WHICH I DON'T THINK IS CONTESTED HERE, AND IT HAS TO HAVE OCCURRED AS A RESULT OF THE INTERRUPTION IN SERVICE. SO THAT'S THE KEY PIECE

THAT THE COURT NEEDS TO UNDERSTAND, AND I THINK IN OUR PRIOR HEARING HERE, AS I REVIEWED THE TRANSCRIPT, THERE WAS SOME DISCUSSION OF THAT, AND THE COURT SEEMED INCLINED TO SEE THAT INTERRUPTION, AND THERE ARE CASES THAT SHOW THAT THAT IS AN INTERRUPTION. THERE'S A CASE CALLED YODER.

**THE COURT:** WELL, CAPITAL ONE, CERTAINLY DOES.

**MR. LOESER:** RIGHT.

THERE'S A CASE CALLED FREY. LET'S SEE, IT'S YODER, YODER & FREY AUCTIONEERS, THAT IS 2013 WESTLAW 1411757. IT'S AN INTERESTING CASE BECAUSE THE ALLEGATIONS THERE WERE THAT THE DEFENDANT WAS HACKING INTO AND DISRUPTING AN ONLINE BIDDING SERVICE, AND WHAT THE COURT FOUND IS THAT THAT WAS AN INTERRUPTION OF SERVICE, SO THAT THE LOSSES THAT THE AUCTIONEER SUFFERED FROM THINGS NOT SELLING, THOSE COUNTED, BECAUSE THERE WAS TECHNICAL DAMAGE, RIGHT, BY BREAKING IN AND MANIPULATING THE DATA INVOLVED, AND THERE WAS A LOSS THAT RESULTED FROM THAT INTERRUPTION OF SERVICE.

NOW THE DEFENDANTS THERE, LIKE PAYPAL, HERE SAID, 'NO, NO, AT BEST YOU'RE ALLEGING WE INTERRUPTED A TRANSACTION, NOT A SERVICE. THAT ARGUMENT WAS REJECTED IN YODER, AND IT MAKES PERFECT SENSE WHY. TAKE THIS HYPOTHETICAL: THERE'S A TRAIN SYSTEM ALONG THE CALIFORNIA WEST COAST. IF I BUY A TICKET TO TRAVEL FROM SAN JOSE TO LOS ANGELES, AND A HACKER BREAKS INTO THE AUTOMATED SWITCHING PLATFORM, AND I END UP IN SAN FRANCISCO, CERTAINLY THAT IS AN INTERRUPTION OF SERVICE. I

WANTED TO GO THERE, I WENT SOMEWHERE ELSE. THAT'S EXACTLY WHAT'S HAPPENING HERE. WE WANTED THE COMMISSION TO GO TO THE AFFILIATE. THAT SERVICE WAS INTERRUPTED. THEY CHANGED ITS DESTINATION, AND NOW IT'S GOING TO PAYPAL.

SO, THE LOSS AND DAMAGE ARE SUFFICIENT IN THIS CASE, BECAUSE THERE'S PHYSICAL AND ACTUAL DAMAGE TO DATA. IT'S DELETED AND REPLACED, AND AS A RESULT OF THAT, WE SUFFER LOSSES BECAUSE THAT SERVICE WAS INTERRUPTED, AND THE MONEY THAT WAS SUPPOSED TO GO TO THE PLAINTIFFS ENDED UP GOING TO PAYPAL.

**THE COURT:** DOES YOUR ANALYSIS APPLY IN THE SITUATION WHERE THE CUSTOMER CHOOSES IN THE PARTICULAR TRANSACTION TO HAVE HONEY BROWSER SEARCH FOR COUPONS?

**MR. LOESER:** YES.

**THE COURT:** BECAUSE I WAS DRAWING A DISTINCTION FROM RETAILMENOT, THAT THERE'S NO DOUBLE PERMISSION, THERE'S THE UNDERLYING TERMS OF SERVICE TO EVEN INSTALL HONEY, AND THEN YOU DESCRIBE IN THE SECOND AMENDED COMPLAINT, AT THE POINT OF SALE THERE'S THE POP-UP BOX OF HONEY, WE CAN HELP YOU, AND THE CONSUMER CAN CLICK THE X AND SAY GO AWAY OR SAY SURE, HELP ME OUT. SO, DOES THIS ANALYSIS APPLY WHEN THE CONSUMER EXPRESSLY ASKS HONEY TO DO THAT SEARCH IN THE PARTICULAR SALE?

**MR. LOESER:** YES.

**THE COURT:** TELL ME WHY.

**MR. LOESER:** I'LL TELL YOU WHY, BECAUSE IN RETAILMENOT -- THE SERVICE RETAILMENOT OVERTLY AND EXPLICITLY

TELLS PEOPLE WHAT IT'S DOING IS EARNING A COMMISSION AND SHARING IT WITH YOU. IF YOU CHOOSE TO DO THIS, THEN WE WILL EARN THE COMMISSION, AND WE WILL SHARE IT WITH YOU.

