**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

*IN RE PAYPAL HONEY BROWSER EXTENSION LITIGATION*

Case No. 5:24-cv-09470-BLF

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Judge: Hon. Beth Labson Freeman
Date: March 18, 2027
Time: 9:00 a.m.
Courtroom: 1, 4th Floor

**REDACTED**

## TABLE OF CONTENTS


NOTICE OF MOTION AND MOTION ........ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........ 2

I. INTRODUCTION ........ 2

II. STATEMENT OF THE ISSUES TO BE DECIDED ........ 3

III. STATEMENT OF FACTS ........ 3

- A. The Affiliate Marketing Industry ........ 3
- B. Affiliate Referrals Are Tracked Using Unique Links ........ 4
- C. "Last Click" Attribution and Affiliate Marketing ........ 5
- D. Plaintiffs' Contracts with Class Merchants ........ 5
- E. Honey Browser Extension Tracks Consumer Data ........ 5
- F. Honey Overwrites the Affiliate IDs of Other Affiliate Marketers ........ 6
- G. Honey Intentionally Subverts Stand Down ........ 8

IV. LEGAL STANDARD ........ 9

V. ARGUMENT ........ 9

- A. The Proposed Class and Subclasses Are Well Defined and Plaintiffs Have Standing ........ 10
- B. The Requirements of Rule 23(a) Are Met ........ 11
  - 1. The Class and Subclasses Are Sufficiently Numerous ........ 11
  - 2. Commonality is Satisfied ........ 11
  - 3. Plaintiffs' Claims are Typical of the Claims of Other Class Members ........ 12
  - 4. Plaintiffs and Their Counsel Will Adequately Represent the Class ........ 12
- C. Common Issues Predominate for Each of Plaintiffs' Claims. ........ 12
  - 1. The Computer Fraud Claims Can Be Adjudicated on a Classwide Basis ........ 13
    - a. Did PayPal act knowingly and intentionally? ........ 13
    - b. Did PayPal cause damage to class members' Affiliate IDs without authorization? ........ 14
    - c. Did PayPal's conduct result in "damage" and "loss"? ........ 14
  - 2. The Tortious Interference with Contract Claim Turns on Common Proof ........ 16
    - a. California Law Applies to the Tortious Interference with Contract Claim ........ 16
    - b. Each Element for the Tortious Interference with Contract Claims Can be Resolved Through Common Proof. ........ 17
- D. A Single Class Proceeding is Superior to Individual Adjudication. ........ 20

E. Monetary Relief Can Be Calculated on a Class-wide Basis ........ 21

a. Disgorgement Can Be Calculated on a Class-wide Basis Through PayPal's Data ........ 21

b. Compensatory Lost Commissions Can Also be Determined for the Class and Subclasses ........ 23

F. The Class and Subclasses Can Alternatively Be Certified as to Key Liability Issues Under Rule 23(c)(4). ........ 24

G. The Class Can Be Certified to Seek Injunctive Relief Under Rule 23(b)(2). ........ 24

VI. CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Cases**

*Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241 (N.D. Cal. 2012) .......... 11

*Allen v. Hyland's Inc.*, 300 F.R.D. 643 (C.D. Cal. 2014) .......... 16

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) .......... 9, 23

*Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472 (5th Cir. 2008) .......... 23

*Beaver v. Omni Hotels Mgmt. Corp.*, 2023 WL 6120685 (S.D. Cal. Sept. 18, 2023) .......... 19

*Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355 (N.D. Cal. 2011) .......... 20, 21

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) .......... 21

*Bush v. Rust-Oleum Corp.*, 2024 WL 422080 (N.D. Cal. Feb. 5, 2024) .......... 25

*Cai v. CMB Exp. LLC*, 2024 WL 2334509 (C.D. Cal. Apr. 4, 2024) .......... 24

*Clay v. CytoSport, Inc.*, 2018 WL 4283032 (S.D. Cal. Sept. 7, 2018) .......... 16

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .......... 21

*Creative Computing v. Getloaded.com LLC*, 386 F.3d 930 (9th Cir. 2004) .......... 21

*DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223 (9th Cir. 2024) .......... 13

*Evans v. Linden Research Inc.*, 2012 WL 5877579 (N.D. Cal. Nov. 20, 2012) .......... 21

*Frasco v. Flo Health, Inc.*, 349 F.R.D. 557 (N.D. Cal. 2025) .......... 14

*GHK Assocs. v. Mayer Grp., Inc.*, 224 Cal. App. 3d 856 (1990) .......... 24

*Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247 (S.D. Cal. 2023) .......... 13, 18, 24

*Hernandez v. WM Wholesale, LLC*,
2026 WL 1195766 (C.D. Cal. Mar. 16, 2026) ........ 25

*In re Apple & AT&TM Antitrust Litig.*,
596 F. Supp. 2d 1288 (N.D. Cal. 2008) ........ 15

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 22

*In re Med. Cap. Sec. Litig.*,
2011 WL 5067208 (C.D. Cal. July 26, 2011) ........ 19

*In re Rubber Chemicals Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ........ 24

*In re Toys R Us, Inc. Privacy Litig.*,
2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) ........ 16

*In re: Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ........ 11

*Ixchel Pharma, LLC v. Biogen, Inc.*,
9 Cal. 5th 1130 (2020) ........ 19

*Kalow & Springut, LLP v. Commence Corp.*,
272 F.R.D. 397 (D.N.J. 2011), *on reconsideration*, 2011 WL 3625853 (D.N.J. Aug. 15, 2011) ........ 21

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) ........ 16

*Kellman v. Spokeo, Inc.*,
2024 WL 2788418 (N.D. Cal. May 29, 2024) ........ 25

*Kumandan v. Google LLC*,
2023 WL 8587625 (N.D. Cal. Dec. 11, 2023) ........ 10

*Kwikset Corp. v. Superior Ct.*,
51 Cal. 4th 310 (2011) ........ 11

*Liu v. Sec. & Exch. Comm'n*,
591 U.S. 71 (2020) ........ 22

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ........ 13, 21, 23

*Margolis v. Apple Inc.*,
743 F. Supp. 3d 1124 (N.D. Cal. 2024) ........ 13, 14

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ........ 16

*Melo-Tone Vending, Inc. v. Sherry, Inc.*,
656 N.E.2d 312 (Mass. App. Ct. 1995) ........ 23

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
605 F. Supp. 3d 1218 (N.D. Cal. 2022) ........ 13

*Nolen v. PeopleConnect, Inc.*,
--- F.4th ----, 2026 WL 2871735 (9th Cir. Sept. 24, 2026)....10

*NuVasive, Inc. v. Madsen Med., Inc.*,
2016 WL 3166834 (S.D. Cal. June 7, 2016)....22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)....9, 13, 16

*Overka v. Am. Airlines, Inc.*,
265 F.R.D. 14 (D. Mass. 2010)....17, 21

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014)....24

*Quelimane Co. v. Stewart Title Guar. Co.*,
19 Cal. 4th 26 (1998)....19

*Rodriguez v. Google LLC*,
2024 WL 38302 (N.D. Cal. Jan. 3, 2024)....21, 22

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2010)....12

*Rosenthal & Rosenthal of California, Inc. v. Hilco Trading, LLC*,
2020 WL 12948055 (C.D. Cal. Dec. 29, 2020), *aff'd,* 2022 WL 18906 (9th Cir. Jan. 3, 2022)....18

*So v. HP, Inc.*,
2023 WL 4596778 (N.D. Cal. July 17, 2023)....15

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020)....23

*Sripetch v. Sec. & Exch. Comm'n*,
608 U.S. 555 (2026)....22

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003)....12

*Torres v. Prudential Fin., Inc.*,
2024 WL 4894289 (N.D. Cal. Nov. 26, 2024)....14

*U.S. Sec. & Exch. Comm'n v. Crowd Mach., Inc.*,
2023 WL 8438553 (N.D. Cal. Dec. 5, 2023)....23

*United States v. Drew*,
259 F.R.D. 449 (C.D. Cal. 2009)....13

*United States v. Nosal*,
844 F.3d 1024 (9th Cir. 2016)....14

*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996)....24

*Van Buren v. United States*,
593 U.S. 374 (2021)....15

*Vizcarra v. Unilever United States, Inc.*, 2023 WL 2364736 (N.D. Cal. Feb. 24, 2023) .....20