THAT IS SIMPLY NOT WHAT HAPPENED WITH HONEY. WITH HONEY, THEY SAY, "HEY, DO YOU WANT A COUPON?" AND IF YOU SAY "YES," IT DOES THIS THING THAT NO ONE EXPECTS, THAT'S NEVER DISCLOSED, THAT NO ONE KNOWS ABOUT, WHICH IS IT SNATCHES THE AFFILIATE. THIS HAS NOTHING -- THE TWO HAVE NOTHING TO DO WITH EACH OTHER. FIND ME THE BEST DEAL ON THE INTERNET HAS NOTHING TO DO WITH TAKE FOR YOURSELF A COMMISSION. THEY'RE TWO COMPLETELY DIFFERENT THINGS, AND THE LATTER IS NEVER EVER DISCLOSED BY PAYPAL IN ANY WAY, SHAPE, OR FORM. AND WHEN IT WAS LEARNED BY THE MARKETPLACE, WHAT HAPPENED? NOT ONLY DID 8 MILLION CONSUMERS DROP THE SERVICE, BUT THE AFFILIATE NETWORKS THREW THEM OFF. THEY SAID, YOU CAN'T DO THIS, YOU'RE HARMING THE MEMBERS OF OUR AFFILIATE NETWORK.

AND ALL OF THIS RELATES BACK, AND IT'S IMPORTANT TO BRING THIS BACK TO THE SUPPRESSED STAND-DOWN CODE, WHICH IS A TROJAN HORSE PROGRAM, BECAUSE THAT EFFECTUATES IT. AND THIS IS VERY SIMILAR TO A VERY RECENT CASE BY JUDGE LIN IN THIS DISTRICT, WHERE FACEBOOK WAS DOING THE SAME THING WITH SENDING NEW CODE IN ITS PIXEL. SO THE EXISTING CODE ON THE PIXEL, PEOPLE KNEW WHAT PIXEL DID, RIGHT? IT TRACKS WHAT HAPPENS ON THE INTERNET, IT FOLLOWS WHERE YOU GO, BUT ON ANDROID PHONES IT DOESN'T WORK, BECAUSE OF THE APPLICATIONS ON ANDROID. ANDROID PHONES ARE

SANDBOXED, WHICH MEANS THEY DON'T TALK TO EACH OTHER.

FACEBOOK SECRETLY SENT CHANGES TO THE PIXEL, SO IT WOULD FIND A BACKDOOR WAY AROUND SANDBOXING TO TRACK PEOPLE, AND THAT, AS JUDGE LIN FOUND, THAT'S A TROJAN, AND THAT'S A VIOLATION OF CDAFA, BECAUSE YOU DON'T GIVE THAT PERMISSION, RIGHT? NO ONE COULD HAVE PERMITTED FACEBOOK TO DO THIS, META TO DO THIS, BECAUSE NOBODY KNEW. THEY WERE ASTONISHED, AND IT'S THE SAME THING HERE. THESE CONSUMERS CAN'T POSSIBLY GIVE PERMISSION FOR HONEY TO DO THIS, BECAUSE THEY HAVE NO IDEA. YOU CAN'T PERMIT SOMETHING THAT YOU DON'T KNOW IS GOING ON. IT'S AS SIMPLE AS THAT.

NOW, I DO WANT TO SPEND JUST A QUICK MOMENT ON THE HACKING CLAIMS, BECAUSE YOU BROUGHT THAT UP, AND JUDGE LIN'S ORDER, ACTUALLY, THOUGH IT'S A CDAFA CLAIM, AS WE KNOW THE TWO STATUTES ARE VERY SIMILAR. ONE THING THAT'S PARTICULAR, AND THIS IS SOMETHING THAT IS TALKED ABOUT BY BOTH JUDGE LIN AND BY JUDGE DAVILA, IS THAT CDAFA, LIKE THE TROJAN HORSE PRONG OF THE CFAA, IT DOESN'T REQUIRE AUTHORIZATION FOR THE ACCESS, IT'S KNOWING ACCESS, RIGHT? AND THIS IS IMPORTANT, AND WHEN JUDGE LIN TALKS ABOUT THE PERMISSIONS, IT'S REALLY IMPORTANT THAT -- SHE GOES INTO THE DETAILED DISCUSSION OF CONSENT AND SAYS, "LOOK, IF YOU'RE GOING TO CONSENT TO SOMETHING, YOU HAVE TO KNOW EXACTLY WHAT IT IS SOMEBODY IS DOING, OR YOU CAN'T CONSENT TO IT." AND THIS IS WHY, AND THIS CAME UP PROMINENTLY IN THEIR BRIEFING, WHY THERE WAS A CHANGE FROM THE FIRST

AMENDED COMPLAINT TO THE SECOND AMENDED COMPLAINT WITH THE WORD PERMISSIONS, BECAUSE IT'S A DOUBLE-EDGED SWORD. THEIR PERMISSIONS CAN MEAN I PERMIT YOU TO DO THIS, WHICH IS WHAT THEY SAY IT MEANS, BUT THAT'S NOT WHAT IT MEANS HERE. WHAT IT MEANT HERE IS THEY'RE A HACKER, AND THE FIRST THING THEY DID WAS GO INTO THE SYSTEM AND GIVE THEMSELVES CARTE BLANCHE TO DO WHATEVER THEY WANTED. AND THAT'S NOT PERMISSION TO DO SOMETHING ON A COMPUTER THAT A PERSON GIVES, THAT'S THIS TECHNICAL KIND OF SOFTWARE PERMISSION. IT'S VERY DIFFERENT, AND THAT'S WHY WE CLEARED UP IN THE COMPLAINT EXACTLY WHAT CONSUMERS KNEW AND ALLOWED FROM WHAT THE SYSTEM WAS CAPABLE OF DOING. BECAUSE EVERY TROJAN HORSE IS DESIGNED TO GIVE ITSELF THE SOFTWARE AND HARDWARE PERMISSIONS TO WREAK HAVOC, THAT'S WHAT IT DOES, AND THAT'S WHY SECURITY ANALYSTS, WHEN THEY LOOK AT HONEY AND THEY LOOK AT THE SUPPRESSED STAND-DOWN CODE, THEY SAY THIS IS MALWARE, PLAIN AND SIMPLE. YOU INSTALL IT THINKING IT DOES ONE THING, IT DOES SOMETHING ELSE. IT NEVER TELLS YOU THAT IS WHAT THE CFAA IS ALL ABOUT.