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).....11

*Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906 (2001) .....16

*Whatsapp Inc. v. NSO Grp. Techs. Ltd.*, 2025 WL 2961368 (N.D. Cal. Oct. 17, 2025) .....25

*Wortman v. Air New Zealand*, 326 F.R.D. 549 (N.D. Cal. 2018).....10

**Statutes**

18 U.S.C. § 1030(a)(4).....3

18 U.S.C. § 1030(a)(5)(A) .....14, 15, 16

18 U.S.C. § 1030(a)(5)(C) .....4

18 U.S.C. § 1030(c)(4)(A)(i)(I) .....17

18 U.S.C. § 1030(e)(11).....16

18 U.S.C. § 1030(e)(8).....16

18 U.S.C. § 1030(g) .....26

Cal. Pen. Code § 502(c)(1) .....4

Cal. Pen. Code § 502(c)(4) .....4

Cal. Penal Code § 502(c)(8).....14

**Other Authorities**

Restatement (Second) of Torts § 766, com. j (1979).....16, 17, 18, 19

Restatement (Second) of Torts § 767, com. c (1979) .....18

Restatement (Third) of Restitution & Unjust Enrichment § 44 (Am. L. Inst. 2011).....22

**Rules**

Fed. R. Civ. P. 23(a) .....1, 3, 9

Fed. R. Civ. P. 23(a)(1).....11

Fed. R. Civ. P. 23(b) .....9

Fed. R. Civ. P. 23(b)(2).....1, 3, 24, 25

Fed. R. Civ. P. 23(b)(3).....1, 12

Fed. R. Civ. P. 23(c)(4).....1, 3, 24

Fed. R. Civ. P. 23(g)(1)(A).....12

Fed. R. Civ. P. 39(c)(1).....22

## GLOSSARY

| Term | Description |
|---|---|
| **Affiliate Commission** | A non-zero amount of money paid to Affiliate Marketers for referrals leading to purchases of products or services |
| **Affiliate Marketer** | An individual or entity—but not a shopping browser extension or software publisher—that has partnered with a Merchant to promote the Merchants' products or services in return for remuneration |
| **Affiliate ID** | The unique identifier that allows the Merchant and Affiliate Network to track and reward traffic and sales generated by a specific Affiliate Marketer |
| **CDAFA** | California Comprehensive Computer Data Access and Fraud Act |
| **CFAA** | Computer Fraud and Abuse Act |
| **Class Merchant** | A merchant identified in Appendix A and Appendix B, which Plaintiffs reserve the right to update based on additional discovery |
| **PayPal** | PayPal, Inc. and PayPal Holdings, Inc. |
| **Purchase** | A transaction completed by a consumer |
| **PayPal's Structured Data** | The transactional data produced by PayPal |
| **Sharp Decl.** | Declaration of Dena C. Sharp in Support of Class Certification Motion |
| **California-based** | California-based refers to an individual or entity domiciled in California |
| **U.S.-based** | U.S.-based refers to an individual or entity domiciled in the United States |
| **UCL** | California's Unfair Competition Law |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on March 18, 2027 at 9:00 a.m., before the Honorable Beth Labson Freeman of the United States District Court for the Northern District of California, Plaintiffs Aaron Ramirez, Ahntourage Media LLC, Angry Snowboarder, Brevard Marketing LLC, Dan Becker LLC, Daniel Lachman, Justin Tech Tips LLC, Red Beard Studios LLC, and Storm Productions LLC, move the Court to certify the Classes specified below under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) or, alternatively, 23(c)(4).

***Nationwide Class:*** *All Plaintiffs, asserting CFAA claims:*

> All U.S.-based Affiliate Marketers whose Affiliate ID was the last non-PayPal Affiliate ID that appeared in a referral URL recorded in a Honey-tracked session at a Class Merchant within 24 hours of a Purchase, where the Honey Browser Extension subsequently replaced the Affiliate ID with PayPal's and PayPal received an Affiliate Commission for the Purchase.

***Tortious Interference Subclass****: All Plaintiffs, asserting tortious interference with contract claims:*

> U.S.-based Affiliate Marketers in all states and in Washington, D.C., but not in Louisiana, whose Affiliate ID was the last non-PayPal Affiliate ID that appeared in a referral URL recorded in a Honey-tracked session at a Class Merchant within 24 hours of a Purchase, where the Honey Browser Extension subsequently replaced the Affiliate ID with PayPal's and PayPal received an Affiliate Commission for the Purchase.

***California Subclass****: Plaintiff Aaron Ramirez, asserting CDAFA and UCL claims:*

> All California-based Affiliate Marketers whose Affiliate ID was the last non-PayPal Affiliate ID that appeared in a referral URL recorded in a Honey-tracked session at a Class Merchant within 24 hours of a Purchase, where the Honey Browser Extension subsequently replaced the Affiliate ID with PayPal's and PayPal received an Affiliate Commission for the Purchase.

Excluded from the Class and Subclasses are Defendants, their employees, agents and assigns; any members of the judiciary to whom this case is assigned, their respective court staff, members of their immediate families; and Plaintiffs' counsel. For purposes of Rule 23(b)(2), the Class and Subclasses are limited to members with a current affiliate agreement with a Class Merchant.

This motion is based upon this Notice of Motion and Motion, the incorporated Memorandum of Law; the Sharp Declaration; the Declarations of Plaintiffs; the expert reports of Jonathan Jaffe, Zubair Shafiq, Carl Mela, and Rich Kahn; the proposed trial plan and proposed verdict form; the evidence submitted in support of the motion and on reply, and any further argument presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

When a shopper clicks a creator's link to a merchant's website and buys a product, the creator has earned a referral fee from the merchant. PayPal's Honey extension takes it. At checkout, Honey opens a hidden tab, fakes a referral, and replaces the creator's tracking code with PayPal's, so the merchant pays PayPal instead. Every step is written in PayPal's source code and recorded in PayPal's own data. Plaintiffs ask the Court to certify the Class and Subclasses so that one trial can decide what PayPal's code did and what PayPal owes for it.

Plaintiffs and Class members are Affiliate Marketers (journalists, bloggers, podcasters, YouTubers, and other creators) who have referral agreements with e-commerce merchants to promote a Merchant's products and use unique "affiliate links" to refer consumers to the Merchant's website. If the consumer completes a purchase, the Class member earns a referral fee when its link was the last one used to refer the consumer within a specified period (e.g., 24 hours) before the purchase.

Since at least 2016, Honey has surreptitiously swapped out Affiliate Marketers' Affiliate IDs to divert millions of dollars in commissions to PayPal, which owns and operates Honey. PayPal knew its conduct was wrong but continued anyway, noting that [redacted]. Plaintiffs' computer fraud (CFAA and CDAFA), tortious interference, and California statutory claims each turn on PayPal's conduct and how Honey works, and Honey has worked the same way across the Class. PayPal's Structured Data [redacted].

Common issues predominate. Each core element of liability can be determined, up or down, with class-wide evidence. The question at the heart of each claim is whether PayPal improperly overwrote Class members' Affiliate IDs and diverted earned commissions, and the answer turns on PayPal's source code and Structured Data, including its records of when Honey declined to follow industry-standard stand-down rules. PayPal employees knew that Honey could "[redacted]" and configured Honey to do just that, inserting PayPal's Affiliate IDs through a Secret Tab designed to be "[redacted]." Whether Class members are entitled to commissions

as the last referring affiliate turns on materially identical provisions in their contracts with the Merchants included in the class definition ("Class Merchants"). *See also* Appendix A (summarizing attribution language and other key provisions in Class Merchant contracts); Appendix B (listing Class Merchants identified to date). Whether PayPal was "authorized" under the CFAA to overwrite Affiliate IDs on consumers' computers turns on PayPal's uniform terms of use and privacy policy. Monetary relief, whether disgorgement of PayPal's wrongful profits or, alternatively, Class members' lost commissions, can be reliably calculated class-wide using PayPal's data.

A class proceeding is superior and manageable. Any individual recovery is small compared to the cost of litigating the technical and legal issues here, and the proposed trial plan and verdict form confirm the manageability of a class trial. Even if PayPal now disputes that California law governs (it hasn't before), the elements of tortious interference, rooted in the Restatement (Second) of Torts, are materially the same in California, the District of Columbia, and the 48 other states in the Subclass.