SORRY, I'VE BEEN TALKING FOR A LONG TIME, YOUR HONOR, AND I WANT TO MAKE SURE ALL YOUR QUESTIONS ARE ANSWERED.

**THE COURT:** NO, THAT'S HELPFUL.

**MR. LOESER:** THIS IS MY WORLD. SO I CAN SAY A LOT.

**THE COURT:** IT CLEARLY IS. IT CLEARLY IS.

THANK YOU.

AND ARE WE GOING TO MOVE TO THE EQUITABLE CLAIMS?

GOOD MORNING.

**MS. SHARP:** I GUESS THAT MAKES THE WORLD OF EQUITY MY WORLD, YOUR HONOR.

**THE COURT:** IT DOES.

**MS. SHARP:** ALL RIGHT, WELL, WISH ME LUCK.

BUT WE HEARD YOUR HONOR LOUD AND CLEAR AT THE FIRST HEARING, AND AS SOMEONE WHO HAS PRACTICED IN THIS BAR FOR MANY YEARS, AND HAD THE PRIVILEGE OF LITIGATING A NUMBER OF, AND A VARIETY OF COMPLEX CASES, I AGREE WITH YOUR HONOR THAT THE UNJUST ENRICHMENT CLAIM USUALLY IS NOT DOING THE HEAVY LIFTING. AND AFTER THE LAST HEARING, WE WENT BACK, WE TOOK YOUR HONOR'S ADMONITION TO TAKE A HARD LOOK AT DISGORGEMENT VERY SERIOUSLY, TO SAY THAT WE HAVE GONE DEEP INTO THE RESTATEMENTS OF RESTITUTION AND UNJUST ENRICHMENT WOULD BE --

**THE COURT:** I AM SO SORRY.

**MS. SHARP:** ACTUALLY, IT TURNS OUT IT'S FASCINATING STUFF. AT LEAST IF YOU'RE AN EQUITY NERD LIKE MY ASSOCIATES, NOT ME.

SO, YOUR HONOR, I THINK I'LL START AT THE BEGINNING, WHICH IS STEPPING BACK FOR US. IT'S HARD TO SQUARE THE NOTION OF PAYPAL ARGUING ON ONE HAND THE DAMAGES ARE JUST WAY TOO SPECULATIVE FOR US TO EVEN HAVE STANDING IN THIS CASE, AND AT THE SAME TIME TO SAY THAT WE HAVEN'T PLED, THAT WE LACK AN ADEQUATE REMEDY AT LAW. THERE'S A BIT OF TENSION THERE, AND I THINK WE CAN ALL APPRECIATE THAT.

WITH THAT SAID, WE APPRECIATE YOUR HONOR'S TENTATIVES ON THE STANDING, AND IT DOESN'T -- EVEN IF THOSE CLAIMS ARE ALLOWED TO PROCEED, WHICH THEY SHOULD. IT CERTAINLY, FROM OUR PERSPECTIVE, DOESN'T FORECLOSE THE UNJUST ENRICHMENT CLAIM FOR A FEW UNIQUE REASONS HERE THAT AREN'T PRESENT IN A LOT OF OUR OTHER CASES.

TO BEGIN WITH, WE DO PLEAD A LACK OF ADEQUATE REMEDY AT LAW --

**THE COURT:** BUT ONLY AT THE HIGHEST OF LEVEL.

**MS. SHARP:** IT'S TRUE, YOUR HONOR, BUT THERE ARE SOME IMPORTANT FLOURISHES, I THINK, IN THE WAY THAT WE PLEAD IT THAT I HOPE PROVIDE A LITTLE BIT OF INSIGHT INTO THE WAY WE'RE THINKING ABOUT IT, BECAUSE IT IS AN IMPORTANT DISTINCTION THAT WE DRAW FROM OTHER CASES.

SO I'LL DIRECT YOUR ATTENTION TO THE UNJUST ENRICHMENT COUNT, AND IN PARTICULAR, PARAGRAPHS 332, AND 333, AND I'LL READ FROM PARAGRAPH 332 IN PARTICULAR, IN WHICH WE ALLEGE PLAINTIFFS AND CLASS MEMBERS LACK AN ADEQUATE REMEDY AT LAW TO RECOVER THE AMOUNTS DEFENDANTS RECEIVED FROM THEIR WRONGFUL CONDUCT, AND THEN WE NOTE THAT PLAINTIFFS CANNOT RECOVER THE AMOUNTS DEFENDANTS RECEIVED FROM THEIR WRONGFUL CONDUCT THROUGH LEGAL CLAIMS, OR IT MAY BE DETERMINED THAT THOSE CLAIMS MAY BE MORE PROMPT OR CERTAIN.