Plaintiffs have current agreements with Class Merchants that entitle them to Affiliate Commissions and Honey continues to overwrite the Affiliate IDs of Affiliate Marketers and divert Affiliate Commissions to PayPal. The requirements of Rule 23(b)(2) are therefore satisfied, because an order requiring PayPal to cease operating Honey to overwrite the Affiliate IDs of Affiliate Marketers and divert Affiliate Commissions will provide relief to the Class and Subclasses as a whole.

The Court should certify the proposed Class and Subclasses.

## II. STATEMENT OF THE ISSUES TO BE DECIDED

1. Should the Court certify the Class, Tortious Interference Subclass, and California Subclass, under Rule 23(b)(3) and Rule 23(b)(2), or, alternatively, Rule 23(c)(4)[1]?

## III. STATEMENT OF FACTS

### A. The Affiliate Marketing Industry

In affiliate marketing, online merchants partner with Affiliate Marketers, conventionally through

---

[1] Plaintiffs do not seek to certify their claims for tortious interference with prospective economic advantage; violation of 18 U.S.C. §§ 1030(a)(4) and (a)(5)(C) (CFAA); Cal. Pen. Code § 502(c)(1) and (c)(4) (CDAFA); the Washington Consumer Protection Act, or unjust enrichment; nor do they seek to appoint Stuber Holdings as a class representative.

intermediaries known as "affiliate networks," to promote the merchant's products in exchange for a commission on purchases derived from the affiliate's referral. *See* Kahn Rpt. ¶ 15; Mela Rpt. ¶¶ 42, 45; Ex. 7 (Rakuten Glossary of Terms for Affiliate Marketing at -061).

Affiliate marketing ordinarily operates on a performance-based referral model. Mela Rpt. ¶¶ 42-45, 56. Merchants pay affiliates for results: when an affiliate's marketing brings a consumer to the merchant's website and produces a completed transaction. *See id.* ¶¶ 42, 45, 50. Affiliates invest in producing content, building audiences, and directing consumers to merchants precisely because they are paid when that effort produces a sale. *See id.* ¶¶ 56-59, 78-80. In 2024, affiliate marketing spending was around $13.6 billion and affiliate-related e-commerce sales totaled roughly $113 billion. *See id.* ¶ 56.

## B. Affiliate Referrals Are Tracked Using Unique Links

Affiliate networks serve as intermediaries between merchants and affiliates, administering referral tracking, performance reporting, and commission payments. Mela Rpt. ¶ 64; Kahn Rpt. ¶ 16. Each participating affiliate has a unique "Affiliate ID" that reflects its relationship with a specific network or merchant and is used to identify who should receive credit for a sale. *See* Kahn Rpt. ¶¶ 17-19; *see also* Ex. 7 (RAD_PayPal_000059 (at -061)); Ex. 8 (AWIN_0000140). Affiliate links are unique URLs that direct the consumer to the Merchant's website and identify the referring affiliate. *See* Kahn Rpt. ¶ 17; Ex. 9 (IMPACT_0000062 at (-075)). When a consumer clicks an affiliate link, the browser routes through the network's tracking system to the Merchant's website. *See* Shafiq Rpt. ¶ 21. The Merchant's website reads the link's parameters to identify the referring affiliate, typically by writing a small text file called a "cookie," here an Affiliate ID, to the consumer's device. *See id.* ¶¶ 18, 21. When the consumer makes a purchase, the Affiliate ID is read from the cookie and used to assign the commission to the Affiliate Marketer. *See id.* ¶ 21. The following image illustrates this process. Mela Rpt. ¶ 92.



### C. "Last Click" Attribution and Affiliate Marketing

Attribution is the mechanism merchants and networks use to assign credit for a compensable action, which the program terms define, ordinarily as a referral. Mela Rpt. ¶ 35. The most widely used attribution model in affiliate marketing is "last-click" attribution, which assigns all credit to the last commissionable interaction. *See id.* ¶ 39. That event is ordinarily the external referral that brings the consumer to the merchant's website. *See id.* ¶¶ 40-45, 47-54; Kahn Rpt. ¶¶ 25-27. If more than one affiliate refers the same consumer to the same Merchant before a purchase, the most recent tracked external referral receives credit as the "last click." Mela Rpt. ¶ 47. In a program that compensates referrals, later clicks on the Merchant's own website do not supplant that external referral. *See* Mela Rpt. ¶¶ 50-53; Kahn Rpt. ¶ 25.

### D. Plaintiffs' Contracts with Class Merchants

Plaintiffs are Affiliate Marketers with affiliate marketing agreements with Class Merchants, conventionally facilitated through affiliate networks and containing standardized terms. *See* Pltf. Decls. ¶ 5; Kahn Rpt. ¶¶ 16, 24. These agreements generally (a) define the circumstances under which an Affiliate Marketer earns a commission ("attribution language"); (b) identify the percentage of a transaction that an Affiliate Marketer earns for each successful referral ("commission rate"); (c) specify the period after a referral during which a consumer's purchase results in a referral fee ("attribution window"); and (d) describe prohibited conduct. Pltf. Decls. ¶ 5; *see also* Appendix A.

Plaintiffs' and Class Members' agreements contain materially identical attribution language: each entitles the Affiliate Marketer to a referral fee when its affiliate link is the last external referral that brings a consumer to the Merchant's website within 24 hours before the purchase. *See* Appendix A. Some Merchants have a longer attribution window; none is shorter than 24 hours. *See id.*

### E. Honey Browser Extension Tracks Consumer Data

PayPal bought the Honey Browser Extension for $4 billion in 2020. Honey is software that runs within a consumer's web browser and adds functionality to websites the consumer visits. *See* Shafiq Rpt. ¶¶ 32-33. PayPal advertises that consumers can use Honey to find coupons and earn cash back rewards.

When a Honey user reaches a Merchant's "cart" page and begins checkout, a Honey pop-up offers to search for coupons or rewards. *See* Shafiq Rpt. ¶¶ 39, 55. PayPal partners with Merchants to receive

commissions on sales meeting defined terms when a consumer uses Honey before purchasing. *See* Ex. 10 (PAYPAL_9470_0053524) ([redacted]).

Once installed, Honey tracks and stores detailed information about the consumer's browsing and Honey's own actions in each session. *See* Jaffe Rpt. ¶¶ 79-114; Shafiq Rpt. ¶¶ 15a, 33, 44-53. This includes [redacted] Jaffe Rpt. ¶¶ 79-114. Plaintiffs' expert Dr. Zubair Shafiq explains that [redacted]. *See* Shafiq Rpt. ¶¶ 45-53, 56-57, 59, 61-66. [redacted]. *See, e.g.,* Ex. 11 (PAYPAL_9470_0129886); Shafiq Rpt. ¶ 62-65. Honey's source code and PayPal's transactional data show [redacted]. *See* Shafiq Rpt. ¶ 62; Jaffe Rpt. ¶¶ 44, 249-50.

PayPal also tracks [redacted]. *See e.g.,* Jaffe Rpt. ¶¶ 94-100, 141-52, 262-63. Both the browsing data and [redacted]. *Id.* ¶ 44.

### F. <u>Honey Overwrites the Affiliate IDs of Other Affiliate Marketers</u>

Honey does far more than collect browsing data or offer coupons. Since at least 2016, it has been configured to insert PayPal's affiliate ID, overwriting any existing one, in virtually every instance in which a consumer interacts with it on a Merchant's website, by mimicking an affiliate referral. *See* Shafiq Rpt. ¶¶ 40-43, 56-58; Ex. 12 (Brawer Depo Tr. at 267:21-22) [redacted]. Honey seeks that interaction when the consumer is already on the Merchant's website, generally just before checkout. *See* Shafiq Rpt. ¶¶ 39, 58; *see also* Ex. 13 (PAYPAL_9470_0015636 (at -59)) [redacted].