NOW, YOUR HONOR ASKED ABOUT THAT PROMPT OR CERTAIN LANGUAGE, AND IT'S NOT NEW LANGUAGE IN THE SENSE THAT IT IS, IT

APPEARS IN SONNER ITSELF, IN PARAGRAPH 8 OF, EXCUSE ME, IN FOOTNOTE 8 OF THE SONNER DECISION, THERE IS A DISCUSSION, AND BY THE WAY, I WOULD JUST NOTE THAT THE DEFENDANTS ONLY RAISED THIS PROMPT OR CERTAIN THING FOR THE FIRST TIME ON REPLY, WHICH IS WHY IT MAYBE WASN'T ELUCIDATED AS MUCH IN THE OPPOSITION AS YOU MIGHT HAVE EXPECTED. BUT IN SONNER, AT NOTE 8, HERE'S A QUOTE, SONNER, WHO, OF COURSE, WAS THE PLAINTIFF THERE, FAILS TO EXPLAIN HOW DAMAGES ARE LESS PROMPT, CERTAIN, OR EFFICIENT THAN RESTITUTION, HERE. SO THERE WAS A FOCUS --

**THE COURT:** THAT WAS RESTITUTIONARY DISGORGEMENT.

**MS. SHARP:** ABSOLUTELY, ABSOLUTELY, AND SO, I DO -- YOU ARE SPOT ON, YOUR HONOR, AND SO I WANT TO GET TO THAT, BECAUSE RESTITUTIONARY DISGORGEMENT IS A VERY DIFFERENT ANIMAL THAN NON-RESTITUTIONARY DISGORGEMENT, AS YOUR HONOR KNOWS.

SO LET'S TURN, OF COURSE, AND NOT -- WE HEARD YOUR HONOR LOUD AND CLEAR THAT DISGORGEMENT IS LARGELY DISFAVORED UNDER CALIFORNIA LAW, BUT OF COURSE, THERE IS A VEIN OF CASE LAW PROVIDING FOR THAT ALTERNATIVE NON-RESTITUTIONARY DISGORGEMENT RELIEF. MEISTER VERSUS MENSINGER IS A CASE IN WHICH IT EXPLAINS THE EMPHASIS WHEN IT COMES TO NON-RESTITUTIONARY DISGORGEMENT IS, OF COURSE, THE EMPHASIS ON THE WRONGDOERS' ENRICHMENT AS OPPOSED TO THE VICTIMS' LOSS, AS OPPOSED TO THE PLAINTIFFS' LOSS, AND THAT IS THE HEART OF IT HERE, AND THAT'S THE HEART OF IT IN SONNER, AND THAT'S THE HEART OF IT IN CALIFORNIA GASOLINE, WHICH IS A CASE THAT WE CITE IN OUR

PAPERS, WHERE JUDGE CORLEY WAS CONFRONTED WITH A VERY SIMILAR SET OF CIRCUMSTANCES IN SOME REGARDS. THAT WAS AN ANTITRUST CASE IN WHICH THERE WERE CLAIMS ASSERTED, STATUTORY ANTITRUST CLAIMS ASSERTED, AND AN ALTERNATIVE UNJUST ENRICHMENT CLAIM WAS ASSERTED AS WELL, AND SO JUDGE CORLEY HAD TO GRAPPLE WITH THAT NON-RESTITUTIONARY DISGORGEMENT THERE, AND WHAT SHE HELD THERE WAS NON-RESTITUTIONARY DISGORGEMENT, ONE, QUOTE, "IS A REMEDY FOR UNJUST ENRICHMENT CLAIMS." SO SHE WAS NOT EQUIVOCAL THAT THAT IS THE RIGHT REMEDY WHEN WE'RE PROCEEDING ON AN UNJUST ENRICHMENT CLAIM, AND THEN SHE NOTED IMPORTANTLY, AND THIS IS WHERE I THINK THE HEART OF THE ISSUE IS HERE, THAT SONNER IS DISTINGUISHABLE BECAUSE, QUOTE, "THE PLAINTIFFS ALLEGE A DIFFERENCE BETWEEN THE MONEY DAMAGES SOUGHT AND THE RESTITUTION CLAIMED." SO WE'RE TALKING ABOUT THE NON-RESTITUTIONARY DISGORGEMENT, AND WE DO ALLEGE THAT DIFFERENCE IN THE MONEY DAMAGES AND THE NON-RESTITUTIONARY DISGORGEMENT ALL OVER OUR COMPLAINT.

THE DEFENDANTS AND THEIR REPLY AT PAGE 13 SAY WE DON'T PLEAD A DIFFERENCE. UNFORTUNATELY, THAT IS JUST FLAT WRONG FOR THEM, BECAUSE WE PLEADED IN PARAGRAPHS 121, PARAGRAPHS 316, 345, 370. TO THE EXTENT THAT THE DEFENDANT'S FOCUS THEN BECOMES -- BECAUSE NOW WE KNOW THAT WE PLED A DIFFERENCE, AND JUST TO TEASE THAT OUT A LITTLE BIT MORE, YOUR HONOR, AS WE'VE PROCEED IN THE CASE, WE'RE LEARNING, WE DON'T KNOW EVERYTHING YET, BUT WHAT WE HAVE LEARNED IS THAT AT LEAST IN SOME