Honey operates this way so PayPal can collect the affiliate commission, even though Honey did

not refer the consumer to the Merchant's website. *See* Ex. 10 (PAYPAL_9470_0053524) [redacted]; Ex. 14 (PAYPAL_9470_0052258) [redacted]. It does so even when it knows [redacted]. *See* Ex. 15 (PAYPAL_9470_0053063) [redacted]; *see also* Shafiq Rpt. ¶¶ 59-62. Honey was even designed to [redacted] Ex. 16 (PAYPAL_9470_0139110 (at -11)). PayPal never disclosed that Honey overwrites affiliate IDs, and [redacted] *See* Ex. 17 (PAYPAL_9470_0000001); Ex. 18 (PAYPAL_9470_0000019); Ex. 12 (Brawer Dep. Tr. at 277:25-278:15).

Honey uses [redacted] methods to open a "Secret Tab" that mimics an affiliate referral and inserts PayPal's affiliate tag. Shafiq Rpt. ¶¶ 35, 40-42, 56-57 [redacted]; *see also* Ex. 19 (PAYPAL_9470_0053510) [redacted]; Ex. 20 (PAYPAL_9470_0139085 (at -86)) [redacted]. Under [redacted] methods, whenever a consumer used an affiliate marketer's link to reach the merchant website during the attribution window, Honey overwrites that marketer's affiliate ID with PayPal's. *See* Shafiq Rpt. ¶¶ 35-43, 54, 56; *see also* Ex. 15 (PAYPAL_9470_0053063).

The Secret Tab [redacted]. *See* Shafiq Rpt. ¶ 56. Using the background tab method, the Secret Tab fabricates a referral click and "redirects" the consumer "back" to the Merchant's site the consumer was already on. *See* Shafiq Rpt. ¶¶ 40-43, 56-57. [redacted]. Shafiq Rpt. ¶ 56. Honey designed both methods to go unnoticed by consumers and industry participants. The source code [redacted] (*see* Shafiq Rpt. ¶ 57,

and internal documents stress the same point. *See, e.g.*, Ex. 19 (PAYPAL_9470_0053510) [redacted]. PayPal employees [redacted] Ex. 10 (PAYPAL_9470_0053524 (at -26)); *see also* Ex. 21 (PAYPAL_9470_0054071 (at -72)) [redacted]; Ex. 19 (PAYPAL_9470_0053510) [redacted].

At least until 2025, Honey inserted its affiliate tag, and thus sought Affiliate Commissions, even when it provided no coupons or rewards. For instance, Honey injected its tag [redacted]. *See*; Ex. 22 (PAYPAL_9470_0053918) [redacted]. Honey also tagged [redacted]. *See* Ex. 23 (PAYPAL_9470_0020922).

**G. <u>Honey Intentionally Subverts Stand Down</u>**

Many affiliate networks have adopted "stand down" rules to stop software publishers, including browser extensions, from overwriting an affiliate marketer's ID and taking credit for its referral. These rules require an extension to recognize when a consumer arrived through another's affiliate link and "stand down": not overwrite the existing Affiliate ID and not show a "pop up." Kahn Rpt. ¶¶ 26-27; Mela Rpt. ¶¶ 64-77. Stand down rules do not modify the attribution rules in Merchant contracts; they are a safeguard to ensure that network tracking accurately credits the referring affiliate marketer.

PayPal understood that [redacted] *See* Ex. 15 (PAYPAL_9470_0053063) [redacted]. It also understood that Honey had to follow PayPal's Merchant contracts, many of which expressly prohibit conduct that [redacted] *See* Ex. 24 (PAYPAL_9470_0094609 (at -10)). Yet throughout the relevant time, Honey intentionally [redacted]. *See* Shafiq Rpt. ¶¶ [redacted] As an

internal PayPal document on [redacted] explains: [redacted] Ex. 15 (PAYPAL_9470_0053063 (at -64)) (emphasis added).

Even for networks with explicit stand down rules, Honey often deliberately did not comply. *First,* Honey stood down [redacted] Shafiq Rpt. ¶¶ 59-61, 64. Until [redacted] Honey's source code [redacted]. Shafiq Rpt. ¶ 61, 65. *Second*, Honey did not stand down [redacted]. *See* Ex. 15 (PAYPAL_9470_0053063); Shafiq Rpt. ¶ 59. *Third*, even where an affiliate marketer's attribution window was 24 hours or more, Honey's code [redacted] *See* Shafiq Rpt. ¶¶ 62, 64. [redacted] *See* Ex. 25 (PAYPAL_9470_0052678) [redacted].

## IV. <u>LEGAL STANDARD</u>

At class certification, Plaintiffs must show that the requirements of Rules 23(a) and (b) are met by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022) (en banc). "[M]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## V. <u>ARGUMENT</u>

Plaintiffs move to certify the Class (CFAA), the Tortious Interference Subclass, and the California Subclass (CDAFA and UCL), each as defined at page 1. At present, the Class Period is functionally limited by the time period of the transactional data PayPal produced. The earliest record in that data of [redacted], but earlier violations are not excluded if evidence becomes

available. *See* Jaffe Rpt. ¶ 44. The latest record PayPal produced is [redacted] but Plaintiffs allege ongoing harms and reserve the right to seek a supplemental data production before trial. *Id.*

The Class is narrower than the class defined in the operative Second Amended Class Action Complaint. ECF No. 249 at 70. The proposed Class is limited to affiliate marketers who have contracts with the Class Merchants, and the definition has been refined to more precisely track the pertinent objective elements in PayPal's transactional data. Appendix B identifies a list of Class Merchants that Plaintiffs have identified to date, which Plaintiffs reserve the right to update based on ongoing discovery. The refinements to the class definition do not broaden Plaintiffs' legal theories or the scope of PayPal's potential liability. *See Kumandan v. Google LLC,* 2023 WL 8587625, at *7 (N.D. Cal. Dec. 11, 2023).

### A. <u>The Proposed Class and Subclasses Are Well Defined and Plaintiffs Have Standing</u>

A class only needs to be objectively defined and there is no freestanding ascertainability or administrative feasibility requirement in the Ninth Circuit. *Nolen v. PeopleConnect, Inc.*, --- F.4th ----, 2026 WL 2871735, at *15 (9th Cir. Sept. 24, 2026).

The Class and Subclasses are defined by "objective, verifiable criteria" drawn from PayPal's and third-party affiliate networks' records. *See Wortman v. Air New Zealand*, 326 F.R.D. 549, 555 (N.D. Cal. 2018). PayPal's timestamped data tables reflect [redacted]. *See* Jaffe Rpt. ¶¶ 79-114, 241-51. As Plaintiffs' expert Jonathan Jaffe explains, these records [redacted]. *Id.* ¶¶ 38, 125-239. [redacted] can then be cross-checked against affiliate network records to identify the Affiliate Marketer who owns each link and their state of domicile. *See* Ex. 7 (RAD_PayPal_000059 (at -61)); Ex. 8 (AWIN_0000140); Ex. 9 (IMPACT_0000062 at (-75)); Ex. 26 (DWS000079); Ex. 27 (CommJunct_00000482 (at -83)); Ex. 28 (DELL_HONEY_0015).

Plaintiffs, the proposed class representatives, also have standing to bring their claims, and the class definition tracks the facts that establish each member's injury: a recorded referral within the applicable contract's window, an overwrite, and a commission paid to PayPal. Each Plaintiff has or had

an affiliate agreement with at least one of the Class Merchants during the Class Period (Pltf. Decls. ¶ 3; Appendix A) and Plaintiffs' expert has identified [redacted]. Jaffe Rpt. ¶¶ 267-69; *see* Pltf. Decls. ¶ 7. The same evidence is sufficient to confer Plaintiff Ramirez with UCL standing because he "lost money or property"—commissions. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (2011).

**B. <u>The Requirements of Rule 23(a) Are Met</u>**

**1. <u>The Class and Subclasses Are Sufficiently Numerous</u>**

Joinder is impracticable, and numerosity met, when a class has at least 40 members. Fed. R. Civ. P. 23(a)(1); *see Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 253 (N.D. Cal. 2012).