CIRCUMSTANCES, BASED ON WHAT WE KNOW, AND WE'RE ANXIOUSLY AWAITING THE TRANSACTION DATA FROM PAYPAL, WHICH WILL TELL US A LOT MORE, BUT WHAT WE HAVE SEEN SO FAR IS THAT THERE ARE AT LEAST SOME INSTANCES, AND PERHAPS THIS IS UNIVERSAL, WE DON'T KNOW, IN WHICH THE AMOUNT THAT PAYPAL RECOVERED AS A COMMISSION INSTEAD OF OUR CLIENTS IS LESS. IT IS LESS THAN WHAT OUR CLIENTS GOT, AND SO THIS IS AN UNUSUAL CIRCUMSTANCE. THIS ISN'T THE USUAL WHERE WE SAY, HEY, THE PLAINTIFF, THE RESTITUTIONARY CLAIM IS BIGGER THAN THE DAMAGES CLAIM, THAT'S OFTEN THE CASE, BUT THAT COMES BACK TO THE FIRST POINT I MADE, WHICH IS MR. JACOBSEN FORCEFULLY, AND VERY EFFECTIVELY, I MIGHT ADD, HAS POINTED OUT THAT THERE ARE ENOUGH DIFFERENCES IN THE COMMISSION RATES AND THINGS LIKE THAT, THAT WE MAY FACE SOME CHALLENGES DOWN THE ROAD ESTABLISHING WHAT THOSE DAMAGES ARE.

ESPECIALLY, AND I'M SURE YOUR HONOR IS FAMILIAR WITH THIS LINE OF IMPORTANT JURISPRUDENCE IN ALL BODIES OF THE LAW THAT EFFECTIVELY HOLD, AND THIS IS THE MEISTER CASE, AND IN THIS -- IN THIS CIRCUMSTANCE THAT ANY RESIDUAL RISK OF UNCERTAINTY IN CALCULATING NET PROFITS THAT HAS TO BE LAID AT THE WRONGDOER'S FEET, BECAUSE IT CAN'T BE HELD AGAINST THE PLAINTIFFS, AND SO, IN LIGHT OF THAT HOLISTIC ANALYSIS OF THE WAY THAT WE ARE GOING TO ESTABLISH, AT A MINIMUM, WHAT THE PLAINTIFFS RECOVER HERE, NOT GOING TO CALL IT DAMAGES, THERE IS A WORLD IN WHICH WE CAN CERTAINLY IMAGINE THAT THE MOST CERTAIN MEASURE OF THE AMOUNT THE PLAINTIFF SHOULD GET BACK IS THE AMOUNT OF COMMISSIONS THAT

PAYPAL GOT. THAT IS READILY ASCERTAINABLE FROM THE TRANSACTION DATA, WE HOPE, AND WE THINK, AND IT -- ALTHOUGH IN SOME CIRCUMSTANCES IT MAY RESULT IN THAT PARTICULAR PLAINTIFF RECOVERING A BIT LESS THAN THEY MIGHT IF THEY WERE ABLE TO GO AND PURSUE THAT FULL LEGAL DAMAGE. YOUR HONOR, OF COURSE, KNOWS THAT SOMETIMES THOSE ARE THE KINDS OF CHOICES THAT PARTIES IN LITIGATION HAVE TO MAKE.

**THE COURT:** SURE.

**MS. SHARP:** AND SO THIS REALLY IS AN UNUSUAL CIRCUMSTANCE IN WHICH THAT DIFFERENCE BETWEEN -- AND WE'RE WITH YOU, YOUR HONOR, RESTITUTION UNDER THE UCL, THAT DOESN'T GET TO BE A SIDECAR TO LEGAL CLAIMS, WE UNDERSTAND THAT. BUT NON-RESTITUTIONARY DISGORGEMENT, WHICH IS AVAILABLE AS A REMEDY FOR UNJUST ENRICHMENT, HERE IT'S AN UNUSUALLY GOOD FIT, AND I'LL CONFESS WE'VE LEARNED A LOT IN THIS CASE BECAUSE OF THAT.

AND THE RESTATEMENT FIRST TO THE EXTENT THE DEFENDANT SEES ON THIS IDEA OF CORRESPONDING LOSS AND SUGGESTS THAT MAYBE THAT DIFFERENTIAL IN THE DIFFERENCE BETWEEN MORE DAMAGES VERSUS LESS THAN RESTITUTIONARY DISGORGEMENT. CORRESPONDING LOSS DOESN'T SUGGEST THAT IT NEEDS TO BE MORE OR LESS. RESTATEMENT ONE OF -- THE FIRST RESTATEMENT OF RESTITUTION, SECTION ONE, TELLS US THAT THE SUPREME COURT ACTUALLY RATIFIED THAT LITTLE PORTION OF THE RESTATEMENT JUST THIS MORNING, SO JUSTICE GORSUCH IS AT LEAST ON THE SAME PAGE THERE, THOUGH THAT WAS AN SEC CASE.

AND THE LAST THING I'LL SAY IS THAT CALIFORNIA GASOLINE HAS BEEN FOLLOWED. WE RAN OUT OF SPACE IN OUR REPLY BRIEF, BUT THERE ARE AT LEAST A FEW DECISIONS THAT HAVE FOLLOWED JUDGE CORLEY'S LEAD THERE WITH THE UNDERSTANDING THAT THOSE NON-RESTITUTIONARY DISGORGEMENT CASES ARE DIFFERENT, MAGISTRATE JUDGE KIM IN A DECISION CALLED CLARK VERSUS YODLEE, AND THAT ONE, UNFORTUNATELY, IS NOT PUBLISHED, BUT I DO HAVE A CITE, IF IT'S HELPFUL TO THE -- TO THE COURT, THAT'S CASE NUMBER 20-CV-5991, DOCKET NUMBER 356, AND THAT, OF COURSE, IS AN ND CAL, SO --

**THE COURT:** 356?

**MS. SHARP:** YES, 356, THANK YOU.

AND IN THAT, I WOULD NOTE THAT JUDGE KIM HAS A, WHAT I THOUGHT WAS A USEFUL TURN OF PHRASE, THAT NON-RESTITUTIONARY DISGORGEMENT IS A CATEGORICALLY DIFFERENT FORM OF RELIEF. IT'S, IT'S NOT LEGAL DAMAGES, AND WE'LL CONFESS, IT'S NOT YOUR STANDARD EQUITABLE SORT OF RESTITUTIONARY RELIEF, EITHER. IT'S SOMETHING DIFFERENT, BUT THERE'S A WELL-WORN PATH TO IT. AND AGAIN, THIS CASE MAY VERY WELL BE AN EXCELLENT FIT FOR IT.