Plaintiffs have conservatively identified [redacted] *See* J. Jaffe Rpt. ¶¶ 234-35, 258. Each subclass is also sufficiently numerous. *See id.*

**2. <u>Commonality is Satisfied</u>**

Commonality requires a common contention whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality is met because the core contentions turn on whether PayPal's uniform operation of the Honey Browser Extension violates the law. *See In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *18 (N.D. Cal. Oct. 27, 2016) ("the question of how the software operates is subject to common proof"). Common questions include: (1) whether PayPal, via Honey, overwrites Affiliate Marketers' Affiliate IDs with its own; (2) whether doing so diverted affiliate commissions from Plaintiffs and Class Members to PayPal; (3) whether PayPal obtained sufficient "authorization" to damage Affiliate IDs on consumers' computers; (4) whether Plaintiffs and Class Members were entitled to commissions when their link was the last external referral to a Class Merchant's website within the applicable attribution window; and (5) whether PayPal's conduct disrupted or breached their contracts with Class Merchants. These questions are central to every claim.

In addition, common questions for the UCL claim of the California Subclass include whether (1) PayPal violated the CFAA and CDAFA and thus the UCL's "unlawful" prong and (2) the same conduct violates the "unfair" prong under either the tethering test under *Cel-Tech Commc'ns, Inc. v. Los Angeles*

*Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) because it violates the CFAA and CDAFA's legislatively declared policy against altering data on another's computer without authorization or the balancing test. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718–19 (2001).

**3. <u>Plaintiffs' Claims are Typical of the Claims of Other Class Members</u>**

Typicality requires only that the representatives' claims be "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted). Plaintiffs, like all Class Members, have agreements with Class Merchants containing materially identical attribution terms and lost commissions through the uniform operation of Honey.

**4. <u>Plaintiffs and Their Counsel Will Adequately Represent the Class</u>**

Adequacy asks whether the representatives and counsel have conflicts with the class and will prosecute the action vigorously. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiffs have no conflicts with other class members and have actively participated in the litigation, including by gathering records, responding to discovery, sitting for depositions, and submitting declarations. *See* Pltfs. Decls. ¶¶ 12-15. The benchmark commission rate creates no conflict, because the distribution protocol described at page 24 pays every claimant the benchmark rate on its own transactions first. Plaintiffs' counsel have also demonstrated their adequacy under Rule 23(g). Fed. R. Civ. P. 23(g)(1)(A). Interim co-lead counsel are experienced in prosecuting complex class actions. *See* Sharp Decl. ¶¶ 12-14. They have dedicated time and resources to investigating, pleading, and pursuing these claims, and demonstrated their knowledge of the applicable law through extensive motion practice. *Id.* ¶¶ 4-11. Accordingly, Plaintiffs request that the Court appoint Girard Sharp LLP, Lieff Cabraser Heimann & Bernstein, LLP, and Cotchett Pitre & McCarthy LLP to serve as co-lead class counsel, to be supported by the members of Plaintiffs' Executive Committee. *See id.* ¶ 15; ECF No. 258.

**C. <u>Common Issues Predominate for Each of Plaintiffs' Claims.</u>**

The test for predominance under Rule 23(b)(3) turns on whether the questions central to Plaintiffs' claims can be resolved through common proof and are more prevalent than any individualized questions. *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1233, 1237–38 (9th Cir. 2024); *Olean*, 31 F.4th at 666-67. This inquiry also requires that "damages can be determined without excessive difficulty and attributed to [Plaintiffs'] theory of liability." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024)

(citation omitted). Each element of Plaintiffs' claims can be resolved with common proof.

**1. The Computer Fraud Claims Can Be Adjudicated on a Classwide Basis**

PayPal's CFAA violation occurs when it "[i] knowingly [ii] causes the transmission of a program . . . and [iii] as a result of such conduct, intentionally causes damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A); *see also* Cal. Penal Code § 502(c)(8). "CDAFA claims generally rise or fall with . . . CFAA claims because the necessary elements of [both claims] do not differ materially . . . ." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260 (N.D. Cal. 2022).

**a. Did PayPal act knowingly and intentionally?**

The CFAA and CDAFA provisions at issue require showing that PayPal acted knowingly or intentionally. *See Margolis v. Apple Inc.*, 743 F. Supp. 3d 1124, 1133 (N.D. Cal. 2024) ("intent" under § 1030(a)(5)(A) requires defendant's "'conscious desire' to cause damage"); *United States v. Drew*, 259 F.R.D. 449, 459 (C.D. Cal. 2009) ("knowing" conduct requires "that one voluntarily engaged in conduct" that caused a result while "intent" requires defendant's "conscious objective" to cause the result). Whether PayPal acted "knowingly" or "intentionally" is subject to common proof as the answer will focus on evidence reflecting its state of mind. *See Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 276 (S.D. Cal. 2023) ("Courts routinely conclude that scienter is a common question subject to common proof.").

That common evidence includes PayPal's internal documents and how it operated Honey. PayPal employees knew that Honey [redacted] Ex. 15 (PAYPAL_9470_0053063). Honey was configured to use mechanisms [redacted] Ex. 10 (PAYPAL_9470_0053524 (at -26)) and PayPal employees [redacted] Shafiq Rpt. ¶ 57. And although PayPal knew [redacted] Ex. 15 (PAYPAL_9470_0053063), [redacted]. *See, e.g.*, Ex. 10 (PAYPAL_9470_0053524 (at -26) [redacted]; Ex. 15 PAYPAL_9470_0053063 [redacted] Honey's source code and developer comments [redacted]

[redacted]. Shafiq Rpt. ¶¶ 59-62.

**b. Did PayPal cause damage to class members' Affiliate IDs without authorization?**

As this Court has already recognized, Plaintiffs' CFAA claim under § 1030(a)(5)(A) turns on whether PayPal had authorization to overwrite Class Members' Affiliate IDs. ECF No. 277 at 15-16. This question has a common answer because it turns on who had the power to grant that authorization. *See United States v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016). Here, no one with that power gave it to PayPal. The Affiliate ID that Honey overwrote recorded which Affiliate Marketer had earned the referral under that marketer's contract with the Merchant. No Class Merchant contract authorizes a third party to change that record or supplies any mechanism for doing so. *See* Appendix A. The same is true for consumers. PayPal's form consumer agreements and disclosures never told consumers that Honey would access Affiliate IDs, much less replace them with PayPal's, and PayPal never offered consumers any mechanism to grant such authorization. *See* Ex. 17 (PAYPAL_9470_0000001); Ex. 18 (PAYPAL_9470_0000019); *Margolis*, 743 F. Supp. 3d at 1134 ("Absent specific and adequate disclosure of the risks of downloading [the software], the plaintiffs' voluntary installation of that software on their devices did not provide [defendant] with authorization to damage those devices."). Until its misconduct in this case came to light, PayPal did not even disclose [redacted]. *See* Ex. 12 (Brawer Dep. Tr. at 277:25-278:15). Courts treat the reach of uniform disclosures as a class-wide question, so whether PayPal caused damage "without authorization" will be decided once, for everyone. *Cf. Torres v. Prudential Fin., Inc.*, 2024 WL 4894289, at *7 (N.D. Cal. Nov. 26, 2024) (how "a reasonable user would understand" the defendant's privacy policies "is a common [question] that can be resolved with class-wide proof"); *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 576 (N.D. Cal. 2025).

**c. Did PayPal's conduct result in "damage" and "loss"?**

Section 1030(a)(5)(A) requires that PayPal's conduct caused "damage," and because Plaintiffs bring a private CFAA action, they must also show that PayPal's conduct caused them "loss." Under the CFAA, "damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss" is defined as "any reasonable cost to any victim . . . and any revenue lost, cost incurred, or other consequential damages incurred because of interruption

of service." 18 U.S.C. § 1030(e)(11). The Supreme Court has observed that these definitions "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren v. United States*, 593 U.S. 374, 392 (2021). Consistent with that approach, this Court held that "[t]he overwriting of [Plaintiffs' Affiliate IDs] stored on consumers' web browsers clearly constitutes" damage under the CFAA. ECF No. 277 at 18. PayPal also causes loss "in the form of diverted commissions" by "swap[ping] Plaintiffs' tracking codes for [PayPal's] code [and] causing merchants to credit the purchases solely to [PayPal]." ECF No. 277 at 19.