I'LL STOP THERE. I AM HAPPY TO CONTINUE ON WITH UNJUST ENRICHMENT, KIND OF WENT LARGE. WE TALKED A LITTLE BIT ABOUT CONTRACTUAL PRIVITY.

WOULD IT BE USEFUL IF I TALKED TO YOUR HONOR A LITTLE BIT ABOUT --

**THE COURT:** WELL, THAT GOES TO THE MERITS OF THE

PLAUSIBILITY OF THE CLAIM.

**MS. SHARP:** I COMPLETELY AGREE, BUT THERE IS AN ARGUMENT THAT IS MADE BY PAYPAL THAT THE EXISTENCE OF THE CONTRACTS HERE SOMEHOW BARS THE UNJUST JUDGMENT CLAIM, AND THAT'S NOT THE CASE, BECAUSE OF COURSE HERE, AS YOUR HONOR FOUND PREVIOUSLY, WITH REGARD TO THE MOTION TO COMPEL ARBITRATION, WE DO NOT HAVE A CONTRACT BETWEEN THESE PARTIES.

**THE COURT:** YES.

**MS. SHARP:** NOW, THE DEFENDANTS, IN THEIR REPLY, POINT OUT, WELL, THE LAW IS NOT THAT STRAIGHTFORWARD.

**THE COURT:** WELL --

**MS. SHARP:** SOMETIMES THERE ARE OTHER CIRCUMSTANCES. SO LET'S TALK ABOUT THOSE OTHER CIRCUMSTANCES IN THE CALIFORNIA MEDICAL VERSUS AETNA CASE. AS DEFENDANTS POINT OUT, THERE WERE EXPRESS BINDING, EXCUSE ME, IN THE CASE IT SAYS THERE ARE EXPRESS BINDING AGREEMENTS THAT EXIST AND DEFINE THE PARTY'S RIGHTS. SO THAT'S A CIRCUMSTANCE IN WHICH THE PLAINTIFF IS KIND OF TRYING TO HAVE IT BOTH WAYS, ASSERT OR -- ENFORCE A CONTRACT, AND IF THAT'S UNSUCCESSFUL, THEN TRY TO GO FOR THE EQUITABLE RELIEF. THAT'S NOT WHAT'S HAPPENING HERE. WE DON'T HAVE PRIVITY WITH PAYPAL.

SAME THING GOES FOR THE PARACOR CASE OUT OF THE NINTH CIRCUIT THAT WE CITE, AND THAT TRYING TO HAVE IT BOTH WAYS PROBLEM IS THE PROBLEM IN THE JACOBS CASE, WHICH, YOUR HONOR, CITED IN YOUR ORDER, BUT OF COURSE DIDN'T HAVE THE

BENEFIT OF THE LANGUAGE OF OUR CONTRACTS AT THAT TIME, NOR THIS CONTEXT.

LAST THING I'LL SAY, I HEARD A SUGGESTION ONCE AGAIN THAT WE'RE SUING THE WRONG PARTY HERE. WE SHOULD BE SUING THE MERCHANTS INSTEAD. FROM OUR PERSPECTIVES, THE MERCHANTS ARE UNWITTING PARTICIPANTS IN PAYPAL SCHEME, AS YOU POINTED OUT, AT MOST, IT'S NOT THAT THEY'RE THE ONES SITTING THERE MAKING THE DECISION, AND THE NINTH CIRCUIT AUTHORITY IS QUITE CLEAR ON THIS, THE MORT VERSUS UNITED STATES DECISION, WE CITE IT IN OUR PAPERS, AND IT'S ALSO CITED FAVORABLY IN SONNER, AND IT'S CITED FAVORABLY IN THE MCKESSON CASE THAT THE DEFENDANTS CITE, AND IN MORT, I'LL READ THE MOST IMPORTANT LANGUAGE FROM OUR PERSPECTIVE, WHICH IS THAT EQUITABLE RELIEF SHOULD NOT BE DENIED, HOWEVER, UNLESS THE AVAILABLE LEGAL REMEDY IS AGAINST THE SAME PERSON FROM WHOM THE EQUITABLE RELIEF IS SOUGHT.

SO TO THE EXTENT THAT THERE'S A SUGGESTION THAT OUR EQUITABLE CLAIMS SHOULDN'T PROCEED, BECAUSE THERE MAY BE SOME LEGAL RELIEF SOMEWHERE AVAILABLE AGAINST THOSE MERCHANTS. WE DON'T SEE THAT AS SQUARED WITH NINTH CIRCUIT LAW. THE DEFENDANTS DO CITE THE MCKESSON CASE, BUT AS THE NINTH CIRCUIT POINTED OUT IN SONNER AT FOOTNOTE FIVE, MCKESSON ITSELF RELIED ON DELAWARE LAW, NOT FEDERAL COMMON LAW PRINCIPLES, AND THE NINTH CIRCUIT FOUND IT WAS NOT BOUND BY THE MCKESSON ANALYSIS.