PayPal's source code and transactional data will show classwide that PayPal caused technological damage by destroying Class members' Affiliate IDs and replacing them with its own. For each offending transaction, the data show [redacted]. *See* Jaffe Rpt. [redacted] 252-53; Shafiq Rpt. ¶¶ 44-53, 66. Whether PayPal's conduct was an "interruption of service" causing loss likewise turns on common proof of PayPal's conduct and the materially identical attribution provisions in the Class Merchant agreements. *See* Appendix A.

The CFAA also requires a showing that the violation caused at least $5,000 in loss within a one-year period. Here, the Class meets that threshold together. This Court has held that class members may combine their losses to reach it "so long as those damages arose from the same act by a defendant." *So v. HP, Inc.*, 2023 WL 4596778, at *11 (N.D. Cal. July 17, 2023) (quoting *In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1308 (N.D. Cal. 2008)); *see* 18 U.S.C. § 1030(c)(4)(A)(i)(I). In *So*, the act was HP's transmission of a firmware update. *Id.* Here, it is PayPal's distribution of a single program, Honey, which [redacted]. *See* Shafiq Rpt. ¶ 62. Each overwrite of a Class member's affiliate ID was damage flowing from that one act. ECF No. 277 at 18–19. That the code ran many times is not material; what counts is that the defendant distributed "a single product," not that users "received and installed that product at various times and places." *In re Toys R Us, Inc. Privacy Litig.*, 2001 WL 34517252, at *11 (N.D. Cal. Oct. 9, 2001). Put simply, one program caused every Class member's loss, so the losses count together.

### 2. The Tortious Interference with Contract Claim Turns on Common Proof

#### a. California Law Applies to the Tortious Interference with Contract Claim

The Court should apply California law to the Class's tortious interference with contract claims. A federal court applies the choice-of-law rules of the state where it sits. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589–90 (9th Cir. 2012), overruled on other grounds by *Olean*, 31 F.4th at 651. Under California law, California has the requisite "significant contact or significant aggregation of contacts" to each Class Member's claim. *Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 921 (2001). PayPal is headquartered in California, directed and operated Honey (including transmitting Honey's code and overwriting Affiliate IDs) from its California offices, and received the diverted commissions in California. *See* ECF No. 281 ¶¶ 27, 35, 37 (PayPal, Inc.'s principal place of business is in San Jose, California); *id.* ¶ 34 (PayPal "conducts business regarding the Honey Browser Extension from its headquarters in San Jose, California, as well as from PayPal's other locations"); Ex. 28 (DELL_HONEY_0015) [redacted]. *See Allen v. Hyland's Inc.*, 300 F.R.D. 643, 657 (C.D. Cal. 2014).

The burden thus shifts to PayPal to show that under California's governmental interest test, there is a material difference in the laws, a true conflict, and that another State's interest "would be the more impaired if its law were not applied." *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-08 (2006). While not binding, PayPal conceded that California law applied to Plaintiffs' tortious interference claims for its motions to dismiss. *See* ECF No. 201 at 14 n.1; *see generally* ECF No. 252 at 15-19.

Even if PayPal now disputes that California law should apply to all Class Members, it cannot show that another state's interest would be more impaired. Every contact that matters points to California, and PayPal admits the core of it in its Answer. *See* ECF No. 281 ¶¶ 27, 34, 35, 37; Ex. 28 (DELL_HONEY_0015). When the wrongful conduct originates in California, California's interest is the one most impaired if its law is displaced. *Clay v. CytoSport, Inc.*, 2018 WL 4283032, at *17 (S.D. Cal. Sept. 7, 2018).

Even applying the law of each Class member's domicile, the Court can certify a nearly nationwide class (all states except Louisiana) because as Plaintiffs' State Law Survey shows, the elements of tortious interference with contract are substantially the same in every state at issue: (1) the existence of a contract;

(2) the defendant's knowledge of the contract; (3) the defendant's conduct caused a breach or disruption of performance; (4) the defendant acted intentionally and improperly; and (5) the defendant's conduct was a substantial factor in causing harm to plaintiffs. Appendix C (State Law Survey); Restatement (Second) of Torts § 766; *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 20-23 (D. Mass. 2010) (comparing state laws for interference with prospective economic advantage and resolving variations by special question). Because every state uses the same key elements based on the Restatement, the same evidence will determine PayPal's liability, and California law can be used to adjudicate all Class Members' claims. *See* Ex. 1 (Trial Plan). *Overka* shows how a court manages the remaining differences. After analyzing the law of tortious interference with prospective advantage in thirty-four states, the court certified a nationwide liability class (carving out Louisiana), explaining that it would charge the jury on the core elements common to every state and use special questions, such as whether the defendant's conduct was independently wrongful, to handle the rest. 265 F.R.D. at 14, 19–20, 22-24. The same can be done here. Where a state requires that the interference be independently wrongful, PayPal's CFAA and CDAFA violations—which will also be proven by common evidence—satisfy that element, as do PayPal's violations of established industry rules requiring browser extensions to "stand down" and prohibiting cookie stuffing. Any remaining variation can be managed through special questions to the jury. *See* Appendix C (State Law Survey); Ex. 1 (Trial Plan); *Overka*, 265 F.R.D. at 23.

**b. Each Element for the Tortious Interference with Contract Claims Can be Resolved Through Common Proof.**

***Existence of a Contract.*** Whether each class member had a contract with a particular Class Merchant can be shown from PayPal's records. As Plaintiffs' expert Jonathan Jaffe explains, [redacted] Jaffe Rpt. ¶¶ 169-222. An affiliate link cannot exist without a contract between that marketer and the Class Merchant. *See* Ex. 8 (AWIN_0000140); *see also* Pltf. Decls. ¶ 4.

***PayPal's Knowledge of the Contract***. PayPal's knowledge of the contracts will also be shown with common proof: its role in the affiliate marketing industry, Honey's source code, and PayPal's Structured Data. As an industry participant, PayPal cannot seriously dispute it knew that other affiliate marketers have commission agreements with merchants, including Merchants with which PayPal has similar agreements. *See, e.g.,* Ex. 15 (PAYPAL_9470_0053063) [redacted]

[redacted]. Honey was configured [redacted]. *See id.*; Shafiq Rpt. ¶ 59-64. And the Structured Data [redacted]. Jaffe Rpt. ¶¶ 169-222.; Shafiq Rpt. ¶¶ 44-53, 66.

***Intentional and Improper Interference Causing Breach.*** The third, fourth, and fifth elements require showing: (i) that PayPal ***intended*** to interfere with Plaintiffs' contracts; (ii) that PayPal's interference was ***improper***; and (iii) that PayPal's interference caused a breach of Plaintiffs' contracts. Each can be answered by classwide evidence.

***Intent.*** To establish intent, a plaintiff must show that the defendant "[knew] that contractual interference or breach is a 'necessary consequence of his action.'" *Rosenthal & Rosenthal of California, Inc. v. Hilco Trading, LLC*, 2020 WL 12948055, at *3 (C.D. Cal. Dec. 29, 2020), *aff'd,* 2022 WL 18906 (9th Cir. Jan. 3, 2022); *see also* Restatement (Second) of Torts § 766, com. j (1979) (intent satisfied where "the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action"). Whether PayPal had that intent will turn on common proof, including Honey's source code and PayPal's records. *See Hall*, 344 F.R.D. at 276 ("Courts routinely conclude that scienter is a common question subject to common proof."). Uniform evidence shows that PayPal knew breach was a necessary consequence of Honey's operation. Honey was designed to insert PayPal's affiliate ID, overwriting any other, to obtain commissions, and [redacted]. Shafiq Rpt. ¶¶ 40-43, 54, 56-57, 62. PayPal employees understood that [redacted]]." *See* Ex. 15 (PAYPAL_9470_0053063).