SO THE ONLY THING I THINK MAYBE LEFT IS INJUNCTIVE RELIEF, YOUR HONOR. IF YOU'D LIKE TO HEAR FROM ME ON THAT A

BIT. OKAY. YEAH. PARACOR, YOUR HONOR, MY CO-COUNSEL, JUST I MIGHT HAVE MISSPOKEN, BUT THE PARACOR CASE ALSO INVOLVES A WEB OF CONTRACTS, AND I COULD READ TO YOUR HONOR A LENGTHY PORTION OF THE DECISION THAT MAKES QUITE CLEAR THE PARTIES WERE ALL WELL AWARE OF THE TERMS OF THOSE CONTRACTS, SO THERE WAS ONE CONTRACT THAT WASN'T SIGNED, IT WAS A VERY COMPLEX WEB OF DEBENTURE CONTRACTS, THERE WAS ONE THAT WASN'T SIGNED, BUT IF READING THE OPINION, IT'S CLEAR THE PARTIES WERE TRYING TO ENFORCE THOSE CONTRACTUAL RIGHTS, AND EVERYBODY KNEW WHAT THEY WERE FIGHTING OVER.

INJUNCTION, YOUR HONOR, TO THE EXTENT THERE'S A QUESTION ABOUT WHETHER THE COURT CAN ALLOW INJUNCTIVE RELIEF TO PROCEED HERE. I DON'T NEED TO DIRECT YOUR HONOR TO YOUR OWN DECISION, CASTILLO VERSUS WALMART, WHERE AN INJUNCTIVE CLAIM CAN SURVIVE, AND IN FACT, DESPITE SONNER, CAN SURVIVE, BECAUSE, OF COURSE, INJUNCTIVE RELIEF IS NOT A LEGAL REMEDY, AND SO THAT'S A COMPLETELY DIFFERENT BALL OF WAX.

**THE COURT:** YES.

**MS. SHARP:** LAST THING I'LL SAY IS, TO THE EXTENT THERE WAS A SUGGESTION THAT PLEADING IN THE ALTERNATIVE IS NOT PERMISSIBLE, IN THE SENSE --

**THE COURT:** I DON'T HAVE A PROBLEM, IT JUST NEEDS TO BE ADEQUATE PLEADING.

**MS. SHARP:** RIGHT, AND IN ROSS VERSUS SHARK NINJA, YOUR HONOR, HELD THAT AS WELL. YES, IF THERE'S ANYTHING

FURTHER I COULD RESPOND TO, YOUR HONOR, I'D BE PLEASED TO DO SO.

**THE COURT:** NO, THANK YOU.

**MS. SHARP:** THANK YOU.

**THE COURT:** ALL RIGHT, LET ME THEN RETURN TO MR. JACOBSEN FOR FINAL COMMENTS.

IT'S GETTING A LITTLE LATE, SO I'LL ASK YOU TO BE SUCCINCT.

**MR. JACOBSEN:** I'M GOING TO AIM TO IMPRESS YOU WITH MY BREVITY, YOUR HONOR. JUST A COUPLE OF POINTS THAT I WANT TO MAKE.

**THE COURT:** I APPRECIATE THAT.

**MR. JACOBSEN:** FIRST OF ALL, WITH RESPECT TO INJUNCTIVE RELIEF, WE WERE TALKING ABOUT THAT BEFORE. I'VE GIVEN SOME THOUGHT TO IT, AND MORE ACCURATELY, MY COLLEAGUES HAVE REMINDED ME THEY DO REQUEST INJUNCTIVE RELIEF FOR THEIR CAFA CLAIM, SO INJUNCTIVE RELIEF IS AVAILABLE TO THEM. THAT'S AT PARAGRAPH 317. THAT'S WHERE THEY REQUEST THE INJUNCTIVE RELIEF.

IN ADDITION, THEY ALLEGE ONLY MONETARY HARM, THAT IS NOT IRREPARABLE HARM, WHICH IS REQUIRED FOR INJUNCTIVE RELIEF, THEY ARE NOT ENTITLED TO INJUNCTIVE RELIEF, SO THEY -- WE BELIEVE THEY CAN'T PROCEED ON THE UCL CLAIM ON THAT GROUND. SO THEY, AN INJUNCTION IS UNAVAILABLE TO THEM.

WITH RESPECT TO CAFA, I WANT TO BE MORE SPECIFIC ABOUT THE

PERMISSIONS. IF YOU GO BACK TO THEIR FIRST AMENDED COMPLAINT, WE COULD TALK ABOUT SICOR, HOW, IF YOU'RE GOING TO KIND OF JUST IGNORE SOMETHING IN YOUR FIRST AMENDMENT COMPLAINT, YOU HAVE TO EXPLAIN WHY, AND SICOR, THE NINTH CIRCUIT, SAYS YOU GOT TO EXPLAIN IT IN YOUR PLEADING, YOU CAN'T DO IT IN YOUR OPPOSITION.

IN THE FIRST AMENDMENT COMPLAINT, THEY ADMITTED IN PARAGRAPH 133 THAT PAYPAL HAD PERMISSION TO QUOTE QUERY AND MODIFY COOKIES, SO THERE WAS MORE EXTENSIVE, THERE WAS MORE SPECIFICITY, YOUR HONOR, THAN JUST SIMPLY SAYING EXTENSIVE PERMISSIONS, THEY GO THROUGH AND THEY LIST IT.