***Impropriety.*** In determining whether a defendant's conduct is improper, "[t]he nature of the actor's conduct is a chief factor." Restatement (Second) of Torts § 767, com. c (1979). If the relevant contracts are terminable at will, California requires proof that the defendant engaged in an independently wrongful act, meaning conduct proscribed by a determinable legal standard. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1142, 1148 (2020). PayPal's CFAA and CDAFA violations—which will

themselves be shown by common evidence as explained above—satisfy that test, as do PayPal's violations of the stand-down rules [redacted]. *See e.g.,* Ex. 29 (PAYPAL_9470_0232243). The Restatement's broader inquiry into whether conduct was "fair and reasonable under the circumstances," Restatement (Second) of Torts § 767, com. j (1979), produces the same common answer. Honey was programmed to overwrite any earlier affiliate's ID and divert the commission to PayPal, contrary to stand-down and industry prohibitions on cookie stuffing and similar methods used to divert affiliate commissions. *See* Shafiq Rpt. ¶¶ 23-31, 40-43, 56-57, 62; Kahn Rpt. ¶¶ 26-27; Ex. 10 (PAYPAL_9470_0053524). PayPal's Structured Data and internal documents confirm that [redacted]. *See e.g.,* Jaffe Rpt. ¶ 241-53; Ex. 15 (PAYPAL_9470_0053063). On either test, the answer turns on PayPal's code and does not change from one Class Member to the next.

***Breach.*** The third requirement is met by showing that the defendant's interference "caus[ed] the third party not to perform the contract." Restatement (Second) of Torts § 766 (1979). Put differently, a plaintiff must establish an "actual breach or disruption of the contractual relationship," *Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal. 4th 26, 55 (1998). This Court previously recognized that "overwriting Plaintiffs' Affiliate IDs and redirecting contractually earned Affiliate Commissions actually disrupts Plaintiffs' contractual relations with Merchants." ECF No. 277 at 22. Whether PayPal engaged in the alleged conduct and caused a breach or disruption of Class Members' contracts is subject to common proof. *See Beaver v. Omni Hotels Mgmt. Corp.*, 2023 WL 6120685, at *14 (S.D. Cal. Sept. 18, 2023).

As explained above, Honey's source code and PayPal's Structured Data will show [redacted]. Whether that conduct breached or disrupted the Class Merchant contracts will not vary among class members, because it turns on the attribution language defining when an Affiliate Marketer earns a commission. Where liability hinges on the interpretation of contracts, courts have repeatedly found that predominance is met where the alleged contracts are "standardized" or "form" contracts that "existed in substantially identical form. . . ." *In re Med. Cap. Sec. Litig.*, 2011 WL 5067208, at *3 (C.D. Cal. July 26, 2011) (collecting cases).

As Appendix A shows, the attribution language is materially identical across the Class Merchant contracts: each agreement pays the Affiliate Marketer whose link is the last external referral to the

Merchant's website before a purchase, within that contract's attribution window. PayPal's stand-down rules confirm that [redacted]. *See* Ex. 15 (PAYPAL_9470_0053063). The meaning of the attribution language is therefore a common question that will predominate over any individualized issues. *Berrien*, which certified a class of more than 5,000 California members of a vacation club who alleged that the club's operators interfered with their membership contracts by imposing a special assessment, is instructive. *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 357–58 (N.D. Cal. 2011). The defendants there argued that breach could not be decided without asking what each member's sales representative had said and what each member understood the contract to allow. *Id.* at 361–62. The court rejected the argument, because no contract term made those individual understandings relevant. *Id.* at 362. So too here: no attribution provision turns on what an Affiliate Marketer privately understood.

***Injury Resulting from the Breach.*** Last, Plaintiffs must establish that they suffered a "pecuniary loss" resulting from PayPal's interference. Restatement (Second) of Torts § 766 (1979). That too turns on common evidence. As Plaintiffs' expert Jonathan Jaffe explains, [redacted]. *See* Jaffe Rpt. ¶¶ 51, 125-239, 252-53.

**D. <u>A Single Class Proceeding is Superior to Individual Adjudication.</u>**

"Rule 23(b)(3) requires a court to consider whether a class action would be a superior method of litigating the claims of the proposed class members[.]" *Vizcarra v. Unilever United States, Inc.*, 2023 WL 2364736, at *18 (N.D. Cal. Feb. 24, 2023).

Class members have little incentive to sue individually (and none has, to counsel's knowledge) when doing so means litigating highly technical issues about how Honey operates. [redacted]. *See* Jaffe Rpt. ¶ 74-78; Shafiq Rpt. ¶ 10. An individual's litigation costs would quickly outpace its expected recovery.

Superiority is also satisfied because a class proceeding will not pose manageability problems. To start with, there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (citation omitted). The attached trial plan and verdict form show how the case can be tried. Ex. 1;

Ex. 2. Plaintiffs seek certification of a Class and two Subclasses for a few federal and California claims, and if the Court declines to apply California law to the tortious interference claim, the limited state-law differences can be addressed through special jury questions. *See Overka,* 265 F.R.D. at 23.

**E. Monetary Relief Can Be Calculated on a Class-wide Basis**

"Damage calculations need not be exact, but 'at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case.'" *Rodriguez v. Google LLC*, 2024 WL 38302, at *7 (N.D. Cal. Jan. 3, 2024) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). Plaintiffs do not need to "prove that classwide damages exist in order to obtain class certification" but only show "that damages *could* be calculated on a classwide basis, even where such calculations have not yet been performed." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024) (emphasis in original).

For each claim, the requested monetary relief "can be determined without excessive difficulty and attributed to [Plaintiffs'] theory of liability." *Lytle*, 114 F.4th at 1025. The disgorgement and damages available under the CFAA are susceptible to class-wide determination. Lost business is a recoverable CFAA loss, *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004), and a CFAA class can be certified where a single mechanism injured every member. *See Kalow & Springut, LLP v. Commence Corp.*, 272 F.R.D. 397 (D.N.J. 2011), *on reconsideration*, 2011 WL 3625853, at *1 & n.1 (D.N.J. Aug. 15, 2011) (certifying CFAA class challenging a "time bomb" built into the defendant's software). Honey's overwrite functionality is that kind of mechanism. For CDAFA, disgorgement can be measured classwide, *Rodriguez*, 2024 WL 38302, at *6, and punitive damages are "amenable to classwide resolution, through common evidence," *id.* at *7 (citation omitted). Likewise, relief under the tortious interference claim is amenable to class calculation because the "types of damage . . . do not require consideration of each member's circumstances," *Berrien*, 276 F.R.D. at 362, and the measure of relief is determinable by review of PayPal's transaction records, *see Evans v. Linden Research Inc.*, 2012 WL 5877579, at *17 (N.D. Cal. Nov. 20, 2012).

**a. Disgorgement Can Be Calculated on a Class-wide Basis Through PayPal's Data**

Plaintiffs seek non-restitutionary disgorgement of the commissions PayPal diverted to itself by

overwriting Class Members' Affiliate IDs, and PayPal's Structured Data allows that amount to be calculated class-wide. The remedy reaches a defendant's unjust gain and the plaintiff "need not have suffered a corresponding loss." *Rodriguez*, 2024 WL 38302, at *6 (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (9th Cir. 2020)); Restatement (Third) of Restitution & Unjust Enrichment § 44 (Am. L. Inst. 2011). Compensatory damages redress what Class Members lost but do not reach what PayPal gained. Disgorgement is available to remedy that gain under each of tortious interference and computer fraud claims for which Plaintiffs seek certification.

*NuVasive* shows how the two measures can be tried together. The jury there found intentional interference with contract and returned separate awards of $7.5 million in lost profits and $14 million in disgorgement, after being instructed that the two "are alternatives" and that the court would decide which one the plaintiff could recover "after you render your verdict." *NuVasive, Inc. v. Madsen Med., Inc.*, 2016 WL 3166834, at *1, *11 (S.D. Cal. June 7, 2016). The court held that disgorgement "can be an appropriate remedy for intentional interference with contract," but entered judgment on lost profits alone because the plaintiff had obtained full redress at law. *Id.* at *6. Plaintiffs propose the same structure here: one verdict form, both measures, an instruction that they are alternatives, and selection of the applicable remedy by the Court after the verdict. Proposed Verdict Form at 3. To the extent disgorgement is deemed equitable, the jury's finding on that measure would be advisory. Fed. R. Civ. P. 39(c)(1). Disgorgement is also available under the CFAA, which authorizes "injunctive relief or ***other equitable relief***," 18 U.S.C. § 1030(g), a category that includes "a remedy tethered to a wrongdoer's net unlawful profits." *Liu v. Sec. & Exch. Comm'n,* 591 U.S. 71, 79-80 (2020); *see also Sripetch v. Sec. & Exch. Comm'n*, 608 U.S. 555, 564 (2026). And it is available under CDAFA. *Rodriguez*, 2024 WL 38302, at *6.