I'M GOING TO TAKE ONE MORE STAB AT THE LANGUAGE IN DELL, BUT I DON'T WANT TO INVITE IRE IF YOU WANT ME TO --

**THE COURT:** NO, IF YOU WANT TO.

**MR. JACOBSEN:** ALL RIGHT, SO SECTION 2.5 OF THE DELL CONTRACT MAKES CLEAR THAT A QUALIFYING LINK CAN ORIGINATE FROM A BROWSER EXTENSION LIKE HONEY, THAT'S OUR POSITION. AND I WANT TO EXPLAIN WHY. IT CAN BE THE LAST LINK TO THE DELL SITE, SO LONG AS THIS PROCESS OF LINKING IS DISCLOSED TO DELL. THE SWAPPING OF LINKS IS HOW THIS ALL WORKS, AND AFFILIATE MARKETERS THEMSELVES SWAP OUT LINKS WHEN THEIR LINK IS THE LAST ONE CLICKED.

SO, A READING TO THE CONTRARY WOULD MEAN THAT HONEY CAN NEVER OBTAIN A COMMISSION, AND THAT THERE WOULD BE NO NEED FOR STAND DOWN, BECAUSE YOU CAN HAVE -- YOU CAN NEVER SWAP OUT

LINKS, AND THEY MAKE REFERENCE IN THE DELL CONTRACT. AND AGAIN, I APOLOGIZE FOR THE MISCITATION TO SECTION 2.9, HIGHLIGHTED HERE, SECTION 2.11. AS LONG AS THIS IS DISCLOSED TO DELL, YOUR MARKETING PLATFORM MEANS ANY MEDIA CHANNEL, INCLUDING BUT NOT LIMITED TO A WORLDWIDE WEBSITE, CAN SPAM COMPLIANT E-MAIL, PAYPAL, OR, SORRY, PAY-PER-CLICK SEARCH OR OTHER MEDIA BUY OR APPROVED AD-SUPPORTED SOFTWARE, AND THAT YOU WILL USE TO LINK TO THE DELL SITE AS IDENTIFIED IN YOUR PROGRAM APPLICATION FORMS. THAT'S WHERE IT'S CLEAR, YOUR HONOR. AS LONG AS IT'S DISCLOSED, THAT'S FINE. AND, AGAIN, THAT'S SECTION 2.11 TO THE DELL CONTRACT AT EXHIBIT A, YOUR HONOR.

I WOULD ALSO NOTE, WITH RESPECT TO CAFA, THERE WAS A LOT OF DISCUSSION ON HARM, AS YOU POINTED OUT IN THE APPLE CASE, WHICH WAS VERY PROMINENT IN MY FRIEND'S DISCUSSION, THE COMPUTER THERE, THE PHONE, IT WAS LOSING ITS BATTERY, THAT WAS A TECHNOLOGICAL HARM, WHEREAS IT USED TO BE ABLE TO LAST FOR THREE HOURS, AS A RESULT OF WHAT HAPPENED WITH THE IOS UPDATE, IT COULD ONLY LAST FOR TWO.

I DID NOT HEAR MY COLLEAGUE ACTUALLY LIST A CASE OTHER THAN CAPITAL ONE, THAT HAS FACTS ANALOGOUS TO THIS, AND AS I SAID BEFORE, WE JUST THINK CAPITAL ONE JUST GOT IT WRONG UNDER VAN BUREN.

YOUR HONOR, UNLESS EVERYBODY WANTS TO SKIP LUNCH, I'M VERY HAPPY TO CONCLUDE.

AGAIN, THANK YOU VERY MUCH FOR HEARING US OUT.

**THE COURT:** ALL RIGHT, THANK YOU.

WELL, THIS HAS BEEN VERY HELPFUL. I THINK THAT THE CFAA CLAIMS ARE REALLY COMPLICATED HERE. I WANT TO GO BACK AND LOOK UNDER THE TWO DIFFERENT PRONGS. I DON'T THINK FURTHER AMENDMENT IS GOING TO BE NEEDED. I THINK THESE CLAIMS ARE EITHER IN OR OUT AT THIS POINT. I DON'T THINK IT SERVES ANYONE ANYTHING AT THIS JUNCTURE OF THE CASE TO STILL BE MIRED IN PLEADING STANDARDS WHEN DISCOVERY HAS MOVED ALONG, AND FRANKLY, I DON'T KNOW WHEN YOUR CLASS CERTIFICATION MOTION IS DUE, BUT IT MAY BE SOON.

**MS. SHARP:** YES, SEPTEMBER, YOUR HONOR.

**THE COURT:** SEPTEMBER, YES. BECAUSE THE TIME GOES FAST.

THIS IS GOING TO TAKE ME A LITTLE BIT OF TIME TO WORK THROUGH. I DON'T MEAN ALL SUMMER, BUT I MEAN IT'S NOT - YOU'RE NOT GOING TO GET THIS NEXT WEEK IN THE MAIL, SO PLEASE INDULGE ME THERE.

BUT THIS REALLY HAS BEEN VERY HELPFUL, THANK YOU FOR THE HARD WORK THAT ALL OF YOU PUT IN.

I THINK WE'RE CONCLUDED.

**MR. LICHTMAN:** THANK YOU.

**MS. SHARP:** THANK YOU, YOUR HONOR.

**MR. JACOBSEN:** THANK YOU, YOUR HONOR.

(COURT CONCLUDED 12:26 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.



TIFFANY SALINAS-HARWELL
CERTIFICATE NUMBER 971863

DATED: JUNE 4, 2026