The amount of wrongful profits that PayPal must disgorge to Class Members is capable of determination by common evidence. As Mr. Jaffe explains, PayPal's transactional data can be filtered to [redacted] Jaffe Rpt. ¶ 125-239. PayPal's data also reflects [redacted], *id.* ¶¶ 262-63, and these records can be readily aggregated to determine the total amount

that PayPal must disgorge to the Class. *E.g., id.* ¶¶ 264-66. No deduction of "legitimate business expenses" is appropriate, given that any costs that PayPal incurred (such as payments of cashback rewards) served to further its unlawful scheme. *See U.S. Sec. & Exch. Comm'n v. Crowd Mach., Inc.*, 2023 WL 8438553, at *4 (N.D. Cal. Dec. 5, 2023).

To the extent PayPal again invokes *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020), the Court need not consider that argument at this stage because whether equitable relief is ultimately available is a merits question that does not bear on certification. *See Amgen*, 568 U.S. at 466. The only question now is whether monetary relief "can be determined without excessive difficulty and attributed to [Plaintiffs'] theory of liability." *Lytle*, 114 F.4th at 1025. Both measures meet that standard, and the verdict form lets the Court choose between them without any risk of double recovery. *See* Trial Plan § III; Proposed Verdict Form at 3.

**b. Compensatory Lost Commissions Can Also be Determined for the Class and Subclasses**

Plaintiffs alternatively seek to recover the amount of their lost commissions under their CFAA, tortious interference, and CDAFA claims. An interferer's records are a recognized way to measure that loss: when a plaintiff cannot readily ascertain its own lost profits, the defendant's profits from the interference are evidence of them. *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 494 (5th Cir. 2008) (station could prove its loss through the $394,407 the interfering competitor earned airing the show it lured away); *see also Melo-Tone Vending, Inc. v. Sherry, Inc.*, 656 N.E.2d 312, 315 (Mass. App. Ct. 1995) (jury could use interferer's "tainted profits" to measure plaintiff's lost profits).

Damages can be calculated classwide by reference to PayPal's transactional data and a benchmark affiliate commission rate. The transactions at issue can be [redacted] PayPal's records reflect [redacted] *e.g.*, Jaffe Rpt. ¶ 232 [redacted], so Plaintiffs can reasonably approximate their lost commissions by multiplying [redacted] by (b) a uniform benchmark commission rate equal to the minimum applicable rate in their contracts with Class Merchants. *See GHK Assocs. v. Mayer Grp., Inc.*, 224 Cal. App. 3d 856, 873-75, 877 (1990) ("[t]he law requires only that some reasonable basis of computation of damages be used," particularly where the

defendant's wrongful acts "have created the difficulty in proving the amount of loss of profits"); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005) (benchmark approach is a "reasonable and commonly-used formulaic approach[] to calculating damages"). Because the benchmark is the lowest rate in any Class Merchant contract, it is conservative and may understate, but will not overstate, any Class Member's loss. Plaintiffs' proposed post-trial protocol distributes the award accordingly: each claimant first receives the benchmark rate on its own transactions; remaining funds then pay claimants who document a higher contractual rate the difference, pro rata if necessary; no Class Member recovers more than its documented loss; and the disposition of any remainder is reserved for a later determination if needed. *See* Trial Plan § III.

**F. <u>The Class and Subclasses Can Alternatively Be Certified as to Key Liability Issues Under Rule 23(c)(4).</u>**

If the Court finds that predominance is not met for any of Plaintiffs' damages claims, the Court should still certify the Class and Subclasses under Rule 23(c)(4). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see Hall*, 344 F.R.D. at 279 (denying nationwide class but certifying Rule 23(c)(4) liability class). Certifying the Class as to the main issues concerning PayPal's liability—e.g., whether PayPal knowingly overwrote Plaintiffs' and Class Members' affiliate IDs, and whether PayPal's conduct caused a breach of Plaintiffs' contracts with Merchants—would materially advance the resolution of this case by "streamlin[ing] the evidence needed to prove liability at trial." *Cai v. CMB Exp. LLC*, 2024 WL 2334509, at *13 (C.D. Cal. Apr. 4, 2024).

**G. <u>The Class Can Be Certified to Seek Injunctive Relief Under Rule 23(b)(2).</u>**

Plaintiffs also move to certify the Class and Subclasses, limited to members with a current affiliate agreement with a Class Merchant, for injunctive relief under Rule 23(b)(2). A Rule 23(b)(2) class "does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014). Instead, Plaintiffs must show that the requirements of Rule 23(a) are met and PayPal "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" *Hernandez v. WM Wholesale, LLC*, 2026 WL 1195766, at *3 (C.D. Cal. Mar. 16, 2026) ) (quoting Fed. R. Civ. P. 23(b)(2)).

The CFAA and CDAFA both provide for "injunctive relief or other equitable relief." 18 U.S.C. § 1030(g); Cal. Penal Code § 502(e)(1); *see Whatsapp Inc. v. NSO Grp. Techs. Ltd.*, 2025 WL 2961368, at *2-10 (N.D. Cal. Oct. 17, 2025)) (granting permanent injunction after trial verdict finding defendant liable for violations of CFAA and CDAFA). Injunctive relief is also available under the UCL. *Cel-Tech*, 20 Cal. 4th at 179; *see, e.g.*, *Hernandez*, 2026 WL 1195766, at *3 (certifying UCL injunctive relief class under 23(b)(2)). The Court already held this relief "is not completely duplicative" of Plaintiffs' legal claims, because legal remedies "can only provide something less than Defendants completely ceasing their misconduct." ECF No. 277 at 25.

Plaintiffs each have standing to seek injunctive relief because they have ongoing contractual relationships with Class Merchants that entitle them to Affiliate Commissions, but PayPal continues to operate the Honey Browser Extension such that it overwrites the Affiliate IDs of affiliate marketers and thereby diverts affiliate commissions through Honey, in violation of the CFAA, CDAFA and UCL. *See* Pltf. Decls. ¶ 8; Shafiq Rpt. ¶ 65; Jaffe Rpt. ¶ 44, 249-53; *see Kellman v. Spokeo, Inc.*, 2024 WL 2788418, at *6 (N.D. Cal. May 29, 2024) (plaintiff had standing to seek injunctive relief where the defendant's practices were "ongoing"). As discussed above, Plaintiffs satisfy the requirements of Rule 23(a) and certification under Rule 23(b)(2) is appropriate where an injunction will provide "uniform relief from a practice applicable to all" class members. *Bush v. Rust-Oleum Corp.*, 2024 WL 422080, at *6 (N.D. Cal. Feb. 5, 2024) (citation omitted). An order requiring PayPal to cease operating Honey to overwrite the Affiliate IDs of Affiliate Marketers and divert Affiliate Commissions will redress PayPal's ongoing violations and provide relief to the Class and Subclasses as a whole. The Court should therefore also certify the Class and Subclasses under Rule 23(b)(2).

## VI. CONCLUSION

Plaintiffs respectfully request that the Court certify the Class and Subclasses under Rule 23 and appoint Plaintiffs as Class Representatives; appoint Girard Sharp LLP, Lieff Cabraser Heimann & Bernstein, LLP, and Cotchett Pitre & McCarthy LLP as co-lead class counsel; and direct the parties to submit a proposed plan of notice.

Dated: October 26, 2026

Respectfully submitted,

By: /s/ Dena C. Sharp

Dena C. Sharp (SBN 245869)
Trevor T. Tan (SBN 281045)
Nina Gliozzo (SBN 333569)
Anthony Rogari (SBN 353784)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

Elizabeth J. Cabraser (SBN 083151)
Roger N. Heller (SBN 215348)
Michael K. Sheen (SBN 288284)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
ecabraser@lchb.com
rheller@lchb.com
msheen@lchb.com

Jason L. Lichtman (*pro hac vice*)
Sean A. Petterson (*pro hac vice*)
Danna Z. Elmasry (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
jlichtman@lchb.com
spetterson@lchb.com
delmasry@lchb.com

Nanci E. Nishimura (SBN 152621)
Karin B. Swope (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000

*Interim Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2026, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

*/s/ Dena C. Sharp*
Dena C. Sharp